**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | § | |
| *Plaintiffs/Counter-Defendants*, | § | |
| v. | § | |
| MAITH SOLUTIONS LLC, | § | Civil Action No: 4:24-cv-00620-SDJ |
| *Defendant/Counter-Plaintiff/Third-Party Plaintiff*, | § | |
| v. | § | |
| BRIAN BORDERS and IVAN BETANCOURT | § | |
| *Third-Party Defendants*. | § | |

**PLAINTIFFS ACACIA INSURANCE MANAGERS, LLC, EDGEPOINT SYSTEMS, LLC, AND THIRD-PARTY DEFENDANTS BRIAN BORDERS AND IVAN BETANCOURT'S MOTION FOR SUMMARY JUDGMENT**

COME NOW Plaintiffs Acacia Insurance Managers, LLC ("Acacia") and Edgepoint Systems, LLC ("Edgepoint") (collectively, "Plaintiffs") and Third-Party Defendants Brian Borders ("Borders") and Ivan Betancourt ("Betancourt") (collectively, "Third-Party Defendants") and file this Motion for Summary Judgment ("Motion") pursuant to Federal Rule of Civil Procedure 56. In support thereof, Plaintiffs and Third-Party Defendants offer the following:

## I.
## STATEMENT OF THE CASE

This case arises from an alleged copyright infringement dispute between Acacia Insurance Managers, LLC, Edgepoint Systems, LLC and Maith Solutions, LLC ("Maith") concerning insurance claims data management software created and developed by Third-Party Defendants

between 2011 and 2024, in their capacity as independent contractors, that Third-Party Defendants then incorporated for use by Acacia and Edgepoint.

On July 5, 2024, Plaintiffs filed their Original Complaint seeking (1) a declaratory judgment that Maith owned only a non-exclusive copyright to the source code for the Insuror Atlas software that was created and developed by Third-Party Defendants; and (2) a declaratory judgment that the Insuror Atlas software used for Edgepoint did not infringe any valid copyright owned by Maith concerning the original source code. *See generally* ECF No. 1 (*Plaintiff's Original Complaint*). On July 12, 2024, Maith filed its Original Answer and Counterclaim in which it asserted a copyright infringement counterclaim against Plaintiffs under 17 U.S.C. § 501 and an accounting counterclaim. *See* ECF No. 3 at 16–19. On July 18, Plaintiffs filed their First Amended Complaint and Application for Temporary Restraining Order. ECF No. 5. On August 16, 2024, Plaintiffs filed their answer to Maith's counterclaim. ECF No. 10. Maith then sought leave on October 29, 2024, to file its First Amended Counterclaim against Plaintiffs and Third-Party Complaint against Third-Party Defendants that this Court granted in part and denied in part on December 19, 2024. ECF Nos. 24, 25, 31. Third-Party Defendants answered Maith's Third-Party Complaint on January 10, 2025. ECF No. 34.

On February 13, 2025, Plaintiffs/Counter-Defendants and Third-Party Defendants filed an opposed motion to amend the scheduling order, which this Court granted on March 4, 2025, setting a new dispositive motion deadline (among others) of April 18, 2025. *See* ECF Nos. 37, 40, 41. The Parties each filed their respective dispositive motions on April 18, 2025. ECF Nos. 44, 45. On May 8, 2025, Plaintiffs/Counter-Defendants and Third-Party Defendants filed a Motion to Dismiss Counts 4 and 5 without Prejudice, effectively rendering their dispositive motion filed on April 18 a "case-dispositive" motion. ECF No. 50. On May 9, 2025, the Parties jointly filed a stipulation

wherein, among other items, Maith did not object to the dismissal of Counts 4 and 5 from Plaintiffs/Counter-Defendants' First Amended Complaint. ECF No. 53. The Parties' dispositive motions were fully briefed by May 23, 2025. *See* ECF Nos. 51, 52, 54–57.

On August 15, 2025, the Court entered an order staying the case pending the Court's resolution of the Parties' dispositive motions. ECF No. 66. On November 12, 2025, the Court entered an order striking Plaintiffs/Counter-Defendants' Motion to Dismiss Counts 4 and 5 without Prejudice and permitted Plaintiffs/Counter-Defendants to seek leave to amend their complaint to remove Counts 4 and 5 as causes of action. ECF No. 67. Plaintiffs/Counter-Defendants filed that motion for leave and Second Amended Complaint on November 25, 2025. ECF Nos. 68, 69. The Court granted Plaintiffs/Counter-Defendants' motion for leave on November 25, 2025, and deemed their Second Amended Complaint properly filed. ECF No. 70. Maith filed an answer to Plaintiffs/Counter-Defendants' Second Amended Complaint on December 8, 2025. ECF No. 71.

On December 18, 2025, the Court entered an order denying without prejudice Plaintiffs/Counter-Defendants and Third-Party Defendants' Motion to Seal Plaintiffs and Third-Party Defendants' Motion for Partial Summary Judgment and Motion for Leave to File in Excess of Page Limit. ECF No. 73. As a result of that denial, the Court struck Plaintiffs/Counter-Defendants and Third-Party Defendants' Motion for Partial Summary Judgment. ECF No. 73. In a second order entered on December 18, 2025, the Court denied as moot Maith's Motion for Partial Summary Judgment, citing the November 25, 2025, filing of Plaintiffs/Counter-Defendants' Second Amended Complaint. ECF No. 74.

On January 12, 2026, the parties filed a joint motion seeking to extend the dispositive motion deadline so they could re-file their respective dispositive motions. ECF No. 75. The Court

granted that joint motion on January 14, 2026. ECF No. 76. Plaintiffs and Third-Party Defendants now file the instant Motion for Summary Judgment.

## II.
## ISSUES PRESENTED

1. Whether Maith's copyright infringement counterclaim fails as a matter of law when Third-Party Defendants created and developed the Software as independent contractors and, thus, possessed ownership rights in the Software.

2. Whether Maith's purported copyright registration of the Software is invalid as a matter of law when it knowingly misrepresented material information on its copyright registration application.

## III.
## SUMMARY JUDGMENT EVIDENCE

| | |
|---|---|
| Exhibit 1: | Deposition of Timothy Hunt (Excerpts) |
| Exhibit 2: | Deposition of Brian Borders (Excerpts) |
| Exhibit 3: | Deposition of Ivan Betancourt (Excerpts) |
| Exhibit 4: | Deposition of John Edwards (Excerpts) |
| Exhibit 5: | Deposition of Maith's Corporate Representative John Killacky (Excerpts) |
| Exhibit 6: | John Edwards' 1099 Tax Forms |
| Exhibit 7: | August 26, 2013 Email from Payroll to T. Hunt |
| Exhibit 8: | May 24, 2024 Asset Purchase Agreement |
| Exhibit 9: | Schedule 5.5(a) to the Asset Purchase Agreement |
| Exhibit 10: | Texas Office of the Comptroller Franchise Tax Account Status for Seguros Direct, Inc. |
| Exhibit 11: | July 1, 2024 Cease-and-Desist Letter from Maith to Acacia |
| Exhibit 12: | Declaration of Brian Borders |
| Exhibit 13: | Declaration of Ivan Betancourt |

## IV.
## STATEMENT OF FACTS

Acacia, a managing general agent in the insurance industry, previously licensed the use of software known as "Insuror Atlas" (the "Software") from Pearl General Agency, Inc. ("Pearl General Agency"), itself a managing general agency operated by Timothy Hunt ("Hunt"). The source code for the Software was initially developed in or around 2011 by a team of independent contractors specializing in information technology ("IT") and software coding to assist in the underwriting of insurance policies and managing claims. That team included Borders, John Edwards ("Edwards"), and eventually Betancourt.

Edwards and Borders had each been hired by Hunt as W-2 employees in 1990 and 1999, respectively, until Hunt terminated each of their employment contracts in 2005. *Depo. of T. Hunt* at 28:3–22, 31:5–32:5, 68:10–12, 68:23–25, 72:20–73:8 (Ex. "1"). After 2005, Hunt engaged Edwards and Borders in contract work and classified both as 1099 independent contractors until their departure from contract work with Hunt in 2024. *Depo. of T. Hunt* at 68:10–12, 72:20–73:8 (Ex. "1"). Betancourt joined Pearl General Agency as a 1099 independent contractor in approximately 2015, after which time he contributed his IT skills to the further development of the Software. *Depo. of T. Hunt* at 91:8–16; 106:22–107:10 (Ex. "1"); *Depo. of I. Betancourt* at 7:6–8:14 (Ex. "3").

