**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | § | |
| *Plaintiffs/Counter-Defendants*, | § | |
| v. | § | |
| MAITH SOLUTIONS LLC, | § | Civil Action No: 4:24-cv-00620-SDJ |
| *Defendant/Counter-Plaintiff/Third-Party Plaintiff*, | § | |
| v. | § | |
| BRIAN BORDERS and IVAN BETANCOURT | § | |
| *Third-Party Defendants*. | § | |

**PLAINTIFFS ACACIA INSURANCE MANAGERS, LLC, EDGEPOINT SYSTEMS, LLC, AND THIRD-PARTY DEFENDANTS BRIAN BORDERS AND IVAN BETANCOURT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 2

Deposition of Brian Borders (Excerpts)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC, and EDGEPOINT SYSTEMS, LLC, | § | |
| Plaintiff/Counter-Defendants, | § | CIVIL NO. |
| VS. | § | 4:24-cv-00620SDJ |
| MAITH SOLUTIONS LLC, | § | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | § | |
| Vs. | § | |
| BRIAN BORDERS and IVAN BETANCOURT, | § | |
| Third-Party Defendants, | § | |

*******************************************

ORAL DEPOSITION OF

BRIAN BORDERS

FEBRUARY 25, 2025

*******************************************

Job no: 10279

The Oral Deposition of BRIAN BORDERS, produced as a witness at the instance of the plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on FEBRUARY 25, 2025, from 9:52 a.m. to 2:15 p.m., before Nicole A. Hatler, CSR No. 11275 in and for the State of Texas, reported by machine shorthand, At the offices of Kessler Collins, P.C., 500 N. Akard Street, Suite 3700, Dallas, Texas 75201, pursuant to the Texas Rules of Civil Procedure.

---oOo---

APPEARANCES ALL REMOTELY VIA ZOOM

For the Plaintiff/Counter-Defendant:

GARY S. KESSLER
SAM KESSLER
EVAN WELTGE
Kessler Collins, P.C.
500 N. Akard Street, Suite 3700
Dallas, TX 75201
(214) 379-0722
gsk@kesslercollins.com
SKessler@kesslercollins.com
Eweltge@kesslercollins.com

For the Defendant/Counter-Plaintiff:

JOHN G. BISBIKIS
Prospect Law LLP
120 North LaSalle Street, Suite 2000
Chicago, Ill 60602
(312) 374-8084
jbisbikis@prospectlaw.com

Also present:

John Killacay

# INDEX

PAGE

Appearances....................................2

WITNESS:

BRIAN BORDERS

Examination by MR. BISBIKIS................6

Signature and Changes..........................170

Reporter's Certificate.........................172

E X H I B I T S

PAGE

DEFENDANT/COUNTER-PLAINTIFF
Exhibit 1 Bates MAITH_0046201 to '04..........37
Exhibit 2 Bates MAITH_0046184 to '85..........39
Exhibit 3 Bates MAITH_0046180 to '81..........43
Exhibit 4 Bates MAITH_0000448 to '53..........48
Exhibit 5 Bates MAITH_0046223 to '24..........50
Exhibit 6 Bates MAITH_0046210.................55
Exhibit 7 Bates MAITH_0046208.................56
Exhibit 8 Bates MAITH_0000485.................58
Exhibit 9 Bates MAITH_0046149.................60
Exhibit 10 Bates MAITH_0046117.................60
Exhibit 11 Bates MAITH_0046222.................63
Exhibit 12 Brian Borders declaration...........77
Exhibit 13 Bates EDWARDS_0000219 to '21........102
Exhibit 14 Bates Borders_000019 to '28.........108
Exhibit 15 Bates Betancourt_000021 to '24......110
Exhibit 16 Bates EDWARDS_0000237 to '38........113
Exhibit 17 Bates Acacia_000457.................117
Exhibit 18 Bates Acacia_000465 to '66..........122
Exhibit 19 Bates Betancourt_000009 to '11......124
Exhibit 20 Bates Betancourt_000132 to '35......125
Exhibit 21 Bates Acacia_000447 to '48..........137
Exhibit 22 Bates Betancourt_000140.............139

# E X H I B I T S

PAGE

DEFENDANT/COUNTER-PLAINTIFF

Exhibit 23 Bates Betancourt_000109 to '10.....145

Exhibit 24 Bates Betancourt_000123 to '31.....150

Exhibit 25 Bates Borders_000157...............153

Exhibit 26 Bates Betancourt_000111............156

BRIAN BORDERS
sworn as a witness
testified as follows:

THE REPORTER: Good morning. My name is Nicole Hatler, Texas Certified Shorthand Reporter No. 11275. This deposition will be stenographically reported pursuant to the rules governing depositions in the State of Texas.

