**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC,<br><br>*Plaintiffs/Counter-Defendants*,<br><br>v.<br><br>MAITH SOLUTIONS LLC,<br><br>*Defendant/Counter-Plaintiff/Third-Party Plaintiff*,<br><br>v.<br><br>BRIAN BORDERS and IVAN BETANCOURT<br><br>*Third-Party Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No: 4:24-cv-00620-SDJ |

**PLAINTIFFS ACACIA INSURANCE MANAGERS, LLC, EDGEPOINT SYSTEMS, LLC, AND THIRD-PARTY DEFENDANTS BRIAN BORDERS AND IVAN BETANCOURT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 4

Deposition of John Edwards (Excerpts)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DIVISION OF TEXAS
SHERMAN DIVISION

ACACIA INSURANCE MANAGERS, )
LLC and EDGEPOINT SYSTEMS, )
LLC, )
Plf/Counter-Defs, )
)
V. )
)
MAITH SOLUTIONS, LLC, ) CIVIL ACTION NO.
Dft/Counter-plf/TP Plf, ) 4:24-cv-00620SDJ
)
V. )
)
BRIAN BORDERS and IVAN )
BETANCOURT, )
Third-Party Dfts. )

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

JOHN EDWARDS

WEDNESDAY, FEBRUARY 26, 2025

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF JOHN EDWARDS, produced as a witness at the instance of the Plaintiffs/Counter-Defendants, and duly sworn, was taken in the above-styled and -numbered cause on the 26th day of February, 2025, from 9:34 p.m. to 1:04 p.m., before Natasha Duckworth, a CSR in and for the State of Texas, reported by machine shorthand at the offices of Haynes and Boone, LLP, 2801 N. Harwood Street, Suite 2300, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS/COUNTER-DEFENDANTS:

MR. GARY S. KESSLER
MR. SAM KESSLER
MR. EVAN WELTGE
KESSLER COLLINS, P.C.
500 N. Akard Street
Suite 3700
Dallas, Texas 75201
Telephone: 214.379.0722
Facsimile: 214.373.4714
E-mail: Gkessler@kesslercollin.com

FOR THE DEFENDANT/COUNTER-PLAINTIFF:

MR. JOHN G. BISBIKIS
PROSPECT LAW, LLP
120 N. LaSalle
Suite 2000
Chicago, Illinois 60602
Telephone: 312.374.8084
Facsimile:
E-mail: Jbisbikis@prospectlaw.com

ALSO PRESENT:

Kevin Dill, video technician
John Killacky
Ivan Betancourt
Brian Borders

I N D E X


| PROCEEDINGS | PAGE |
|---|---|
| Appearances | 2 |
| JOHN EDWARDS | |
| Examination by Mr. Kessler | 7 |
| Signature and Changes | 113 |
| Reporter's Certificate | 116 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Second Amended Notice | 11 |
| Exhibit 2 | Non-Party John Edwards' First Amended Objections and Responses to Subpoena to Produce Documents | 49 |
| Exhibit 3 | Offer Letter Agreement | 54 |
| Exhibit 4 | Emails (Edwards 160-172) | 55 |
| Exhibit 5 | 8/26/13 email from Tom Edwards to Tim Hunt | 56 |
| Exhibit 6 | 5/24/11 email from John Edwards to Tom | 62 |
| Exhibit 7 | 6/3/09 email from Brian Border to John Edwards | 63 |
| Exhibit 8 | Copies of checks to Ivan Betancourt and Brian Borders | 64 |
| Exhibit 9 | 1099s to John Edwards from 2006- 2023. | 66 |
| Exhibit 10 | 1/23/24 email from Brian Borders to John Edwards | 68 |
| Exhibit 11 | 12/13/23 email from John Edwards to Ivan Betancourt | 70 |

EXHIBITS cont.

