**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | § | |
| *Plaintiffs/Counter-Defendants*, | § | |
| v. | § | |
| MAITH SOLUTIONS LLC, | § | Civil Action No: 4:24-cv-00620-SDJ |
| *Defendant/Counter-Plaintiff/Third-Party Plaintiff*, | § | |
| v. | § | |
| BRIAN BORDERS and IVAN BETANCOURT | § | |
| *Third-Party Defendants*. | § | |

**PLAINTIFFS ACACIA INSURANCE MANAGERS, LLC, EDGEPOINT SYSTEMS, LLC, AND THIRD-PARTY DEFENDANTS BRIAN BORDERS AND IVAN BETANCOURT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 5

Deposition of Maith's Corporate Representative John Killacky (Excerpts)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DIVISION OF TEXAS
SHERMAN DIVISION

ACACIA INSURANCE MANAGERS, )
LLC and EDGEPOINT SYSTEMS, )
LLC, )
Plf/Counter-Defs, )
)
V. )
)
MAITH SOLUTIONS, LLC, ) CIVIL ACTION NO.
Dft/Counter-plf/TP Plf, ) 4:24-cv-00620SDJ
)
V. )
)
BRIAN BORDERS and IVAN )
BETANCOURT, )
Third-Party Dfts. )

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

30(b)(6) CORPORATE REPRESENTATIVE

OF MAITH SOLUTIONS, LLC

JOHN KILLACKY

MONDAY, MARCH 3, 2025

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF JOHN KILLACKY, produced as a witness at the instance of the Plaintiffs/Counter-Defendants, and duly sworn, was taken in the above-styled and -numbered cause on the 3rd day of March, 2025, from 1:13 p.m. to 4:40 p.m., before Natasha Duckworth, a CSR in and for the State of Texas, reported by machine shorthand at the offices of Haynes and Boone, LLP, 2801 N. Harwood Street, Suite 2300, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS/COUNTER-DEFENDANTS:

MR. GARY S. KESSLER
MR. SAM KESSLER
MR. EVAN WELTGE
KESSLER COLLINS, P.C.
500 N. Akard Street
Suite 3700
Dallas, Texas 75201
Telephone: 214.379.0722
Facsimile: 214.373.4714
E-mail: Eweltge@kesslercollin.com

FOR THE DEFENDANT/COUNTER-PLAINTIFF:

MR. JOHN G. BISBIKIS
PROSPECT LAW, LLP
120 N. LaSalle
Suite 2000
Chicago, Illinois 60602
Telephone: 312.374.8084
Facsimile:
E-mail: Jbisbikis@prospectlaw.com

ALSO PRESENT:

Kevin Dill, video technician

# I N D E X


| PROCEEDINGS | PAGE |
|---|---|
| Appearances........................................ | 2 |
| JOHN KILLACKY<br>Examination by Mr. Kessler.................... | 7 |
| Signature and Changes............................ | 128 |
| Reporter's Certificate........................... | 131 |


## EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of 30(b)(6) Corporate Rep Depo. | 7 |
| Exhibit 2 | 1/25/24 email from Mr. McClure to John Edwards............................... | 36 |
| Exhibit 3 | 2/1/24 email from John Edwards to Mr. McClure............................... | 37 |
| Exhibit 4 | 2/9/24 email from Brian Borders to Mr. McClure............................... | 38 |
| Exhibit 5 | 2/8/24 email from Mr. McClure to John Edwards............................... | 39 |
| Exhibit 6 | Employee Proprietary Information and Inventions Agreement.................. | 40 |
| Exhibit 7 | February 8, 2024 Offer Letter to Ivan Betancourt........................... | 45 |
| Exhibit 8 | February 8, 2024 Offer Letter to Brian Borders............................. | 47 |
| Exhibit 9 | 2/8/24 email to Mr. Warden to Ivan and Brian re employment contract questions | 48 |
| Exhibit 10 | 2/22/24 email from John Edwards to Mr. McClure............................... | 51 |

EXHIBITS cont.


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Proposed changes to offer letter...... | 52 |
| Exhibit 12 | April 10, 2024 Offer Letter Agreement to Brian Betancourt.................. | 57 |
| Exhibit 13 | April 10, 2024 Offer Letter Agreement to John Edwards...................... | 60 |
| Exhibit 14 | Employee Proprietary Information and Inventions Agreement.................. | 61 |
| Exhibit 15 | 4/14/24 email from Brian Borders to Mr. McClure.......................... | 63 |
| Exhibit 16 | 4/30/24 email from Ivan Betancourt to Mr. McClure.......................... | 70 |
| Exhibit 17 | 5/1/24 email from Brian Borders to Clinton Grumbles...................... | 72 |
| Exhibit 18 | Software Consulting Agreement......... | 82 |
| Exhibit 19 | 6/5/24 email from John Killacky to Mr. McClure.............................. | 85 |
| Exhibit 20 | Asset Purchase Agreement.............. | 87 |
| Exhibit 21 | Disclosure Schedules to Asset Purchase Agreement............................ | 93 |
| Exhibit 22 | June 1, 2023 Cease and Desist letter.. | 97 |
| Exhibit 23 | Maith's First Amended Counterclaim and Third-Party Complaint............. | 104 |
| Exhibit 24 | July 31, 2024 Notice of Breach and Demand for Indemnification letter..... | 105 |
| Exhibit 25 | September 17, 2024 letter from Vincent Allen to Mr. Bisbikis................. | 111 |

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record. Today is March 3rd, 2025, and the time is now 1:13 p.m. in the Central time zone.

