Neutral
As of: April 17, 2025 10:30 PM Z

# Alcatel United States v. Cisco Sys.

United States District Court for the Eastern District of Texas, Sherman Division

October 30, 2001, Decided ; October 30, 2001, Filed, Entered

Civil Action No. 4:00CV199

**Reporter**
2001 U.S. Dist. LEXIS 25113 *

ALCATEL USA, INC., Plaintiff, v. CISCO SYSTEMS, INC., Defendant. CISCO SYSTEMS, INC., Counterclaimant, v. ALCATEL S.A. and ALCATEL USA, INC., Counterdefendants.

**Subsequent History:** Partial summary judgment granted by *Alcatel USA, Inc. v. Cisco Sys., 239 F. Supp. 2d 645, 2002 U.S. Dist. LEXIS 25873 (E.D. Tex., Dec. 17, 2002)*

**Disposition:** **[*1]** Defendant's Motion for Summary Judgment denied.

## Core Terms

hired, programs, factors, summary judgment, assign, independent contractor, ownership, software, employment status, projects, contractor, purposes, hiring party, argues, independent contractor status, employee benefits, right to control, cross-connect, nonmovant, skill, contracts, courts, team, genuine issue of material fact, copyright infringement, skilled worker, matter of law, one half, circumstances, accomplished

## Case Summary


**Procedural Posture**
Plaintiff manufacturer sued defendant competitor, alleging patent infringement, misappropriation of trade secrets, and copyright infringement. The competitor moved for summary judgment as to the ownership element on the manufacturer's copyright infringement claim.

**Overview**

A software engineer worked for the manufacturer through an authorized contractor. The engineer authored several software programs while working for the manufacturer and later used those programs while working for the predecessor of the competitor. The manufacturer claimed ownership of all right, title, and interest in and to the copyrights in the computer programs. The competitor argued that the manufacturer could not prove it owned the copyrights in the programs. The court determined that summary judgment was inappropriate for deciding whether the engineer was an employee within the meaning of the work made for hire provisions, *17 U.S.C.S. §§ 101* and *201*. Under the Reid analysis, certain facts favored finding that the engineer was an independent contractor, such as the series of six-to-nine-month contracts and the manufacturer's failure to treat the engineer as an employee for tax and employment benefit purposes. However, factual issues existed as to the manufacturer's right to control the manner and means of the engineer's work and the manufacturer's right to assign additional projects to the engineer.

**Outcome**
The court denied the competitor's summary judgment motion.


## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

***HN1***[] **Summary Judgment, Opposing Materials**

The granting of summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. The trial court must resolve all reasonable doubts in favor of the party opposing the motion.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

***HN2***[] **Summary Judgment, Burdens of Proof**

The party seeking summary judgment carries the burden of demonstrating that there is no actual dispute as to any material fact in the case. This burden, however, does not require the moving party to produce evidence showing the absence of a genuine issue of material fact. The moving party satisfies its burden by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

***HN3***[] **Summary Judgment, Evidentiary Considerations**

*Fed. R. Civ. P. 56* does not impose a duty on a district court to sift through the record in search of evidence to support a party's opposition to summary judgment. Once the moving party has satisfied its burden, the nonmovant must set forth specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e)*. Such nonmovant must also articulate the precise manner in which evidence he sets forth supports his claims. Moreover, in designating specific facts, the nonmovant must go beyond the pleadings and use his own affidavits, depositions, answers to interrogatories, and admissions on file.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

*HN4*[] **Entitlement as Matter of Law, Appropriateness**

U.S. Dist. Ct., E.D. Tex., R. 56(b) states that a party's response to a summary judgment motion should be supported by appropriate citations to proper summary judgment evidence. U.S. Dist. Ct., E.D. Tex., R. 56(c) further states that the court will not scour the record in an attempt to determine whether the record contains an undesignated genuine issue of material fact for trial before entering summary judgment.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Scintilla Rule

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

*HN5*[] **Entitlement as Matter of Law, Appropriateness**

If the nonmovant fails to set forth specific facts in support of allegations essential to that party's claim and on which that party will bear the burden of proof, then summary judgment is appropriate. Even if the nonmovant brings forth evidence in support of its allegations, summary judgment will be appropriate unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Computer & Internet Law > Intellectual Property Protection > Copyright Protection > General Overview

Copyright Law > Copyright Infringement Actions > Civil Infringement Actions > General Overview

Copyright Law > Scope of Copyright Protection > Assignments & Transfers > Divisibility of Rights

Copyright Law > Scope of Copyright Protection > Ownership Interests > General Overview

Copyright Law > Scope of Copyright Protection > Ownership Interests > Initial Ownership

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

Copyright Law > ... > Protected Subject Matter > Limited Protection for Ideas > General Overview

Copyright Law > ... > Protected Subject Matter > Literary Works > General Overview

**HN6[] Intellectual Property Protection, Copyright Protection**

Under the 1976 Copyright Act, ownership of a copyright vests initially in the author or authors of the work. 17 U.S.C.S. § 201(a). As a general rule, the author of a work is the person who translates an idea into a fixed, tangible expression entitled to copyright protection. However, this general rule is subject to the all important exception of the work made for hire doctrine. 17 U.S.C.S. § 201(b). Under this doctrine, the general rule conferring copyright ownership to its author is qualified to provide that the employer or other person for whom the work was prepared is considered the author and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright. 17 U.S.C.S. § 201(b). Under § 101 of the Act, a work made for hire can arise under two circumstances (1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. 17 U.S.C.S. § 101.

Copyright Law > ... > Civil Infringement Actions > Elements > Ownership

Labor & Employment Law > Employment Relationships > At Will Employment > Definition of Employees

Copyright Law > Scope of Copyright Protection > Ownership Interests > General Overview

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

**HN7[] Elements, Ownership**

Under the United States Supreme Court's non-exhaustive, 13-factor test for determining whether an author is an employee within the meaning of the Copyright Act's work made for hire provision and whether a hired party is an employee under the general common law of agency, the court considers (1) the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party. No single factor is determinative.

Business & Corporate Law > ... > Agents Distinguished > Independent Contractors, Masters & Servants > Independent Contractors

Labor & Employment Law > Employment Relationships > At Will Employment > Definition of Employees

Business & Corporate Law > ... > Agents Distinguished > Independent Contractors, Masters & Servants > General Overview

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

Labor & Employment Law > Employment Relationships > Independent Contractors

**HN8[] Independent Contractors, Masters & Servants, Independent Contractors**

Regarding the determination of whether one is an employee or independent contractor, there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common-law agency principles.

Copyright Law > Scope of Copyright Protection > Ownership Interests > General Overview

Copyright Law > ... > Civil Infringement Actions > Presumptions > Validity of Copyright

Copyright Law > ... > Civil Infringement Actions > Presumptions > Validity of Facts

Copyright Law > Scope of Copyright Protection > Formalities > General Overview

Copyright Law > ... > Formalities > Deposit & Registration Requirements > General Overview

Copyright Law > ... > Deposit & Registration Requirements > Registration > Registration Certificates

***HN9***[] **Scope of Copyright Protection, Ownership Interests**

See *17 U.S.C.S. § 410(c)*.

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

***HN10***[] **Ownership Interests, Works Made for Hire**

To determine whether one is acting in the capacity of an independent contractor, one must measure the amount of control the hiring party exerts or has the right to exert over the worker. Specifically, the United States Supreme Court directs courts to examine the hiring party's right to control the manner and means by which the relevant product is accomplished.

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

Labor & Employment Law > Employment Relationships > At Will Employment > Definition of Employees

Labor & Employment Law > Employment Relationships > Independent Contractors

***HN11***[] **Ownership Interests, Works Made for Hire**

In a conventional employment relationship, the hired party may typically be assigned additional projects at his employer's behest. However, independent contractors typically are hired for a particular project and the hiring party generally may not unilaterally assign additional duties to the hired party.

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

Labor & Employment Law > Employment Relationships > Independent Contractors

Tax Law > ... > Tax Credits & Liabilities > Estimates & Withholding > General Overview

Copyright Law > Scope of Copyright Protection > Ownership Interests > General Overview

**HN12[] Ownership Interests, Works Made for Hire**

A hiring party's tax and benefits treatment of its alleged employee is regarded as a significant factor in the determination of work for hire status. Virtually every case that has found the hired party to be an independent contractor did so in part because the hiring party failed to provide employee benefits to or withhold taxes from its worker. Therefore, a hiring party's failure to treat a worker as an employee for tax and benefits purposes is inconsistent with a subsequent claim that the worker is an employee for the purpose of copyright ownership.

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

**HN13[] Ownership Interests, Works Made for Hire**

The level of skill the hired party possesses is a factor typically afforded great weight in determining work for hire status.

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

**HN14[] Ownership Interests, Works Made for Hire**

Courts are directed to inquire whether the hiring party is "in business," and if so, whether the retention of the hired party was pursuant to or in furtherance of that business. Where a hiring party is engaged in a not-for-profit activity and retains a highly skilled worker, the circumstances tend to resemble an independent contracting relationship.

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

**HN15[] Ownership Interests, Works Made for Hire**

In the context of determining work for hire status, courts describe the authority to hire assistance factor as virtually meaningless in a situation where the hired party does not need assistants.

Copyright Law > Scope of Copyright Protection > Ownership Interests > Works Made for Hire

**HN16[] Ownership Interests, Works Made for Hire**

Assuming an employment relationship has been established, it must then be determined whether the employee created the work within the scope of his or her employment. Reid requires courts to apply the general common law of agency to evaluate whether the work was created within the scope of employment. An employee's work is performed within the scope of employment if, but only if: (1) it is the kind of work he was hired to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by the employee's desire to further the employer's goals.

**Counsel:** For Alcatel USA Inc, PLAINTIFF: Harry M Reasoner, Scott J Atlas, Kenneth P Held, Vinson & Elkins, Houston, TX USA.

For Alcatel USA Inc, PLAINTIFF: Stuart J Sinder, Alan H Pollack, Kenyon & Kenyon, Ronald S Rauchberg, Proskauer Rose Goetz & Mendelsohn, LLP, John C Stellabotte, Mark Davidson, Kenneth Rubenstein, Scott Shorr, Karen D Coombs, Scott A Eggers, Charles Guttman, Nolan M Goldberg, Proskauer Rose, LLP, New York, NY USA.

For Alcatel USA Inc, PLAINTIFF: Clyde Moody Siebman, Siebman Reynolds & Burg LLP, Sherman, TX USA.

For Alcatel USA Inc, PLAINTIFF: Thomas M Melsheimer, Matthew E Yarbrough, Michael Brett Johnson, Neil J McNabnay, Fish & Richardson PC, Dallas, TX USA.

For Alcatel USA Inc, PLAINTIFF: Alec W Farr, Proskauer Rose LLP, Ruffin B Cordell, Fish & Richardson PC, Washington, DC USA.

For Cisco Systems Inc, DEFENDANT: Roger D Sanders, Sanders O'Hanlon & Motley, Sherman, TX USA.

For Cisco Systems Inc, DEFENDANT: Barry C Barnett, Susman Godfrey LLP, Dallas, TX USA.

For Cisco Systems Inc, DEFENDANT: Gregory L Lippetz, Elizabeth R Weiss, Brobeck Phleger Harrison, Franklin Brockway Gowdy, Renee **[*2]** T Lawson, Morgan Lewis & Bockius, Gregory L Lippetz, Bingham McCutchen LLP, San Francisco, CA USA.

For Cisco Systems Inc, DEFENDANT: Fred Irvin Williams, Akin Gump Strauss Hauer & Feld, Austin, TX USA.

For Sevin Rosen Funds, MOVANT: Fred Irvin Williams, Brobeck Phleger & Harrison, Austin, TX USA.

For Lucent Technologies Inc, MOVANT: James Corley Henderson, Wolfe Tidwell & McCoy, Sherman, TX USA.

For Chiaro Networks Ltd, MOVANT: James A Diboise, Elizabeth M Saunders, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA USA.

For Chiaro Networks Ltd, MOVANT: Jill Hubbard Bowman, Brinks Hofer Gilson & Lione, Chicago, IL USA.

For Cisco Systems Inc, COUNTER-CLAIMANT: Roger D Sanders, Sanders O'Hanlon & Motley, Sherman, TX USA.

For Cisco Systems Inc, COUNTER-CLAIMANT: Barry C Barnett, Susman Godfrey LLP, Dallas, TX USA.

For Alcatel USA Inc, COUNTER-DEFENDANT: Stuart J Sinder, Kenyon & Kenyon, Ronald S Rauchberg, Proskauer Rose Goetz & Mendelsohn, LLP, New York, NY USA.

For Alcatel USA Inc, COUNTER-DEFENDANT: Clyde Moody Siebman, Siebman Reynolds & Burg LLP, Sherman, TX USA.

**Judges:** Paul Brown, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Paul Brown

## Opinion

**MEMORANDUM [*3] OPINION AND ORDER DENYING CISCO SYSTEMS, INC'S MOTION FOR SUMMARY JUDGMENT ON ALCATEL U.S.A., INC'S COPYRIGHT CLAIM (DOCUMENT 100)**

Pending before this Court is Defendant's Motion for Summary Judgment. The Court, having considered the motion, Plaintiff's response, and Defendant's reply to such response, as well as all of the summary judgment evidence, is of the opinion that Defendant's motion should be DENIED.

**INTRODUCTION**

The underlying dispute between Alcatel USA, Inc. ("Plaintiff" or "Alcatel") and Cisco Systems, Inc. ("Defendant" or "Cisco") involves exceedingly complex and voluminous facts from which numerous claims and counterclaims

derive. However, although Plaintiff's allegations include patent infringement, misappropriation of trade secrets and copyright infringement, solely at issue in Defendant's Motion for Summary Judgment is the ownership element on Plaintiff's claim for copyright infringement.

The resolution of this motion requires the Court to evaluate the relationships between Alcatel, Prism Consultants, Inc. ("Prism"), Marian Trnkus, and Cisco. Alcatel USA and its subsidiaries are engaged in engineering, manufacture and sale of numerous products and **[*4]** services for use in the domestic and international telecommunications industry. Likewise, Cisco, an Alcatel competitor, is a large corporation engaged in engineering, manufacture and sale of products and services for the telecommunications industry. Marian Trnkus has worked for many years as a computer programmer and software engineer. In fact, throughout his career, Trnkus has been employed at Alcatel, both as an employee and contractor, as well as Monterey Networks, Inc. ("Monterey"), Cisco's predecessor-in-interest. Specifically, in 1989, Trnkus began work at Rockwell International, which was subsequently acquired by Alcatel in 1990. Following Trnkus's full-time, two-year employment with Rockwell / Alcatel, he left Texas to work for an Alcatel affiliate in Germany. Shortly thereafter, Trnkus worked in 1993 as a contractor at Ericsson for approximately six months. Following his contract work for Ericsson, Trnkus resumed work at Alcatel in the Dallas area in 1994, this time, however, as a contractor assigned to work on Alcatel's cross-connect project. As fairly common in large technological markets, Alcatel had a policy permitting the acquisition of workers on a contract basis through **[*5]** certain authorized contractors, one of which was Prism. Thus, beginning in January of 1994, through Prism, Trnkus worked for Alcatel on a contract basis until 1998, conducting primarily software engineering.

The precise nature of Trnkus's relationship with and employment conditions at Alcatel are directly at issue and will be discussed more thoroughly below. However, suffice it to say Alcatel retained Trnkus for his known level of skill and paid Trnkus for his services indirectly through Prism; which is to say that Alcatel paid Prism, who in turn, paid Trnkus. In addition, Alcatel did not provide Trnkus with employee benefits such as a retirement package or health insurance, nor did Alcatel treat Trnkus as an employee for tax purposes. Plaintiff claims, however, that all other characteristics of Trnkus's relationship with Alcatel closely resemble a conventional employment relationship. Whatever the case, Trnkus continued to work at Alcatel as a contractor until July of 1998. This four and one half year duration, however, was segregated into a series of approximately six to nine-month contracts and extensions. In fact, the evidence suggests that neither Alcatel nor Trnkus knew whether **[*6]** their work relationship would extend past each current contract. Instead, as Alcatel's needs were assessed near each contract's expiration, Alcatel would extend or renew Trnkus's work contract. For example, Trnkus's initial contract with Alcatel in January of 1994 called for him to work on a specific feature for one of the cross-connect products [1] (the 1631SX R4A release), and was to last until approximately October of 1994. However, in January of 1995, Alcatel submitted a requisition for the extension of Trnkus's services. The requisition memorandum authored by Trnkus's supervisor, Mr. Church, stated the renewal contract would be the last extension of Trnkus's contract. Pursuant to this contract, Alcatel engaged Trnkus's services for work on the cross-connect and 1633SX R9 development, which was to entail object oriented design, which evidently was an area with which Trnkus had prior experience. Church has stated that his intent was to "assign Mr. Trnkus to take one of [Alcatel's] existing subsystems and convert it to accomplish the same functions using object oriented design. [Alcatel] gave this assignment to Mr. Trnkus and asked him to convert a subsystem known as PMPOLL to **[*7]** object-oriented design." During this second nine-month contract, Trnkus authored several generic software programs to apparently assist him in his work performance at Alcatel. [2] These programs, Whip, WhipSource and various "make" files [hereinafter collectively referred to as "the programs,"] form the basis of Plaintiff's claim for copyright infringement. Essentially, the programs are software tools used to develop

---

[1] A "cross-connect" is a system that connects signals in multiple telecommunication input lines to multiple telecommunication output lines. Cross-connects are used to route or switch signals from input lines to output lines in an optimal manner that makes efficient use of a telecommunications transmission network. (Alcatel's First Amended Complaint, P 19).

[2] The precise impetus for the programs' creation, however, is directly at issue. Defendant alleges that Trnkus's creation of the programs was not necessarily a part of his role or duties at Alcatel, but rather that Trnkus created them for his own use, education and benefit. Conversely, Plaintiff claims Trnkus's production of the programs were directly in response to his Alcatel assignment.

and maintain software source code, and the "make" files are an automated method for translating human readable source code into a finished working program. After developing the programs, Trnkus deposited them into Alcatel's program repository for subsequent use by Alcatel, and sometime in 1997, Alcatel decided to adopt Whip and Whipsource for its development program for the Optical Gateway Cross-Connect (OGX cross-connect). [3] During the developmental phase, Trnkus was requested to change the Whip tool to add an additional function to it that other software developers at Alcatel recognized would assist the Alcatel team in developing and maintaining code on this new project. Pursuant to Alcatel's request, Trnkus apparently made the appropriate modifications at Alcatel. **[*8]**

In 1998, Trnkus **[*9]** left Alcatel and began work at Monterey, Cisco's predecessor. While at Monterey, Trnkus allegedly began using the programs he created while at Alcatel and that were deposited in Alcatel's program repository. He named the programs "Genapt" and "Deppat." In addition, others at Monterrey were evidently persuaded into using the programs. The underlying copyright dispute is thus created by the fact that Alcatel claims ownership of all right, title and interest in and to the copyrights in the computer programs "Whip," "Whipsource," and "Makedep," ("make" file) and that, because Defendant used these programs (or substantial similarities thereof), it infringed on Alcatel's copyrights. Cisco has moved for summary judgment on the grounds that Alcatel cannot prove it owned the copyrights in the programs.

## SUMMARY JUDGMENT STANDARD

***HN1***[] The granting of summary judgment is proper if "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(c)*. The trial court must resolve all reasonable doubts in favor of the party opposing the motion. *Casey Enters. v. Am. Hardware Mut. Ins. Co., 655 F.2d 598, 602 (5th Cir. 1981)* ***[*10]*** (citations omitted). ***HN2***[] The party seeking summary judgment carries the burden of demonstrating that there is no actual dispute as to any material fact in the case. This burden, however, does not require the moving party to produce evidence showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)*. The moving party satisfies its burden by "pointing out to the district court … that there is an absence of evidence to support the nonmoving party's case." *Id.*

***HN3***[] *Federal Rule of Civil Procedure 56* does not impose a duty on a district court to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Doddy v. Oxy USA, Inc., 101 F.3d 448, 463 (5th Cir. 1996)* (citations omitted). Once the moving party has satisfied its burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *FED. R. CIV. P. 56(e)*. Such nonmovant must also articulate the precise manner in which evidence he sets forth supports his claims. *See* *Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994)* (citation **[*11]** omitted). Moreover, in designating specific facts, the nonmovant must "'go beyond the pleadings'" and use "'his own affidavits, … depositions, answers to interrogatories, and admissions on file.'" *Jones v. Sheehan & Young Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996)* (citation omitted). [4]

***HN5***[] If the nonmovant fails to set forth specific facts in support of allegations essential to that party's claim and on which that party will bear the burden of proof, then summary judgment is appropriate. *Celotex, 106 S. Ct. at 2552-53*. Even if the nonmovant brings forth evidence **[*12]** in support of its allegations, summary judgment will be appropriate unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

---

[3] "OGX" is a cross-connect system that is used to manage information carried on fiber optic telecommunications networks, and is comprised of computer software and telecommunications hardware that performs the actual routing or switching of signals.

[4] The Court also notes that ***HN4***[] Local Rule CV-56(b) states that a party's response to a summary judgment motion should "be supported by appropriate citations to proper summary judgment evidence …." Local Rule CV-56(c) further states that the Court will not "scour the record in an attempt to determine whether the record contains an undesignated genuine issue of material fact for trial before entering summary judgment."

party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)* (citations omitted).

## DISCUSSION

### I. Copyright Ownership:

To establish copyright infringement, Plaintiff must demonstrate it owns the copyrights to the relevant computer programs. *Alcatel USA, Inc. v. DGI Technologies, Inc., 166 F.3d 772, 790 (5th Cir. 1999)*. ***HN6***[] Under the 1976 Copyright Act ("the Act"), ownership of a copyright "vests initially in the author or authors of the work." *17 U.S.C. § 201(a) (1996)*. As a general rule, the author of a work is "the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S. Ct. 2166, 2171, 104 L. Ed. 2d 811 (1989)*. However, this general rule is subject to the all important exception **[*13]** of the work made for hire doctrine, which is the focus of Defendant's Motion for Summary Judgment. *17 U.S.C. § 201(b)*. Under this doctrine, the general rule conferring copyright ownership to its author is qualified to provide that "the employer or other person for whom the work was prepared is considered the author … and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Id.* Under *section 101 of the Act*, a work made for hire can arise under two circumstances "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned … if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." *Id.* at *§ 101*. [5] In this case, Plaintiff does not assert copyright ownership pursuant to a signed writing regarding a specially ordered or commissioned work. Instead, Plaintiff contends Marian Trnkus was an employee of Alcatel for copyright purposes rather than an independent contractor, and consequently, Plaintiff owns the relevant copyrights pursuant **[*14]** to the work made for hire doctrine. Therefore, the central issues facing this Court concern the correct characterization of Trnkus's employment status and whether, assuming Trnkus is not an independent contractor as a matter of law, the programs were created within the scope of his employment at Alcatel.

Although the Act does not define the term "employee," the United States Supreme Court has set forth a non-exhaustive, thirteen-factor test for determining whether an author is an employee within the meaning of the *Copyright Act*'s work made for hire provision. *Reid, 109 S. Ct. at 2178-79*. In its decision, the Court inferred that the congressional intent in its use of the term and phrase "employee" and "work made for hire" was to apply conventional principles of the master-servant relationship. *Id. at 2172*. In so doing, the **[*15]** Court essentially adopted the Fifth Circuit's rationale and reliance on general principles of common law agency to assist in the fact finder's determination. *Id. at 2178-79*; *Easter Seal Soc'y v. Playboy Enters., 815 F.2d 323 (5th Cir. 1987)*.

> ***HN7***[] In determining whether a hired party is an employee under the general common law of agency, we consider (1) the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party.

*Reid, 109 S. Ct. at 2178-79* ***[*16]*** (footnotes omitted). In addition, the Court noted that no single factor is determinative. *Id.*

---

[5] *Section 101 of the Act* lists and defines each of the nine categories of "specially ordered or commissioned" works; none of which, however, are applicable in this case.

In this case, Defendant moves for summary judgment contending Plaintiff cannot meet the ownership element on its copyright claim. Defendant argues that the application of the *Reid* factors establish as a matter of law that Trnkus was an independent contractor rather than an employee of Alcatel. In general, Defendant attempts to bolster its position by claiming the circumstances and means under which the relevant programs were created were not subject to Alcatel's control or input. In addition, Defendant points to various factors surrounding Trnkus's position at Alcatel as being consistent with independent contractor status. For example, Defendant argues that the fact Trnkus was paid, not by Alcatel, but instead through Prism, that Alcatel did not withhold taxes or furnish Trnkus with employee benefits, that Trnkus had flexibility in deciding his work schedule, and was hired pursuant to a series of relatively short-term contracts, etc., indicate Trnkus was an independent contractor as a matter of law.

Plaintiff, however, alleges that, notwithstanding Trnkus's undisputed creation of **[*17]** the relevant programs, the works constitute work for hire, and thus ownership is conferred to Alcatel. Essentially, Plaintiff argues that, although Trnkus was a contractor, he was not in fact independent, and rather for all practical purposes was the functional equivalent to an Alcatel employee. To support this position, Plaintiff relies on a number of factors it claims are consistent with employee status, such as the long-term relationship between Alcatel and Trnkus, Alcatel's apparent right to assign Trnkus additional assignments and to control the performance and direction of his work product, as well as Alcatel's general treatment of Trnkus as one of its employees. Finally, Plaintiff argues that Defendant is not entitled to summary judgment on an independent ground. It alleges that Prism, acting as Trnkus's agent, assigned to Alcatel all intellectual property rights in any works Trnkus created while working at Alcatel through Prism. In sum, both parties claim that the relevant *Reid* factors support their respective positions regarding Trnkus's employment status at Alcatel and to whom copyright ownership vests.

Often times, deciding cases under the work made for hire provision **[*18]** of the *Copyright Act* involves highly complex and detailed evaluation of the exceedingly fact intensive factors promulgated by the Supreme Court in *Reid.* In any given case, certain of the *Reid* factors may be more or less probative on the issue of employment status, and in some instances even, certain other factors may contain no relevance whatsoever. Although the Supreme Court has guided courts' analyses by enumerating factors for consideration, the Court has not stated the relative weight that any of these factors should be afforded. However, it seems clear that factually specific analyses such as these do not lend themselves well to bright-line rules regarding specific treatment of factors and, consequently, the Court's silence with respect to this issue was perhaps not unintentional. Nonetheless, in this case, Defendant has directed this Court's attention to five of the thirteen *Reid* factors it claims are relevant in nearly all cases. Specifically, Defendant asserts (1) the hiring party's right to control the manner and means of creation, (2) the skill required, (3) the provision of employee benefits, (4) the hired party's tax treatment, and (5) whether the hiring party **[*19]** has the right to assign the hired party additional projects, are all factors that are significant in virtually every case and that support the granting of summary judgment in this case. *Aymes v. Bonelli, 980 F.2d 857, 861 (2d Cir. 1992)*; *Carter v. Helmsley-Spear, 71 F.3d 77, 85 (2d Cir. 1995)* (relying on the above five factors with greater emphasis as being significant and highly probative of employment status in nearly all cases). However, Defendant's heightened emphasis on five of the thirteen *Reid* factors is misplaced. Although it is clear that the Second Circuit regards these five factors as somehow deserving of increased attention, there is no evidence that the Fifth Circuit universally weighs any of the factors greater than others. [6] Moreover, the Supreme Court in *Reid* has certainly given no indication courts should apply elevated weight to various factors. Instead, the Supreme Court has merely stated none "of these factors is determinative." *Reid, 109 S. Ct. at 2179*. [7] Therefore, this Court has

[6] This apparent jurisdictional conflict is disturbing and seemingly antithetical to Congress' expressed "objective of creating national, uniform copyright law …." *Reid, 109 S. Ct. at 2173* (citing *17 U.S.C. § 301(a)*).

[7] ***HN8***[] Regarding the determination of whether one is an employee or independent contractor, the Supreme Court noted over thirty years ago that:

examined *all* of the relevant *Reid* factors and analyzed and weighed each in a fashion in which this Court felt appropriate **[*20]** in light of the facts unique to this case. Following this examination, and resolving all reasonable doubts in favor of Plaintiff, the Court finds that while some of the factors favor the finding that Trnkus was an independent contractor rather than an Alcatel employee, genuine issues of material fact exist such to preclude the granting of summary judgment.

**[*21]** At the outset, the Court notes that Defendant's burden on its Motion for Summary Judgment in this case is slightly augmented by the fact that Plaintiff, by virtue of securing copyright registration in the relevant programs, enjoys a *prima facie* presumption that it is the owner of a valid copyright for each of the relevant programs. *17 U.S.C. § 410(c)*. [8] In May of 2000, following the commencement of this cause of action, Plaintiff filed a copyright registration reflecting Alcatel, Inc. as the author in the relevant programs which were created less than five years prior. Consequently, this registration, and the facts stated therein, constitute *prima facie* evidence of validity. *Id; Edmark Indus. SDN.BHD. v. South Asia Int'l (H.K.) Ltd., 89 F. Supp. 2d 840, 844 (E.D. Tex. 2000)*. However, this presumption is certainly not irrebuttable. Defendant, however, has the burden to rebut the statutory presumption of Alcatel's copyright ownership by demonstrating Trnkus was an independent contractor rather than an Alcatel employee, which can be done by pointing out to this Court the absence of genuine issues of material facts regarding Trnkus's employment **[*22]** status. *Lakedreams v. Taylor, 932 F.2d 1103, 1108 n.10 (5th Cir. 1991)*; 3 *NIMMER ON COPYRIGHT § 13.01[A]*, at 13-14. Although some of the factors Defendant points to are indeed consistent with independent contractor status, in evaluating the following *Reid* factors, the Court finds a rational jury could conclude Trnkus was an Alcatel employee.

A. Alcatel's Right to Control the Manner and Means of Trnkus's Work:

***HN10***[] To determine whether one is acting in the capacity of an independent contractor, one must measure the amount of control the hiring party exerts or has the right to exert over the worker. Specifically, the Supreme Court directs courts to examine the "hiring party's right to control the manner **[*23]** and means by which the [relevant] product is accomplished." *Reid, 109 S. Ct. at 2178*; *see also,* Restatement (Second) of Agency § 220(2)(d) (1958). Relevant to this case, therefore, is the extent Alcatel had the right to control Trnkus's performance of his duties, and in particular, its right to control the manner and means under which the programs at issue were developed. In support of its allegation that Trnkus was an independent contractor, Defendant argues that Alcatel neither requested nor supervised Trnkus's creation of the programs, and in fact, Trnkus was not even hired specifically to create these programs. In addition, Defendant argues that, although Alcatel may have retained control over the ultimate project, Trnkus created the programs at home, and thus Alcatel lacked control over the precise manner and means by which the project was to be accomplished. However, a careful review of the summary judgment evidence reveals the precise level of control Alcatel possessed over Trnkus's creation of the programs at issue is unclear.

For example, the evidence demonstrates that Trnkus was hired by Alcatel as a software engineer to work on its complex cross-connect **[*24]** project, and that during the performance of this project, Trnkus created the programs at issue. The circumstances surrounding Trnkus's technical and skilled work for Alcatel do not involve the simplicity of a hiring party's relatively independent creation of a sculpture, for example. Instead, this case involves the creation of programs for a complex and technical project, the very nature of which, required the collective efforts of several Alcatel employees. The evidence demonstrates that Trnkus was not working on the cross-connect project by himself, but rather was a member of a team of other highly skilled workers, all of whom seemingly worked under

---

> There is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common-law agency principles.

*NLRB v. United Insurance Company of America, 390 U.S. 254, 88 S. Ct. 988, 991, 19 L. Ed. 2d 1083 (1968)*.

[8] ***HN9***[] "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." *17 U.S.C. § 410(c)*.

the direction of Alcatel management. For example, Trnkus's former Alcatel supervisor, Ronald Church, stated in his memorandum regarding the retention of Trnkus's Alcatel contract in January of 1995, that Alcatel's renewal of Trnkus's contract was for the purpose of his work on the 1633SX R9 development, and that Trnkus's "addition to this team has allowed [Alcatel] to include the key MCI feature …." The Court finds this factor significant. In light of the very nature and circumstances of Alcatel's project to which Trnkus was assigned, **[*25]** the notion that Trnkus's creation of the relevant programs was possibly subjected to Alcatel's control, is not entirely remote. Indeed, Church's declaration underscores the possibility that Alcatel in fact retained control over the manner and means under which the programs were developed. He stated, for example, that Trnkus's work was not independent, but was regularly subject to review and critique by his supervisors and teammates. In addition, Church stated that, although Trnkus was hired as a contractor, he was treated no differently than permanent Alcatel software engineers, and that "Trnkus did not control the manner and means by which he performed his development work for Alcatel. Rather, Alcatel had the same right to control the manner and means by which Mr. Trnkus performed his development work as it did the work of other software engineers." [9] These statements by Trnkus's former supervisor directly refute Defendant's assertions regarding Alcatel's alleged lack of control and the level of autonomy Trnkus retained over his developmental work, and thus, present a genuine factual issue for trial.

**[*26]** B. Alcatel's Right to Assign Additional Projects to Trnkus:

Whether Alcatel had the right to assign Trnkus additional projects is a relevant factor in this case. ***HN11***[] In a conventional employment relationship, the hired party may typically be assigned additional projects at his employer's behest. However, independent contractors typically are hired for a particular project and the hiring party generally may not unilaterally assign additional duties to the hired party. In reviewing the summary judgment evidence on this issue, the Court finds this factor is inconclusive.

Although Trnkus's testimony in the state court proceedings for temporary injunction indicates Alcatel did not have the right to assign him additional projects, [10] he also stated in his deposition that he worked on various projects assigned to him while at Alcatel. [11] Trnkus's apparent contradiction creates an ambiguity. In addition, Trnkus has included on his employment resume a list of his various accomplishments while at Alcatel, many of which seemingly pertain to different assignments; and moreover, Church has specifically stated that Alcatel had the right to assign Trnkus to work on different projects, to work **[*27]** with different teams, and to use different programming languages. The evidence clearly establishes Trnkus was engaged in numerous projects during his four and one half

---

[9] In Defendant's Reply, it argues that Church's statements regarding Alcatel's alleged right of control are insufficient to raise a genuine issue for trial because they do not specify the precise time period to which they relate. While the Court agrees with Defendant that in and around July of 1995 should be the appropriate time frame to examine Alcatel's level of control, since it was within this period the programs at issue were developed, the Court disagrees that these statements are insufficient and indefinite as a matter of law. Church has provided many statements regarding Alcatel's alleged right to generally control Trnkus's developmental work he performed at and for Alcatel. Although these statements do not necessarily indicate the precise time frame to which they relate, Alcatel's level of control over Trnkus within the relevant time remains an issue for trial.

[10]

Q: Mr. Trnkus, did Alcatel have the right to assign you additional projects in addition to the ones that you were doing on your contract?

A: Only whatever I was doing on the contract.

[11]

Q: [While at Alcatel], you worked on projects that were assigned to you by a supervisor at Alcatel?

A: Yes.

Q: And you reported to him?

A: Yes.

year tenure at Alcatel. However, notwithstanding the existence of this testimony and evidence, the record is ambiguous and fails to answer the precise issue this Court must ascertain; namely, whether Alcatel had the *right* to assign Trnkus additional projects at its discretion. Although the evidence clearly indicates Trnkus was assigned various projects over the course of his four and one half year contractor relationship with Alcatel, the evidence does not indicate whether, within each contractual term, Alcatel had the right to assign Trnkus to work on a project he was not initially assigned to perform. In other words, it is unclear whether Alcatel's exclusive means of assigning Trnkus the various projects on which he worked was to extend or renew his contract, or whether within each contract, Alcatel had the right to assign Trnkus additional work. [12] **[*29]** Finally, Defendant's contentions that Trnkus was retained in 1995 for a particular project, for a specific time period, and for a specific amount of compensation, **[*28]** even if true, still fail to answer the question of whether Alcatel had the *right* to assign him additional work. [13] This issue is crucial and left unanswered by the summary judgment evidence.

C. The Duration of Alcatel and Trnkus's Relationship:

The Court finds the duration of Trnkus's relationship with Alcatel to be somewhat indicative of independent contractor status. Although Trnkus was working almost exclusively at Alcatel [14] for a period of approximately four and one half years, this long-term duration was not pursuant to a single contract, but was rather broken down into a series of distinct, six to nine-month contracts. Therefore, while the overall length of Trnkus's relationship with Alcatel resembles employment, this otherwise probative evidence is offset by the fact that the four and one half year relationship was pursuant to several shorter termed contracts. In addition, the significance of the relatively long-term relationship between Alcatel and Trnkus is further undermined **[*30]** by the evidence suggesting that at the inception of each contract, neither party knew whether Trnkus would remain at Alcatel following each contract's expiration. Thus, although the contractual relationship between the two ultimately proved long-term, it is likely that Trnkus's job security at Alcatel, as well as Alcatel's prospects with respect to Trnkus, were very much short-term. In fact, prior to extending Trnkus's second Alactel contract, Church indicated in his requisition memorandum that Alcatel would engage Trnkus's services "to September 30, 1995." In addition, he stated that this would be the final extension of Trnkus's contract, and "any retention of [Trnkus] beyond this contract will only be as a permanent employee." Therefore, this factor slightly favors independent contractor status.

**[*31]** D. Trnkus's Treatment for Purposes of Tax and Employee Benefits Purposes:

***HN12***[↑] This Court regards a hiring party's tax and benefits treatment of its alleged employee as a significant factor in the determination of work for hire status. Since *Reid,* virtually every case that has found the hired party to be an independent contractor did so in part because the hiring party failed to provide employee benefits to or withhold taxes from its worker. *See, e.g., Aymes v. Bonelli, 980 F.2d 857, 862-63 (2d Cir. 1992)*; NEIL BOORSTYN, BOORSTYN ON COPYRIGHT § 3.03[2], at 3-18 (2000). The Court, therefore, agrees that a hiring party's failure to

---

[12] Plaintiff relies on Church's statement in his declaration wherein he stated "Mr. Trnkus could be and was directed to fix, modify or redo work that he had already done at the request of his managers or in response to suggestions and recommendations made at peer review sessions." Plaintiff argues this evidence supports Trnkus's status as an employee. The Court disagrees. Defendant has correctly cited case law, albeit not within this jurisdiction, indicating a hiring party's right to final approval by requiring the hired party to redo or complete unsatisfactory work, differs from the right to assign additional work, and is not particularly relevant to employment status. *Marco v. Accent Publishing Co., Inc., 969 F.2d 1547, 1551 (3rd Cir. 1992)*.

