**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | § | |
| | § | |
| Plaintiffs/Counter-Defendants, | § | |
| | § | |
| v. | § | Civil Action No: 4:24-cv-00620SDJ |
| | § | |
| MAITH SOLUTIONS LLC, | § | |
| | § | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BRIAN BORDERS and IVAN BETANCOURT | § | |
| | § | |
| Third-Party Defendants. | § | |

**MAITH SOLUTIONS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant/Counter-Plaintiff Maith Solutions LLC ("Maith") states as follows for its Motion for Partial Summary Judgment ("Motion") against Plaintiffs/Counter-Defendants Acacia Insurance Managers, LLC ("Acacia") and Edgepoint Systems, LLC ("Edgepoint"), and Third-Party Defendants Brian Borders ("Borders") and Ivan Betancourt ("Betancourt").

## I. Statement of Issues

On May 31, 2024, Maith acquired exclusive ownership rights in certain software known as "Insuror Atlas Software" ("IAS") from Timothy Hunt. Maith holds a copyright on the IAS, and Acacia, Edgepoint, and Borders and Betancourt concede they copied and used the IAS in their alleged "Edgepoint Software" (Dkt. 29). Accordingly, Maith is seeking partial summary judgment on its claim for "Copyright Infringement – 17 U.S.C. §501" and a permanent injunction against their use of the copyrighted IAS and the infringing Edgepoint Software (or in the alternative a preliminary injunction), reserving all damages claims. (See Dkt. 25, Count I, ¶¶69-71).

Acacia, Edgepoint, Borders and Betancourt contend that Borders and Betancourt had non-exclusive rights in the IAS and were entitled to copy and use the IAS in connection with the Edgepoint Software. ] However, to the extent they made any copyrightable contributions to the IAS, as a matter of law they did so as employees within the course and scope of their employment for Hunt under the "work made for hire" doctrine codified at 17 U.S.C. § 101(1). Thus, Maith is entitled to the relief requested herein, as well as judgment in its favor on Acacia and Edgepoint's claims in their operative complaint (Dkt. 69), all of which fail as a matter of law if this Court's decides the "work made for hire" issue in Maith's favor.

## II. Statement of Undisputed Material Facts ("SUF")

1. In the early 1980s, Hunt started a managing general agency called American Recreational Markets, General Agency, Inc. ("ARM"). There he created and developed an

underwriting and claims management/data management software system used to run his general agency. (Ex. A, Hunt Dep., 16:16-24, 17:16-18:22, 143:21-144:16).

2. The claims management software was written in a programming language called Dataflex. (Ex. A, 16:16-21). In developing the software, Hunt would sit beside the ARM programmers and they would decide how to do things. Hunt would also code with them and oversaw the programmers during this time. (Ex. A, 17:16 -18: 5).

3. John Edwards ("Edwards") began working for Hunt as an employee for ARM in about 1991. Initially, he started in the mailroom, but had a computer science background from college courses and moved into IT and data programming for ARM. (Ex. B, Edwards Dep., 12:24-13:23, 15:4-18; Ex. A, 50:20 –51:11).

4. Borders began working for Hunt as an employee for ARM in about 1999, about a year after he graduated high school. Initially, his role was working at ARM's PC help desk, but over time he worked with the company's servers and moved into programming and networking. He worked for Hunt until Hunt sold the IAS to Maith in May 2024. (Ex. C, Borders, Dep., 7:20-25, 8:9 - 9-23; Ex. A, 68:23 –25, 84:2-11; Ex. B, 19:7–17).

5. Around 2005 or 2006, Hunt decided to update the claims management software from Dataflex to the Visual Dataflex programming language. Edwards and Borders wrote the code for that change. (Ex. A, 103:2-13; Ex. B, 23:12-18; Ex. K, Edwards Decl, ¶ 11). Hunt supervised the update and approved all major decisions about the code's operation and design (Ex. K, ¶ 11.)

6. By 2007, Hunt was marketing the software to other insurance companies as "Insuror Atlas" ("Hunt's Insuror Atlas Business"). (Ex. K, ¶ 6; Ex. E, MAITH_0046113).

