# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DIVISION OF TEXAS
SHERMAN DIVISION

ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC,
Plf/Counter-Defs,

V.

MAITH SOLUTIONS, LLC,
Dft/Counter-plf/TP Plf,

V.

BRIAN Borders and IVAN BETANCOURT,
Third-Party Dfts.

CIVIL ACTION NO. 4:24-cv-00620SDJ

---

ORAL AND VIDEOTAPED DEPOSITION OF

TIMOTHY HUNT

FRIDAY, FEBRUARY 28, 2025

---

A. Right. I just defined the differences of them.
Q. Could you tell the jury the differences between DataFlex, Visual DataFlex, and Visual Basic?
A. DataFlex and Visual DataFlex are from the same company. One of them was designed for the web. The other one is an older one that goes back probably 12 years prior to Visual DataFlex. And what was the other one?
Q. Visual Basic.
A. I think that's a Microsoft product and it's a programming language.
Q. Have you ever personally coded any software using Visual DataFlex, DataFlex, or Visual Basic?
A. DataFlex I have, but not Visual Basic or Visual DataFlex.
Q. When did you use DataFlex for coding?
A. Oh, in the '80s and early '90s.
Q. What were you using the DataFlex coding language for in the '80s and early '90s?
A. The software programs that we used to run our general agency.
Q. What general agency were you using that language for?
A. American Recreational Markets General Agency.
Q. I'm sorry, sir. You said American Recreational

Markets General Agency?
A. Yep. And then we had a company that ran premium finance. We used it for that. And then we had a -- I'm sorry, a claims management company and we programmed it for that also.
Q. When you say "we programmed it," who is we?
A. The people that I hired to helped run my IT department.
Q. Do you know their names?
A. Dan Heron is the one that comes to mind.
Q. Dan Heron?
A. Uh-huh.
Q. Any other -- anyone else that you can remember?
A. Calvin. I can't remember his last name, and John Edwards.
Q. Okay. And I just want to make sure I'm clear on this. When you said we were engaging in the DataFlex coding, did you -- did you personally use the DataFlex coding and build code with these three individuals, or did these three individuals do it for you in their position as employees?
A. Both.
Q. What did you do for the DataFlex code building?
A. What did I do?
Q. Yes, sir.

A. I would sit there beside them and we would decide how to do things a lot of times.
Q. Were you coding with them or were you just overseeing them?
A. Both. I did both.
Q. In the early -- I'm sorry, not the early '80s. In the 1980s, were you only working -- I'm sorry. Let me back up. American Recreational Markets General Agency, was that your company?
A. Yes.
Q. So you started it?
A. Yes.
Q. When did you start that company?
A. 1982.
Q. Had you started any other insurance company prior to 1982?
A. No.
Q. So ARM was the first insurance company that you had founded?
A. Yes.
Q. What kind of insurance work did ARM provide?
A. They were a Texas managing general agency.
Q. How long was ARM in existence?
A. Twenty-two years.
Q. What was your position at ARM?

Seguros Direct?
A. Either -- maybe 2005 or 2006.
Q. Okay. So in 2005 or 2006, what individuals were you paying through Seguros Direct?
A. John Edwards, Brian Borders.
Q. Okay. Were these individuals W-2 employees of Seguros Direct?
A. Not at that time.
Q. Were they ever W-2 employees of Seguros Direct?
A. No.
Q. Were they ever W-2 employees of yours?
A. Yes.
Q. When were they W-2 employees?
A. Whenever John Edwards came to work for me. That would have been 1990.
Q. Was that with ARM?
A. Yes.
Q. Okay. When did John Edwards stop being a W-2 employee?
A. When they were paid by Seguros Direct.
Q. And that was in 2005 or 2006?
A. I believe so.
Q. Okay. Why did you stop paying John Edwards as a W-2 employee?
A. I think I previously stated that we ran off our

business in American Recreational Markets and were shutting it down, and then I also had an accountant who was responsible for doing all the W-9s, the tax stuff and she left. So we just went ahead and started using just a straight payment as a W- -- as a 1099.

