# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DIVISION OF TEXAS
SHERMAN DIVISION

ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC,
Plf/Counter-Defs,

V.

MAITH SOLUTIONS, LLC,
Dft/Counter-plf/TP Plf,

V.

BRIAN BORDERS and IVAN BETANCOURT,
Third-Party Dfts.

CIVIL ACTION NO. 4:24-cv-00620SDJ

---

ORAL AND VIDEOTAPED DEPOSITION OF

JOHN EDWARDS

WEDNESDAY, FEBRUARY 26, 2025

---

notice that was served on your counsel, and attached to it is the subpoena. Correct?

A. It appears to be. I'm not a legal person, but it appears to be.

Q. Okay. What's your -- where did you go to high school?

A. I went to North Mesquite High School.

Q. All right. What year did you graduate?

A. 1985.

Q. After you graduated from high school, did you go on for further education?

A. I did.

Q. Okay. And where was that?

A. Texas Christian University.

Q. Did you obtain a degree from Texas Christian University?

A. I did not.

Q. When did you start your classes at Texas Christian University?

A. It would have been, I assume, August of 1985.

Q. And how many years did you attend Texas -- can I just call it TCU?

A. Yes, you can call it TCU.

Q. All right. How many years did you attend TCU?

A. About five and a half.

Q. What was your concentration or major?
A. Computer science.
Q. And that included, for instance, programming, software programming?
A. Yes, sir.
Q. How many credits did you earn?
A. I can't remember.
Q. Okay. What caused you not to get the degree?
A. There were classes that were being offered by the system by -- classes offered in my degree that kept moving on and -- on and off to summer semester to winter semester to spring semester, and I could never actually get enrolled in those classes so I dropped out.
Q. Okay. Did you attempt to go to any other educational institution to complete your degree?
A. I did not.
Q. What did you do after, I guess, it would be 1990 or '91?
A. It was '90, '91. I worked -- I became employed by American Recreational Markets.
Q. And what is American -- what's the business of American Recreational Markets?
A. It was an MGA.
Q. That's a managing general agency?
A. Correct.

A. Yes, sir.
Q. Is he a CPA?
A. Yes, sir.
Q. And what was your position when you first joined American Recreational Markets?
A. I was in the mailroom.
Q. Did you ever move out of the mailroom?
A. I did.
Q. Okay. When did you move out of the mailroom, approximately?
A. '92. Maybe '93.
Q. And what did -- what position did you take in '92 or '93?
A. I became the -- I became the software programmer.
Q. What software was being used when you became the softer programmer?
A. DataFlex.
Q. That was the program that was a third-party vendor-type program?
A. Yes.
Q. Did you have to do any customization of the DataFlex program? In other words, writing code to have it perform certain functions that you wanted it to perform?

A. We update -- we kept it updated, yes, sir.
Q. Other than you, was there anyone else in 19 -- I guess, this is now we're in 1992, '93 time frame. Is that right?
A. Programmers, no. There was a network person.
Q. And the network person would handle the computer system, the ethernet system or whatever was in your office at the time?
A. That's correct.
Q. So in 1992, you were the sole software programmer in American Recreational Markets who did the -- whatever enhancements had to be done on the DataFlex software program. Correct?
A. That's correct.
Q. Did Tim Hunt at that time have any expertise in software programming?
A. Programming, no.
Q. So Tim Hunt was not in a position where he would assist you with any of the updates to the DataFlex. Correct?
A. That's not true.
Q. What would -- how would he assist you?
A. He would advise on how it should be done, the processes.
Q. Well, give me an example of how he would advise

employee -- or anyone else work at American Recreational and do software development or programming other than you?

A. There were several people.

Q. Who else?

A. I can't remember all of them. There were at least three other people besides me that came and went.

Q. Okay. Were you an employee of American Recreational -- it's American Recreational Market. Right?

A. Yes, sir.

Q. Yeah. Are you okay if I just call it ARM --

A. That is.

Q. -- for short?

A. -- correct. That's what -- that's what it is called, ARMGA.

Q. Okay. Were you a W-2 employee of ARM?

A. I was.

Q. And how long did you work for ARM?

A. I worked for ARM from 1991 or so until it ended.

Q. And when did it end, approximately?

A. 2002.

Q. And why did it end? What happened?

A. Tim no longer felt he wanted to continue in the

insurance writing business. He wanted to go into the software business.

