# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC, and EDGEPOINT SYSTEMS, LLC, | § | |
| Plaintiff/Counter-Defendants, | § | CIVIL NO. |
| VS. | § | 4:24-cv-00620SDJ |
| MAITH SOLUTIONS LLC, | § | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | § | |
| Vs. | § | |
| BRIAN BORDERS and IVAN BETANCOURT, | § | |
| Third-Party Defendants, | § | |

******************************************

ORAL DEPOSITION OF

BRIAN BORDERS

FEBRUARY 25, 2025

******************************************

Job no: 10279

A. Thank you.
Q. Where do you currently reside?
A. North Garland.
Q. North -- North Garland?
A. North Garland.
Q. Okay. Do you have a college degree?
A. No.
Q. No. Okay.
Do you have a high school degree?
A. High school degree?
Q. High school degree, diploma?
A. Yes. Yes.
Q. Any education beyond high school?
A. Yes. I went -- started going through Microsoft certifications for -- right after that. And then I started working in IT straight out of that.
Q. Okay. Microsoft certifications, was that after high school?
A. Yes.
Q. Okay. And what year did you graduate high school?
A. I believe it would be '98.
Q. '98. Okay.
And how long have you known Tim Hunt?
A. Since about '99.

Q. Since 1999. Is that when you first met him?
A. I believe so. Yes.
Q. Okay. And are you related to Mr. Hunt?
A. My dad and him are cousins.
Q. Okay. All right.
A. My mom wouldn't let me see Dad's side of the family, so I may have, as a little kid, but not that I remember.
Q. I see. And -- and what was -- what was the occasion that you met him in 1999?
A. Job interview.
Q. Okay. And that was for a job interview with whom?
A. With Tim.
Q. With Tim.
Okay. And was that for a company called -- it's -- American Recreational Markets General Agency --
A. Yes.
Q. -- Inc.?
A. Yes.
Q. And that would be -- and if I refer to that as ARM, A-R-M, you'll know what I'm referring to?
Is that okay?
A. Yes.
Q. So you met Mr. Hunt for a job interview with

ARM. Did you begin working for him after that job interview?

A. Yes.

Q. Okay. You started working for ARM at that time?

A. Yes.

Q. Okay. And what were your job responsibilities when you started?

A. PC help desk annually.

Q. Okay. And what -- what was entailed in -- in that?

A. If people couldn't print or had trouble logging in their computer or accessing things, I would fix that, sometimes reinstall Windows, install updates.

Q. Okay. That was in 1999?

A. Yes.

Q. And about how long were you in that role?

A. It was several years. And then I started helping with the servers after that.

Q. With the servers?

A. Uh-huh.

Q. Okay.

A. On the network, like, Microsoft.

Q. Is that --

A. I don't remember exact years.

Q. Okay. So you -- and we'll get to that.
Was that about 2005?
A. Yes.
Q. When that switch -- okay. We'll get to that.
A. Yeah.
Q. So I just want to stick with the pre-switch --
A. Okay.
Q. -- to that 2005 --
A. Okay.
Q. -- right now.
So you worked for -- after Seguros -- well, is that the company you were with when the switch happened?
A. Which switch?
Q. Seguros Direct, is that the company you were with when you -- you switched the employment status?
A. No. I believe that was Axess Insurance Agency still.
Q. Okay. I'm sorry. I thought you said you moved from Axess to Seguros?
A. I did.
Q. Okay. And that was after 2005?
A. Yes. I don't know which year, which company was issuing the checks.
Q. Okay. Well, prior to that 2005 date, you were

a W-2 employee; is that right?
     A.  Yes.
     Q.  Okay.  And after that in 2005, Hunt started paying you as a self-employed 109 -- by 1099; is that right?
     A.  Yes.
     Q.  Okay.  All right.  So back to -- to -- I just, kind of, want to know some of your job responsibilities with Axess.
               What did you do for Axess?
     A.  Axess was an insurance agency with several branch offices.  I was responsible for helping them with their connectivity, their computers, Internet. Sometimes I'd have to go to the branch offices.
     Q.  So would -- would it be fair to say it was I -- IT?
     A.  Uh-huh.
     Q.  Were you a programmer at that time?
     A.  No.  I did help start learning some of the stuff, but I was not mainly a programmer at that time.
     Q.  Okay.  When did you become -- when did you start programming?
     A.  For Tim or on my own?
     Q.  At any time.  On your, when -- when was there --

sound -- would 2004 been about the time that you worked on that?

