# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | ) |
| Plaintiffs/Counter-Defendants, | ) CIVIL ACTION |
| VS. | ) NO.: 4:24-CV-00620SDJ |
| MAITH SOLUTIONS LLC, | ) |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | ) |
| V. | ) |
| BRIAN BORDERS and IVAN BETANCOURT | ) |
| Third-Party Defendants. | ) |

---

ORAL DEPOSITION OF

IVAN BETANCOURT

FEBRUARY 27, 2025

---

ORAL DEPOSITION OF IVAN BETANCOURT, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the FEBRUARY 27, 2025, from 9:35 a.m.

P R O C E E D I N G S

IVAN BETANCOURT,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BISBIKIS:

Q. Good morning, Mr. Betancourt.
A. Good morning.
Q. When did you start working for Tim Hunt?
A. Me and Mr. Hunt made an agreement to work in 2015.
Q. And that was the first time you began working for Mr. Hunt?
A. That's the first time I made -- I provided services for Mr. Hunt.
Q. What do you mean by provided services for him?
A. I provided a service for him and he paid me for that service.
Q. So you worked for him?
A. If what you said is what I just said, is I provided a service and he paid me, then yes.
Q. Okay. Was there a specific service you provided?
A. To begin with, I provided the service of consulting and underwriting for Pearl General Agency.
Q. Okay. And did you do any software development

Q. It was a fee. Okay.
Did you use the word at that time, fee, with him?
A. I don't recall.
Q. Why are you saying it's a fee?
A. Because that's what it is.
Q. Okay. But why do you say it's a fee?
What do you mean by fee?
A. A fee is something you charge someone for a service.
Q. Okay. And did he agree to engage you for a certain period of time?
A. Length of time was not discussed.
Q. Okay. So he could have kept you on for a month, could have kept you on for two months and just terminated at any time?
A. Correct.
Q. Okay. And were there any -- did you -- so you didn't -- you got paid -- you got paid these monthly amounts, and did you get paid for any, you know, upon completion of any special projects?
A. Not that I can recall.
Q. Okay. When did you start programming, doing software programming for Mr. Hunt?
A. For Mr. Hunt?

Q. Yeah.
A. I started in 2000 -- I can't remember the exact date, but I believe it was around 2016.
Yeah, about 2016, when his -- when he stopped doing business with Pearl General Agency.
Q. And Pearl is where you first started with Hunt, right?
A. Correct, Pearl/Paladin.
Q. Yeah, Pearl Paladin. Paladin's the D/B/A, the name for Pearl General Agency, right?
A. That's my understanding.
Q. Okay. And so they stopped doing business and then Mr. Hunt kept you on?
A. Yes.
Q. Okay. Did you start -- did you -- was your first agreement over at that point?
A. Well, no, because there was still -- even though he couldn't write business, there were still claims to take, customers to service.
But that started to fade away slowly towards the end of 2016.
Q. Okay. So the original agreement you made was effectively over, right, because you said it was to provide services to Paladin?
A. I didn't consider it over until all the -- all

business.

So I would come in early sometimes to prepare for the day and then I would leave usually after the business was closed to make sure everything that had been processed was done.

Q. Okay. So you were flexible in hours.

Is that what I'm understanding?

A. Correct. I was very flexible in hours.

Q. So let me ask you: When you first started with Mr. Hunt in 2015 through '16 and continued through the set amount after he converted you to development, right?

MR. WELTGE: I'm sorry. I didn't hear the last part of your question.

MR. BISBIKIS: I'm sorry. We'll scratch that. I probably trailed off there.

Can we mark this as Exhibit 1?

(Defendant's Exhibit No. 1 marked)

Q. (BY MR. BISBIKIS) Mr. Betancourt, the court reporter has handed you what's been marked as Exhibit 1.

Do you recognize this?

A. I do.

Q. What is it?

A. It's a LinkedIn page.

Q. Okay. Do you see in the upper left-hand corner a date?

A. I do.
Q. What date is that?
A. It says October 4th, 2024 at 10:47 a.m.
Q. And do you know what that means?
A. I don't know what it means on this page. I assume it means that's the date it was printed.
Q. Okay. I'd like to refer you down to your experience where it says software developer.
Do you see that?
A. Oh, yes.
Q. And it says, Insuror-Atlas.com, full time?
A. Correct.
Q. Is that information you put out on your LinkedIn page?
A. I don't remember if that's what the LinkedIn page suggested I put in and I selected it from a group of two or three different options.
Q. What were the other options?
A. I don't remember. The LinkedIn page setting up was a bit...
Q. Okay. But you set that up; you selected full time, right?
A. I'm not certain. I couldn't tell you that I actually did that or the LinkedIn did it. I'm not --
Q. Okay.

