**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | § | |
| *Plaintiffs/Counter-Defendants*, | § | |
| v. | § | |
| MAITH SOLUTIONS LLC, | § | Civil Action No: 4:24-cv-00620-SDJ |
| *Defendant/Counter-Plaintiff/Third-Party Plaintiff*, | § | |
| v. | § | |
| BRIAN BORDERS and IVAN BETANCOURT | § | |
| *Third-Party Defendants*. | § | |

**PLAINTIFFS AND THIRD-PARTY DEFENDANTS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

COME NOW Plaintiffs Acacia Insurance Managers, LLC ("Acacia") and Edgepoint Systems, LLC ("Edgepoint") (collectively, "Plaintiffs") and Third-Party Defendants Brian Borders ("Borders") and Ivan Betancourt ("Betancourt") (collectively, "Third-Party Defendants") and file this Response in Opposition to Defendant Maith Solutions LLC's ("Maith") Motion for Partial Summary Judgment ("Motion"). In support thereof, Plaintiffs and Third-Party Defendants offer the following:

## I.
## RESPONSE TO MAITH'S STATEMENT OF ISSUES

Maith wrongfully asserts in its "Statement of Issues" that it "acquired exclusive ownership rights in certain software known as 'Insuror Atlas Software' ('IAS') from Timothy Hunt[,]" that Third-Party Defendants' contributions to the Insuror Atlas Software were as employees of Hunt,

and that, therefore, Maith is entitled to partial summary judgment on its copyright infringement claim and a permanent (or, in the alternative, a preliminary) injunction. ECF No. 82 at 2. Plaintiffs and Third-Party Defendants, however, have shown in their dispositive motion (*see* ECF No. 80) that the Insuror Atlas software ("Software") was not a "work made for hire" and that Third-Party Defendants retain non-exclusive ownership rights to the Software by virtue of their creation and development of the Software in their capacity as independent contractors. The overarching issue then, as it pertains to Maith's dispositive motion, is whether Third-Party Defendants possess ownership rights in the Software when the summary judgment evidence proves that the Software was not a "work made for hire."

## II.
## RESPONSE TO MAITH'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Maith's "Statement of Undisputed Material Facts" mischaracterizes, or omits altogether, material facts related to Maith's claims against Plaintiffs and Third-Party Defendants as well as Plaintiffs' and Third-Party Defendants' defenses and counterclaims against Maith. Consequently, Maith has failed to provide a complete and objective statement of facts to this Court.

In Paragraph 5 of Maith's Motion, Maith states that Hunt "decided to update the claims management software" from one programming language to another in or around 2005 or 2006 and "supervised the update and approved all major decisions" concerning the software update. ECF No. 82 at 3, ¶ 5. Maith's representation is wrong. Hunt testified that he merely "discussed" the change from DataFlex to Visual DataFlex with Edwards. *See Depo. of T. Hunt* at 103:2–13 (Ex. "1"). Second, while there may have been a software programming change from Dataflex to Visual Dataflex around 2005, Maith fails to identify for the Court the fact that, in 2010, the Software was a "scratch rewrite" of the previous insurance management software whereby "all new code" was created in Microsoft Visual Basic by Borders and Edwards, originally for use for themselves,

without any authorization from Hunt. *See Depo. of B. Borders* at 27:8–28:18; 29:2–5 (Ex. "2"). In fact, Hunt was not involved with the launch of the new software. *See Depo. of B. Borders* at 29:9–18 (Ex. "2").

In Paragraph 7, Maith claims that Hunt was intimately involved with the creation of the Software. ECF No. 82 at 3–4, ¶ 7. Maith, however, completely ignores Hunt's deposition testimony that Hunt had no knowledge that Borders and Edwards had individually decided to create a new software platform that they would incorporate for use in Hunt's insurance business. *Depo. of T. Hunt* at 104:4–8; 104:12–105:7 (Ex. "1"); *see also Depo. of J. Edwards* at 31:10–17 (Ex. "3") (Edwards also testified that he and Borders made the decision, without Hunt, to create the Software using the Visual Basic coding language). Maith also ignores the fact that Hunt did not direct Borders or Edwards on the means by which they would create the Software, nor did Hunt have any knowledge that Betancourt was also working on the development of the Software. *See Depo. of T. Hunt* at 106:7–12; 106:22–107:5 (Ex. "1"). Further, Edwards testified in his deposition that Hunt did not write any of the source code for the development of the Software at any time from 2010 through 2024, and that Edwards and Borders worked together, "pick[ing] sections [of the code] and [running] with it." *See Depo. of J. Edwards* at 34:24–35:3; 37:17–38:7 (Ex. "3").