Sometime in 2017, Seaharbor Insurance Agency, LLC ("Seaharbor")—owned by Michael J. McClure—obtained a license to use and incorporate the Software for its insurance platform. In 2023, McClure engaged in early negotiations with Hunt to purchase exclusive rights to the Software. *Depo. of T. Hunt* at 118:6–119:7 (Ex. "1"). While these negotiations were ongoing in December 2023, Hunt notified Borders, Betancourt, and Edwards that he was considering selling the Software that they had developed to McClure and encouraged each individual to accept an

employment position with McClure. *Depo. of T. Hunt* at 122:5–16 (Ex. "1"). By February 2024, McClure had formed Maith Solutions, LLC, for the specific purpose of purchasing the Software from Hunt and extended offers of employment to Edwards, Borders, and Betancourt with terms expressly disclaiming any ownership rights that the three independent contractors had in the Software. *Depo. of Maith's Corp. Rep. J. Killacky* at 18:22–19:3, 36:10–37:3, 54:12–24 (Ex. "5"). While all three contractors sought legal advice as to their ownership rights in the Software—and although each were advised that they very likely owned the Software by virtue of their development of it as independent contractors—Edwards eventually accepted an offer of employment with McClure and Seaharbor and disclaimed any of his ownership rights in the Software. *Depo. of Maith's Corp. Rep. J. Killacky* at 68:5–18 (Ex. "5").

Borders and Betancourt each rejected McClure's offers of employment given McClure's insistence that they disclaim their ownership rights in the Software. *Depo. of Maith's Corp. Rep. J. Killacky* at 64:4–10, 68:19–69:3 (Ex. "5").

In light of Borders' rejection of McClure's terms of employment, Maith's general counsel, John Killacky, drafted a Non-Disclosure and Intellectual Property Rights Disclaimer and Assignment Agreement written from the perspective of Tim Hunt (as purported "Owner" of the Software) in April 2024. *Depo. of Maith's Corp. Rep. J. Killacky* at 72:16–76:8 (Ex. "5"); *April 30, 2024 Non-Disclosure and Intellectual Property Rights Disclaimer* (Ex. "11"). Hunt then sought to have both Borders and Betancourt sign the agreement, which again expressly disclaimed any ownership rights Borders and Betancourt had in the Software. *Depo. of T. Hunt* at 140:19–141:22 (Ex. "1"). Unsurprisingly, Borders and Betancourt refused to sign the disclaimer and agreement. *Depo. of T. Hunt* at 152:23–153:8 (Ex. "1").

Nevertheless, and even though Maith and Hunt could not convince Borders or Betancourt to disclaim their ownership rights to the Software, Maith and Hunt entered into an Asset Purchase Agreement for the Software on May 24, 2024. *See generally May 24, 2024 Asset Purchase Agreement* (Ex. "8"). Notably, the Asset Purchase Agreement contained an "Anti-Sandbagging" provision (Section 5.5) with a specific carveout added by Maith (Schedule 5.5(a)) concerning any ownership claims asserted by Borders and Betancourt given their refusal to disclaim their ownership rights in the Software. *May 24, 2024 Asset Purchase Agreement* at 15 (Ex. "8"); *Schedule 5.5(a) to the Asset Purchase Agreement* (Ex. "9").

Soon after Hunt sold the Software to Maith, Acacia hired Borders and Betancourt to develop and utilize a new software solution developed by Edgepoint (the "Edgepoint Software"). At the end of June 2024, Maith directed Edwards to hack Acacia's system using the confidential and statutorily-protected login information of an Acacia client and take screenshots of the Edgepoint Software platform. *Depo. of Maith's Corp. Rep. J. Killacky* at 100:2–103:21 (Ex. "5"). After Edwards' unauthorized access to the Edgepoint Software, Maith sent a cease-and-desist letter to Acacia's CEO, Clinton Grumbles, claiming that Acacia "misappropriated" and infringed the Software, and that the Software was "protected by copyright, trade secret and other intellectual property rights." *July 1, 2024 Cease-and-Desist Letter from Maith to Acacia* (Ex. "11"). Despite its representation in the cease-and-desist letter, Maith did not register a purported (and invalid) copyright until July 3, 2024. *See* ECF No. 3-1 at 2 (Maith's July 3, 2024 Certificate of Registration for the Software).

In response to Maith's cease-and-desist, Plaintiffs Acacia and Edgepoint filed a declaratory judgment action seeking judicial clarification that Maith's copyright claims are invalid and that their use of the Edgepoint Software does not infringe upon any valid copyright owned by Maith.

*See* ECF No. 1 (*Plaintiff's Original Complaint*). Maith holds, at best, concurrent, non-exclusive rights to the Software on the basis that Third-Party Defendants created and developed the Software. Therefore, Maith's claims of infringement are meritless.

## V. <br> SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." There is no genuine issue of material fact "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) (stating that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact"). "A fact is material only if its resolution would affect the outcome of the action, and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (citing *Anderson*, 477 U.S. at 248). A party is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## VI. <br> ARGUMENT & AUTHORITIES

Plaintiffs and Third-Party Defendants did not infringe on Maith's purported copyright of the Software when Third-Party Defendants created and developed the Software in their capacity

as independent contractors. Further, Maith's purported registration of a copyright on the Software is invalid when Maith knowingly misrepresented material information in its copyright registration application concerning the Software. Accordingly, Plaintiffs and Third-Party Defendants are entitled to summary judgment as a matter of law on Maith's counterclaim for copyright infringement and a declaratory judgment that Maith's purported copyright on the Software is invalid and of no effect.

**A. Maith's copyright infringement counterclaim fails as a matter of law when Third-Party Defendants created and developed the Software as independent contractors and, thus, possessed ownership rights in the Software.**

Under the 1976 Copyright Act ("the Act"), ownership of a copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright; and (2) unauthorized copying of the constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). As a general rule, the author of a work is "the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). The "work made for hire" doctrine, however, carves out an important exception. *See* 17 U.S.C. § 201(b). Under this doctrine, the general rule conferring copyright ownership to its author is qualified to provide that "the employer or other person for whom the work was prepared is considered the author … and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Reid*, 490 U.S. at 738. Under section 101 of the Act, a "work made for hire" can arise under two circumstances: "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned … if the parties expressly agree in

a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101 (defining a "work made for hire").

Concerning the first circumstance, the Supreme Court set forth a non-exhaustive, thirteen-factor test for determining whether an author is an employee within the meaning of the Act's "work made for hire" provision:[1]

> In determining whether a hired party is an employee under the general common law of agency, we consider (1) the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are [(2)] the skill required; [(3)] the source of the instrumentalities and tools; [(4)] the location of the work; [(5)] the duration of the relationship between the parties; [(6)] whether the hiring party has the right to assign additional projects to the hired party; [(7)] the extent of the hired party's discretion over when and how long to work; [(8)] the method of payment; [(9)] the hired party's role in hiring and paying assistants; [(10)] whether the work is part of the regular business of the hiring party; [(11)] whether the hiring party is in business; [(12)] the provision of employee benefits; and [(13)] the tax treatment of the hired party.

*Reid*, 490 U.S. at 751–52. In its decision, the Court noted that no single factor is determinative. *Id*. Finally, the Fifth Circuit has held that "[t]he ultimate finding as to employee status is not simply a factual inference drawn from historical facts, but more accurately is a legal conclusion based on factual inferences drawn from historical facts." *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1045 (5th Cir. 1987). Therefore, "the ultimate determination of employee status is a finding of law[.]" *Id.*

Here, it is undisputed that Third-Party Defendants did not expressly agree with Hunt in a signed, written instrument that the Software "shall be considered a work made for hire." 17 U.S.C. § 101 (defining a "work made for hire"); *Reid*, 490 U.S. 738; *Depo. of T. Hunt* at 104:4–8 (Ex.