Q. EXAMINATION BY MR. BISBIKIS: Good morning, Mr. Borders. Can you tell me, have you ever been deposed before?
A. No.
Q. Never been deposed?
A. No.
Q. All right. So I'll just kind of give -- I'm you probably had some discussions with your lawyers about the rules, but I'll -- I'll kind -- I, kind of, tell you the rules here.
I'm going to ask you a series of questions, and you just can answer, you know, whatever question I ask. If you don understand something I say, please let me know. We'll clarify it. And if you need to take a break, let us know. We'll take a break whenever you need to.
Okay?

2099 -- I'm sorry -- in 2005 as a 1099 self-employed person; is that right?
A. Kind of. My paychecks in 2005 showed withholding. It was not paid to the IRS. And part of the IRS settlement, he wanted to convert some of us to self-employed contractors.
Q. Okay. So at some point in 2005, you were an employee, but at some later point, you became a 1099?
A. Cleaning out the 2005 tax year, yes.
Q. Yeah. Okay. And when that happened, did your job responsibilities change?
A. A little bit, yes, the roles changed. I was -- mainly worked from home.
Q. In 2005, you worked from home?
A. Yes. Partly. I don't -- I'd have to go back through all the documents to get an exact.
Q. What documents would help you with that?
A. 2005, I just don't remember clearly.
Q. So did you work exclusively from home at that time?
A. Exclusively, no. I would go into his office, occasionally. I don't remember when he sold his office either.
Q. Okay. So in 2005 --
A. There was no office.

Q. I'm sorry?
A. Then there was no office to go to, ever. But I don't remember what year that was.
Q. But in terms of your job responsibilities, did those change just because you were converted from a W-2 to a 1099?
A. No, not immediately. It would just change over time.
Q. Okay. And as part of the normal course of business, your responsibilities changed?
A. It was always IT-related in the different aspects of that, but, yes, the IT demands did change over time.
Q. Okay. All right. Did you have any agreement with Tim Hunt as a -- as a contractor?
MR. WELTGE: Objection. Vague.
THE WITNESS: Nothing written or defined.
Q. BY MR. BISBIKIS: Did you -- in 2004, so prior to the conversion, were you -- were you paid salary?
A. No.
Q. You were paid hourly?
A. Yes.
Q. Okay. And how frequently were -- were you paid, do you remember?
A. No, I don't.

Q. But would it have been regular intervals, like, biweekly or monthly, something like that?
A. Yes. Something like that, yes.
Q. Okay. But it would have been regular payments?
A. Yes.
Q. Okay. And after the conversion, were you still paid hourly?
A. Yes.
Q. Okay. And at some point between 2005 and 2024, did you become salary?
A. No. He switched from hourly billing to just a flat rate.
Q. A flat rate?
A. Uh-huh.
Q. So you would pay -- you were paid flat rate salary for -- on a monthly basis or bimonthly basis?
A. Yes, bimonthly.
Q. Okay. And -- and after the conversion to, you know, the 1090 status, Hunt paid you, personally, right?
A. Yes.
Q. He didn't pay -- you have -- you have a company called TDB Technologies --
A. Yes, sir.
Q. -- is that right?
A. Yes. I founded that.

Q. When did you file that?
When did you start that company?
A. Because I wanted to build software that wasn't DOS based, and I had a project or two I wanted to build using the latest Microsoft technologies.
Q. Okay. And that was outside of the work you did for Tim?
A. Correct.
Q. Okay. Outside of your day job for Tim Hunt?
A. I would do some of it during the day, yes. I would do both during the day.
Q. It -- can you clarify that?
A. I would work on my own software and other clients, as well, during the day.
Q. Okay. And what other clients did you have?
A. Impact Finance was one.
Q. What did you do for them?
A. At first, originally, I created document management system for them so they could -- office could go paperless.
Q. Okay.
A. That's where I originally started out with.
Q. And when did you do that?
A. That would have been 2008 when I started it. At the end of 2008 is when I formed TDB Technologies.