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | Letter from John Edwards to Ivan regarding employment.................. | 71 |
| Exhibit 13 | 1/9/24 email from John Edwards to Brian Borders......................... | 72 |
| Exhibit 14 | Letter from Conley Rose to John Edwards.............................. | 75 |
| Exhibit 15 | 2/8/24 email from Mr. McClure to John Edwards.............................. | 79 |
| Exhibit 16 | 2/8/24 email from Mr. Warden to Ivan and Brian............................ | 83 |
| Exhibit 17 | 2/8/24 email to Mr. Warden to Ivan and Brian re employment contract questions | 88 |
| Exhibit 18 | 2/9/24 email from John Edwards to Ivan and Brian............................ | 90 |
| Exhibit 19 | 2/9/24 email from Mr. Warden to John, Ivan, and Brian...................... | 91 |
| Exhibit 20 | 2/21/24 email from Mr. Warden to John, Ivan, and Brian...................... | 94 |
| Exhibit 21 | 2/26/24 email from John Edwards to Mr. Warden, Ivan and Brian............ | 97 |
| Exhibit 22 | 2/26/24 Email from Mr. Warden to John, Ivan and Brian....................... | 99 |
| Exhibit 23 | 4/10/24 email from Mr. McClure to John Edwards.............................. | 101 |
| Exhibit 24 | 4/11/24 email from Mr. Edwards to Mr. Warden, Ivan, and Brian.............. | 103 |
| Exhibit 25 | 4/17/24 email from Mr. Warden to John, Ivan and Brian....................... | 104 |
| Exhibit 26 | 4/29/24 email from Mr. McClure to John Edwards.............................. | 106 |

EXHIBITS cont.



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 27 | 3/1/24 email from Brian Borders to Clinton Grumbles...................... | 106 |
| Exhibit 28 | July 1, 2024 cease and desist letter.. | 108 |

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record. Today is February 26, 2025. The time is now 9:34 a.m. in the Central time zone.

And now the counsel will please state their appearance for the record after which the court reporter will swear in the witness.

MR. KESSLER: Gary Kessler, Sam Kessler, Evan Weltge for Acacia Insurance Managers, Edgepoint Systems, Brian Borders, and Ivan Betancourt.

MR. BISBIKIS: And John Bisbikis from Prospect Law for Maith Solutions and with me is John Killacky.

(The witness was sworn by court reporter.)

JOHN EDWARDS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. KESSLER:

Q. Mr. Edwards, would you state your full name for the record?

A. John Anthony Edwards.

Q. And what's your residence address?

A. 1617 Marty Drive, Royse City, Texas 75189.

Q. And how are you presently employed?

A. I'm employed by Maith Solutions.

1099.

A. I was self-employed. I was never an independent contractor.

Q. Okay. So you were self-employed?

A. Was -- was what I was being told, yes.

Q. When did that happen? When did you --

A. About 2005, 2006.

Q. And why did that happen?

A. The reason I was gave -- the reason I was given was because Tim no longer wanted to have employees.

Q. And do you know why he didn't want to have employees?

A. I do.

Q. Why?

A. Because an accountant in his department -- in his company forgot or refused to pay the IRS and was fined a half-million dollars.

Q. The employee was fined?

A. No. Tim was fined.

Q. He was fined $500,000 by the IRS?

A. That is my understanding, yes.

Q. Because he wasn't paying the payroll taxes?

A. That is correct.

Q. And so in 2005 as a result of his failure to pay payroll taxes, he decided he didn't want that

responsibility and he would put it on the employees to pay their own payroll taxes basically by self-employment tax. Correct?
A. Correct.
Q. And so from 2005 up through 2024, you were a 1099 self-employed person writing code for Seguros Direct. Is that true?
A. That is true.
Q. And from 2005 up through 2024, you reported the monies that you were paid by Seguros Direct on your income taxes as basically self-employment income. Correct?
A. Yes, but 2015 it went to Pearl General Agency was the 1099.
Q. Okay.
A. Not Seguros Direct, just to keep the record clear.
Q. No, I appreciate that. Thank you. Okay. So from 2005 for next ten years, you were a self-employed software developer for Seguros Direct. Correct?
A. I was a 1099ed person, yes.
Q. Okay. And then in 2015, you became a self-employed person for Pearl Insurance Agency?
A. General Agency.
Q. Pearl General Agency. Why did you change from