And now the counsel will please state their appearances for the record after which the court reporter will swear in the witness.

MR. WELTGE: Evan Weltge for Acacia Insurance Managers, LLC; Edgepoint Systems, LLC, Brian Borders and Evan -- Ivan Betancourt, excuse me. I'm also with my colleagues Charmaine Becken and Caroline Rombolo.

MR. BISBIKIS: John Bisbikis on behalf of Maith Solutions.

And before we get started, I just want to say, you know, on the record, as we discussed earlier, we're providing a witness today subject to our objections and subject to our right to continue the deposition in the event -- to seek a protective order in the event we need. And that was the approach we agreed to with Gary on Friday and I discussed with you a little bit earlier this morning.

MR. WELTGE: That's correct.

(The witness was sworn by court reporter.)

JOHN KILLACKY,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. WELTGE:

Q. Good morning, Mr. Killacky.

A. Good morning.

Q. Mr. Killacky, you're a practicing attorney. Correct?

A. I am.

Q. All right. So can I not go through the deposition basics with you and give you that courtesy? Or would you prefer me to go through deposition basics with you?

A. You do not need to go through them.

Q. Okay.

A. I've given them a hundred, maybe 200 times myself.

Q. Very good. Thank you, sir. Mr. Killacky, do you understand that you here to testify as the corporate representative for Maith Solutions, LLC?

A. Yes.

Q. Okay. Have you reviewed the topics that my client has forwarded to you and Maith's counsel related to the deposition of Maith's corporate representative?

A. Yes.

(Exhibit 1 marked.)

A. Correct.
Q. What are your responsibilities as chief operating officer at both?
A. I oversee all of our operations, including underwriting, claims, IT, customer service, policy services, human resources, work directly with the chief executive officer to execute our strategy.
Q. At both entities. Right?
A. Well, what I described for you mostly was the SeaHarbor aspect of chief operating officer. Maith is much more limited to just the IT portion.
Q. Okay. When you worked with the CEO to implement the strategy, is the CEO of SeaHarbor Mike McClure?
A. Yes, he is.
Q. Is the CEO of Maith Mike McClure?
A. Yes.
Q. Okay. And that's your current employment. Right? You haven't had any title changes or role changes at either in the last year?
A. That is my current employment, and I have not had any title changes or role changes in the past year.
Q. Okay. I want to go back to you briefly mentioning earlier that you met Mike McClure at Affirmative Insurance Holdings, Incorporated during your

time there between 2007 and 2012 or '13. What were the circumstances of your meeting Mr. McClure?

MR. BISBIKIS: Objection. This is beyond the scope. I certainly appreciate a little bit of background, but I don't know how much time we're going spend on things that are outside the scope of the deposition. So I'll object to the question as beyond the scope, but John can answer if he knows.

MR. WELTGE: Okay.

THE WITNESS: Mr. McClure initially joined as the vice president of financial planning and analysis. He then became the CFO of Affirmative and later the CEO of Affirmative. I worked with Mr. McClure not so much when he was financial planning analysis, but in my role as deputy general counsel I worked with Mr. McClure in his role as the CFO and as CEO.

Q. (BY MR. WELTGE) Okay. In your capacity now as general counsel and chief operating officer of Maith and SeaHarbor, are you working with Mr. McClure on a daily basis?

A. Yes.

Q. Okay. Turning to Maith Solutions specifically, can you give me an idea of the kind of entity Maith is and why it was formed?

A. Maith is a limited -- Texas Limited Liability

Company. It was formed for the purpose of acquiring the Insuror Atlas business, including the Insuror Atlas software.

Q. Is that its only purpose?

A. Define purpose.

Q. Well, you mentioned that Maith was formed for purpose of acquiring the software. So my question is is that the only purpose that Maith serves or served when it acquired the software in May of 2024?

A. Yeah. I guess on its charter, it was filed for any purpose under which it could legally conduct activities under the Texas Limited Liability Company Act. So in that respect, its purpose is as what was stated in its charter. Currently, Maith operates, owns the Insuror Atlas and services SeaHarbor currently.

Q. Okay. When was Maith formed, if you know?

A. I believe the papers were filed on February 5th of 2024.

Q. And I believe you testified that the president or CEO of Maith is Mike McClure?

A. Yes.

Q. How many officers does Maith Solutions have?

A. Just myself and Mr. McClure.

Q. Any other members who are not officers?

A. You mean members as in owners --

Q. Yes, sir.
A. -- in an LLC sense?
Q. Yes, sir.
A. No.
Q. Is Sea --
A. Let me clarify that, too. I am not a member of Maith Solutions. Mr. McClure is the 100 percent owner of Maith Solutions.
Q. Okay. Is SeaHarbor the only client that Maith has currently?
A. Yes.
Q. Is SeaHarbor the only client that Maith has ever had?
A. No.
Q. What other clients has Maith had in the time of its existence?
A. Acacia Insurance Managers.
Q. Okay. Does Maith have any employees?
A. No.
Q. What about independent contractors?
A. It has vendors. It has no individuals who are independent contractors if that's what you're asking.
Q. Okay. What kind of vendors does Maith have?
A. We have vendors that provide us with co-location for our servers, backup services, network