[13] Moreover, although the requisition memorandum and orders appear to be requesting Trnkus for specific projects, nothing in the contracting agreement between Prism and Alcatel, through which Trnkus was retained, purports to limit the work or duties of the hired party to a particular project.

[14] Although in September and October of 1995 Trnkus engaged in contract work at another company, Earth Information Systems, he worked exclusively at Alcatel during the remainder of his Alcatel tenure, and thus, Trnkus's short-term engagement at another company does not compel a finding of independent contractor status. *See Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc., 119 F.3d 55, 60 (1st Cir. 1997)*.

treat a worker as an employee for tax and benefits purposes is inconsistent with a subsequent claim that the worker is an employee for the purpose of copyright ownership. However, the Court is also of the opinion that the presence of this inconsistency does not necessarily compel a finding that Trnkus was an independent contractor. While the parties do not dispute Alcatel's failure to treat Trnkus as an employee for tax and employment benfits purposes, [15] **[*33]** the Court is not willing to elevate these factors into an outcome determinative **[*32]** litmus test, the function of which is to circumvent the thorough *Reid* analysis. To do so would be in direct contravention to the Supreme Court's directives in *Reid,* in which the unanimous Court stated that none of the factors are determinative. *Reid, 109 S. Ct. at 2179*. Moreover, as Plaintiff points out, at least one commentator has sharply criticized courts' elevated reliance on the tax and benefits factors. [16] Even though Trnkus may have held the title of "independent contractor" for tax purposes, one may nevertheless conclude he was an Alcatel employee if the other factors ultimately prove consistent with employment and indicate Trnkus was not truly "independent" in the performance of his duties.

E. Remaining *Reid* Factors:

The remaining *Reid* factors are either inconclusive or not substantially relevant to the facts of this case. For example, ***HN13***[] the level of skill **[*34]** the hired party possesses is a factor typically afforded great weight. *See, e.g., Aymes v. Bonelli, 980 F.2d 857, 861-62 (2d Cir. 1992)*. However, in this case, while it is clear Trnkus is a highly skilled worker, it is equally clear that highly skilled workers are nothing new to technical companies such as Alcatel. A technical company comprised almost exclusively of highly skilled employees, seeking the services of another highly skilled contractor, is not significantly probative on the issue of employment status.

In addition, courts are directed to examine the source of instrumentalities and tools as well as the location of work in determining one's employment status. In this case, however, these factors have reduced relevance. The evidence indicates Trnkus created the programs at issue while at home and working on his own computers. However, as Plaintiff points out, Trnkus's working at home is nothing unique and not unlike other full-time Alcatel software engineers. Moreover, even if Trnkus produced the programs from his house, Alcatel workers, including Trnkus, were provided with remote access to the Alcatel systems network. In addition, Plaintiff points out that, **[*35]** although Trnkus may have created the programs at his home, he made improvements to these programs at Alcatel and on Alcatel's computer equipment, and even subsequently deposited them into Alcatel's program repository. [17]

---

[15] Plaintiff does not dispute that it did not provide Trnkus with the employee benefits of medical insurance or an employer sponsored retirement program. However, it does argue that Alcatel provided other employee benefits such as paid vacation and paid sick leave. This contention is, however, in dispute because, as Defendant points out, it is unclear how Plaintiff provided Trnkus with paid vacation or sick leave when Trnkus was being paid through Prism, not Plaintiff. Nonetheless, a jury would be permitted to hear evidence on the issue of Plaintiff's alleged provision of employee benefits and would be considered as a factor in the analysis.

[16]

Besides being confounded by subsequent cases, [*Aymes* for example] … suggests an end- run around the Supreme Court's [*Reid*] opinion and resurrection of the … rule that only 'formal, salaried employees' qualify under the work for hire doctrine …. *Reid* expressly declined to adopt [the rule that only 'formal, salaried employees' qualify under the work for hire doctrine] and plainly did not consider these two factors to be determinative ….

1 MELVILLE B. NIMMER & DAVID NIMMER, *NIMMER ON COPYRIGHT § 5.03[B][1][a]*, at 5-29-5-30 (2000) (citations omitted). *Sasnett v. Convergent Media Sys., Inc., 1997 U.S. Dist. LEXIS 17960, No. CIV.A.95-12262-NG, 1997 WL 33142149, at *10 (D.Mass. Aug. 29, 1997)* (stating that tax and benefits treatment is not dispositive and although the hired party *looked* like an independent contractor for tax purposes, he worked and acted like an employee).

[17] Plaintiff alleges that under Alcatel's Information System's Security Policy, which applies to contractors, consultants and employees, all software deposited in the library belongs to Alcatel. The policy states:

All data within the ANS Computer Resources, generated by the ANS Computer Resources, or in anyway related to ANS Computer Resources, is considered company private information. [sic] Personal data should not be stored on ANS Computer

Therefore, the source of instrumentalities and work location factors are not substantially probative on the issue of Trnkus's employment status in this case.

**[*36]** In examining the extent of Trnkus's discretion in determining when and how long to work, as well as the method by which he was compensated, the summary judgment evidence again is inconclusive. It is undisputed that Trnkus had a flexible work schedule. As Trnkus himself pointed out, while he may have worked an average of forty hours per week, he was afforded the freedom to work more or less than forty hours as he felt necessary. The evidence reveals, for example, that he would often take time off to engage in activities such as wind surfing, while still being paid for forty-hour work weeks. However, although a flexible work schedule such as this would typically be consistent with independent contractor status; again, other Alcatel programming engineers enjoyed the sort of flexible work schedule under which Trnkus worked. In addition, the manner in which Trnkus was paid tends to cut both in favor of employment and independent contractor status. Trnkus was not paid by the job; rather, he was paid by the hour and bi-weekly like an Alcatel employee. However, while he was consistently paid bi-weekly based upon a forty-hour work week, he was paid not directly by Alcatel, but by and through **[*37]** Prism- a characteristic which is indicative of independent contractor status. Thus, these factors too are indeterminate.

In addition, ***HN14***[] courts are directed to inquire whether the hiring party is "in business," and if so, whether the retention of the hired party was pursuant to or in furtherance of that business. *Reid, 109 S. Ct. at 2179*. Where a hiring party is engaged in a not-for-profit activity and retains a highly skilled worker, the circumstances tend to resemble an independent contracting relationship. Alcatel, however, is certainly engaged in a for-profit business; but this fact carries little relevance because this factor has been deemed to be not particularly useful in most cases. *Aymes v. Bonelli, 980 F.2d 857, 863 (2d Cir. 1992)*. Additionally, Alcatel is in the regular business of software development, and the programs at issue were written for the purpose of furthering Alcatel's development of its software. Because Alcatel was engaged in the same business for which it retained Trnkus, this factor, if anything, tends to gravitate toward employment status. Finally, whether Trnkus had the authority to hire assistants is a factor of little relevance **[*38]** in this case. The evidence indicates Trnkus was a member of a team, and whether or not Trnkus used Alcatel employees or teammates to assist him in his actual duties is unclear. However, the evidence does tend to establish that Trnkus arguably had little reason to hire his own assistants because, should the need for help arise, Trnkus had other teammates and Alcatel employees from which to seek assistance. In addition, ***HN15***[] courts have described the authority to hire assistance factor as "virtually meaningless in a situation where the hired party does not need assistants." *Aymes, 980 F.2d at 864*.

In sum, having carefully reviewed the summary judgment evidence in the light most favorable to Plaintiff, the Court finds a rational jury could conclude Trnkus was in substance an Alcatel employee. Although it is clear that Trnkus was treated as an independent contractor for tax and significant employee benefits purposes, in examining the overall relationship between Trnkus and Alcatel, his true employment status becomes less clear. It is possible a jury could determine Alcatel had the rights to control Trnkus's developmental work and unilaterally assign Trnkus additional work **[*39]** within each contractual term. In addition, Trnkus's true employment status is further called into question by analyzing his general work conditions over the course of his four and one-half year contracting relationship with Alcatel. The evidence, for example, suggests he did not have complete autonomy in performing his

---

Assets. [sic] If it is being used or stored on ANS computer resources then it is considered company data rather [than] private personal data.

> In reviewing this security policy, it seems Alcatel's intent may have been to treat all personal or private data stored in its systems as Alcatel property for the purposes of confidentiality and security. After all, this provision is contained in the document entitled "Information System's *Security* Policy," and within this document, the provision is found in the section solely pertaining to confidentiality of data. The Court is of the opinion that the programs are likely considered Alcatel property for purposes of security and confidentiality, but is not willing to vest complete ownership in the programs to Alcatel merely by virtue of Trnkus's deposit. Moreover, Plaintiff doesn't request the Court to do so. Instead, it argues that Trnkus's program deposit indicates he created them in the scope of his employment at Alcatel, not necessarily that Alcatel owns the programs for all purposes. At any rate, the precise meaning and intent of this provision is ambiguous as a matter of law and remains a factual issue for the jury.

duties at Alcatel; instead, he worked with and reported to a team comprised of other highly skilled workers, all of whom seemingly worked under Alcatel's direction and for a common objective. Moreover, although carrying the label of contractor, Trnkus's supervisor stated "he was treated no differently than permanent Alcatel software engineers … [and] Alcatel provided him with the same type of facilities and support environment as any other Alcatel software engineer." The Court disagrees with Defendant's claim that the *Reid* factors establish Trnkus was an independent contractor as a matter of law. Accordingly, summary judgment should be denied on this issue.

***HN16***[] Assuming an employment relationship has been established, it must then be determined whether the employee created the work within the scope of his or her employment. [18] *Reid* requires courts to apply **[*40]** the general common law of agency to evaluate whether the work was created within the scope of employment. *Reid, 109 S. Ct. at 2172-73*. An employee's work is performed within the scope of employment if, but only if: (1) it is the kind of work he was hired to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by the employee's desire to further the employer's goals. Restatement (Second) of Agency § 228 (1958). This Court, of course, has not found Trnkus was an Alcatel employee, but merely that a rational jury could conclude as much. However, assuming a jury in fact concludes Trnkus was an Alcatel employee, the Court also finds a rational jury could conclude the programs at issue were created within the scope of his employment with Alcatel. Consequently, this issue, along with Trnkus's employment status, is a matter for the trier of fact.

**[*41] II. <u>Alleged Copyright Assignment:</u>**

In Plaintiff's Response Brief, it argues that there is an independent reason as to why summary judgment is not warranted in this case. Plaintiff argues Defendant is not entitled to summary judgment because Prism, acting as Trnkus's agent, assigned to Alcatel all interest in any copyrights in any works that Trnkus created while he was working at Alcatel through Prism. Contained in the contract between Alcatel and Prism, through which Trnkus was retained, is a clause purporting to assign all copyrights to Alcatel. It states:

> In the event that the copyright in any data and information generated in the performance of this Agreement does not vest in [Alcatel] by law, [Prism] hereby agrees to assign and assigns to [Alcatel] the copyright in all such data and information.

Plaintiff points out that Trnkus came to Alcatel through the existing contract between Prism and Alcatel, which contains the above assignment clause. Plaintiff proceeds to argue that Trnkus left it to Mr. Richardson of Prism as his agent to negotiate all terms of his work for Alcatel, and that, because the underlying Prism / Alcatel contract contained **[*42]** the assignment clause, and Trnkus came to Alcatel through this existing contract, the assignment clause equally pertains to Trnkus.

Plaintiff's alternative argument suffers, however, for several reasons. First of all, it is beyond this Court as to why Plaintiff would attempt to apply the terms of the Alcatel / Prism contract equally to Trnkus. Plaintiff's success in its copyright infringement action hinges on its ability to prove Trnkus was an Alcatel employee and not an independent contractor. However, the Alcatel / Prism contract, through which Alcatel attempts to tie Trnkus, specifically states in its first paragraph that the services shall be performed "only by C. Douglas Richardson on behalf of [Prism], an *independent contractor, and not as an employee of* [Alcatel]." It seems unclear how Plaintiff intends this contract to pertain to Trnkus for purposes of his assigning copyright ownership to Alcatel, but to not apply to Trnkus in characterizing him "as an independent contractor, and not as an employee" of Alcatel. In other words, it seems that if Plaintiff genuinely believes the Alcatel / Prism contract should equally apply to Trnkus, then by virtue of this

---

[18] The Court need not engage in an in-depth analysis on this issue. First of all, the scope of employment prong of the work made for hire analysis presupposes the existence of an employment relationship. No such relationship has been established. Secondly, Defendant has not clearly moved for summary judgment on this issue. In fact, the only significant discussion of whether the programs were created within the scope of Trnkus's Alcatel employment occurred in Plaintiff's Response Brief, wherein it argued that a jury could conclude the programs were created in the scope of employment.

contract's **[*43]** expressed terms, Trnkus should then be characterized as an independent contractor, the same as Prism and Richardson. This paradox can only be resolved if Plaintiff intends to make certain provisions of the Alcatel / Prism contract applicable to Trnkus, but not other provisions. However, it is unclear. Nonetheless, as Defendant points out, the evidence indicates Trnkus did not sign this agreement, did not see this agreement, nor possibly even knew of its existence. Even so, while the contractual terms apply to Richardson, it is not clear they would equally apply to Trnkus on an agency theory. What is clear, however, is that the Court need not thoroughly evaluate this issue because neither party has moved for summary judgment seeking resolution of this issue. Instead, Plaintiff has proffered this theory as an alternative or independent ground for the denial of Defendant's Motion for Summary Judgment. Plaintiff suggests this theory only as a means for raising genuine issues of material fact as to the ownership element on its copyright claim. This Court, however, has already determined that genuine factual issues exist such to preclude the granting of summary judgment, and consequently, **[*44]** Plaintiff's assignment theory is moot.

**CONCLUSION**

For all the foregoing reasons, the Court finds genuine issues of material facts exist as to whom copyright ownership vests. Therefore, Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

Signed this 30 day of October, 2001.

Paul Brown

UNITED STATES DISTRICT JUDGE

**ORDER GRANTING MOTION TO EXCEED PAGE LIMIT**

On this 30th day of October, 2001, upon the Motion of Defendant Cisco Systems, Inc. Motion to Exceed Page Limits Imposed By Local Rule 7(a),

Having considered the motion and any opposition to it, the Court finds it to have merit and accordingly ORDERS that the motion is granted and that Cisco Systems, Inc. may exceed the page limits imposed by Local Rule 7(a) in its Reply Brief in Support of Motion for Leave to File Amended Answer.

SIGNED this 30th day of October, 2001.

Paul Brown

United States District Judge

---

End of Document

Neutral
As of: April 17, 2025 10:30 PM Z

# Young Again Prods., Inc. v. Supplement Spot, LLC (In re Supplement Spot, LLC)

United States Bankruptcy Court for the Southern District of Texas, Houston Division

July 8, 2009, Decided; July 8, 2009, Filed, Entered

Case No. 06-35903-H4-11, Adversary No. 07-03019

**Reporter**
2009 Bankr. LEXIS 1981 *

In re: SUPPLEMENT SPOT, LLC, Debtor. YOUNG AGAIN PRODUCTS, INC., Plaintiff, v. SUPPLEMENT SPOT, LLC, JOHN ACORD, and MARCELLA ORTEGA, Defendants.

**Subsequent History:** Related proceeding at *Young Again Prods. v. Acord, 2011 U.S. App. LEXIS 13370 (5th Cir. Tex., June 28, 2011)*

## Core Terms

YAP, documents, Seal, attorney-client, fact finding, independent contractor, communications, e-mails, Products, Motions, motion in limine, website, adversary proceedings, work product, privileged, confidential, waived, public access, deposition, disclosure, subpoena, motion for a protective order, unresolved, factors, weighs, Internet, nutritional, contractor, Exhibits, pretrial

## Case Summary

### Procedural Posture

In this adversary proceeding, plaintiff company filed a complaint alleging that defendant insiders failed to disclosure assets of the debtor's estate. The company filed a motion in limine, motions to seal, and a motion for a protective order.

### Overview

With respect to the motions before the court, the primary issue was whether approximately 1,900 documents should be sealed based on the company's non-specific assertion that some or all of the documents were privileged. The court conducted an independent review of the documents and found that the company was not entitled to have them sealed. For example, the court noted that the company failed to mention *11 U.S.C.S. § 107(b)*. However, even if it had asserted that the documents were entitled to protection under *§ 107(b)*, it would have needed to establish that the documents contained a trade secret or confidential research, development, or commercial information, or scandalous or defamatory matter, which they did not. Also, as to documents turned over to an employee by an independent contractor, the court found that such documents were not entitled to any privilege protection. The court applied the Restatement (Second) of Agency factors to determine that the individual was an independent contractor instead of an employee. Her communications, therefore, were not entitled to any privilege. Documents disclosed pursuant to a subpoena also were not entitled to privilege.

### Outcome

The court denied the motions to seal, but granted the motion tin limine and the motion for protective order.

## LexisNexis® Headnotes

Bankruptcy Law > Procedural Matters > Jurisdiction > Federal District Courts

**HN1[] Jurisdiction, Federal District Courts**

District courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11. *28 U.S.C.S. § 1334(b)*. Furthermore, each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district. *28 U.S.C.S. § 157(a)*.

Civil Procedure > Pretrial Matters > Motions in Limine > General Overview

**HN2[] Pretrial Matters, Motions in Limine**

Motions in limine allow a trial court to make a pretrial ruling on the admissibility and relevance of evidence. Unless the evidence at issue is clearly inadmissible on all potential grounds, it should not be excluded in limine. A motion in limine that seeks to exclude broad categories of evidence is rarely granted.

Evidence > Relevance > Relevant Evidence

**HN3[] Relevance, Relevant Evidence**

*Fed. R. Evid. 402* states that only evidence relevant to the issue before the court will be admissible, and irrelevant evidence is inadmissible. *Fed. R. Evid. 402*. Evidence is relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would otherwise be without the evidence. *Fed. R. Evid. 401*.

Governments > Courts > Court Records

**HN4[] Courts, Court Records**

The courts recognize a general right to inspect and copy judicial records and documents. This right of public access serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness. Thus, under the common law, there is a long-standing presumption of public access to judicial records. Because most courts endorse a presumption of public access to discovery materials, the district court is required to make a determination of good cause before entering an order keeping the documents out of the public.

Governments > Courts > Court Records

**HN5[] Courts, Court Records**

The common law presumption of public access to judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. Therefore, courts must balance the factors favoring secrecy against the common law presumption of access. Because this balancing exercise is fact intensive, the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case. The decision to seal court records and pleadings should not be taken lightly; only the most compelling reasons can justify non-disclosure of judicial records.

Bankruptcy Law > Procedural Matters > General Overview

Governments > Courts > Court Records

***HN6***[] **Bankruptcy Law, Procedural Matters**

The right of public access to judicial records is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system. In the bankruptcy context, the presumption of public access is codified in *11 U.S.C.S. § 107(a)*. *Section 107(a)* provides that a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge. However, like the common law right of public access, *§ 107(a)* is not absolute. *Section 107(b)* provides limited exceptions to the right of public access in bankruptcy cases. *Section 107(b)* provides that the bankruptcy court shall, on request of a party in interest, or may, on its own motion: (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

Bankruptcy Law > Procedural Matters > General Overview

Governments > Courts > Court Records

***HN7***[] **Bankruptcy Law, Procedural Matters**

See *11 U.S.C.S. § 107(b)*.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Governments > Courts > Court Records

***HN8***[] **Discovery, Privileged Communications**

It is not enough for a movant to make a sweeping statement that a voluminous collection of documents should be sealed. The party seeking to seal the documents must identify which specific documents must be sealed, and the attorney-client privilege must be specifically asserted with respect to particular documents.

Bankruptcy Law > Procedural Matters > General Overview

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

**HN9[] Bankruptcy Law, Procedural Matters**

Certainly, a lawyer's work product is one type of confidential research that falls within the plain language of the *11 U.S.C.S. § 107(b)* protection. And certainly a client's disclosures made in confidence to its attorneys is one kind of confidential commercial information.

Civil Procedure > ... > Discovery > Privileged Communications > Attorney-Client Privilege

Evidence > Privileges > Attorney-Client Privilege > General Overview

**HN10[] Privileged Communications, Attorney-Client Privilege**

The attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents.

Labor & Employment Law > Employment Relationships > Independent Contractors

**HN11[] Employment Relationships, Independent Contractors**

Under Texas law, whether a person is an employee or independent contractor is a question of fact. If one contracts to do a specific piece of work for another and furnishes, and has the absolute control of, his assistants, and the work is done in accord with his own ideas, or with a previously agreed plan, without being subject to the other's orders with respect to the details of the work, he is an independent contractor. However, if he and his assistants are subject to the control of the other party with respect to the details and method of doing the work then he is an employee. The supreme test in determining whether one is an employee or an independent contractor, according to our decisions and most of the modern cases, is the test with respect to the right of control.

Labor & Employment Law > Employment Relationships > Independent Contractors

**HN12[] Employment Relationships, Independent Contractors**

Under Texas common law, the test to determine whether a worker is an employee or an independent contractor is whether the employer has the right to control the progress, details, and methods of operations of the employee's work. For an individual to be considered an employee, the employer must control not merely the end sought to be accomplished, but also the means and details of its accomplishment as well. In contrast, an independent contractor is an individual who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control and all its details.

Labor & Employment Law > Employment Relationships > Independent Contractors

**HN13[] Employment Relationships, Independent Contractors**

Although it seems that control of the detailed physical performance may be the most critical factor in identifying an employee, it is not necessarily the only factor. Factors which are deemed relevant to determining whether an individual is an employee or an independent contractor are listed in Section 220 of the Restatement (Second) of Agency: (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with

reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.

Labor & Employment Law > Employment Relationships > Independent Contractors

**HN14[] Employment Relationships, Independent Contractors**

Short time periods of work performed indicate a status as an independent contractor. Long periods of employment with an employer indicate an employee status.

Civil Procedure > ... > Discovery > Privileged Communications > Attorney-Client Privilege

Evidence > Privileges > Attorney-Client Privilege > General Overview

**HN15[] Privileged Communications, Attorney-Client Privilege**

The attorney-client privilege is one of the oldest common law privileges and it serves to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.

Evidence > Privileges > Attorney-Client Privilege > Scope

**HN16[] Privileges, Attorney-Client Privilege**

The United States Supreme Court has extended the attorney-client privilege to cases involving communication between a corporation's employees acting at the direction of its officers and the corporation's attorney.

Evidence > Privileges > Attorney-Client Privilege > Elements

**HN17[] Attorney-Client Privilege, Elements**

The elements of the attorney-client privilege are as follows: (1) where legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) except that the protection be waived. Whether the attorney-client privilege applies is determined on a case-by-case basis.

Civil Procedure > ... > Discovery > Privileged Communications > Attorney-Client Privilege

Evidence > Burdens of Proof > Allocation

Evidence > Privileges > Attorney-Client Privilege > General Overview

***HN18***[] **Privileged Communications, Attorney-Client Privilege**

*Fed. R. Civ. P. 26(b)(5)* requires parties to submit a privilege log in order to claim that the attorney-client privilege or the work product doctrine apply. This privilege log must contain information sufficient to allow a court or a party to determine the applicability of the privilege. *Fed. R. Civ. P. 26(b)(5)*. Furthermore, a party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability.

Evidence > Privileges > Attorney-Client Privilege > Elements

***HN19***[] **Attorney-Client Privilege, Elements**

The elements outlined by the United States Court of Appeals for the Fifth Circuit for the attorney-client privilege require that the client seek legal advice from a professional legal advisor in his capacity as such.

Evidence > Privileges > Attorney-Client Privilege > Scope

***HN20***[] **Privileges, Attorney-Client Privilege**

The United States Supreme Court has held that middle-level--and indeed lower-level--employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties.

Evidence > Privileges > Attorney-Client Privilege > Waiver

***HN21***[] **Attorney-Client Privilege, Waiver**

The disclosure of any significant portion of a confidential communication waives the attorney-client privilege as to the whole. The confidentiality of a client's communications may be compromised either through the publication of evidence of the communications themselves or through the publication of evidence of attorney statements or documents that disclose the client's confidential communications.

Civil Procedure > Discovery & Disclosure > Discovery > Protective Orders

Evidence > Burdens of Proof > Allocation

Evidence > Privileges > General Overview

***HN22***[] **Discovery, Protective Orders**

When a request to seal a large number of documents is made, the movant has the burden to prove with specificity which documents are entitled to protection and why.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > General Overview

*HN23*[] **Privileged Communications, Work Product Doctrine**

The work product doctrine insulates a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries. The work product privilege applies to documents prepared in anticipation of litigation. The work product privilege applies even when litigation is not imminent, as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > General Overview

Evidence > Burdens of Proof > Allocation

*HN24*[] **Privileged Communications, Work Product Doctrine**

The burden of establishing that a document is work product is on the party who asserts the claim, but the burden of showing that the materials that constitute work product should nonetheless be disclosed is on the party who seeks their production.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Waiver of Protections

Evidence > Privileges > Attorney-Client Privilege > Waiver

*HN25*[] **Work Product Doctrine, Waiver of Protections**

Production of records, documents, or evidence, in compliance with a subpoena waives any claim to attorney-client privilege or work product immunity.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Waiver of Protections

Evidence > Privileges > Attorney-Client Privilege > Waiver

*HN26*[] **Work Product Doctrine, Waiver of Protections**

The attorney-client privilege does not apply to communications that are intended to be disclosed to third parties or that in fact are so disclosed. Waiver of work product protection only results if the work product is disclosed to an adversary or treated in a manner that substantially increases the likelihood that an adversary will come into possession of that material.

Bankruptcy Law > Procedural Matters > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Protective Orders

*HN27*[] **Bankruptcy Law, Procedural Matters**

*Fed. R. Bankr. P. 9018* sets forth the procedure governing *11 U.S.C.S. § 107*, which authorizes a bankruptcy court to issue an order to protect any entity by way of a protective order.

Bankruptcy Law > Procedural Matters > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Protective Orders

***HN28***[] **Bankruptcy Law, Procedural Matters**

See *Fed. R. Bankr. P. 9018*.

Bankruptcy Law > Procedural Matters > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Protective Orders

***HN29***[] **Bankruptcy Law, Procedural Matters**

Although *11 U.S.C.S. § 107(b)(2)* requires a bankruptcy court to only protect a person with respect to scandalous or defamatory filings, *Fed. R. Bankr. P. 9018(2)* authorizes the bankruptcy court to protect any entity. According to the definition set forth in *11 U.S.C.S. § 101(15)*, the term "entity" includes person, estate, trust, governmental unit, and United States trustee.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Evidence > Privileges > Trade Secrets > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Protective Orders

***HN30***[] **Discovery, Privileged Communications**

There is no true privilege against discovery of trade secrets or other confidential business information, but the courts nevertheless will exercise their discretion to avoid unnecessary disclosure of such information, particularly where the action is between competitors.

**Counsel:** **[*1]** For Supplement Spot, LLC, Debtor: Barbara Mincey Rogers, David W Anderson, Rogers, Anderson & Bensey, PLLC, Houston, TX.

For Ben B Floyd, Trustee: David Ronald Jones, Porter and Hedges LLP, Houston, TX; Lynn Chuang Kramer, Randall A Rios, Munsch Hardt et al, Houston, TX; Timothy Aaron Million, Munsch Hardt Kopf & Harr, P.C., Houston, TX.

For US Trustee, U.S. Trustee: Ellen Maresh Hickman, Stephen Douglas Statham, Office of the U S Trustee, Houston, TX.

**Judges:** Jeff Bohm, United States Bankruptcy Judge.

**Opinion by:** Jeff Bohm

## Opinion

**MEMORANDUM OPINION ON (1) YOUNG AGAIN PRODUCTS, INC.'S MOTIONS IN LIMINE; (2) PLAINTIFF'S EMERGENCY MOTION TO SEAL AND ORDER JOHN ACORD TO DESTROY THE EXHIBITS ATTACHED TO HIS MOTION TO STRIKE; (3) YOUNG AGAIN PRODUCTS, INC'S MOTION TO SEAL EXHIBIT 2 IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SANCTIONS AND CONTEMPT AGAINST PLAINTIFF AND ITS ATTORNEYS; AND (4) YOUNG AGAIN PRODUCTS, INC'S MOTION FOR PROTECTIVE ORDER TO PRECLUDE DEFENDANTS FROM USING OR DISCLOSING YAP'S PROPRIETARY BUSINESS INFORMATION AND COMMUNICATIONS PRODUCED BY MR. MASON OR MS. PITTS TO FURTHER DEFENDANTS' OWN BUSINESS INTERESTS OR TO GAIN AN [sic] COMPETITIVE BUSINESS ADVANTAGE**

[Docket Nos. 206, 228, **[*2]** 258, & 307] [1]

**I. INTRODUCTION**

Although the reference has been withdrawn in this adversary proceeding, this Memorandum Opinion resolves pretrial matters in this adversary proceeding pursuant to instructions from the Honorable Nancy F. Atlas, United States District Judge for the Southern District of Texas. The remainder of this highly acrimonious lawsuit will be addressed at trial in the United States District Court.

In this Memorandum Opinion, this Court will resolve four pretrial motions which the plaintiff has filed: a motion in limine, two motions to seal documents, and a motion for a protective order. In the motions to seal, the plaintiff has requested this Court to seal approximately 1,900 documents based on its sweeping and non-specific assertion that some or all of these documents are privileged. Because the plaintiff has not identified which of these documents are privileged, it has necessarily requested this Court to wade through this sea of documents **[*3]** to determine which are entitled to protection. Despite the fact that the plaintiff bears the burden of showing, with specificity, which documents are privileged, this Court has conducted an independent review of all these documents and finds that the plaintiff is not entitled to the relief that it seeks in the motions to seal.

After considering the arguments and pleadings of the parties, the testimony adduced at the hearings, and the evidence admitted, the Court now makes its written findings of fact and conclusions of law pursuant to *Federal Rules of Bankruptcy Procedure 7052* and *9014*. [2] To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

**II. FINDINGS OF FACT**

1. On November 3, 2006, Supplement Spot, LLC (the Debtor) filed a voluntary Chapter 11 petition. [Case No. 06-35903, Docket No. 1.] The Debtor sells nutritional supplements and health-related products. Marcella Ortega (Ortega) is the sole owner and president of the Debtor, and John Acord (Acord) is an employee of the Debtor and Ortega's son.

---

[1] Any reference to a "Docket No." herein is a reference to a docket number in the adversary proceeding number 07-03019. Any reference to a pleading filed on the docket in the main case will be identified with the main case number 06-35903.

[2] Any reference herein to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a "Rule" or "Bankruptcy Rule" **[*4]** refers to the Federal Rules of Bankruptcy Procedure.

2. On January 24, 2007, Young Again Products, Inc. (YAP) filed its Complaint (the Complaint) against the Debtor, Ortega, and Acord (collectively, the Defendants) initiating this adversary proceeding. [3] [Docket No. 1.] In the Complaint, YAP seeks recovery for alleged fraud and civil conspiracy in an amount not less than $ 1.1 million (comprising $ 100,000.00 in compensatory damages and $ 1,000,000.00 in punitive damages) and the appointment of a Chapter 11 trustee. Specifically, the Complaint alleges that Ortega and Acord, as insiders of the Debtor, failed to disclose assets of the Debtor's estate, perpetrated fraud, and absconded with those assets.

3. On March 1, 2007, in the main case, the Court approved the appointment of Ben B. Floyd as the Chapter 11 trustee (the Trustee), effective as of February 28, 2007. [Case No. 06-35903, Docket No. 100.]

4. Roger Mason (Mason) is the president of YAP. [Docket No. 262, p.49.] YAP is a business entity incorporated under the laws of Maryland and is an unsecured creditor listed on the Debtor's bankruptcy schedules. YAP sells nutritional supplements and health-related products. Mason assisted Vicki Pitts (Pitts) with her own web-based business, "The Natural Woman" (a nutritional supplement business which sold inventory supplied by YAP through Mason). Pitts developed a business relationship with YAP in 2004 which lasted until 2006. [Joint Ex. I., p.39, ll. 8-19.] [4]

5. Numerous e-mails between "Yap1993" (i.e. Mason or Ivey Mason's [5] e-mail username) and "VFPitts" (i.e. Pitts's e-mail username) **[*6]** are on a flash drive labeled "YAP & [DELTA] s 3," admitted into evidence as Joint Exhibit 3 (Joint Ex. 3). In an e-mail dated "1/7/2005" from Ivey Mason to Pitts, Ivey Mason states:

> I will need to send you a 1099 misc. tax form for the money you received from YAP Internet in 2004. I will verify the amount with you when I'm done. You act as an "independent contractor" and YAP Internet pays you the monthly payments for your services. You know you need to pay taxes from these earnings.

[Joint Ex. 3, "Scan319.bmp".]

In an e-mail dated "2/9/2006" from Mason and Ivey Mason to Pitts, they informed Pitts as follows:

> [W]e have sent out 1099 forms today based on the finalized computations of the transfers and withdrawals relating to both you and subcontractors compensation . . . . [Y]ap internet via these transfers and withdrawals had an expense that was paid to you and others as compensation. [T]his entire amount has to be reported on 1099 forms. . . . [A]s yap's internet contractor, we are required to provide you with this form. . . . [F]inally, as we discussed, we will be providing you with our YAP Internet Contractor Agreement outlining the above.

[Joint Ex. 3, "888.bmp".]

6. On May 20, 2008, YAP, through its counsel, filed a Privilege Log with this Court (the Original Privilege Log). [Docket No. 186.]

7. On June 23, 2008, this Court held a hearing on Acord's Motion for Leave to File First Amended Answer and Counterclaim (Acord's Motion for Leave). [Docket No. 174.] YAP filed a Response opposing Acord's Motion for Leave. [Docket No. 187.] After considering the pleadings and listening to oral arguments, the Court ruled from the bench that Acord's Motion for Leave was granted in part and denied in part. The Court granted Acord's Motion for Leave to allow Acord to amend his answer so that he could plead the affirmative defenses of *res judicata* and collateral estoppel; however, the Court denied Acord's Motion for Leave in all other respects, including denying Acord leave to file a claim for defamation and tortuous interference with business relations. On July 7, 2008, the Court issued a written order consistent with this oral ruling. [Docket No. 220.]

---

[3] See *infra* Finding of Fact Number 28 noting that the Court signed the Stipulation of Dismissal of Claims dismissing with prejudice **[*5]** YAP's claims against the Debtor but not the other two Defendants--Acord and Ortega. [Docket No. 297.]

[4] On February 26, 2009, Pitts gave her deposition. Joint Exhibit 1 refers to Pitts's deposition which was admitted into evidence as "YAP & JA & [DELTA] s 1" (Joint Ex. 1). *See infra* Finding of Fact No. 34.

[5] Ivey Mason is Mason's **[*7]** wife and was involved in the operations of YAP.

8. Additionally, at the June 23, 2008 hearing, the Court asked YAP to produce the unredacted copies of the documents listed in the Original Privilege Log. The Court **[*8]** instructed YAP's counsel to produce these documents in a sealed envelope to chambers by June 30, 2008--which she did.

9. On June 27, 2008, YAP filed a Revised Privilege Log. [Docket No. 205.] The Revised Privilege Log lacked certain documents which YAP now seeks to have sealed for privilege reasons. Additionally, YAP's counsel admitted on the record at a hearing held on December 19, 2008 that YAP failed to produce some of these documents to this Court for in camera review. [6] [Docket No. 304, pp. 72-73.]

10. On June 27, 2008, YAP filed a Motion in Limine. [Docket No. 206.] In its Motion in Limine, YAP moved for the Court to exclude any evidence, testimony, or argument by the Defendants regarding two categories of evidence: (1) "any evidence, testimony, or argument by the Defendants regarding any alleged derogatory and/or defamatory statements by YAP and/or Roger Mason against Marcella **[*9]** Ortega ('Ortega'), John Acord ('Acord') or Supplement Spot ('the Debtor')" (the unresolved portion of the Motion in Limine); and (2) any criminal convictions or incarceration of Mason.

11. On July 3, 2008, YAP, Acord, Ortega, and the Debtor (through the Trustee) filed their Joint Pretrial Statement. [Docket No. 211.]

12. On July 7, 2008, Acord filed a Motion to Strike Plaintiff's Pleadings and Hold Roger W. Mason and Thomas Freeman [7] in Contempt (the Motion to Strike), [Docket No. 224], along with attached exhibits. These attached exhibits include documents Pitts provided to Acord which, according to YAP, are privileged documents. The present discovery dispute concerns these attached documents.

13. On July 9, 2008, Acord, joined by Ortega, filed their Opposition to Plaintiff's Motion in Liminie [sic]. [Docket No. 225.]

14. On July 9, 2008, YAP filed an Emergency Motion to Seal and Order John Acord to Destroy the Exhibits Attached to His Motion to Strike (the First Motion to Seal), [Docket No. 228]; and on August 21, 2008, YAP filed its Motion to Seal Exhibit 2 in Support of its Opposition **[*10]** to Defendants' Joint Motion for Sanctions and Contempt Against Plaintiff and its Attorneys (the Second Motion to Seal), [Docket No. 258] (collectively, the Motions to Seal). In the Motions to Seal, YAP requests that the Court seal, and order Acord to destroy, the documents attached to Acord's Motion to Strike, along with any other documents Acord has received from Pitts. In the First Motion to Seal, YAP argues that these "documents contain attorney-client privileged and work product documents, mental impressions of the president of Young Again Products, Inc., and its attorneys, Freeman & Freeman and divulge Plaintiff's litigation strategy in the Maryland federal litigation." [Docket No. 228, P 1.] In the Second Motion to Seal, YAP argues that the documents attached as "Exhibit 2" to its Opposition to Defendant's Joint Motion for Sanctions and Contempt Against Plaintiff and its Attorneys are "communications protected under the attorney-client privilege and work product doctrine. . . . mental impressions of the president of Young Again Products, Inc. and its attorneys, Freeman & **[*11]** Freeman, P.C. and communications divulging Plaintiff's litigation strategy in the Maryland federal litigation." [Docket No. 258, P 1-2.] YAP argues that sealing these documents is necessary because disclosure to the public or any non-party will result in immediate, substantial, and irreparable harm to YAP. [Docket No. 258, P 4.] The Motions to Seal may be considered together because the documents referenced in the First Motion to Seal (i.e. the documents attached to Acord's Motion to Strike) include the same documents referenced in the Second Motion to Seal (i.e. Exhibit 2 of YAP's Opposition to Acord and Ortega's Joint Motion for Sanctions and Contempt). Because of this overlap, the Court will hereinafter refer to both sets of documents, collectively, as "the Documents."

---

[6] The Court referenced these documents at the hearing held, on December 19, 2008. When asked by this Court which documents are the ones allegedly "secreted" by YAP's counsel, Acord's counsel, Joe A. Izen, stated that these documents are what YAP's counsel referred to as Exhibit 2. [Docket No. 304, pp. 66-67.]