7. In about 2010, the software was again updated, this time to the Visual Basic programming language. Hunt chose the programming language and Edwards and Borders updated

the software to Visual Basic with input and direction from Hunt. Hunt went over the code with them and they would show him what they were doing and how they were going to change things. They would discuss whether that was the way to do it or not. Hunt went over code with them and they would make changes Hunt directed. Edwards and Borders reported to Hunt consistently on their plans and development for the build and the progress for the updated Insuror Atlas Software. (Ex. A, 105:8-107:17, 108:13-109:19; Ex. B, 23:1-2 Ex. K, ¶ 11). Hunt also supervised the update and approved all major decisions about the code's operation and design (Ex. K, ¶ 11).

8. In about 2016 or 2017, Betancourt began working for Hunt's Insuror Atlas business and started doing programming for Hunt. (Ex. D, Betancourt Dep., 5:8-20, 11:23-12:5).

9. Over the course of their employment with Hunt, in addition to any programming responsibilities, Borders and Betancourt worked on various tasks and projects for Hunt's Insuror Atlas business. Borders worked on anything Hunt asked him to do. (Ex. A, 72:20 -73:18). For example, Borders' job responsibilities included creating and helping run reports for Hunt's clients, helping maintain the hardware that ran the IAS, and making sure the website was online. (Ex. C, 35:2-36:6, 41:14-25, 42:12-25). Betancourt's responsibilities included code maintenance, IT-related tasks, and database management for Hunt's Insuror Atlas business and he also helped Borders as needed. (Ex. D, 25:11-22). Betancourt would also respond to and address requests submitted by Hunt's clients through a project management and issue tracking system called the Jira system that Hunt paid for. (Ex. D, 53:13-54:5). Borders and Betancourt also provided technical support to Hunt's clients and attended client presentations. (Ex. A, 114:13-20; Ex. C, 50:23-51:13; Ex. F, MAITH_0046224).

10. During the course of their work for Hunt's Insuror Atlas business, Borders, Betancourt and Edwards received salaries, vacation and paid time off from Hunt. They also

received periodic raises and bonuses, paid at Hunt's discretion. (Ex. A, 86:9-13; 94:21-95:13; Ex. B, 34:6-24; 64:1-17; Ex. C, 20:9-20:17, 25:18-27:7; Ex. D, 42:13-43:17, 44:10-45:10)

11. Borders, Betancourt and Edwards all worked as a part of the "Insuror Atlas team" and utilized "insuroratlas.com" email addresses for communicating among themselves, with Mr. Hunt, vendors, and Hunt's clients. (Ex. C, 47:1-3; 49:15-25; Ex. D, 65:3-12).

12. Borders, Betancourt and Edwards were also issued Insuror Atlas business cards. (Ex. C, 59:19-25; Ex. D, 65:20-22; Ex. G, MAITH_0046074).

13. Hunt, Borders, Betancourt and Edwards were identified on the Insuror Atlas website (www.insuroratlas.com) as "Key Personnel at Insuror Atlas". Hunt was identified as "Business Development." Edwards was identified as "Account Management". Borders and Betancourt were identified as "Software Development". (Ex. C - Ex. 4, Ex. D - Ex. 7, Ex. H, MAITH_0000454-459).

14. Borders identified himself on LinkedIn as "Developer / Systems Administrator at Insuror Atlas." (Ex. C, 58:7-59:18, Ex. 8; Ex. I, MAITH _0000485).

15. Betancourt identified himself on LinkedIn both as "Software Developer – Insuror Atlas.com – Full Time" and, separately, as "Software Developer/Consultant - Freelance" since 2017. (Ex. D, 15:18-16:6, Ex. 1; Ex. J).

16. Borders and Betancourt were identified as "Software Development (Insuror Atlas)" and Edwards was identified as "CTO (Insuror Atlas)", in materials used for an Insuror Atlas customer demonstration of the Insuror Atlas system in 2019. (Ex. C, 50:23-51:15, Ex. 5; Ex. F, MAITH_0046224).

17. Hunt paid all expenses for development of the IAS including the code location (*i.e.*, where the software was housed), hard discs, servers, memory, programs used, payroll for Edwards,

Borders and Betancourt, office space, and reimbursement for phones and other expenses Edwards, Borders and Betancourt incurred. (Ex. A, 148:10-23).