Q. Okay. So John Edwards stopped being a W-2 employee with ARM when and because your accountant left?

A. That was part out of it, yes.

Q. Okay. Was there any other part of it?

A. Yeah. I didn't have someone to calculate it. So we just went ahead so their consistency of payment continued.

Q. Okay. So you didn't have an accountant to calculate what?

A. The taxes and file the reports.

Q. Okay. What kind of taxes are you referring to?

A. Income taxes that was -- withholding.

Q. Okay. All right. Did you have any tax trouble in 2005 with ARM?

A. Any tax trouble?

Q. Yes, sir. Any issues with the IRS?

A. I don't recall that.

Q. You don't recall any issues at all with the IRS?

A. In 2005?

A. I don't believe so.
Q. You don't believe you employed any individuals as 1099 contractors?
A. In Pearl General Agency?
Q. Yes, sir.
A. I don't believe so.
Q. Was Pearl General Agency ever listed as the payee -- or, I'm sorry, the payor on any 1099 form for Brian Borders, Ivan Betancourt, or John Edwards?
A. I don't recall other than the accounting.
Q. So in 2005 when you terminated the employment status of Mr. Edwards and Mr. Borders as W-2 employees and transferred them or reclassified them as 1099 contractors, did you have any specific office space where they conducted their work?
A. Yes.
Q. What office space was that and where?
A. It was 4050, I believe, Interstate 30 West, Caddo Mills 75135.
Q. Is that an office building?
A. Yes.
Q. And was that where you had offices for ARM?
A. Yes.
Q. How long did you maintain an office space there?

Q. Was he a bookkeeper or was he an accountant?
A. That I don't know.
Q. Do you know if he had a CPA or was a CPA?
A. Don't know.
Q. You don't know if he was a CPA?
A. Don't know.
Q. Okay. And you don't know if he had an accounting degree?
A. Don't know.
Q. Did he -- did George Edwards serve as your bookkeeper or accountant only between the early to mid '80s?
A. I don't recall the amount of time that he did that. He did my personal taxes as well, so he may have still continued doing my personal taxes after he helped with the business.
Q. And you said that's how you were introduced to John Edwards. Is that right?
A. Yes.
Q. When did you first meet John?
A. I believe it was the summer of 1990.
Q. Is that when you offered him employment at ARM?
A. Actually his father asked if I would employ him.
Q. At ARM?

A. Yes. A summer job.
Q. So was he a W-2 employee at that time?
A. Yes, he was.
Q. What were Mr. Edwards job duties during his time as a W-2 employee at ARM for you?
A. Well, initially, he was a mail -- opened the mail.
Q. You say initially, implying there were other jobs. What other jobs did he have with you?
A. After the mailroom, I believe he worked in the IT department. His degree was in IT.
Q. Do you know what he did in the IT department?
A. Initially, I couldn't tell you. We had a lot of people.
Q. How many people did you have in your IT department?
A. You know, that's 35 years ago almost. I would say we had about seven.
Q. So Mr. Edwards initially opened the mail for you at ARM and then worked in the IT department. Did he have any other job or responsibility during that time at ARM?
A. John's a good guy. And if I had asked him to help sweep out the floors, he would have done it. He was a very good guy. He was brought up to do whatever.

His dad was a good guy, and John and I worked together a lot. So I can't -- I can't tell you necessarily what in between, but he was always working.