Q. Did he sell the business?

A. No.

Q. He just closed it.

A. He closed it.

Q. Did Mr. Borders ever work for ARM?

A. Yes, he did.

Q. When did Mr. Borders join ARM?

A. Approximately 1999.

Q. Was he a W-2 employee of ARM?

A. Yes, he was.

Q. And what were his duties at ARM?

A. He worked as a programmer. Also did some networking. Started mainly as networking.

Q. And then moved into the programming?

A. That is correct.

Q. So in 1999 through 2002, I guess you and Mr. Borders were the sole persons doing programming on the software that was being used at ARM?

A. No. We had other people in there as well.

Q. But you don't recall who they were?

A. No.

Q. Was there a major overhaul of the software during the time you were at ARM?

DataFlex to Visual DataFlex or from Visual DataFlex to VB. Correct?
A. Correct.
Q. So in 2002, what happened to you as far as your employment --
A. Nothing.
Q. -- when ARM close?
A. Nothing.
Q. Who did you work for?
A. I still worked for the same company, the same people, the same everything. Nothing actually changed.
Q. Well, ARM was no longer around so they had -- what entity did you work for?
A. I guess it would have been Seguros Direct.
Q. And what was Seguros Direct?
A. It was a software company.
Q. And who owns Seguros Direct?
A. Timothy Hunt.
Q. Did he have any other owners or he owned all of it?
A. He owned all of it.
Q. Were you a full-time W-2 employee in 2002 at Seguros Direct or 1099 independent contractor?
A. W-2.
Q. Did Mr. Borders also in 2002 become an employee

Q. And when did you move to VB?
A. Approximately 2010.
Q. So from 2002 to 2005 or 2006, you used DataFlex for Seguros Direct --
A. Correct.
Q. -- software program.
A. Yes, sir.
Q. And who were the clients of Seguros Direct at that time?
A. We had a couple of them. I can't think of them right off the top of my head.
Q. And in 2005 to 2006, you changed from DataFlex to Visual DataFlex. Correct?
A. That was the migration, yes, sir.
Q. And the only persons that were writing code for that change from DataFlex to Visual DataFlex were yourself and Mr. Borders. Correct?
A. Probably. We did have other employees, but --
Q. Did you ever cease being a W-2 employee of Seguros Direct? Did you ever transition from a W-2 employee to a 1099 independent contractor?
A. I went to a 1099 employee, yes.
Q. Okay. You went to a 1099 employee? Are you just making that term up or where did that come from? If you're an independent contractor, you received a

responsibility and he would put it on the employees to pay their own payroll taxes basically by self-employment tax. Correct?

A. Correct.

Q. And so from 2005 up through 2024, you were a 1099 self-employed person writing code for Seguros Direct. Is that true?

A. That is true.

Q. And from 2005 up through 2024, you reported the monies that you were paid by Seguros Direct on your income taxes as basically self-employment income. Correct?

A. Yes, but 2015 it went to Pearl General Agency was the 1099.

Q. Okay.

A. Not Seguros Direct, just to keep the record clear.

Q. No, I appreciate that. Thank you. Okay. So from 2005 for next ten years, you were a self-employed software developer for Seguros Direct. Correct?

A. I was a 1099ed person, yes.

Q. Okay. And then in 2015, you became a self-employed person for Pearl Insurance Agency?

A. General Agency.

Q. Pearl General Agency. Why did you change from

for entities during that time?
A. Responsible for, no, sir.
Q. So after 2017, you switched back to becoming a self-employed computer software developer for Seguros Direct. Is that correct?
A. Yes, sir.
Q. And you continued with that up through May of 2024?
A. Yes, sir.
Q. And what happened in May of 2024?
A. The business was purchased, from my understanding.
Q. And the business of Seguros Direct?
A. No.
Q. What --
A. Just the software.
Q. Well, who owned the software at that time?
A. Timothy Hunt.
Q. Personally?
A. Seguros Direct, Timothy Hunt. Same person.
Q. Well, wasn't Seguros Direct a corporation?
A. That -- I have no -- I'm assuming it was.
Q. So corporation's different than Mr. Hunt? Isn't it a separate entity? I'm just trying to figure out who owned the software. Who do you believe owned

the Insuror Atlas software in 2017?