Does that sound about right?

A. About right. I can't recall which year.

Q. Okay. At -- at that time, were you still -- you hadn't converted to a self-employment status of 1099s, had you?

A. No.

Q. Okay. The -- so the insurance atlas code that's -- that's in Visual DataFlex, are you making any claim of ownership as to that software?

A. No.

Q. Does Tim own that software?

A. I don't know that software exists anymore.

Q. Okay. Did Tim own it?

A. I believe so. The start-up screen, I -- there was a problem with the previous developers. I don't know.

Q. Okay.

A. I don know its history.

Q. But as between you and Tim, you -- you don't have any claim of ownership as to the insurance management software that was in Visual DataFlex?

A. No.

Q. Okay. Then Tim started paying you sometime in

2099 -- I'm sorry -- in 2005 as a 1099 self-employed person; is that right?

A. Kind of. My paychecks in 2005 showed withholding. It was not paid to the IRS. And part of the IRS settlement, he wanted to convert some of us to self-employed contractors.

Q. Okay. So at some point in 2005, you were an employee, but at some later point, you became a 1099?

A. Cleaning out the 2005 tax year, yes.

Q. Yeah. Okay. And when that happened, did your job responsibilities change?

A. A little bit, yes, the roles changed. I was -- mainly worked from home.

Q. In 2005, you worked from home?

A. Yes. Partly. I don't -- I'd have to go back through all the documents to get an exact.

Q. What documents would help you with that?

A. 2005, I just don't remember clearly.

Q. So did you work exclusively from home at that time?

A. Exclusively, no. I would go into his office, occasionally. I don't remember when he sold his office either.

Q. Okay. So in 2005 --

A. There was no office.

Q. I'm sorry?
A. Then there was no office to go to, ever. But I don't remember what year that was.
Q. But in terms of your job responsibilities, did those change just because you were converted from a W-2 to a 1099?
A. No, not immediately. It would just change over time.
Q. Okay. And as part of the normal course of business, your responsibilities changed?
A. It was always IT-related in the different aspects of that, but, yes, the IT demands did change over time.
Q. Okay. All right. Did you have any agreement with Tim Hunt as a -- as a contractor?
MR. WELTGE: Objection. Vague.
THE WITNESS: Nothing written or defined.
Q. BY MR. BISBIKIS: Did you -- in 2004, so prior to the conversion, were you -- were you paid salary?
A. No.
Q. You were paid hourly?
A. Yes.
Q. Okay. And how frequently were -- were you paid, do you remember?
A. No, I don't.

Q. But would it have been regular intervals, like, biweekly or monthly, something like that?
A. Yes. Something like that, yes.
Q. Okay. But it would have been regular payments?
A. Yes.
Q. Okay. And after the conversion, were you still paid hourly?
A. Yes.
Q. Okay. And at some point between 2005 and 2024, did you become salary?
A. No. He switched from hourly billing to just a flat rate.
Q. A flat rate?
A. Uh-huh.
Q. So you would pay -- you were paid flat rate salary for -- on a monthly basis or bimonthly basis?
A. Yes, bimonthly.
Q. Okay. And -- and after the conversion to, you know, the 1090 status, Hunt paid you, personally, right?
A. Yes.
Q. He didn't pay -- you have -- you have a company called TDB Technologies --
A. Yes, sir.
Q. -- is that right?
A. Yes. I founded that.

A. Uh-huh.

Q. -- so, essentially, he would reimburse or purchase or repurchase it retail?

A. I would invoice him.

Q. But the 109 -- the 1099s, for what -- your salary was always paid to you, personally, right?

A. Yes.

Q. Okay. And you had, you know -- after 2005, after the conversion, again, you didn't have any contract with Tim concerning your employment, did you?

A. Any kind of what?

Q. Any contract with --

A. Contract, no.

Q. Okay. So you could have fired you at any time?

A. He would terminate a contract, wouldn't he?

Q. Could he have fired you as -- just like he would have fired an employee?

A. I think so.

Q. Okay. I mean, you had no contract saying --

A. No. No. Written term length, no.

Q. So he would have been -- and you didn't have any contractual obligations with him outlining --

A. No.

Q. -- what you would do?

A. No.

Q. Okay. So he didn't -- and you -- so you could have quit and -- at any time you wanted to, as well, right?

You didn't have any obligations to provide any services, anything like that?