Q. Do you do database management?
A. Yes.
Q. Okay. How about hardware management?
A. Yes.
Q. Okay. Do you cover for Brian, if needed?
A. I don't know what you mean by cover.
Q. Do you cover for Brian Borders, if needed?
A. What do you mean by cover?
Q. Do you help him out with work?
A. I do help him, yes.
Q. Okay. All right. And did you do code maintenance for software when you worked for Mr. Hunt?
A. Yes.
Q. Did you do IT-related tasks when you worked for Mr. Hunt?
A. Yes.
Q. Did you do database management when you worked for Mr. Hunt?
A. Yes.
Q. Did you cover for Brian, if needed, when you worked for Mr. Hunt?
A. I helped Brian.
Q. You helped Brian. Okay. So what has substantively changed?
What substantively are you doing different

Q. (BY MR. BISBIKIS) Okay. Do you recognize the documents in this exhibit?

A. Yes.

Q. And these are your 1099s, right? I think they're from 2017 to 2023, except for 2018 you don't have.

A. Correct.

Q. And then there's the last page that's not a 1099. Can you tell me what that last page is? I'll represent this is something -- that last page is something you produced.

A. Yes. This is a list of credits from Mr. Hunt to me for the work that I did on the Insuror-Atlas.

Q. Okay. And it indicates you got some Pearl General AG payroll; is that right?

A. Correct.

Q. Is that the full amount that you were paid from Mr. Hunt in 2024, if we added up all those numbers on that last page?

A. Yes.

Q. Okay. I'd like to turn back to, if you could look at the second-to-last page, Betancourt 19.

Do you see that in the lower right corner?

A. I do.

Q. It's your 2023 1099, and it shows that there's

A. No.
Q. Did you do any work with Mr. Grumbles outside of the work you did for Mr. Hunt in the first six months of 2024?
A. No.
Q. Did you work through TBB Technologies on any projects for Acacia in the first six months of 2024?
A. No, I don't believe I did.
Q. Okay. Did you work on any projects through TBB Technologies for Edgepoint in the first six months of 2024?
A. No.
Q. During the time you worked for Mr. Hunt since 2014, were the amounts he paid you how you supported yourself?
A. What do you mean by supported myself?
Q. Is that how you paid the bills, through work from working for Mr. Hunt?
A. Yes.
Q. Okay. And did you have steady work with him over those ten years -- or how many years that was, about ten years.
A. Yes.
Q. Okay. And did he give you raises over time?
A. He increased the amount he paid me over --

Q. Okay.
A. -- a period of time.
Q. Did it look like a raise? You're using your words very carefully here for some reason. You say he increased it. It wasn't a raise?
MR. WELTGE: Objection, argumentative.
A. He increased the amounts he paid me through time.
Q. (BY MR. BISBIKIS) Okay. Did you receive bonuses from Mr. Hunt periodically?
A. He paid me extra money aside from the fee that I charged him.
Q. Did you submit invoices to Mr. Hunt?
A. No.
Q. Okay. So how did you charge him?
A. We had agreed on a monthly fee every month, so that was just the way it was.
Q. When did -- so you said you had two times you met with him on agreements, right?
A. I talked to him two times on the amount -- on the fee.
Q. Once when you started in 2014, but there's no written agreement, right?
A. Correct. It was verbal.
Q. And then when you joined his Insuror-Atlas

business, you said there was another agreement; is that right?
A. When I start doing programming, that's when we started talking about the different work that I was going to be doing for him and he said he was going to give me more money.
Q. Okay. But there was no written agreement at that point either?
A. There was no written agreement.
Q. Okay. And from time to time when he gave you bonuses, that was discretionary, right?
A. Yes.
Q. Okay. And he also reimbursed you for your mobile phone; isn't that right?
A. He gave me a check that said check -- that said phone reimbursement and I cashed it.
Q. Okay. And he didn't dock you if you took sick days off, did he?
A. There was no reason to dock me because there was just a fee that he would pay me. He wasn't paying me per day or per, you know, hour. It was if I got the work done, that's what it was. So it didn't matter if I was sick or not.
Q. Okay. But there weren't any specific deliverables that you had in any contract written out

that you had to deliver to him, right?

A. No. The -- the agreement, no.

Q. Okay. And he didn't dock you time for taking off vacation, did he?

A. He didn't take anything away from the fee for any reason.

Q. Okay. You didn't work through any employment agency or anything like that, right; you worked directly with Mr. Hunt?

A. Correct.

THE WITNESS: Can we take a break? I've got to go to the restroom.

MR. BISBIKIS: Sure. You want to take a little break? That's fine.