In Paragraph 10, Maith failed to expound on the form and type of payment Third-Party Defendants received from Hunt for the services they performed. ECF No. 82 at 4–5, ¶ 10. For example, between 2010 and 2015, Borders was first paid hourly and then paid a fixed fee on a bimonthly basis. *See Decl. of B. Borders* at ¶¶ 7, 8 (Ex. "4"). Similarly, Betancourt was paid a fixed fee twice each month for the software consulting services he provided for Hunt, and Betancourt testified that he charged Hunt an agreed upon monthly fee for services rendered. *See*

*Decl. I. Betancourt* at ¶ 5 (Ex. "5"); *See Depo. of I. Betancourt* at 43:15–21 (Ex. "6"). Moreover, Maith also failed to recognize that Hunt paid Borders and Betancourt through operating accounts associated with his affiliate entities, Seguros Direct and Pearl General Agency, Inc. *See Depo. of T. Hunt* at 81:18–82:7 (Ex. "1"); *Depo. of B. Borders* at 69:12–13 (Ex. "2"); *Decl. of B. Borders* at ¶ 7 (Ex. "4"); *Borders Checks* (Ex. "4" at MAITH0021805, *et seq.*); *Decl. of I. Betancourt* at ¶ 5 (Ex. "5"); *Betancourt Checks* (Ex. "5" at MAITH0021883, *et seq.*). Further, as demonstrated by the preliminary report for payroll prepared by Hunt's Certified Public Accountant, Third-Party Defendants (and Edwards) were paid as independent contractors. *See August 26, 2014 Email from Payroll to T. Hunt* (Ex. "7").

In Paragraph 18 of its Motion, Maith ignores the fact that while Hunt at times provided computer equipment for Third-Party Defendants' occasional use, Hunt testified that Borders and Edwards used their personal computer equipment for their contract work. ECF No. 82 at 6, ¶ 18; *Depo. of. T. Hunt* at 66:19–25; 89:10–21 (Ex. "1"). Additionally, Hunt testified that Borders would often perform backups of the Software on his personal computers, and Hunt further acknowledged the possibility that Borders used his personal data repositories located at Borders' house for his work on the Software—something Borders confirmed in his own deposition. *Depo. of T. Hunt* at 89:10–21; 96:1–8 (Ex. "1"); *see also Depo. of B. Borders* at 29:20–30:8 (Ex. "2"). In fact, Borders testified specifically that he used his own laptop and equipment for writing and storing the code for the Software, not computer equipment supplied by Hunt. *Depo. of B. Borders* at 29:20–31:22 (Ex. "2"). Similarly, Betancourt used his "own personal laptop or desktop to work on the Software" and used three total personal laptops and various personal monitors. *Decl. of I. Betancourt* at ¶¶ 9, 10 (Ex. "5"). While Hunt had monitors set up in his physical office, Betancourt "brought [his] personal laptop to plug in to the monitors during the times [he] went into the office." *Decl. of I.*

*Betancourt* at ¶ 10 (Ex. "5").

Maith's factual allegations in Paragraph 20 of its Motion exclude the fact that Third-Party Defendants largely worked remotely during their time providing contract work to Hunt. ECF No. 82 at 6, ¶ 20; *see Depo. of I. Betancourt* at 47:19–50:3 (Ex. "6"); *Depo. of B. Borders* at 18:21–22; 32:7–8 (Ex. "2"). Additionally, Third-Party Defendants produced Google Location/GPS data spanning the years of 2015–2019 for Betancourt and 2017–2020 for Borders. *See Decl. of I. Betancourt* at 3 (Ex. "5"); *Betancourt GPS Data* (Ex. "5" at Bates label 13-D); *Decl. of B. Borders* at ¶ 3 (Ex. "4"); *Borders GPS Data* (Ex. "4" at Bates label 12-C). As provided in Plaintiffs and Third-Party Defendants' Motion for Summary Judgment (ECF No. 44), a review of that data indicates that in a period of five years (or roughly 1,825 days), Borders was physically present in an office associated with Hunt only 445 times through 2019. *Decl. of B. Borders* at ¶ 3 (Ex. "4"). Similarly, in a period of four years (or roughly 1,460 days), Betancourt was physically present in an office associated with Hunt only 252 times through 2020. *Decl. of I. Betancourt* at ¶ 3 (Ex. "5").