[1] In its decision, the *Reid* Court inferred that Congress' intent in its use of the term "employee" and phrase "work made for hire" was to apply conventional principles of the master-servant relationship. *Reid*, 490 U.S. at 739–40. In so doing, the Court essentially adopted the Fifth Circuit's reliance on general principles of common law agency to assist in the fact-finder's determination. *Reid*, 490 U.S. at 739–40; *Easter Seal Soc'y for Crippled Children & Adults of Louisiana, Inc. v. Playboy Enters.*, 815 F.2d 323 (5th Cir. 1987).

"1") (stating that Hunt did not know Edwards and Borders decided to build the Software using Visual Basic coding language). Therefore, Maith can prevail on its "work made for hire" theory only if Third-Party Defendants were Hunt's "employees" under the *Reid* Test, the application of which firmly establishes that Third-Party Defendants were independent contractors—*not* Hunt's employees—at the time the Software was created and developed.

**1. Hunt did not exercise control over the manner and means by which the Software was developed.**

Because Hunt did not control the manner and means by which the Software was developed by Third-Party Defendants, this factor weighs heavily in favor of Third-Party Defendants' status as independent contractors. "In determining whether a hired party is an employee under the general common law of agency, [a court] considers the hiring party's right to control the manner and means by which the product is accomplished." *Reid*, 490 U.S. at 751. "No one fact is dispositive of the issue, but the 'right to control' test is clearly the 'master test' for determining the nature of a professional working relationship." *Resolution Trust Corp. v. Texas Moline, Ltd.*, 96 F. Supp. 2d 644, 648 (S.D. Tex. 2000). "Under this test, an employer/employee relationship exists when an alleged employer retains the 'right to control' the manner and means by which an alleged employee performs his services." *Id.*

Here, Hunt did not control the manner or means by which the Third-Party Defendants (or Edwards) wrote code for and developed the Software. Specifically, Hunt did not require Borders, Betancourt or Edwards to log hours; in effect, they could work whenever they wanted. *See Depo. of. T. Hunt* at 59:6–13; 60:5–10; 95:14–17 (Ex. "1"); *Depo of I. Betancourt* at 14:16–17, 15:6 (Ex. "3"). Additionally, while Hunt at times provided computer equipment for Third-Party Defendants' occasional use, Hunt testified that Borders and Edwards used their personal equipment for their contract work. *Depo. of. T. Hunt* at 66:19–25, 89:10–21 (Ex. "1"). Neither Borders, Betancourt,

nor Edwards had a set schedule of work hours dictated by Hunt, and none of them were required to work a specific number of hours per week. *Depo. of. T. Hunt* at 64:12-17; 66:19-25; 84:17–85:11; 95:14–17 (Ex. "1").

Concerning the creation of the Software, Hunt also testified that he had no knowledge that Borders and Edwards had individually decided to create a new software platform that they would then incorporate for use in Hunt's insurance business:

> Q. Did you know that Mr. Edwards and Mr. Borders decided to build the new platform using the Visual Basic coding language after you terminated them as W-2 employees specifically?
> Mr. Allen: Objection; form.
> A. I believe in the timeline, that would be correct.
> Q. (By Mr. Weltge) And Mr. Borders and Mr. Edwards were working on the build of Insuror Atlas software on their own, weren't they?
> Mr. Allen: Objection; form.
> A. I disagree with that.
> Q. (By Mr. Weltge) You disagree with that?
> A. Yeah, if I understood the question correctly.
> Q. Why do you disagree with that?
> A. Repeat the question. Let me make sure I understood it.
> Q. Did you know that Mr. Borders and Mr. Edwards were working on the Insuror Atlas software on their own?
> Mr. Allen: Objection; form.
> A. No.

*Depo. of T. Hunt* at 104:12–105:7 (Ex. "1"). Hunt also never directed Borders or Edwards on the means by which they would create the Software, nor did he have any knowledge that Betancourt was also working on the development of the Software:

> Q. At any point did you specifically direct Mr. Borders or Mr. Edwards on how to implement the Visual Basic code for [the] Insuror Atlas software?
> A. The code itself?
> Q. Yes, sir.
> A. I don't believe I did.
> . . .
> Q. When did you learn that Mr. Betancourt was also working on the development of the Insuror Atlas software with Mr. Borders and Mr. Edwards?
> Mr. Allen: Objection; form.

A. I never knew that.
Q. (By Mr. Weltge) Did Mr. Betancourt ever come to you and discuss what he was doing and what he was adding to the software?
A. No.

*Depo. of T. Hunt* at 106:7–12, 106:22–107:5 (Ex. "1").

In his deposition, Edwards testified that Hunt did not write any of the source code for the development of the Software at any time from 2010 through 2024, and that Edwards and Borders worked together, "pick[ing] sections [of the code] and [running] with it." *See Depo. of J. Edwards* at 34:24–35:3; 37:17-38:7 (Ex. "4").

Consequently, the summary judgment evidence firmly establishes that Hunt did not control the manner or means by which Third-Party Defendants and Edwards created and developed the Software, as he originally had no knowledge of Borders and Edwards' decision to create the Software or that Betancourt was also working on the Software's further development. Borders and Betancourt additionally maintained complete control over their work hours and routinely used their personal computer equipment to continue developing the Software. Thus, the first factor of the *Reid* test unquestionably supports Third-Party Defendants' status as independent contractors in relation to the creation of the Software at issue.

**2. The creation and development of the Software required the particularized skill of Third-Party Defendants.**

The skill set required for Third-Party Defendants to create and develop the Software was particularized and distinct, weighing in favor of their classification as independent contractors. "The level of skill the hired party possesses is a factor typically afforded great weight." *Alcatel USA, Inc. v. Cisco Sys.*, No. 00-199, 2001 U.S. Dist. LEXIS 25113, at *33–34 (E.D. Tex. Oct. 30, 2001); *see also Young Again Prods., Inc. v. Supplement Spot, LLC (In re Supplement Spot, LLC)*,

Nos. 06-35903-H4-11, 07-03019, 2009 Bankr. LEXIS 1981 (Bankr. S.D. Tex. July 8, 2009)[2] (finding that an occupation requiring computer skills and technological savvy, including website maintenance, weighed in favor of independent contractor status).

In this case, Third-Party Defendants maintained a particular skill set in their work on the Software, and that skillset (i.e., software coding, development, and maintenance) did not include activities inherent to Hunt's insurance claims managing general agency. For instance, Hunt testified that Pearl General Agency's operations consisted of issuing insurance policies, canceling insurance policies, and handling insurance claims. *Depo. of T. Hunt* at 110:16–17 (Ex. "1"). In his deposition, however, Borders testified that he "kept the servers and system – the servers that ran the Insuror Atlas software online" and operating. *Depo. of B. Borders* at 59:5–6 (Ex. "2"). Similarly, Betancourt's testimony as to his development of the Software unquestionably indicates the particularized skill both he and Borders possessed for its development:

> Q. Okay. What functional pieces have you added to the software since 2014 or 2015?
>
> A. I created the entire content management system that is used for marketing reps to track the agencies and the potential agencies that a marketing rep might have and is turned into an agent. I also created reports for that system.
>
> . . .
>
> Q. Anything else?
>
> A. Yes. I rewrote the claims module from the ASPX architecture that it used to MVC models, and as I rewrote it, I also corrected any inconsistencies, errors that it had and added new features. I also co-created the system maintenance module of the Insuror-Atlas system, which was used to add agents to the system, modify their permissions, add commissioned appointments, most of the agency information that would be required for an agent to do business.
>
> Q. Okay. Anything else?
>
> A. I helped—no, I authored the document system that is used by the underwriting portion of the Insuror Atlas [software]. It catalogs and uploads memos from the agents into the Insuror Atlas system. I also modified a version of that same software and added it to the claims system with a drag-and-drop feature so that you could get the photos and images straight from

[2] Due to the two cases in this string citation having citations provided by Lexis Nexis, Plaintiffs and Third-Party Defendants have attached copies of each case to the Motion for the Court's reference.

> your desktop and drag them onto the website and automatically upload them.

*Depo. of I. Betancourt* at 7:6–8:14 (Ex. "3").