So I think it was effective January 1st, 2009.
Q. So you worked for -- I'm just a little confused.
So when did you work for Impact clients?
A. Impact was a customer of TDB Technologies.
Q. Okay. And when did you work for them?
You started in 2008.
A. I started developing the software in 2008, and I believe they started using it in 2009.
Q. And do they still use it to this day?
Is that still a --
A. They closed last summer.
Q. Oh, last summer okay.
A. I'm still maintaining it for them to access.
Q. Okay. And they paid TDB Technologies?
A. Yes, sir.
Q. Okay. Any other software projects you have through TDB Technologies?
A. Yes. I have done other consulting and programming work, yes, over the years for various people.
Q. Okay. And did Tim Hunt know that you were working with Impact?
And I forget, is it Impact Finance?
A. Impact Finance Corporation.

A. Uh-huh.
Q. -- so, essentially, he would reimburse or purchase or repurchase it retail?
A. I would invoice him.
Q. But the 109 -- the 1099s, for what -- your salary was always paid to you, personally, right?
A. Yes.
Q. Okay. And you had, you know -- after 2005, after the conversion, again, you didn't have any contract with Tim concerning your employment, did you?
A. Any kind of what?
Q. Any contract with --
A. Contract, no.
Q. Okay. So you could have fired you at any time?
A. He would terminate a contract, wouldn't he?
Q. Could he have fired you as -- just like he would have fired an employee?
A. I think so.
Q. Okay. I mean, you had no contract saying --
A. No. No. Written term length, no.
Q. So he would have been -- and you didn't have any contractual obligations with him outlining --
A. No.
Q. -- what you would do?
A. No.

work while -- while you worked for Tim?
A. When I was hourly, no.
Q. Okay. How about when you were salary?
A. There was no accounting. It would -- some weeks, I would work more than others. There was no -- and it was a fixed fee. So I never took -- I didn't ever take vacations, really. It was just the hours I had available to work varied week to week.
Q. You never took any days off when you -- while you worked for Tim?
A. Yes. There were a couple days I did not work. Yes.
Q. And did you get docked for those -- those days on your paychecks?
A. No. It was a fixed fee, and the hours were worked other days.
Q. What do you mean fixed fee?
A. He paid the same amount no matter how many hours I worked. When there were projects that required more hours, I would put in more hours, and there was no extra pay based on that.
Q. Okay. And over time, did you get raises?
And I'm talking about the time period after 2005.
A. Yes.

space at that time, at all.

Q. In 2011. Okay. How long did it take you to write that code?

A. I believe it would have been 2010, not 2011.

Q. Okay. 2010. Yeah.

And did it go live in 2011 for Tim's business?

A. I don't remember.

Q. At some point, it went live for Tim's business?

A. Correct.

Q. Okay. And was Tim involved with the launch of that?

A. No.

Q. He didn't help you test it?

A. No.

Q. He didn't look at any results to see if it worked right?

A. No, not that I'm aware of. He never talked to me about any of that.

Q. Did you -- where did you write the code?

Where -- where was the code stored?

A. My house.

Q. At your house.

And code that you wrote was stored there, on what -- what computer?

A. On my own personal computer.
Q. Okay. And anywhere else?
Was it stored anywhere else?
A. There would have been copies on my -- like, my laptop, John's laptop, and then at some point there was -- code was also placed on computers of Tim and his servers, a copy of it. But the main service code repository remained at my house.
Q. Why did you put it on Tim's computer?
A. To be able to access current client data for troubleshooting.
Q. So you --
A. For debunking purposes.
Q. And that client data was part of Tim's business, correct?
A. Yes.
Q. That wasn't part of your business?
A. No.
Q. So you used Tim's business to test the software?
Let me -- let me. I'll scratch that.
You used Tim's business information to test your software?
A. We were working with Tim's clients to tailor the software for them.