the Insuror Atlas software in 2017?
A. Timothy Hunt.
Q. Personally?
A. Yes.
Q. And you believe Timothy Hunt owned the Insuror Atlas software in 2000?
A. I don't think it existed in 2000.
Q. The prior version.
A. Yes, DataFlex, definitely. Yes, sir.
Q. All right. So I think you mentioned that in 2010 the decision was made to go from Visual DataFlex to VB as far as the software that would run the insurance programs. Correct?
A. Yes, sir.
Q. Okay. Who participated in making the decision to go to VB in 2010?
A. Brian and I did.
Q. And why did you and Brian decide to go to VB or go to VB from Visual DataFlex?
A. Because Visual DataFlex wasn't capable of doing what we needed it to do.
Q. All right. Explain to me what the limitations were and what you needed the program to do.
A. Visual DataFlex was a database programming language. It required a specific database to make it

A. That's correct, yes, sir.
Q. And you continued to pay self-employment tax on each of those tax returns from 2010 up through 2024. Correct?
A. Yes, sir.
Q. From 2010 to 2024, did Seguros Direct pay you any employee benefits like medical insurance?
A. No, but they did pay for vacation.
Q. Okay.
A. They also paid for time off.
Q. Okay. Thank you for volunteering that. I appreciate that. Did they pay you for any -- did they provide any type of dental insurance?
A. No, sir.
Q. Did they provide any type of disability insurance?
A. No, sir.
Q. You said you were paid for vacation time. How many weeks?
A. It -- at that time, I worked for Mr. Hunt for 10, 15 years. I got pretty much three or four weeks if I needed it.
Q. Okay. Did you take three or four weeks?
A. No, sir.
Q. And Mr. Hunt did not write any of the software

code at any time from 2010 through 2024 that was involved with the VB software program, did he?

A. No, sir.

Q. When did Mr. Orosco start working on the code?

A. Sometime in 2010.

Q. And how long did he work on the code?

A. I don't know.

Q. When did Mr. Betancourt become associated with Seguros Direct?

A. About 2015.

Q. And when Mr. Betancourt became associated with Seguros Direct, he, like you, wrote code for the enhancement or maintenance of the software. Correct?

A. No, sir.

Q. What did he do?

A. He was originally with CSR in underwriting for Pearl General.

Q. So he didn't work for Seguros Direct?

A. No. By your statement earlier, Seguros Direct had already been -- was already nonexistent so he couldn't have worked for them.

Q. Well, who were you working for at the time? Pearl?

A. Pearl.

Q. Okay. Did he -- when did he -- when did

Q. Okay. So where you could, you would move some of the code from the Visual DataFlex into the new program.
A. That's actually the way I did it. I copied the code over. And as it needed to enhance it up, we changed it back to straight VB as it went.
Q. What portion of -- well, let me ask you this: You started in 2010 to transition to the VB. How long did it take from 2010 until you actually completed the transformation of the software?
A. I can't remember. Six, nine months.
Q. So while you and Mr. Borders were working on transitioning to the VB, you continued I would assume to use the Visual DataFlex until your program was operational. Correct?
A. That makes sense, yes, sir.
Q. Okay. In the six to nine months where you and Mr. Borders were writing the code for the VB software, describe for me how that was done, how you interacted with Mr. Borders and how you decided who was going to write what portions of the code. Do you understand the question?
A. I don't know if there really is a way -- we sat basically across the table from each other, and we just picked sections and ran with it. I mean, Brian decided

he wanted to do the printing so he took over the printing side. I worked on the rater and the policy, and as we came together, it just all came together.

Q. Okay. And so you were free to choose as between the two of you who was going to do what portion of the software writing. Correct?