Q. Okay.
A. That's it.
Q. Did Mr. Hunt specifically represent to Mr. McClure that he -- let me back up.
I understand that it's your testimony that a contract from 2017 made it clear that Mr. Hunt owned the Insuror Atlas software. Correct?
A. The written contract made it clear that Seguros Direct owned the Insuror Atlas software.
Q. Yes. Thank you. To your knowledge, did Mr. Hunt have any conversations with Mr. McClure about ownership in the Insuror Atlas software and who had ownership rights in the software?
A. At the January 2024 due diligence call I testified about earlier, Mr. Hunt informed us that the seller in the deal would be him personally and not Seguros Direct. And we questioned him regarding the ownership of the software, and our concern at that point was ensuring that the Insuror Atlas software was owned by Mr. Hunt and not by Seguros Direct or any of his entities that he owned.
Q. Okay. But at no point was an issue raised that maybe Mr. Borders or Mr. Betancourt or Mr. Edwards had ownership rights?
A. Never.

Q. Throughout this period of negotiation and drafting of the Asset Purchase Agreement, was it Maith's understanding that if the Asset Purchase Agreement was signed by all parties involved, that it would have exclusive rights to the Insuror Atlas software?
A. Yes.
Q. Okay. I'll start going over some exhibits with you, Mr. Killacky.
(Exhibit 2 marked.)
Q. (BY MR. WELTGE) I will hand you now what's been marked as Exhibit Number 2. Mr. Killacky, I'll represent to you that I've just handed you a January 25th, 2024, email between Mr. McClure and Mr. John Edwards, Brian Borders, and Ivan Betancourt with the subject line entitled "Offer Letters." Do you see that, sir?
A. Yes.
Q. And you are not included on this email. Correct?
A. No.
Q. Were you aware of this email?
A. I was aware that offer letters were being prepared. I was not aware of this email.
Q. Okay. So as of January 25th of 2024, employment offers -- employment offer letters were being

prepared for Mr. Edwards, Mr. Borders, and Mr. Betancourt. Correct?
A. Yes.
Q. Were those employment letters and employment offers through SeaHarbor or Maith?
A. I believe at that time Maith had not been formed, so they were through SeaHarbor.
Q. Okay. So was it your understanding that these individuals would be receiving offer letters for employment with SeaHarbor?
A. Yes. I think ultimately we decided that the employment -- that SeaHarbor would be -- we were going to stand up another payroll entity and we were just going to assign the employees. So the offer letters were always coming from SeaHarbor.
Q. Okay. And as of this date, January 25th, did anyone at SeaHarbor have any concerns as to ownership rights in the Insuror Atlas software belonging to anyone apart from Mr. Hunt?
A. No.
(Exhibit 3 marked.)
Q. (BY MR. WELTGE) Okay. I'm handing you now, sir, what's been marked as Exhibit 3. This is another email now dated February 1st, 2024. Are you included on this email?

A. No.
Q. But you agree with me that Mr. McClure emails the three individuals we mentioned earlier asking for their home address for the offer letter?
A. That's what the February 1st email says.
Q. Okay. So was -- were the offer letters for employment with SeaHarbor to these three individuals Mr. Edwards, Borders, Betancourt prepared and ready by February 1st?
A. I don't know. I believe the date on the first offer letters was February 8th.
Q. Okay. So you don't know if it was -- if the offer letters were finalized?
A. I don't know if they were finalized by February 1st.
Q. Okay. And you see that Mr. Edwards responds giving his home address. Correct?
A. Yes.
(Exhibit 4 marked.)
Q. (BY MR. WELTGE) Okay. I'm now handing you what's been marked as Exhibit four. And you're not on this email either, are you?
A. I am not on either of these emails.
Q. This is an email exchange between Mr. McClure and Mr. Borders specifically. Correct?

representing?

Q. I'm representing to you, sir, that this document here shows Maith's changes to the edits and revisions made by Mr. Warden, the intellectual property attorney representing Mr. Edwards, Borders, and Betancourt.

MR. BISBIKIS: Objection; form. Can you tell us which -- I mean, there's -- are the changes layered over changes here? What --

MR. WELTGE: Yes.

Q. (BY MR. WELTGE) So let's just go through it, Mr. Killacky. In the first paragraph here, we have track changes that are crossed out. Do you see that?

A. Yes.

Q. Okay. And the track changes that are crossed out specifically state that the individual signing the agreement, meaning Mr. Edward, Mr. Betancourt, and Mr. Borders, if they were to sign it, would be "hereby grant to Company," meaning SeaHarbor, "a perpetual, worldwide, royalty-free, nonexclusive license to use, reproduce, distribute, and modify or prepare derivatives of the software," meaning the Insuror Atlas software, "under any intellectual property rights in the software that I may have." Do you see that, sir?

A. I see where that language is struck through.

Q. Uh-huh. Who struck that language?
A. I -- I don't know. You just represented this to me as a document. I'm not going to -- I'm not going to assume that representation.
Q. Do you recognize these edits at all?
A. I recognize the edits were made to the offer letter and the PIIA at various times in response to requests from Mr. Edwards and these documents were negotiated by the parties. As to pulling this out of one isolated incident, I can't tell you anything about this particular document without further context.
Q. Was Maith looking for Mr. Edwards or Mr. Borders or Mr. Betancourt to grant it a license to use the Insuror Atlas software?
A. No.
Q. Why not?
A. Because Maith's -- because Mr. Hunt owned the software.
Q. Well, that's not what those crossed out changes state. Right?
A. Well, if this is what they put in there, that's not what we were looking for.
Q. Right.
A. So my testimony is no.
Q. Okay. And so we see that those changes that

were added were at some point later crossed out.  Right? They were deleted using Microsoft track changes in the document.  Correct?