[7] Thomas Freeman (Freeman) is YAP's counsel in Maryland who is admitted *pro hac vice* in this Court.

15. On July 9, 2008, this Court held a pretrial conference on, among other matters, the First Motion to Seal. At this hearing, the Court questioned Freeman as to why he did not turn over all documents in his law firm's possession to Acord. The Court then ordered Freeman to turn over redacted copies of documents to Acord by 5:00 p.m. on July 10, 2008. Freeman made the following arguments with respect to the First Motion **[*12]** to Seal:

> We just learned yesterday that there were 400 odd pages of materials that came into the possession of Mr. Acord that was taken from our servers from a former employee of ours. Those communications are replete with direct attorney-client communications. They are replete with the mental impressions of our attorneys, mental impressions of our client--all related to the litigation in Maryland. Once we learned of this, we are actually having to take emergency action now in Maryland. But apparently, outside the discovery process, the Defendant has contacted a former employee who had control over our servers and was in our employ from '04 and '05, and has obtained every document, proprietary information included, including codes, customer lists, the whole nine yards, and all of our communications with our client in Maryland. We learned this just yesterday. We're still looking through the documents and we have serious concerns about the information that is presently in the possession of Mr. Acord.

[Tape recording of hearing on July 9, 2008 at 4:54 p.m.]

16. On July 10, 2008, YAP filed a Certificate of Compliance indicating that it "complied with the Court's Order as pronounced at the **[*13]** July 9, 2008, pretrial conference and delivered a copy of the 'privileged' documents to JOHN P. ACORD prior to 5:00 p.m. on July 10, 2008." [Docket No. 230.]

17. On July 10, 2008, YAP filed its Memorandum in Support of Emergency Motion to Seal and Order John Acord to Destroy the Exhibits Attached to his Motion to Strike (YAP's Brief). [Docket No. 231.] In YAP's Brief, YAP asserts that the Documents constitute attorney-client privileged and work product documents, including mental impressions of YAP's president (Mason) and its attorneys, Freeman & Freeman, P.C., and communications divulging YAP's litigation strategy in the Maryland federal court litigation. Further, YAP contends that Acord disregarded the privileges by filing the Documents with this Court. YAP argues that even if this Court concludes Pitts's status is that of an independent contractor, the attorney-client privilege and work product doctrines nevertheless apply. [Docket No. 231, p.7.]

18. According to Mason, between 2004 and 2006, Pitts worked with YAP under the title "Webmaster, youngagainproducts.com." [Docket No. 231-1.] As a webmaster, Pitts was responsible for website maintenance, mailing lists, quality control of **[*14]** the website and server, key word advertising, article placement on the website, product description, pricing, complete fulfillment of orders, and username and password access for the website. [Docket No. 231.] Mason stated in his July 10, 2008 In Camera Affidavit, [Docket No. 231-1], that, through e-mail communication, he discussed with Pitts legal advice received from YAP's attorney and also forwarded to her internal memoranda and corporate counsel's status letters. Additionally, during the Utah and Maryland litigation, [8] according to Mason, Pitts played a key support role by investigating trademark violations on the internet and gathering factual information to support YAP's trademark claims. [Docket No. 231-1, P 6.]

19. On July 14, 2008, Acord and Ortega filed their Opposition to Plaintiff's Emergency Motion to Seal and Destroy Records Obtained from Vicki Pitts (the Opposition to the Motion to Seal). [Docket No. 232.]

20. On July 14 and 15, 2008, this Court held a hearing. [9] The First Motion to Seal was among the various motions addressed at this hearing. Counsel made arguments, presented evidence, and adduced testimony from Mason and Acord. YAP stated that it could have made timely objections to the Documents if Acord had requested the

---

[8] The litigation in Maryland is a pending action against the Debtor and others as of the petition date in the United States District Court for the District of Maryland, styled as *Young Again Products, Inc. v. John Acord a/k/a John Livingston et al., Civil No. RWT 03CV2441, 307 F. Supp. 2d 713*. The litigation in Utah is a pending action against the Debtor and others as of the petition date in the United States District Court for the District of Utah, styled as *Dodart et al. v. Young Again Products,* ***[*15]*** *Inc.,* Civil No. 2:03-CV-0035 PGC.

[9] A transcript of the hearing held on July 14, 2008 is available at Docket Number 262.

Documents through proper discovery. [Docket No. 262, p. 44-45.] During the July 14, 2008 hearing, Mason discussed his employment relationship with Pitts and described Pitts as an "employee." [Docket No. 262, p.58-59.] Mason stated that "we [i.e. YAP] provided her [i.e. Pitts] with all the products. . . . [W]e provided her with all the information and direction. She used her computer skills and education to run the business at my direction." [Docket No. 262, p.50.] Further, according to Mason, Pitts was permitted to work from home to run the business. [Docket No. 262, p.50.] Mason also testified that, "with certain latitude . . . **[*16]** she ran the business." [Docket No. 262, p.54.] When Robert Singer (Singer), counsel for Marcella Ortega, asked whether Mason considered Pitts "an expert or someone with special knowledge as a webmaster," Mason testified, "Yes, she did have computer skills." [Docket No. 262, p.59.] Singer also asked Mason the following: "You gave her [i.e. Pitts] the information concerning the raw data about your company and she did something with it under her own expertise, is that not correct?" Mason answered, "That's correct." [Docket No. 262, p.60.] Mason also testified that he communicated with Pitts on a regular basis about the Maryland litigation and other matters. [Docket No. 262, p.52.] In response to questions about how YAP compensated Pitts or withheld taxes, Mason testified, "You'd have to ask my wife [i.e. Ivey Mason]." [Docket No. 262, p.57, l. 22; p.59, l. 5; p.64, ll. 11-17.]

21. On July 25, 2008, this Court signed an Order Granting Motion in Limine filed by Young Again Products, Inc. (the Order Granting Motion in Limine). [Docket No. 238.] The Order Granting Motion in Limine instructed the Defendants **[*17]** not to introduce any evidence concerning Mason's 23-year-old criminal conviction. The Court reserved its ruling on the Motion in Limine insofar as it sought to suppress evidence of defamatory statements made by YAP or Mason against the Defendants (i.e. the unresolved portion of the Motion in Limine).

22. The Court ceased taking any action on the unresolved portion of the Motion in Limine and the Motions to Seal while the Honorable Nancy F. Atlas, United States District Judge, considered the undersigned judge's Report and Recommendation to the United States District Court Recommending Withdrawal of the Reference of this Adversary Proceeding, signed on July 25, 2008. [Docket No. 237.] On August 7, 2008, Judge Atlas issued an order withdrawing the reference. [Docket No. 250.] On August 18, 2008, Judge Atlas assigned all pretrial matters in this adversary proceeding to this Court.

23. On August 1, 2008, Acord and Ortega filed their Joint Motion for Sanctions and Contempt Against Plaintiff and its Attorneys (Acord and Ortega's Joint Motion for Sanctions and Contempt). [Docket No. 248.]

24. On August 21, 2008, YAP filed its Opposition to Acord and Ortega's Joint Motion for Sanctions and Contempt. **[*18]** [Docket No. 256.]

25. On September 9, 2008, this Court held a status conference and announced that all pending motions would be set for a hearing on November 18, 2008.

26. On November 18, 2008, this Court held a hearing on, among other matters, the unresolved portion of the Motion in Limine and the Motions to Seal. During this hearing, the Court informed the parties that it would continue the hearing on the unresolved portion of the Motion in Limine and also consider allowing the parties to have an opportunity to present evidence and make further oral argument on the Motions to Seal.

27. On November 18, 2008, this Court signed an Order Dismissing Without Prejudice the Motion to Strike. [Docket No. 268.] Although the Court dismissed the Motion to Strike, the Documents attached thereto remain on the docket in the public domain.

28. On November 26, 2008, Acord filed his "Amended Opposition to Young Again Products, Inc.'s Motion to Seal Exhibit 2 in Support of its Opposition to Defendants' Joint Motion for Sanctions and Contempt Against Plaintiff and its Attorneys and Plaintiff's Expedited Motion for Reconsideration and, in the Alternative, John Acord's Motion to Strike and Issue a Protective **[*19]** Order Preventing John Acord from Use or Disclosure of the Exhibits" (Acord's Amended Opposition). [Docket No. 283.] In Acord's Amended Opposition, Acord alleged that Pitts was not an employee of YAP, as Mason had testified at the July 2008 hearing, but rather that Pitts was a "sales agent" of YAP. [Docket No. 283, p.4.]

29. On December 17, 2008, YAP filed its Motion to Strike, or in the Alternative YAP's Response, to Docket No. 283--Acord's Amended Opposition (YAP's Response to Acord's Amended Opposition). [Docket No. 289.]

30. On December 19, 2008, Acord filed his "Reply to Young Again Products' Response to Defendant, John Acord's Opposition to Young Again Products' Motion to Seal … etc., and Response to Defendant Acord's Motion to Impose Sanctions and YAP's Request for Sanctions" (Acord's Reply). [Docket No. 290.]

31. On December 19, 2008, this Court held a hearing [10] on Acord's Motion to Impose Sanctions. [Docket No. 286.] At this hearing, the Court admitted YAP's Exhibit Number 1--the subpoena to Pitts issued out of the United States Bankruptcy Court for the District of Arizona on January 14, 2008 (the Pitts Subpoena). YAP failed to file notice of the Pitts Subpoena with the Clerk **[*20]** of this Court. [11] The attorney for the Trustee, Randall A. Rios (Rios), testified that on January 17, 2008, his office received a copy of the Pitts Subpoena. Rios testified that he did not recall whether he received any other documents along with the Pitts Subpoena. Acord testified that he did not receive a copy of the Pitts Subpoena in the mail. Additionally, at this hearing, the Court granted Acord leave to take the deposition of Mason and other witnesses by February 28, 2009.

32. On December 29, 2008, the Trustee and YAP filed their Consent Motion and Stipulation of Dismissal of Claims, [Docket No. 296], requesting this Court to dismiss, with prejudice, YAP's claims against the Debtor but not the other defendants. On December 31, 2008, this Court signed the Stipulation **[*21]** of Dismissal of Claims dismissing with prejudice the claims against the Debtor but not the other Defendants--Acord and Ortega. [Docket No. 297.] Therefore, the only remaining defendants in this adversary proceeding are Acord and Ortega.

33. On February 20, 2009, in the main case, this Court issued an Order Confirming the Chapter 11 Trustee's First Amended Plan of Reorganization. [Case No. 06-35903, Docket No. 241.]

34. On February 26, 2009, Pitts gave deposition testimony. The transcript of this deposition was admitted into evidence as "YAP & JA & [DELTA] s 1" (Joint Ex. 1). In her deposition, Pitts explained her relationship with YAP. Pitts stated that she received conflicting assessments about her employment classification: sometimes she was told she was an employee and other times she was told that this business was hers or going to be hers or her children's. [Joint Ex. 1., p.41, 11. 4-10.] Pitts also claimed that her net profit from the business was approximately 15 percent. [Joint Ex. 1., p.44, ll. 1-10.] Pitts stated that she ran the YAP website. [Joint Ex. 1, p.94, l. 1.] Indeed, Freeman asked Pitts the following: "Is it fair to say you were running the website on behalf of Young **[*22]** Again Products?" Pitts responded, "I was running it on behalf of myself, as well as Young Again Products. Like I say [sic], I did never [sic] say I entirely owned the website." [Joint Ex. 1, p.97-98, ll. 25, 1-4.]

35. On February 26, 2009, Mason also gave deposition testimony. The transcript of this deposition was admitted into evidence as "YAP & As 2" (Joint Ex. 2). In his deposition, Mason states that Pitts was YAP's employee: "I call her an employee regardless of the legal definition of the term employee, because we paid her to do certain services for us, and she did those services." [Joint Ex. 2, p.89, ll. 17-20.]

36. In response to document requests attached to Acord and Ortega's deposition notices, Pitts and Mason produced copies of YAP's business documents, which YAP contends are proprietary. At the deposition, counsel for YAP and counsel for Mason asked counsel for Acord, Joe A. Izen (Izen), to agree to maintain those documents as confidential for use only in this adversary proceeding. Izen did not agree. *See* [Docket No. 319, P 6-7.]

37. On March 17, 2009, YAP filed its Motion for Protective Order to Preclude Defendants from Using or Disclosing YAP's Proprietary Business Information **[*23]** and Communications Produced by Mr. Mason or Ms. Pitts to Further Defendants' Own Business Interests or to Gain an [sic] Competitive Business Advantage (the Motion for Protective

---

[10] A transcript of this hearing is available at Docket Number 304.

[11] At this hearing, YAP's counsel stated that if Acord needed any documents, Acord should have called Freeman's law office and the documents would have been produced to Acord. Given the extremely high degree of acrimony in this case, the Court finds that a simple phone call would not have been enough for Acord to obtain documents in Freeman's possession.

Order). [Docket No. 307.] In the Motion for Protective Order, YAP requests that this Court issue a protective order designating the proprietary business information and communications produced by Mason and Pitts on February 26, 2009 (along with all copies thereof) as follows: (1) confidential, (2) for use only in this adversary proceeding, (3) for use only as permitted under the Federal Rules of Civil Procedure and Federal Rules of Evidence, (4) not for use or disclosure outside of this adversary proceeding (except as may be required by an order of court), and (5) not for use or disclosure by the Defendants to further their own business interests or to gain any competitive business advantage. [Docket No. 307, P 11.]

38. On April 1, 2009, this Court issued an order scheduling the continued hearing on the unresolved portion of the Motion in Limine and the Motions to Seal. [Docket No. 310.]

39. On April 15, 2009, Acord and Ortega filed a pleading entitled Further Response to Plaintiff, Young Again Products', Motion **[*24]** to Seal and Destroy Documents and for Protective Order (Acord and Ortega's Response to the Motion for Protective Order). [Docket No. 319.]

40. On April 15, 2009, this Court concluded the hearing on the unresolved portion of the Motion in Limine and also allowed the parties to present evidence and make further oral arguments on the Motions to Seal and the Motion for Protective Order. At the conclusion of this hearing, the Court took the matter under advisement.

## III. CREDIBILITY OF WITNESSES

At the hearing held on July 14, 2008, the Court heard testimony from Mason and Acord. The Court finds Mason's testimony to be mostly credible. The Court finds Acord to be evasive at times, which casts doubts on his credibility.

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

The United States Code sets forth that ***HN1***[] "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." *28 U.S.C. § 1334(b)*. Furthermore, "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to **[*25]** the bankruptcy judges for the district." *28 U.S.C. § 157(a)*. The United States District Court for the Southern District of Texas maintains a "General Order of Reference" that provides, in pertinent part, that "[b]ankruptcy cases and proceedings arising under Title 11 of the United States Code are automatically referred to the bankruptcy judges of this district." *See* 2005 General Order of Reference.

On July 25, 2008, this Court signed the Report and Recommendation to the United States District Court Recommending the Withdrawal of the Reference of this Adversary Proceeding. [Finding of Fact No. 22.] On August 7, 2008, the Honorable Nancy F. Atlas, United States District Judge for the Southern District of Texas, issued an Order withdrawing the reference. [Finding of Fact No. 22.] On August 18, 2008, Judge Atlas assigned all pretrial matters in the adversary proceeding to this Court. [Finding of Fact No. 22.]

Although the Debtor is no longer a party-defendant in this adversary proceeding [Finding of Fact No. 32], the Court has "related to" jurisdiction. The suit at bar is similar to *In re Coral Petroleum, Inc., 62 B.R. 699 (Bankr. S.D. Tex. 1986)*. In *Coral Petroleum,* the plaintiff brought **[*26]** suit against a Chapter 11 debtor and other parties not in bankruptcy. Subsequently, the debtor settled with the plaintiff. In evaluating whether jurisdiction existed for the bankruptcy court to hear the plaintiff's complaint, Bankruptcy Judge Wheless recognized that if jurisdiction existed at the time that the complaint was filed, it is not defeated by subsequent events. *Id. at 701*. As such, Judge Wheless

found that he had jurisdiction over the suit despite the fact that the debtor had settled with the plaintiff, thereby removing the debtor as a party-defendant.

Accordingly, for all pretrial matters in this adversary proceeding, the Court has related to jurisdiction pursuant to *28 U.S.C. § 1334(b)*. Venue is proper pursuant to *28 U.S.C. § 1409*.

**B. The Unresolved Portion of YAP's Motions in Limine**

The Court's July 25, 2008 Order Granting Motion in Limine instructed the Defendants not to introduce any evidence concerning Mason's 23-year-old criminal conviction, but the Court reserved its ruling on the Motion in Limine insofar as it sought to suppress evidence of defamatory statements made by YAP or Mason against the Defendants. [Finding of Fact No. 21.] The Court now addresses this unresolved **[*27]** portion of the Motion in Limine.

***HN2***[] Motions in limine allow a trial court to make a pretrial ruling on the admissibility and relevance of evidence. *Wechsler v. Hunt Health Sys., Ltd., 381 F. Supp. 2d 135, 140 (S.D.N.Y. 2003)* (citing *Luce v. United States, 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984)* ("Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials. *See generally* *Fed. R. Evid. 103(c)*.")). Unless the evidence at issue is clearly inadmissible on all potential grounds, it should not be excluded in limine. *Rivera v. Salazar, No. C-04-552, 2008 U.S. Dist. LEXIS 58065, 2008 WL 2966006, at *1 (S.D. Tex. July 30, 2008)* (citing *Hawthorne Partners v. AT&T Tech., Inc., 831 F. Supp. 1398, 1400 (N.D. Ill. 1993))*; *United States v. Ozsusamlar, 428 F. Supp. 2d 161, 164-65 (S.D.N.Y. 2006)* ("The trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds."). A motion in limine that seeks to exclude broad categories of evidence is rarely granted. *Rivera, 2008 U.S. Dist. LEXIS 58065, 2008 WL 2966006, at *1* (citing *Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975))*.

In **[*28]** the unresolved portion of the Motion in Limine, YAP urges this Court to specifically "exclude any evidence, testimony, or argument by the Defendants regarding any alleged derogatory and/or defamatory statements by YAP and/or Roger Mason against Marcella Ortega ('Ortega'), John Acord ('Acord') or Supplement Spot ('the Debtor')." [Finding of Fact No. 10.] ***HN3***[] *Federal Rule of Evidence (FRE) 402* states that only evidence relevant to the issue before the court will be admissible, and irrelevant evidence is inadmissible. *Fed. R. Evid. 402*. Evidence is relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would otherwise be without the evidence. *Fed. R. Evid. 401*.

The Court concludes that the evidence, testimony, or argument sought to be excluded (i.e. the alleged derogatory or defamatory statements made by YAP or Mason against the Defendants) are irrelevant to the claims and defenses at issue in this adversary proceeding and do not assist the Court in reaching an ultimate determination of the legal issues in this suit. *See* *Fed. R. Evid. 401*. Therefore, because the evidence is irrelevant, it is inadmissible **[*29]** in this adversary proceeding. *See* *Fed. R. Evid. 402*. Specifically, derogatory or defamatory statements by Mason or YAP, even if made, do not have any bearing on the claims of fraud and failure to disclose assets which YAP has asserted against the Defendants. Moreover, on June 23, 2008, this Court denied Acord's motion for leave to file a claim for defamation or tortuous interference with business relations. [Finding of Fact No. 7.] Indeed, for consistency, to the extent that any of the information sought to be excluded by the Motion in Limine concerns these claims, this Court is unwilling to allow such evidence.

Accordingly, this Court concludes that the unresolved portion of the Motion in Limine should be granted. Therefore, any evidence, testimony, or argument by the Defendants regarding any alleged derogatory or defamatory statements by YAP or Mason against the Defendants are hereby excluded from trial. [12]

---

[12] Because this Court concludes the Motion in Limine should be granted, the Documents which this Court refuses to seal must be redacted to exclude any mention of what this Court finds to be potentially derogatory or defamatory statements by YAP or

**C. The Motions to Seal**

In the Motions to Seal, YAP requests that the Court seal and order Acord to destroy the Documents and any other exhibits Acord has received from Pitts. [Finding of Fact No. 14.] Specifically, YAP argues that the Documents are protected by the attorney-client privilege and the work product privilege. However, Acord and Ortega argue that this Court should deny the Motions to Seal. [Finding of Fact No. 19.] For the reasons set forth below, this Court concludes that the Motions to Seal should be denied.

**1. The Common Law Presumption of Public Access**

HN4[] "[T]he courts of this country recognize a general right to inspect and copy . . . judicial records and documents." *Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978)*. This right of public access serves to "promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception **[*31]** of fairness." *SEC v. Van Waeyenberghe, 990 F.2d 845, 849 (5th Cir. 1993)* (quoting *Littlejohn v. BIC Corp., 851 F.2d 673, 678 (3d Cir. 1988))*. Thus, "[u]nder the common law, there is a long-standing presumption of public access to judicial records." *Gitto v. Worcester Telegram & Gazette Corp. (In re Gitto Gloval Corp.), 422 F.3d 1, 6 (1st Cir. 2005)*. Because most courts endorse a presumption of public access to discovery materials, the district court is required to make a determination of good cause before entering an order keeping the documents out of the public. *See Citizens First Nat'l Bank of Princeton v. Cincinnati, 178 F.3d 943, 946 (7th Cir. 1999)* (citing numerous federal cases from various circuits).

HN5[] However, the common law presumption of public access to judicial records is not absolute. *Id.; see also Van Waeyenberghe, 990 F.2d at 848* ("[T]he common law right of access to judicial records is not absolute."); *Fed. Sav. & Loan Ins. Corp. v. Blain, 808 F.2d 395, 399 (5th Cir. 1987)* ("[T]here are well-recognized situations in which the seal may and should be used."). As the Supreme Court has recognized, "[e]very court has supervisory power over its own records and files, and access **[*32]** has been denied where court files might have become a vehicle for improper purposes." *Nixon, 435 U.S. at 598*. Therefore, the Court must "balance the factors favoring secrecy against the common law presumption of access." *Bank of Am. Nat'l Trust v. Hotel Rittenhouse, 800 F.2d 339, 345 (3d Cir. 1986)*. Because this balancing exercise is fact intensive, "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon, 435 U.S. at 599*. The decision to seal court records and pleadings should not be taken lightly; as the First Circuit explained, "[o]nly the most compelling reasons can justify non-disclosure of judicial records." *Gitto, 422 F.3d at 6*.

**2. The Bankruptcy Code Presumption of Public Access: *11 U.S.C. § 107***

HN6[] The right of public access to judicial records "is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system." *Id. at 7* (quoting *In re Crawford, 194 F.3d 954, 960 (9th Cir. 1999))*. In the bankruptcy context, the presumption of public **[*33]** access is codified in *11 U.S.C. § 107(a)*. *Section 107(a)* provides that "a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge." However, like the common law right of public access, *§ 107(a)* is not absolute. *Section 107(b)* provides limited exceptions to the right of public access in bankruptcy cases. *Section 107(b)* provides that the bankruptcy court "shall," on request of a party in interest, or "may," on its own motion: "(1) protect

Mason against the Defendants. This **[*30]** Court will require counsel for all parties to meet and redact the Documents. Where agreement cannot be reached on what specifically should be redacted, this Court will hold a hearing to resolve the specific disputes over what to redact.

an entity with respect to a trade secret or confidential research, development, or commercial information; or (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title." [13]

**3. The First Motion to Seal should be denied.**

On July 9, 2008, YAP filed its First Motion to Seal. [Finding of Fact No. 14.] Though the Court recognizes that it filed this pleading promptly as an emergency motion, the Court concludes that the two paragraphs of this First Motion to Seal fail to adequately explain why the Documents are entitled to protection. Indeed, YAP must overcome the well-established presumption of public access to judicial records and filings. *See* In re Gitto Gloval Corp., 422 F.3d at 6.

The First Motion to Seal--in its entirety--is as follows:

> John Acord, Defendant herein, filed a Motion to Strike with attached exhibits with this Court, which was docketed on July 9, 2008 [sic]. Within the Exhibits attached thereto are documents provided to John Acord by Vicki Pitts, a former employee of Young Again Products, Inc. In part, *those documents* contain attorney-client privileged and work product documents, mental impressions of the president of Young Again Products, Inc., and its attorneys, Freeman & Freeman and divulge Plaintiff's litigation strategy in the Maryland federal litigation. This Motion to Strike and its Exhibits were delivered to counsel for **[*35]** the Plaintiff by an employee of John Acord and/or Supplement Spot at or about 3:00 p.m. on July 8, 2008. Prior to that time and date, Plaintiff had no knowledge that John Acord had these documents in his possession.
> Plaintiff moves this Honorable Court to seal and order John Acord to destroy the documents which are the subject of this Motion, along with any and all other documents that he has received from Vickie [sic] Pitts. Plaintiff prays for general relief.

[Docket No. 228] (emphasis added). YAP failed to identify which of "those documents" are entitled to protection. ***HN8***[] It is not enough for the movant to make a sweeping statement that a voluminous collection of documents should be sealed. United States v. El Paso Co., 682 F.2d 530, 539 (5th Cir. 1982) ("[W]e have made clear that the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents.") (citing United States v. Davis, 636 F.2d 1028, 1044 n.20 (5th Cir. 1981)). The party seeking to seal the documents must identify which specific documents must be sealed, and the attorney-client privilege "must be specifically asserted with respect to particular documents." El Paso Co., 682 F.2d at 539. **[*36]** Here, YAP failed to specifically identify which documents are entitled to protection in the First Motion to Seal.

Additionally, YAP does not even mention § 107(b) in the First Motion to Seal. However, even if it had asserted that the Documents are entitled to protection under § 107(b), YAP would have needed to establish that the Documents contained a "trade secret" or "confidential research, development, or commercial information" or "scandalous or defamatory matter." Because YAP has failed to establish that the Documents contain any such material, and because YAP did not argue § 107(b), the Court is not required to protect YAP under this section of the Code. Nevertheless, pursuant to § 107(b), the Court *may* on its own motion protect YAP.

In the First Motion to Seal, YAP describes the Documents as "contain[ing] attorney-client privileged and work product documents [and] mental impressions" of YAP's attorneys. *In re 50-Off Stores, Inc.,* an opinion by the

[13] The exact language of § 107(b) is as follows:

> ***HN7***[] (b) On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may --

(1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or

(2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case **[*34]** under this title.

Honorable Leif M. Clark, Bankruptcy Judge for the Western District of Texas, holds that **HN9**[] "[c]ertainly, a lawyer's work product is one type of 'confidential research' that falls within the plain language of the statute's [i.e. § 107(b)'s] **[*37]** protection. And certainly a client's disclosures made in confidence to its attorneys is one kind of 'confidential . . . commercial information.'" [14] 213 B.R. 646, 655-56 (Bankr. W.D. Tex. 1997). In *50-Off Stores,* the debtor affirmatively sought the protection of the bankruptcy court under § 107(b), and, therefore, the bankruptcy court was required to protect the debtor under § 107(b). *Id.; see* § 107(b) ("On request of a party in interest, the bankruptcy court *shall* . . . protect an entity." *Emphasis added.*). Here, unlike the debtor in *50-Off Stores,* YAP has not sought protection under § 107(b), and the Court concludes that it should not exercise its discretion under § 107(b) to *sua sponte* seal the Documents. Accordingly, the First Motion to Seal should be denied.

**4. The Second Motion to Seal should be denied.**

On August 21, 2008, YAP filed the Second Motion to Seal. [Finding of Fact No. 14.] In paragraph 4 of this Motion, YAP makes the following broad assertion: "Based upon the nature of information contained in Exhibit 2, Plaintiff has a substantial basis for believing that Exhibit 2 is properly subject to an order precluding inspection, and that disclosure to the public or any other non-party will result in immediate, substantial, and irreparable harm to Plaintiff." As with the First Motion to Seal, the Second Motion to Seal is devoid of citations to legal authorities and contains no details about which particular documents are privileged. *See* El Paso Co., 682 F.2d at 539 ("[W]e have made clear that the **HN10**[] attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents."). For example, in paragraphs 1 and 2 of this Motion, YAP asserts that the Documents contain "communications protected under the attorney-client privilege and work product doctrine" and that the Documents "include the mental impressions of the president of Young Again Products, Inc. and its attorneys, Freeman & Freeman, P.C. **[*39]** and communications divulging Plaintiff's litigation strategy in the Maryland federal litigation." Mere conclusory statements simply will not suffice to overcome the presumption of public access.

Further, in the Second Motion to Seal, YAP once again failed to argue that the Documents are entitled to protection under § 107(b). Thus, for the reasons set forth above, the Court concludes that it should not exercise its discretion under § 107(b) to *sua sponte* seal the Documents. The Second Motion to Seal should be denied.

In sum, because YAP has failed to meet its burden to overcome the presumption of public access codified in § 107(a), the Court concludes that the two Motions to Seal should be denied.

**D. Pitts was an independent contractor, not YAP's employee.**

There is a separate and independent reason why this Court should not seal the Documents: the Documents were turned over by a former contractor of YAP (i.e. Pitts) and, therefore, are not entitled to any privilege protections. Acord and Ortega argue--and this Court agrees--that because Pitts was a contractor, and not YAP's employee, the documents she turned over to Acord are not subject to any privilege protections.

**1. Texas and Federal [*40] Law on Employment Classifications**

**HN11**[] Under Texas law, whether a person is an employee or independent contractor is a question of fact. *Campbell v. Keystone Aerial Surveys, Inc., 138 F.3d 996, 1006 (5th Cir. 1998)* (citing *Halliburton v. Texas Indem.*

---

[14] The bankruptcy court in *50-Off Stores* mentioned in a footnote that it was "unable to find any cases specifically applying section 107(b)(1) to attorney-client privilege or attorney work product." *In re 50-Off Stores, Inc., 213 B.R. at 655 n. 14*. Because this Court ultimately does not apply § 107(b) to the present discovery dispute, this Court need not address whether § 107(b) applies to attorney-client privileged documents **[*38]** or work product.

*Ins. Co., 147 Tex. 133, 213 S.W.2d 677 (Tex. 1948))*. In *Halliburton,* the Texas Supreme Court provided the applicable test:

> If one contracts to do a specific piece of work for another and furnishes, and has the absolute control of, his assistants, and the work is done in accord with his own ideas, or with a previously agreed plan, without being subject to the other's orders with respect to the details of the work, he is an independent contractor. However, if he and his assistants are subject to the control of the other party with respect to the details and method of doing the work then he is an employee. The supreme test in determining whether one is an employee or an independent contractor, according to our decisions and most of the modern cases, is the test with respect to the right of control.

*Halliburton, 213 S.W.2d at 680* (citing numerous Texas cases).

Moreover, the Fifth Circuit has defined "the traditional Texas common law distinction between employees **[*41]** and independent contractors" as follows:

> ***HN12***[] Under Texas common law, "[t]he test to determine whether a worker is an employee or an independent contractor is whether the employer has the right to control the progress, details, and methods of operations of the employee's work." *Thompson v. Travelers Indem. Co. of R.I., 789 S.W.2d 277, 278 (Tex. 1990)*. For an individual to be considered an employee, "[t]he employer must control not merely the end sought to be accomplished, but also the means and details of its accomplishment as well." *Id.* In contrast, an independent contractor is an individual who, "[i]n the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control and all its details." *William Sommerville & Son, Inc. v. Carter, 571 S.W.2d 953, 956 (Tex. Civ. App.--Tyler 1978), aff'd on other grounds, 584 S.W.2d 274 (Tex. 1979)*.

*Consumers County Mut. Ins. Co. v. P.W. & Sons Trucking, Inc., 307 F.3d 362, 364 n.3 (5th Cir. 2002)*. Therefore, if YAP "control[led] not merely the end sought to be accomplished, but also the means and details of its accomplishment as well," then Pitts **[*42]** would be YAP's employee. *Thompson, 789 S.W.2d at 278*. However, if Pitts used her own means and methods, without submitting herself to YAP's control, then Pitts would not be YAP's employee.

***HN13***[] Although it seems that "'control of the detailed physical performance may be the most critical factor in identifying an employee, it is not necessarily the only factor.'" *Linkous v. United States, 142 F.3d 271, 275 (5th Cir. 1998)* (quoting *Broussard v. United States, 989 F.2d 171, 175 (5th Cir. 1993))*. The Fifth Circuit has held that the factors which are deemed relevant to determining whether an individual is an employee or an independent contractor are listed in Section 220 of the Restatement (Second) of Agency:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and **[*43]** the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2); *Linkous, 142 F.3d at 275*; *Rodriguez v. Sarabyn, 129 F.3d 760, 766 (5th Cir. 1997)*; *see* *Emtel, Inc. v. Lipidlabs, Inc., 583 F. Supp. 2d 811, 829-30 (S.D. Tex. 2008)* (citing the ten factors);

*see also* Salameh v. Provident Life & Acc. Ins. Co., 23 F. Supp. 2d 704, 712 (S.D. Tex. 1998) ("[I]n addition to control, the court must consider the other factors listed in the Restatement to differentiate between an employee and an independent contractor.") (citing Linkous, 142 F.3d at 276).

**2. Based on the arguments and evidence, Pitts was never an employee of YAP.**

After considering the evidence, deposition testimony, and pleadings, this Court concludes that Pitts was never YAP's employee, but rather, she was an independent contractor. The Court applies the ten factors from **[*44]** the Restatement (Second) of Agency in making this determination. After considering this non-exclusive list of factors, the Court concludes that Pitts was an independent contractor rather than YAP's employee.

**a. Factor # 1: The extent of control which, by the agreement, the master may exercise over the details of the work**

As noted earlier, the control factor is often thought of as the most critical factor for determining whether someone is an employee or an independent contractor. Linkous, 142 F.3d at 275. The more control an employer exerts over a person employed, the more likely that person is an employee. Therefore, if YAP "control[led] not merely the end sought to be accomplished, but also the means and details of its accomplishment as well," then Pitts would be YAP's employee. Thompson, 789 S.W.2d at 278. However, if Pitts used her own means and methods, without submitting herself to YAP's control, then Pitts would not be YAP's employee.

In Pitts' deposition, Pitts testified that she ran the YAP website, [Finding of Fact No. 34], and when asked by Freeman: "Is it fair to say you were running the website on behalf of Young Again Products?" Pitts responded: "I was running it on behalf **[*45]** of myself, as well as Young Again Products. Like I say [sic], I did never [sic] say I entirely owned the website." [Finding of Fact No. 34.] Under the arrangement Pitts had with YAP, YAP gave Pitts inventory to sell through the website, and Pitts was free to use her own means and methods to sell this inventory. [Finding of Fact No. 20.] Although YAP exercised some control over Pitts, Pitts was given wide latitude to run the business without YAP controlling the day-to-day operations of the website and sale of the nutritional products. [Finding of Fact No. 20.]

Because Pitts had considerable freedom to run the website and conduct business without significant oversight, the Court concludes that this factor weighs in favor of classifying Pitts as an independent contractor.

**b. Factor # 2: Whether or not the one employed is engaged in a distinct occupation or business**

Pitts worked in the nutritional supplement business prior to developing a business relationship with YAP from 2004 to 2006. For example, prior to working with YAP, Pitts ran a website-based business called "The Natural Woman," another nutritional supplement business which sold inventory supplied by YAP through Mason. [Finding **[*46]** of Fact No. 4.] As such, the Court concludes Pitts is engaged in a distinct business and is therefore more likely an independent contractor than an employee.

**c. Factor # 3: The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision**

YAP's web-based business for selling nutritional products to customers can be performed by a specialist with computer skills, like Pitts, and does not require much supervision. Although Mason testified that Pitts worked under his direction at all times, Pitts worked from home selling the products and running the website on her own without his supervision. [Finding of Fact No. 20.] Accordingly, the Court concludes that this factor indicates that Pitts was more likely an independent contractor than an employee.

**d. Factor # 4: The skill required in the particular occupation**

Pitts was responsible for YAP's website maintenance, mailing lists and quality control of the website and server, key word advertising, article placement on the website, product description, pricing and complete fulfillment of orders, and username and password access for the website. **[*47]** [Finding of Fact No. 18.] To perform such tasks, Pitts needed to have computer skills and, to a certain extent, be technologically savvy. Indeed, Mason testified that Pitts had the expertise and skills necessary to operate the website. [Finding of Fact No. 20.] Therefore, because a particular set of skills was necessary to perform Pitts's responsibilities, this factor weighs in favor of Pitts's independent contractor status.

**e. Factor # 5: Whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work**

YAP supplied the inventory (i.e. the nutritional products) to Pitts and the information about the products, and Pitts ran the web-based operations at a location of her own choosing. [Finding of Fact No. 20.] Pitts used her own computer and home-based office to run the web-based operations. [Finding of Fact No. 20.] However, without YAP providing the instrumentalities--i.e. the actual inventory and the product information--Pitts could not have consummated the website transactions. Thus, this factor weighs both for, and against, a finding that Pitts was an independent contractor because, although Pitts provided her own office **[*48]** and computer, YAP provided the actual inventory sold.

**f. Factor # 6: The length of time for which the person is employed**

Pitts had a business relationship with YAP from 2004 to 2006. [Finding of Fact No. 4.] ***HN14***[] Short time periods of work performed indicate a status as an independent contractor. *See Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 299, 305 (5th Cir. 1998)* (finding drivers who worked for short periods of time to be independent contractors). Long periods of employment with an employer indicate an employee status. *Robicheaux v. Radcliff Material, Inc., 697 F.2d 662, 666 (5th Cir. 1983)* (Welders working for ten months to three years was "a substantial period of time" and was sufficient to indicate employee status.).

Pitts's approximately two- to three-year working relationship with YAP is lengthy enough to support a conclusion that Pitts was an employee rather than an independent contractor. *See Linkous, 142 F.3d at 277* (concluding that a doctor who worked for the government for "a period of several years" weighed in favor of employee status); *see also Robicheaux, 697 F.2d at 666* (Ten months to three years was sufficient to indicate employee status.). Therefore, **[*49]** the Court concludes that this factor weighs in favor of concluding that Pitts was an employee of YAP.

**g. Factor # 7: The method of payment, whether by the time or by the job**

Acord argues that Pitts is not YAP's employee because W-4's or W-2's for Pitts were not produced. Indeed, Pitts was not paid with W-4's or W-2's. Among the Documents is an e-mail dated "2/9/2006" from YAP's president, Mason, [15] to Pitts stating that Pitts, as "yap internet's contractor," was compensated as reported on a "1099 form" for income tax purposes. [Finding of Fact No. 5.] Moreover, in another e-mail dated "1/7/2005" Ivey Mason (the wife of YAP's president) sent Pitts an e-mail stating:

> I will need to send you a 1099 misc. tax form for the money you received from YAP Internet in 2004. I will verify the amount with you when I'm done. You act as an "independent contractor" and YAP Internet pays you the monthly payments for your services. You know you need to pay taxes from these earnings.