18. The IAS operated on servers owned by Tim Hunt. The servers were located in office space owned by Hunt or leased by and paid for by Hunt. These servers were acquired by Maith. (Ex. K, ¶ 7; Ex. A, 148:21-149:2 -150:15; Ex. B, 45:22-46:2)

19. Edwards, Borders, and Betancourt utilized "virtual machine" (*i.e.*, a virtual computer) located on servers owned by Hunt, on which the IAS was also operated. (Ex. K, ¶ 9; Ex. B, 45:14-46:2; Ex. C, 31:15-32:11).

20. Hunt procured various office spaces over the years for the Insuror Atlas business. Prior to 2020 (*i.e.*, prior to Covid), Borders, Betancourt and Edwards worked almost primarily in the office. After Covid, they were allowed to work from home, but they still met regularly in the office (Ex. A, 38:11-16, 53:3-9, 71:22-72:7; Ex. B, 44:20-23, 47:9-48:25; Ex. C, 161:1-20).

21. Although their work hours were flexible, they generally set working hours, from 9am to 5pm. (Ex. B, 49:1-7; Ex. A, 64:3-20).

22. Edwards, the most senior developer, believed Hunt owned the software and did not believe he held any ownership interest in the software. (Ex. B. 30:17-31:2, 53:14-20).

23. Neither Borders nor Betancourt ever told Hunt that they had any ownership rights in the IAS. In fact, in 2024, when Maith was in discussions with Hunt to purchase the IAS, Hunt asked Borders and Betancourt "point blank" if they had any ownership in the software and they told him "no". (Ex. A, 139:7-10). Borders never tried to monetize the IAS. (Ex. C, 77:5-11; Ex. D, 74:15-17).

24. When Borders and Edwards were first hired by Hunt, they were issued W-2s from Hunt's ARM Business. (Ex. A, 70:15-19, 76:18-21; Ex. B, 18:17-18, 19:11-12; Ex. C, 12:25-13:2).

In about 2005, Hunt was shutting down ARM and lost his accountant that had been preparing tax withholding reports and filings, so he began issuing them 1099s from other companies Hunt owned called Seguros Direct (from 2005 to about 2015) and Pearl General Agency (from about 2015-to 2024). (Ex. A, 28:23-29:17; Ex. B, 25:5-24). But their job responsibilities and roles did not change as a result of being issued 1099s instead of W2s. (Ex. B, 21:4-11; Ex. C, 19:4-13).

25. When Betancourt began working for Hunt's Insuror Atlas Business in 2017, he was issued 1099s from Pearl General Agency. (Ex. D, 38:4-7)

26. Borders and Betancourt had no written agreements concerning their employment with Hunt, were not paid by the project, and Hunt could have terminated their employment at any time. (Ex. C, 24:8-25:6; Ex. D, 11:11-22). Borders and Edwards were required to get permission from Hunt if they wanted to do any side jobs. (Ex. A, 76:1-7).

27. Effective May 31, 2024, Maith acquired Hunt's Insuror Atlas Business, including all right, title, and interest in and to the source code for the IAS, including the copyright rights in the IAS, subject to existing licenses of the IAS to third parties. (Ex. L, Maith_0000355).

28. Following its IAS acquisition, Maith registered its copyright to the IAS with the United States Copyright Office. Maith is the owner of Copyright Registration No. TXu002436022 with an effective date of registration of July 3, 2024 for software. The registration identifies "Hunt" as the author and the software as a "work made for hire." (Ex. M, Certificate of Registration).

29. On July 1, 2024, Maith sent Acacia a Cease and Desist letter to stop infringing the copyrighted IAS (See, Ex. A to Plaintiffs' Second Amended Complaint, Dkt. 69-1), and they refused and instead Plaintiffs sued Maith first seeking a declaration that their use of the alleged Edgepoint Software does not infringe upon any valid copyright owned by Maith. (Dkt. 1, ¶3, Dkt. 69 ¶4).

30. Acacia, Edgepoint, Borders and Betancourt (i) used the IAS source code to create the accused Edgepoint software source code, (ii) copied original elements of the IAS source code into the accused Edgepoint software source code, and (iii) the accused Edgepoint software source code is substantially similar to the IAS source code. (Dkt. 29, ¶4-6).