Q. Was he paid specifically for his IT work for ARM?

A. No, he wasn't. He was paid just as an employee.

Q. So he was paid to do whatever you told him to do, essentially?

A. Asked him to do.

Q. Okay. During his time as a W-2 employee of ARM, did you -- or did ARM provide benefits to Mr. Edwards?

A. I'm sorry. I guess I missed the question.

Q. You're fine. I asked during his time as a W-2 employee at ARM, did ARM provide benefits to Mr. Edwards?

A. What kind of benefits?

Q. Did ARM provide health insurance?

A. Yes, they did.

Q. Dental and vision insurance?

A. No. I think you probably could have opted for it.

Q. Okay. Did ARM provide access to a 401K?

A. No.

Q. Did you control Mr. Edwards' hours?
A. No.
Q. Was Mr. Edwards required to be -- to work in the office?
A. Yes.
Q. At all times?
A. I'm not sure what that means.
Q. Was he a full-time employee?
A. Oh, yes.
Q. So he was working a 40-hour week, presumably?
A. I don't think John ever worked a 40-hour week.
Q. Are you implying that he worked more than 40 hours?
A. Probably more.
Q. Okay. For that full-time employment, was he required to be in the office?
A. Yes.
Q. Okay. Did you terminate Mr. Edwards' status as a W-2 employee at ARM around the same time that you terminated Brian Borders' status as an employee in 2005, 2006?
A. Oh, yes. It was about the same time.
Q. And I believe you testified you never hired John Edwards as a W-2 employee through Seguros Direct. Is that right?

other people that asked us to -- you know, work on for them.

Q. But you didn't control his hours. Right?

MR. ALLEN: Objection; form.

THE WITNESS: I didn't --

Q. (BY MR. WELTGE) You testified to that. Right?

A. Would you let me answer the question?

Q. Happily, yes, sir.

A. Okay. I didn't control his hours because he could take off any time he needed to, or if he needed to take a vacation, just whatever.

Q. Did you tell him John, you need to be in by 9:00 every morning and you were out by 5:00?

A. No.

Q. Did you give him a specific set number of hours that he had to work per week?

A. No.

Q. Did he have the freedom to come and go as he pleased?

A. To some extent, yes.

Q. Did he have the freedom to work where he wanted?

A. No.

Q. Did he have the freedom to do software development or coding outside of the -- any number of

A. Yes.

Q. Okay. Was that -- were those software repositories for the Insuror Atlas software?

A. Yes.

Q. Any other software?

A. There would have been a lot of other software.

Q. Okay. At any point after 2005 did you ask John Edwards to return to being a W-2 employee?

A. No.

Q. So he was -- after 2005, he was always a 1099 contractor?

A. Yes.

Q. When did you meet Brian Borders?

A. Maybe when he was nine months old.

Q. Do you have a family connection to Mr. Borders?

A. I'm sorry?

Q. Do you have a family connection to Mr. Borders?

A. I do.

Q. What's that connection?

A. He is a second cousin.

Q. So that would make your first cousin his dad?

A. Yes.

Q. Okay. When did Mr. Borders join you as an employee at ARM?

A. I believe it was in 1999.

Q. Are you aware that Mr. Borders is a third-party defendant in this lawsuit?
A. I've been told that.
Q. Who told you?
A. I think some paperwork I saw.
Q. Would that have been the third-party complaint filed by Maith?
A. Probably so.
Q. Who provided that document to you?
A. Yes. Who provided it?
Q. Yes, sir.
A. I believe my attorney did.
Q. Mr. Allen?
A. Yes.
Q. So you first hired Mr. Borders as a W-2 employee. Right?
A. Yes.
Q. And you said that was around 1999?
A. I believe so.
Q. From 1999 to 2005, did Mr. Borders do any software coding that you are aware of for ARM?
A. Yes, I would say he did.
Q. What -- what coding did he do, if you know?
A. I don't know because John Edwards would have assigned that to him.

Q. Would you tell Mr. Edwards what to assign to Mr. Borders?
A. I told him what we wanted him to do in terms of what he was able to do.
Q. Did you ever have any -- during this time period from 1999 to 2005, did you ever have any conversations with Mr. Borders about software development for ARM?
A. What was the last word?
Q. Did you have any conversations with Mr. Borders about software development for ARM?
A. I don't recall that, to be honest.
Q. Was Mr. Borders salaried?
A. I believe he was.
Q. And I take it he had medical insurance provided by ARM?
A. If he opted for it.
Q. Okay. Same with dental and vision insurance?
A. Same.
Q. Okay. But no 401K. Is that right?
A. No 401K.
Q. Was he required to be in the office full time during that period?
A. He knew what our operational hours were, but he had the option of being there if he needed to. If he

had other matters he needed to take care of, he was able to do that if he would let us know. He would take his grandmother shopping to get groceries sometimes in the day or to the doctor.