A. Timothy Hunt.

Q. Personally?

A. Yes.

Q. And you believe Timothy Hunt owned the Insuror Atlas software in 2000?

A. I don't think it existed in 2000.

Q. The prior version.

A. Yes, DataFlex, definitely. Yes, sir.

Q. All right. So I think you mentioned that in 2010 the decision was made to go from Visual DataFlex to VB as far as the software that would run the insurance programs. Correct?

A. Yes, sir.

Q. Okay. Who participated in making the decision to go to VB in 2010?

A. Brian and I did.

Q. And why did you and Brian decide to go to VB or go to VB from Visual DataFlex?

A. Because Visual DataFlex wasn't capable of doing what we needed it to do.

Q. All right. Explain to me what the limitations were and what you needed the program to do.

A. Visual DataFlex was a database programming language. It required a specific database to make it

A. That's correct, yes, sir.
Q. And you continued to pay self-employment tax on each of those tax returns from 2010 up through 2024. Correct?
A. Yes, sir.
Q. From 2010 to 2024, did Seguros Direct pay you any employee benefits like medical insurance?
A. No, but they did pay for vacation.
Q. Okay.
A. They also paid for time off.
Q. Okay. Thank you for volunteering that. I appreciate that. Did they pay you for any -- did they provide any type of dental insurance?
A. No, sir.
Q. Did they provide any type of disability insurance?
A. No, sir.
Q. You said you were paid for vacation time. How many weeks?
A. It -- at that time, I worked for Mr. Hunt for 10, 15 years. I got pretty much three or four weeks if I needed it.
Q. Okay. Did you take three or four weeks?
A. No, sir.
Q. And Mr. Hunt did not write any of the software

A. From an associate at -- at his place at Conley Rose. I called them. They didn't do -- the person I spoke to didn't do intellectual property and referred me to him.

Q. And who did you know at Conley Rose? Who was the lawyer, do you remember?

A. No.

Q. But you knew somebody there that you could call? Is that how this happened?

A. No. I spoke to somebody at my -- I spoke to somebody at my church who gave me Conley Rose's name.

Q. Okay. All right. And you reached out to Mr. Warden and engaged him?

A. Correct.

Q. All right. Do you want to take -- let's take a little break. We've been going about an hour.

THE VIDEOGRAPHER: We're off at 10:30.

(Break taken from 10:30 a.m. to 10:43 a.m.)

THE VIDEOGRAPHER: We're back on at 10:43.

Q. (BY MR. KESSLER) In 2010, where were you doing most of your work?

A. At the office that Tim provided for us at his house.

Q. So you worked at Tim's house?

A. We worked in an office at Tim's house. Well,

Tim's location, his property. It wasn't in his house.

Q. So he had a separate building?

A. Yes.

Q. Was it one big room or --

A. Yeah, it was basically a big room.

Q. Okay. And you and Mr. Borders worked there?

A. And Mr. Orosco and Tim.

Q. Did you use your own computer to write the software?

A. Sometimes.

Q. Most of the time?

A. I can't remember. Sometimes I purchased my laptop. Sometimes Tim provided them.

Q. So from 2010 to 2024, those 14 years, did you use your computer more than you used -- well, how many times did Mr. Hunt provide you with a computer to use?

A. I can't remember but --

Q. Go ahead. Go ahead.

A. I was just going to say the actual laptop to log on to the system didn't really matter. It was the servers that we were typing everything on.

Q. All right. So you might use your laptop, but you would connect into a server that was owned by Tim Hunt or Seguros or --

A. Yes, sir.

Q. And where was the server located?
A. In that same office.
Q. Did you also keep a copy of the software that you were writing on your own computer?
A. I did not, no.
Q. Do you know if Mr. Borders kept it on his own computer?
A. I can't tell you if he did or not.
Q. So to your knowledge, the only place where the code that you were writing was being stored was on the server in Mr. Hunt's building on his property.
A. That's my understanding, yes, sir.
Q. How often from 2010 to -- well, how -- let me back up. From 2010 to what date did you work primarily out of Mr. Hunt's building on his property?
A. From 2000 -- you mean the number of years or --
Q. Yeah.
A. -- the days of the week.
Q. No, first number of years. So I'm just trying to get how long a period. From 2010, I mean, did you work there --
A. To about 2014. I don't know the exact date, but then we moved to a building in Rockwall.
Q. And how long were you in the building at Rockwall?