A. Correct.

Q. Did Tim Hunt reimburse you for your cellphone, personal cellphone?

A. They issued a cellphone reimbursement check, yes. However, the cellphone was always paid for by TDB Technologies. So I asked them what to do with it, and they said don't worry about it. Just keep it.

Q. So they -- they would issue that to you -- the check to you, though?

A. Yes.

Q. And you're -- you're TDB Technologies, right?

A. Yes.

Q. Did Tim Hunt pay you bonuses from time to time?

A. Occasionally, yes.

Q. And they were at his discretion; is that right?

A. Yes.

Q. So he didn't have any obligation to pay you bonuses?

A. No.

Q. Okay. Did you get paid for days you took off

work while -- while you worked for Tim?
A. When I was hourly, no.
Q. Okay. How about when you were salary?
A. There was no accounting. It would -- some weeks, I would work more than others. There was no -- and it was a fixed fee. So I never took -- I didn't ever take vacations, really. It was just the hours I had available to work varied week to week.
Q. You never took any days off when you -- while you worked for Tim?
A. Yes. There were a couple days I did not work. Yes.
Q. And did you get docked for those -- those days on your paychecks?
A. No. It was a fixed fee, and the hours were worked other days.
Q. What do you mean fixed fee?
A. He paid the same amount no matter how many hours I worked. When there were projects that required more hours, I would put in more hours, and there was no extra pay based on that.
Q. Okay. And over time, did you get raises?
And I'm talking about the time period after 2005.
A. Yes.

Q. Okay. And did you get raises before 2005, as well, when you were an employee?
A. Yes.
Q. So when you were a W-2 employee, you would get raises, and when you were a 1099, self-employed, you also continued to get raises?
A. Yes.
Q. Okay. Do you recall -- I, kind of, want to orient you to about 2011. Did you work on a project for Tim's business insurance Atlas business, where you converted the insurance management software to Visual Basic?
A. There was no conversion. It was a scratch rewrite.
Q. Okay. And what do you mean by scratch rewrite?
A. Everything was started fresh with Microsoft technologies.
Q. Okay. So you rewrote the code in Microsoft Visual Basic; is that right?
A. Yes. We created all new code.
Q. And so, you created a code that existed from 2004 in 2011?
A. No.
Q. Okay. What did you rewrite?
A. We created entirely new system with all new

addition.

Q. And what are reports?

A. How do I explain?

Basically, report that the insurance company would need for different, like, whether it's a state report it would go to the Department of Insurance, or whether it was data -- a data type report for an actuary, or other reports needed for other departments to review and manage the business.

Q. And -- and would you run these reports for -- for clients?

A. Yes.

Q. And these are Tim's clients?

A. Yes.

Q. Okay. And -- and so, if a client needed a report, they could ask you to run it and --

A. Yes. We'd create them and program it, add new ones to the system.

Q. Well, there's -- there's -- I assume there's a programming aspect for it to be able to run the report?

A. Yes.

Q. But then there's the actual running of the report, right?

A. Yes.

Q. So that's more of a service you provide for the

clients?

A. Yes.

Q. And could clients ask -- and this is part of the -- this is part of the Insuror-Atlas business; is that right?

A. It's Insuror-Atlas product, yes.

Q. Let me back up.

So about 2004, are you familiar -- is that -- is that when you started -- Tim started operating under the Insuror-Atlas name?

Does that sound about right?

We don't need the exact date, but --

A. I don't know what year it was.

Q. Okay. But it's -- but certainly by 2011, you had been operating under Insuror-Atlas?

A. Yes.

Q. Okay. But at some point, you're not exactly sure, Tim started operating under the Insuror-Atlas name; is that right?

A. Correct.

Q. Okay. And so, would you run reports for Tim's clients, for Tim's Insuror-Atlas -- as part of his Insuror-Atlas business?

A. Yes.

Q. Okay. Did you do rate changes for client --

Q. And why did you have to run them repeatedly?
A. We were testing to get this built, to build this.
Q. And did you do it for any purposes other than testing?
Would you run them as part of the business?
A. Yes. At the end of the month -- I eventually automated it. It would submit a batch of reports to compare to then take all the reports, compile and verify everything, totals together.
Q. And that was important for the client's business; is that right?
A. Correct.
Q. Okay. Did clients ever call you and ask for help running -- running reports?
A. Yes.
Q. And was that part of your job responsibility --
A. Yes.
Q. -- for Tim?
Did you have any other job responsibilities for Tim?
A. Pretty much the Insuror-Atlas software and then the servers that ran it.
Q. So you maintained the hardware, as well?
A. Yes.