(Break taken)

Q. (BY MR. BISBIKIS) Mr. Betancourt, do you have a college degree?

A. I do not.

Q. Okay. Do you have a high school diploma?

A. Yes.

Q. Have you taken any -- what year did you graduate from high school?

A. 1996.

Q. 1996. Okay. Have you taken any classes in computer programming?

Q. Yeah.
A. And what do you mean by service them?
Q. Did you provide services for Hunt's clients?
A. Like did I personally provide services for his clients?
Q. Let me ask this: You're aware that there was Hunt -- Hunt's Insuror-Atlas utilized a -- his Insuror-Atlas business utilized a system called the JIRA system?
Are you familiar with that?
A. Yes. That's a project management and issue tracking system.
Q. Okay. And would Hunt's clients submit requests through the JIRA system that they wanted done?
A. They would request issues and requests.
Q. Okay. And what are issues?
A. Problems with the system.
Q. Okay. And so would you address issues for Hunt's clients?
A. Yes.
Q. Okay. And would they -- through that system, would they request maybe certain features on the software be changed?
A. Correct.
Q. Okay. And would you always change -- make any

changes that they requested?

A. Not always, no.

Q. Okay. And Hunt paid for that JIRA system; is that right?

A. Correct.

Q. Okay. And did clients ever request reports through that system?

A. New reports or reports to be run?

Q. Did they ever request new reports?

A. Yes.

Q. Okay. And would you make the new reports for them?

A. If they were reasonable, yes.

Q. Okay. What if they're unreasonable?

A. We would usually not do unreasonable requests.

Q. If there -- so if it was routine, you could do it?

A. Correct.

Q. Okay. If there's anything out of the ordinary, is it something you would need to check with Mr. Hunt on to see if you needed to do anything?

A. No, I could determine that on my own.

Q. Okay. Did you ever run reports for clients?

A. If I did, it was very rare.

Q. Okay.

Q. Is he paying for Brian's lawyers fees?
A. I don't know.
Q. Okay. When you worked for Tim's Insuror-Atlas business, you had an Insuror-Atlas e-mail address; isn't that right?
A. Yes.
Q. And that was used for business, tend to business?
A. It was used for communicating between ourselves, Mr. Hunt and vendors.
Q. Okay. Any clients?
A. Occasional clients, yes.
Q. Okay. And did you also communicate with clients through one of -- an e-mail address related to Siguros (phonetic)?
A. I don't remember.
Q. Okay. All right. That Insuror-Atlas.com domain, that was Tim's domain, right?
A. I believe so.
Q. Okay. Did you have Insuror-Atlas business cards?
A. He provided some at one point.
Q. Okay.
MR. BISBIKIS: Can we mark this next exhibit, please?

(Defendant's Exhibit No. 7 marked)

Q. (BY MR. BISBIKIS) I'm handing you what's been marked as Exhibit 7.

Do you recognize this?

A. I do.

Q. And what is it?

A. This is a printout of the Insuror-Atlas commercial site. I don't know from what year it was. Oh, June 30th, 2024.

Q. Okay. And you were aware that the Insuror -- this -- the Insuror-Atlas website was updated around 2019?

A. Yes.

Q. And this is what was updated?

A. Yes.

Q. So this was the website from 2019 until at least June 30th, 2024; is that right?

A. Correct, yes.

Q. Okay. And do you see on the top, the first paragraph says, "Insuror-Atlas is a privately owned company founded in 2004, comprised of a team of insurance and software industry experts with over 40 years of experience in the insurance industry."

Do you see that?

A. Yes, I do.

Q. And were you part of that team?
A. If by part of that team you mean I was a part of a group of independent contractors that did work for the Insuror-Atlas, then yes.
Q. Well, was Tim holding -- was Tim holding himself out to clients in the Insuror-Atlas team?
MR. WELTGE: Objection, speculation.
A. He was holding himself out to be owner of the company called Insuror-Atlas.
Q. (BY MR. BISBIKIS) Okay.
A. Which did not exist.
Q. He didn't hold you out as an independent contractor, did he?
A. No, he wouldn't -- I was aware that he would make it seem that we were part of a company.
He would -- he's done that before where he presented us to be part of a company with employees and, you know, everything that comes -- that goes along with a company, and I was okay with that.
Q. Yeah. Okay. And you were okay with it, right, because he held you out as a software development, right?
A. I was okay with it because it didn't affect my other clients and it made him happy, so I was fine with that.