In Paragraph 21 of its Motion, Maith misrepresents the nature of Third-Party Defendants' lack of a work schedule when it claims that Third-Party Defendants "generally set working hours, from 9 am to 5 pm." ECF No. 82 at 6, ¶ 21. Maith conveniently neglected to include both Hunt and Betancourt's deposition testimony in which both testified as to the freedom of Third-Party Defendants' working hours. *See Depo. of. T. Hunt* at 59:6–13; 60:5–10; 84:17–85:11 (stating that Borders was not required to work, for instance, "if he had something to do for his grandmother, if he wanted to take some days off"); 95:14–17 (Ex. "1"); *Depo. of I. Betancourt* at 14:16–17; 15:6 (Ex. "6"). In fact, Third-Party Defendants and Edwards did not have a set schedule of work hours dictated by Hunt, and none of them were required to work a specific number of hours per week. *Depo. of. T. Hunt* at 64:12–17; 66:19–25; 84:17–85:11; 95:14–17 (Ex. "1"). In fact, Borders

testified that his contract labor hours would vary week to week, and Betancourt testified that he "worked when [he] wanted to work." *Depo. of B. Borders* at 26:7–8 (Ex. "2"); *Depo. of I. Betancourt* at 14:16–17 (Ex. "6").

In Paragraph 24 of its Motion, Maith alleges that because Hunt was shutting down his business, "ARM," and lost his accountant that had previously been preparing his tax filings, he then began issuing 1099s to Third-Party Defendants and Edwards from his other companies. ECF No. 82 at 7, ¶ 24. However, Maith fails to include that when Hunt terminated Borders' W-2 status and converted him to a 1099 independent contractor, it was because "Tim no longer wanted to have employees." *Depo. of T. Hunt* at 68:23–25 (Ex. "1") (stating that Borders joined Hunt as an employee at ARM in 1999); *Depo. of J. Edwards* at 24:9–10 (Ex. "3"). Further, Edwards testified that he was intentionally transitioned to an independent contractor status by Hunt. *See Depo. of J. Edwards at* 24:4–25:4 (Ex. "3").

In Paragraph 26 of its Motion, Maith represents that "Borders and Edwards were required to get permission from Hunt if they wanted to do any side jobs." ECF No. 82 at 7, ¶ 26. In actuality, Third-Party Defendants were not required to obtain permission from Hunt to perform work outside of the contract work provided to Hunt. *See Depo. of I. Betancourt* at 19:24–23:3 (Ex. "6"); *Depo. of B. Borders* at 20:21–22:9 (Ex. "2"). Specifically, during the time Betancourt provided contract work for Hunt, Betancourt also performed software development work for other clients as well, including a premium finance company in or around 2019 and 2020 that paid him approximately $10,000.00. *See Depo. of I. Betancourt* at 19:24–23:3 (Ex. "6"). Similarly, Borders also performed work for other clients apart from his contract work for Hunt. *See Depo. of B. Borders* at 20:21–22:9 (Ex. "2") (stating that he formed TDB Technologies at the end of 2008 and provided software services to clients outside of his contract work for Hunt).

Finally, in Paragraph 27 of its Motion, Maith provides that "[e]ffective May 31, 2024, Maith acquired Hunt's Insuror Atlas Business, including all right, title, and interest in and to the source code for the IAS, including the copyright rights in the IAS, subject to existing licenses of the IAS to third parties." ECF No. 82 at 7, ¶ 27. Tellingly, Maith makes no reference to the Asset Purchase Agreement, which was made "by and between *Timothy Craig Hunt, an individual* resident of Texas ('Seller'), [and] Maith Solutions LLC, a Texas limited liability company ('Buyer')." *See Asset Purchase Agreement* (Ex. "8") (emphasis added). Further, the evidence in this case is unclear as to whether Insuror Atlas was a "business." For example, Third-Party Defendants and Edwards were never paid by an entity called "Insuror Atlas Business." *See Depo. of T. Hunt* at 27:7–28:22 (Ex. "1"). Moreover, Hunt testified that he formed or bought the following entities, which does not include "Insuror Atlas Business": (i) ARM; (ii) Pearl General Agency; and (iii) Seguros Direct. *See Depo. of T. Hunt* at 18:6–20; 21:14–17; 33:22–34:1 (Ex. "1").