As demonstrated by the testimony of Third-Party Defendants, creating the Software consisted of technical skill that both Borders and Betancourt clearly possessed and used in their creation and development of the Software—skills that were undeniably separate and distinct from those inherent to Hunt's insurance claims business. Therefore, the second factor also weighs in favor of Third-Party Defendants' status as independent contractors in relation to their work on the Software.

**3. Third-Party Defendants largely used their personal instrumentalities and tools for the creation and development of the Software.**

Although Hunt, at times, provided computer equipment for Third-Party Defendants to use for their contract work, Hunt testified that Borders would often perform backups of the Software on Borders' personal computers. *Depo. of T. Hunt* at 89:10–21 (Ex. "1"). Hunt further acknowledged the possibility that Borders used his personal data repositories located at Borders' house for his work on the Software—something Borders confirmed in his own deposition. *Depo. of T. Hunt* at 96:1–8 (Ex. "1"); *Depo. of B. Borders* at 29:20–30:8 (Ex. "2") (responding that the Software code was stored in a repository at his house). In fact, Borders testified specifically that he used his own laptop and equipment for writing and storing the code for the Software, not computer equipment supplied by Hunt:

> Q. Did you – where did you write the code? Where – where was the code stored?
> A. My house.
> Q. At your house. And code that you wrote was stored there, on what – what computer?
> A. On my own personal computer.
> Q. Okay. And anywhere else? Was it stored anywhere else?

A. There would have been copies on my – like, my laptop, John [Edwards'] laptop, and then at some point there was – code was also placed on computers of Tim and his servers, a copy of it. But the main service code repository remained at my house.

. . .

Q. So you – you mentioned you had a laptop, and you also had a PC at home?
A. Multiple PCs, yes.
Q. Okay. Well, the PC that the information was stored on?
A. Uh-huh.
Q. Okay. So was that one that you owned?
A. Yes.
Q. Had Tim paid for that?
A. No.
Q. Okay. How about your laptop?
A. No.
Q. How about the – the computers, when you stored it on Tim's – you said you – you got copies on Tim's computers. What computers were those?
A. He had some computers in an extra building at his house. This is where he ran his client's software.
Q. Okay. And how is it that you had access to those?
A. Remote log in.

*Depo. of B. Borders* at 29:20–31:22 (Ex. "2").

As his deposition testimony provides, Borders worked on the Software from his personal laptop, desktop computers, and repositories that Hunt did not fund or purchase for Borders' use. Even though Hunt provided occasional access to his own computers for Third-Party Defendants, Borders' access to those workstations was largely through remote means. Therefore, Both Hunt and Borders' deposition testimony establish that Third-Party Defendants routinely used their own personal instrumentalities and tools for the development of the Software, and the third factor of the *Reid* test thus supports Third-Party Defendants' status as independent contractors in relation to the creation and development of the Software.

**4. Third-Party Defendants primarily worked remotely and at locations of their choosing when they created and developed the Software.**

Third-Party Defendants spent only a small fraction of their contract time in an office associated with or owned by Hunt, further supporting their status as independent contractors. In

analyzing the fourth factor, the U.S. Supreme Court in *Reid* found in favor of a contractor relationship where the contractor worked in his own studio in Baltimore, which made daily supervision of his activities from Washington practically impossible. *Reid*, 490 U.S. at 752.

Here, Hunt maintains that he provided office space for Edwards, Borders, and Betancourt to work in after he terminated their employment as W-2 employees and converted them to independent contractors. *See Depo. of T. Hunt* at 38:11–42:1 (Ex. "1"). Hunt's testimony, however, is belied by deposition testimony from both Borders and Betancourt, who each stated that they worked remotely and from home most days of the week during the time the Software was created and developed. *See Depo. of I. Betancourt* at 47:19–50:3 (Ex. "3"); *Depo. of B. Borders* at 18:21–22, 32:7–8 (Ex. "2"). Additionally, Borders and Betancourt produced cell phone Google Location/GPS data spanning the years of 2015–2019 and 2017–2020, respectively. *See Decl. of I. Betancourt* at 3 (Ex. "13"); *Betancourt GPS Data* (Ex. "13-D"); *Decl. of B. Borders* at 3 (Ex. "12"); *Borders GPS Data* (Ex. "12-C"). A review of that data indicates that in a period of five years (or roughly 1,825 days), Borders was physically present in an office associated with Hunt only 445 times through 2019. *Decl. of B. Borders* at 3 (Ex. "12"). Similarly, in a period of four years (or roughly 1,460 days), Betancourt was physically present in an office associated with Hunt only 252 times through 2020. *Decl. of I. Betancourt* at 3 (Ex. "13"). Obviously then, Third-Party Defendants performed the majority of their contract work in locations not affiliated with or owned by Hunt but instead controlled the location at which they completed their work. Therefore, the fourth factor of the *Reid* test supports the status of Third-Party Defendants as independent contractors.

**5. The duration of Borders and Betancourt's professional relationship with Hunt does not weigh against the determination that they were independent contractors.**

Although Third-Party Defendants provided contract work for Hunt over a period spanning several years, that duration of time does not necessarily weigh against a determination that Third-Party Defendants were independent contractors when they created and developed the Software. After Cisco Systems filed a second motion for summary judgment under the same (albeit further developed) facts, the Eastern District of Texas in *Alcatel USA, Inc. v. Cisco Systems* analyzed the duration of the relationship between the parties and noted that "[i]n its attempt to resist summary judgment, Alcatel contends, in part, that the long-term relationship between Alcatel and Trnkus militates against a finding of an independent contractor relationship . . . *the court does not necessarily agree*." *Alcatel USA, Inc. v. Cisco Sys.*, 239 F. Supp. 2d 645, 657 (E.D. Tex. 2002) (emphasis added) (hereinafter, "*Alcatel 2002*"). Specifically, "Trnkus's authorship of the relevant programs in mid-1995 occurred in the infancy of his work relationship with Alcatel, at which time it was evident that neither Alcatel nor Trnkus had reason to believe their contracting relationship would exceed nine months." *Id*. Accordingly, "that Alcatel and Trnkus's relationship ultimately proved to last beyond four years becomes substantially less relevant when considered within the context of the parties' understanding in 1995, the year the relevant programs were created." *Id.* In a footnote, the court stated that "long-term relationships with independent contractors are not entirely novel with Alcatel" referencing a five-year consulting agreement between Alcatel and another individual, Ted Bensinger. *Id*. at n.13.

Though not binding authority, the Eighth Circuit has found the existence of an independent contractor status notwithstanding a six-year relationship between the two parties where the company did not treat the independent contractor as an employee for tax purposes, did not pay him traditional employee benefits, the contractor was highly skilled, and the contractor continued to

consult with other companies and on one occasion unilaterally hired a subcontractor. *See Kirk v. Harter*, 188 F.3d 1005, 1009 (8th Cir. 1999).

Concerning Third-Party Defendants, while Borders first joined one of Hunt's businesses as a W-2 employee in 1999, Hunt later terminated Borders' W-2 status and converted him to a 1099 independent contractor because "Tim no longer wanted to have employees." *Depo. of T. Hunt* at 68:23–25 (Ex. "1") (stating that Borders joined Hunt as an employee at ARM in 1999); *Depo. of J. Edwards* at 24:9–10 (Ex. "4"). Betancourt, on the other hand, was only ever brought on as an independent contractor and not a W-2 employee for Hunt at any time from 2016 through 2024. *See Betancourt's 1099 Tax Forms* (Ex. "13-B"). Further, the summary judgment evidence (as discussed in the sections above and below) firmly proves that Hunt did not treat either Borders or Betancourt as employees for tax purposes, that Hunt did not offer them traditional employee benefits at any time from 2005 (2016 for Betancourt) through 2024, and that each maintained particular software programming skills. Finally, during the time Betancourt provided contract work for Hunt, Betancourt also performed software development work for other clients as well, including a premium finance company in or around 2019 and 2020 that paid him approximately $10,000.00. *See Depo. of I. Betancourt* at 19:24–23:3 (Ex. "3"). Borders, too, performed work for other clients apart from his contract work for Hunt. *See Depo. of B. Borders* at 20:21–22:9 (Ex. "2") (stating that he formed TDB Technologies at the end of 2008 and provided software services to clients outside of his contract work for Hunt).