Q. Okay.
A. Yes.
Q. So you -- you mentioned you had a laptop, and you also had a PC at home?
A. Multiple PCs, yes.
Q. Okay. Well, the PC that that information was stored on?
A. Uh-huh.
Q. Okay. So was that one that you owned?
A. Yes.
Q. Had Tim paid for that?
A. No.
Q. Okay. How about your laptop?
A. No.
Q. How about the -- the computers, when you stored it on Tim's -- you said you -- you got copies on Tim's computers. What computers were those?
A. He had some computers in an extra building at his house. This is where he ran his client's software.
Q. Okay. And how is it that you had access to those?
A. Remote log in.
Q. Through -- was that through what you call a virtual machine?
A. It -- later, yes. I don't remember if -- when

we transitioned from physical machines to virtual machines.

Q. Okay. But at one point, you did work on virtual machines?

A. Yes. We used virtual machines. Yes.

Q. Okay.

A. We use them at home and on our own personal laptops, too.

Q. So you could use your personal laptop to log into a virtual machine through Tim's computer?

A. Yes, I could do that.

Q. Okay. And is that how you worked primarily when you worked for Tim's business?

A. During the creation, no. Later, when it was mainly, you know, client request, more, yes, because we needed access to the actual client data --

Q. Okay.

A. -- to develop the features.

Q. All right. When you -- when you -- when you develop the -- the code in 2010 or 2011, did you look at the existing code?

A. Very little because it was a different programming language. It cannot be chosen.

Q. Did the -- did the 2010 code have the same functions as the 2004 code?

A. CTO usually stands for chief technical officer.
Q. Chief technical officer.
A. Is that right?
Q. Okay. And you're listed as software development?
A. Yes.
Q. Did you report to John Edwards?
A. No.
Q. No.
Who did you report to?
A. We, more or less, collaborated together. We were more or less peers.
Q. Okay. Did -- did John have more experience than you in -- in computer program?
A. Yes.
Q. And what -- did you have different responsibilities or did you all share the --
A. We -- we shared and divided it up.
Q. When you say "shared and divided it up," what did you share and divide up?
A. The tasks, the coding tasks.
Q. For the -- the -- for the Insuror-Atlas --
A. Yes.
Q. -- software?
A. Yes.

Q. And what about other tasks for Insuror-Atlas?
A. Like, could I get an example?
Q. Yeah. Servicing clients.
A. Yes. Yes.
Q. And at one point, were you -- did you become more assigned to service Acacia?
A. Yes.
Q. And did John become more assigned to service Sea Harbor?
A. Yes.
Q. And so, when you service the clients, what were the types of things you would do for Acacia?
A. There would be, as you mentioned, rate changes, reports, customer reports integrate with vendors.
Q. And what -- what type -- whose vendors?
A. Acacia's vendors.
Q. Okay. And that was part of the work that you did for Insuror-Atlas?
A. Yes.
Q. Okay. For Tim's client.
And that was Tim's client, right?
A. Yes.
Q. And John would do similar types of things for Sea Harbor?
A. Yes.

Insuror-Atlas?
A. Yes.
Q. Okay. And what's this -- what do you mean by systems administrator?
A. I kept the servers and system -- the servers that ran the Insuror-Atlas software online and --
Q. Okay. And you did that at Insuror-Atlas --
A. Yes.
Q. -- as part of your full-time job for them?
A. Yes. I did that at Insuror-Atlas. Yes.
Q. And was it part of a full-time job with Tim?
A. It was as an independent contractor.
Q. Was it full-time?
A. What's the definition of full-time?
Q. Well, did you work --
A. I mean, yes.
Q. Did you work full-time for Tim?
A. Yes.
Q. Okay. Did you have business cards for any of Tim's businesses?
A. Yes.
Q. Do you know which businesses you had business cards for?
A. I know there was an Insuror-Atlas business card and then a Paladin business card.

A. Yes.
Q. And so, you were paid $36,777 from them that year?
A. 36,777, yes.
Q. Yeah. Sorry. I got to get some better glasses.
So that was the year that the transition -- is that the year the -- Tim started paying you from a different company that year in 2015?
A. I got different 1099s starting that year.
Q. Okay.
A. Checks would be, typically, Seguros Direct. If they paid via ACH, it would come from Pearl.
Q. I see. Okay. Let's run through just a few more. 26 -- this next document ends at Borders 141 for 2016.
A. Uh-huh.
Q. And what's the amount that you were paid that year?
A. 48,375.
Q. Okay. Next document is Borders 142. And that's for 2017. And how much were you paid that year?
A. 53,670.
Q. All right. Is it -- you know, I can skip through these real quick.