A. Correct.

Q. Okay. And no one -- for instance, Mr. Hunt didn't tell you what to do or how to do it. You used your skill set to write that software. Correct?

A. He advised on different parts, but yes.

Q. So Mr. Hunt may have said I'd like it to do this and then you would figure out from a software standpoint how to write it so it would do what Mr. Hunt wanted. Correct?

A. Or how it looked, yes, sir.

Q. But he didn't tell you how to do that. You did that because of your skill set that you had. Correct?

A. Yes, sir, using his knowledge.

Q. And Mr. Borders did the same thing, to your knowledge?

A. To my knowledge, that's correct.

Q. So after nine months approximately in 2010, at some point you determined that there was -- you were complete in the transformation from Visual DataFlex to

A. 2015.
Q. And why that is?
A. Because I basically handled all the information. I basically took care of most of Pearl's, Paladin's stuff.
Q. Okay.
(Exhibit 7 marked.)
Q. (BY MR. KESSLER) The reporter has just handed you what's been marked as Exhibit Number 7. This is an email from you to Brian and Mr. Orosco. And at the top is Brian's response back to you. It says, "Can you please get your time sheets ready?"
What's he referring to here? What are time sheets?
A. Basically it was them clocking in and out for the office, coming into the office.
Q. Well, what -- if that's all it was, clocking in and out, why would he have to get a time sheet ready? I thought it would be automatic.
A. Because at that time both Brian and Mr. Orosco were paid by the hour. They were paid by when they came in and when they left.
Q. Okay. And were you paid the same way at that time?
A. No.

Q. How were you paid?
A. I was paid via salary.
Q. Always.
A. Always at that time. I went salary in early 2000s and was that way ever since.
Q. When you say early 2000s, what approximately?
A. 2001, 2002, somewhere in there.
Q. Okay. And your salary was just set regardless of -- you were paid the same regardless of the number of hours you worked.
A. Correct.
Q. And when did Mr. Borders move from hourly to --
A. I can't remember.
Q. -- a fixed payment?
A. I can't remember.
Q. But he did at some point. Correct?
A. He did move to a salary payment, yes.
(Exhibit 8 marked.)
Q. (BY MR. KESSLER) The court reporter's handed you what's been marked as Exhibit 8. These are documents that were produced by Maith in this case. Is this the same format of the checks that -- in other words, would your checks have been in a similar format to this?
A. Yes.

Q. So if you go to the third page, which is Bates-numbered -- the little number on the bottom, 21805. Do you see that? And the memo there says, "services provided - contract." Do you see that, $2,000?

A. Yep.

Q. Then the next page services provided - contract. Did your checks have similar notations?

A. I can't remember.

Q. And the services provided that were mentioned here would be the coding of the -- writing code and development of the Insuror Atlas software. Correct?

A. Not just that. It was also maintaining the customer service between issues that came up.

Q. So talking to clients.

A. It was their time from when they came into the office to when they left.

Q. Yeah. So that's what I want to talk to you about because part of -- part of maintaining the software was being able to be responsive to clients' needs and customize the software to produce what the clients wanted. Correct?

A. Correct.

Q. So it would not be inconsistent with your duties as a programmer to have to understand what the

Q. (BY MR. KESSLER) Okay. So if you look at the first page, this is a 1099 for 2006. And in box number 7, it shows nonemployee compensation. Correct?
A. Yes, sir.
Q. And it has presumably the amount you were paid. Correct?
A. I'm hoping so.
Q. And if you look at Box 4, it shows zero federal income tax withheld. Correct?
A. Correct.
Q. And in number 6, it shows that there were no medical or health care benefits paid to you. Right?
A. Yes, sir.
Q. Okay. And if we go through all of these years all the way up through 2023, all of the reported income figures are categorized as nonemployee compensation. Correct?
A. Yes, sir.
Q. And you agreed with that reporting, didn't you?
A. Yes, sir.
Q. Now, were you participating in the preparation of the 1099s?
A. Initially, no.
Q. And when did you begin participating in the preparation?