A.   Again, this is based off of, you know, what you've provided me, it looks like a Microsoft track changes document.  Which iteration of this particular document, I cannot tell.

Q.   Okay.  Would you agree with me -- well, let me ask you this:  Have you used Microsoft Word to track changes before?

A.   Yes.

Q.   Okay.  Would you agree with me that the insertion in red in this first paragraph towards the bottom starting with "hereby grant to Company" has been deleted or marked out, scratched out?

A.   Yes.

Q.   Okay.  Do you further agree with me that moving to -- further down the page on Section 2.2, Prior Inventions, there are track changes showing language added that says, "For the avoidance of doubt, certain software commonly known as 'Insuror Atlas,' (the Insuror Atlas Software) is not included in the definition of Prior Invention.  I represent and warrant that I do not have and do not claim any rights to the Insuror Atlas Software or its associated intellectual property, nor do

letter was sent to him.

(Exhibit 15 marked.)

Q. (BY MR. WELTGE) I'm handing you what's marked as Exhibit 15. This the correspondence in which Mr. Borders declined the offer from SeaHarbor on April 14th?

A. This is -- yes, this is the -- this is that correspondence.

Q. Okay. If you look further down in the first email of this exchange from Mr. McClure that was sent to Mr. Edwards, Mr. Borders, and Mr. Betancourt on April 11th, Mr. McClure writes: "Believe it or not, we have a firm closing date of Monday." What's he referring to?

A. We had an initial closing date for April 15th.

Q. Closing date for what?

A. The transaction.

Q. What transaction?

A. To acquire the Insuror Atlas business.

Q. With Mr. Hunt?

A. From Mr. Hunt.

Q. Sorry. I don't mean to interrupt you. So there was apparently a firm closing date of Monday for the acquisition of the Insuror Atlas software from Mr. Hunt by Maith. Correct?

A. Yes.

Q. That transaction did not close on that Monday, did it?
A. It didn't.
Q. Why did it not close on that Monday?
A. It did not close on that Monday because on February 14th, Mr. Borders rejected the offer of employment. He stated that he would still be open to a consulting role; however, at that point, Mr. Edwards informed Mr. McClure that he believed Mr. Borders might be asserting an ownership right to the software.
Q. Okay.
A. And didn't want to sign an employment agreement.
MR. BISBIKIS: I don't mean to interrupt. I think you said February 14th.
THE WITNESS: I'm sorry. April 14th. It was --
MR. BISBIKIS: Just a clarification.
THE WITNESS: It was right around the date of this letter. We found out -- I think April 14th was a Sunday. April 15th was a Monday.
Q. (BY MR. WELTGE) Okay. So as of April 11th or April 14th or April 15th, somewhere in that week, Maith recognized a potential dispute in the ownership of the Insuror Atlas, didn't it?

A. No. I told you exactly what -- on April 14th when Mr. Borders rejected his offer of employment, Mr. Edwards informed Mr. McClure that he believed Mr. Borders was asserting an ownership interest in the Insuror Atlas software.

Q. Okay. So at that point, Maith was aware of Mr. Borders potentially asserting an ownership interest.

A. Yes.

Q. Okay. Why did that have any effect at all on the transaction of closing with Mr. Hunt?

A. Well, Mr. Hunt was making various representations and warranties regarding exclusive ownership of the software that he was going to be transferring in the closing. We had -- we now -- we also had an anti-sandbagging provision in the Asset Purchase Agreement which would prohibit any sort of indemnification for issues of which Maith had prior knowledge prior to closing. And, therefore, Mr. Hunt could not make those representations and warranties having -- now having knowledge that Mr. Borders was potentially asserting an ownership interest in Insuror Atlas software. And we were not going to move forward waiving, you know, any sort of indemnification rights based on the anti-sandbagging provision.

Q. So to put it simply, Mr. Hunt was saying

Q. Right. So and then --
A. If you want to say those are different things, fine. That's your characterization.
Q. Okay. And it's not a trick question. It's just a simple distilling of what I'm hearing you say, and that is you're negotiating -- Maith's negotiating with Mr. Hunt for the acquisition of the Insuror Atlas software and Mr. Hunt has represented that he has the exclusive ownership in the software. Correct?
A. Yes.
Q. Okay. So that's -- that's one it, that's one side. Then you hear something from Mr. Edwards where Mr. Edwards tells Maith that Mr. Borders might be asserting or might assert an ownership interest in the software. Correct?
A. He was -- Mr. Edwards was telling us that Mr. Borders -- he was giving us a reason for why he thought Mr. Borders wasn't doing this.
Q. And that reason was that Mr. Borders was or might be asserting an ownership interest or an ownership claim to the Insuror Atlas software. Right?
A. Yes, but I don't know if that came from Mr. Edwards and his own opinion or -- at the time, we didn't know if that was Mr. Edwards' opinion or if he had a conversation with Mr. Borders or where he was