---

[15] The Court concludes that Mason is a sophisticated person who should know whether someone is an employee of his or an independent contractor. Although Mason testified that his wife, not he, knows how taxes were taken out of Pitts's compensation--whether by W-2 or 1099 forms [Finding of Fact No. 20], the Court finds it highly unlikely that he knew nothing about his company's taxes. However, even if only Ivey Mason knew how Pitts's taxes were reported, the Court finds that sufficient to conclude that YAP knew Pitts's was an independent contractor.

[Finding of Fact No. 5.] Accordingly, because (1) Pitts was compensated as reported on a 1099 form rather than through an annual salary, and (2) both Mason, YAP's president, and Mason's wife referred to Pitts as an independent **[*50]** contractor, this factor weighs heavily in favor of concluding that Pitts was an independent contractor. *See* Linkous, 142 F.3d at 277 (concluding that a doctor who was paid on a fee-for-service rather than an annual salary was an independent contractor).

**h. Factor # 8: Whether or not the work is a part of the regular business of the employer**

Indeed, the work performed by Pitts--i.e. selling nutritional supplements--is the regular business of YAP. [Finding of Fact No. 4.] Because Pitts performs the "regular business" of YAP, Pitts is more likely an employee rather than an independent contractor. *See* Linkous, 142 F.3d at 277 (concluding that because **[*51]** a doctor performed the regular services of the hospital, that weighed in favor of employee status).

**i. Factor # 9: Whether or not the parties believe they are creating the relation of master and servant**

In Mason's deposition and at the July 14, 2008 hearing, Mason identified Pitts as an employee of YAP. [Finding of Fact Nos. 20 & 34.] In Acord's Amended Opposition, Acord alleged that, contrary to Mason's deposition testimony, Pitts was not YAP's employee, but rather, she was YAP's sales agent (i.e. a contractor). [Finding of Fact No. 28.] While doing business with YAP, Pitts herself believed that the website business was hers or was going to be hers or her children's. [Finding of Fact No. 34.] Therefore, Pitts did not share Mason's belief that they created a master and servant relationship. Accordingly, the Court concludes that this factor weighs in favor of concluding that Pitts is not YAP's employee.

**j. Factor # 10: Whether the principal is or is not in business**

As was stated above, *supra* Part IV.D.2.h, (i.e. factor # 8: whether or not the work is a part of the regular business of the employer), YAP is in business of selling nutritional supplements over the internet, including the same **[*52]** or similar products Pitts sold while she worked for YAP. Therefore, this factor supports the conclusion that Pitts was an employee.

In summary, of the ten factors examined above, six weigh in favor of independent contractor status (i.e. factors # 1, 2, 3, 4, 7, and 9), three weigh in favor of employee status (i.e. factors # 6, 8, and 10), and one weighs neither for, nor against, a finding either way (i.e. factor # 5). After considering these ten factors listed in Section 220 of the Restatement (Second) of Agency, and placing particularly heavy emphasis on factors # 1 (i.e. control) and # 7 (i.e. the method of payment), the Court concludes that Pitts was an independent contractor rather than YAP's employee. The Court reaches this conclusion because (a) YAP exercised little to no control over the detailed performance of Pitts; (b) YAP paid Pitts as an independent contractor and sent her 1099 tax forms; and (c) the balance of the remaining factors weighs in favor of independent contractor status. Additionally, the Court places particularly heavy emphasis on the fact that Mason (YAP's president) and Ivey Mason (Mason's wife) both referred to Pitts as either an "independent contractor" or **[*53]** YAP's "internet contractor." [Finding of Fact No. 5.]

Because Pitts is an independent contractor, the Court concludes that the documents she turned over to Acord are not entitled to any privilege protections and should not be sealed.

**E. The Court's Independent Review of the Documents**

Based on the Court's own review of the Documents in chambers, the Court concludes that the Motions to Seal should be denied because the Documents are not entitled to privilege or work product protections. Because the Court has already determined that the Motions to Seal should be denied for the reasons stated in *supra* Parts IV.C

& D, this Court's independent review of the Documents provides additional support for the conclusions reached above. [16]

**1. [*54] YAP makes no arguments that persuade this Court that the Documents should be sealed due to the attorney-client privilege or the work product privilege.**

YAP argues that the Documents should be sealed and protected under the attorney-client privilege. **HN15**[] The attorney-client privilege is one of the oldest common law privileges and it serves "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)*. [17]

**HN17**[] The elements of the attorney-client privilege are as follows: "(1) where legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) except **[*55]** that the protection be waived." *El Paso Co., 682 F.2d at 539*. Whether the attorney-client privilege applies is determined on a case-by-case basis. *Upjohn, 449 U.S. at 396-97*.

In the Revised Privilege Log, YAP failed to list certain documents which YAP now seeks to have sealed based on the attorney-client privilege. Additionally, as YAP's counsel admitted on the record, some of these omitted documents were not produced to this Court for *in camera* review. [Finding of Fact No. 9.] **HN18**[] *Federal Rule of Civil Procedure 26(b)(5)* requires parties to submit a privilege log in order to claim that the attorney-client privilege or the work product doctrine apply. This privilege log must contain information sufficient to allow a court or a party to determine the applicability of the privilege. *Fed. R. Civ. P. 26(b)(5)*. Furthermore, "[a] party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability." *In re Santa Fe Intern. Corp., 272 F.3d 705, 710 (5th Cir. 2001)*.

**a. The e-mails between Pitts and Mason should not be sealed under the attorney-client privilege.**

**HN19**[] The elements outlined by the Fifth Circuit for the attorney-client privilege require that "the client" **[*56]** seek "legal advice" from "a professional legal advisor in his capacity as such." *See El Paso Co., 682 F.2d at 539*. Here, some of the e-mails contained in the Documents are e-mails between Pitts and Mason, neither of whom are attorneys. Therefore, by definition alone, the attorney-client privilege would not apply to protect the communications between Pitts and Mason.

YAP argues that the e-mails between Pitts and Mason contain information that Mason received from his attorneys, and that therefore, the privilege applies to protect the e-mails between Mason and Pitts. YAP cites *Upjohn* to support this proposition. **HN20**[] In *Upjohn,* the United States Supreme Court held that "[m]iddle-level--and indeed lower-level--employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties." *Upjohn,*

[16] The Court has spent numerous hours reviewing each and every one of the approximately 1,900 documents which YAP produced *in camera.* Another court captured this Court's exact sentiments: "Because this Court no longer charges for its services it had no occasion to maintain time records covering its research and preparation, but those efforts certainly entailed the expenditure of a substantial number of hours." *Scarlato v. Village of Bellwood, Ill., No. 08-C-546, 2008 U.S. Dist. LEXIS 49038, 2008 WL 4866433, at *1 (N.D. Ill. 2008)*.

[17] **HN16**[] In *Upjohn,* the United States Supreme Court extended the attorney-client privilege to cases involving communication between a corporation's employees acting at the direction of its officers and the corporation's attorney. *Upjohn, 449 U.S. at 394-95*.

449 U.S. at 391-92. Here, Pitts is not the type of person protected under *Upjohn.* As this Court has already determined, Pitts is an independent contractor, not **[*57]** an employee. *See supra* Part IV.D. As such, Upjohn's holding that privileges may apply to middle-level and lower-level employees is inapplicable because Pitts is not an employee at all.

Additionally, ***HN21***[] the "'disclosure of any significant portion of a confidential communication waives the [attorney-client] privilege as to the whole.'" *Nguyen v. Excel Corp., 197 F.3d 200, 208 (5th Cir. 1999)* (quoting *Indus. Clearinghouse, Inc. v. Browning Mfg. Div., 953 F.2d 1004, 1007 (5th Cir. 1992))*. The Fifth Circuit has held that "[t]he confidentiality of a client's communications may be compromised either through the publication of evidence of the communications themselves or through the publication of evidence of attorney statements or documents that disclose the client's confidential communications." *Indus. Clearinghouse, Inc., 953 F.2d at 1007*. In the e-mails between Mason and Pitts, Mason made no effort to protect the attorney-client privilege. Accordingly, the Court concludes that, even if some or all of the Documents were privileged, Mason has waived the privilege as to the communications between Pitts and himself.

**b. The e-mails between Pitts and Freeman should not be sealed under the attorney-client [*58] privilege.**

Although Freeman (one of YAP's attorneys) and Pitts communicated via e-mails, some of which are reproduced in the Documents, his status as YAP's attorney alone does not necessitate the sealing of those documents containing their communications. Based upon this Court's review of the Documents, several reasons justify not sealing the Documents. First, Pitts did not seek legal advice from Freeman, as she was an independent contractor of YAP and not Freeman's client. Second, Freeman did not provide legal advice to Pitts. Third, his communications with Pitts--an independent contractor--are not entitled to protection under the attorney-client privilege. *See El Paso Co., 682 F.2d at 539* (listing the requisite elements of the attorney-client privilege). YAP has failed to identify which documents in the voluminous set provided to this Court are e-mails between Pitts and Freeman deserving protection under the attorney-client privilege. [18] YAP should have identified the purportedly privileged e-mails by date and briefly described why each are privileged. ***HN22***[] When a request to seal a large number of documents is made, the movant has the burden to prove with specificity which documents are **[*59]** entitled to protection and why. *See El Paso Co., 682 F.2d at 539*; *see Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1122 (3d Cir. 1986)* (Even when there is an umbrella protective order, "the burden of justifying the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the protective order.").

For example, YAP should have identified to this Court if certain of the Documents contained legal advice or communications between Freeman and Pitts or were prepared in anticipation of litigation because those documents would fall under the privilege protection. *See Fair Isaac Corp. v. Texas Mut. Ins. Co., 2006 U.S. Dist. LEXIS 86576, 2006 WL 3484283, at *4 (S.D. Tex. Nov. 30, 2006)* (holding that a set documents was protected by the attorney-client privilege and work product protections because the documents were created in anticipation of litigation); *see also LaSalle Bank N.A. v. Mobile Hotel Props., LLC, 2004 U.S. Dist. LEXIS 7293, 2004 WL 902169, at *7 (E.D. La. Apr. 23, 2004)* (holding that a litigation committee's document that revealed opinions, thought processes and recommendations of counsel prepared **[*60]** in anticipation of litigation is "protected by both the work product and attorney-client privileges"). However, YAP failed to meet its burden to identify which e-mails contain communications protected by a privilege. Based upon this Court's independent review of the Documents, the e-mails between Pitts and Freeman do not contain privileged communications. Alternatively, even if the e-mails contained privileged communications, Pitts is not an employee, and therefore YAP, through the actions of its attorney, Freeman, waives any privilege that may exist by communicating with Pitts, an independent contractor. Therefore, the Court concludes that the Documents should not be sealed under the attorney-client privilege.

**2. The work product privilege does not necessitate the sealing of the Documents.**

---

[18] The Court notes that YAP failed to Bates-stamp the Documents for ease of reference.

HN23[] "[T]he work product doctrine insulates a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries." Dunn v. State Farm Fire & Cas. Co., 927 F.2d 869, 875 (5th Cir. 1991) (citing Upjohn, 449 U.S. at 400). "The work product privilege applies to documents 'prepared in anticipation of litigation.'" In re Kaiser Aluminum & Chem. Co., 214 F.3d 586, 593 (5th Cir. 2000) **[*61]** (quoting Fed. R. Civ. P. 26(b)(3)). According to the Fifth Circuit, the work product privilege applies even when litigation is not imminent, "'as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.'" Id. (quoting El Paso Co., 682 F.2d at 542).

Here, the Documents that YAP seeks to seal do not appear to be work product of an attorney or legal assistant. There may be an argument for a protection if the conversations between Pitts and Mason were in "anticipation of litigation." *See* In re Kaiser Aluminum & Chem. Co., 214 F.3d at 593. However, YAP failed to identify which e-mails were prepared in anticipation of litigation. HN24[] "The burden of establishing that a document is work product is on the party who asserts the claim, but the burden of showing that the materials that constitute work product should nonetheless be disclosed is on the party who seeks their production." Hodges, Grant & Kaufman v. U.S. Gov't, Dept. of Treasury, I.R.S., 768 F.2d 719, 721 (5th Cir. 1985). Thus, YAP has the initial burden of proving that the Documents are work product, and, if YAP satisfies this burden, Acord and Ortega have the burden of proving **[*62]** that the work product should nonetheless be disclosed. YAP failed to prove to this Court which documents were work product. However, even if YAP had met its burden, the Court would still conclude that Mason's communications with Pitts waived any available protections. This Court's review of the documents has revealed that even though some of the e-mails between Pitts and Mason appear to be drafted and sent in anticipation of litigation, Mason has waived any protections to these communications through his e-mail communications with Pitts, an independent contractor. *See supra* Part IV.E.1.a (discussing waiver of privilege).

**3. The privilege has been waived because the Documents were the subject of YAP's subpoena in another federal court.**

Acord argues that because the Documents were obtained from Pitts through issuance of a subpoena in another case before another federal court, then YAP, through its counsel, waived any right to attorney-client privilege or work product immunity because Pitts produced the Documents to both YAP and Acord. [19] The Court agrees. HN25[] Production of records, documents, or evidence, in compliance with a subpoena waives any claim to attorney-client privilege or work product **[*63]** immunity. Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1427 & n.14 (3d Cir. 1991) ("[U]nder traditional waiver doctrine a voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else."). By subpoenaing its own records, the Court concludes that YAP, through its counsel, voluntarily waived any claim to work product immunity or attorney-client privilege.

As an aside, YAP asserts that it did not **[*64]** raise privilege objections as soon as Acord received the Documents (and prior to Acord attaching the Documents to the Motion to Strike on July 7, 2008) because the Documents were not obtained through the normal discovery channels. [Finding of Fact No. 20.] YAP alleges that Pitts, as a disgruntled former employee of YAP, turned over the Documents to Acord unbeknownst to YAP. YAP argues that, if the Documents had been produced to Acord through proper discovery, then privilege objections could have been made before Acord attached the Documents to his Motion to Strike. The Court notes that the timeliness of YAP's

[19] The subpoena was issued out of the Bankruptcy Court for the District of Arizona. A review of the docket sheet in this adversary proceeding reveals that YAP failed to file notice of the issuance of the Pitts Subpoena as required by Federal Rule of Civil Procedure 45 (Rule 45) which is applicable to this proceeding under Bankruptcy Rule 9016. Fed. R. Civ. P. 45(b)(1) ("If the subpoena commands the production of documents, electronically stored information, or tangible things . . . , then before it is served, a notice must be served on each party."). Rios, counsel for the Trustee, received a copy of the Pitts Subpoena at his office on January 17, 2008. [Finding of Fact No. 31.]

privilege objections are of no import to the question of whether the privilege has been waived with respect to the Documents.

The Court agrees with the Third Circuit's decision in *Westinghouse* that disclosure through a subpoena waives privilege protections. *Westinghouse, 951 F.2d at 1427 & n.14*. Therefore, YAP's January 2008 subpoena waived any privilege protections on the Documents. *See, e.g., United States v. Rockwell, 897 F.2d 1255, 1265 (3d Cir. 1990)* (**HN26**[ ] "The attorney-client privilege does not apply to communications that are intended to be disclosed to third parties or that **[*65]** in fact are so disclosed."); *see also S.E.C. v. Brady, 238 F.R.D. 429, 444 (N.D. Tex. 2006)* ("Waiver of work product protection only results if the work product is disclosed to an adversary or treated in a manner that substantially increases the likelihood that an adversary will come into possession of that material.") [20] (citing *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 218 F.R.D. 125, 136 (E.D. Tex. 2006))*. Accordingly, the Court concludes that the subpoena eliminates any privilege that may have existed and provides this Court with yet another reason to conclude that the Documents should not be sealed.

**4. YAP's concerns over what the jury may think of the Documents at trial are unfounded.**

Any concerns YAP may have regarding whether the jury will see these documents and be improperly influenced is unfounded. YAP has the option of protecting itself at trial in the District Court by objecting to the introduction of any of these documents into evidence. The only issue presently before this Court is whether to seal these documents **[*66]** for purposes of pretrial discovery.

For all the reasons set forth above, this Court concludes that the Motions to Seal should be denied.

**F. The Motion for Protective Order**

On March 17, 2009, YAP filed the Motion for Protective Order to preclude Defendants from using or disclosing YAP's proprietary business information and communications produced by Mason or Pitts to further Defendants' own business interests or to gain any competitive business advantage. [Finding of Fact No. 37.] "Ample precedent exists for limiting disclosure of highly sensitive, confidential or proprietary information to outside attorneys and experts, particularly when there is some risk that a party might use the information or disseminate it to others who might employ it to gain a competitive advantage over the producing party." *Asch/Grossbardt, Inc. v. Asher Jewelry Co., No. 02 Civ. 5914 (SAS), 2003 U.S. Dist. LEXIS 2837, 2003 WL 660833, at *2 (S.D.N.Y. Feb. 28, 2003)* (citing *Westside-Marrero Jeep Eagle, Inc. v. Chrysler Corp., No. Civ. A. 97-3012, 1998 U.S. Dist. LEXIS 5614, 1998 WL 186728, at *2 (E.D. La. Apr. 17, 1998)*).

Because this Court has denied the Motions to Seal, this Court realizes that the Defendants may attempt to use the Documents in any manner they see **[*67]** fit. In YAP's Motion for Protective Order, it did not mention *§ 107* in support of its arguments. However, this Court concludes that *§ 107* provides the applicable law for protective orders.

**HN27**[ ] *Federal Rule of Bankruptcy Procedure 9018* sets forth the procedure governing *§ 107*, which authorizes this Court to issue an order to protect any entity [21] in the manner YAP set forth in the Motion for Protective Order. Specifically, *Rule 9018* provides:

---

[20] The Court recognizes that the use of the word "only" in *Brady* is limiting, but nevertheless the Court finds YAP has waived the privilege protections.

[21] **HN29**[ ] Although *§ 107(b)(2)* requires a bankruptcy court to only protect a "person" with **[*68]** respect to scandalous or defamatory filings, Rule 9018(2) authorizes the Court to protect "any entity." According to the definition set forth in § 101(15), "[t]he term 'entity' includes person, estate, trust, governmental unit, and United States trustee." 11 U.S.C. § 101(15).

> HN28[] On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information, (2) to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code, or (3) to protect governmental matters that are made confidential by statute or regulation. If an order is entered under this rule without notice, any entity affected thereby may move to vacate or modify the order, and after a hearing on notice the court shall determine the motion.

Fed. R. Bankr. P. 9018.

HN30[] "There is no true privilege against discovery of trade secrets or other 'confidential' business information, but the courts nevertheless will exercise their discretion to avoid unnecessary disclosure of such information, particularly where the action is between competitors." United States v. United Fruit Co., 410 F.2d 553, 557 (5th Cir. 1969).

To prevent the unnecessary disclosure of the Documents, this Court will grant the Motion for Protective Order to prevent the Defendants from using the Documents outside this adversary proceeding and to prevent the Defendants from using the Documents to further their own business interests or to gain any competitive business advantage.

**V. CONCLUSION**

For all the reasons set forth herein, the Court hereby concludes that the unresolved portion of the Motion in Limine regarding suppression of evidence of defamatory or derogatory statements made by YAP or Mason against the Defendants **[*69]** should be granted. The Court further concludes that the Motions to Seal should be denied. Finally, the Court concludes that the Motion for Protective Order should be granted.

An order consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 8th day of July, 2009.

/s/ Jeff Bohm

Jeff Bohm

United States Bankruptcy Judge

---

End of Document

Caution
As of: April 18, 2025 4:34 PM Z

# Interplan Architects, Inc. v. C.L. Thomas, Inc.

United States District Court for the Southern District of Texas, Houston Division

October 27, 2010, Decided; October 27, 2010, Filed

CIVIL ACTION NO. 4:08-cv-03181

**Reporter**
2010 U.S. Dist. LEXIS 114306 *; 2010 WL 4366990

INTERPLAN ARCHITECTS, INC., Plaintiff, v. C.L. THOMAS, INC., MORRIS & ASSOCIATES ENGINEERS, INC., AND HERMES ARCHITECTS, Defendant.

**Prior History:** *Interplan Architects, Inc. v. C.L. Thomas, Inc., 2010 U.S. Dist. LEXIS 107941 (S.D. Tex., Oct. 8, 2010)*

## Core Terms

drawings, deposit, summary judgment, infringement, architectural drawings, Declaration, architectural, copies, documents, affirmative defense, deposition testimony, registration, license, copyright infringement, floor plan, summary judgment motion, ownership, registration certificate, Food, objects, plans, third-party, projects, certificates, elevation, grounds, parties, personal knowledge, block, expert opinion

**Counsel:** **[*1]** For Interplan Architects, Inc., Plaintiff: Ira Phillip Domnitz, LEAD ATTORNEY, Khannan Suntharam, Winstead PC, Houston, TX; Louis K Bonham, LEAD ATTORNEY, Osha Liang L.L.P., Houston, TX.

For C.L. Thomas Inc., Defendant, Cross Defendant, Counter Claimant, Cross Claimant: Brock Cordt Akers, LEAD ATTORNEY, Phillips & Akers, Houston, TX.

For Morris and Associates, Engineers, Inc., Defendant, Cross Claimant, Cross Defendant: Jesus David Cabello, LEAD ATTORNEY, Wong Cabello et al, Houston, TX.

For Hermes Architects, Defendant: William T Green, III, LEAD ATTORNEY, Attorney at Law, Houston, TX.

For Morris & Associates, Engineers, Inc., Cross Claimant: David J Cabello, LEAD ATTORNEY, Houston, Tx.

For Interplan Architects, Inc., Counter Defendant: Ira Phillip Domnitz, LEAD ATTORNEY, Khannan Suntharam, Winstead PC, Houston, TX.

**Judges:** KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KEITH P. ELLISON

## Opinion

**MEMORANDUM AND ORDER**

Pending before the Court are the following motions:

Filed by Interplan Architects, Inc. ("Plaintiff"):

1. Motion for Partial Summary Judgment for Infringement of Technical Drawings Copyrights (Doc. No. 108)

2. Motion for Partial Summary Judgment (Ownership of Valid Architectural Works Copyrights **[*2]** (Doc. No. 110)
3. Motion for Partial Summary Judgment on Defendant's Affirmative Defenses (Doc. No. 111)
4. Objections to and Motion to Strike Defendant's Summary Judgment Evidence (Doc. No. 131)
5. Objections to and Motion to Strike Defendant's Summary Judgment Opposition Evidence (Doc. No. 143)
6. Motion for Discovery Sanctions Against Defendant C.L. Thomas, Inc. (Doc. No. 114)

Filed by C.L. Thomas, Inc. (the "Defendant" or "Defendant Thomas"): [1]

7. Motion for Summary Judgment (Doc. No. 104)
8. Motion to Dismiss for Lack of Subject Matter Jurisdiction All Claims Based on Unregistered Copyrighted Works (Doc. No. 119)
9. Motion to Dismiss for Lack of Standing All Copyrights Registered and Owned by Marcel Meijer, Individually (Doc. No. 119)
10. Motion to Strike Declaration of Marcel Meijer (Doc. No. 119)
11. Motion to Strike Exhibit V to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. No. 138)
12. Motion to Strike Plaintiff's Motions for Summary Judgment (Doc. No. 155)

13. Motion for Sanctions Pursuant to *Rule 11* (Doc. No. 157)
14. Rule 54(d) Motion for Attorneys' Fees and Costs Under the Texas Theft Liability Act (Doc. No. 105)

Upon considering the Motions, all responses thereto, and the applicable law, the Court finds that Plaintiff's Motion for Partial Summary Judgment for Infringement of Technical Drawings Copyrights (Doc. No. 108) should be denied, Plaintiff's Motion for Partial Summary **[*4]** Judgment (Ownership of Valid Architectural Works Copyrights (Doc. No. 110) should be denied, Plaintiff's Motion for Partial Summary Judgment on Defendant's Affirmative Defenses (Doc. No. 111) is granted in part and denied in part, Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Evidence (Doc. No. 131) is granted in part and denied in part, Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Opposition Evidence (Doc. No. 143) is granted in part and denied in part, Plaintiff's Motion for Discovery Sanctions Against Defendant C.L. Thomas, Inc. (Doc. No. 114) is denied, Defendant's Motion for Summary Judgment (Doc. No. 104) is granted in part and denied in part, Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction All Claims Based on Unregistered Copyrighted Works (Doc. No. 119) is denied, Defendant's Motion to Dismiss for Lack of Standing All Copyrights Registered and Owned by Marcel Meijer, Individually (Doc. No. 119) is denied, Defendant's Motion to Strike Declaration of Marcel Meijer (Doc. No. 119) is granted in part and denied in part, Defendant's Motion to Strike Exhibit V to Plaintiff's Opposition to Defendant's **[*5]** Motion for Summary Judgment (Doc. No. 138) is granted in part and denied in part, Defendant's Motion to Strike Plaintiff's Motions for Summary Judgment (Doc. No. 155) is denied, Defendant's Motion for Sanctions Pursuant to *Rule 11* (Doc. No. 157) is deferred, Defendant's Rule 54(d) Motion for Attorneys' Fees and Costs Under the Texas Theft Liability Act (Doc. No. 105) is deferred, Morris's Motion for Partial Summary Judgment

---

[1] These motions were originally filed jointly **[*3]** by C.L. Thomas, Inc., Morris and Associates Engineers, Inc., and Hermes Architects, since all three were named as defendants in this case. The Court understands that Morris & Associates Engineers, Inc. and Hermes Architects, Inc. have reached a settlement on the record with Plaintiff. As C.L. Thomas, Inc. still remains as a defendant in this case, the Court will treat these motions as pending and decide them. However, the Court will not decide the following motions filed individually by Morris and Associates Engineers, Inc. and Hermes Architects, and will deny them as moot:

Filed by Morris & Associates Engineers, Inc.:

1. Motion for Partial Summary Judgment on Plaintiff's DMCA Claims (Doc. No. 109)

Filed by Hermes Architects:

2. Motion for Summary Judgment on Plaintiff's Copyright Act Claim (Doc. No. 102)

3. Motion for Partial Summary Judgment (Doc. No. 101)

4. Motion for Order Regarding Joint & Several Liability (Doc. No. 103)

on Plaintiff's DMCA Claims (Doc. No. 109) is denied as moot, Hermes's Motion for Summary Judgment on Plaintiff's Copyright Act Claim (Doc. No. 102) is denied as moot, Hermes's Motion for Partial Summary Judgment (Doc. No. 101) is denied as moot, and Hermes's Motion for Order Regarding Joint & Several Liability (Doc. No. 103) is denied as moot.

## I. FACTUAL BACKGROUND

This case arises from alleged violations by Defendant of the Federal Copyright Act and the Digital Millennium Copyright Act ("DMCA"). Plaintiff is a company whose business involves architectural planning, architectural design, and preparation of architectural and construction documents, including, but not limited to, site plans, floor plans, exterior elevations, interior designs, and construction documents **[*6]** ("Architectural Documents"). Architectural Documents contain title blocks, which are areas on the document displaying information identifying the project, the company preparing the Architectural Documents, and information about the scope of the document.

Defendant Thomas designs and constructs convenience stores in south Texas called Speedy Stop. (Deposition of Carlton Labeff ("Labeff Depo.") at 19.) In early 2003, Defendant Thomas hired Plaintiff to design two Speedy Stop stores, No. 59 in Portland, Texas and No. 82 in Columbus, Texas. (Deposition of Marcel Meijer on November 16, 2009 ("Meijer I Depo.") at 33.) Plaintiff submitted proposals to Defendant Thomas describing the services it would provide in connection with Store Nos. 59 and 82 (the "Design Proposals"). (Meijer I Depo. at 33, 38.) The Design Proposals contained language asserting Plaintiff's ownership of the Architectural Documents it prepared in connection with the projects, and limiting Defendant Thomas's ability to copy or distribute the plans without Plaintiff's permission. (Doc. No. 104, Exh. O at 49, 83.) The Design Proposals were never signed by Defendant Thomas. (Meijer Depo. I at 35, 38, 243)

During the design process **[*7]** for Store Nos. 59 and 82, Defendant Thomas provided Plaintiff with certain drawings it had prepared in-house as well as drawings and surveys from third-party consultants and vendors. (Labeff Depo. at 25, 73-74; Meijer I Depo. at 290-91; Deposition of Marcel Meijer on January 15, 2010 ("Meijer III Depo.") at 40-41.) However, the extent and content of Defendant Thomas's contribution to Plaintiff's Architectural Drawings is highly disputed. [2]

Plaintiff was hired again by Defendant Thomas to provide architectural design services for Speedy Stop Store Nos. 209 and 201 in Austin, Texas. (Deposition of Marcel Meijer on January 4, 2010 ("Meijer II Depo.") at 386-87.) Plaintiff sent Design Proposals to Defendant Thomas dated October 14, 2003 for Store Nos. 209 and 201. (Doc. No. 104, Exh. O at 85-88.) Neither of these Design Proposals contained language asserting Plaintiff's ownership of its Architectural Documents nor limiting Defendant's ability to use or distribute Plaintiff's drawings. (*Id*.) Only the Design Proposal for Store No. 201 was signed by Defendant Thomas (*Id*. at 86.) Once again, Defendant Thomas provided Plaintiff with certain drawings for inclusion in the design of Store Nos. 201 and 209. (Labeff Depo. at 74.)

Subsequently, in 2003 and 2004, Defendant Thomas hired Plaintiff to design five more Speedy Stop stores, specifically Store Nos. 85 (El Campo, Texas), 70 (Victoria, Texas), 216 **[*9]** (Austin, Texas), 206 (Austin, Texas), and 58 (Corpus Christi, Texas). (Meijer II Depo. at 387-89; Doc. No. 104, Exh. O at 68.) Again, Defendant Thomas provided Plaintiff with some drawings during the design process for at least some of these five stores. (Meijer III Depo. at 49.)

---

[2] *Compare* Labeff Depo. at 25-26 (stating that Defendant Thomas provided Plaintiff with CAD files of the floor plan and site plan, tear sheets, and photos for the design of Store No. 85); Labeff Depo. at 73-74 (stating that Defendant Thomas provided site plans and floor plans for Store Nos. 82 and 59 and later for Store Nos. 209 and 201); Labeff Depo. at 169 (stating that Defendant Thomas provided Plaintiff with elevation drawings) *with* Meijer I Depo. at 290-91 (stating that Defendant Thomas provided a "preliminary site plan"); Meijer III Depo. at 40-41 (for Store No. 59, Defendant Thomas provided only a topographic boundary survey, carwash location, gas island location, and store location on the site); Meijer III Depo. at 49-50 (stating that Plaintiff **[*8]** received a CAD file from Defendant Thomas that may have consisted of a vicinity map); Meijer III Depo. at 66 (acknowledging that Plaintiff always received boundary layouts from clients in order to know the configuration of the land).

During the period in which Plaintiff and Defendant Thomas worked together, Plaintiff sent Defendant Thomas electronic and hard copies of its Architectural Drawings. Plaintiff's Architectural Drawings contained a title block and a "scope of the document" box. [3] (Doc. No. 54 at ¶ 17.) The title block consisted of Plaintiff's name, logo, the project number, the project title, and the name of the client. (*Id*. at Exh. C.) The "scope of the document" box contained the following text:

> "This drawing indicates the general scope of the project in terms of architectural design concept, the dimensions of the building, the major architectural elements and the type of structural, mechanical electrical systems [sic]. As scope documents, the drawings do not necessarily indicate or describe all work required for full performance and completion of the requirements of the Contract Documents. On the basis of the general scope indicated **[*10]** or described, the contractor shall furnish all items required for the proper execution and completion of the work. These drawings shall not be used for construction unless DATED and noted as ISSUED FOR CONSTRUCTION WORK.
> The information, details and drawings shown by this document can not be reproduced, copied or photocopied in a similar manner without the expressed written consent from the owner INTERPLAN ARCHITECTS, INC."

(*Id*. at Exh. D.) On November 5, 2003, Plaintiff sent Defendant Thomas a set of vellums corresponding to Plaintiff's Architectural Drawings for Store No. 201, unaccompanied by other documents restricting Defendant Thomas's use or distribution of the drawings (Meijer I Depo. at 65-66; Labeff Depo. at 75; Doc. No. 104, Exh. O at 113.)

In December 2003, Carlton Labeff, an employee at Defendant Thomas in charge of construction projects, requested from Marcel Meijer, Plaintiff's President, certain drawings that Plaintiff had prepared in connection with the Speedy Stop stores. (Meijer I Depo. at 309-10.) On December 12, 2003, Plaintiff sent a computer disc containing CAD files for Store No. 201 to Defendant Thomas that similarly lacked any accompanying restrictions on Defendant Thomas's use of the CAD files. (Doc. No. 104, Exh. O at 69.)

In February 2004, Jeff Johanson, Defendant Thomas's President and Chief Operating Officer, requested Plaintiff's Architectural Drawings **[*12]** from Mr. Meijer, who agreed to send Defendant Thomas some of the drawings. (Meijer I Depo. at 310-12.) On February 2, 2004 and on October 1, 2004, Plaintiff sent Defendant Thomas vellum copies of its Architectural Drawings for Speedy Stop Store No. 85. In neither of these transmissions were the vellum copies accompanied by documents restricting Defendant Thomas's ability to use or distribute Plaintiff's Architectural Drawings to other parties. (Meijer I Depo. at 69-70; Labeff Depo. at 75; Doc. No. 104, Exh. Oat 116, 118.)

On March 2, 2004, Plaintiff sent Defendant Thomas a computer disk containing a full set of electronic files and a set of vellum prints for Thomas's "use and records in the above referenced project [Store No. 85]." (Labeff Depo. at 76; Doc. No. 104, Exh. O at 70.) Plaintiff acknowledged, however, that this transmission did not contain any restrictions limiting Defendant Thomas's use of the electronic files. (Meijer I Depo. at 178-79.)

On November 9, 2004, Plaintiff again sent Defendant Thomas a computer disk containing CAD files for certain drawings related to Store No. 85. (Labeff Depo. at 76; Doc. No. 104, Exh. O at 59.) Along with computer disk, Plaintiff sent Defendant **[*13]** Thomas a confidentiality agreement (the "Confidentiality Agreement") in which it designated the drawings being sent to Thomas as "confidential information" and prohibited Thomas from using or authorizing any other person to use the drawings in connection with any other projects. (Doc. No. 104, Exh. O at 60-61.) However, the Confidentiality Agreement was never signed by Thomas. (*Id*. at 63.)

---

[3] Plaintiff claims in its Opposition to Defendant's Motion for Summary Judgment (Doc. No. 124) that the Architectural Drawings it sent to Defendant Thomas also contained a "copyright reserved" statement near the Interplan logo. However, Plaintiff does not refer to appropriate summary judgment evidence for this factual claim. Exhibits B-J to Doc. No. 110 purport to be copies of deposit material sent to the Copyright Office, not the Architectural **[*11]** Drawings sent to Defendant Thomas. Pages 8-9 of Doc. No. 64 and Paragraph 17 of Doc. No. 54 make no mention of the "copyright reserved" statement. Finally, Exhibits C and D to Doc. No. 54 only reproduce the title block and "scope of the document" text and do not reproduce the "copyright reserved" statement. On the basis of this evidence, the Court cannot conclude, in light of the many versions of drawings sent between Plaintiff and Defendant Thomas, that any set of Architectural Drawings sent to Defendant Thomas contained the "copyright reserved" statement.

In November 2004, Defendant Thomas asked Plaintiff to provide architectural services for additional Speedy Stop stores. However, Plaintiff declined to provide these services, for reasons that are in dispute. (Labeff Depo. at 95.)

At some point in 2004, Defendant Thomas engaged Morris and Associates Engineers, Inc. ("Morris") to provide plans for Speedy Stop Store Nos. 301, 303, and 309. (Labeff Depo. at 36, 63-64.) Defendant Thomas's first telephone call with Morris occurred on July 1, 2004, with their first meeting taking place on July 21, 2004, and subsequent meetings on September 10, 2004 and September 16, 2004. (Deposition of William Morris ("Morris Depo.") at 110, 113; Labeff Depo. at 23, 33, 37.) Morris agreed to produce prototype plans for the Speedy Stop stores and gave Defendant Thomas a discount **[*14]** for providing "client-supplied drawings." (Morris Depo. at 121-24.)

Morris received electronic copies of certain architectural drawings from Defendant Thomas in AutoCAD file format. (Morris Depo. at 36-43.) The AutoCAD files provided to Morris by Defendant Thomas consisted of the "design criteria, floor plans and site plans" for Speedy Stop Store No. 85, a store that had been designed by Plaintiff, and contained Plaintiff's title block. (Doc. No. 108, Exh. G; Doc. No. 108, Exh. I at 5; Morris Depo. at 50.) Morris copied the electronic files containing Plaintiff's Architectural Drawings on to its computer server, and used them as the basis for its own Architectural Drawings. (Morris Depo. at 43-46, 50.) As it drafted its Architectural Drawings, Morris removed Plaintiff's title block from the AutoCAD files and inserted its own title block on the files. (Morris Depo. at 90.) Morris did not receive permission from Plaintiff to replace Plaintiff's title block on the Architectural Drawings with its own. (Morris Depo. at 90.)

Also in 2004, Defendant Thomas approached Hermes Architects ("Hermes") to design Speedy Stop Store No. 86. [4] (Deposition of William Daren Penewitt ("Penewitt Depo.") at **[*15]** 67.) Defendant Thomas also asked Hermes to take over the production of plans for Store No. 301 that were previously handled by Morris. (Labeff Depo. at 36.) Hermes was later hired to provide plans for other Speedy Stop stores and ultimately completed construction drawings for eleven Speedy Stop stores: Store Nos. 14, 86, 87, 91, 95, 102, 301, 302, 305, 306, 311. (Penewitt Depo. at 22.)

For at least some of these stores, Defendant Thomas furnished Hermes with AutoCAD files for a floor plan, an elevation, and a site plan that did not contain any title blocks. (Penewitt Depo. at 35.) On another occasion, Defendant Thomas sent Hermes a set of hard copy drawings containing Plaintiff's **[*16]** title block on them. (Penewitt Depo. at 74; Doc. No. 101, Affidavit of Daren Penewitt ("Penewitt Aff.") at 1; Doc. No. 108, Exh. E at 2.) On yet another occasion, Hermes received from Defendant Thomas AutoCAD files containing Morris's Architectural Drawings in AutoCAD file format. (Penewitt Depo. at 74-75.) Hermes scanned the hard copies of Plaintiff's Architectural Drawings into its computer and saved them as electronic files on its computer server. (Penewitt Aff. at 1-2; Doc. No. 108, Exh. P.) [5] Hermes used Plaintiff's Architectural Drawings in order to establish how Defendant Thomas liked its "sheets laid out." (Penewitt Depo. at 91). During the design process, Defendant Thomas verbally provided Hermes with feedback on the floor plans and elevation drawings, made revisions directly to AutoCAD files, and sent these revised files to Hermes. (Penewitt Depo. at 60-63.)