## III. Legal Standard

Summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the burden of demonstrating that there is no actual dispute as to any material fact in the case. This burden, however, does not require the moving party to produce evidence showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party satisfies its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Id.* Even if the nonmovant brings forth evidence in support of its allegations, summary judgment will be appropriate unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## IV. The IAS is a "Work Made For Hire"

The Copyright Act states that "a work prepared by an employee within the scope of his or her employment" is a "work made for hire." 17 U.S.C. § 101(1) (definition of "work made for hire"). The terms "employee," "employer" and "scope of employment" in 17 U.S.C. § 101(1) are not defined in the Act. The Supreme Court has explained, however, that Congress intended to incorporate general common law agency principles into the statute to determine whether someone was an "employee" working within the course and scope of his or her "employment." *See*

*Community For Creative Non-Violence v. Reid ("CCNV")*, 490 U.S. 730, 740-41, 750-51 (1989);| *see also, Pritchett v. Pound*, 2004 WL 7334119, at *4 (E.D. Tex. Dec. 27, 2004).

In so doing, the Supreme Court essentially adopted the Fifth Circuit's reliance on general principles of common law agency to assist in the fact-finder's determination. *Id*. at 751; *Easter Seal Soc'y v. Playboy Enters*., 815 F.2d 323 (5th Cir.1987). In determining whether a hired party is an employee under the general common law of agency, the courts consider "the hiring party's right to control the manner and means by which the product is accomplished." *CCNV*, 490 U.S. at 751-752. Other relevant factors include (i) the level of skill required; (ii) the source of the instrumentalities and tools; (iii) the location of the work; (iv) the duration of the relationship between the parties; (v) whether the hiring party had the right to assign additional projects to the hired party; (vi) the extent of the hired party's discretion over when and how long to work (vii) the method of payment; (viii) the hired party's role in hiring and paying assistants; (ix) whether the work is part of the regular business of the hiring party; (x) whether the hiring party is in business; and (xi) the provision of employee benefits to and (xii) other tax treatment of the alleged employee. *Id.* No particular factor is necessarily dispositive. *CCNV*, 490 U.S. at 752. These factors "must be assessed and weighed, with no one factor being decisive." *CCNV,* 490 U.S. at 751-52.

In *JAH IP Holdings LLC v. Mascio*, 2014 WL 6477923 at *5 (D. Col. Nov. 19, 2014), in a ruling on a motion for summary judgment, the court determined as a matter of law that software created by a software developer was a "work made for hire" where the developer was hired for an indefinite term to perform a variety of duties, the software in question was specifically created for the use of the hiring party and the developer received some direction from the hiring party as to how the software could be improved or modified, despite the fact that the developers compensation was changed from a salary (after withholdings) to a share of company revenues (with no

withholdings made) for "tax reasons." Id. at *6-8. The facts in that case stand in contrast with those in *Alcatel USA, Inc. v. Cisco Systems, Inc.*, 239 F. Supp. 2d 645 (E.D. Tex. 2002), where the copyrighted programs at issue were not works for hire. The facts in *Alcatel* are very different from the above case and from the situation here. Alcatel, a sophisticated company retained a programmer for his known level of skill and paid him indirectly through one of Alcatel's authorized contractors. Alcatel retained him on a series of 6-9 month contracts, none of which were guaranteed to be renewed and were evaluated at the end of each contract. Alcatel also issued him a different color badge from Alcatel employees and did not provide employee benefits or treat him as an employee for tax purposes. *See also, Interplan Architects, Inc. v. C.L. Thomas, Inc*., No. 4:08-CV-03181, 2010 WL 4366990, at *32 (S.D. Tex. Oct. 27, 2010) (summary judgment that draftsman was an employee under the "work for hire" when company controlled the manner and means by which he performed his work, even though the he was paid hourly, did not receive medical benefits, and was not paid sick time or holidays); *Pritchett v. Pound*, No. 4:03CV349, 2004 WL 7334119, at *4-6 (E.D. Tex. Dec. 27, 2004), *report and recommendation adopted*, No. 4:03-CV-349, 2005 WL 8160965 (E.D. Tex. Feb. 1, 2005), *aff'd*, 473 F.3d 217 (5th Cir. 2006) (summary judgment that handbooks were "works made for hire" because they were prepared at the company's office, under the direction of the company, and at the expense of the company).