Q. But for the majority of his full-time work, was he required to be in the office?

A. Yes.

Q. You said you received the -- that your attorney provided the third-party complaint, Maith's third-party complaint to you. Did you review that document?

A. I briefly looked at it.

Q. Did you review any other documents related to this lawsuit?

A. You're going to have to kind of look at me when you talk. Did I review any other documents?

Q. Yes, sir, related to this lawsuit?

A. Other than the notices?

Q. Yes, sir.

A. Nothing besides that, I don't believe.

Q. Okay. After 2005, you transitioned or you terminated Mr. Borders' status as a W-2 employee --

A. Yes.

Q. -- for ARM. Correct?

A. Yes.

Q. And then that's when he became a 1099 employee?

A. Yes.
Q. Or, I'm sorry, a 1099 contractor.
A. Okay.
Q. For how many years did Mr. Borders perform contract work for PGA?
MR. ALLEN: Objection; form.
THE WITNESS: I'm sitting here thinking. Seventeen, maybe. Sixteen.
Q. (BY MR. WELTGE) Seventeen years of contract work?
MR. ALLEN: Objection; form.
Q. (BY MR. WELTGE) What kind of contract work would Mr. Borders handle for PGA?
MR. ALLEN: Objection; form.
THE WITNESS: He was my employee. What he would do is whatever I asked him do.
Q. (BY MR. WELTGE) You say as my employee.
A. Yep.
Q. So that brings me back to a conversation we had earlier. Why do you think Mr. Borders, during time that he was a 1099 contractor, was an employee?
A. That's what I thought.
Q. Why did you think that?
A. Because he worked for me full time.
Q. So is that -- is because he provided contract

Q. Were they required to get your approval to do work on the side for anyone else?
A. Yes.
Q. When did you ask them -- when did you tell them that they needed your approval?
A. From the very beginning that if they ever asked about that.
Q. From the beginning of their status as a W-2 employee?
A. No, no.
Q. So from when?
A. It was before that.
Q. It was before their status as a W-2 --
A. Yes --
Q. -- employee?
A. -- yes.
Q. So we're talking the 1990s?
A. Yes, for John Edwards.
Q. Okay. And you testified earlier that he was a W-2 employee. Right?
A. Yes, yes.
Q. Okay. And you told him at that time that any work he did on the side outside of his work for you he needed approval for. Right?
A. Yes.

A. Okay. Ask one more time. Repeat that.
Q. When did Mr. Borders stop working for you as an independent contractor?
MR. ALLEN: Objection; form.
THE WITNESS: Brian quit working for me when we sold the company, the software.
Q. (BY MR. WELTGE) When you sold the Insuror Atlas software?
A. Yes.
Q. Would that have been around May of last year?
A. That would have been.
Q. Okay. From 2005 to May of last year, did you control what hours Mr. Borders was required to work?
MR. ALLEN: Objection; form.
THE WITNESS: Repeat the question, please, one more time.
Q. (BY MR. WELTGE) From 2005 to May of 2024, did you -- did you control the hours that Mr. Borders was required to work?
MR. ALLEN: Objection; form.
THE WITNESS: I mean, to the extent that he was able to work for me, yes.
Q. (BY MR. WELTGE) What do you mean to the extent that he was able to work for you?
A. If he was sick, if he had to do something for

MR. ALLEN: Objection; form.
THE WITNESS: No. I don't recall him doing that.
Q. (BY MR. WELTGE) Did his rate for contract pay fluctuate from 2005 to 2024?
MR. ALLEN: Objection; form.
THE WITNESS: There were fluctuations in his pay up or down, I'm pretty sure.
Q. (BY MR. WELTGE) Did you provide or give bonuses to Mr. Borders?
A. Yes.
Q. Did you give bonuses to Mr. Edwards?
A. Yes.
Q. Was Mr. Borders ever directly responsible for hiring or paying any assistants for Seguros Direct or PGA?
A. No.
MR. ALLEN: Objection; form.
Q. (BY MR. WELTGE) Would you agree with me that you essentially used Seguros Direct as a vehicle for paying individuals who were performing contract work for you?
MR. ALLEN: Objection; form.
THE WITNESS: No, I don't agree.
Q. (BY MR. WELTGE) What don't you agree with?