A. 2017, 2018.
Q. And then what happened?
A. We moved to the building in Garland.
Q. And how long were you in the building in Garland?
A. Until the purchase.
Q. Until 2024.
A. (Nods.) Sorry. Yes. I'm trying.
Q. How often did you work from home during the period from 2010 to 2014 when you were --
A. Almost never.
Q. Spent most of your time at Mr. Hunt's property?
A. In the office, yes.
Q. All right. And what about 2014 to 2017 when you were in Rockwall, did you work at home?
A. Almost exclusively in the office.
Q. And how about in Garland when the office moved to Garland?
A. Up until COVID hit, we were exclusively in the office.
Q. And then what happened when COVID hit?
A. The building actually shut down and forced us out so -- except for one day a week on Thursdays.
Q. And that continued for four years?
A. Yes, sir.

Q. So you would go into the office -- from 2020 to 2024 you would go into the office one day a week?
A. Yes, sir.
Q. And the rest of the time you worked at home.
A. On average, yes, sir. Occasionally more, but --
Q. And what about Brian from 2010 to 2014? How much time was he spending at Mr. Hunt's property?
A. He was there exclusively.
Q. And what about 2014 to 2017 when you were in Rockwall?
A. He was in the office.
Q. And then what about 2017 until 2020?
A. He was in the office.
Q. And then he -- from 2020 to 204, he would work one day a week in the office. Is that your testimony?
A. That is correct.
Q. And what about Mr. Betancourt when he joined your team?
A. He started in the -- he started in the office in Rockwall.
Q. And then moved to Garland.
A. Yes, sir.
Q. Did he also come to the office every day?
A. Yes, sir.

Q. Did you have set working hours from 2010 to 2024?
A. Not really.
Q. You could set your own hours?
A. Pretty much. We needed to be there when the people started working, which is about 9 o'clock until 5 o'clock. So that's pretty much the hours that we set.
Q. Okay. Did you do work at other times as well?
A. Yes, sir.
Q. In other words, you would write code after hours. You would continue to work.
A. Normally we didn't write code after hours.
Q. You were just writing the code from 9:00 to 5:00?
A. Yes, sir.
Q. If you wanted to work at a different hour, would you -- you weren't dictated to be there from 9:00 to 5:00, were you?
A. No, sir.
Q. All right. Let me mark this.
(Exhibit 2 marked.)
Q. (BY MR. KESSLER) Let me show you what's been marked as Exhibit 2. This was -- Exhibit 2 is a response that your attorneys filed to the subpoena. Did you have an opportunity to review this before your

A. Yes, sir.

Q. Okay. Did you ever offer to sell or get a request from SeaHarbor to purchase your interest in the Atlas Insuror software?

A. No.

Q. Did you ever discuss with anyone at either SeaHarbor or Maith the issue of whether or not you had an ownership interest in the Insuror Atlas software?

A. Discussions, no.

Q. Any other communications about your ownership -- potential ownership interest in the Insuror Atlas software other than discussions?

A. Not that I'm aware of.

Q. Did you ever tell anyone at Maith or SeaHarbor that you claimed an ownership interest in the Insuror Atlas software?

A. No.

Q. Did you ever believe you owned an ownership interest in the Insuror Atlas software?

A. No.

Q. Turn to page 22, please. Request No. 32 asks for all agreements between you and Maith, including (but not limited to) all drafts and executed agreements. And you answered this one saying there are none. Is that true?

Q. How were you paid?
A. I was paid via salary.
Q. Always.
A. Always at that time. I went salary in early 2000s and was that way ever since.
Q. When you say early 2000s, what approximately?
A. 2001, 2002, somewhere in there.
Q. Okay. And your salary was just set regardless of -- you were paid the same regardless of the number of hours you worked.
A. Correct.
Q. And when did Mr. Borders move from hourly to --
A. I can't remember.
Q. -- a fixed payment?
A. I can't remember.
Q. But he did at some point. Correct?
A. He did move to a salary payment, yes.
(Exhibit 8 marked.)
Q. (BY MR. KESSLER) The court reporter's handed you what's been marked as Exhibit 8. These are documents that were produced by Maith in this case. Is this the same format of the checks that -- in other words, would your checks have been in a similar format to this?
A. Yes.