Q. Were you in charge of Tim's -- the
Insuror-Atlas website?
A. No.
Q. Who -- who managed the website?
A. I don't know who created it. It was placed on
a web server of Tim's that I could -- I do not know who
created the website --
Q. Okay. So you --
A. -- originally.
Q. All right. Did you ever have any input on the
website or any -- scratch that.
A. No.
Q. Did you ever have any responsibilities with
respect to the website?
A. Only that it was online.
Q. What do you mean by that?
A. That the server was functioning to be
accessible.
Q. Got it.
So you didn't create the content for the
website?
A. No.
Q. But you were responsible for making sure it was
online?
A. Yes.

Q. Would Tim hold you out as part of the Insuror-Atlas team to the client?
A. Yes.
Q. Okay. Did you ever -- did you ever tell any client that you weren't part of the Insuror-Atlas team?
A. Yes.
Q. Which one?
A. I know Acacia knew, as well.
(Reporter clarification.)
THE WITNESS: Acacia knew.
Q. BY MR. BISBIKIS: You told -- okay.
A. Tim would --
Q. How did Acacia know you weren't part of the Insuror-Atlas team?
A. I'm trying to remember how did that come up. I mean, they knew I was an independent contractor. Is that what you mean?
Q. Well, I want to know what -- how did they know you were an independent contractor?
A. I don't remember how the conversation originally came up. I believe --
Q. Did you tell them you were?
A. I don't remember.
Q. Okay. How is -- how do you -- you don't remember how they knew you were an -- and independent

contractor?
A. Everything was such verbal and in meetings, like, I don't know if Tim mentioned it to them or I mentioned it first. I don't know who mentioned it first.
Q. Okay.
A. I don't know.
Q. Do you know when this happened?
A. No.
Q. Okay. And how long did Acacia work with Tim?
A. Acacia started business in 2016.
Q. Apart from Acacia, did you tell any other employees that you weren't part of the Insuror-Atlas team?
A. Could you repeat the question?
Q. Apart from Acacia, did you tell any of Tim's Insuror-Atlas clients --
A. Oh, clients.
Q. -- that you weren't part of the Insuror-Atlas team?
A. No.
Q. Okay. Did you -- and I'll mark this Exhibit 4.
(Exhibit 4 was marked for identification.)
Q. BY MR. BISBIKIS: Do -- do you recognize that?
A. Yes.

Q. And what is this?
A. This was a new website Tim had made to try to promote the software.
Q. Do you remember when this was made?
Does 2019 sound about right?
A. Somewhere along there.
Q. Okay.
A. I don't remember exactly, but yes.
Q. Okay. And on the third page of this, it has page 450 at the bottom right-hand corner.
Do you see that?
A. Yes.
Q. And that's -- that's your handwriting, right?
A. Yes.
Q. And do you see at the top on the first page, it says, "Insuror-Atlas is a privately-owned company founded in 2004 comprised of a team of insurance and software industry experts"?
A. Yes.
Q. Did you consider yourself to be part of that team?
A. I mean, yes, we did all our work together as a team, for the most part.
Q. And you did a lot as a team --
A. Yes.

Q. And on the website?

A. Yes.

Q. And hold -- hold yourself -- hold you out as part of the team, right?

A. Yes.

Q. Okay. This is marked -- I'm going to hand you what's been marked as Exhibit 5.

(Exhibit 5 was marked for identification.)

Q. BY MR. BISBIKIS: Give you a second to look at that.

Can you tell me what that is?

A. It's an e-mail from Heather.

Q. Heather Hunt?

A. Yes.

Q. Is that Tim's daughter?

A. Yes.

Q. And who is it sent to?

Were you included on that?

A. Yes.

Q. Okay. And it was sent to -- was it sent to John Edwards and Adam, as well?

A. Yes.

Q. Okay. And the reference says, "Meeting agenda. Get Jerry and Insuror-Atlas."

Do you see that?

A. Yes.
Q. Do know who get Jerry is?
A. Yes.
Q. What is that?
A. They were another -- I believe they're an insurance agency. They sell insurance. I don't know the --
Q. Okay. And this references a meeting agenda. Do you know what the purpose of the meeting was?
A. To see if they would be interested in using the software.
Q. Okay. And did you participate in this meeting?
A. I attended it, yes.
Q. And it was around October 10th, 2019?
A. Yes.
Q. Okay.
A. That's what it says.
Q. And there's an attachment to this e-mail.
Do you see that?
A. Yes.
Q. And the second page that's marked Maith 46224, do you see that?
A. Yes.
Q. And it lists the principal attendees.
Do you see that?