Q. And because he was paying you?
A. It was more of a favor.
Q. It was a favor for him. Okay. But you didn't object to being on the website?
A. I didn't.
Q. You didn't object to him calling you one of the team members?
A. No.
Q. So clients perceived you as one of the team members?
MR. WELTGE: Objection, calls for speculation.
A. I don't know. I'm sure they would.
Q. (BY MR. BISBIKIS) Do you see on the last page, there's a quote from Mr. Grumbles. It says, "I've known the crew at Insuror-Atlas for close to 20 years."
A. Yes.
Q. Were you part of the Insuror-Atlas crew?
A. If by part of the Insuror-Atlas crew you mean a part of the team that -- part of the independent consultants that worked on the Insuror-Atlas, then yes.
Q. You went and got your picture taken to be posted on the website, right?
A. I was asked to come and take a picture to be part of the website, and I agreed.

Q. Okay. And did you approve the letter?
A. Yes.
Q. Okay. So then it looks like, if you turn to page 42441, the next page.
A. Yes.
Q. He said, "Ivan, here's the letter," and then attached to that is a copy of the signed letter, right?
A. Correct.
Q. So John helped you out when you needed it to help you get a mortgage, right?
A. Yeah, he did.
Q. And you wouldn't have submitted anything to the mortgage company you thought was untrue, right?
A. Correct.
Q. Did you ever tell Mr. Hunt that you thought you co-owned the Insuror-Atlas software?
A. I did not.
Q. Did Mr. Hunt ever have a meeting with you about ownership of the Insuror-Atlas software?
A. There was a meeting on May 1st where he asked us to sign a document that said that we did not own the Insuror-Atlas and that we gave up all know-how and knowledge on how to do Insuror-Atlas -- or how to do an insurance management system.
Q. And where was that meeting?

Home My Network Jobs Messaging 25 Notifications Me For Business Try Premium for $0



# ivan betancourt

Software Developer

Mansfield, Texas, United States · **Contact info**

1 connection

Connect Message More

## Activity

1 followers

**ivan hasn't posted yet**

Recent posts ivan shares will be displayed here.

Show all activity →

## Experience

**Software Developer**
InsurorAtlas.com · Full-time

JavaScript, Visual Basic .NET (VB.NET) and +8 skills

**Software Developer/Consultant**
Freelance
Jan 2017 - Present · 7 yrs 10 mos

## Skills

**.NET Framework**

Software Developer at InsurorAtlas.com

**JavaScript**

Software Developer at InsurorAtlas.com

Show all 10 skills →

EXHIBIT
tabbles
1
2.27.25 KB

## Interests

Companies Newsletters

**Microsoft**
23,630,888 followers

+ Follow

# Insurance industry experts creating software solutions

Insuror Atlas is a privately owned company founded in 2004 comprised of a team of insurance and software industry experts with over 40 years of experience in the insurance industry. Our goal is to give clients the tools to build and grow their businesses in the most efficient and effective way possible.



(https://www.insuroratlas.com/about/timothy-hunt/)

**Timothy Hunt (https://www.insuroratlas.com/about/timothy-hunt/)**

Business Development

EXHIBIT 7



(https://www.insuroratlas.com/about/john-edwards/)

**John Edwards (https://www.insuroratlas.com/about/john-edwards/)**

Account Management



(https://www.insuroratlas.com/about/brian-borders/)

**Brian Borders (https://www.insuroratlas.com/about/brian-borders/)**
Software Development



(https://www.insuroratlas.com/about/ivan-betancourt/)

**Ivan Betancourt (https://www.insuroratlas.com/about/ivan-betancourt/)**
Software Development

## With nearly 40 years of experience in the insurance industry, we're more than just a software company.

Partnering with Insuror Atlas brings an invaluable knowledge base to your MGA that will support your business efforts and drive your company forward! Call 1 800 700 5943 to request more information or to schedule a free software demo.

**Request Demo (https://www.insuroratlas.com/contact/)**

Recommended by leaders in the insurance industry

★★★★★

## 5/5 RECOMMEND
### INSUROR ATLAS SOFTWARE

**"I've known the crew at Insuror Atlas for close to twenty years. One thing that has been consistent throughout that time, is their ability to respond rapidly and effectively in providing technology solutions for property and casualty programs."**

-Clinton Grumbles, Acacia MGA

In 1983, we were among the first to design a data management system. Since then, we have created the most powerful and intuitive insurance policy management system available.

### Software Overview

Personal Auto (https://www.insuroratlas.com/software/personal-auto/)
Commercial Trucking (https://www.insuroratlas.com/software/commercial-trucking/)
Residential Property (https://www.insuroratlas.com/software/residential-property/)

### Request Demo

To request a software demo, please call our office at 1-800-700-5943 or submit an online request through our website submission form.

### Contact Us

- P.O. Box 1187, Caddo Mills, TX 75135
- 1-800-700-5943
- inquiries@insuroratlas.com

Copyright © 2019 Insuror Atlas. Website by Brand New Marketing (https://www.thebrandnewmarketing.com). Made in USA.