## III.
## ARGUMENT & AUTHORITIES

In its Motion, Maith contends that Third-Party Defendants' creation and development of the Software amounted to a "'work made for hire' for Hunt." ECF No. 82 at 11. Maith's position, which is largely informed by three cases cited in its Motion, is baseless given that the case law Maith cites is distinguishable from the facts of this case.

### 1. Maith's reliance on *JAH IP Holdings LLC v. Mascio* is misplaced.

In its Motion, Maith errantly likens the Colorado District Court's opinion in *JAH IP Holdings LLC v. Mascio* to the facts of this case to negate this Court's *Alcatel* opinion, which the Plaintiffs and Third-Party Defendants relied on in their dispositive motion. *See* ECF No. 82 at 9–10, 11–12, 14, 15; *JAH IP Holdings, LLC v. Mascio*, No. 13-cv-02195-MSK-KLM, 2014 U.S. Dist. LEXIS 162546 (D. Colo. 2014). The *JAH* Court's opinion is clearly distinguishable from this

case. First, in *JAH IP Holdings LLC*, the plaintiffs did not provide any substantive response to the defendants' motion for summary judgment at issue and, therefore, the material facts were undisputed. *See JAH IP Holdings, LLC*, 2014 U.S. Dist. LEXIS 162546, at *5–6, *26. That scenario is obviously not before this Court.

Second, Maith conveniently addressed only a fraction of the factors that supported the Colorado District Court's conclusion that the software was a work made for hire—namely, duration of the relationship, tax treatment, right to assign additional projects, and control over the software development. *See* ECF No. 82 at 9–10. On top of those factors, the Colorado District Court noted that the employee at issue, Mr. Hall, (a) "*describe[d] himself as an* '*employee*'" during his deposition, (b) reported to the office daily, (c) used the company's office computers and its subscription to the data service to create the software at issue, and (d) Mr. Hall "tendered the software to [the company] for its use with the hope that it would assist him in demonstrating his worth and negotiating a greater stake in the company"—all of which are facts entirely absent from the case at bar. *JAH*, 2014 U.S. Dist. LEXIS, at *20–21 (emphasis added).

Here, as noted, Third-Party Defendants did not describe themselves as employees of Hunt during the time in which they created and developed the Software. Instead, the summary judgment evidence thoroughly establishes that Third-Party Defendants were independent contractors and, thus, retained ownership rights in the Software. For instance, (a) Third-Party Defendants were provided 1099 tax forms year after year during their contract work for Hunt (*See Decl. of I. Betancourt* at 2 (Ex. "5"); *Betancourt's 1099 Tax Forms* (Ex. "13-B"); *Depo. of B. Borders* at 24:5–7 (Ex. "2"); *Decl. of B. Borders* at 2 (Ex. "4"); *see also Borders' 1099 Tax Forms* (Ex. "12-A" and "12-B")); (b) Hunt's own accountant unquestionably classified Borders and Betancourt's work for Hunt as contract labor (*August 26, 2013 Email from Payroll to T. Hunt* (Ex. "7"));

(c) Hunt never directed Borders or Edwards on the means by which they would create the Software, nor did he have any knowledge that Betancourt was also working on the development of the Software (*Depo. of T. Hunt* at 106:7–12, 106:22–107:5 (Ex. "1")); and (d) Borders and Betancourt controlled their own work schedule (*Depo. of B. Borders* at 26:7–8 (Ex. "2"); *Depo. of I. Betancourt* at 14:16–17 (Ex. "6")). Hence, the summary judgment evidence proves that Third-Party Defendants were independent contractors during the time in which they provided services to Hunt, that they created and developed the Software as independent contractors, and that they did not infringe upon Maith's purported (and invalid) copyright of the Software, to which they retained ownership rights. Accordingly, Maith's Motion should be denied.

**2. Maith's reliance on *JustMed, Inc. v. Byce* is similarly ineffective.**

Maith's dependence on *JustMed, Inc. v. Byce* in an attempt to support the duration, control over the software development, and payment method *Reid* factors and to discredit the *Reid* factor favoring Third-Party Defendants' ability to set their own work hours or work from home is similarly misguided. *See* ECF No. 82 at 11–14 (citing *JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010)).