Even though both Borders and Betancourt maintained professional relationships with Hunt over a period of several years, the duration of those relationships do not cut against their status as independent contractors when Hunt, himself, classified both as 1099 independent contractors, and when Borders and Betancourt were highly skilled programmers, received no benefits from Hunt,

and maintained their own clients while also providing contract work to Hunt. Accordingly, the fifth factor of the *Reid* test does not weigh against a determination that Third-Party Defendants were independent contractors during the time in which they created and developed the Software.

**6. Hunt's assignment of additional projects to Third-Party Defendants is not inconsistent with their status as independent contractors.**

Whether Hunt assigned additional tasks to Third-Party Defendants does not weigh against their status as independent contractors. In examining the right to assign factor, courts should not consider whether the hiring party has a general right to assign to the hired party various projects that relate to the completion of the assigned task, but whether the hiring party has the right to assign projects in addition to the project of creating the copyrighted works themselves. *Alcatel 2002*, 239 F. Supp. 2d at 655. Further, "present in nearly all independent contractor relationships is a hiring party's right to assign various tasks and projects that relate or are necessary to the completion of an underlying project." *Id*.

In analyzing the sixth *Reid* factor, the *Alcatel* Court stated that the factor "is not necessarily material to the ultimate resolution of Trnkus's employment status." *Id*. The Court then made two points regarding this factor. First, "the court agree[d] with Cisco's contention that the relevance of the right to assign factor is somewhat diminished by the factual context surrounding the present case." *Id*. at 654–55. Applying the preceding rules to the facts, the court stated, "In the instant case, Trnkus was not assigned the specific project of creating the copyrighted tools at issue . . . instead, he was assigned the developmental task of rewriting the [subsystem] function for the 1633 SX." *Id*. Accordingly, "that Alcatel may have enjoyed a vague right to assign projects related to his developmental assignment becomes substantially less relevant." *Id*.

Second, the court provided that "the force and significance that Alcatel seeks to attach to its contentions that it maintained a right to assign to Trnkus additional projects, as well as control

Trnkus's developmental work, is substantially undermined by Alcatel's treatment of other independent contractors who worked at Alcatel pursuant to various consultant agreements." *Id*. Specifically, Alcatel consultant agreements into which it entered with various independent contractors "demonstrate that, to the extent Trnkus was subject to Alcatel's control and assignment of additional projects, these rights were consistent with the rights Alcatel maintained with other independent contractors who worked at Alcatel concurrently with Trnkus." *Id*. As the court stated, "the rights that Alcatel expressly maintained over its independent contractors pursuant to this and other agreements belie Alcatel's contention that Mr. Trnkus was treated in a manner that was somehow inconsistent with independent contractor status." *Id*.

In this case, similar to the facts in *Alcatel 2002*, Hunt did not assign the specific project of creating the Software at issue to Third-Party Defendants. *Alcatel 2002*, 239 F. Supp. 2d at 654–55. In fact, Hunt was unaware that Edwards and Borders decided on their own to build a new software platform using Visual Basic coding language. *See Depo. of T. Hunt* at 104:4–8 (Ex. "1"). As to additional projects, however, Hunt testified that Edwards worked on software for "whatever" Hunt asked Edwards to work on including software for Hunt's general agency, claims, and software for "other people that asked us to – you know, work on for them." *Depo. of T. Hunt* at 63:20–64:2 (Ex. "1"). Edwards also testified that he and Borders made the decision, without Hunt, to create the Software using the Visual Basic coding language. *See Depo. of J. Edwards* at 31:10–17 (Ex. "4"). In addition to creating and developing the Software, Edwards also worked on additional projects besides the Software, including "writing code" and "maintaining the customer service between issues that came up." *See Depo. of J. Edwards* at 65:10–17 (Ex. "4"). This contractor arrangement between Hunt and Edwards was similar to the arrangement Hunt had with Third-Party Defendants. For instance, Betancourt testified that he did various other work for Hunt,

which included mostly web-related work but also some IT-related work and database management. *See Depo. of I. Betancourt* at 25:14–19; 35:4–6 (Ex. "3"). For Borders, in addition to creating and developing the Software, Borders performed other tasks for Hunt, including "[s]ervicing clients." *See Depo. of B. Borders* at 54:1–4 (Ex. "2"). Further, Borders testified he would also address Hunt's clients' issues submitted through the JIRA system that the Software utilized. *See Depo. of B. Borders* at 53:6–24 (Ex. "2").

Hunt's contractor arrangement with Third-Party Defendants was, therefore, much like the contractor arrangement between Alcatel and Trnkus in that Hunt treated all of his independent contractors the same in having them work on multiple projects at various times. Those arrangements were not inconsistent with the independent contractor status of Third-Party Defendants.

**7. Third-Party Defendants had complete discretion over when and how long to work.**

Because Third-Party Defendants maintained autonomy and discretion over when and how long they provided contract work to Hunt, the seventh factor of the *Reid* test supports their status as independent contractors for the creation and development of the Software. When an individual has "absolute freedom to decide when and how long to work," such facts support a determination that the individual is properly considered an independent contractor. *Reid*, 490 U.S.at 753.

The Eastern District's opinion in *Alcatel United States v. Cisco Systems* is both instructive and distinguishable. In *Alcatel*, the court recognized that Trnkus, a computer programmer and software engineer, "had a flexible work schedule," "was afforded the freedom to work more or less than forty hours as he felt necessary," and "would often take time off to engage in activities such as wind surfing, while still being paid for forty-hour work weeks." *Alcatel*, 2001 U.S. Dist. LEXIS 25113, at *36. While the *Alcatel* court understood that "*a flexible work schedule such as*

*this would typically be consistent with independent contractor status*," it found the evidence of Trnkus' work schedule inconclusive because "other Alcatel programming engineers enjoyed the sort of flexible work schedule under which Trnkus worked." *Id.* (emphasis added).

Here, Third-Party Defendants enjoyed a work schedule that was similarly flexible. Hunt testified that he did not require Borders or Betancourt to log their hours, but rather that Borders and Betancourt could effectively work whenever they wanted to work. *See Depo. of T. Hunt* at 59:6–13, 84:17–85:11 (stating that Borders was not required to work, for instance, "if he had something to do for his grandmother, if he wanted to take some days off"), 95:14–17 (Ex. "1"). Edwards, too, had no set work hours and was not required to work a predetermined number of hours per week. *Depo. of T. Hunt* at 64:12–17 (Ex. "1"). In fact, Borders testified that his hours would vary week to week—since "the hours [he] had available to work varied week to week." *Depo. of B. Borders* at 26:7–8 (Ex. "2"). Betancourt echoed Borders, testifying that he "worked when [he] wanted to work. So sometimes it was a long time, sometimes it wasn't." *Depo. of I. Betancourt* at 14:16–17 (Ex. "3").

The *Alcatel* case is, in one aspect, significantly distinguishable from the case at bar. There, the court found the evidence of Trnkus' flexible work schedule—which would normally be an indication of independent contractor status—to be inconclusive precisely because Alcatel had *employed* software programmers who also had flexible work schedules. *Alcatel*, 2001 U.S. Dist. LEXIS 25113, at *36. In this case, however, Hunt had no employees during the time in which Third-Party Defendants created and developed the Software. Borders and Betancourt worked with Edwards on creating and developing the Software, and Edwards, too, enjoyed a flexible work schedule, was a 1099 contractor, and could effectively work whenever he wanted. *See Depo. of T. Hunt* at 60:5–10 (Ex. "1"). Thus, the evidence for this factor abundantly supports the conclusion

that Third-Party Defendants were independent contractors when they created and developed the Software.