getting that information from.
Q. Okay. But that's different than what Mr. Hunt was telling Maith, isn't it?
A. Of course it's different.
Q. Okay. When did Mr. Edwards accept SeaHarbor's offer of employment?
A. We made another offer of employment to Mr. Edwards and Mr. Betancourt towards the end of April wherein the guaranteed salary was changed to a retention bonus. And Mr. Edwards accepted that offer shortly thereafter.
Q. Did the offer that was extended to Mr. Edwards at that point disclaim any ownership rights in the Insuror Atlas software as to Mr. Edwards specifically?
A. Yes.
Q. And Mr. Edwards accepted that -- those terms -- the terms of the employment offer?
A. Yes.
Q. Did Mr. Betancourt accept the employment offer from SeaHarbor?
A. No.
Q. But SeaHarbor sent him an additional iteration of an employment offer on April 29th. Right?
A. Yes, as I just testified.
Q. Uh-huh. And did that employment offer still

disclaim or still seek to have Mr. Betancourt disclaim any ownership rights in the Insuror Atlas software?
A. Yes.
Q. Did Mr. -- did Mr. Edwards ever express to Maith whether -- Mr. McClure or to you that Mr. Betancourt might also be asserting an ownership claim in the Insuror Atlas software?
A. Not to my recollection.
Q. So Mr. Edwards only told Maith about a potential claim of ownership for Mr. Borders?
A. Well, on April 14 --
MR. BISBIKIS: I'm going to object to form and I'll object to the extent it's calling for attorney-client privileged information.
Can you read that question back again?
(The reporter read the requested portion.)
MR. WELTGE: Mr. Edwards is not an attorney and not Maith's attorney.
MR. BISBIKIS: Are you talking about at that time then?
MR. WELTGE: Yes.
MR. BISBIKIS: Okay. At that time.
THE WITNESS: Yes. Mr. Borders was the only one that came up on April 14th.
Q. (BY MR. WELTGE) When did Maith learn that

Mr. Betancourt might be asserting ownership rights to the Insuror Atlas software?

A. Probably last August in the course of this litigation.

Q. At no point prior?

A. Not that I'm aware of.

(Exhibit 16 marked.)

Q. (BY MR. WELTGE) I'm going to hand you now what's marked as Exhibit 16, Mr. Killacky. Do you see that this is an email from -- or an email exchange between Mr. McClure and Mr. Betancourt on Monday, April 29th, 2024, and April 30th, 2024?

A. Yes.

Q. You're not on this email exchange, are you?

A. I am not.

Q. Okay. And Mr. McClure on April 29th attached an offer letter updated for the retention bonus, which also included the inventions agreement. Correct?

A. Yes.

Q. And Mr. Betancourt responded the next day asking Mr. McClure for a call because he had a few questions. Is that right?

A. That's correct.

Q. Did that call ever take place?

A. Yes.

Q. What questions did Mr. Betancourt have?
A. I'm not aware of what questions Mr. Betancourt had on that call.
Q. Were you on the call?
A. I was, actually.
Q. Mr. McClure presumably was on the call?
A. Yes.
Q. Would Mr. McClure be the individual we should ask that question to?
MR. BISBIKIS: Objection; form.
THE WITNESS: I can't speculate if Mike remembers specifically what questions Mr. Betancourt had. I recall that from that call Mr. Betancourt was asking whether we would consider a consulting arrangement as opposed to an employment agreement.
Q. (BY MR. WELTGE) Okay. So now you remember Mr. Betancourt's questions?
A. Well, that -- I don't -- he says I have a few questions --
MR. BISBIKIS: Objection; form. Mischaracterizes his testimony.
THE WITNESS: The main thrust of that call was Mr. Betancourt was asking whether we would consider a consulting arrangement as opposed to an employment agreement. Whether he had specific questions regarding

the employment offer or PIIA itself, I do not recall him having those questions.

Q. (BY MR. WELTGE) Did Mr. Betancourt explain why he was exploring the idea of a consulting arrangement as opposed to an employee -- an employee arrangement with Maith or SeaHarbor?

A. It was the same thing as we had understood from the get-go that he and Mr. Borders were concerned about their side work and their ability to engage in business outside of -- outside of SeaHarbor and Maith.

Q. Okay. Did it have anything at all to do with Mr. Betancourt's concern as to his ownership rights in the Insuror Atlas software?

A. He did not raise them at that time.

(Exhibit 17 marked.)

Q. (BY MR. WELTGE) Okay. I'm handing you now what's been marked as Exhibit 17. First page, sir, do you agree with me shows an email from BrianB@tdbtechnologies.com to Clinton Grumbles copying Ivan Betancourt, subline line New Agreement, dated May 1st, 2024?