Defendant Thomas did not obtain authorization from Plaintiff to distribute copies of Plaintiff's Architectural Drawings to Morris and Hermes. (Labeff Depo. at 115.) Neither Morris nor Hermes received permission from Plaintiff to copy Plaintiff's Architectural Drawings onto their respective computer servers. (Penewitt Depo. at 96; Doc. No. 108, Exh. D at 10-11; Doc. No. 108, Exh. E at 6.)

---

[4] In 2002, Hermes had designed Speedy Stop Store No. 84 for Defendant Thomas, including the interior floor plan and exterior elevation. (Penewitt Depo. at 56-57, 59-64; Labeff Depo at 72.) After completing the design and production of documents for Store No. 84, Hermes did not design any more stores for Defendant Thomas until being approached again in 2004 for the design of Store No. 86. (Penewitt Depo. at 68.) Hermes completed the design of Store No. 84 in approximately January 2003. (Penewitt Depo. at 146-47.)

[5] The set of hard copies of Plaintiff's Architectural Drawings that Hermes received from Defendant Thomas consists of four sheets while the set of electronic copies of Plaintiff's Architectural Drawings found on Hermes's computer server consists of eight sheets. (*Compare* Penewitt Aff., Exhs. A-D *with* Doc. No. 108, Exh. **[*17]** P.)

In March 2006, Plaintiff's president, Marcel Meijer, discovered the existence of Speedy Stop stores that were based upon Plaintiff's Architectural Drawings, but which Plaintiff had not been involved in designing. (Meijer I Depo. at 22-23.) On June 22, 2006, Plaintiff's president, Marcel Meijer, wrote to Defendant Thomas about the potential infringement of Plaintiff's Architectural Works. (Meijer I Depo. at 24; Doc. No. 104, Exh. O at 89.) In his letter, Mr. Meijer sent a copy of Plaintiff's exterior building elevation and Morris's exterior building elevation and claimed that both were exactly alike. (Doc. No. 104, Exh. O at 89.) Mr. Meijer informed Defendant Thomas that it should not release electronic versions of Plaintiff's Architectural Drawings to any architectural and/or engineering firm or **[*18]** any other entity without Plaintiff's permission. (*Id.*) Not long after, in June or July 2006, Mr. Meijer went to the offices of Morris to complain about Morris's use and copying of Plaintiff's Architectural Drawings. (Meijer I Depo. at 79; Morris Depo. at 61.)

Plaintiff subsequently submitted applications for copyright registration of "architectural works" copyrights and "technical drawings" copyrights within 5 years after the first publication of the works. (Doc. No. 108, Exh. H, Declaration of Marcel Meijer ("First Meijer Declaration"), Exhibit A.) The Copyright Office issued certificates of copyright registration for both "architectural works" and "technical drawings" for each of the nine stores on which Plaintiff provided architectural design services for Defendant Thomas: Store Nos. 58, 59, 70, 82, 85, 201, 206, 209, 216. [6] (*Id.*) Thereafter, Plaintiff filed suit against Thomas, Morris, and Hermes, alleging that they infringed upon Plaintiff's copyrights in the nine Speedy Stop stores designed by Plaintiff (Store Nos. 58, 59, 70, 82, 85, 201, 206, 209, 216) by creating drawings and/or constructing thirteen other Speedy Stop stores (Store Nos. 14, 86, 87, 91, 95, 102, 301, 302, 303, **[*19]** 305, 306, 309, 311). (Doc. No. 54 at 12-13.) Plaintiff has asserted the following causes of action: (1) copyright infringement of its "architectural works" and "technical drawings" copyrights under *17 U.S.C. § 501(a)*; (2) violation of integrity of copyright management information under the DMCA, specifically *17 U.S.C. § 1202*; and (3) fraud. [7] Defendant Thomas has asserted various defenses to Plaintiff's claims, including, among others, that it is a joint author of Plaintiff's Architectural Documents, that it was granted an implied nonexclusive license to copy and use Plaintiff's Architectural Documents, and that Plaintiff does not hold a valid copyright for architectural works and technical drawings.

## II. EVIDENTIARY MOTIONS

Plaintiff and Defendant have filed a number of motions seeking to strike evidence submitted in support of each others' motions for summary judgment. Each of these evidentiary motions will be considered in turn below.

### A. Legal Standard

In deciding motions for summary judgment, a court may consider pleadings, affidavits, depositions, motions, answers to interrogatories, stipulations and any other material properly before it. *Munoz v. Int'l Alliance of Theatrical Stage Emp., 563 F.2d 205, 207 n.1 (5th Cir. 1977)*. **[*21]** "The admissibility of summary judgment evidence is subject to the same rules of admissibility applicable to a trial." *Resolution Trust Corp. v. Starkey, 41 F.3d 1018,*

---

[6] Architectural works are protected by copyright law under two distinct provisions of the Copyright Act. First, section *§ 102(a)(5)* protects "pictorial, graphic, and sculptural works," which includes "technical drawings, including architectural plans." Second, in 1990, the Architectural Works Copyright Protection Act ("AWCPA") extended copyright protection to "architectural works" as a distinct new category of authorship. *See* *17 U.S.C. § 102(a)(8)*. Architectural works are defined in *section 101* **[*20]** as the "design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." *17 U.S.C. § 101*. In order for a work to be protected as both an "architectural work" and a "technical drawing," it must be registered under both categories. *See* *37 C.F.R. § 202.11(c)(4)*; *Nat'l Med. Care, Inc. v. Espiritu, 284 F. Supp. 2d 424, 434 (S.D. W.Va. 2003)*.

[7] Plaintiff's claim of trade secret misappropriation was dismissed with prejudice by the Court by stipulation of Plaintiff and agreement by Defendant. (Doc. No. 71.)

1024 (5th Cir. 1995) (citing Munoz, 563 F.2d at 207 n.1). Affidavits submitted in support of or opposed to a motion for summary judgment must be made based on personal knowledge, state admissible facts, and show the affiant's competence to testify on the matters stated. Fed. R. Civ. P. 56(e)(1). Although "an unsworn affidavit is incompetent to raise a fact issue precluding summary judgment," 28 U.S.C. § 1746 provides a statutory exception to this rule by permitting "unsworn declarations to substitute for an affiant's oath if the statement contained therein is made 'under penalty of perjury' and verified as 'true and correct.'" Nissho-Iwai American Corp. v. Kline, 845 F.2d 1300, 1306 (5th Cir. 1988) (quoting 28 U.S.C. § 1746).

If an affidavit refers to any written material, a sworn or certified copy of that material must be attached to or served with the affidavit. Fed. R. Civ. P. 56(e)(1); Marshall v. Norwood, 741 F.2d 761, 764 (5th Cir. 1984). "This means that if written documents are relied upon they actually must be **[*22]** authenticated by and attached to an affidavit that meets the requirements of Rule 56(e), and the affiant must be a person through whom the exhibits could be admitted into evidence." Nolla Morell v. Riefkohl, 651 F. Supp. 134, 140 (D.P.R. 1986).

An affidavit may be supplemented or opposed by depositions, interrogatories, or additional affidavits. Fed. R. Civ. P. 56(e)(1). "[A] party opposing a motion for summary judgment may proffer an affidavit to show the movant's deponents are not credible, thus raising a genuine issue of fact that must be tried by the jury." Eisbach v. Jo-Carroll Electric Cooperative, Inc., 440 F.2d 1171, 1174 (7th Cir. 1971).

**B. Motion to Strike Declaration of Marcel Meijer (Doc. 119)**

Defendant has moved to strike the declaration of Marcel Meijer, Plaintiff's President, which Plaintiff submitted in support of its motions for summary judgment (Doc. No. 108; Doc. No. 110.) Plaintiff's motions seek summary judgment on, among other things, ownership of valid copyrights in the technical drawings and architectural works at issue. In order to support its motions for summary judgment, Plaintiff submitted Mr. Meijer's declaration (the "First Meijer Declaration"), to which **[*23]** were attached: (a) copies of the certificates of registration issued by Copyright Office for the copyrights at issue, and (b) copies of deposit material submitted by Plaintiff to the Copyright Office in connection with the copyrighted works. (Doc. No. 108, Exh. H, First Meijer Decl.; Doc. No. 110, First Meijer Decl.)

Defendant claims that attachments B-J to the First Meijer Declaration do not accurately represent the deposit materials actually submitted by Plaintiff to the Copyright Office. [8] (Doc. No. 119 at 9-10; Doc. No. 123 at 8-9.) Rather, Defendant argues that the deposit materials Plaintiff submitted to the Copyright Office actually consist of a smaller subset of drawings than what was attached to Mr. Meijer's declaration. For example, Defendant states that, of the sixty-three drawings that Mr. Meijer's declaration stated had been submitted to Copyright Office for Speedy Stop store No. 59, only twenty-nine drawings were actually submitted. (Doc. No. 119, Cabello Decl., Exh. C at 2-4.) For the "technical drawing" and "architectural works" copyright registrations for Store Nos. 58, 70, 85, 201, 206, 209, and 216, Defendant claims that only two drawings—elevation and floor plans—were **[*24]** submitted to the Copyright Office for each type of registration rather than the larger set of drawings attached to the First Meijer Declaration and that Mr. Meijer claimed had been submitted. (Doc. No. 119, Cabello Decl., Exh. C at 2; Doc. No. 149, Suppl. Cabello Decl., Exh. A at 2-3.)

After Defendant filed its motion to strike Mr. Meijer's declaration, Plaintiff submitted a corrected declaration of Mr. Meijer (the "Second Meijer Declaration"). (Doc. No. 154, Corrected Declaration of Marcel Meijer ("Second Meijer Decl."), Exh. A) In the Second Meijer Declaration, Mr. Meijer states that the First Meijer Declaration was signed under the belief that the deposit materials attached to it actually comprised the deposit materials submitted to the Copyright Office. He states that this belief was based on the fact that Plaintiff created a larger number of drawings than simply the exterior elevation and floor plan drawings that were submitted to the Copyright Office. Plaintiff argues that the discrepancy between the **[*25]** drawings attached to the First Meijer Declaration and the small number of drawings sent as deposit material to the Copyright Office does not implicate its claims of ownership or

[8] Defendant does not dispute, however, that the certificates of registration attached as Exhibit A to Mr. Meijer's declaration accurately reflect those issued by the Copyright Office.

infringement, and therefore does not prejudice Defendant or otherwise affect the claims or defenses in this case. Defendant moves to strike the First Meijer Declaration on grounds that the best evidence rule requires the submission of certified copies of registration certificates and deposit materials, and that Mr. Meijer's declaration is false, misleading, and unreliable.

Defendant's best evidence rule objection misses the mark. Neither party appears to dispute that copies of the certificates of registration and copies of deposit materials are the best evidence to prove that Plaintiff registered certain copyrights and deposited certain drawings as mandated in the copyright registration process. Plaintiff's belief that copies of the certificates and deposit materials were the appropriate way to support its claims of copyright ownership is what led it to submit those documents, via the First Meijer Declaration, to the Court. Neither do the parties dispute that *Rule 56(e)(1)* requires that certified or sworn copies **[*26]** of these materials must be attached to Mr. Meijer's affidavit. Rather, the parties essentially dispute whether copies of these documents are sufficiently certified through Mr. Meijer's declaration or whether copies certified by the Copyright Office should be submitted. This is a question of authentication under *Federal Rules of Evidence 901* and *902*.

Unauthenticated documents are improper as summary judgment evidence. *King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994)*; *Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 192 (5th Cir. 1991)*. *Rule 901* provides that a document may be authenticated by "evidence sufficient to support a finding" that it is "what its proponent claims." *Fed. R. Evid. 901*. While *Rule 901* does not require conclusive proof of authenticity, it requires at least some evidence sufficient to support a finding that the evidence in question is what the proponent claims it to be. *See United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993)*.

In order to authenticate public records such as the certificates and deposit materials, Plaintiff could provide "testimony that a matter is what it is claimed to be," *Fed. R. Evid. 901(b)(1)*, or evidence that the certificates and deposit **[*27]** materials are obtained from the Copyright Office. *Fed. R. Evid. 901(b)(7)*. Additionally, Plaintiff could submit self-authenticating copies of the certificates and deposit materials that have been certified by the Copyright Office. *Fed. R. Evid. 902(4)*. Plaintiff chose to authenticate the copyright registration certificates and deposit materials by submitting the First Meijer Declaration as testimony stating that the certificates and deposit materials corresponded to those possessed by the Copyright Office. (Doc. No. 108, Exh. H, Meijer Decl.; Doc. No. 110, Meijer Decl.)

The Court agrees that Plaintiff has failed to properly authenticate the deposit material appearing as Exhibits B-J to the First Meijer Declaration. Plaintiff conceded in the Second Meijer Declaration that "deposit materials do not include the entirety of Exhibits B-J" to the First Meijer Declaration, but only "a subset of those documents." (Doc. No. 154, Second Meijer Declaration at ¶ 4). The Second Meijer Declaration did not purport to authenticate a correct set of deposit materials. Therefore, the deposit materials attached as Exhibits B-J have not been authenticated through any means and must be stricken.

The Court **[*28]** next considers the certificates of registration appearing as Exhibit A to the First Meijer Declaration. The First Meijer Declaration meets the requirements of *Rule 56(e)* by certifying that the copies of the certificates attached to the declaration are "true and correct" and that this representation is based upon personal knowledge. Unlike the deposit materials, the Second Meijer Declaration does not concede that the certificates attached to the First Meijer Declaration are inaccurate copies of what was issued by the Copyright Office. Though Defendant attacks the entire First Meijer Declaration as false and misleading, it does not specifically note anything false or misleading about the certificates in Exhibit A to the First Meijer Declaration. Moreover, even though, as Defendant argues, copies of the certificates certified by the Copyright Office would be self-authenticating, *Rules 901(b)(1)* and *901(b)(7)* expressly allow Plaintiff to authenticate public records like the certificates of registration through testimony such as the First Meijer Declaration. The Court finds that Plaintiff has made a *prima facie* showing of authenticity of the certificates by attaching them to the First Meijer **[*29]** Declaration. The ultimate issue of authenticity is a question for the jury. *See United States v. Barlow, 568 F.3d 215, 220 (5th Cir. 2009)*; *United States v. Guidry, 406 F.3d 314, 320 (5th Cir. 2005)*.

Defendant's motion to strike the declaration of Marcel Meijer submitted in support of Plaintiff's motions for summary judgment is granted in part as to Exhibits B-J of the declaration and denied in part as to Exhibit A.

### C. Motion to Strike Exhibit V to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. 138)

Defendant Thomas moves to strike Exhibit V to Plaintiff's Opposition to Defendant's Motion for Summary Judgment [9] on two grounds, each of which will be addressed separately below.

#### 1. Exhibit V's statements about an Implied Nonexclusive License

Defendant claims, in its motion for summary judgment, that it is not liable for copyright **[*30]** infringement or DMCA violations because Plaintiff granted Defendant Thomas an implied nonexclusive license to copy or distribute Plaintiff's drawings. (Doc. No. 104 at ¶ 17.) As evidence of the existence of this license, Defendant cites certain deposition testimony of Mr. Meijer. A representative sample of the deposition testimony relevant to the motion to strike is the following:

> "Q. And you recall the discussion that we saw your floor plan and it was your original work that was taken and used in these soil plans, yes?
> A. To the best of my ability looking at this very bad illustration, it looks like it is my site plan. . . .
> Q. Right. And what that means is that C.L. Thomas had taken your work and had given it to these soils people, these geotechnical experts, and they ended up taking that and including it in their plan without using any of your digital rights management?
> . . .
> A. The way you're placing the question, I have to answer yes.
> Q. Okay. And that was okay with you because everyone was on the same — on that same project, right?
> A. It's okay with me because I'm being paid by my client to do this work.
> . . .
>
> Q. Right. And in the course of your daily work they had either an express license **[*31]** from you wherein you said it's okay for you to do that or an implied one that they did it; they sent it to you; and you never said anything about it, right?
> . . .
> A. If it is a project that I'm the architect of record and I'm being paid to work on, this is okay with me.
> Q. Okay. So —
> A. I am aware at some point.
> Q. All right. That's the point. You're aware of and you are at a minimum implying the license of the use of your drawing there, right?
> A. I disagree with the way you asked that question.
> Q. Why?
> A. Something about the license of that I'm implying. I'm trying to facilitate an exhibit only for the location of this project and this location only, at this piece of land, at this boundary condition in this city of Austin only; and that's acceptable to me, sir.
> Q. Okay. And you never said to them - at least I haven't been able to find a document that says, You can only do it on this project?
> A. No. I'm sure there's nothing.
> . . .

---

[9] For purposes of clarity, the relevant documents are the following: Defendant's Motion for Summary Judgment (Doc. No. 104); Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. No. 124); and Defendant Thomas's Reply to Plaintiff's Opposition to Defendant Motion for Summary Judgment and Motion to Strike Exhibit V (Doc. No. 138).

A. Okay. An employee of C.L. Thomas called Joey Dunlap. He's requested this soil report. He gave them an exhibit that he has availability to or access to and the soil report man placed these three bores and there's the exhibit. . . .

. . .

Q. You gave permission, either **[*32]** expressly or by way of the implication of not objecting. Is that fair?
A. That would be a fair statement.
Q. And you never withdrew that permission as reflected there, did you?
A. Correct.

(Meijer Depo. III at 215-20.) Defendant points to portions of this deposition testimony as well as other deposition testimony [10] as evidence that Plaintiff allowed Defendant Thomas to use and distribute Plaintiff's drawings and never limited Defendant Thomas's ability to do so. Plaintiff, in its opposition to Defendant's motion for summary judgment, argues that this deposition testimony reveals only Plaintiff's limited consent to allow the inclusion of its drawings into survey reports and other third-party drawings produced for the projects in which Plaintiff was involved, and does not show any intent of Plaintiff to allow its drawings to be used in completely different projects by rival architects. (Doc. No. 124 at 15.) Plaintiff attached to its opposition Exhibit V, an undated declaration of Mr. Meijer in which he states that he was not aware of and did not consent to Defendant Thomas's sharing of Plaintiff's construction plans with other architects or other parties not involved in the projects for **[*33]** which the plans were designed. (Doc. No. 124, Exh. V at ¶ 3.) Defendant now seeks to strike Exhibit V, Mr. Meijer's declaration, as an attempt to contradict his prior sworn deposition testimony without explanation.

The Court rejects Defendant's argument that Mr. Meijer's statements in Exhibit V contradict his prior deposition testimony. Mr. Meijer's deposition testimony at issue makes two key points. First, Mr. Meijer repeatedly states that any explicit or implied license to use Plaintiff's drawings was given only in relation to projects on which Plaintiff served as the architect. Nothing in Mr. Meijer's subsequent declaration contradicts this position. Second, Mr. Meijer states during the deposition that there are no signed documents that limit Defendant Thomas's ability to use Plaintiff's drawings to only Plaintiff's projects with Defendant Thomas. Again, nothing in Mr. Meijer's subsequent declaration contradicts Mr. Meijer's deposition testimony about the non-existence of documents. Rather, Mr. Meijer's declaration focuses on Mr. Meijer's ignorance of and lack of consent **[*34]** to Defendant Thomas's use of its plans and does not contradict his deposition testimony about the non-existence of documents. Defendant Thomas has not cited any deposition testimony, nor can the Court find any, in which Mr. Meijer states that he is aware of Defendant Thomas's provision of Plaintiff's drawings either to other architects or to third-parties not involved in Plaintiff's projects with Defendant Thomas. Even under a generous reading that Mr. Meijer's declaration is slightly at odds with his deposition testimony, this raises an issue of credibility rather than admissibility. *See* *Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980)* ("In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition.")

**2. Exhibit V's Statements about License Fees**

Defendant also seeks to strike Exhibit V because, in it, Mr. Meijer states that he would have charged Defendant Thomas $25,000 for a license to use Plaintiff's drawings for each additional store or site. (Doc. No. 124, Exh. V. at ¶ 9.) Defendant claims that Exhibit V should be **[*35]** stricken because (1) this statement fails to set forth the proper measure of actual damages, and (2) gives testimony without cross-examination on an issue that Mr. Meijer was specifically asked about, but could not answer, during his deposition.

The Court agrees with Defendant that Mr. Meijer's statement in Exhibit V regarding the amount he would have charged Defendant Thomas as a license fee should be stricken because it sets forth an incorrect measure of actual damages, and is therefore irrelevant. *Section 504(a)* of the Copyright Act provides that a copyright owner may

---

[10] *See* Mr. Meijer's deposition testimony cited in Defendant's Motion for Summary Judgment. (Doc. No. 104 at ¶¶ 18-19.)

recover actual damages he or she suffers as a result of copyright infringement. 17 U.S.C. § 504(a). Courts have construed the "actual damages" measure to include license fees that the copyright owner would have obtained for the infringer's use of the copyrighted material. *See* On Davis v. The Gap, Inc., 246 F.3d 152, 165 (2d Cir. 2001). "[W]here the infringer could have bargained with the copyright owner to purchase the right to use the work, actual damages are "'what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work.'" Jarvis v. K2 Inc., 486 F.3d 526, 533 (9th Cir. 2007) **[*36]** (quoting Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 512 (9th Cir. 1985)). The license fee is determined by reference to fair market value, which is an objective analysis rather than a subjective analysis based on what the copyright owner would have charged. [11] Mackie v. Rieser, 296 F.3d 909, 917 (9th Cir. 2002); On Davis, 246 F.3d at 166. Fair market value may be established where: "(1) a plaintiff demonstrates that he previously received compensation for use of the infringed work; or (2) the plaintiff produces evidence of benchmark licenses, that is, what licensors have paid for use of similar work." Thornton v. J Jargon Co., 580 F. Supp. 2d 1261, 1276 (M.D. Fla. 2008).

Mr. Meijer's statement that he "would have charged [C.L. Thomas] a licensing fee of $25,000 for each additional store or site" cannot alone establish the amount of actual damages to which Plaintiff is entitled. Mr. Meijer fails to represent that $25,000 is the fair market value for a licensing fee. He does not claim that Thomas would have agreed to pay such a fee. Mr. Meijer does not state that $25,000 is generally what he charges for a license fee for similar material or that he has ever received this amount as a license fee. Neither has Mr. Meijer produced evidence that this amount is what companies such as C.L. Thomas pay for use of commercial architectural plans. The license fee of $25,000 appears to be nothing more than Mr. Meijer's subjective calculation. On its own, it is not a proper measure of Plaintiff's actual damages. The Court will strike the paragraph in Mr. Meijer's affidavit, but will consider the other portions of his affidavit. *See* Mayfield v. Tex. Dep't of Crim. Justice, 529 F.3d 599, 607 (5th Cir. 2008) (quoting Aikin v. Q-L Invs., 959 F.2d 521, 531 (5th Cir. 1992) **[*38]** ("On a motion for summary judgment the district court should disregard only those portions of an affidavit that are inadequate and consider the rest."). The Court grants Defendant's motion to strike Exhibit V as to Mr. Meijer's statement about licensing fees and denies the motion otherwise.

**D. Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Evidence (Doc. 131)**

Plaintiff has objected to and moved to strike various summary judgment evidence submitted by Defendant. [12] Specifically, Plaintiff objects to portions of deposition testimony of Jeff Johanson, Carlton Labeff, Marcel Meijer, William Morris, William Daren Penewitt, Ismail Urfi, and portions of affidavits submitted by Jeff Johanson and William Daren Penewitt. Plaintiff cites to various rules of the Federal Rules of Evidence as the basis for its objections, but has not provided any argument to explain how the summary judgment evidence is objectionable on these grounds. Despite the difficulty in ascertaining why Plaintiff believes the summary judgment evidence to be objectionable, the Court will grant Plaintiff's motion in part as to Mr. Labefff's opinions on the copyrightability of Plaintiff's architectural **[*39]** designs and technical drawings, Mr. Labeff's conclusions about derivative works, Mr. Meijer's testimony about violations of the DMCA, and Mr. Urfi's statements about Mr. Meijer's permission to use third-party drawings, and deny it otherwise.

---

[11] Contrary to Plaintiff's argument, Thoroughbred Software Int'l, Inc. v. Dice Corp., 488 F.3d 352, 358 (6th Cir. 2007), does not support the principle that "actual damages" may be measured by what Plaintiff would have *charged* Defendant for a license. Rather, *Thoroughbred Software* states that actual damages may be measured by what the plaintiff would have *received*, and approves of a calculation based on "the reasonable license fee on which a willing buyer and a willing seller would have *agreed* for **[*37]** the use taken by the infringer." Id. at 358-59 (quoting On Davis, 246 F.3d at 167) (emphasis added).

[12] Plaintiff's objections to and motion to strike is Doc. No. 131. According to Plaintiff, Defendant's motions containing the objectionable summary judgment evidence are Doc. Nos. 101, 102, 103, 104, 105, 106, 107, 109. The Court notes that Doc. No. 103, Hermes' Motion for Order regarding Joint and Several Liability, does not even contain any supporting evidence. Similarly, Doc. No. 106, Defendant's Motion to Exclude Opinions of Leonard Lane, does not contain as supporting evidence any of the deposition or affidavit testimony Plaintiff seeks to strike. Therefore, neither Doc. No. 103 nor Doc. No. 106 should be included among the motions containing objectionable summary judgment evidence.

**1. Deposition Testimony of Jeff Johanson**

Jeff Johanson is Defendant Thomas's President and Chief Operating Officer. Plaintiff objects to portions of Mr. Johanson's deposition testimony where he states that Speedy Stop, LLC, owns the real estate and land on which the **[*40]** Speedy Stop stores are located and that it, not Defendant Thomas, receives the revenue from the stores. This testimony is not objectionable on grounds of the best evidence rule because Mr. Johanson is not attempting to prove the existence or content of a writing. *See* *Fed. R. Evid. 1002*; *R.R. Mgmt. Co. LLC v. CFS La. Midstream Co., 428 F.3d 214, 217 (5th Cir. 2005)* (stating that *Fed. R. Evid. 1002* requires the original writing in order to prove the content of that writing, but *Fed. R. Evid. 1004* allows other evidence of the contents of the writing when the writing is not closely related to the controlling issue). Neither is Mr. Johanson's testimony speculative or without foundation. A review of Mr. Johanson's deposition testimony shows that, as the chief executive of Defendant Thomas, he was heavily involved in reviewing the revenues and expenses of the Speedy Stop stores and has personal knowledge of which entities receive which revenue. In addition, Mr. Johanson's testimony regarding the relationship between Speedy Stop, LLC and C.L. Thomas was not undisclosed expert opinion because he was simply describing what he knows about the relationship and not offering any scientific, technical **[*41]** or other specialized knowledge. *See* *Fed. R. Evid. 702*.

Mr. Johanson's testimony about the process by which the Speedy Stop store design was created is not objectionable on the grounds of speculation because a review of his deposition shows that he was involved in the design process and testified based on his personal knowledge. *See* *Fed. R. Evid. 602*. Neither is this testimony objectionable on grounds of the best evidence rule as Mr. Johanson is not referring to the content of any writing. Finally, Mr. Johanson's testimony is not improper expert opinion because he simply describes the process by which Defendant Thomas arrived at a particular design.

**2. Deposition testimony of Carlton Labeff**

Mr. Labeff is in charge of Defendant Thomas's construction group. Plaintiff objects to portions of Mr. Labeff's deposition testimony in which he discusses Defendant Thomas's involvement in the design process for the Speedy Stop stores, the nature and scope of Defendant Thomas's in-house design work, his opinions regarding the copyrightability of architectural drawings, and Mr. Urfi's departure from Plaintiff.

None of the excerpts of Mr. Labeff's deposition testimony is inadmissible on the grounds of **[*42]** the best evidence rule because Mr. Labeff does not testify about the contents of a writing. At most, Mr. Labeff testifies about the process of generating a certain drawing or floor plan.

Mr. Labeff's deposition testimony regarding (a) Defendant Thomas's involvement in the design process with Plaintiff and Hermes, (b) the amount of design and drawing work done internally at C.L. Thomas, and (c) Mr. Meijer's statement that Plaintiff could no longer keep up with Defendant Thomas's projects are not inadmissible on grounds of speculation. A review of Mr. Labeff's deposition testimony shows that these statements are based on his personal knowledge. *See* *Fed. R. Evid. 602*.

However, Mr. Labeff's opinions on the copyrightability of Plaintiff's architectural designs and technical drawings must be stricken as improper expert opinion. Mr. Labeff acknowledged that he does not have any professional licenses and does not claim to be an expert on copyright law. (Labeff Depo. at 13-14.) Therefore, his opinions regarding the ownership of Plaintiff's drawings and architectural designs, and whether architectural designs in general should be copyrightable are improper as Mr. Labeff does not have the qualifications **[*43]** to render an opinion on these matters. *See* *Fed. R. Evid. 702*. Mr. Labeff's agreement with the statement that Plaintiff's drawings were derived from Defendant Thomas's designs is an improper legal opinion to the extent that Mr. Labeff attempted to offer a legal conclusion regarding a derivative work under copyright law, but proper to the extent that Mr. Labeff was merely describing, based on his personal knowledge, the process by which Plaintiff arrived at its architectural design. *See* *Fed. R. Evid. 602*, *704*.

As to the final portion of deposition testimony to which Plaintiff objects, it is unclear whether Plaintiff objects on grounds of speculation to Mr. Labeff's statement that Mr. Meijer performed very little work in the design process, or to his statement that Mr. Urfi worked for Buckee's after leaving Plaintiff. A review of Mr. Labeff's deposition testimony does not reveal the personal knowledge upon which he based these statements. Regardless of whether the statements were based on Mr. Labeff's personal knowledge, they are irrelevant to any facts at issue in this case and therefore are inadmissible. *See Fed. R. Evid. 401*, *402*.

**3. Deposition testimony of Marcel Meijer**

Mr. Meijer testified **[*44]** in his deposition on November 16, 2009 about being furnished with third-party layouts from food service vendors, removing the names of architects and engineers on those layouts, and placing the layouts in Plaintiff's drawings. Mr. Meijer testified in his deposition on January 4, 2010 about whether a third-party's title block appeared on Plaintiff's drawings and whether removing a third-party's title block from a drawing and subsequently using the drawing in Plaintiff's own drawing is a violation of the DMCA. Finally, Mr. Meijer testified in his deposition on January 15, 2010 that he gave Defendant Thomas permission to use and to share Plaintiff's drawings with third-parties also working on the projects for which Plaintiff served as an architect, and that he never withdrew this permission.

Plaintiff's objections to this testimony on the basis of the best evidence rule miss the mark. Mr. Meijer is not testifying as to the content of the drawings, but as to whether he received the third-party drawings and removed the name of any architect or engineer that appeared on the third-party drawings. Plaintiff also cannot object to this testimony on the grounds of leading questions because Mr. **[*45]** Meijer, as an adverse party to the Defendant, could be interrogated through use of leading questions by Defendant's attorneys. *See Fed. R. Evid. 611(c)*. Finally, Mr. Meijer's testimony is neither speculative nor without foundation since Mr. Meijer's testimony about (a) the process by which Plaintiff generated its architectural designs and technical drawings, and (b) whether he granted permission to Defendant Thomas to share Plaintiff's drawings are based on his personal knowledge.

Mr. Meijer's statement about providing Defendant Thomas with permission to share Plaintiff's drawings with third-parties is not improper expert opinion because Mr. Meijer is providing information about his actions rather than any specialized, technical or scientific knowledge. *See Fed. R. Evid. 702*. However, Mr. Meijer's statement about whether removal of a title block from an architectural drawing constitutes a violation of the DMCA is an improper legal opinion and must be stricken because it attempts to state a legal conclusion that is within the realm of the jury to decide. *See Fed. R. Evid. 704*.

**4. Deposition Testimony of William Morris**

Mr. Morris is a civil engineer and the principal in charge of Morris. **[*46]** He testifies during his deposition about industry practice as it relates to use of prototype drawings in retail industry projects, circumstances in which notification of a prior engineer is required when using that engineer's drawings, ownership of drawings generally, and what constitutes reasonable diligence in ascertaining ownership of drawings.

Mr. Morris's opinions in this regard are not speculative. Mr. Morris's deposition testimony shows that he is testifying based on his personal knowledge, accumulated over years of work as a licensed professional engineer. Neither does Mr. Morris offer improper expert opinion or improper legal opinions. Mr. Morris is offering specialized knowledge of the process by which engineers receive prototypical plans from their clients, adapt those plans for a particular project, and the extent to which they are required to determine ownership of those plans. Mr. Morris's professional qualifications and experience in the industry appear to qualify him to offer these types of opinions. In the portions of his deposition testimony objected to by Plaintiff, Mr. Morris is only testifying to general industry practice and not to the specific actions by the parties **[*47]** in this case. As such, he is not offering a legal conclusion about the parties' ownership of designs or drawings that would be within the realm of the jury to decide.

**5. Deposition Testimony of William Daren Penewitt**

William Daren Penewitt is a draftsman and project manager with Hermes. In his deposition testimony, Mr. Penewitt discusses the profitability of Hermes's projects for C.L. Thomas, the hope that working with C.L. Thomas would eventually lead to profits, his conversation with Mr. Labeff about why C.L. Thomas needed a new architect, and the completion date of some of Hermes's drawings.

Mr. Penewitt's testimony on all of these issues is not speculative since it is based on upon his personal knowledge. Mr. Penewitt states that he created 95 percent of all the documents prepared by Hermes for Defendant Thomas. (Penewitt Depo. at 24.) In addition, Mr. Penewitt served as the main contact person at Hermes Architects for Defendant Thomas. (Penewitt Depo. at 115.)

Neither does the best evidence rule affect Mr. Penewitt's testimony. Mr. Penewitt testifies about the dates by which certain documents were completed and the overall state of Hermes's profitability. On neither of these issues **[*48]** is Mr. Penewitt testifying as to the content of a writing. *See* Fed. R. Evid. 1002.

Finally, it is difficult for the Court to evaluate Plaintiff's hearsay objection because Plaintiff has not identified how Defendant has used Mr. Penewitt's testimony in its motions. Mr. Penewitt testifies, in response to a question about why Hermes was hired by Defendant Thomas, that Mr. Labeff told him that Thomas's current architect couldn't handle the workload given to him. To the extent that Defendant cites Mr. Penewitt's testimony for either the fact that Mr. Labeff made such a statement or that Plaintiff could not handle Defendant Thomas's workload, the Court will disregard it.

**6. Deposition Testimony of Ismail Urfi**

Ismail Urfi is a former employee of Plaintiff and worked as a draftsman on many of Plaintiff's projects for Defendant Thomas. Mr. Urfi testifies in his deposition about whether Mr. Meijer had permission to use certain third-party and prototype drawings, and the similarity between Plaintiff's drawings and Quik Trip's floor plan.

Mr. Urfi's testimony about whether Mr. Meijer had permission to use third-party and prototype drawings should be stricken as speculative. Mr. Urfi's deposition shows **[*49]** that he had no personal knowledge of Mr. Meijer's interactions with third parties. (Urfi Depo. at 177.)

Mr. Urfi's testimony about whether Plaintiff's drawing looks the same as Quik Trip's floor plan is admissible. He is not speculating about the similarity, but basing his testimony on a comparison of the drawings. In addition, he is not providing expert testimony in the form of specialized or technical knowledge, but offering a lay witness opinion based on his perception about the two drawings. *See* Fed. R. Evid. 701. Finally, Plaintiff's best evidence objection is not well-founded because Plaintiff's drawing and Quik Trip's floor plan are part of the summary judgment record. *See* Fed. R. Evid. 1002.

**7. Affidavit of Jeff Johanson**

Mr. Johanson submitted an affidavit in support of Defendant's Motion for Summary Judgment (Doc. No. 104). In his affidavit, Mr. Johanson testified regarding conversations he had with Mr. Meijer about Plaintiff's services, the process by which the Speedy Stop design was created, and Defendant Thomas's working relationship with Plaintiff.

None of Mr. Johanson's statements is inadmissible on the grounds of best evidence. In his affidavit, Mr. Johanson does not refer **[*50]** to the contents of any writing except those of the Confidentiality Agreements. Even then, Mr. Johanson doesn't testify to the actual language of the Confidentiality Agreements, but only makes the point that the terms contained therein were ones that Defendant Thomas had never seen or agreed upon.

Neither are Mr. Johanson's statements speculative. Mr. Johanson clearly states that he worked personally with Mr. Meijer on Plaintiff's projects with Defendant Thomas and had conversations with Mr. Meijer directly about Plaintiff's work. Therefore, Mr. Johanson's statements are based upon his personal knowledge.

Finally, Mr. Johanson's statements are not improper expert opinion. He does not offer specialized or technical knowledge about the construction or architectural design process. Rather, he offers first-hand knowledge of how Defendant Thomas designed and built the Speedy Stop stores at issue in this case and how Defendant Thomas interacted with Plaintiff to that end.

**8. Affidavit of Daren Penewitt**[13]

Plaintiff objects to the portions of Mr. Penewitt's affidavit where he states that **[*51]** Hermes did not receive any electronic copies or CAD drawings with Plaintiff's title block and that it did not remove or alter Plaintiff's title block from any drawing, electronic or hard copy. Plaintiff also objects to Mr. Penewitt's statements that Hermes did not provide the hard copy drawings it received from Defendant Thomas to any third party, and that the hard copy drawings were only to see how Defendant Thomas wanted its drawings laid out and did not serve as the starting point for Hermes's work.

Plaintiff's best evidence rule objection is not applicable here. Most of Mr. Penewitt's statements do not testify as to the content of any drawing. To the extent that Mr. Penewitt makes a claim about whether Plaintiff's title block was present on a document, these documents have been attached to his affidavit and made a part of the summary judgment record.

Plaintiff next objects to nine different statements in Mr. Penewitt's affidavit on the grounds that they contradict his prior sworn deposition testimony. However, Plaintiff fails to identify the deposition testimony contradicted by these nine different statements. After reviewing the declaration and deposition testimony submitted in **[*52]** support of Defendant's motions, the Court concludes there is no contradiction that would prove fatal to the declaration's admissibility.

**E. Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Opposition Evidence (Doc. 143)**

Plaintiff objects to and moves to strike certain deposition testimony and affidavits that Defendant cites in its opposition to Plaintiff's motions for summary judgment. Specifically, Plaintiff objects to portions of deposition testimony of Marcel Meijer, William Morris, Greg Mitchell, Ismail Urfi, portions of affidavits submitted by Jeff Johanson and J. David Cabello, and portions of an expert report of Jeff Johanson. Once again, Plaintiff cites to various rules of the Federal Rules of Evidence as the basis for its objections, but does not provide any argument as to why the summary judgment evidence is objectionable on these grounds. The Court will grant Plaintiff's motion in part as to Mr. Meijer's testimony about violations of the DMCA and Mr. Morris's testimony about the originality of Plaintiff's drawings, and deny it otherwise. The reasons are set forth below.