"[W]hether a given individual is an employee or independent contractor is a question of law, which must be decided by reviewing the particular facts of each case." *Kirk v. Harter*, 188 F.3d 1005, 1007 (8th Cir.1999) (quoting *Berger Transfer & Storage v. Central States*, 85 F.3d 1374, 1377 (8th Cir.1996)) (citations omitted); *see also Alcatel,* 239 F. Supp. 2d at 650; *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4366990, at *32 (S.D. Tex. Oct. 27, 2010).

**a. Borders and Betancourt Worked as Employees under the *CCNV* Factors.**

The undisputed facts here establish that the IAS is a "work made for hire" for Hunt. Courts have noted that a computer programmer hired for an indefinite term favored a determination that software was developed on a work for hire basis. *See JAH IP Holdings,* 2014 WL 6477923 at *5 (an ongoing relationship that extends beyond the time necessary to produce the work tips in favor of a finding of employment); *Siniouguine v. Mediachase Ltd.*, 2012 WL 2317364 (C.D. Cal. 2012) (fact that programmer worked for company for twelve years weighs in favor of a determination that programmer was an employee); *JustMed, Inc. v. Byce*, 600 F.3d 1118 at 1126 (9th Cir. 2010).

Here, Borders and Betancourt had very long relationships with Hunt. Borders worked for Hunt for over 25 years and Betancourt worked for Hunt for over 8 years. (SUF ¶ 4, 8). They also held themselves out as being part of the Insuror Atlas team, including on the Insuror Atlas website, on their own LinkedIn Pages and for customer demonstrations. (SUF ¶ 11, 13, 14, 15 and 16). They also had Insuror Atlas email addresses and Insuror Atlas business cards. (SUF ¶ 11, 12). Borders and Betancourt also had no written contracts with Hunt, and Hunt could have terminated their employment at any time. (SUF ¶ 26). Also, "[i]n examining the right to assign factor, courts should not consider whether the hiring party has a general right to assign to the hired party various projects that relate to the completion of the assigned task, but whether the hiring party has the right to assign projects in addition to the project of creating the copyrighted works themselves." *Alcatel*, 239 F.Supp.2d at 655. Borders and Betancourt did a variety of work for Hunt's Insuror Atlas business. In addition to updating the Insuror Atlas code to Visual Dataflex in 2005 and to the Visual Basic language in 2010, Borders also created and help run reports for Hunt's clients, and helped maintain the hardware that ran the IAS and website. (SUF ¶ 5, 7, 9). Betancourt did code maintenance for the Insuror Atlas system, IT-related tasks and database management for Hunt. (SUF ¶ 9). He also responded to and addressed requests from Hunt's clients. (SUF ¶ 9). They both

also attended presentations to clients. (SUF ¶ 9). These facts also support an employee determination on summary judgment here, as they have in other cases. *See Siniouguine,* 2012 WL 2317364 at *7 (the fact that programmer was not hired to work on a single program and, in fact, worked on multiple computer programs and other projects supported a summary judgment ruling that programmer was an employee.)

The fact that a computer programmer's work is integral to a company's regular business weighs in favor of an employee determination. Here, Hunt marketed and licensed the IAS to third-parties, and ultimately sold his Insuror Atlas business, including the Insuror Atlas Software, to Maith. (SUF ¶¶ 6, 27). This factor weighs in favor of an employee determination. *See JAH IP Holdings,* 2014 WL 6477923 at *5 (the software in question was specifically created for the use of the [employer's] business supported a summary judgment ruling that developer was an employee); *Siniouguine,* 2012 WL 2317364 at *7 (that work as a computer programmer was integral to [employer's] regular business activity supported a summary judgment ruling that he was an employee).