any reason not to.
Q. Okay. Do you know who prepared these 1099 forms?
A. No, I don't.
Q. Do you see on the second page Bates-labeled Betancourt 15 it says contact information John Edwards?
A. Yes.
Q. And the same for Betancourt 17, 18, and 19?
A. Yes.
Q. Did John Edwards prepare these forms?
MR. ALLEN: Objection; form.
Q. (BY MR. WELTGE) Do you know? Do you know if John Edwards prepared these forms?
A. I don't know.
Q. Okay. How is Mr. Betancourt's compensation determined, if you know?
A. How?
Q. How was Mr. Betancourt's compensation determined?
A. I don't recall.
Q. Do you know Mr. Betancourt's rate for contract work once he became an independent contractor?
MR. ALLEN: Objection; form.
THE WITNESS: I never knew he had a rate. Just he had a salary.

Q. (BY MR. WELTGE) He had a salary?
A. That's what I believe is correct.
Q. What was his salary?
A. It was different at different times.
Q. Do you normally give 1099 contractors a salary?
MR. ALLEN: Objection; form.
THE WITNESS: I gave these guys a salary.
Q. (BY MR. WELTGE) But you --
A. So that would have been normal since that was the only employees I had.
Q. You gave them a salary but you classified them as 1099 contractors?
A. Yes.
Q. Did you control what hours Mr. Betancourt was required to work?
MR. ALLEN: Objection; form.
THE WITNESS: Not that I'm aware of.
Q. (BY MR. WELTGE) Was Mr. Betancourt ever directly responsible for hiring or paying any assistants?
A. No, not that I'm aware of. I take that back. He -- never mind.
Q. Did you supply any laptops to Mr. Betancourt specifically?
A. I don't recall.

A. Visual DataFlex.
Q. Was it your decision to change it from DataFlex to Visual DataFlex?
A. I think John Edwards and I discussed it.
Q. What did you discuss with Mr. Edwards?
A. That it was time to upgrade it because the people weren't going to support the DataFlex, the regular DataFlex.
Q. How would Visual DataFlex differ?
A. It was more designed for the web.
Q. What does that mean?
A. So they could go across the internet versus just being attached to a server with a note on it.
Q. Do you know the differences between the coding specifically for DataFlex and Visual DataFlex?
A. I don't know the specific differences, no.
Q. Could you have built the platform in using Visual DataFlex language yourself?
A. I think I --
MR. ALLEN: Objection; form.
THE WITNESS: I think I was in a way because I was paying them and directing them what to do. I wasn't a full-time programmer. I had other job titles that I took care of.
Q. (BY MR. WELTGE) Okay. But did you

Q. Why do you disagree with that?
A. Repeat the question. Let me make sure I understood it.
Q. Did you know that Mr. Borders and Mr. Edwards were working on the Insuror Atlas software on their own?
MR. ALLEN: Objection; form.
THE WITNESS: No.
Q. (BY MR. WELTGE) Was Mr. Borders reporting consistently to you on his plans for the build and the progress of the build for the Insuror Atlas software?
A. Yes.
Q. How often did he report to you?
A. I don't recall exactly that he even gave me a report necessarily.
Q. What -- if he didn't give you a report, what did he give you?
A. He would come and speak with me.
Q. Did you ask him to?
A. No, I don't recall doing that. But I guess also those hours that they recorded said what they were doing also.
Q. Was Mr. Edwards required to report consistently to you on his plans for Insuror Atlas software and his development?
MR. ALLEN: Objection; form.