A. Yes.
Q. And you're listed there, and it says Brian Borders software development Insuror-Atlas --
A. Yes.
Q. -- is that right?
Okay. And so, were you being held out as part of the Insuror-Atlas team --
A. Yes.
Q. -- to this client?
A. Yes.
Q. Okay. Did that client ever do business with --
A. No.
Q. Okay.
A. Can we take a break in a few minutes?
Q. Sure. We can take a break now, if you'd like. Do you need 5, 10 minutes?
MR. WELTGE: 10 minutes.
THE WITNESS: Thank you.
(A recess was held from 10:45 a.m. to 11:00 a.m.)
MR. BISBIKIS: Back on the record.
Q. BY MR. BISBIKIS: Okay. Mr. Borders, if I could ask you to go back to Exhibit No. 5 for a second, it's a two-page document. It lists John Edwards as the CTO.
And what does that stand for, CTO?

Is that the type of work we were talking about earlier, client data that's being migrated in the Insuror-Atlas system?
A. Yes.
Q. Okay. Okay.
(Exhibit 8 was marked for identification.)
Q. BY MR. BISBIKIS: Hand you what's been marked as Exhibit 8. Sorry. I didn't mean to throw it at you. Kind of sliding it across and got a little -- so can you identify this document?
A. It looks like a printout from LinkedIn.
Q. Okay. And did -- so did you have a LinkedIn page?
A. Yes, I did.
Q. And do you still have it?
A. I still have an account. I don't know what's on it currently.
Q. Okay. Did you create your LinkedIn page?
A. Yes.
Q. Okay. And the information that's on here, is this information that you would have -- that you put on LinkedIn?
A. Yes.
Q. Okay. And there you -- you identify yourself as a developer and systems administrator at

Insuror-Atlas?
A. Yes.
Q. Okay. And what's this -- what do you mean by systems administrator?
A. I kept the servers and system -- the servers that ran the Insuror-Atlas software online and --
Q. Okay. And you did that at Insuror-Atlas --
A. Yes.
Q. -- as part of your full-time job for them?
A. Yes. I did that at Insuror-Atlas. Yes.
Q. And was it part of a full-time job with Tim?
A. It was as an independent contractor.
Q. Was it full-time?
A. What's the definition of full-time?
Q. Well, did you work --
A. I mean, yes.
Q. Did you work full-time for Tim?
A. Yes.
Q. Okay. Did you have business cards for any of Tim's businesses?
A. Yes.
Q. Do you know which businesses you had business cards for?
A. I know there was an Insuror-Atlas business card and then a Paladin business card.

created the software in 2011, did you think that you owned it at that time?

A. I don't remember my thought processes from 2011. No.

Q. Did you ever try to monetize that --

A. No.

Q. -- the Insuror-Atlas software?

A. No.

Q. Okay. Did you ever tell Tim that you owned that software?

A. No.

MR. BISBIKIS: Okay. All right. Let me -- you know, if we, maybe, take a short break, just to, kind of, switch gears here a little bit.

MR. WELTGE: Sure. Want to --

MR. BISBIKIS: Make it more efficient.

MR. WELTGE: No problem.

MR. BISBIKIS: Just need five minutes. Does that work?

MR. WELTGE: Yep.

MR. BISBIKIS: Try to get through this. It will be help the change.

(A recess was held from 11:29 a.m. to 11:38 a.m.)

(Exhibit 12 was marked for identification.)

Q. BY MR. BISBIKIS: Okay. Mr. Borders, I'm going

# Insurance industry experts creating software solutions

Insuror Atlas is a privately owned company founded in 2004 comprised of a team of insurance and software industry experts with over 40 years of experience in the insurance industry. Our goal is to give clients the tools to build and grow their businesses in the most efficient and effective way possible.



(https://www.insuroratlas.com/about/timothy-hunt/)

**Timothy Hunt (https://www.insuroratlas.com/about/timothy-hunt/)**

Business Development

EXHIBIT 4
B. Borders
2/25/2025
Stenographically Reported by:
Nicole A. Hatler CSR 11275



(https://www.insuroratlas.com/about/john-edwards/)

John Edwards (https://www.insuroratlas.com/about/john-edwards/)

Account Management



(https://www.insuroratlas.com/about/brian-borders/)

**Brian Borders (https://www.insuroratlas.com/about/brian-borders/)**

Software Development



(https://www.insuroratlas.com/about/ivan-betancourt/)

Ivan Betancourt (https://www.insuroratlas.com/about/ivan-betancourt/)
Software Development

## With nearly 40 years of experience in the insurance industry, we're more than just a software company.

Partnering with Insuror Atlas brings an invaluable knowledge base to your MGA that will support your business efforts and drive your company forward! Call 1 800 700 5943 to request more information or to schedule a free software demo.