As an initial matter, the Ninth Circuit was clear that its weighing of the *Reid* factors was guided significantly by JustMed's status as a technology start-up company—a fact which surely does not apply in this case. *See JustMed*, 600 F.3d at 1126. To that end, Maith's citation of *JustMed* for the purpose of minimizing the applicability of the control factor in this case is puzzling. *See* ECF No. 82 at 13. Specifically, the *JustMed* Court's statement that "[t]he 'control of the manner and means by which' a programmer creates source code is not as important to a technology startup'" is irrelevant to Hunt's entities at issue here (i.e., ARM, Pearl General Agency, and Seguros Direct), none of which were technology startups. *JustMed*, 600 F.3d at 1127.

Moreover, the Ninth Circuit emphasized the "*inherent unfairness* in a company claiming a worker to be an independent contractor in one context but an employee in another." *Id*. at 1128 (emphasis added). That "inherent unfairness" is on full display in the case now before this Court. In fact, the Ninth Circuit recognized facts in other copyright cases that directly align with the present case: the hiring party's treatment of the hired party "by not withholding taxes and by giving the hired party 1099 forms—and only later assert[ing] that the individual was an employee." *Id*. Our case is factually distinguishable from *JustMed*, as the Ninth Circuit noted that the tax treatment for the employee at issue was "more ambiguous" where he previously was paid only through shares of stock and later clearly filled out a W-4 form and had taxes withheld once he started receiving paychecks from *JustMed*.

Here, at the time they created and developed the Software, Borders and Betancourt were independent contractors who were issued 1099 tax forms, and whose "contract labor" was documented by Hunt's accountant. S*ee Depo. of T. Hunt* at 68:10–12, 72:20–73:8, 91:8–16; 106:22–107:10 (Ex. "1"); *Depo. of I. Betancourt* at 7:6–8:14 (Ex. "6"); *August 26, 2013 Email from Payroll to T. Hunt* (Ex. "7"); *Decl. of I. Betancourt* at 2 (Ex. "5"); *Betancourt's 1099 Tax Forms* (Ex. "5" at Bates label 13-B); *Depo. of B. Borders* at 24:5–7 (Ex. "2"); *Decl. of B. Borders* at 2 (Ex. "4"); *see also Borders' 1099 Tax Forms* (Ex. "4" at Bates labels 12-A and 12-B). Furthermore, it cannot be reasonably disputed that Hunt did not control the manner and means by which the Software was developed by Third-Party Defendants when (1) Borders and Betancourt could work whenever they wanted, (2) Borders and Betancourt largely used their personal computer equipment for the creation and development of the Software, (3) Hunt had no knowledge that Borders and Edwards decided on their own to create a new software platform, (4) Hunt had no knowledge that Betancourt was also working on the Software, and (5) Edwards testified that

Hunt did not write any of the source code for the development of the Software at any time from 2010 through 2024. *See Depo. of. T. Hunt* at 59:6–13; 60:5–10; 95:14–17, 104:12–105:7, 106:7–12, 106:22–107:5 (Ex. "1"); *Depo of I. Betancourt* at 14:16–17, 15:6 (Ex. "3"); *Depo. of J. Edwards* at 34:24–35:3; 37:17-38:7 (Ex. "3"). Therefore, Maith's contention that *JustMed* supports its position that the Software created and developed by Third-Party Defendants was a "work made for hire" is demonstrably inaccurate.

**3. *Siniouguine v. Mediachase Ltd.* is similarly distinguishable from this case.**

Maith's reliance on *Siniouguine* is also misplaced. In its Motion, Maith pointed to *Siniouguine* to support its argument that courts have noted that computer programmers hired for an indefinite term favored a determination that software was developed on a work made for hire basis. *See* ECF No. 82 at 11 (citing *Siniouguine v. Mediachase Ltd.*, No. CV 11-6113-JFW (AGRx), 2012 U.S. Dist. LEXIS 87190 (C.D. Cal. 2012)). While the programmer at issue in *Siniouguine* worked for the company for twelve years, that was not the single determining factor supporting the conclusion that the programmer was an employee and that the computer programs were thus a work made for hire. The California Central District Court held that the computer programs at issue in *Siniouguine* "easily qualif[ied] as 'works made for hire' under Section 101(2) [of the Copyright Act]" based on the *written agreement* in which the parties expressed that the computer programs would be "works made for hire." *Siniouguine*, 2012 U.S. Dist. LEXIS at *16.