**8. Hunt paid Third-Party Defendants by issuing checks for contract work.**

Because Hunt deliberately paid the Third-Party Defendants on a 1099 contract fee basis, as opposed to a regular salary or wages, this factor weighs strongly in favor independent contractor status. In analyzing this factor, the *Reid* Court examined the character of the payments in connection with the scope of job requirements. *Reid*, 490 U.S. at 753. Accordingly, the *Reid* Court found that because "CCNV paid Reid $15,000, a sum dependent on 'completion of a specific job,'" this factor weighed in favor of independent contractor status. *Id.*

Further, in *Alcatel 2002,* "Alcatel ensured that independent contractors were not on its payroll, that independent contractors would receive a different colored badge, and that Alcatel would try to limit the amount of time independent contractors worked for them to six months." *Alcatel 2002*, 239 F. Supp. 2d at 656. Notably, when the *Alcatel* court considered Cisco's first motion for partial summary judgment, the court highlighted a specific characteristic of independent contractor status—namely, that Trnkus "was paid not directly by Alcatel, but by and through Prism—a characteristic which is indicative of independent contractor status." *Alcatel*, 2001 U.S. Dist. LEXIS 25113, at *36.

Here, Hunt intentionally maintained Border's and Betancourt's non-employee status, and he took deliberate steps to compensate them as independent contractors from 2006 and 2016, respectively. Consequently, like in *Alcatel and Alcatel 2002*, Hunt paid Borders and Betancourt through operating accounts associated with his affiliate entities, Seguros Direct and Pearl General Agency, Inc. *See Depo. of T. Hunt* at 81:18–82:7 (Ex. "1").

Hunt deliberately terminated Border's W-2 employment in 2005 and began paying him a

"flat rate" on a bi-monthly basis as a 1099 contractor. *See Depo. of B. Borders* at 19:18–20:5 (Ex. "2"). From 2005 forward, Hunt either issued checks to Borders through Seguros Direct or paid him via ACH through Pearl General Agency. *See Depo. of B. Borders* at 69:12–13 (Ex. "2"). Similarly, Betancourt charged Hunt an agreed-upon monthly fee for services rendered. *See Depo. of I. Betancourt* at 43:15–21 (Ex. "3"). Edwards, to the contrary, testified that he was compensated through payroll in the form of salary from Hunt for the entire duration he worked on the Software. *See Depo. of J. Edwards* at 63:17–64:17 (Ex. "4"). However, as demonstrated by the preliminary report for payroll prepared by Hunt's CPA, Thomas Edwards, Third-Party Defendants (and Edwards) were paid as 1099 contractors. *See August 26, 2013 Email from Payroll to T. Hunt* (Ex. "7").

As demonstrated above, Third-Party Defendants and Edwards were paid by check or ACH from Seguros Direct or Pearl General Agency for contract services performed. Thus, this fact weighs in favor of a contractor relationship between Third-Party Defendants and Hunt under the eighth factor of the *Reid* test.

**9. Third-Party Defendants did not require additional help through the hiring and paying of assistants, rendering the ninth factor of the *Reid* Test immaterial.**

The ninth factor of the *Reid* test is inconsequential to a determination of Third-Party Defendants' independent contractor status when they did not require additional help for the creation and development of the Software. In *Reid*, the U.S. Supreme Court held that the hired parties' discretion in hiring and paying assistants weighed in favor of independent contractor status. *Reid*, 490 U.S. at 753. In analyzing the hired party's role in hiring and paying assistants, however, "courts have described [this factor] as 'virtually meaningless in a situation where the hired party does not need assistants'" *Id*. at 38; *Aymes*, 980 F.2d at 864. The *Alcatel* Court analyzed the following facts as applicable to the ninth factor:

> “. . . whether Trnkus has the authority to hire assistants is a factor of little relevance in this case. The evidence indicates Trnkus was a member of a team, and whether or not Trnkus used Alcatel employees or teammates to assist him in his actual duties is unclear. However, the evidence does tend to establish that Trnkus arguably had little reason to hire his own assistants because, should the need for help arise, Trnkus had other teammates an Alcatel employees from which to seek assistance. *Alcatel 2001* at. 37-38.

Here**,** neither Borders nor Betancourt were responsible for hiring or paying any assistants for Hunt. *See Depo. of T. Hunt* at 86:14–17 (Ex. “1”). Like in *Alcatel* and *Alcatel 2002*, Borders and Betancourt were members of a team and responsible for their own work on the Software. Indeed, they did not rely on Hunt to provide assistance or hire additional workers, nor did such necessity arise during their development of the Software. *See Decl. of B. Borders* at 3 (Ex. “12”); *Decl. of I. Betancourt* at 3–4 (Ex. “13”). Accordingly, and as demonstrated above, this factor is largely non-probative and indeterminate of a contractor relationship under the facts in this case. Notwithstanding the foregoing, to the extent this factor is weighted, Plaintiffs and Third-Party Defendants would emphasize that Borders and Betancourt retained the right to hire their own assistants had such necessity arisen.

**10. Third-Party Defendants’ creation and development of the Software was not part of the regular business of Hunt’s entities.**

Third-Party Defendants’ creation and development of the Software was not part of Hunt’s regular business and thus supports their status as independent contractors. Notably though, in analyzing this factor, the *Alcatel* Court found that “this factor has been deemed to be not particularly useful in most cases.” *Alcatel USA, Inc.,* 2001 U.S. Dist. LEXIS 25113 at *37.

Hunt testified that he formed or bought the following entities that Edwards and Borders—and later Betancourt—worked for and/or were associated with: (i) ARM; (ii) Pearl General Agency; and (iii) Seguros Direct. *See Depo. of T. Hunt* at 18:6–20; 21:14–17; 33:22–34:1 (Ex. “1”). ARM was an insurance company, or more specifically, a Texas managing general agency.

*See Depo. of T. Hunt* at 18:21–22 (Ex. "1"). Pearl General Agency is also a "managing general agency" that Hunt "bought from Home State General Agency." *See Depo. of T. Hunt* at 33:22–34:4 (Ex. "1"). Hunt further testified that Pearl General Agency was in the business of issuing policies, cancelling policies, and handling claims. *See Depo. of T. Hunt* at 110:7–17 (Ex. "1").

Seguros Direct did not use the Software. *See Depo. of T. Hunt* at 109:25-110:6 (Ex. "1"). Hunt testified that Seguros Direct was a company that he used for owning and financing property. *See Depo. of T. Hunt* at 21:25–22:9 (Ex. "1"). At the time it was formed, Seguros Direct "did not have any involvement in insurance underwriting of coding used for the insurance industry." *See Depo. of T. Hunt* at 22:10–13 (Ex. "1"). Further, Seguros Direct was merely the "vehicle by which [Hunt] paid" Borders and Edwards, and it did not use the Software. *See Depo. of T. Hunt* at 109:25–110:6 (Ex. "1").

Accordingly, the summary judgment evidence establishes that creating, developing, and coding software was hardly part of the "regular business" for ARM, Pearl General Agency, or Seguros Direct. Thus, the tenth factor favors an independent contractor relationship between Third-Party Defendants and Hunt.

**11. Seguros Direct and Pearl General Agency are no longer conducting business in Texas.**

The eleventh *Reid* factor assesses whether the hiring party is actively engaged in business. In *Reid*, the U.S. Supreme Court held that the lack of active business operations weighed in favor of an independent contractor relationship. *Reid*, 490 U.S. at 733.

Here, Hunt's affiliate entities—ARM, Pearl General Agency, and Seguros Direct—are no longer engaged in business. Specifically, Hunt testified that ARM went out of business around 2006 or 2007 and that Pearl General Agency is no longer actively conducting business. *Depo. of T. Hunt* at 20:16–20; 37:9–14 (Ex. "1"). As for Seguros Direct, Hunt forfeited Seguros Direct's

right to conduct business in Texas for failure to pay franchise taxes, and the entity is currently inactive. *See Texas Office of the Comptroller Franchise Tax Account Status for Seguros Direct, Inc.* (Ex. "10"). The eleventh *Reid* factor, therefore, weighs in favor of classifying the relationship between Hunt and the Third-Party Defendants as one between a (now former) business owner and independent contractors, particularly given the lack of active business operations by Hunt's entities.