A. That is what it shows.

Q. Okay. Do you also agree with me that the document shows Mr. Borders writing "Tim wanted us to sign these"?

A. Yes.
Q. And you were here for Mr. Hunt's deposition testimony last Friday. Right?
A. I was.
Q. Do you recall Mr. Hunt's testimony on this particular issue?
A. You're going to have to ask a more specific question about that.
Q. I will. Do you recall me asking Mr. Hunt about this page where Mr. Borders writes "Tim wanted us to sign these"?
A. I don't recall specific questions. I remember Mr. Hunt generally discussing this exhibit.
Q. Okay. I'll represent to you, sir, that the Tim referenced here by Mr. Borders is Tim Hunt. Do you have any reason to disagree with me on that?
A. No.
Q. Okay. You do, though, recognize what's on the second and third page, don't you?
A. I do.
Q. What is on the second page here that we're looking at?
A. It's a document entitled Nondisclosure and Intellectual Property rights disclosure and assignment.
Q. In the first paragraph of this Assignment

states: "This Non-Disclosure and Intellectual Property Rights Disclaimer and Assignment Agreement is entered into as of April 30, 2024, (Effective date) by and between Tim Hunt, "designated as owner, "and Brian Borders." Do you see that, sir?
A. Yes.
Q. And in the next paragraph, the first recital, it says, "Whereas, Owner has developed through substantial effort, research, time, and expense certain inventions, design concepts, methodologies, technical know-how, copyrightable material and trade secrets directed and related to certain software commonly known as 'Insuror Atlas,'" designated as the Insuror Atlas software. Do you see that, sir?
A. Yes.
Q. This document wasn't written by Mr. Hunt, was it?
A. Not that I'm aware of.
Q. Are you aware of who wrote the document?
A. I worked on this document with Mr. Hunt's counsel Mr. Presbitero.
Q. Okay. So you were involved in the drafting of this Rights Disclaimer and Assignment?
A. I was.
Q. In your capacity as Maith's general counsel and

chief operating officer?
A. No.
Q. In what capacity?
A. As Maith's outside counsel.
Q. Okay. So did you draft this at the time that you were employed by Momkus?
A. I did.
Q. Okay. Why did you draft this agreement or this assignment, excuse me?
A. This document came about as a result of discussions with Mr. Hunt and his counsel regarding the statement that Mr. Edwards had made regarding Mr. Borders asserting potential ownership interest and specifically to address the anti-sandbagging provision in the APA, which would have precluded Maith from asserting any sort of indemnification provision or indemnification rights arising out of matters of which we had actual knowledge prior to the closing.
The discussion was that given that -- and by this time, Mr. Borders had also -- or Mr. Betancourt had also indicated that he would prefer a consulting agreement. So we had to assume, you know, there was a potential there of him potentially asserting an ownership right. This document was to address any sort of issue regarding knowledge under the anti-sandbagging

requirement. So if we were going to agree to the anti-sandbagging provision on the May 1st closing, which we had projected there, Maith wanted disclaimer signed by Mr. Borders and Mr. Betancourt so that we had effectively cornered off any sort of risk there by -- due to the fact that we had knowledge that at least Mr. Borders was potentially asserting some ownership interest.

Q. Okay. Were you the individual who told Mr. Hunt to have Mr. Borders and Mr. Betancourt sign this document?

MR. BISBIKIS: Form.

THE WITNESS: I believe that would have come from his attorney. I didn't have any discussions with Mr. Hunt. I had discussions with his attorney regarding this document.

Q. (BY MR. WELTGE) Okay.

A. His attorney gave me this document. I did disagree with that portion of Mr. Hunt's testimony on Friday. I never had an email with Mr. Hunt.

Q. Mr. Borders and Mr. Betancourt did not end up signing this agreement, did they?

A. No. We understood that Mr. Hunt had presented the agreements to them on or around May 1st. They didn't get signed on that May 1st date. Mr. Hunt's

attorney reported to me that they had indicated that they wanted more time and they wanted their own attorneys to review the documents.

Q. Did Mr. Hunt express to you any frustration as to that request by Mr. Borders and Mr. Betancourt?

A. I never spoke to Mr. Hunt about it.

Q. Do you know if Mr. Hunt expressed any frustration as to that request by those individuals?

A. If -- he never expressed frustration or anything other than what his attorney communicated to me. He didn't communicate with Mike McClure regarding this.

Q. Okay. Looking back on Exhibit 16, it's the one just prior to this one, and specifically Mr. McClure's April 29th email to Mr. Betancourt on the employment agreement with SeaHarbor, do see in that second paragraph, sir, Mr. McClure writes: "We plan on closing on Wednesday. If I get these back prior to then, that would be great. Looking forward and excited to working with you even closer." Do you see that, sir?

A. Yes.

Q. And we now know that Mr. Betancourt did not end up signing this agreement as -- or not this document shows. But we know that Mr. Betancourt didn't sign the employment agreement. Right?

MR. BISBIKIS: Objection as to form to the extent it mischaracterizes it but -- his testimony.

THE WITNESS: We were aware that -- actually, no. You skipped over some time frames, so I need to tell you what we were aware of at the time.

Q. (BY MR. WELTGE) Please do.

A. So Mr. -- Mr. Edwards had informed us that Mr. Borders was asserting an ownership -- or he thought Mr. Borders might be asserting an ownership right as a reason as to why he would not move forward with the Insuror -- with the employment agreement. We had further discussions with Mr. Hunt. And what we understood ultimately was that Mr. Borders was concerned about a payment processing application that he had prepared and I believe was using with Acacia. That that was the -- that was clearly his. It was not part of Insuror Atlas and it was not something that Mr. Hunt had put forth.

That software application was mentioned in the disclaimer agreement and carved out of the disclaimer agreement, which is what I had spoken to Mr. Hunt's attorney about. So what Mr. Edwards had conveyed to us, we had learned that that was actually a concern about this payment processing application, not the Insuror Atlas software itself.