**1. Deposition Testimony of Marcel Meijer**

Plaintiff objects to portions of Mr. Meijer's **[*53]** deposition testimony where Mr. Meijer (a) acknowledges that certain errors in Plaintiff's profit and loss statement would affect the calculation of Plaintiff's profitability and may make such statements unreliable, (b) admits that he saw plans for only one store designed by Hermes (Store No. 301) prior to litigation and that Plaintiff's claim against Hermes is based upon that store, and (c) opines on whether removal of a title block constitutes a violation of the DMCA.

---

[13] "Daren Penewitt" is the same person as "William Daren Penewitt," the civil engineer for Hermes Architects.

As an initial matter, all of Plaintiff's objections based on leading questions are misplaced because, as an adverse party, Defendant's counsel can interrogate Mr. Meijer using leading questions. *See Fed. R. Evid. 611(c)*.

None of Plaintiff's objections to Mr. Meijer's testimony about Plaintiff's profitability statements is well-founded. First, the best evidence rule is inapplicable here. Mr. Meijer's testimony about the errors in Plaintiff's profit and loss statements focus not on the content of those statements and errors but rather on whether Mr. Meijer would rely upon those statements if they contained errors. Second, though Mr. Meijer is responding to hypothetical questions, Plaintiff has failed to explain why his responses **[*54]** are not based on personal knowledge or are otherwise improper expert opinion. The Court declines to strike these statements.

Plaintiff's objections to Mr. Meijer's testimony about the factual basis of his claims against Hermes are unfounded. Mr. Meijer's testimony to this effect is based on his personal knowledge that he only remembers viewing one set of plans from Hermes prior to filing suit against Defendant. He acknowledges that, therefore, his claims against Hermes are based on this store's set of plans. This testimony does not purport to offer any specialized, technical or scientific knowledge and cannot be characterized as expert opinion.

Plaintiff's objections to Mr. Meijer's testimony about title block removal and the DMCA, while not speculative, are correct in identifying it as improper expert opinion. Mr. Meijer does not have any special expertise in copyright law that would allow him to define violations of the DMCA and whether removal of title blocks is proscribed by the DMCA.

**2. Deposition Testimony of William Morris**

Mr. Morris offers a number of opinions about the creativity, functionality, uniqueness, and originality of elements within a convenience store and its general **[*55]** layout, both with respect to Plaintiff's drawings specifically and convenience stores generally. Plaintiff objects to these opinions on grounds that they are improper expert opinion, speculation, and do not conform to the best evidence rule.

The best evidence rule is inapplicable to Mr. Morris's statements, which do not refer to the content of any architectural plans but rather characterize certain elements as unique, original, creative, or functional elements and make conclusions about similarities between the plans. Neither of Mr. Morris's statements is speculative. He speaks based on his personal knowledge of the plans he developed for Defendant Thomas, his review of Plaintiff's drawings, his comparison of various floor plans, and the general knowledge of the convenience store industry he has developed over the years working in retail store construction. Finally, Mr. Morris's statements are not improper expert opinion because he has sufficient professional expertise to offer his observations regarding the elements of a convenience store, whether these elements are unique, creative or functional, whether these elements are commonly found in convenience stores, and whether Plaintiff's **[*56]** drawings are similar to those of other architects.

To the extent that Mr. Morris offers legal conclusions about the originality of Plaintiff's drawings, these statements will be stricken as improper legal opinions. *See Fed. R. Evid. 704*.

**3. Deposition Testimony of Greg Mitchell**

Plaintiff objects to two portions of the deposition testimony of Greg Mitchell, one of Defendant Thomas's technical experts. First, Plaintiff objects to Mr. Mitchell's statement that his testimony is necessary to assist the jury to analyze the layout and functionality of the floor plans. Plaintiff claims that this statement is improper expert opinion, undisclosed expert opinion, and speculation. This portion of Mr. Mitchell's testimony is not expert opinion because, in it, he does not express any technical or specialized knowledge. He only states his opinion as to why his knowledge would be relevant or helpful to the trier of fact. Neither is this statement speculative. Mr. Mitchell is making a claim for the relevance of his testimony based on his personal knowledge of the convenience store industry and the details of how layouts of convenience stores are arranged.

Second, Plaintiff objects to Mr. Mitchell's statement **[*57]** that he makes the floor plan of his own convenience store chain, Toot 'n Totum, as identical to that of Quik Trip as he can. Contrary to Plaintiff's arguments, this statement is not improper or undisclosed expert opinion because Mr. Mitchell is not expressing any technical or specialized knowledge about his store's floor plan or Quik Trip's floor plan. He explains, based on his personal knowledge, that he has made his own company's floor plans as similar as possible to another company's floor plans for reasons of functionality.

**4. Deposition Testimony of Ismail Urfi**

Plaintiff objects to Mr. Urfi's testimony that he did not offer any creativity in generating the floor plan or elevation and that he did not consider himself the author of these drawings. Mr. Urfi's testimony is not speculative since it is based on his personal knowledge of the work that he performed in drafting the Speedy Stop store drawings. The questions posed to Mr. Urfi are not objectionable due to their leading nature because Mr. Urfi was being questioned by counsel for Defendant. Finally, Mr. Urfi's statements are not expert opinion because he is not providing any expert or technical knowledge, but only his perception **[*58]** of whether he came up with the ideas for the Speedy Stop store layouts and elevations or contributed creative ideas.

**5. Expert Report and Supplemental Expert Report of Jeff Johanson**

Plaintiff objects to Mr. Johanson's opinions about the primary factors in the Speedy Stop stores' profitability, his belief that store layout and design do not affect customer's buying decisions, and that the allegedly infringing stores' profit and loss statements show a loss of $4 million dollars through December 31, 2009. As discussed more fully in the Court's Memorandum and Order dated October 9, 2010 (Doc. No. 175), Mr. Johanson's statements on these issues are proper expert opinions that are based on his extensive professional experience as an executive of a convenience store chain and his personal knowledge of Speedy Stop's operations. In addition, Mr. Johanson's statements about the factors that affect store profitability, rather than quantitative assessments of each factor's specific effect upon profits, are permissible. These types of statements do not purport to prove the content of any writing and therefore are not objectionable under the best evidence rule. Mr. Johanson's statements about the **[*59]** loss reflected on the allegedly infringing stores' profit and loss statements are also not objectionable because, to the extent these statements are inadmissible, Mr. Johanson is allowed to rely on inadmissible evidence as a basis for his expert report. *See* Fed. R. Evid. 703.

**6. Affidavit of Jeff Johanson**

Mr. Johanson's affidavit contains several statements to which Plaintiff has objected, including his description of conversations with Mr. Meijer, the practice of using "go-bys," the genesis of Plaintiff's elevation as Hermes' elevation for Store No. 84, and Defendant Thomas's provision of the stores' elevation concept and floor plans to Plaintiff.

Mr. Johanson's statements that Defendant Thomas provided Plaintiff with the ideas for the elevation and floor plan, and that the elevation concept came from Defendant Thomas, are not objectionable on grounds of expert opinion, speculation or best evidence rule. Mr. Johanson makes these statements based on his personal knowledge of Defendant Thomas's and Plaintiff's working relationship, does not refer to the contents of any writing, and does not purport to offer any specialized or technical knowledge. Plaintiff does not explain how these statements **[*60]** constitute hearsay. Accordingly, the Court declines to strike these statements.

As for Mr. Johanson's statements regarding his conversations with Mr. Meijer and the use of Plaintiff's drawing as "go-bys," these are not improper expert opinion or speculation as they are based on Mr. Johanson's personal knowledge of his conversations with Mr. Meijer and do not offer any specialized or technical knowledge. These statements are also unobjectionable on best evidence grounds because they do not refer to the contents of a

writing. Plaintiff does not explain how these statement constitute hearsay or how they represent an improper attempt to use an affidavit. The Court declines to strike these statements.

**7. Affidavit of J. David Cabello**

Plaintiff objects to the declaration of J. David Cabello, attorney for Morris, on several grounds. First, to the extent that Plaintiff objects on grounds of the best evidence rule and hearsay, Mr. Cabello attaches copies of the certified copies of the copyright registration certificates and deposit materials he has received from the Copyright Office for the relevant Speedy Stop stores. These documents are what the Court will examine to determine the exact nature **[*61]** of the certificates of registration and deposit materials; Mr. Cabello's statements regarding these documents will not be stricken. Next, a foundation for Mr. Cabello's statements about the certificates and deposit materials has been properly laid through a description of the process by which Mr. Cabello and his associate personally requested and obtained the documents. Mr. Cabello's statements will not be stricken on grounds of speculation and lack of foundation.

Finally, Plaintiff objects to the certificates, deposit material, and correspondence between Mr. Cabello's law firm and the Copyright Office that have been attached to Mr. Cabello's declaration on the grounds that these were untimely produced. However, Plaintiff fails to explain in its motion to strike why Defendant had an obligation to produce these documents. After reviewing the numerous other briefs filed by Plaintiff, the Court has found Plaintiff's argument in Doc. No. 139 that Defendant was obligated to produce these documents under the Federal Rules of Civil Procedure and this Court's previous order dated February 25, 2010 (Doc. No. 93). The Court's order makes clear that Defendant were required to disclose the factual **[*62]** bases for their affirmative defenses so that Plaintiff could request further documents if necessary during the discovery period. However, the copyright registration certificates and deposit materials are relevant to Plaintiff's claim that it owned valid copyrights, rather than Defendant's affirmative defenses. "A certificate of registration, if timely obtained, is *prima facie* evidence both that a copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004)*. A defendant may rebut the presumption of validity by showing errors in the registration. *See* *Berg v. Symons, 393 F. Supp. 2d 525, 539 (S.D. Tex. 2005)*. Defendant here was not required to produce the certificates or deposit material they obtained from the Copyright Office until Plaintiff had attempted to establish that it owned a valid copyright by submitting copies of these same documents. Further, Defendant's method and manner of rebutting Plaintiff's evidence are proper. *Rule 56(e)(1)* provides that an affidavit from one party may be opposed by affidavits from another party. "[A] party opposing a motion for summary judgment may proffer an affidavit to show the **[*63]** movant's deponents are not credible, thus raising a genuine issue of fact that must be tried by the jury." *Eisbach v. Jo-Carroll Electric Cooperative, Inc., 440 F.2d 1171, 1174 (7th Cir. 1971)*. Defendant has proceeded by the method contemplated by the Rules of Civil Procedure and has not violated the Court's prior order.

**III. MOTIONS TO DISMISS**

Before the Court are Defendant's motion to dismiss for lack of subject matter jurisdiction all of Plaintiff's claims based on unregistered works (Doc. No. 119) and Defendant's motion to dismiss for lack of standing all claims based on copyrights registered and owned by Marcel Meijer, individually (Doc. 119). The Court denies both motions as explained below.

**A. Motion to Dismiss Standard**

The court must dismiss a case when Plaintiff fails to establish subject matter jurisdiction. *Fed. R. Civ. P. 12(b)(1)*. "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking." *Stockman v. Federal Election Comm'n, 138 F.3d 144, 151 (5th Cir. 1998)*. A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case. **[*64]** *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss., 143 F.3d 1006, 1010 (5th Cir. 1998)*

(internal quotation marks and citation omitted). "Because standing goes to the constitutional power of a federal court to entertain an action, [a] court has a duty to address it." *James v. City of Dallas, 254 F.3d 551, 562 (5th Cir. 2001)*. The burden of establishing federal jurisdiction rests on the party seeking the federal forum. *Stockman, 138 F.3d at 151*.

**B. Motion to Dismiss Claims Based on Unregistered Works**

Defendant argues that Interplan has failed to invoke the Court's subject matter jurisdiction insofar as Interplan's claims for copyright infringement rest on drawings that have not been registered or deposited with the Copyright Office. Plaintiff responds by stating that the registration requirement of *17 U.S.C. § 411(a)* is not a jurisdictional bar for bringing suit for copyright infringement.

It is clear that this Court possesses subject matter jurisdiction over copyright infringement claims under *28 U.S.C. § 1331* (conferring subject matter jurisdiction over questions of federal law) and *28 U.S.C. § 1338* (conferring subject matter jurisdiction over claims arising under the **[*65]** Copyright Act). However, *section 411* of the 1976 Copyright Act imposes a requirement of copyright registration as a precondition to filing a copyright infringement claim. *17 U.S.C. § 411(a)*. The Supreme Court has held that registration requirement imposed by *17 U.S.C. § 411* is not jurisdictional in nature, but rather a "claims-processing rule." *See* *Reed Elsevier v. Muchnick, 559 U.S. __, 130 S. Ct. 1237, 1248, 176 L. Ed. 2d 18 (2010)*. Therefore, the Court denies Defendant's motion to dismiss for lack of subject matter jurisdiction all claims of infringement of Plaintiff's unregistered works.

**C. Motion to Copyrights Registered by Marcel Meijer, Individually**

Defendant argues that Plaintiff does not have standing to bring copyright infringement claims based on Speedy Stop stores no. 58 and 59 because these copyrights have been registered to Marcel Meijer, individually, who is not a plaintiff in this action. [14] The Court understands Plaintiff to be making two arguments in response. First, Plaintiff argues that it has always been the original owner and copyright claimant, notwithstanding Mr. Meijer's listing on the copyright certificates as copyright author and claimant, because Mr. Meijer created these works **[*66]** on behalf of Interplan. This argument seems to attribute Mr. Meijer's authorship to Plaintiff through the "work for hire" doctrine. Second, Plaintiff argues that, to the extent that Mr. Meijer rather than Plaintiff is the copyright author and owner, Defendant cannot raise the issue of standing because Mr. Meijer and Plaintiff do not have a dispute over copyright ownership.

The Court agrees with Plaintiff's first argument and need not reach the second one. *Section 501* of the Copyright Act limits the availability of a cause of action for copyright infringement to the "legal or beneficial owner of an exclusive right under a copyright." *17 U.S.C. § 501(b)*. Copyright ownership vests "initially in the author or authors of the work." *17 U.S.C. § 201(a)*. An "author" is generally the "party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to a copyright protection." *Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989)*. However, in a "work for hire" situation, an entity other than the actual creator is considered the author and owner of the copyright. A "work made for hire" includes "(1) work prepared by an employee within the scope of his or her employment." *17*

---

[14] As an initial matter, there are only three copyrights at issue where Mr. Meijer is listed individually as the copyright author and claimant: (1) Speedy Stop Store No. 58's technical drawing copyright (VA 1-368-557) (Doc. No. 108, Exh. B at 22-23.); (2) Speedy Stop Store No. 59's architectural work copyright (VA 1-368-553) (Doc. No. 108, Exh. B at 6-7.); and (3) Speedy Stop Store No. 59's technical drawing copyright (VA 1-368-552) (Doc. No. 108, Exh. B. at 24-25.) A fourth copyright (Speedy Stop No. 58's architectural work copyright VA 1-368-556) does list Mr. Meijer individually as copyright author and claimant, but Plaintiff has submitted a subsequent registration certificate for the same store's architectural work copyright that lists Plaintiff as the copyright author and claimant. Therefore, the Court will only **[*67]** treat the three copyrights—Store No. 58's technical drawing copyright and Store No. 59's technical drawing and architectural works copyrights—as the ones where Plaintiff potentially lacks standing.

*U.S.C. § 101*. Mr. Meijer clearly states that he is an employee of Plaintiff for purposes of determining ownership of the architectural **[*68]** drawings. (Doc. No. 139, Exh. A at 2-3.) In addition, Mr. Meijer wrote a letter to the United States Copyright Office in which he states that he had created the works as an "officer" of Interplan Architects. (Doc. No. 124, Exh. L at 3-4.) Therefore, Plaintiff can be deemed the author and owner of the three copyrights under the "work for hire" doctrine. Since copyright registration is not a jurisdictional prerequisite to filing suit for copyright infringement, Plaintiff's failure to obtain corrected certificates of registration listing it as copyright claimant does not deprive this Court of jurisdiction.

**IV. MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Interplan has moved for summary judgment on its ownership of valid architectural works copyrights (Doc. No. 110), on the infringement of its technical drawings (Doc. No. 108), and on Defendant's affirmative defenses (Doc. No. 111). Defendant has crossmoved for summary judgment on numerous grounds, including joint authorship, the existence of an implied nonexclusive license, statute of limitations, lack of damages, and lack of fraud (Doc. No. 104). Each ground asserted in support of summary judgment is analyzed below.

**A. Legal Standard for Summary [*69] Judgment**

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *Fed. R. Civ. P. 56(c)*. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett, 247 F.3d 206, 210 (5th Cir. 2001)* (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000)*. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1074 (5th Cir. 1997)*. If the movant meets this burden, then the nonmovant is required to go beyond its pleadings and designate, by competent summary judgment evidence, the specific facts showing that there is a genuine issue for trial. *Id*. The **[*70]** Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id*.

**B. Defendant's Motion to Strike Interplan's Motions for Summary Judgment (Doc. No. 155)**

Before the Court turns to the substance of the parties' motions for summary judgment, it must first address Defendant's motion to strike Plaintiff's motions for summary judgment. Defendant states that Plaintiff's motions for summary judgment (Doc. Nos. 108, 110) are supported by the First Meijer Declaration. Defendant argue that, since the First Meijer Declaration incorrectly represents the deposit material on file with the Copyright Office, it should be stricken. Consequently, Defendant maintains, Plaintiff's motions for summary judgment are without supporting evidence and should also be stricken. Plaintiff responds by stating that any inaccuracies in Mr. Meijer's declaration are immaterial and are cured by the Second Meijer Declaration.

The Court denies Defendant's Motion to Strike Plaintiff's motions for summary judgment. First, the Court has already ruled on Defendant's Motion to Strike Mr. Meijer's declaration in Part II.B, above. The Court has stricken exhibits **[*71]** B-J (copies of deposit materials) to the First Meijer Declaration, but has not stricken exhibit A (copies of certificates of copyright registration) to the declaration. Plaintiff's motions for summary judgment remain supported by evidence in the form of copies of the copyright registration certificates issued by the Copyright Office.

Second, Plaintiff has not improperly altered the remaining summary judgment evidence. The Second Meijer Declaration does not modify the First Meijer Declaration's representation that Exhibit A to the First Meijer Declaration consists of the "true and correct copies of the certificates of registration issued by the United States Copyright Office for the architectural works and technical drawings for Speedy Stop Store Nos. 58, 59, 70, 82, 85,

201, 206, 209, and 216." (Doc. No. 110, First Meijer Declaration at ¶ 3.) Defendant has attacked the certificates of registration as "unauthenticated and unreliable," but the Court has ruled that the certificates are neither. *See supra* Part II.B.

Therefore, Plaintiff's motions for summary judgment are supported by evidence in the form of Exhibit A to the First Meijer Declaration, and will not be stricken by the Court.

**C. [*72] Violations of the Copyright Act**

All parties have moved for summary judgment on various issues related to Plaintiff's copyright infringement claims. In order to establish copyright infringement, a plaintiff must prove "ownership of a valid copyright and copying of constituent elements of the work that are copyrightable." *See* *Eng'g Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1340 (5th Cir. 1994)* (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1999))*. Defendant has asserted affirmative defenses to copyright infringement, including the existence of an implied nonexclusive license, joint authorship, and others.

**1. Ownership of Valid Copyright**

Plaintiff has moved for summary judgment on the basis that it owns valid architectural works copyrights (Doc. No. 110). In addition, Plaintiff moves for summary judgment on the issue of infringement of technical drawings copyrights (Doc. No. 108), which requires a showing that Plaintiff first owns valid copyright in the technical drawings. Finally, Plaintiff moves for summary judgment on Defendant's claims that Plaintiff's copyrights are not valid because the works are not original or copyrightable and contain **[*73]** errors in registration. (Doc. No. 111.)

Copyright ownership is shown by: (1) proof of originality and copyrightability, and (2) compliance with the applicable statutory requirements. *See* *Compaq Computer Corp. v. Ergonome Inc., 387 F.3d 403, 407-408 (5th Cir. 2004)*. A plaintiff complies with statutory formalities of copyright registration by submitting a complete application for registration, fee, and deposit to the Copyright Office. *Geoscan, Inc. v. Geotrace Techs., Inc., 226 F.3d 387, 393 (5th Cir. 2000)*.

"A certificate of registration, if timely obtained, is *prima facie* evidence both that a copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004)*. However, the presumption of validity and ownership that a certificate of registration creates is rebuttable. *See* *Berg v. Symons, 393 F. Supp. 2d 525, 539 (S.D. Tex. 2005)*. "The effect of such a certificate is to place the burden of proof on the alleged infringer to disprove the validity of the copyright." *Guillot-Vogt Assocs., Inc. v. Holly & Smith, 848 F. Supp. 682, 686 (E.D. La. 1994)*.

Courts may find a registration invalid if the copyright claimant willfully misstated **[*74]** or failed to state a fact that, if known, might have caused the Copyright Office to reject the copyright application. *Id. at 542*. There must be a showing of "scienter" in order to invalidate a copyright registration. *See* *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson, 573 F.3d 1186, 1201 (11th Cir. 2009)*. "[A] misstatement or clerical error in the registration application if *unaccompanied by fraud* will not invalidate the copyright nor render the registration certificate incapable of supporting an infringement action." 2 M. Nimmer & D. *Nimmer, Copyright § 7.20[B]* at 7-208, § 7.18[C][1] at 7-201 (2000) (emphasis added). Once a court determines that errors were inadvertent, courts generally turn to the question of whether the misstatements were material. *Morelli v. Tiffany and Co., 186 F. Supp. 2d 563, 565-66 (E.D. Pa. 2002)*. An error is immaterial if its discovery is not likely to have resulted in the Copyright Office's refusal of the application. *Raquel v. Education Management Corp., 196 F.3d 171, 176 (3d Cir. 1999)*. In sum, immaterial, inadvertent errors in an application for copyright registration will be excused and do not destroy the validity of the registration. *See* *Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1161 (1st Cir. 1994)*.

Plaintiff **[*75]** relies upon certificates of registration *as prima facie* evidence of ownership of valid "architectural works" and "technical drawings" copyrights in nine Speedy Stop stores. Plaintiff has attached copies of certificates

of registration for each copyright over which Plaintiff asserts ownership. (Doc. No. 108, Exh. H at Exhibit A; Doc. No. 110, Exhibit A to First Meijer Decl.) In addition, Mr. Meijer's declaration purportedly incorporates the deposit materials submitted to the Copyright Office in connection with the applications for copyright registration for these nine Speedy Stop stores. However, the Court has struck from the First Meijer Declaration the attachments purporting to represent the deposit materials submitted to the Copyright Office. *See supra* Part II.B. Therefore, the Court will consider only the certificates of registration, and not the deposit material, when deciding Plaintiff's motions for summary judgment. Here, the Defendant has challenged the certificates of registration on the following grounds: (1) existence of errors in the certificates themselves; (2) lack of originality; and (3) lack of copyrightability. The Court will review each of Defendant's challenges in **[*76]** turn. Ultimately, the Court concludes that genuine issues of material fact do exist with respect to some issues, and grants in part and denies in part Plaintiff's motion for summary judgment as to ownership of valid copyright in the architectural works and technical drawings, and Plaintiff's motion for summary judgment as to Defendant's claims that its works are not original or copyrightable.

**a. Errors in Deposit Material Submitted to the Copyright Office**

Defendant first claims that the certificates of registration are invalid because Plaintiff did not submit an entire set of construction drawings as deposit material for its applications for copyright registration. Plaintiff responds by stating that the smaller set of drawings that was submitted as deposit material to the Copyright Office was sufficient to obtain a valid registration of each copyright. Further, Plaintiff argues, even if there were errors in the scope of deposit material submitted to the Copyright Office, Defendant has not shown that these errors were either material or made with intent to defraud the Copyright Office. The Court addresses each type of copyright at issue in this case in turn in order to determine whether **[*77]** Plaintiff has made an error in deposit materials for each type of copyright, and whether these errors are material and fraudulent.

**i. Deposit Materials for Technical Drawings Copyrights**

Plaintiff has submitted copies of certificates of registration for the following nine "technical drawings" copyrights: Store No. 58 (VA 1-368-557), Store No. 59 (VA 1-368-552), Store No. 70 (VAu755-524), Store No. 82 (VAu739-454), Store No. 85 (VAu755-523), Store No. 201 (VAu755-526), Store No. 206 (VAu755-527), Store No. 209 (VAu755-525), Store No. 216 (VAu755-528). (Doc. No. 108, Exh. B.; Doc. No. 108, Exhibit A to First Meijer Decl.) Plaintiff claimed in the First Meijer Declaration that it had submitted a certain set of drawings to the Copyright Office as deposit materials for these "technical drawings" copyrights. However, Defendant has shown and Plaintiff has acknowledged in the Second Meijer Declaration that only a subset of the drawings previously claimed by Plaintiff to have been submitted to the Copyright Office were actually submitted. Defendant claims that, for Stores 70, 82, 85, 201, 206, 209, and 216, only two drawings were submitted to the Copyright Office—the elevation drawing and the **[*78]** floor plan drawing. (Doc. No. 150, Exh. A at ¶¶ 8-9.) For Store No. 59, Defendant claims that 29 drawings have been submitted as deposit material to the Copyright Office. (*Id*. at ¶ 11.) For Store No. 58, Defendant has been unable to obtain the deposit material on file with the Copyright Office. (*Id*. at ¶ 14.) Plaintiff has not specifically identified which drawings were actually submitted as deposit material for the "technical drawings" copyrights but merely stated in the Second Meijer Declaration that the "deposit materials do not include the entirety of Exhibits B-J to my earlier declaration, but a subset of those documents, e.g., the March 2007 set of applications each include sheets A02 and A05, representing the exterior elevation and floor plan of the store. *See, e.g.*, IAI 0008840-928." This representation leaves open the question of what Plaintiff submitted as deposit material for the "technical drawings" copyrights for Store No. 58 (VA 1-368-557) and Store No. 59 (VA 1-368-552).

The Court need not reach the question of whether Plaintiff's errors in deposit material for the "technical drawings" copyrights were inadvertent and immaterial because the Court will dismiss Plaintiff's **[*79]** claims for copyright infringement based on unregistered drawings.

*Section 411(a)* of the Copyright Act requires that a copyright in a work be registered before a copyright owner brings a suit for infringement of that copyright. *17 U.S.C. § 411(a)*. The Supreme Court in *Reed Elsevier* clearly

stated that *§ 411(a)* is not jurisdictional in nature, though it noted that it is a form of a claims-processing rule. *See Reed Elsevier, 130 S. Ct. at 1247*. *Reed Elsevier* left open the question of how strictly courts should interpret the registration requirement imposed by *§ 411(a)*. *Id. at 1249* (declining to address whether *§ 411(a)* registration requirement is a "mandatory precondition to suit that . . . district courts may or should enforce *sua sponte* by dismissing copyright infringement claims involving unregistered works"). Claims-processing rules "do not limit a court's jurisdiction, but rather regulate the timing of motions or claims brought before the court. Unless a party points out to the court that another litigant has missed such a deadline, the party forfeits the deadline's protection." *Dolan v. United States, 559 U.S. __, 130 S. Ct. 2533, 2538, 177 L. Ed. 2d 108 (2010)*.

The Fifth Circuit's leading case on *§ 411(a)*'s **[*80]** registration requirement, *Positive Black Talk, Inc. v. Cash Money Records, Inc., 394 F.3d 357 (5th Cir. 2004)*, was abrogated by *Reed Elsevier* insofar as *Positive Black Talk, Inc*. held that *§ 411(a)*'s registration requirement was jurisdictional in nature. However, *Positive Black Talk, Inc.*'s holding regarding what constitutes fulfillment of the claims-processing rule imposed by the *section 411(a)* registration requirement is still good law. The Fifth Circuit "requires only that the Copyright Office actually receive the application, deposit, and fee before a plaintiff files an infringement action," unlike other circuits that require a plaintiff to actually obtain a certificate from the Copyright Office before bringing suit. *Positive Black Talk, Inc. v. Cash Money Records, Inc., 394 F.3d at 365*. In order to determine whether Plaintiff has fulfilled *§ 411(a)*'s registration requirement as construed by the Fifth Circuit, the Court must examine whether the Copyright Office received the application, the required deposit, and fee for the copyrights that are the subject of this suit.

An owner of copyright may obtain registration of his or her copyright by "delivering to the Copyright Office the **[*81]** deposit specified by this section, together with the application and fee." *17 U.S.C. § 408(a)*; *see also Geoscan, Inc. v. Geotrace Techs., Inc., 226 F.3d 387, 393 (5th Cir. 2000)*. The deposit required by *17 U.S.C. § 408(a)* is, "in the case of a published work, two complete copies or phonorecords of the best edition." *17 U.S.C. § 408(b)*. Plaintiff has acknowledged that it failed to submit a "complete copy" of the material it wished to copyright as "technical drawings." (Doc. No. 154, Second Meijer Declaration at ¶¶ 4-5.) Though such errors might be excused as immaterial and inadvertent for the purposes of assessing a copyright's validity, they are not immaterial insofar as Plaintiff wishes to claim copying of those particular drawings constitutes infringement by Defendant. Plaintiff has failed to state claims of copyright infringement of unregistered technical drawings because it has not shown that it properly deposited those drawings with the Copyright Office. As such, Plaintiff's claims for copyright infringement of those drawings not submitted to the Copyright Office as deposit material for the "technical drawings" copyrights are dismissed. [15] Further, since the Court has struck Plaintiff's **[*82]** deposit material that was submitted to the Copyright Office, Plaintiff cannot receive summary judgment on the issue of valid ownership for even some of its technical drawings copyrights. Therefore Plaintiff's motion for summary judgment on infringement of its technical drawings copyright is denied.

**ii. Deposit Materials for Architectural Works Copyrights**

Plaintiff has submitted copies of certificates **[*83]** of registration for the following nine "architectural works" copyrights: Store No. 58 (VA 1-368-556 and VAu739-455), [16] Store No. 59 (VA 1-368-553), Store No. 70 (VAu739-

---

[15] The Court notes that Plaintiff has stated that it intends to file supplementary registrations for its technical drawings to include the complete set of construction drawings prepared by Plaintiff. (Doc. No. 154 at 2.) The Fifth Circuit has stated that "a plaintiff who files a copyright infringement lawsuit before registering with the Copyright Office may cure the *§ 411* defect by subsequently amending or supplementing its complaint once it has registered the copyright." *Positive Black Talk, Inc., 394 F.3d at 365*. Should Plaintiff wish to subsequently bring claims for copyright infringement of its newly registered technical drawings, the proper manner of doing so would be a motion to amend or supplement its pleading. The Court takes no position on the merits or likely success of any such motion.

[16] Store No. 58 has two copyright registration certificates: VA 1-368-556 has an effective date of June 8, 2006, and the copyright claimant is Marcel Meijer, while VAu739-455 has an effective date of March 23, 2007 and the copyright claimant is Interplan Architects, Inc.

457), Store No. 82 (VAu739-453), Store No. 85 (VAu703-006), Store No. 201 (VAu739-459), Store No. 206 (VAu739-456), Store No. 209 (VAu739-458), and Store No. 216 (VAu739-452). (Doc. No. 110, Exhibit A to the First Meijer Declaration). Plaintiff claimed in the First Meijer Declaration that it had submitted a certain set of drawings to the Copyright Office as deposit materials for these "architectural works" copyrights. However, Defendant has shown and Plaintiff has acknowledged in the Second Meijer Declaration that only a subset of the drawings previously claimed by Plaintiff to have been submitted to the Copyright Office were actually submitted. Plaintiff has not specifically identified which drawings were actually submitted as deposit material for the "architectural works" copyrights. Defendant claims that, for Stores 70, 82, 85, 201, 206, 209, and 216, only two drawings were submitted to the Copyright Office—the elevation drawing and the floor plan drawing. (Doc. No. 149, Exh. A at ¶¶ 8-9.) For Store No. 59, Defendant **[*84]** claims that 29 drawings have been submitted as deposit material to the Copyright Office. (*Id*. at ¶ 11.) For Store No. 58, Defendant claims that only two drawings (the elevation and the floor plan) for Copyright No. VAu739-455, and have not been able to obtain the deposit material on file for Copyright No. VA 1-368-556.

Plaintiff responds by stating that, even if the registration and deposit materials do not reflect the entirety of drawings related to the stores designed by Interplan, Defendant has not shown that the deposit materials that were submitted fail to convey the "design of the building as embodied in any tangible medium of expression," *see* *17 U.S.C. § 101*, or otherwise fail to show the Copyright Office the architectural works of the stores in question. (Doc. No. 139 at 4). The burden is upon Defendant to show that the error in deposit material, if any, submitted by Plaintiff was both intentional and material.

First, **[*85]** the Court does not believe that there is an error in the deposit material submitted by Plaintiff for the "architectural works" copyrights. The deposit requirements for "architectural works" copyrights differ from the deposit requirement for "technical drawings." The Register of Copyrights is authorized to alter the statutorily-specified deposit requirements for certain types of works. *See* *17 U.S.C. § 408(c)(1)*. The corresponding regulations outline special provisions for "architectural works":

> "(xviii) Architectural Works. (A) For designs of unconstructed buildings, the deposit must consist of one complete copy of an architectural drawing or blueprint in visually perceptible form showing the overall form of the building and any interior arrangements of spaces and/or design elements in which copyright is claimed. For archival purposes, the Copyright Office prefers that the drawing submissions consist of the following in descending order of preference:
> (1) Original format, or best quality form of reproduction, including offset or silk screen printing;
> (2) Xerographic or photographic copies on good quality paper;
> (3) Positive photostat or photodirect positive;
>
> (4) Blue line copies (diazo or **[*86]** ozalid process).
> The Copyright Office prefers that the deposit disclose the name(s) of the architect(s) and draftsperson(s) and the building site, if known.
> (B) For designs of constructed buildings, the deposit must consist of one complete copy of an architectural drawing or blueprint in visually perceptible form showing the overall form of the building and any interior arrangement of spaces and/or design elements in which copyright is claimed. In addition, the deposit must also include identifying material in the form of photographs complying with § 202.21 of these regulations, which clearly discloses the architectural works being registered. For archival purposes, the Copyright Office prefers that the drawing submissions constitute the most finished form of presentation drawings and consist of the following in descending order of preference:
> (1) Original format, or best quality form of reproduction, including offset or silk screen printing;
> (2) Xerographic or photographic copies on good quality paper;
> (3) Positive photostat or photodirect positive;
> (4) Blue line copies (diazo or ozalid process).
>
> With respect to the accompanying photographs, the Copyright Office prefers 8x10 inches, good **[*87]** quality photographs, which clearly show several exterior and interior views. The Copyright Office prefers that the deposit disclose the name(s) of the architect(s) and draftsperson(s) and the building site."

*37 C.F.R. § 202.20(c)(2)(xviii)*. Further, the Register of Copyrights may permit the deposit of "incomplete copies" or permit the deposit of actual copies in place of "identifying material" that would otherwise be required. *See* *37 C.F.R. § 202.20(d)(1)*.

Plaintiff's submission to the Copyright Office of elevation drawings and floor plans as deposit material for the "architectural works" is sufficient to satisfy the deposit requirements for "architectural works." These drawings show the "showing the overall form of the building and any interior arrangement of spaces and/or design elements in which copyright is claimed." *37 C.F.R. § 202.20(c)(2)(xviii)*. Because there is no error in the deposit material associated with the "architectural works" copyrights, the deposit material cannot be a ground for challenging the validity of Plaintiff's architectural works' copyrights.

**b. The Identification of Derivative Works**

Defendant also attacks the validity of the copyright registrations because **[*88]** of conflicting information that appears among the certificates of registration in response to the application's question asking for an identification of any preexisting work that the work being copyrighted is based upon. Defendant notes that, on some registrations, Plaintiff answered "N/A," while in other registrations, Plaintiff answered "Speedy Stop #59 (Portland, Texas)," and yet in others, Plaintiff answered "Speedy Stop # 59 (Portland, Texas) and Speedy Stop #82 (Columbus, Texas)." (Doc. No. 119 at 17-20.) With respect to the "architectural drawings" copyrights, it is clear that these discrepancies are immaterial. For Store No. 58, the original certificate of registration for "architectural works" (VA 1-368-556), where Plaintiff did not disclose any prior material, was replaced by a subsequent certificate of registration for "architectural works" in which Plaintiff disclosed that Store No. 58 was based on Store Nos. 59 and 82. (*Id*. at 17.) The Copyright Office's decision to issue a certificate of registration for "architectural works" once it became aware that preexisting material did exist shows that the Copyright Office would not have rejected the copyright registration applications **[*89]** if this information had been known to them at the time of Plaintiff's initial copyright application.

As for the "technical drawings" copyrights, the certificate of registration for Store No. 70, effective March 23, 2007, states that the "technical drawings" work is based upon "Speedy Stop # 59 (Portland, Texas)." (*Id*. at 18.) The earlier-issued "technical drawings" certificate of registration for Store No. 58, effective June 8, 2006, lists the response "N/A" in response to the question of whether the current work being copyrighted is based upon previous works. (*Id*. at 17.) Once again, the Copyright Office's willingness to issue a copyright registration when it became aware of the preexisting material is evidence that it would not have rejected Plaintiff's copyright registration for Store No. 58 if it had known about the preexisting work at the time of the earlier application.

Finally, the Court cannot conclude that the discrepancies between the "architectural works" copyrights (listing both Store Nos. 59 and 82 as preexisting works) and the "technical drawings" copyrights (listing only Store No. 59 as preexisting work) create a question of material fact about the validity of the copyright **[*90]** registration. First, Defendant has not shown that such a discrepancy is an error, as opposed to an actual distinction between the preexisting work that the "architectural works" were based upon and the preexisting work that the "technical drawings were based upon. Second, Defendant has not offered any evidence that the omissions, if any, were made with the intent to defraud the Copyright Office. Finally, Defendant has not identified why the Copyright Office would have rejected the "technical drawings" copyrights had it learned that they were based on Store No. 82 in addition to Store No. 59. Therefore, the discrepancies as to the information listed as preexisting work on the copyright certificates does not meet the standard necessary to rebut the presumption of validity of the copyright registrations.