Payment of a "regular monthly salary," as opposed to a single payment upon conclusion of a project, "heavily" favors a determination of employee status. *Siniouguine,* 2012 WL 2317364 at *7 (receipt of regular monthly compensation and benefits weighs "heavily" in favor of employment); *see also*,.*JustMed,* 600 F.2d at 1127 (payment of regular monthly salary weighs heavily in favor of employment). Here, Hunt paid Borders and Betancourt salary during the years in which they worked for the company, and while the nature and amount of that compensation varied, they worked for Hunt and were paid regularly and not by the project and they did not receive any royalties. (SUF ¶ 10, 26). *Pritchett*, 2004 WL 7334119, at *3.

In addition to the above factors, other factors also favor an employee determination here. Edwards, the most senior developer, believed Hunt owned the software. (SUF ¶ 22). Neither Borders nor Betancourt ever claimed ownership of the software and explicitly confirmed they held no rights when asked during the 2024 sale to Maith. (SUF ¶ 23). Borders never tried to monetize the Insuror Atlas Software. (SUF ¶ 23). Thus, their own conduct and admissions underscore that they were acting as employees for purposes of the Copyright "work made for hire" doctrine.

The "control of the manner and means by which" a programmer creates source code "is not as important to a technology startup." *JustMed, Inc.*, 600 F.3d at 1127. Hunt nevertheless exercised control here. From the initial version of the software written in DataFlex, to the version written in Visual DataFlex, to the 2010 version written in Visual Basic, Hunt maintained control of the creation of the software. In the initial 1983 version, he helped write code and oversaw the programmers. (SUF ¶ 2). In the Visual Dataflex update he made the decision to update the software and supervised the update and approved all major decisions about the code's operation and design. (SUF ¶ 5, 7). In the Visual Basic update, he reviewed code with Edwards and Betancourt and directed changes, and he received reports from Edwards and Hunt on the progress of the development. Again, he also supervised the update and approved all major decisions about the code's operation and design. (SUF ¶ 7). *See Interplan*, 2010 WL 4366990, at *32 (control of way in which plans and drawings were created influenced finding of employee status). Further, Betancourt also used Hunt's project management collaboration software that Hunt paid for so that the software development team could receive and respond to requests from clients. (SUF ¶ 9). Hunt's input and control of the "means" by which the programs were created weighs heavily in favor of an employee determination.

A computer programmer's ability to set his own hours or work from home is not particularly relevant to evaluating employee status in the factual setting present here. *JustMed, Inc.*, 600 F.3d at 1127. This factor nevertheless favors the work being a "work made for hire". Hunt provided Borders and Betancourt with an office in which to work. (SUF ¶ 20). Although Hunt permitted them on occasion to work from home, prior to Covid they primarily worked in the office and met regularly in the office after Covid. (SUF ¶ 20). While their work hours were somewhat flexible, they were required to generally be available during operational hours. (SUF ¶ 21). *Interplan*, 2010 WL 4366990, at *32 (provision of office space and requirement that work be conducted during certain hours influence employee finding).

Courts in other circuits have cautioned against relying too heavily on whether a small tech company paid benefits to a programmer when evaluating employment status because that factor does "not bear directly on the substance of the employment relationship -- the right to control." *JAH IP Holdings,* 2014 WL 6477923 at *7 (employee determination even though programmer was not paid benefits at start-up company) This factor still favors Hunt here because Hunt did provide benefits of paid time off (*e.g.*, for vacations), as well as cell phone reimbursement. (SUF ¶ 10, 17). This weighs in favor of a determination employee status.

Hunt also provided and paid for all expenses for development of the IAS. (SUF ¶ 17). This favors an employee determination. *Siniouguine,* 2012 WL 2317364 at *7 ([employer] provided programmer with an office and all of the equipment and computer programs required during his employment, all of which favor a determination that programmer was an employee).

In terms of "tax treatment", Hunt's issuing of 1099s to his employees is a reflection of the informal nature of his business, rather than indication of an independent contractor arrangement. *JAH IP Holdings*, 2014 WL 6477923 at *7 (fact that programmer was not subject to payroll

withholding was a reflection on the sophistication of the business entity, rather than an independent contractor arrangement). This factor is neutral here. Borders was initially issued W-2's (from 1999 to about 2004) and later was issued 1099s because Hunt no longer had an accountant and decided to simply issue his employees 1099s under the circumstances - not because of any change in the nature of Borders' work for Hunt. (SUF ¶ 24). Betancourt was issued 1099s. (SUF ¶ 25).