THE WITNESS: It was never a requirement because he had done it for, I don't know, 16 years already.
Q. (BY MR. WELTGE) He hadn't worked on the Insuror Atlas software --
A. No, but he reported to me regularly.
Q. At any point did you specifically direct Mr. Borders or Mr. Edwards on how to implement the Visual Basic code for Insuror Atlas software?
A. The code itself?
Q. Yes, sir.
A. I don't believe I did.
Q. Did you ever sit down with Mr. Borders and Mr. Edwards and code with them or the Insuror Atlas software?
A. No, but I went over the code with them.
Q. What do you mean by "you went over the code with them"?
A. They would show me what they were doing and how they were going to change something, and we would discuss whether that was the way to do it or not.
Q. When did you learn that Mr. Betancourt was also working on the development of the Insuror Atlas software with Mr. Borders and Mr. Edwards?
MR. ALLEN: Objection; form.

THE WITNESS: I never knew that.
Q. (BY MR. WELTGE) Did Mr. Betancourt ever come to you and discuss what he was doing and what he was adding to the software?
A. No.
Q. Did you ever require him to come to you and discuss with you what he was doing and adding to the software?
A. No. He worked under John Edwards so John would tell me.
Q. But you never required John to come to you and tell you --
A. It was understood that he would do that and he did.
Q. Did he understand that?
MR. ALLEN: Objection; form.
THE WITNESS: Yes, he understood that.
Q. (BY MR. WELTGE) Can you tell me what the specific differences were between Insuror Atlas software with the Visual Basic language versus your previous -- the software that you used, Visual DataFlex or DataFlex?
MR. ALLEN: Objection; form.
THE WITNESS: Would you repeat the question, please?
Q. (BY MR. WELTGE) Yes, sir. Can you tell me the

specific differences between the Insuror Atlas software using the Visual Basic coding language --

A. I don't know that I could tell --

Q. Let me finish my question.

A. I'm sorry.

Q. You're fine. From --

MR. ALLEN: Let me object too. Thanks.

Q. (BY MR. WELTGE) From the software platform that used Visual DataFlex?

MR. ALLEN: Objection; form.

Q. (BY MR. WELTGE) Do you need me to repeat it again?

A. No, we're good. I don't know that I could give specifics because we're talking about such a broad, large program of coding and different functions. But I believe that I was the person who actually chose that software to be our next transition. That was partly because DataFlex had no further path. In other words, they weren't going to change their program and grow. The use of the internet grew. We felt it was time to make a change and that's what we did.

Q. You're talking about the transition from DataFlex to Visual DataFlex.

A. No. Visual DataFlex to the next trans- -- change of the software.

Q. I thought you testified that you didn't know that Mr. Borders and Mr. Edwards were working on --
A. No, I didn't say that. I didn't say that. I believe you asked me if I knew that they were doing it, if they had -- they had chosen to do that.
Q. And did you?
A. No, because I'm the one that chose to do that.
Q. When did you choose?
A. Sometime after 2005 when we went from the Visual DataFlex to I believe it was Microsoft C Basic.
Q. But you didn't contribute any code specifically to --
A. I'm sorry?
Q. You didn't contribute any code specifically to the Insuror Atlas software, did you?
MR. ALLEN: Objection; form.
THE WITNESS: I would say I did contribute code to it because when I went over it with them and we would make changes, those were changes I directed.
Q. (BY MR. WELTGE) But you didn't specifically code for the platform, did you?
MR. ALLEN: Objection; form.
THE WITNESS: I didn't get on a keyboard and code, no.
Q. (BY MR. WELTGE) What was Seguros Direct's

in 2016, you had a positive working relationship with him as well?
A. In 2016?
Q. Yes, sir.
A. Yes, I think so.
Q. Was Acacia a client of Seguros Direct?
A. Was it?
Q. Yes, sir.
A. I believe so.
Q. Was it a client of Pearl?
A. I don't know if -- that's hard to say. I can't answer that.
Q. Do you know if Mr. Edwards, Mr. Borders, or Mr. Betancourt ever provided technical support to Acacia during the time that they worked as independent contractors for you?
A. I know that while they were under employ they did provide technical support.
Q. Say that last -- I didn't understand.
A. They did provide technical support.
Q. What's your understanding of the relationship between Mr. Edwards and Mr. Grumbles?
MR. ALLEN: Objection; form.
THE WITNESS: Well, that would be speculation.