Request Demo (https://www.insuroratlas.com/contact/)

Recommended by leaders in the insurance industry

★★★★★

# 5/5 RECOMMEND

## INSUROR ATLAS SOFTWARE

**"I've known the crew at Insuror Atlas for close to twenty years. One thing that has been consistent throughout that time, is their ability to respond rapidly and effectively in providing technology solutions for property and casualty programs."**

-Clinton Grumbles, Acacia MGA

In 1983, we were among the first to design a data management system. Since then, we have created the most powerful and intuitive insurance policy management system available.

### Software Overview

Personal Auto (https://www.insuroratlas.com/software/personal-auto/)

Commercial Trucking (https://www.insuroratlas.com/software/commercial-trucking/)

Residential Property (https://www.insuroratlas.com/software/residential-property/)

### Request Demo

To request a software demo, please call our office at 1-800-700-5943 or submit an online request through our website submission form.

### Contact Us

P.O. Box 1187, Caddo Mills, TX 75135

1-800-700-5943

inquiries@insuroratlas.com



MAITH_0000452

Copyright © 2019 Insuror Atlas. Website by Brand New Marketing (https://www.thebrandnewmarketing.com). Made in USA.

**From:** Heather Hunt [hhunt@fulbrightmail.org]
**Sent:** 10/9/2019 11:56:37 AM
**To:** John Edwards [jedwards@sdinc.cc]; Brian Borders [bborders@sdinc.cc]; Ivan Betancourt [ivan@sdinc.cc]
**Subject:** Please review agenda
**Attachments:** Meeting Agenda - Get Jerry and Insuror Atlas.pdf

Hi everyone -

I've made a few edits to tomorrow's agenda for the demonstration. Minor tweaks. Please look over and let me know if everything looks accurate.

Thank you!
Heather

--
Heather M. Hunt

EXHIBIT 5
B. Borders
2/25/2025
Stenographically Reported by:
Nicole A. Hatler CSR 11275

**Get Jerry // Insuror Atlas**

# Insuror Atlas Software Demonstration

October 10, 2019 / 9:30 a.m. PDT / GoTo Meeting

## Meeting Credentials:

Please join the virtual demonstration from your computer:
https://global.gotomeeting.com/join/610060645

You can also dial in using your phone:
United States: +1 (872) 240-3412

Access Code: 610-060-645

**If assistance is needed in joining the virtual meeting please contact Heather Hunt at +1.214.998.1850*

## PRINCIPLE ATTENDEES

- Tim Hunt, Founder and President (Insuror Atlas)
- John Edwards, CTO (Insuror Atlas)
- Brian Borders, Software Development (Insuror Atlas)
- Ivan Betancourt, Software Development (Insuror Atlas)
- Heather Hunt, Business Development and Marketing (Insuror Atlas)
- Stephanie Kramer, VP of Insurance Products (Get Jerry)

## System Demonstration

- Quoting and Binding
    - An overview of the quoting and binding of policies with emphasis on the Quick App and electronic signature.
- Policy Maintenance
    - A demonstration of the policy overview showing transactions, images, payments, endorsements and Underwriting features.
- System Reports
    - Quick overview of system reports available. Including but not limited to Earned Premium, Daily Processing, Statement of Losses, and FRVP reports.
- System Features
    - Summary of the unique features of the Atlas system including the Weather Restriction Map, Recurring Credit Cards, Customer SMS bill reminders and Integrated Data Orders (DAVES report).
    - Quick overview of claims system.

Contact

www.linkedin.com/in/brian-borders-51833747 (LinkedIn)

Top Skills

VB.NET

Microsoft SQL Server

MySQL

# Brian Borders

**Developer / Systems Administrator at Insuror Atlas**

Garland, Texas, United States

## Summary

**Over 20 years of experience in the software industry. Focused on designing custom workflows for client's business needs.**

EXHIBIT 8
B. Borders
2/25/2025
Stenographically Reported by:
Nicole A. Hatler CSR 11275