Here, it is undisputed that there existed no written agreement establishing the development of the Software as a work made for hire or one that was specially ordered or commissioned. *See* ECF No. 82 at 7, ¶ 26; *see also* ECF No. 80 at 10–11; *Depo. of T. Hunt* at 104:4–8 (Ex. "1") (stating that Hunt did not know Edwards and Borders decided to build the Software using Visual Basic coding language). Moreover, unlike Betancourt and Borders, the employee in *Siniouguine*

(1) admitted he was the company's "employee" in an "Employee Application" for medical insurance coverage, (2) signed a lease application identifying the company as his "current" employer and "employer" for "10 years[,]" (3) received monthly benefits, (4) received a regular monthly "salary," (5) only occasionally worked from home, and (6) the company "exercised significant control" over the employee. *Siniouguine*, 2012 U.S. Dist. LEXIS at *23–26. In fact, in this case Edwards signed a letter in which he expressly stated that Betancourt "has been continuously working for Pearl General Agency, Inc. *as a self-employed individual since January 4, 2016*. He is currently working on long-term, ongoing projects involving the development and enhancement of software programs, as well as software maintenance." *Decl. of I. Betancourt* at 2, ¶ 7, 55 (Ex. "5") (emphasis added). Neither Betancourt nor Borders ever admitted they were Hunt's employees, never identified Hunt as their employer, did not receive benefits, did not receive a "salary," largely worked remotely, and Hunt exercised little to no control over Borders and Betancourt. Therefore, *Siniouguine* is readily distinguishable from this case, and the Court should thus deny Maith's Motion.

**4. Maith is not entitled to injunctive relief.**

Maith has failed to show that it is entitled to injunctive relief, be it preliminary or permanent. "The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need of its issuance." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). For a preliminary injunction, a movant must establish the following:

> (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest. The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572–73 (5th Cir. 1974)). Concerning a permanent injunction, "[c]ourts have traditionally granted permanent injunctions[] if liability is established and a continuing threat to the copyright exists." *Fermata Intern. Melodies, Inc. v. Champions Golf Club, Inc.*, 712 F. Supp. 1257, 1262 (S.D. Tex. 1989). The factors for permanent injunctive relief are the same as those for preliminary relief. *Broadcast Music, Inc. v. Tex Border Mgmt., Inc.*, 11 F. Supp. 3d 689, 696 (N.D. Tex. 2014).

Here, Maith failed to discuss—let alone establish—the factors required for preliminary or permanent injunctive relief. In its Motion, Maith argued that an injunction was "proper" because "Acacia was sent a Cease and Desist letter to stop infringing and Plaintiffs refused and instead sued Maith first[], and they are still seeking a declaration that the alleged Edgepoint Software does not infringe." ECF No. 82 at 16. But Maith's mailing of a self-serving cease-and-desist letter does not prove that (1) "there is a substantial likelihood that the movant will prevail on the merits," (2) "there is a substantial threat that irreparable harm will result" barring an injunction, (3) "the threatened injury outweighs the threatened harm to the defendant," or (4) "the granting of the preliminary injunction will not disserve the public interest." *Clark*, 812 F.2d at 993. In fact, Plaintiffs and Third-Party Defendants have shown, both in this response to Maith's Motion and in their Motion for Summary Judgment (*see* ECF No. 80), that Maith will likely *not* prevail on the merits, that Maith's purported copyright of the Software is invalid, that Third-Party Defendants' creation and development of the Software was not a "work made for hire," and that Third-Party Defendants thus retain ownership rights in the Software. Consequently, Maith is not entitled to the injunctive relief it seeks in this case.

## IV.
## CONCLUSION

For the foregoing reasons, Plaintiffs and Third-Party Defendants request that the Court deny Defendant Maith Solutions LLC's Motion for Partial Summary Judgment.

Respectfully submitted,

**KESSLER COLLINS, P.C.**


*/s/ Gary S. Kessler*
GARY S. KESSLER
State Bar No. 11358200
gkessler@kesslercollins.com
SAMUEL C. KESSLER
State Bar No. 24118431
skessler@kesslercollins.com
EVAN W. WELTGE
State Bar No. 24110523
eweltge@kesslercollins.com

500 N. Akard St., Suite 3700
Dallas, Texas 75201
214-379-0722 Telephone
214-373-4714 Telecopier


**ATTORNEYS FOR PLAINTIFFS ACACIA INSURANCE MANAGERS, LLC AND EDGEPOINT SYSTEMS, LLC, AND THIRD-PARTY DEFENDANTS BRIAN BORDERS AND IVAN BETANCOURT**

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 29, 2026, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Gary S. Kessler*
GARY S. KESSLER