**12. Third-Party Defendants received no benefits during the time in which they performed contract work for Hunt.**

Third-Party Defendants received no benefits for their contract work for Hunt on the Software, which thus weighs in favor of their independent contractor status. Under *Reid*, when the hiring party does not "provide any employee benefits, or contribute to unemployment insurance or workers' compensation funds this factor weighs in favor of a contractor relationship. *Reid*, 490 U.S. at 753. Similarly, the *Alcatel* Court found that "this factor is significant" and a decision "taken obviously to Alcatel's advantage." *Alcatel 2002*, *Inc*., 239 F. Supp. 2d at 656; *see also Alcatel*, 2001 U.S. Dist. LEXIS 25113, at *31 ("Since *Reid*, virtually every case that has found the hired party to be an independent contractor did so in part because the hiring party failed to provide employee benefits[.]"); *see also Aymes v. Bonelli,* 980 F.2d 857, 862–63 (2d Cir. 1992) ("every case since *Reid* that has applied the test has found the hired party to be an independent contractor where the hiring party failed to extend benefits"). "[A] hiring party's failure to treat a worker as an employee for . . . benefits purposes is inconsistent with a subsequent claim that the worker is an employee for the purpose of copyright ownership." *Alcatel*, 2001 U.S. Dist. LEXIS 25113, at *31.

Here, Third-Party Defendants and Edwards received no employee benefits from Hunt. *See Depo. of T. Hunt* at 66:3–18 (Ex. "1"); *Decl. of I. Betancourt* at 2 (Ex. "13"); *Decl. of B. Borders*

at 2 (Ex. "12"). Specifically, Third-Party Defendants were not offered, compensated for, or otherwise provided medical insurance, retirement program benefits, workers' compensation, or unemployment insurance by Seguros Direct, Pearl General Agency, or Hunt. *See Decl. of I. Betancourt* at 2 (Ex. "13"); *Decl. of B. Borders* at 2 (Ex. "12"). Glaringly, even Edwards testified that neither Hunt nor his entities provided employee benefits. *Depo. of J. Edwards* at 34:6–17 (Ex. "4"). Accordingly, the twelfth *Reid* factor strongly favors the existence of an independent contractor relationship between Third-Party Defendants and Hunt.

**13. Borders and Betancourt were issued 1099 tax forms from 2006–2024 and 2016–2024, respectively.**

Third-Party Defendants' status as independent contractors is further supported by their 1099 tax forms from 2006 and 2016, respectively, through 2024. In *Reid*, where the hiring party "did not pay payroll or Social Security taxes," this factor weighed heavily in favor of a contractor relationship. *Reid*, 490 U.S. at 753. Moreover, the *Alcatel 2002* Court found that "this factor is significant." *Alcatel 2002*, 239 F. Supp. 2d at 656; *see also Alcatel*, 2001 U.S. Dist. LEXIS 25113, at *31 ("Since Reid, virtually every case that has found the hired party to be an independent contractor did so in part because the hiring party failed to . . . withhold taxes from its worker."); *Aymes,* 980 F.2d at 862–63 ("every case since *Reid* that has applied the test has found the hired party to be an independent contractor where the hiring party failed to . . . pay social security taxes."). In fact, "a hiring party's failure to treat a worker as an employee for tax . . . purposes is inconsistent with a subsequent claim that the worker is an employee for the purpose of copyright ownership." *Alcatel*, 2001 U.S. Dist. LEXIS 25113, at *31.

Here, Hunt treated the Third-Party Defendants and Edwards as independent contractors by issuing 1099 tax forms to them for the relevant years they created and developed the Software. Third-Party Defendants and Edwards were treated as independent contractors, paid by Hunt

through Pearl General Agency and Seguros Direct, from 2006 through 2024. *See Depo of T. Hunt* at 68:10–12; 72:20–73:8 (Ex. "1"). In fact, even Edwards testified that he was intentionally transitioned to an independent contractor status by Hunt:

> Q. Okay. So you were self-employed?
> A. Was -- was what I was being told, yes.
> Q. When did that happen?· When did you --
> A. About 2005, 2006.
> Q. And why did that happen?
> A. The reason I was gave -- the reason I was given was because Tim no longer wanted to have employees.
> Q. And do you know why he didn't want to have employees?
> A. I do.
> Q. Why?
> A. Because an accountant in his department – in his company forgot or refused to pay the IRS and was fined a half-million dollars.
> Q. The employee was fined?
> A. No. Tim was fined.
> Q. He was fined $500,000 by the IRS?
> A. That is my understanding, yes.
> Q. Because he wasn't paying the payroll taxes?
> A. That is correct.
> Q. And so in 2005 as a result of his failure to pay payroll taxes, he decided he didn't want that responsibility and he would put it on the employees to pay their own payroll taxes basically by self-employment tax. Correct?
> A. Correct.

*See Depo. of J. Edwards at* 24:4–25:4 (Ex. "4"). Accordingly, Edwards received 1099s from Seguros Direct for the tax years of 2006 to 2015 and from Pearl General Agency, Inc., for tax years 2015 to 2023, demonstrating that zero federal income tax was withheld and all income figures were reported as "nonemployee compensation." *See Edwards' 1099 Tax Forms* (Ex. "6"); *Depo. of J. Edwards* at 67:14–20 (Ex. "4"). Similarly, Third-Party Defendants received 1099s from Hunt through his entities. *See Decl. of I. Betancourt* at 2 (Ex. "13"); *Betancourt's 1099 Tax Forms* (Ex. "13-B"); *Depo. of B. Borders* at 24:5–7 (Ex. "2"); *Decl. of B. Borders* at 2 (Ex. "12"); *see also Borders' 1099 Tax Forms* (Ex. "12-A" and "12-B").

It cannot, therefore, be reasonably disputed that Hunt strategically hired Third-Party Defendants as independent contractors. Third-Party Defendants were paid non-employee compensation from 2005 through 2024, as Hunt avoided paying federal payroll taxes in connection with his contracting with Third-Party Defendants. Thus, the thirteenth *Reid* factor also strongly evidences the existence of an independent contractor relationship between Third-Party Defendants and Hunt.

**B. Maith's purported copyright registration of the Software is invalid as a matter of law when it knowingly misrepresented material information on its copyright registration application.**

Because Plaintiffs have established as a matter of law that Third-Party Defendants were independent contractors at the time they created and developed the Software, the Software was not a "work made for hire," and therefore, Maith's purported registration of a copyright on the Software is invalid as a matter of law. "A certificate of registration, if timely obtained, is *prima facie* evidence both that a copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004). However, "the presumption that a certificate of registration creates is rebuttable." *Berg v. Symons*, 393 F. Supp. 2d 525, 539 (S.D. Tex. 2005). "Courts may find a registration invalid if the copyright claimant willfully misstated or failed to state a fact that, if known, might have caused the Copyright Office to reject the copyright application." *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 U.S. Dist. LEXIS 114306, at *73–74 (S.D. Tex. Oct. 27, 2010).[3] Importantly, a certificate of registration meets the requirements of 17 U.S.C. § 411, *unless*:

> (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and

[3] Due to the this case having a citation provided by Lexis Nexis, Plaintiffs and Third-Party Defendants have attached a copy of this case to the Motion for the Court's reference.

(B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1). "In any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(2).

Here, Maith sought and obtained a copyright registration from the United States Copyright Office on July 3, 2024, under Registration No. TXu 2-436-022. *See* ECF No. 3-1 ("Certificate of Registration"). A review of Maith's purported registration shows "Timothy Hunt" as the sole author of the Software. ECF No. 3-1 ("Certificate of Registration"). The registration also states the Software is a "work made for hire" and that "Maith Solutions LLC" is the "Copyright Claimant," listing "By written agreement" next to "Transfer statement[.]" ECF No. 3-1 ("Certificate of Registration"). Maith, however, knowingly provided inaccurate information on its application for copyright registration that, if known, would have caused the Register of Copyrights to refuse registration. For instance, the purported registration indicates that that the Software was authored by Hunt as a "work made for hire." However, as clearly established in Section A of this Motion, (1) Third-Party Defendants created and developed (and, thus, co-authored) the Software, (2) Third-Party Defendants were independent contractors during the time in which they created and developed the Software, and (3) it is undisputed that the Software was not the result of an express written and signed instrument specially ordering or commissioning the work (i.e., the Software). Thus, the Software was *not* a "work made for hire," Hunt was *not* the author of the work, and Maith is *not* entitled to an exclusive registration. Maith's claim to the contrary, and specifically its claim that the Software was authored as a "work made for hire" is demonstrably false.