Q. When did these conversations occur?
A. With Mr. Hunt and his attorney?
Q. Yes, sir.
A. It was in late April when we went to prepare the disclaimer agreement.
Q. So in late April, did Maith no longer have a concern -- strike that.
As of late April, did Maith fully believe that Mr. Hunt had complete and exclusive ownership rights in the Insuror Atlas software?
A. Well, I don't know how you answer that. We had reps and warranties from Mr. Hunt regarding his ownership software. We didn't have facts that gave us any reason to doubt it at the time, but Mr. Borders' and Mr. Betancourt's refusal of the consulting agreements, you know, certainly -- we certainly did not ignore those facts.
Q. Was Mr. Borders' and Mr. Betancourt's refusal to sign the disclaimer and assignment of rights in the software something that raised a red flag for Maith at that time?
A. No. Again, I already testified that their refusal to sign the disclaimer just meant we had to deal with the anti-sandbagging issue in another way.
Q. Okay. And is that -- was that issue dealt with

in Section 5.5 in the accompanying schedule of the Asset Purchase Agreement?

A. Yes.

Q. Can you turn with me to page 15 in the Asset Purchase Agreement which is marked Maith 369. Do you see Section 5.5?

A. Yes.

Q. Is that the anti-sandbagging provision?

A. Yes.

Q. Okay. What was your understanding -- or what was Maith's understanding as to the meaning of this provision and how it carved out any concerns as to the assertion of ownership rights in the software?

MR. BISBIKIS: Objection; form. Objection; asked and answered. I think he's explained this already.

THE WITNESS: This provision does not specifically relate to the ownership rights in the software. This provision -- the reason for this provision is that the parties, either Maith directly or through SeaHarbor, had had at this point over seven years of experience in dealing with each other and working with the software and working with the -- Mr. Hunt's employees, providing the insurance management services pursuant to the contract that SeaHarbor had.

asked and answered.

THE WITNESS: Again, I can't tell you who insisted on this specific language. This is the language that the parties agreed to. What Maith insisted on is that it not be caught by the anti-sandbagging provision by any future claim that Mr. Borders or Mr. Betancourt might make purely because of the knowledge or the facts that we had knowledge of at the time.

Q. (BY MR. WELTGE) And the facts or the knowledge that you had at the time of this Asset Purchase Agreement, at the time that it was entered, included, at least, Mr. Edwards' notification to Maith that Mr. Borders may pursue an ownership claim to the software. Right?

MR. BISBIKIS: Objection; form.

THE WITNESS: No. That's not what Mr. Edwards told us.

Q. (BY MR. WELTGE) Well now I'm confused. What did Mr. Edwards tell you?

MR. BISBIKIS: Objection; form.

THE WITNESS: He told us --

MR. BISBIKIS: Asked and answered.

THE WITNESS: Mr. Edwards told us that he believed that Mr. Borders believed he had some ownership

interest. Not that he would pursue it.
Q. (BY MR. WELTGE) Okay. So at that time, Maith was aware of Mr. Edwards making that representation to Maith. Correct?
MR. BISBIKIS: Objection; form.
THE WITNESS: Mr. Edwards wasn't making a representation. Mr. Edwards was giving us his opinion as to why Mr. Borders might not want to be an employee.
Q. (BY MR. WELTGE) And if Maith knew that Mr. Borders might have some claim or might assert some claim or might think that his ownership rights in the software, then that's -- then it would be important to have Schedule 5.5(a) included in the Asset Purchase Agreement, wouldn't it?
A. Maith had a set of facts that we've talked about in front of us. Maith was negotiating an Asset Purchase Agreement. Maith's knowledge of those facts without any modification to the anti-sandbagging provision potentially precluded it from pursuing indemnification against Mr. Hunt if Mr. Borders or Mr. Betancourt did decide to pursue a claim. Maith was not going to get caught in a situation where it agreed to a provision that would prohibit it from exercising its rights based on the facts that were known to it.
Q. Thank you. Did Maith send a cease and desist

at some point to Acacia Insurance Managers?
A. Yes.
Q. Why did Maith send a cease and desist to Acacia?
A. Because we discovered that the Insuror Atlas software had likely been misappropriated.
Q. What was Maith's basis for that concern?
A. Maith's basis for that concern is fully set forth in the cease and desist letter, and I'll refer to you to that.
Q. Was that cease and desist letter sent on July 1st, 2024?
A. I believe that's correct.
(Exhibit 22 marked.)
Q. (BY MR. WELTGE) I'm going to hand you what's been marked as Exhibit 22, Mr. Killacky. Is this the cease and desist letter, sir?
A. Yes, it is.
Q. I want to go through some of the exhibits in this cease and desist letter with you. Let's first turn to Exhibit A. Can you tell me what Exhibit A is, sir?
A. It's a printout from the Jira Service Management software that we acquired from Mr. Hunt.
Q. Is it -- does it includes a notification from April Grumbles?

there. We needed to coordinate the logistics of how that data was going to be returned.

Q. Okay. And those logistics were coordinated?

A. No. Mr. Grumbles never responded to Mr. Edwards.

Q. Turning to Exhibit B.

A. Yes.

Q. What is this? What are we looking at?

A. This was the public-facing consuming login for Acacia that we -- we identified as set forth in the cease and desist letter.