**c. The Identification of Marcel Meijer as "Author"**

Defendant argues that Interplan knowingly misrepresented the author of the "technical drawings" as Marcel Meijer even though he did not actually author these drawings. (Doc. No. 123). An "author" is generally the "party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to

**[*91]** a copyright protection." *Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989)*.

After reviewing the evidence submitted by the parties, the Court concludes that there was no error in listing Mr. Meijer as an author on the copyright registrations. Defendant highlights deposition testimony that purportedly shows Mr. Meijer's lack of involvement in the AutoCAD process by which the technical drawings were rendered. Mr. Urfi stated in his deposition that he never once saw Mr. Meijer use AutoCAD in the 13 years that Mr. Urfi worked for Mr. Meijer and that Mr. Meijer supervised the draftsmen in the office who did use AutoCAD. (Urfi Depo., Doc. No. 123, Exh. H at pp.107-08, 111-12). However, Mr. Urfi also stated that Mr. Meijer "used to draw stuff, you know, by hand." (Urfi Depo., Doc. No. 123, Exh. H at p.112). When questioned specifically about Mr. Meijer's working process, Mr. Urfi said:

> "Q. Okay. And so he would give you on a piece of paper, and I presume with a pencil, a drawing?
> A. Yes.
> Q. And do you know where he got that paper from?
> A. Like — I don't know when the clients come or something, he discuss. He has his own meeting with the clients —
> Q. Uh-huh.
>
> A. — you know. Then **[*92]** he has all the paper ready. Then he used to call us, whoever will start the work. Hey, start this thing, you know. He give us the guidance, like this looks like this project, so all the drawings, you know, from that directory, start with that.
> Then he, you know, make a big 24, 36 drawing, and then he used to modify that. Look, this should be like this. Get that, you know, driveway this way, get that this — this way. He used to — on the — on the — on the drawing he used to — by pencil or pen, you know, he used to do like a red mark. It was a red mark.
> Q. Okay.
> A. Yeah. Here's the car wash put it there. Here's the entrance, there's the exit. He's going, put the lane there; landscaping, put it here. Take five feet from the property line right of way, you know, or three feet . . . ."

(Urfi Depo., Doc. No. 123, Exh. H at pp.112-13). Mr. Urfi's deposition testimony, rather than establishing that Mr. Meijer was not the one who "created" the work, shows that Mr. Meijer was intimately engaged with his draftsmen in translating the architectural designs into fixed drawings. Though Mr. Meijer may not have engaged in computer-created drawings using AutoCAD, he did make hard-copy additions and modifications **[*93]** that resulted in the creation of the copyrightable material. *See* *Lakedreams v. Taylor, 932 F.2d 1103, 1108 (5th Cir. 1991)* ("Authors are entitled to copyright protection even if they do not perform with their own hands the mechanical tasks of putting the material into the form distributed to the public."). As described above, under the "work for hire" doctrine, Plaintiff can be considered the "author" of works that Mr. Meijer created within the scope of his employment.

Next, the Court addresses the instances in which Mr. Meijer was listed as "claimant" on the certificates of copyright registration instead of Plaintiff. Improper designation of the copyright claimant is generally not grounds to dismiss an infringement claim unless: (a) the error misleads the public as to the existence of the copyright or true owner of the copyright; (b) otherwise prejudices a defendant. *King Records, Inc. v. Bennett, 438 F. Supp. 2d 812, 838 (M.D. Tenn. 2006)*. Neither of these circumstances is present here. In each certificate where Mr. Meijer is listed individually as copyright claimant, "Interplan Architects, Inc." appears under his name. The inclusion of Plaintiff's name provides the public with notice **[*94]** of the true owner of the copyright. There is no evidence that Defendant has been prejudiced by Mr. Meijer's listing individually as copyright claimant. Moreover, this error was unintentional. Mr. Meijer testified that he had very little experience registering copyrights. Therefore, the Court does not find the validity of copyright rebutted on this ground. *See* *LZT/Filliung Partnership, LLP v. Cody/Braun & Assoc., Inc., 117 F. Supp. 2d 745 (N.D. Ill. 2000)* (holding that mistakes in the copyright infringement were innocent where the plaintiff had attempted for the first time ever to register plans).

**d. The Identification of Ismael Urfi as "Author"**

Next, Defendant claims that Plaintiff's copyrights are invalid because they assert Plaintiff's authorship of the copyrights as the employer of Ismail Urfi. (Doc. No. 123 at 13-14.) Defendant argue that Mr. Urfi performed his work on the drawings as an independent contractor and not as an employee of Interplan Architects. (Doc. No. 123 at 14-16, Doc. No. 119 at 12-13.) Therefore, Defendant concludes, Interplan is not the author of the technical drawings or architectural works and cannot claim copyright protection in either.

Copyright in a work protected **[*95]** by the Act vests "initially in the author or authors of the work." *17 U.S.C. § 201(a)*. The Copyright Act affords an exception to the general rule that copyright vests in authors in situations involving works made for hire. A "work made for hire" includes: "(1) work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work for hire." *17 U.S.C. § 101*. As there is no evidence of a written agreement between Mr. Urfi and Interplan designating Mr. Urfi's drawings as works for hire, Plaintiff may claim ownership of Mr. Urfi's drawings only if he is determined to be an employee of Plaintiff during the period in which the drawings were created.

The determination of whether an individual is an employee or independent contractor for purposes of the "work for hire" doctrine is made using the common law of agency. *See* *Community for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989)*; *Quintanilla v. Texas TV, 139 F.3d 494, 497 (5th Cir. 1998)*. In applying the common law of agency, courts consider the "hiring party's right to control **[*96]** the manner and means by which the product is accomplished," which, in turn, involves the application of a number of factors. *Reid, 490 U.S. at 751*. [17]

Applying the factors enumerated in *Reid*, there are a few indications that Mr. Urfi was an independent **[*97]** contractor. For one, Mr. Urfi states that, throughout his employment at Interplan between the years of 1994-2007, he was a "contract employee." (Urfi Depo. at 16, 20.) He was paid on an hourly basis according to the number of hours worked. (Urfi Depo. at 18, 31.) Mr. Urfi did not receive medical benefits and was not paid for sick time or holidays. (Urfi Depo. at 17, 28-29.)

On the other hand, Mr. Urfi relates characteristics of his position as a draftsman that point towards a conclusion that he was an employee. Most significantly, Mr. Urfi paints a picture of an employment relationship between Mr. Meijer and himself wherein Mr. Meijer controlled the manner and means by which Mr. Urfi and other draftsmen at Interplan performed their work. Mr. Urfi describes Mr. Meijer as having "all the control, how much — or how many works he has, you know. We're not supposed to know that, you know. He was the president of Interplan Architects." (Urfi Depo. at 45.) Mr. Meijer supervised the work of the draftsmen, answered any questions the draftsmen had, provided instructions and specific guidance to the draftsmen on their projects, and possessed the final say in the content of the drawings. (Urfi Depo. **[*98]** at 107-08, 115, 130-31.) Mr. Urfi was required to arrive at the office at a specific time each morning and punch in and out of a time clock. (Urfi Depo. at 18, 26.) During the times relevant to this lawsuit, he received a paycheck from which Social Security taxes, Medicare taxes, and perhaps income taxes were deducted (Urfi Depo. at 17-27.) He was paid for vacation days. (Urfi Depo. at 29.) Though Mr. Urfi describes himself variously as a "contract employee" and "contract labor," he obscures any difference between Interplan's treatment of independent contractors and employees by also stating that "we were the regular employees, you know, like a contract, but we are regular employees." (Urfi Depo. at 19.)

---

[17] In *Reid*, the Supreme Court outlined a list of non-exhaustive factors that are relevant in deciding whether the hired party is an employee or an independent contractor: (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party. *490 U.S. at 751-52*. No single factor is determinative. *Id*.

Defendant does not dispute any of the facts contained in Mr. Urfi's deposition. Nor does Defendant reference the existence of any additional facts that, if known, would assist the trier of fact in making a determination of Mr. Urfi's employment status. Defendant merely states that issues of fact exist as to Mr. Urfi's designation as an employee on the copyright registrations. (Doc. No. 119 at 12-13). However, the employee versus independent contractor determination is a question of **[*99]** law. *See Massingill v. Stream, LTD., Case No. 08-cv-0091-M, 2009 U.S. Dist. LEXIS 91959, at *15 (N.D. Tex. Oct. 1, 2009)* (stating that employee versus independent contractor determination is a question of law). If the facts necessary to determine employee versus independent contractor status are unsettled, the court cannot make a legal conclusion as to the individual's employment status. *See Easter Seal Soc. for Crippled Children & Adults, Inc. v. Playboy Enterprises, 815 F.2d 323, 336 (5th Cir. 1987)*. Here, there are no facts in dispute as to the work Mr. Urfi performed at Interplan Architects, the circumstances of his employment, and the way in which Mr. Urfi interacted with Mr. Meijer. Rather the dispute centers on whether, after taking all these facts into consideration, Mr. Urfi should be classified as an employee or independent contractor. This is a question of law that the Court finds to be amenable to disposition.

Plaintiff, through its president Mr. Meijer, controlled the way in which Mr. Urfi drafted plans and drawings for Interplan's clients. Mr. Meijer assigned Mr. Urfi architectural projects, which were part of Interplan's regular business. Moreover, Interplan's long-running **[*100]** employment relationship with Mr. Urfi, its requirement that he conduct his work during certain hours and at Interplan's office, and its deduction of payroll taxes from his paychecks are all evidence of Mr. Urfi's status as an employee. Though Mr. Urfi was not given medical insurance or paid for certain days on which he did not work, these factors are not determinative.

Therefore, the Court concludes that Mr. Urfi was an employee of Interplan for the purposes of the "work for hire" doctrine. Interplan is the "author" of any works created by Mr. Urfi during the scope of his employment at Interplan. The copyright registrations listing Interplan as the "author" of the technical drawings and architectural works are valid in this respect. [18]

**e. Lack of Originality**

Plaintiff has moved for summary judgment on Defendant's claim that Plaintiff's copyrighted material is not original, and therefore undeserving of copyright protection. Originality means only that the work was independently created by the author (as opposed to copied from other works) and that it possesses at least some minimal degree of creativity. *Feist Publications, Inc. v. Rural Tel. Servs. Co., 499 U.S. 340, 345, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)*. "Practically speaking, because the degree of creativity required is so low, the originality requirement amounts to 'little more than a prohibition of actual copying.'" *Axelrod & Cherveny Architects, P.C. v. Winmar Homes, Case No. 2:05-cv-711-ENV-ETB, 2007 U.S. Dist. LEXIS 15788, *9 (E.D.N.Y. Mar. 6, 2007)* (citing *Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 103 (2d Cir. 1951))*. **[*102]** In cases where the defendant offers proof that plaintiff copied from other works, the burden shifts to the plaintiff to prove originality. *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 97 F.3d 1504 (1st Cir. 1996)*.

Defendant's main challenges to the originality of Plaintiff's works all center around whether the works were independently created, as opposed to whether they possess a minimal degree of creativity, and can be distilled into three main arguments. First, Defendant maintains that Plaintiff's Architectural Drawings are not original because they incorporate many drawings generated by third-party vendors and consultants. [19] This contention, even if true,

---

[18] Defendant makes the additional argument that Mr. Urfi is not an author of Plaintiff's drawings because he did not contribute any creativity in the design or layout of the Speedy Stop stores. (Doc. No. 123 at ¶ 20.) The Court need not parse out which contributions by Mr. Urfi were creative and which were not. To the extent that Mr. Urfi only transposed the expression of the architectural design onto paper, he did so at the direction and with the feedback **[*101]** of Mr. Meijer. (Urfi Depo. at 94-102.) Therefore, Mr. Meijer may be deemed the author of Plaintiff's drawings. *See Lakedreams v. Taylor, 932 F.2d 1103, 1108 (5th Cir. 1991)* ("Authors are entitled to copyright protection even if they do not perform with their own hands the mechanical tasks of putting the material into the form distributed to the public.").

is not sufficient as a legal matter to challenge the originality of Plaintiff's Architectural Drawings. Defendant offers as evidence of the third-party and consultant contributions to Plaintiff's Architectural Drawings a list of the contributions made by these third-parties and consultants. (Doc. No. 119, Exh. G.) These contributions consist of vicinity maps, surveys, property and boundary lines, standards for restroom accessibility, glass mullions standards, climatic zone maps, electrical layouts and specifications, plumbing **[*103]** information, canopy elevations and similar information and drawings. (*Id.*) Even though Plaintiff's architectural drawings may contain such contributions by other parties, they are original due to the selection, arrangement and composition of the elements. *Sturdza v. United Arab Emirates, 281 F.3d 1287, 350 U.S. App. D.C. 154 (D.C. Cir. 2002)*; *The Rottlund Co. v. Pinnacle Corp., Case No. 01-1980, 2004 U.S. Dist. Lexis 16723, *50 (D. Minn. Aug. 20, 2004)*.

Second, Defendant states that Plaintiff modeled its Architectural Drawings on the design of another convenience store chain called Quik Trip, and therefore Plaintiff's work cannot be original. The only relevant evidence offered by Defendant is the affidavit of Jeff Johanson. Mr. Johanson's affidavit does not state that Defendant Thomas provided a Quik Trip floor plan or elevations to Plaintiff, or even that Defendant Thomas possessed drawings of Quik Trip's floor plan, but only that Defendant Thomas acquired "some of the ideas for the floor plan by a review of another major convenience **[*104]** store operation, Quik Trip." (Doc. 121, Exh. 9, Affidavit of Jeff Johanson at 2.) Defendant also point to the deposition testimony of Ismail Urfi and Greg Mitchell, which acknowledges the similarity of Plaintiff's floor plan to Quik Trip's floor plan. However, these individuals do not offer any personal knowledge of Plaintiff's access to and copying of Quik Trip's floor plan. Defendant has not proffered evidence of either Plaintiff's direct access to Quik Trip's floor plan drawings, or access through Defendant Thomas to the floor plan. Therefore, Defendant has not raised a genuine issue of material fact with respect to Plaintiff's alleged copying of Quik Trip's floor plan.

Third, Defendant contends that Plaintiff's Architectural Drawings are not original because they are based on Defendant Thomas's in-house drawings of both floor plans and elevations. The Court finds that there exist genuine issues of material fact with respect to Plaintiff's alleged copying from Defendant Thomas's floor plan and elevation drawings, and will deny Plaintiff's motion for summary judgment due to this particular issue only. Defendant Thomas and Plaintiff clearly dispute the extent to which Defendant Thomas **[*105]** contributed site plans, floor plans, and elevation drawings for the nine Speedy Stop stores that Plaintiff designed. A reasonable juror could enter a verdict for Defendant Thomas, the non-movant here, on the grounds that Plaintiff's Architectural Drawings were not original because they had been copied from Defendant Thomas's in-house drawings. *See* *Guillot-Vogt. Assocs., Inc., 848 F. Supp. at 689* (denying summary judgment when genuine issues of originality were raised by defendant's provision of drawings to plaintiff). Therefore, the Court denies Plaintiff's motion for summary judgment on Defendant's claim of lack of originality and denies Plaintiff's motion for partial summary judgment on ownership of valid architectural works copyrights.

**f. Lack of Copyrightability**

Plaintiff has moved for summary judgment on Defendant's claim that Plaintiff's copyrighted material does not contain copyrightable subject matter. Defendant contends that "functional" drawings such as Plaintiff's Architectural Drawings are not copyrightable.

With respect to the "technical drawings" copyrights, this material is protected under *17 U.S.C. § 101*. The limitation of copyrightability of functional aspects applies **[*106]** only to physical objects, not to drawings of such objects. *Guillot-Vogt. Assocs., Inc., 848 F. Supp. at 688-89*.

With respect to "architectural works" copyrights, these works are protected by the Architectural Works Copyright Protection Act. The legislative history confirms that architectural works contain many non-protected component parts. See H.R. Rep. No. 101-375, *reprinted in* 1990 U.S.C.C.A.N. at 6949 ("[C]reativity in architecture frequently

---

[19] This argument is distinguishable from Defendant's claim that Plaintiff is not the sole author of the works due to its incorporation of third-party vendor and consultant drawings.

takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole . . . ."). Congress purposefully excluded any consideration of the utilitarian aspects of architectural design when determining the copyrightability of architectural works. *See id*. at 6951 ("[T]he copyrightability of architectural works shall not be evaluated under the separability test applicable to pictorial, graphic, or sculptural works.") Regardless of the functional nature of aspects of Plaintiff's Architectural Drawings, they are copyrightable as "architectural works" because copyright protection extends to "the gestalt of the plans including things like an architect's choices regarding shape, arrangement, and location **[*107]** of buildings, the design of open space, the location of parking and sidewalks, and the combination of individual design elements." *Axelrod & Cherveny Architects, P.C., 2007 U.S. Dist. LEXIS at *32*.

Defendant has not raised a genuine issue of material fact regarding the copyrightability of Plaintiff's Architectural Drawings as either "technical drawings" or "architectural works." Plaintiff is entitled to summary judgment on Defendant's claim of lack of copyrightability.

**2. Infringement**

Plaintiff has moved for summary judgment on the issue of Defendant's infringement of its "technical drawings" copyrights. To succeed on a claim on copyright infringement, a plaintiff must establish valid copyright ownership and demonstrate actionable copying by a defendant. The "copying" inquiry comprises two separate questions. First, a plaintiff must establish factual copying. Second, a plaintiff must establish that the copying involved improper appropriation of copyrightable expression—i.e., actionable copying.

As to the first inquiry, Plaintiff must, as a factual matter, prove that Defendant "actually used the copyrighted material to create his own work." *General Universal Sys. v. Lee, 379 F.3d 131, 142 (5th Cir. 2004)*. **[*108]** Copying can be proven by direct or circumstantial evidence. *See* *Bridgmon v. Array Sys. Corp., 325 F.3d 572, 576 (5th Cir. 2003)*. Circumstantial evidence must demonstrate both: (1) that Defendant had access to the copyrighted work; and (2) that the two works are "probatively" similar. *General Universal Sys. v. Lee, 379 F.3d 131, 142 (5th Cir. 2004)*; *Engineering Dynamics v. Structural Software, 26 F.3d 1335, 1340-1341 (5th Cir. 1994)*. The access element is satisfied if the person who created the allegedly infringing work had a reasonable opportunity to view the copyrighted work. *General Universal Sys., 379 F.3d at 142*. The second element — probative similarity — requires a showing that the works, "when compared as a whole, are adequately similar to establish appropriation." *Id*. In some cases, factual copying may be proven without a showing of access "if the two works are so strikingly similar as to preclude the possibility of independent creation." *Id*.

The second inquiry determines whether the copying is legally actionable. Plaintiff must demonstrate that the copying is legally actionable by showing that the allegedly infringing work is substantially similar to protectable elements of **[*109]** the infringed work. *See* *General Universal Sys., 379 F.3d at 142*; *Engineering Dynamics, 26 F.3d at 1340-41*. [20] Generally, one must compare the original and the copy "side-by-side" to determine "whether a layman would view the two works as substantially similar." *General Universal Sys., 379 F.3d at 142*. The "substantial similarity" determination is typically left to the ultimate factfinder, but "summary judgment may be appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression." *Id*.

Plaintiff's motion for summary judgment on the issue of "technical drawings" copyright infringement cannot be granted. Plaintiff cannot conclusively establish which of its technical drawings were submitted as deposit material

[20] "We note that this court stated in *Eng'g Dynamics, Inc., 26 F.3d at 1340-1341*, and again in *King v. Ames, 179 F.3d 370, 375-76 (5th Cir. 1999)*, that with respect to factual copying the test is 'probative similarity' (if relying on circumstantial evidence of copying) and that the test for actionable copying is 'substantial similarity.' *See also* *Peel & Co. v. Rug Mkt., 238 F.3d 391, 397-98 (5th Cir. 2001)* (analyzing probative similarity and substantial similarity separately). While it is possible that the same evidence will satisfy both tests, the **[*110]** tests are not the same." *Bridgmon v. Array Sys. Corp., 325 F.3d 572, 577 (5th Cir. 2003)*.

for its "technical drawings" copyrights. As a result, a question of material fact exists as to the scope of "copyrighted material" that may have been used by Defendant to create its own work. *See* General Universal Sys. v. Lee, 379 F.3d 131, 142 (5th Cir. 2004). Without knowing which technical drawings have been copyrighted, the Court is unable to determine questions of access, probative similarity, or substantial similarity. Bridgmon, 325 F.3d at 577; Jack Preston Wood: Design, Inc., v. BL Building Co., H-03-713, 2004 U.S. Dist. LEXIS 30511, *31-*32 (S.D. Tex. June 22, 2004) (declining to award summary judgment on the issue of infringement when the court did not have one set of plans with which to conduct the necessary side-by-side comparison). Therefore, the Court cannot grant summary judgment to Plaintiff on the issue of infringement of its technical drawings copyrights.

**D. [*111] Fraud Claim**

Defendant moves for summary judgment on Plaintiff's state-law claims of fraud. Specifically, Defendant claims that two of Plaintiff's fraud claims, based on alleged misrepresentations made by Defendant Thomas in December 2003 and March 2004, are barred by the statute of limitations. As to the third fraud claim, Defendant claims that there is no evidence of any misrepresentation made by Defendant Thomas in November 2004.

A cause of action for fraud must be brought within four years after the date the cause of action accrues. Tex. Civ. Prac. & Rem. Code § 16.004(a)(4). The general rule is that actions for fraud must be commenced within four years after the fraud is perpetrated. Buffington v. Lewis, 834 S.W.2d 601, 603 (Tex. App.—Houston [1 Dist.] 1992, no writ). However, if "the fraud is concealed or is not known to the injured party," the statute of limitations begins to run when "the plaintiff knew, or exercising reasonable diligence, should have known of the wrongful act causing injury." Buffington v. Lewis, 834 S.W.2d 601, 603 (Tex. App.—Houston [1st Dist.] 1992, no writ); BP Am. Prod. Co. v. Marshall, 288 S.W.3d 430, 452 (Tex. App.—San Antonio 2008, pet. filed).

Defendant **[*112]** is correct that, if Plaintiff was aware of the alleged fraud at the time Defendant Thomas made its alleged misrepresentations, Plaintiff's fraud claims would accrue beginning the date when the alleged misrepresentations were made. However, Defendant has not offered any evidence that Plaintiff was aware that its Architectural Drawings were being shared with Morris, Hermes, or other third-parties working on projects for which Plaintiff was not the architect. Without such a showing, the Court is not required to apply the accrual rule that requires action for fraud to be commenced within four years of the date of alleged misrepresentations instead of the discovery rule. As a result, Defendant is not entitled to summary judgment that two of Plaintiff's fraud claims are barred by the statute of limitations.

Plaintiff's third fraud claim is based on an alleged representation made by Mr. Johanson in November 2004 that Defendant Thomas needed electronic copies of Plaintiff's Architectural Drawings in order to make minor changes to the construction sites and for archival purposes. (Doc. No. 54 at ¶ 84.) Defendant argues that Plaintiff has not offered any evidence that Mr. Johanson made such a **[*113]** representation in November 2004. Plaintiff directs the Court to only one piece of evidence for its claim that Mr. Johanson made this statement in November 2004: Mr. Meijer's affidavit, subsequent to his depositions, that Mr. Johanson requested electronic copies of Plaintiff's Architectural Drawings "on several occasions." (Doc. No. 124, Exh. V at ¶ 4.) This statement, which does not provide any particulars and is otherwise unsupported by Mr. Meijer's prior deposition testimony, is insufficient to create an issue of material fact. *See* Poole v. Marlin Drilling Co., 592 F. Supp. 60, 63 (W.D. La. 1984) (rejecting a conclusory statement of ultimate fact made in an affidavit submitted in opposition to summary judgment); United States v. Dercacz, 530 F. Supp. 1348, 1350 (E.D.N.Y. 1982) (stating that the party opposing summary judgment must supply "supporting arguments or facts" and "concrete particulars" in order to present a genuine issue for trial). As a result, Defendant has met its burden of showing that there is no evidence in the record to support Plaintiff's claim that a misrepresentation by Defendant Thomas occurred in November 2004. Defendant's motion for summary judgment on Plaintiff's **[*114]** fraud claim based on misrepresentations allegedly made in November 2004 is granted.

**E. Affirmative Defenses**

Plaintiff has moved for summary judgment on all of Defendant's affirmative defenses. Defendant has cross-moved for summary judgment on some of its defenses. The Court will address each of these in turn.

**1. Joint Authorship**

Defendant moves for summary judgment on its affirmative defense that Plaintiff's copyrighted works are "joint works" and, therefore, Defendant is not liable under either the Copyright Act or the DMCA for using Plaintiff's copyrighted works. Plaintiff has cross-moved for summary judgment on this issue.

A "joint work" is a "work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." *17 U.S.C. § 101*. "Authors of a joint work are initial co-owners of the copyright in the work, and are each entitled to equal undivided interest in the whole work." *Jordan v. Sony BMG Music Entm't, Inc., 637 F. Supp. 2d 442, 459 (S.D. Tex. 2008)*. Joint authors cannot be liable to one another for infringement. *Quintanilla v. Texas Television, Inc., 139 F.3d 494 (5th Cir. 1998)*. Authorship is generally **[*115]** a question of fact for the jury. *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 110 (2d Cir. 2002)*.

The mere fact of collaboration, however, does not make the collaborators "joint authors." *Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1068-69 (7th Cir. 1994)*. "To establish that his contributions were significant enough to make him a joint author, a party must show that he and the other party: (1) intended to create a joint work; and (2) each contributed independently copyrightable material." *Janky v. Lake County Convention & Visitors Bureau, 576 F.3d 356, 361 (7th Cir. 2009)*; *Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998)*. In the context of architectural works, courts have recognized that, although the "client, the developer, the engineer, and the ultimate inhabitants of a project, may have a voice in the design process . . . only in unusual circumstances will someone other than the architect be the author, the one to give spatial expression to the design ideas." *Fairview Dev. Corp. v. Aztex Custom Homebuilders, LLC, Case No. CV-07-0337-PHX-SMM, 2009 U.S. Dist. LEXIS 16501, *13 (D. Ariz. Mar. 2, 2009)*. "[N]ormal client participation does not transform a client **[*116]** into an author or joint author of an architectural work." *2009 U.S. Dist. LEXIS 16501, [WL] at *13-*14*; *M.G.B. Homes v. Ameron Homes, 903 F.2d 1486, 1493 (11th Cir. 1990)* (finding that a client's provision of a thumbnail sketch of a floor plan to his architect did not render the client an "author" of the architectural plans because there was no intent that the sketch become part of the finished expression).

Neither party is entitled to summary judgment at this stage of the proceedings because questions of material fact exist regarding joint authorship. The viability of Defendant Thomas's claim of joint authorship rests on, first, a showing that it made independently copyrightable contributions to Plaintiff's works. However, the parties dispute whether Defendant Thomas gave Plaintiff original site plans, floor plans, and elevation drawings it generated in-house, or simply drawings and surveys from third-party consultants and vendors. [21] (*Compare* Labeff Depo. 25-26, 73-75, 137-38, 169 *with* Meijer I Depo. at 41, 45; Meijer II Depo. at 443-44, 483, 506, 526; Meijer III Depo. at 43, 49-50, 61, 62, 66.) Without knowing the scope of Defendant Thomas's contributions to Plaintiff's Architectural Drawings, the Court cannot **[*117]** make a determination of whether these contributions, if any, were independently copyrightable. *See* *Guillot-Vogt. Assocs., Inc., 848 F. Supp. at 689* (denying summary judgment due to questions of authorship raised by defendant's provision of drawings to plaintiff).

Second, the parties dispute whether both Plaintiff and Defendant Thomas intended to be joint authors. "[T]he intent prong does not have to do with the collaborators' intent to recognize each other as coauthors for purposes of copyright law; the focus is on the parties' intent to work together in the creation of a single product, not on the legal

---

[21] Defendant appears to argue also that Plaintiff's claim of sole authorship is defeated because of its inclusion of third-party and consultants drawings in its Architectural Drawings. (Doc. No. 119, Exh. G.) However, Defendant Thomas' claim of joint authorship cannot rest on purported contributions by parties other than itself. Therefore, the Court will not consider the contributions of third-parties and consultants when analyzing the question of Defendant Thomas's joint authorship of Plaintiff's Architectural Drawings.

consequences of that collaboration." Janky, 576 F.3d at 362 (quoting **[*118]** Erickson, 13 F.3d at 1068-69). Defendant contends that the requisite intent is shown through Defendant Thomas's high level of decision-making authority over content and revisions to the Speedy Stop store designs. Further, Defendant claims that Plaintiff also intended to share authorship of its plans by failing to obtain signed Design Proposals asserting Plaintiff's sole authorship and ownership of its Architectural Drawings. Plaintiff contends that its intent to be sole author of its Architectural Drawings is shown by the title block and "scope of the document" language contained on its drawings. Further, Plaintiff challenges the level and nature of Defendant Thomas's participation in the design process, arguing that provision of third-party and consultant drawings does not transform Defendant Thomas into joint author. The Court acknowledges that "[a]n important indicator of authorship is a contributor's decisionmaking authority over what changes are made and what is included in a work." Thomson v. Larson, 147 F.3d 195, 202-03 (2d Cir. 1998). Here, the parties have offered differing factual accounts of the nature and scope of Defendant Thomas's involvement in the design process such **[*119]** that a jury could properly enter a verdict in favor of Plaintiff, the nonmovant. Therefore, the Court cannot grant summary judgment to either party on Defendant Thomas's status as a joint author of the copyrighted works.

**2. Implied Nonexclusive License**

Defendant has moved for summary judgment on its affirmative defense that Plaintiff granted Defendant Thomas an implied nonexclusive license to copy or distribute Plaintiff's Architectural Drawings. Thus, Defendant argues, it is not liable for either copyright infringement or violations of the DMCA. Violations of the DMCA require that a defendant know or have reason to know that removal of copyright management information would "induce, enable, facilitate, or conceal an infringement" of any right under copyright law. 17 U.S.C. § 1202(b); Gordon v. Nextel Communications, 345 F.3d 922, 927 (6th Cir. 2003). Plaintiff has cross-moved for summary judgment on the basis that Defendant did not plead this defense.

Rule 8(c) requires a party to set forth all affirmative defenses in a responsive pleading. Fed. R. Civ. P. 8(c). "Generally, an affirmative defense not pled is considered waived." Marine Overseas Svcs., Inc. v. Crossocean Shipping Co., 791 F.2d 1227, 1233 (5th Cir. 1986). **[*120]** However, "where the matter is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply precisely with Rule 8(c) is not fatal." Lafreniere Park Found. v. Broussard, 221 F.3d 804, 808 (5th Cir. 2000) (quoting United States v. Shanbaum, 10 F.3d 305 at 312). If the affirmative defense is raised at a pragmatically sufficient time, and the party opposing the defense is not prejudiced in its ability to respond, a court may hold that the defense is not waived. Rogers v. McDorman, 521 F.3d 381, 386 (5th Cir. 2008); United States v. Shanbaum, 10 F.3d 305, 312 (5th Cir. 1994).

Defendant first unambiguously raised the issue of being granted a license or permission by Plaintiff in the deposition of Marcel Meijer on January 15, 2010, when Mr. Meijer was asked whether Defendant Thomas "had either an express license from you wherein you said it's okay for you to do that or an implied one that they did it; they sent it to you; and you never said anything about it, right?" (Meijer III Depo. at 218.) At the time of Mr. Meijer's Deposition, the close of discovery was one month away on February 15, 2010. (Doc. No. 56.) Plaintiff, along with Defendant, **[*121]** twice moved for an extension of time to conclude expert discovery, both of which were granted. (Doc. Nos. 88, 96.) Defendant filed the present motion for summary judgment on April 5, 2010, and Plaintiff has had ample time to respond to the license defense and prepare for trial on November 8, 2010. Further, Plaintiff has not identified any prejudice that has resulted from Defendant's late-raised license defense. Therefore, the Court declines to find that Defendant has waived the license defense.

Turning to the defense itself, courts have held that the existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement. Johnson v. Jones, 149 F.3d 494, 500 (6th Cir. 1998). An implied nonexclusive license to use a copyrighted work need not be evidenced by a writing, but may be implied through conduct or granted orally. Carson v. Dynegy, Inc., 344 F.3d 446, 451 n.5 (5th Cir. 2003). An implied nonexclusive license exists when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor **[*122]** copy and distribute his work." Lulirama Ltd. v. Axcess Broadcast Servs., 128 F.3d

872, 879 (5th Cir. 1997) (quoting Effects Associates, Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1991)). The existence of a license is an affirmative defense and a defendant bears the burden of proving its existence. Lulirama Ltd., 128 F.3d at 884.

Defendant correctly identifies the third prong of the *Lulirama* test—Plaintiff's intent—as the controlling issue here. Defendant claims that Plaintiff's intent to grant a license can be implied from Mr. Meijer's admission that he was aware of and gave Defendant Thomas permission to distribute Plaintiff's Architectural Drawings to third-party consultants and vendors. (Meijer III Depo. at 54, 92, 95, 100, 216, 220.) Mr. Meijer never complained about or objected to Defendant Thomas's use of Plaintiff's Architectural Drawings nor withdrew permission to distribute them. (Meijer III Depo. at 60, 92, 93, 102, 220.) In addition, Mr. Meijer never expected Defendant Thomas to seek Plaintiff's permission before giving a set of Plaintiff's Architectural Drawings to permitting agencies or contractors. (Meijer I Depo. at 153.)

Defendant Thomas also claims that Plaintiff's **[*123]** lack of confidentiality restrictions is evidence of Plaintiff's intent to *not* restrict Defendant Thomas's ability to use and distribute Plaintiff's Architectural Drawings. Plaintiff's Design Proposals that contained language preventing Defendant Thomas from copying or distributing Plaintiff's Architectural Drawings were never signed. (Labeff Depo. at 126; Meijer I Depo. at 35, 38.) Similarly, Defendant Thomas never signed Plaintiff's Confidentiality Agreements that, on at least one occasion, accompanied the computer disks containing Plaintiff's AutoCAD files. (Meijer I Depo. at 68.) Finally, Defendant points to the several occasions when Plaintiff transmitted hard copies and electronic copies of its drawings without ever imposing confidentiality restrictions. (Meijer I Depo. at 62-66, 70-72, 178-79.)

Plaintiff correctly notes that there is no evidence that Mr. Meijer ever consented to Defendant Thomas's use of Plaintiff's Architectural Drawings in connection with projects on which Plaintiff did not serve as the architect. (Meijer III Depo. at 95.) Neither has Defendant shown that Plaintiff ever provided permission for Defendant Thomas to share Plaintiff's works with other architects. **[*124]** Plaintiff has also submitted evidence that he spoke to Defendant Thomas's personnel, Jeff Johanson and Carlton Labeff, and requested that Defendant Thomas keep Plaintiff's Architectural Drawings confidential. (Meijer I Depo. at 321.) In addition, Plaintiff points to the restrictive language contained in the unsigned Design Proposals and Confidentiality Agreements as evidence of Plaintiff's *lack* of intent to allow Defendant Thomas to copy and distribute its copyrighted works.

After considering the summary judgment evidence presented, the Court finds that Defendant has not met its burden of showing that Plaintiff intended for Defendant to copy and distribute its work. The parties' dispute turns on whether Plaintiff intended for its work to be shared with architects and third parties who did not work on Defendant Thomas's projects with Plaintiff. *See Johnson*, 149 at 501 (finding that an implied nonexclusive license did not exist because plaintiff's drawings "were used in a way he never intended"). In similar situations, courts have examined three factors to determine whether an implied nonexclusive license exists:

> (1) whether the parties were engaged in a short-term discrete transaction **[*125]** as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such as the standard AIA contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 514-16 (4th Cir. 2002). Here, the first and third factors point away from the existence of an implied nonexclusive license. Plaintiff and Defendant Thomas were engaged in an ongoing relationship encompassing nine different Speedy Stop stores. In addition, nothing in Plaintiff's conduct indicated that it was aware, much less approved of, the use of its Architectural Drawings in projects on which it did not serve as an architect. The second factor is unhelpful in this case because, although Plaintiff submitted Design Proposals containing language restricting Defendant Thomas's ability to use or distribute Plaintiff's works without its permission, these documents were never signed. An application **[*126]** of the factors enumerated in *Nelson-Salabes* to this case leads to the conclusion that Plaintiff did not grant an implied nonexclusive license to Defendant Thomas.

Defendant's reliance on Architettura, Inc. v. DBSI Cumberland at Granbury, L.P., 652 F. Supp. 2d 775 (N.D. Tex. 2009) is misplaced. In *Architettura, Inc.*, the court did not decide the question of whether the plaintiff granted a license to the defendant because both parties in the case agreed that defendant had permission to use plaintiff's site plan during the time period in which defendant showed the site plan to a rival architect. The court instead examined whether this license was revocable or irrevocable. Here, Plaintiff disputes whether Defendant had permission to show its Architectural Drawings either to rival architects or to third-parties not involved in Plaintiff's projects.

Defendant also cites Gordon v. Nextel Communications, 345 F.3d 922 (6th Cir. 2003), which involved a plaintiff who did not give defendant permission to use his illustrations. The court held that the defendant could not be liable for DMCA violations because there was no evidence that the defendant knew or had reason to know that it was facilitating **[*127]** or concealing an infringement. Here, however, Defendant argues that it possessed an implied nonexclusive license to use Plaintiff's Architectural Drawings. It has not argued that, even if it did not possess a license, it did not know or have reason to know that they would be facilitating an infringement of Plaintiff's copyrighted works.

Ultimately, the Court cannot conclude that the objective evidence of Plaintiff's conduct implied a license for Defendant Thomas to share Plaintiff's drawings with Morris and Hermes. The Court thus declines to grant Defendant's motion for summary judgment on the issue of an existence of an implied nonexclusive license.

**3. Statute of Limitations**

Defendant has moved for summary judgment that Plaintiff's Copyright Act claims are barred by the three year statute of limitations applicable to such claims. *See* 17 U.S.C. § 507(b). Plaintiff has cross-moved for summary judgment on this affirmative defense due to Defendant's purported failure to produce any evidence on this issue. In the Fifth Circuit, a copyright claim accrues "when [the party] knew or had reason to know of the injury upon which the claim is based." Jordan v. Sony BMG Music Entm't Inc., Case No. 08-20835, 354 Fed. Appx. 942, 2009 U.S. App. LEXIS 26730 (5th Cir. Dec. 8, 2009) **[*128]** (quoting Pritchett v. Pound, 473 F.3d 217, 220 (5th Cir. 2006)). In order for Defendant to obtain summary judgment on this issue, they must establish that that Plaintiff knew or had reason to know of the alleged copyright infringement prior to October 24, 2005 (Plaintiff filed suit on October 24, 2008). Defendant points to Plaintiff's knowledge in early 2005 that its Architectural Drawings were being used in geotechnical engineering reports. (*See, e.g.*, Meijer III Depo. at 77.) However, all of these geotechnical reports were generated in connection with projects on which Plaintiff served as the architect. (Meijer III Depo. at 77, 78, 79, 84, 91, 92, 99-100.) Plaintiff's copyright infringement claims are based not on projects where it served as an architect and received geotechnical reports, but rather on Defendant's use of Plaintiff's drawings in projects on which Plaintiff *did not* serve as architect—namely, Store Nos. 14, 86, 87, 91, 95, 102, 301, 302, 303, 305, 306, 309, 311). (Doc. No. 54 at 12-13.) Defendant has not proffered any evidence showing that Plaintiff was aware, prior to October 24, 2005, that its Architectural Drawings were being used in connection with these thirteen **[*129]** stores.