Following Maith's acquisition of the IAS, Maith obtained a copyright registration identifying Hunt as the "author" and that the work was created as a "work made for hire". (SUF ¶¶ 27, 28). This is prima facie evidence of the facts stated therein. *See* 17 U.S.C. 410(c).

**b. Borders and Betancourt Helped Create the Programs at Issue Within the Course and Scope of Their Employment**

Courts generally look at three factors to determine whether an employee's work was created "in the course and scope" of his or her performance under 17 U.S.C. § 101(1): (a) whether the work is of the kind he or she is employed to perform; (b) whether the work occurs substantially within the authorized time and space limits; and (c) whether the work is actuated, at least in part, by a purpose to serve the master. *CCNV*, 490 U.S. at 739-40 (citing *Restatement (Second) of Agency* § 228 (1958)); *Pritchett*, 2004 WL 7334119, at *3. Here, Borders' and Betancourt's developing and maintaining the IAS was in "the course and scope" of their employment as a matter of law because their responsibilities included developing and maintaining the code for the IAS that Hunt marketed and licensed to his clients. (SUF ¶ 5, 7, 9).

## V. Maith is Entitled to Injunctive Relief.

To establish copyright infringement, a copyright owner must show "ownership of a valid copyright" and "copying of constituent elements of the work that are original." *Feist Publ'ns v. Rural Tel. Serv.*, 499 U.S. 340, 362 (1991). If the Court agrees the IAS source code was a "work made for hire" for Hunt, Maith is the owner of a valid copyright because it is undisputed that Hunt

assigned his rights in the copyright to Maith. 17 U.S.C. § 201(a). (SUF ¶ 27; Dkt. 80, p. 2). Further, Maith has also established copying of the copyrighted IAS source code. (SUF ¶30). *See Gen. Universal Sys., Inc. v. Lee*, 379 F. 3d 131, 142 (5th Cir. 2004).

"[U]nder the Copyright Act, a court may grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "In short, an injunction is appropriate if liability has been established and if there is a continuing threat of copyright infringement." *Broad. Mus., Inc. v. Tex. Border Mgmt., Inc.*, 11 F. Supp. 3d 689, 696 (N.D. Tex. 2014). Here, Acacia was sent a Cease and Desist letter to stop infringing and Plaintiffs refused and instead sued Maith first (SUF ¶ 29), and they are still seeking a declaration that the alleged Edgepoint Software does not infringe. (Dkt. 69, ¶ 27). An injunction against their use of that software is therefore proper.

## VI. Conclusion

For all the reasons described above, partial summary judgment should be entered for Maith on Count I of its Counterclaim given that the Insuror Atlas Software was developed as a "work made for hire" for Hunt and, as such, Acacia, Edgepoint, Borders and Betancourt are liable for copyright infringement (Maith's Count I). Maith further requests that the Court issue a permanent injunction, or in the alternative a preliminary injunction, against their use of the copyrighted Insuror Atlas Software and their use of the Edgepoint Software as requested in Maith's Counterclaim. For the avoidance of doubt, Maith reserves its right to seek an award of damages for Acacia, Edgepoint, Borders and Betancourt's infringement. Maith also respectfully requests that the Court enter judgment in favor of Maith on Acacia and Edgepoint's claims for declaratory judgment (Counts I and II) and to invalidate Maith's copyright (Count III) given that the Insuror Atlas Software was developed as a "work made for hire" for Hunt. (Dkt. 69).

Respectfully Submitted,

By: */s/ John G. Bisbikis*
Jason P. Bloom
jason.bloom@haynesboone.com
State Bar No. 24045511
HAYNES AND BOONE, LLP
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

John G. Bisbikis
jbisbikis@prospectlaw.com
Derek J. Meyer (pro hac vice)
rmeyer@prospectlaw.com
PROSPECT LAW LLP
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
Telephone: (312) 374-8084

*Attorneys for Defendant/Counter-Plaintiff MAITH SOLUTIONS LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 20, 2026, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ John G. Bisbikis*
John G. Bisbikis