A. Because I do.
Q. You have no basis?
A. I didn't say I didn't have a basis. I just said I disagree.
Q. I asked you why. Do you have a basis?
A. Because I own the software.
Q. Why do you think you own the software?
A. I have no reason to believe otherwise. I asked those men pointblank, direct to their face did they have any ownership in and they all said no.
Q. Okay. So you thought you owned the software because you thought you owned the software.
MR. ALLEN: Objection; form.
THE WITNESS: Because I paid to develop it.
Q. (BY MR. WELTGE) In the midst of your interactions with Maith and SeaHarbor, did you ever consult an intellectual property attorney regarding who had ownership rights in the Insuror Atlas software?
A. No, I don't recall doing that.
Q. Is it possible you met with an intellectual property attorney on that issue?
A. No, I don't think so.
Q. Did you attempt to have Mr. Borders or Mr. Betancourt enter into a Nondisclosure and Intellectual Property Rights Disclaimer and Assignment

THE WITNESS: I wouldn't have a problem with that. In fact, I believe they told me when we were talking about it. They asked about that.

Q. (BY MR. WELTGE) I want to look to the recital section of this agreement, sir. So same page, Betancourt 133. And we're going to go through the first recital. I'll go ahead and read the preamble anyway, though, just for clarity.

"This Non-Disclosure and Intellectual Property Right Disclaimer and Assignment Agreement is entered into as of April 30, 2024 (effective date) by and between Tim Hunt (Owner) and Brian Borders. Whereas, Owner," meaning you, Mr. Hunt," has developed through substantial effort, research, time, and expense certain inventions, design concepts, methodologies, technical know-how, copyrightable material and trade secrets directed and related to certain software commonly known as Insuror Atlas," designated as the Insuror Atlas software. Do you see that, sir?

A. I do.

Q. What substantial effort did you make in creating and developing the Insuror Atlas software?

MR. ALLEN: Objection; form.

THE WITNESS: What did I make?

Q. (BY MR. WELTGE) Yes, sir. This recital says

that you made a substantial effort. So my question is what substantial effort did you make in creating and developing the software?

MR. ALLEN: Objection; form.

THE WITNESS: I think as far back as 1984 I began making an effort to develop the software.

Q. (BY MR. WELTGE) So is it your testimony that the Insuror Atlas software was in existence in 1984?

A. It wasn't called Insuror Atlas at that time, but it was the same software.

Q. But it wasn't the same software, was it?

MR. ALLEN: Objection; form.

THE WITNESS: I don't know that's a fact. That's -- it may have changed the language that we programmed it with, but it was essentially the same software.

Q. (BY MR. WELTGE) And so what --

A. I'm sorry. Go ahead.

Q. What substantial effort did you make in the creation of the Insuror Atlas software that was sold to Maith?

MR. ALLEN: Objection; form.

THE WITNESS: I established our imaging system for one thing, which is a pretty substantial piece of that software.

that needed to be done since we already had an existing platform. I don't know if there was any code written. It was from a blank sheet of paper. It's been built upon since 1984.

Q. How much time did you spend creating and developing the Insuror Atlas software between 2010 and 2024?

MR. ALLEN: Objection; form.

THE WITNESS: I couldn't tell you.

Q. (BY MR. WELTGE) What expenses did you incur in creating and developing the software?

MR. ALLEN: Objection; form.

THE WITNESS: What expenses?

Q. (BY MR. WELTGE) Yes, sir.

A. Like our code location, all of the expenses associated with that, hard discs, servers, memory, programs that we use, you know different applications, the payroll for those guys, location where we had offices, reimbursement for phones and expenses they incurred.

Q. Where was the software housed?

MR. ALLEN: Objection; form.

THE WITNESS: At the code location?

Q. (BY MR. WELTGE) No, sir. Where was the Insuror Atlas software housed? Do you know where it was