Moreover, Maith was well aware of the foregoing facts at the time it submitted its copyright registration application. Specifically, during its attempt to acquire the Software from Hunt, Maith approached Third-Party Defendants several times from February through April 2024, extending multiple iterations of offers of employment to Third-Party Defendants with terms expressly disclaiming any ownership rights that each had in the Software. *Depo. of Maith's Corp. Rep. J. Killacky* at 18:22–19:3, 36:10–37:3, 54:12–24 (Ex. "5"); *see also Decl. of B. Borders* at 4 (with attached exhibit "12-F") (Ex. "12"). Borders and Betancourt both rejected Maith's offers of employment precisely because of Maith's insistence that they disclaim their ownership rights in the Software. *Depo. of Maith's Corp. Rep. J. Killacky* at 64:4–10, 68:19–69:3 (Ex. "5"). Undeterred, Maith's general counsel, John Killacky, drafted a Non-Disclosure and Intellectual Property Rights Disclaimer and Assignment Agreement written from the perspective of Tim Hunt (as purported "Owner" of the Software) in April 2024. *Depo. of Maith's Corp. Rep. J. Killacky* at 72:16–76:8 (Ex. "5"); *April 30, 2024 Non-Disclosure and Intellectual Property Rights Disclaimer* (Ex. "11"). Hunt then sought to have both Borders and Betancourt sign the agreement, which, again expressly disclaimed any ownership rights Borders and Betancourt had in the Software. *Depo. of T. Hunt* at 140:19–141:22 (Ex. "1"). Borders and Betancourt again refused to sign the disclaimer and agreement. *Depo. of T. Hunt* at 152:23–153:8 (Ex. "1").

Despite recognizing that its concerted and repeated efforts to convince Third-Party Defendants to disclaim their ownership rights in the Software were (and would continue to be) ineffectual, Maith proceeded to enter into an Asset Purchase Agreement with Hunt for the Software on May 24, 2024. *See May 24, 2024 Asset Purchase Agreement* (Ex. "8"). Critically, Maith ensured that the Asset Purchase Agreement contained an Anti-Sandbagging Clause and qualifying schedule to mitigate its risk related to Third-Party Defendants' claims of ownership rights in the Software.

*See May 24, 2024 Asset Purchase Agreement* at 15 (Ex. "8"); *Schedule 5.5(a) to the Asset Purchase Agreement* at MAITH_0000404 (Ex. "9"). Specifically, the "Anti-Sandbagging" provision and the accompanying Schedule 5.5(a) provided the following:

**Section 5.5. Anti-Sandbagging.** Notwithstanding anything contained herein to the contrary, the parties agree that:

(a) Except as set forth in **Schedule 5.5(a),** Seller will not be liable for indemnification for direct claims by Buyer against Seller or claims by Seaharbor or its Affiliates if Michael J. McClure or Buyer's attorneys, Momkus LLP, had actual knowledge of the inaccuracy, breach, act, omission, non-performance, non-compliance, or any other matter that, directly or indirectly, gave rise to Seller's indemnification obligation; and

(b) Buyer will not be liable for indemnification for direct claims by Seller against Buyer if Timothy Craig Hunt or Seller's attorneys, Starr Law Firm, P.C., had actual knowledge of the inaccuracy, breach, act, omission, non-performance, non-compliance, or any other matter that, directly or indirectly, gave rise to Buyer's indemnification obligation;

provided, however, that nothing in this Section 5.5 shall preclude Buyer or Seller from seeking indemnification for third-party claims, other than claims by Seaharbor or its Affiliates as provided in Section 5.5(a)..

*May 24, 2024 Asset Purchase Agreement* at 15 (Ex. "8");

**<u>Schedule 5.5(a)</u>**

**Anti-Sandbagging Exceptions**

(i) Claims asserted by Brian Borders alleging any interest or ownership in or to the Acquired Assets.

(ii) Claims asserted by Ivan Betancourt alleging any interest or ownership in or to the Acquired Assets.

*Schedule 5.5(a) to the Asset Purchase Agreement* at MAITH_0000404 (Ex. "9").

In his March 3, 2025, deposition, Maith's corporate representative, John Killacky all but admitted that Maith had acute knowledge of an ownership dispute as to the Software and plotted

to circumvent the issue in the event that Third-Party Defendants were the rightful owners of the Software:

Q. Was Mr. Borders' and Mr. Betancourt's refusal to sign the disclaimer and assignment of rights in the software something that raised a red flag for Maith at that time?
A. No. Again, I already testified that their refusal to sign the disclaimer just meant we had to deal with the anti-sandbagging issue in another way.
Q. Okay. And is that – was that issue dealt with in Section 5.5 in the accompanying schedule of the Asset Purchase Agreement?
A. Yes.
. . .
Q. (By Mr. Weltge) And if Maith knew that Mr. Borders might have some claim or might assert some claim or might think that his ownership rights in the software, then that's – then it would be important to have Schedule 5.5(a) included in the Asset Purchase Agreement, wouldn't it?
A. Maith had a set of facts that we've talked about in front of us. Maith was negotiating an Asset Purchase Agreement. Maith's knowledge of those facts without modification to the anti-sandbagging provision potentially precluded it from pursuing indemnification against Mr. Hunt if Mr. Borders or Mr. Betancourt did decide to pursue a claim. Maith was not going to get caught in a situation where it agreed to a provision that would prohibit it from exercising its rights based on the facts that were known to it.

*Depo. of Maith's Corp. Rep. J. Killacky* at 90:18–91:3, 96:9–24 (Ex. "5").

Notwithstanding Third-Party Defendants' repeated rejection of Maith's attempts to have them disclaim their ownership rights in the Software, and notwithstanding Maith's calculated decision to ensure it could target Hunt for indemnification related to Borders and Betancourt's ownership rights in the Software through inserting Schedule 5.5(a) to the Asset Purchase Agreement, Maith applied for and obtained a copyright registration for *exclusive* rights to the Software as a "work made for hire" on July 3, 2024. *See* ECF No. 3-1 ("Certificate of Registration"). Maith's awareness of a dispute as to ownership in the Software at that time, however, is certifiably undeniable. Because Maith willfully misstated or failed to state a fact that, if known, might have caused the Copyright Office to reject the copyright application—namely, that the Software was *not* a "work made for hire" and *not* authored by Hunt—Maith's copyright

registration to the Software is necessarily invalid. Accordingly, Plaintiffs are entitled to judgment as a matter of law on their claim for the invalidation of Maith's copyright in the Software.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request and pray that upon determination of this Motion, the Court enter summary judgment in favor of Plaintiffs as follows:

A. A declaratory judgment that Maith retains only non-exclusive rights, if any, to the Software, and that Maith's alleged exclusive ownership rights to the Software are unenforceable as a matter of law;

B. That Maith take nothing on its Counterclaim for Copyright Infringement;

C. That Plaintiffs receive an order invalidating Maith's purported copyright with an award of attorneys' fees pursuant to 17 U.S.C. § 505 in an amount to be determined at a later date;

D. For pre-judgment interest, attorney's fees and costs after resolution of a motion under Fed. R. Civ. P. 54; and

E. For such other and further relief to which Plaintiffs and Third-Party Defendants may show themselves justly entitled.

Respectfully submitted,

**KESSLER COLLINS, P.C.**

*<u>/s/ Gary S. Kessler</u>*
GARY S. KESSLER
State Bar No. 11358200
gkessler@kesslercollins.com
SAMUEL C. KESSLER
State Bar No. 24118431
skessler@kesslercollins.com
EVAN W. WELTGE
State Bar No. 24110523
eweltge@kesslercollins.com

500 N. Akard St., Suite 3700
Dallas, Texas 75201
214-379-0722 Telephone
214-373-4714 Telecopier

**ATTORNEYS FOR PLAINTIFFS ACACIA INSURANCE MANAGERS, LLC AND EDGEPOINT SYSTEMS, LLC, AND THIRD-PARTY DEFENDANTS BRIAN BORDERS AND IVAN BETANCOURT**

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 16, 2026, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Gary S. Kessler*
GARY S. KESSLER