Q. Okay. So was this Acacia's website?

A. That's what it says.

Q. Why was this screenshot included in the cease and desist?

A. Let me go back to the cease and desist to page 2. It says Acacia -- the first bullet says, "Acacia operates a website at the address www.AcaciaMGA.com which provided systems access to Acacia's policyholders and agents."

We had learned that on June 28th, Acacia emailed its agents saying that this was a new website and that they would be contacting with them with the login information. And when you went to that new website and clicked on the consumer access button on

that website, it took you to this consumer login page.

Q. Did Maith attempt -- let me back up. Did Maith or anyone associated with Maith in an employment capacity attempt to log into Acacia's system?

A. Again, I'm going to direct you to my cease and desist letter that tells you exactly what happens and what we did, and yes.

Q. So that's a yes. Correct?

A. Yes.

Q. Who was the individual who attempted to access Acacia's system?

MR. BISBIKIS: Objection; form.

THE WITNESS: Mr. Edwards was the individual who provided screenshots.

Q. (BY MR. WELTGE) Well, he provided screenshots. Was he the one who attempted to access --

A. Well, yeah --

Q. -- Acacia's system?

A. -- he would have been the individual that went to the site and put the information in.

Q. Turning to Exhibit C, why was this image included in the cease and desist letter?

A. Because this image shows that the new Acacia website went to a software screen that -- or a consumer login screen that was identical in all material respects

to the Insuror Atlas software.

Q. And if we look at the -- looking at the image right side up, at the top right-hand corner of the image, it appears that there is a notification that says. "Welcome Consumer Login" and there is a button that says logout. Do you see that?

A. Uh-huh, yes.

Q. So it appears from this image that Mr. Edwards gained access to Acacia's system. Is that right?

A. I can't tell you that.

MR. BISBIKIS: Objection; form.

Q. (BY MR. WELTGE) You don't know if Mr. Edwards gained access to Acacia's system?

A. Acacia --

MR. BISBIKIS: Same objection.

THE WITNESS: Mr. Edwards obtained access to the screen displaying this data, whether that's -- I don't define that as Acacia's system, whatever Acacia's system was.

Q. (BY MR. WELTGE) Okay. Well, let's go back to the previous exhibit then. Looking at the consumer login page, do you agree with me that that is Acacia's logo and Acacia -- Acacia's login page for their clients?

A. Yes.

Q. Okay. And you agree that Mr. Edwards provided a screenshot of that page and that -- well, you agree with that. Correct?

A. Yes.

Q. You agree that you included that screenshot in the cease and desist letter. Right?

A. Yes.

Q. Okay. And the next exhibit is not the login page. Correct?

A. Correct.

Q. But instead, it appears that a successful login has occurred. Correct?

MR. BISBIKIS: Objection; form.

THE WITNESS: A successful login to this policyholder's page has occurred.

Q. (BY MR. WELTGE) And why is there portions of this page that are redacted?

A. Because when we sent this information over to Acacia, I was not going to display personal information on the page.

Q. Is it Maith's position that it was legal to use policy information of a client that was not a client of Maith or SeaHarbor to gain access to Acacia's system?

MR. BISBIKIS: Objection; form.

THE WITNESS: Yes.

Q. (BY MR. WELTGE) Do you recognize that Texas Insurance Code, Chapter 601, Safeguards of Privacy of Insurance Policy Details?

A. If you say so.

Q. Do you recognize that Section 823.011 of the Texas Insurance Code specifically states that insurance information is confidential and privileged?

A. Again, I would need the statute in front of me. So I'd have to take your word for it at this point.

Q. Is it your Acacia's position that Mr. Edwards did nothing wrong in hacking Acacia's system?

MR. BISBIKIS: Objection; form. That's a mischaracterization of -- objection; form.

THE WITNESS: You also said Acacia's position.

Q. (BY MR. WELTGE) I'm sorry. Thank you. Is it Maith's position that Mr. Edwards did nothing wrong in hacking Acacia's system?

MR. BISBIKIS: Objection; form.

THE WITNESS: Mr. Edwards did nothing wrong, and I would not qualify this as a hack.

Q. (BY MR. WELTGE) Can you tell me what Exhibit E is to this cease and desist letter, sir?

A. Again, I'll refer back to the cease and desist letter itself. Exhibit E shows the HDML source code

behind the Acacia login page.

Q. And it's Maith's position that the HDML source code here is identical to the source code for the Insuror Atlas software. Is that correct?

A. Yes. We attached the -- the next page of that exhibit is the source code for the Insuror Atlas login page. Again, this is the HDML source code, which is publicly available.

Q. Okay. John, I don't think I have too much left. Do you want to take a short break?

MR. BISBIKIS: Sure.

MR. WELTGE: Let's take a five-minute break.

THE VIDEOGRAPHER: We're off at 3:54.

(Break taken from 3:54 p.m. to 4:00 p.m.)

THE VIDEOGRAPHER: Back on at 4:00 p.m.

Q. (BY MR. WELTGE) Mr. Killacky, before we move on from this cease and desist letter that we were just speaking before the break about Mr. Edwards' access into the Acacia system, and I just want to know did Maith authorize Mr. Edwards to access Acacia's system?

A. Yes, as described in this letter.

(Exhibit 23 marked.)

Q. (BY MR. WELTGE) All right. I'm going to hand you what's been marked as Exhibit 23. Can you tell me