Next, Defendant argues that Plaintiff knew or should be charged with constructive knowledge of the alleged infringement by Morris because Morris's design and permitting work was completed as a matter of public record by October 18, 2005. (Morris Depo. at 136-39.) The "public records" that Defendant claims put Plaintiff on notice of the alleged infringement appear to be permits issued by state, local or municipal authorities. (Morris Depo. at 136-39.) The Copyright Act provides that "[r]ecordation of a document in the Copyright Office gives all persons constructive notice of the facts stated in the recorded document." 17 U.S.C. § 205(c); Jordan v. Sony BMG Music Entm't Inc., 354 Fed. Appx. 942, 2009 U.S. App. LEXIS 26730 at *8. However, the Copyright Office does not provide that public records in offices other than the Copyright Office, such as a permitting agency, can be used to charge a copyright owner with constructive notice that his or her copyright is being infringed. Copyright holders "are not obligated to seek out instances of potential infringement when they are reasonably unaware of any infringing acts." *See* Jack Preston Wood: Design, Inc., v. BL Building Co., Case No. H-03-713, 2004 U.S. Dist. LEXIS 30511, *44 (S.D. Tex. June 22, 2004). **[*130]** Plaintiff should not be expected to regularly comb through the permitting agencies records in order to search for potential instances of infringement. *See* Warren Freedenfeld Assocs., Inc. v. Michael P.

*McTigue, D.V.M., 531 F.3d 38, 46 (1st Cir. 2008)* ("Architects have no general, freestanding duty to comb through public records . . . in order to police their copyrights."). The Court declines to charge Plaintiff with constructive notice of Morris's allegedly infringing Architectural Drawings through the public recordation of those drawings in permitting offices.

Finally, Defendant has not shown any evidence that Plaintiff was aware of Defendant Thomas's sharing of its Architectural Drawings with Hermes and Morris—the injury upon which Plaintiff's copyright infringement claims are based—prior to October 24, 2005. [22] Plaintiff's claim that it discovered the existence of allegedly infringing stores designed by Morris and Hermes in March 2006 is uncontroverted. Therefore, Plaintiff is entitled to summary judgment on Defendant's affirmative defense of statute of limitations and Defendant's motion on this issue is denied.

**4. Lack of Damages**

Defendant moves for summary judgment on Plaintiff's damage claims under the Copyright Act and the DMCA.

First, Defendant's motion for summary judgment as to Plaintiff's claim for attorney's fees and statutory damages under the Copyright Act is denied. Plaintiff is not seeking attorney's fees or statutory damages under the Copyright Act. (Doc. No. 54 at ¶ 60.)

Second, Defendant's motion for summary judgment as to Plaintiff's claim for statutory damages under the DMCA is denied. Plaintiff has sought statutory damages under *17 U.S.C. §§ 1203(c)(1)(B)*, *1203(c)* for DMCA violations as an alternative to actual damages and infringer's profits. **[*132]** The DMCA provides that statutory damages may be awarded for "each violation of *section 1202* in the sum of not less than $2,500 and more than $25,000." *17 U.S.C. § 1203(c)(3)(B)*. Contrary to Defendant's claim, *17 U.S.C. § 1203(c)(3)* does not limit the definition of "violation" to "each instance in which a copy of an infringed [work] was provided to a third party." (Doc. No. 104 at ¶ 28.) Rather, the latter language comes from a case *Goldman v. Healthcare Management Sys., Inc., 559 F. Supp. 2d 853, 868 (W.D. Mich. 2008)*, which held, in that case, that "violation" would mean each time the defendant distributed the infringed program to hospitals. The term "violation" has also been held to mean ""each violative act performed by Defendant." *McClatchey v. AP, Case No. 3:05-cv-145, 2007 U.S. Dist. LEXIS 40416 (W.D. Pa. June 4, 2007)*; *see also Stockwire Research Group, Inc. v. Lebed, 577 F. Supp. 2d 1262, 1267 (S.D. Fla. 2008)*. Under the latter interpretation, Defendant's removal of Plaintiff's title block could constitute the "violation" contemplated by *17 U.S.C. § 1203(c)(3)(B)*. *See* *Gregerson v. Vilana Fin., Inc., Case No. 06-1164 ADM/AJB, 2008 U.S. Dist. LEXIS 11727, *21 (D. Minn. Feb. 15, 2008)* **[*133]** (recognizing a DMCA "violation" for purposes of calculating statutory damages as Defendant's removal of a digitally embedded watermark from plaintiff's copyrighted photograph rather than Defendant's distribution of plaintiff's photograph in print and web advertisements). Defendant cannot establish that it did not perform "violations" of the DMCA such that Plaintiff would not be entitled to statutory damages under the DMCA.

Third, Defendant's motion for summary judgment as to Plaintiff's claims for actual damages under the Copyright Act and DMCA is granted. The Copyright Act and the DMCA provide that a copyright owner may recover actual damages he or she suffers as a result of the copyright infringement. *17 U.S.C. § 504(a)*; *17 U.S.C. § 1203(c)(2)*. Defendant contends that Plaintiff is not entitled to actual damages because it has proffered no evidence that it sustained any losses due to the alleged infringement of its drawings. However, courts have construed the "actual damages" measure to include license fees that the copyright owner would have obtained for the infringer's use of the copyrighted material. *See* *On Davis v. The Gap, Inc., 246 F.3d 152, 166 (2d Cir. 2001)* (noting that, though

---

[22] Defendant also argues in various places in their motions that Plaintiff **[*131]** was or should have been aware that Defendant Thomas would hire other architects because Plaintiff was unable to continue providing architectural services. To the extent that Defendant is charging Plaintiff with inquiry notice of the infringing activities, the Court does not find that the events here provided Plaintiff with such notice. *See* *Warren Freedenfeld Assocs., Inc., 531 F.3d at 45* ("There is no presumption that failed business relationships inevitably will give rise to either tortious conduct or disregard or proprietary rights.").

**[*134]** a copyright "owner may be incapable of showing a loss of either sales or licenses to third parties," the owner may be able to recover as actual damages "owner's loss of the fair market value of the license fees he might have exacted of the defendant"). Plaintiff has offered, as evidence of the license fee it might have obtained from Defendant Thomas, Mr. Meijer's affidavit stating that Plaintiff would have charged $25,000 for each additional store or site for which its plans would be used. The Court has stricken this portion of Mr. Meijer's affidavit for the reasons explained in Part II.C.2, above. Plaintiff has offered no other evidence of the fair market value of license fees for its Architectural Drawings. Therefore, Plaintiff has failed to make a showing sufficient to establish an essential element of its claim for actual damages. Defendant is entitled to summary judgment on Plaintiff's claim for actual damages under the Copyright Act and the DMCA.

Fourth, Defendant's motion for summary judgment as to Plaintiff's claims for infringer's profits under the Copyright Act and DMCA is denied. A copyright owner is entitled to recover "infringer's profits" as a measure of damages for copyright **[*135]** infringement. "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *17 U.S.C. § 504(b)*.

Plaintiff has offered evidence of Thomas's gross revenue in the form of the expert report of its damages expert, Walter Bratic. Though the Court excluded Mr. Bratic's expert opinion as to Defendant Thomas's gross revenue, Plaintiff has been allowed to provide another opinion as to the calculation of Defendant Thomas's gross revenue. (Doc. No. 175 at 12.) As a question of material fact exists as to Defendant Thomas's gross revenue attributable to the allegedly infringing activity, the Court will withhold judgment until Plaintiff's resubmission of its expert report regarding Defendant Thomas's gross revenue.

**5. Fair Use**

Plaintiff has moved for summary judgment on Defendant's affirmative defense of fair use. In determining whether use of copyrighted material constitutes fair use, courts must apply four factors: (1) the purpose and character of the use, including whether such **[*136]** use is of commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *17 U.S.C. § 107*; *Campbell v. Acuff-Rose Music, 510 U.S. 569, 577, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994)*.

The first factor weighs against a finding of fair use since Defendant's alleged use of Plaintiff's copyrighted material was strictly for commercial purposes. *See* *Compaq Computer Corp. v. Ergonome Inc., 387 F.3d 403, 409-10 (5th Cir. 2004)* (stating that commerciality generally weighs against a finding of fair use). Defendant has admitted that its use was for commercial purposes. (Doc. No. 121 at 11.) Where the primary use of the copyrighted work is for a commercial purpose, the use is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright," and the central question is "whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC, 629 F. Supp. 2d 526, 533 (E.D. Va. 2008)* **[*137]** (omitting citations), *aff'd*, *377 Fed. Appx. 303, 2010 U.S. App. LEXIS 9299 (4th Cir. 2010)*.

The second factor—the nature of the copyrighted material—also weighs against a finding of fair use. Creative or fictional works receive more protection than non-fictional or factual works. *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC, 629 F. Supp. 2d 526, 534 (E.D. Va. 2008)*. Architectural designs and drawings have been held to be creative works. *Id*. Defendant has not offered any factual or legal support for considering architectural works or drawings non-creative works. This factor also weighs against a finding of fair use.

The third factor—the amount and substantiality of the portion used in relation to the copyrighted work as a whole—cannot be applied one way or another because Defendant contends in its opposition to Plaintiff's motion for summary judgment on the fair use defense that it did not use Plaintiff's copyrighted work.

The fourth factor—the effect of the use upon the potential market for or value of the copyrighted work—weighs against a finding of fair use here. The parties correctly note that this factor is the most important of the four. *Compaq Computer Corp. v. Ergonome Inc., 387 F. 3d 403, 410 (5th Cir. 2004)*. **[*138]** "This factor requires courts to consider not only actual harm to the market for the original, but also whether widespread use of the work, like the sort complained of by the copyright-holder, would impair the potential market for the original work and any derivative works." *Id*. Defendant will have the burden at trial of showing that its alleged commercial use of Plaintiff's Architectural Drawings did not have a significant effect upon the market for or value of the drawings. However, Defendant has not shown that its use of Plaintiff's Architectural Drawings did not significantly impact Plaintiff's ability to sell or license its works. In fact, Defendant acknowledges that Plaintiff's primary business is the design of convenience stores. (Meijer I Depo. at 100-02.) Defendant's argument that Plaintiff's market was not harmed because it did not have the ability to handle its work is also unavailing. Even if Plaintiff was unable to draft new Architectural Drawings itself, Plaintiff would have been able to license the pre-existing Architectural Drawings to Defendant Thomas. Defendant Thomas's alleged commercial use of the plans—sharing them with Morris and Hermes—impaired Plaintiff's ability **[*139]** to derive licensing fees from Defendant Thomas for this use.

Considering all of these four factors together, the Court finds that Defendant Thomas has not shown the existence of essential elements of the fair use defense and that Plaintiff is entitled to summary judgment on this affirmative defense.

**6. Estoppel**

Plaintiff has moved for summary judgment on Defendant's affirmative defense of estoppel because of Defendant's failure to produce evidence regarding any of the elements of estoppel. Under the doctrine of estoppel, a plaintiff is barred from bringing a copyright infringement claim against a defendant if: (1) plaintiff knew about defendant's infringing conduct; (2) plaintiff must intend that its conduct shall be acted on, or must so act that the defendant has a right to believe that it is so intended; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment. *Carson v. Dynegy, Inc., 344 F.3d 446, 453 (5th Cir. 2003)*.

In order for Defendant to survive summary judgment, it must identify a genuine issue of material fact. Where, as here, the Defendant will have the burden of proof at trial on the essential elements of the estoppel defense, **[*140]** it must make a showing sufficient to establish the existence of the essential elements. Defendant has not shown sufficient evidence that Plaintiff was aware of Defendant Thomas's sharing of Plaintiff's Architectural Drawings with parties not involved on Plaintiff's projects. There is no genuine issue of material fact that exists regarding Plaintiff's specific knowledge of Morris's and Hermes's use of its Architectural Drawings. Therefore, Plaintiff is entitled to summary judgment on the first element of estoppel. Since all four elements of the estoppel defense are required, Plaintiff is entitled to summary judgment on the estoppel defense as a whole.

**7. Laches**

Plaintiff has moved for summary judgment on Defendant's affirmative defense of laches. "To establish that a cause of action is barred by laches, the defendant must show (1) a delay in asserting the right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the defendant." *Goodman v. Lee, 78 F.3d 1007, 1014 (5th Cir. 1996)*. "Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the **[*141]** lawsuit in which the defendant seeks to counterpose the laches defense." *Jacobsen v. Deseret Book Co., 287 F.3d 936, 949 (10th Cir. 2002)* (quoting *Danjaq LLC v. Sony Corp., 263 F.3d 942, 952 (9th Cir. 2001))*. The Fifth Circuit has not addressed whether the laches defense applies in a case where the copyright owner files suit within the three-year statute of limitations applicable to copyright infringement claims. However, other circuits have acknowledged that courts should defer to the statute of limitations rather than decide copyright infringement cases on the issue of laches. *See, e.g., Jacobsen v. Deseret Book Co., 287 F.3d 936, 950 (10th Cir. 2002)*; *Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 798 (4th Cir. 2001)*; *Jack Preston Wood: Design, Inc., 2004 U.S. Dist. LEXIS at *45-*47*. In rare cases, "a statute of

limitations can be cut short by the doctrine of laches . . . ." *Jacobsen v. Deseret Book Co., 287 F.3d 936, 951 (10th Cir. 2002)*.

The Court has already issued summary judgment in favor of Plaintiff on the issue of whether Plaintiff filed its copyright infringement claim within the three-year statute of limitations. Defendant has not presented evidence of extraordinary **[*142]** circumstances that would warrant the imposition of the laches defense. Plaintiff discovered the alleged infringement in March 2006. Plaintiff wrote to Defendant Thomas in June 2006 about the alleged infringement and asked Defendant Thomas to refrain from releasing Plaintiff's Architectural Drawings to any other architectural firm without Plaintiff's written approval. (Doc. No. 104, Exh. O at 65.) Plaintiff registered its "architectural works" and "technical drawings" copyrights between June 2006 and October 2007. (*Id*. at 103-08.) The approximately year-long delay between the copyright registration process and filing of suit appears due to Plaintiff's interaction with its counsel. (Meijer I Depo. at 25-27.) There is nothing remarkable in Plaintiff's conduct requiring the Court to shorten the statute of limitations by applying the laches defense. Finally, Defendant has not shown how it was prejudiced by Plaintiff's filing of suit in October 2008. Therefore, Plaintiff is entitled to summary judgment on this affirmative defense.

**8. Innocent Infringement**

Plaintiff has moved for summary judgment on Defendant's affirmative defense of innocent infringement. The use of the innocent infringement **[*143]** defense for claims brought under the Copyright Act differs from its use in alleged violations of the DMCA.

With respect to claims brought under the Copyright Act, innocent infringement is not an affirmative defense to liability for infringement of works created after March 1, 1989. *Bryce & Palazzola Architects & Assocs. v. A.M.E. Group, 865 F. Supp. 401, 405 (E.D. Mich. 1994)*. Innocent infringement remains an affirmative defense to an award of statutory damages under *17 U.S.C. § 504(c)* for copyright infringement. Here, Plaintiff has not asserted a claim for statutory damages for copyright infringement. Therefore, Defendant cannot assert innocent infringement as an affirmative defense to either liability or statutory damages for copyright infringement.

With respect to DMCA claims, innocent infringement can be an affirmative defense to the award of statutory damages under *17 U.S.C. § 1203(c)(5)*. Defendant has proffered sufficient evidence that a jury might reasonably conclude that its removal of Plaintiff's title block from its Architectural Drawings was done without knowledge that such removal constituted a violation of the DMCA. Therefore, Plaintiff is not entitled to summary judgment **[*144]** as to Defendant's affirmative defense of innocent infringement to Plaintiff's DMCA claims.

**9. Unclean Hands**

Plaintiff has moved for summary judgment on Defendant's affirmative defense of unclean hands. In order for the equitable doctrine of "unclean hands" to apply, the plaintiff's misconduct must "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Mitchell Bros. Film Group v. Cinema Adult Theater, 604 F.2d 852, 863 (5th Cir. 1979)*, *cert. denied*, *445 U.S. 917, 100 S. Ct. 1277, 63 L. Ed. 2d 601 (1980)* (quoting *Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S. Ct. 146, 78 L. Ed. 293, 1934 Dec. Comm'r Pat. 639 (1933))*. The plaintiff's conduct must personally injure the defendant. *Id*. (quoting *Lawler v. Gilliam, 569 F.2d 1283, 1294 (4th Cir. 1978)*. "The defense is rarely effective and is properly denied when the "plaintiff's transgression is of an . . . inconsequential nature." *Los Angeles News Service v. Tullo, 973 F.2d 791, 799 (9th Cir. 1992)* (omitting citations). The application of the unclean hands doctrine raises primarily a question of fact. *Id*.

Defendant contends that Plaintiff's purposeful errors in the copyright registration process, failure to disclose that its **[*145]** work was copied from a third party, misstatements in authorship, and failure to disclose that its work was a derivative work are all wrongful acts that bar Plaintiff's recovery under the clean hands doctrine. The Court has

already resolved all of these issues in favor of Plaintiff. Plaintiff is entitled to summary judgment on the unclean hands defense.

#### 10. Failure to Identify Portions of Infringed Copyrighted Works

Plaintiff moves for summary judgment on Defendant's affirmative defense of failure to identify portions of infringed copyrighted works. Defendant acknowledges that "failure to identify portions of infringed copyrighted works" is not an affirmative defense but claim that it is Plaintiff's burden of proof at trial. Plaintiff contends that it is not required to identify portions of its copyrighted works because, under the substantial similarity test, the fact finder is required to review the work as a whole without dissection to judge the total concept and feel of the structure. In the Fifth Circuit, the "substantial similarity" test requires the plaintiff to "demonstrate that the copying is legally actionable by showing that the allegedly infringing work is substantially similar **[*146]** to *protectable* elements of the infringed work." *General Universal Sys. v. Lee, 379 F.3d 131, 142 (5th Cir. Tex. 2004)* (emphasis added). Therefore, Plaintiff bears a burden of identifying the protectable elements of its Architectural Drawings and presenting evidence that Defendant's Architectural Drawings are substantially similar to those elements. The Court withholds summary judgment on the issue of Plaintiff's failure to identify portions of infringed copyrighted works.

#### 11. De Minimis Infringement

Plaintiff moves for summary judgment on Defendant's affirmative defense of de minimis infringement. "To establish that the infringement of a copyright is de minimis, and therefore not actionable, the alleged infringer must demonstrate that the copying of the protected material is so trivial as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying." *Sandoval v. New Line Cinema Corp., 147 F.3d 215, 217 (2d Cir. 1998)* (omitting quotations).

As stated above, genuine issues of material fact exist as to which technical drawings within Plaintiff's Architectural Drawings were copyrighted. Further, there are factual issues in dispute **[*147]** regarding the substantial similarity of Plaintiff's "architectural works" material and Defendant's Architectural Drawings. Therefore, the Court cannot conclude that Defendant has shown no evidence that its potential use of Plaintiff's protected material is below the de minimis level. Plaintiff's motion for summary judgment on this issue is denied.

#### 12. Failure to Mitigate Damages

Plaintiff moves for summary judgment on Defendant's affirmative defense that Plaintiff failed to mitigate its damages. Plaintiff first suggests that courts have never recognized a failure to mitigate as a defense in a copyright infringement case. However, a brief search of the case law yields exactly such cases. *See* *Tingley Sys. v. Healthlink, Inc., 509 F. Supp. 2d 1209, 1219 (M.D. Fla. 2007)*; *Frank Betz Assocs. v. J.O. Clark Constr., L.L.C., Case No. 3:08-cv-00159, 2010 U.S. Dist. LEXIS 53437 (M.D. Tenn. May 30, 2010)*; *Software Publrs. Ass'n v. Scott & Scott, LLP, Case No. 3:06-CV-0949-G, 2007 U.S. Dist. LEXIS 59814 (N.D. Tex. Aug. 15, 2007)*.

Second, Plaintiff claims that Defendant has not adduced evidence to support this defense. In response, Defendant cites as evidence Plaintiff's discovery of the allegedly **[*148]** wrongful activity in March 2006 and failing to do anything for over two years until the initiation of this lawsuit in October 2008. The Court finds that a genuine issue of material fact exists regarding whether Plaintiff properly mitigated the damages it is requesting for copyright infringement, DMCA violations, and fraud claims. Therefore, Plaintiff is not entitled to summary judgment as to Defendant's affirmative defense of failure to mitigate damages.

#### 13. Fraud on Copyright Office

Plaintiff moves for summary judgment on Defendant's defense of fraud on the Copyright Office. As explained in Part IV.C.1, above, Defendant has not been able to show that there are genuine issues of material fact relating to Plaintiff's errors in copyright registration, nor that, as a legal matter, Plaintiff committed fraud on the Copyright Office. Therefore, the Court grants Plaintiff's motion for summary judgment as to this defense.

**14. Impermissible Taking**

Plaintiff has moved for summary judgment on Defendant Thomas's defense of impermissible taking. Defendant Thomas has clarified that this defense would only be applicable in the event that a jury awards punitive damages on Plaintiff's fraud claim. The **[*149]** Court withholds summary judgment on this defense.

**15. Failure to State a Claim**

Plaintiff moves for summary judgment on the defense that Plaintiff has failed to state a claim under *Rule 12(b)(6)*. This defense was raised by Hermes, which is no longer a defendant in this case. Therefore, Plaintiff is entitled to summary judgment on this defense.

**16. Intervening Third Parties**

Plaintiff is entitled to summary judgment on the defense of "intervening third parties" as this defense has no applicability to copyright infringement and was raised with respect to the now-dismissed trade secret misappropriation claims.

**17. Comparative Responsibility**

Plaintiff moves for summary judgment on Defendant Thomas's affirmative defense of comparative responsibility. Both parties acknowledge that this defense is inapplicable to copyright infringement claims. As for the fraud claim, Defendant Thomas is correct in stating that comparative responsibility is an affirmative defense under Texas law. However, Defendant Thomas has not identified the facts that would support such a defense. See *Celotex, 477 U.S. at 323-24* (the nonmoving party must go beyond the pleadings and designate specific facts showing that there is **[*150]** a genuine issue for trial). Therefore, the Court grants summary judgment to Plaintiff on the affirmative defense of comparative responsibility.

**18. Sufficient Resources**

Plaintiff has moved for summary judgment on the issue of "sufficient resources." Plaintiff and Defendant Thomas agree that there is no affirmative defense of "sufficient resources." Defendant Thomas states that the issue of sufficient resources relates to its defenses of limitations, estoppel and laches since Plaintiff knew that it did not have the manpower to meant Defendant Thomas's requirements and was on notice that other Speedy Stop stores would be built and other architects would be used. Insofar as "sufficient resources" is asserted as a separate defense, the Court grants summary judgment to Plaintiff on this defense.

**19. Reasonable and Necessary Attorney's Fees**

The parties agree that Defendant Thomas's defense of reasonable and necessary attorney's fees is not an affirmative defense. The Court grants summary judgment to Plaintiff as to the affirmative defense of reasonable and necessary attorney's fees.

**20. Defenses Related to Trade Secret Misappropriation**

The Court grants summary judgment to Plaintiff as to the affirmative **[*151]** defenses asserted by Defendant with respect to Plaintiff's trade secret misappropriation claims. These claims were dismissed by agreement and stipulation of the parties.

**V. MOTION FOR DISCOVERY SANCTIONS**

Plaintiff has moved for discovery sanctions against Defendant Thomas due to Defendant Thomas's alleged failure to cooperate in the production of documents, responses to interrogatories, and appropriate disclosures (Doc. No. 114). This motion was originally filed on April 13, 2010. Defendant Thomas responded on April 23, 2010. After a hearing on the motion, the Court issued on an order on May 5, 2010 permitting Plaintiff to conduct an additional deposition of Jeff Johanson, permitting Plaintiff to identify financial information it believed that Defendant Thomas previously had failed to make available, requiring Defendant Thomas to make such financial information available for Plaintiff's inspection, and allowing the parties to file supplemental briefs. The parties have filed supplemental briefs and the motion is ripe for disposition. The imposition of sanctions for failure to cooperate in discovery is within the sound discretion of the district court. *See* *Tollett v. City of Kemah, 285 F.3d 357, 363 (5th Cir. 2002)* **[*152]** (citations omitted). The Court turns to each of the discovery disputes raised by Plaintiff.

**A. Production of Responses to Plaintiff's Interrogatories 1-4**

Plaintiff seeks sanctions because Defendant's responses to Plaintiff's Interrogatories #1-4 occurred on March 30, 2010, over 30 days after this Court's order on February 25, 2010 requiring Defendant Thomas to turn over responsive information. Defendant Thomas correctly points out that the Court's February 25th order contained no deadline for response. Further, a review of Defendant Thomas's response suggests that the process of obtaining the information requested was intensive. Defendant Thomas's delay in producing responsive documents cannot serve as the basis for sanctions.

Plaintiff also seeks sanctions because Defendant Thomas's responses did not include information about how potentially-infringing architectural documents were used or modified, and the purpose of any modification. Defendant Thomas responds that the reason that such information was not included is because Defendant Thomas is not aware of any modification by third-parties of the architectural drawings it sent to those third parties. To the extent that Defendant Thomas **[*153]** wishes to rely on claims that third-parties, including Morris and Hermes, *did or did not* modify architectural drawings that they were sent by Defendant Thomas, it is barred from relying on such evidence since it has maintained that it does not possess information about the drawings' modification or lack thereof.

**B. Preclusion Order barring Defendant Thomas's Affirmative Defenses**

The Court again declines to award sanctions on the basis that Defendant Thomas's identification of the factual bases of its affirmative defenses was late, because the Court did not set a deadline for response in its February 25th order. As for Plaintiff's argument that Defendant Thomas did not respond in good faith, the Court's order simply required Defendant Thomas to "identify the primary documents on which [Defendant] rely to support the identified affirmative defenses. It will be understood that the documents identified will not be an exhaustive list, but should provide Interplan with notice of the factual basis for these affirmative defenses." (Doc. No. 93 at 2.) Therefore, Defendant Thomas's provision of a list of Bates-numbered documents comports with the Court's order. To the extent that Defendant Thomas **[*154]** raises an affirmative defense not based on the list of Bates-numbered documents provided to Plaintiff on March 30, 2010, the Court will strike such defenses.

**C. Order in Limine Barring Defendant Thomas from Relying on Financial Summaries**

Plaintiff argues that Defendant Thomas should be prevented from presenting and relying upon the financial summaries Thomas prepared as evidence of deductible expenses related to the gross revenue of the Speedy Stop Stores. Plaintiff's first basis for this request is unsupported by fact. Plaintiff claims that Defendant Thomas did not make the "backup" or documents underlying the financial summaries available in a timely manner. Plaintiff refers to an email dated March 22, 2010 in which it requested production of the underlying documents. However, this Court's February 25th order denied Plaintiff's motion to compel the production of documents and stated that, if Plaintiff wished to inspect the summaries' underlying documents, the Defendant only had to make these documents available at its offices for Plaintiff's inspection and limited duplication. Plaintiff's March 22nd email makes no request to access and inspect Defendant Thomas's underlying documents **[*155]** and instead asks for production of these documents. It appears that Plaintiff, not Defendant Thomas, is the party who has not complied with the Court's February 25th order. Plaintiff's inability to conduct a meaningful audit of Defendant Thomas's invoices appears to be due to its own failure to go to Defendant Thomas's offices rather than any purported deficiency in Defendant Thomas's financial summaries.

Plaintiff's second basis for barring Defendant Thomas's introduction of the financial summaries at trial is that these summaries are, in fact, summaries of summaries of summaries and inadmissible under *Federal Rule of Evidence 1006*. In response to Plaintiff's request for intermediate summaries, Defendant Thomas produced "intermediate level" summaries after this Court's order on May 5, 2010. Plaintiff contends that these "intermediate level" summaries are still improper under *Rule 1006*. The Court fails to understand what is improper about these summaries and will withhold ruling on this issue until Defendant Thomas attempts to introduce such evidence at trial.

**D. Preclusion Order Barring Defendant Thomas from Offering Evidence of Attribution of Revenue to Third-Party**

Plaintiff argues **[*156]** that Defendant Thomas should be prevented from offering any evidence that the gross revenues from the Speedy Stop stores are captured by a third-party, such as Speedy Stop Food Stores, LLC, that is not a party to this case. Defendant Thomas has argued in its Motion for Summary Judgment that Thomas only designed and constructed the Speedy Stop stores, but that they are actually owned and operated by Speedy Stop Stores, LLC, a non-party to this litigation. Therefore, Defendant Thomas attempts to disclaim any gross revenue obtained by Speedy Stop Food Stores, LLC, as a way to calculate Defendant Thomas's "infringer's profits" under the Copyright Act and DMCA.

Plaintiff's first argument, that Defendant Thomas failed to timely disclose the existence of Speedy Stop Food Stores, LLC, does raise concerns about Defendant's behavior. On December 5, 2008, Defendant Thomas filed its original answer, in which it clearly stated, "Defendant does not operate Speedy Stop Food Stores. Speedy Stop Food Stores, LLC ("Speedy Stop" herein), formerly known as Speedy Stop Food Stores, Ltd. is in the business of operating Speedy Stop Food Stores. C.L. Thomas, Inc. is Speedy Stop's Manager. Speedy Stop is in **[*157]** the business of designing and constructing convenience stores, and C.L. Thomas, Inc. acts in its role as manager." (Doc. No. 12 at ¶ 19.) Its corporate disclosure statement, made on December 10, 2008, stated, "Defendant, C.L. Thomas, Inc. is not aware of any other entities that are financially interested in the outcome of this litigation. Other than Speedy Stop Food Store, LLC, a Texas limited liability company, of which C.L. Thomas, Inc. is the Manager." (Doc. No. 13 at ¶ 3.) Despite these earlier disclosures, Defendant Thomas stated in response to a question on the Joint Discovery/Case Management Plan ("List anticipated additional parties that should be included, when they can be added, and by whom they are wanted.") that "Defendant is unaware of any additional parties at this time." Similarly, in its responses to Plaintiff's motion to compel information about the gross revenues of the Speedy Stop stores, Defendant Thomas did not mention that this gross revenue was actually captured by Speedy Stop Food Stores, LLC. (Doc. Nos. 35, 38.) In September 2009, Plaintiff filed a motion for leave to file a first amended complaint, but did not seek to include Speedy Stop Food Stores, LLC as **[*158]** a new defendant. (Doc. No. 51.)

Subsequently, Defendant Thomas produced financial information that clearly stated "Speedy Stop Food Stores, LLC" on top of each page. In November 2009, Defendant Thomas filed its first amended answer, in which it once again stated that it did not own the Speedy Stop stores, but that Speedy Stop Food Stores, LLC operated the stores. (Doc. No. 70 at ¶ 19.) Both the expert reports of Defendant's financial experts, James Mandel and Jeff Johanson, referred to financial summaries that contained the words "Speedy Stop Food Stores, LLC" on top of each page. After reviewing these events in detail, the Court concludes that Defendant Thomas's behavior, while less than forthcoming, did not constitute active concealment or delay that is sanctionable.

Plaintiff next claims that the corporate formalities that distinguish Defendant Thomas from related business entities, such as Speedy Stop Food Stores, LLC, and Speedy Stop Food Stores, Ltd., should be ignored. Prior to June 29, 2007, Speedy Stop Food Stores, Ltd., a limited partnership, existed to own the real estate and capture the revenue from the Speedy Stop stores. Defendant Thomas was the sole general partner in **[*159]** Speedy Stop Food Stores, Ltd. Though Plaintiff correctly pointes out that, as a general partner, Defendant Thomas would be liable for any damages or obligations incurred by Speedy Stop Food Stores, Ltd., Plaintiff has not provided legal support for the opposite principle—that Speedy Stop Food Stores, Ltd. is responsible for the obligations of its general partner. It is the latter legal rule that is applicable here. Liability for copyright infringement, DMCA violations, and fraud in the present lawsuit turn on Defendant Thomas's conduct. Therefore, any award of damages will be awarded against Defendant Thomas, for which Speedy Stop Food Stores, Ltd. is not responsible.

On June 29, 2007, Speedy Stop Food Stores, Ltd. was merged into Speedy Stop Food Stores, LLC. Defendant Thomas is a manager and member of Speedy Stop Food Stores, LLC and owns 1% of the limited liability company. Plaintiff argues that the court should disregard the distinction between Defendant Thomas and Speedy Stop Food Stores, LLC because both are considered a combined entity, have combined financial reporting, have the same employees, and are ultimately both owned by Cliff and Cathy Thomas. However, two of the three **[*160]** cases that Plaintiff cites in support of the alter ego doctrine are no longer good law, having been superseded by statute. Rather, application of the alter ego theory in Texas requires a showing that the owner "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the . . . owner." See *Tex. Bus. Corp. Act Ann. art. 2.21(A)(2)* (Vernon 2003); *Tex. Bus. Org. Code ¶ 21.223*; *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd., 237 S.W.3d 379, 387 (Tex. App. Houston 14th Dist. 2007)*. After taking the additional deposition of Mr. Johanson, Plaintiff has not offered evidence that Speedy Stop Food Stores, LLC was created for the purpose of wrongful conduct. At most, its creation appears to have been for the purpose of "reduc[ing] franchise taxes." (Deposition of Jeff Johanson on May 14, 2010 at 133.) The Court cannot attribute the revenue of Speedy Stop Food Stores, LLC to Defendant Thomas on the basis of the alter ego theory.

The Court notes, however, that Plaintiff's claim for infringer's profits may not be completely foreclosed. In his deposition, Mr. Johanson acknowledged **[*161]** that Defendant Thomas possesses a 1% ownership interest in Speedy Stop Food Stores, LLC that is reflected on K-1 IRS form since the LLC is treated like a partnership.

### E. Attorneys' Fees and Expenses

The Court has not found any of Plaintiff's requests for discovery sanctions to be meritorious and therefore declines to award attorneys' fees and expenses.

## VI. MOTIONS FOR RULE 11 SANCTIONS AND ATTORNEYS' FEES AND COSTS

The Court defers Defendant's Motion for Sanctions Pursuant to *Rule 11* (Doc. No. 157) and Defendant's Rule 54(d) Motion for Attorney's Fees and Costs Under the Texas Theft Liability Act (Doc. No. 105).

## VII. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment for Infringement of Technical Drawings Copyrights (Doc. No. 108) is **DENIED**;

2. Plaintiff's Motion for Partial Summary Judgment (Ownership of Valid Architectural Works Copyrights (Doc. No. 110) is **DENIED**;

3. Plaintiff's Motion for Partial Summary Judgment on Defendant's Affirmative Defenses (Doc. No. 111) is **GRANTED IN PART** and **DENIED IN PART**:

a. Plaintiff is entitled to summary judgment on the defenses of lack of copyrightability, statute of limitations, estoppel, laches, **[*162]** unclean hands, fair use, fraud on Copyright Office, failure to state a claim, intervening third parties, comparative responsibility, sufficient resources, reasonable and necessary attorney's fees, and defenses related to trade secret misappropriation claims;

b. Plaintiff is not entitled to summary judgment on the defenses of lack of originality, joint authorship, implied nonexclusive license, innocent infringement, failure to identify portions of copyrighted works, de minimis infringement, failure to mitigate damages, and impermissible taking;

4. Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Evidence (Doc. No. 131) is **GRANTED IN PART** and **DENIED IN PART**:

a. Mr. Labefff's opinions on the copyrightability of Plaintiff's architectural designs and technical drawings, Mr. Labeff's conclusions about derivative works, Mr. Meijer's testimony about violations of the DMCA, and Mr. Urfi's statements about Mr. Meijer's permission to use third-party drawings are stricken;

5. Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Opposition Evidence (Doc. No. 143) is **GRANTED IN PART** and **DENIED IN PART**:

a. Mr. Meijer's testimony about violations of the **[*163]** DMCA and Mr. Morris's testimony about the originality of Plaintiff's drawings are stricken;

6. Plaintiff's Motion for Discovery Sanctions Against Defendant C.L. Thomas, Inc. (Doc. No. 114) is **DENIED**;

7. Defendant's Motion for Summary Judgment (Doc. No. 104) is **GRANTED IN PART** and **DENIED IN PART**:

a. Defendant is entitled to summary judgment with respect to Plaintiff's claim that fraudulent misrepresentation was made in November 2004;

b. Defendant is entitled to summary judgment with respect to Plaintiff's claim for actual damages under the Copyright Act and the DCMA;

8. Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction All Claims Based on Unregistered Copyrighted Works (Doc. No. 119) is **DENIED**;

9. Defendant's Motion to Dismiss for Lack of Standing All Copyrights Registered and Owned by Marcel Meijer, Individually (Doc. No. 119) is **DENIED**;

10. Defendant's Motion to Strike Declaration of Marcel Meijer (Doc. No. 119) is **GRANTED IN PART** and **DENIED IN PART**:

a. Exhibits B-J to the First Meijer Declaration are stricken;

11. Defendant's Motion to Strike Exhibit V to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. No. 138) is **GRANTED IN PART** and **DENIED IN PART**:

a. **[*164]** Paragraph 9 of Exhibit V is stricken;

12. Defendant's Motion to Strike Plaintiff's Motions for Summary Judgment (Doc. No. 155) is **DENIED**;

13. Defendant's Motion for Sanctions Pursuant to *Rule 11* (Doc. No. 157) is **DEFERRED**;

14. Defendant's Rule 54(d) Motion for Attorneys' Fees and Costs Under the Texas Theft Liability Act (Doc. No. 105) is **DEFERRED**;

15. Morris's Motion for Partial Summary Judgment on Plaintiff's DMCA Claims (Doc. No. 109) is **DENIED AS MOOT**;

16. Hermes's Motion for Summary Judgment on Plaintiff's Copyright Act Claim (Doc. No. 102) is **DENIED AS MOOT**;

17. Hermes's Motion for Partial Summary Judgment (Doc. No. 101) is **DENIED AS MOOT**; and

18. Hermes's Motion for Order Regarding Joint & Several Liability (Doc. No. 103) is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 27th day of October, 2010.

/s/ Keith P. Ellison

KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE

---

End of Document