**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC,<br><br>*Plaintiffs/Counter-Defendants*,<br><br>v.<br><br>MAITH SOLUTIONS LLC,<br><br>*Defendant/Counter-Plaintiff/Third-Party Plaintiff*,<br><br>v.<br><br>BRIAN BORDERS and IVAN BETANCOURT<br><br>*Third-Party Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No: 4:24-cv-00620-SDJ |

**PLAINTIFFS AND THIRD-PARTY DEFENDANTS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 1

*Deposition of Timothy Hunt (Excerpts)*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DIVISION OF TEXAS
SHERMAN DIVISION

ACACIA INSURANCE MANAGERS, )
LLC and EDGEPOINT SYSTEMS, )
LLC, )
Plf/Counter-Defs, )
)
V. )
)
MAITH SOLUTIONS, LLC, ) CIVIL ACTION NO.
Dft/Counter-plf/TP Plf, ) 4:24-cv-00620SDJ
)
V. )
)
BRIAN Borders and IVAN )
BETANCOURT, )
Third-Party Dfts. )

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

TIMOTHY HUNT

FRIDAY, FEBRUARY 28, 2025

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF TIMOTHY HUNT, produced as a witness at the instance of the Plaintiffs/Counter-Defendants, and duly sworn, was taken in the above-styled and -numbered cause on the 28th day of February, 2025, from 9:56 a.m. to 2:16 p.m., before Natasha Duckworth, a CSR in and for the State of Texas, reported by machine shorthand at the offices Carstens, Allen & Gourley, LLP, 7500 Dallas Parkway, Suite 300, Plano, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS/COUNTER-DEFENDANTS:

MR. GARY S. KESSLER
MR. SAM KESSLER
MR. EVAN WELTGE
MS. CHARMAINE BECKEN
KESSLER COLLINS, P.C.
500 N. Akard Street
Suite 3700
Dallas, Texas 75201
Telephone: 214.379.0722
Facsimile: 214.373.4714
E-mail: Eweltge@kesslercollin.com

FOR THE DEFENDANT/COUNTER-PLAINTIFF:

MR. JOHN G. BISBIKIS
PROSPECT LAW, LLP
120 N. LaSalle
Suite 2000
Chicago, Illinois 60602
Telephone: 312.374.8084
Facsimile:
E-mail: Jbisbikis@prospectlaw.com

FOR THE WITNESS:

MR. VINCENT J. ALLEN
CARSTENS ALLEN & GOURLEY, LLP
7500 Dallas Parkway
Suite 300
Plano, Texas 75024
Telephone: 972.367.2001
Facsimile:
Email: Allen@caglaw.com

ALSO PRESENT:

Kevin Dill, video technician
John Killacky

# I N D E X


| PROCEEDINGS | PAGE |
|---|---|
| Appearances | 2 |
| TIMOTHY HUNT | |
| Examination by Mr. Kessler | 6 |
| Signature and Changes | 172 |
| Reporter's Certificate | 175 |


## EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Franchise Tax Report for Seguros Direct as of 5/7/21 | 23 |
| Exhibit 2 | Forfeiture pursuant to Section 171.309 of the Texas Tax Code of Seguros Direct | 24 |
| Exhibit 3 | Application for Reinstatement and Request to Set Aside Revocation or Forfeiture for Seguros Direct | 25 |
| Exhibit 4 | Franchise Tax Report for Pearl General Agency as of 5/7/21 | 34 |
| Exhibit 5 | Forfeiture pursuant to Section 171.309 of the Texas Tax Code of Pearl General Agency | 34 |
| Exhibit 6 | Application for Reinstatement and Request to Set Aside Revocation or Forfeiture for Pearl General Agency | 36 |
| Exhibit 7 | 1099s to John Edwards from 2006-2023 | 54 |
| Exhibit 8 | 8/26/13 email from Tom Edwards to Tim Hunt | 57 |
| Exhibit 9 | 5/24/11 email from John Edwards to Tom | 79 |

EXHIBITS cont.


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 10 | Copies of checks to Ivan Betancourt and Brian Borders | 81 |
| Exhibit 11 | 1099s to John Edwards from 2017-2023 | 92 |
| Exhibit 12 | 12/13/23 email from John Edwards to Ivan Betancourt | 96 |
| Exhibit 13 | 2/8/24 email to Mr. Warden to Ivan and Brian re employment contract questions | 129 |
| Exhibit 14 | 2/21/24 email from Mr. Warden to John, Ivan, and Brian | 132 |
| Exhibit 15 | 2/26/24 email from John Edwards to Mr. Warden, Ivan and Brian | 135 |
| Exhibit 16 | 5/1/24 email from Brian Borders to Clinton Grumbles | 140 |
| Exhibit 17 | Asset Purchase Agreement | 151 |
| Exhibit 18 | Disclosure Schedules to Asset Purchase Agreement | 167 |

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record. Today is February 28th, 2025. The time is now 9:56 a.m. in the Central time zone.

And now the counsel will please state their appearances for the record after which court reporter will swear in the witness.

MR. WELTGE: Good morning. My name is Evan Weltge from Kessler Collins. I represent Acacia Insurance Managers, LLC; Edgepoint Systems, LLC; Mr. Brian Borders and Mr. Ivan Betancourt. I'm also with my colleagues Sam Kessler, Charmaine Becken, and Gary Kessler.

MR. ALLEN: I'm Vincent Allen. I'm here representing Mr. Tim Hunt.

MR. BISBIKIS: John Bisbikis. I represent Maith Solutions. With me John Killacky.

(The witness was sworn by court reporter.)

TIMOTHY HUNT,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. WELTGE:

Q. Good morning, Mr. Hunt. My name is Evan Weltge, and as you heard I represent Acacia Insurance Managers, Edgepoint Systems, Mr. Border, and

Mr. Betancourt in this lawsuit. Do you understand who I am and who I represent, sir?
A. I do.
Q. Okay. Mr. Hunt, by virtue of the oath you've just taken, your testimony today is essentially the same as if you were giving it in court, albeit, now just in a more informal environment. Do you understand, sir, that everything you say today can be used in court at trial if we were to go to trial in this case?
A. I do.
Q. Okay. As we go through some questions I have for you today, Mr. Hunt, I would ask that you give me verbal responses. Since we have a court reporter here who's recording everything that everyone is saying, it will be much easier for you and for me to give verbal responses as opposed to uh-huh or huh-uh. Do you understand?
A. Yes.
Q. Okay. If I ask a question today that you don't understand or need clarification on, can you please ask me to clarify the question?
A. I will.
Q. Thank you, sir. And can we agree that if you do not ask me to clarify a question, that you fully understand my question?

Markets General Agency?
    A. Yep. And then we had a company that ran premium finance. We used it for that. And then we had a -- I'm sorry, a claims management company and we programmed it for that also.
    Q. When you say "we programmed it," who is we?
    A. The people that I hired to helped run my IT department.
    Q. Do you know their names?
    A. Dan Heron is the one that comes to mind.
    Q. Dan Heron?
    A. Uh-huh.
    Q. Any other -- anyone else that you can remember?
    A. Calvin. I can't remember his last name, and John Edwards.
    Q. Okay. And I just want to make sure I'm clear on this. When you said we were engaging in the DataFlex coding, did you -- did you personally use the DataFlex coding and build code with these three individuals, or did these three individuals do it for you in their position as employees?
    A. Both.
    Q. What did you do for the DataFlex code building?
    A. What did I do?
    Q. Yes, sir.

A. I would sit there beside them and we would decide how to do things a lot of times.
Q. Were you coding with them or were you just overseeing them?
A. Both. I did both.
Q. In the early -- I'm sorry, not the early '80s. In the 1980s, were you only working -- I'm sorry. Let me back up. American Recreational Markets General Agency, was that your company?
A. Yes.
Q. So you started it?
A. Yes.
Q. When did you start that company?
A. 1982.
Q. Had you started any other insurance company prior to 1982?
A. No.
Q. So ARM was the first insurance company that you had founded?
A. Yes.
Q. What kind of insurance work did ARM provide?
A. They were a Texas managing general agency.
Q. How long was ARM in existence?
A. Twenty-two years.
Q. What was your position at ARM?

A. I was the president.
Q. Any other position that you held during the time that you were operating or working with and for ARM?
A. I'm not sure I understand the question.
Q. Did you hold any other position at ARM besides president?
A. I think like any business, I was bottle washer, hamburger fryer. Whatever the job was I did it, but my position was officially the president, yeah.
Q. Okay. And to be clear, ARM did not actually fry hamburgers. Right?
A. Except on picnics.
Q. So was ARM the only company that you operated or founded between 1980 and the year 2000?
A. No.
Q. What other company or companies did you found or create during that time?
A. The premium finance company I mentioned earlier.
Q. You said premium finance company?
A. Yes.
Q. When did you create that company?
A. Either '89 or '90, I think. I'm not a hundred percent sure.

Q. What other companies did you create or operate during that time?
A. We had a claims management company, a premium finance company. I had a company called 36 Bonanza. We had a local recording agency, All Risk -- I'm sorry. That's the claims company. That's all I can think of right now.
Q. What was the claims management company you mentioned?
A. All Risk Claims.
Q. All Risk. And I believe you testified that ARM was in business for 42 years. Is that right?
A. That's not correct. I said 22.
Q. Twenty-two?
A. Yes.
Q. When did ARM go out of business?
A. When did it go out of business?
Q. Yes, sir.
A. Oh, I want to say 2006 or 2007 we -- I started shutting it down after 9/11.
Q. Why did you start shutting it down after 9/11?
A. Our primary insurance management was in one of the buildings. They lost about 360 people that day, and it was a decision that we made to do that at that time.
Q. Is there any other reason why you decided to

shut down ARM?
A. No, that was it.
Q. That was it? When you said that you were involved in to some degree the coding using the DataFlex language in the 1980s and early '90s, was that at ARM?
A. Yes. I'm the one that picked that language.
Q. What is Seguros Direct?
A. I'm sorry?
Q. What is Seguros Direct?
A. Seguros Direct, that's a company that was a -- like a -- we put our property in. We built an office building and that was the entity that borrowed the money.
Q. Okay. I want to break that down a little bit because I'm not sure I understand. When did you form Seguros Direct?
A. I was to say it was in '99 or 2000.
Q. And what kind of work did Seguros Direct do?
A. In '99 or 2000?
Q. Yes, sir.
A. They didn't do any work.
Q. When did it start doing work or when did you start working through Seguros Direct?
A. Oh, maybe 2003 or '4.
Q. What was the purpose of that company?

A. What I previously explained. It was the company that bought property and financed the building we used.
Q. Okay. I'm having a little difficulty understanding. It's the company that bought and financed the building that you used?
A. It was the one that held the ownership of property, which we officed in. It was the entity that borrowed the money to build that building.
Q. So Seguros Direct didn't have any involvement in insurance underwriting or coding used for the insurance industry. Is that correct?
A. Not at that time, no.
Q. Okay. What was your motivation for forming Seguros Direct?
A. My motivation?
Q. Yes, sir.
A. Was to have an entity to hold the property.
Q. You said that it was a company that held ownership of the property that -- that you had an office in. Is that right?
A. Yes.
Q. Okay. When you said that you had an office in, what was that office for?
A. It's where we had Recreational Markets, All

Risk Claims. We had -- some accounting functions were taken care of there for our local recording agency. It's where we housed our servers where everyone that worked on those servers were at.

(Exhibit 1 marked.)

Q. (BY MR. WELTGE) Okay. Mr. Hunt, I'm going to hand you what's been marked as Exhibit 1. I'll represent to you, sir, that this is a publicly available document using the Texas Secretary of State website.

A. Uh-huh, yes.

Q. Do you recognize the information on this document?

A. Say again.

Q. Do you recognize the information on this document?

A. Yes.

Q. Can you tell me what I'm looking at here?

A. It looks like you've got a copy of the franchise tax report.

Q. And does that franchise tax report show a registration date for Seguros Direct of 12/1/2000?

A. That's what it says.

Q. Who's Kerri Fields?

A. She's an attorney.

Q. Was she an attorney that was representing you

me that it didn't stop -- didn't start operating until 2003?

A. No, I didn't say that.

Q. What did you say?

A. I said that it didn't operate as an entity for anything else other than the property until then.

Q. Okay. So at any time after 2003 or 2004, did the entity, meaning Seguros Direct, do anything else other than serve as the property ownership company or vehicle for the office that you described earlier?

A. No. We paid our -- some of our staff through Seguros Direct.

Q. What -- staff for what company?

A. For the software development.

Q. What company was that?

A. Seguros Direct is what we called it.

Q. So Seguros Direct paid staff --

A. Yes.

Q. -- of Seguros Direct through Seguros Direct?

A. They weren't necessarily staffed with Seguros Direct. That's who paid them.

Q. Okay. And who were these individuals that you paid through Seguros Direct?

A. What years?

Q. When did you start paying individuals through

Seguros Direct?

A. Either -- maybe 2005 or 2006.

Q. Okay. So in 2005 or 2006, what individuals were you paying through Seguros Direct?

A. John Edwards, Brian Borders.

Q. Okay. Were these individuals W-2 employees of Seguros Direct?

A. Not at that time.

Q. Were they ever W-2 employees of Seguros Direct?

A. No.

Q. Were they ever W-2 employees of yours?

A. Yes.

Q. When were they W-2 employees?

A. Whenever John Edwards came to work for me. That would have been 1990.

Q. Was that with ARM?

A. Yes.

Q. Okay. When did John Edwards stop being a W-2 employee?

A. When they were paid by Seguros Direct.

Q. And that was in 2005 or 2006?

A. I believe so.

Q. Okay. Why did you stop paying John Edwards as a W-2 employee?

A. I think I previously stated that we ran off our

business in American Recreational Markets and were shutting it down, and then I also had an accountant who was responsible for doing all the W-9s, the tax stuff and she left.  So we just went ahead and started using just a straight payment as a W- -- as a 1099.
Q.   Okay.  So John Edwards stopped being a W-2 employee with ARM when and because your accountant left?
A.   That was part out of it, yes.
Q.   Okay.  Was there any other part of it?
A.   Yeah.  I didn't have someone to calculate it. So we just went ahead so their consistency of payment continued.
Q.   Okay.  So you didn't have an accountant to calculate what?
A.   The taxes and file the reports.
Q.   Okay.  What kind of taxes are you referring to?
A.   Income taxes that was -- withholding.
Q.   Okay.  All right.  Did you have any tax trouble in 2005 with ARM?
A.   Any tax trouble?
Q.   Yes, sir.  Any issues with the IRS?
A.   I don't recall that.
Q.   You don't recall any issues at all with the IRS?
A.   In 2005?

Q. Yes, sir.
A. No, sir, I don't.
Q. You don't recall paying the IRS a fine of $500,000?
A. No.
Q. For failure to pay payroll taxes?
A. No.
Q. Okay. When is the last time you spoke with Mr. Edwards?
A. Maybe April, a year ago.
Q. So April of 2024?
A. Yes.
Q. You haven't spoken with him at all in the last couple of weeks?
A. No.
Q. Are you aware that he was deposed this week?
A. No.
Q. In connection with this lawsuit?
A. No.
Q. Okay. Do you have any understanding as to his involvement in this lawsuit?
A. I'm sorry?
Q. Are you aware that John Edwards is not a party to this lawsuit?
A. No.

Q. Okay. I will represent to you, sir, that he was deposed this week on Wednesday, February 26th, and he testified about his W-2 status.
A. Yes.
Q. And the changeover from being a W-2 employee to a 1099 contractor. And I will also represent to you, Mr. Hunt, that Mr. Edwards testified that in 2005 or 2006, as you mentioned, he was no longer W-2 employee. And he said that the reason he was given for the change in his employment status was because Tim no longer wanted to have employees. Do you agree with that statement?
MR. ALLEN: Objection; form.
THE WITNESS: I don't agree with it.
Q. (BY MR. WELTGE) What don't you agree with it on? What -- where do you differ with Mr. Edwards here?
A. I had employees.
Q. You had employees for what, for what entity?
A. I'm sorry?
Q. What entity did you have employees for?
A. Well, we were paying them from Seguros.
Q. You were paying employees from Seguros, but who were you paying?
A. I was paying John Edwards, Brian Borders, myself. I can't remember who else.

Q. Were you paying them as W-2 employees or 1099 contractors?
A. 1099.
Q. Okay. So they were not W-2 employees?
A. No.
Q. When Mr. Edwards was asked on Wednesday why, in his opinion, you didn't want to have employees anymore, I'll represent to you, sir, that Mr. Edwards testified that "because an accountant in his department -- in his company forgot or refused to pay the IRS and was fined half a million dollars."
A. Okay.
Q. Is there anything in that statement that you disagree with?
MR. ALLEN: Objection; form. And just to be clear, I was not a party to that deposition. I have no idea what was said or not said. So would you mind giving me a standing objection to any representations about testimony?
MR. WELTGE: No problem.
MR. ALLEN: Thank you.
THE WITNESS: Would you repeat the question?
Q. (BY MR. WELTGE) Do you have anything -- is there anything in Mr. Edwards' answer there that you

disagree with?
A. Repeat his answer, please.
Q. Mr. Edwards testified that he was transferred from a W-2 employee or his status as a W-2 employee ended because an accountant in your department at ARM forgot or refused to pay the IRS and was fined, meaning you, were fined half a million dollars.
A. I disagree with all of it.
Q. So you were never fined half a million dollars --
A. No.
Q. -- from the IRS?
A. No, I wasn't fined anything.
Q. Did you ever fail to pay payroll taxes through ARM?
A. My accountant did fail to pay them.
Q. When did your accountant fail to pay payroll tax?
A. I don't recall.
Q. Could it have been around this time 2005, 2006?
A. Yes, it could have.
Q. Okay. What is Pearl General Agency?
A. It's a corporation that we bought from Home State General Agency.
Q. It's a corporation that you bought from what?

A. Home State General Agency.
Q. What kind of business did Pearl General Agency do --
A. It was a managing general agency.
(Exhibit 4 marked.)
Q. (BY MR. WELTGE) I'm going to hand you now, sir, what's been marked as Exhibit 4. I'll represent to you, sir, that this is another publicly available document from the Texas Secretary of State. Would you agree with me, sir, that Pearl General Agency has a registration date listed on this page as February 6th, 2014?
A. Yes.
Q. Did you ever have any tax trouble with Pearl?
A. Not that I'm aware of.
Q. So you never failed to pay franchise tax or any other taxes associated with Pearl General Agency?
A. This was a possibility they didn't get paid on time.
(Exhibit 5 marked.)
Q. (BY MR. WELTGE) Okay. I'm going to hand you now, sir, what's been marked as Exhibit 5. Can you tell me what this document is, sir?
A. It's a record that you had produced, I guess.
Q. No, sir. This is a publicly available document

that was not produced by any party in this case. Do you --

A. So this wasn't reproduced?

Q. What do you mean reproduced, sir?

A. You had a record pulled, a copy of a publicly available record?

Q. Correct. Yes, sir.

A. Okay, yeah.

Q. Would you agree with me that this document is dated January 15th of 2021?

A. Yes.

Q. Okay. If you look at the last paragraph, sir, it says, "Therefore, pursuant to Section 171.309 of the Texas Tax Code, Secretary of State hereby forfeits the charter, certificate, of registration of the taxable entity as of the date noted above and records this notice of forfeiture in the permanent files and records of the entity." Did I read that correctly?

A. Yes.

Q. Okay. Do you -- after reading this document, do you recall why Pearl General Agency forfeited its charter in January of 2021?

MR. ALLEN: Objection; form.

THE WITNESS: I don't recall exactly. We were probably in the process of shutting that company

down.
Q. (BY MR. WELTGE) In 2021, you were in the process of shutting it down?
A. Probably so.
(Exhibit 6 marked.)
Q. (BY MR. WELTGE) All right. Mr. Hunt, I'm going to hand you what's been marked as Exhibit 6. Take a moment to read through these two pages, sir. Are you ready?
A. Yes.
Q. Is this an Application for Reinstatement and Request to Set Aside Revocation or Forfeiture for Pearl General Agency, Incorporated?
A. It appears to.
Q. This document is dated November 29th of 2023. Is that correct?
A. That's what it says.
Q. Is your name listed on this document?
A. I'm sorry?
Q. Is your name listed on this document?
A. Yes, it is.
Q. It says, "By Timothy Hunt, President"?
A. Yes.
Q. Okay. If you look with me to Section 4, it reads, "The entity named above was forfeited or its

authority to transact business in Texas was revoked on 1/15/2021 for the following reason: Failure to file a franchise tax return and/or pay state franchise tax."

Does that refresh your memory as to why Pearl General Agency, Incorporated lost its forfeiture or forfeited its right to do business in Texas?

MR. ALLEN: Objection; form.

THE WITNESS: I don't recall.

Q. (BY MR. WELTGE) Are you still involved with Pearl General Agency?

A. I would say no.

Q. Is Pearl General Agency still actively conducting business?

A. No.

Q. When did you close Pearl General Agency?

A. I believe in 2017 or '18.

Q. So you were not in the process of shutting it down in 2021?

A. I don't know that that would be the case, but it's possible.

Q. Did you employ any individuals as W-2 employees through Pearl General Agency?

A. I don't believe so.

Q. Did you employ any individuals as 1099 contractors?

A. I don't believe so.
Q. You don't believe you employed any individuals as 1099 contractors?
A. In Pearl General Agency?
Q. Yes, sir.
A. I don't believe so.
Q. Was Pearl General Agency ever listed as the payee -- or, I'm sorry, the payor on any 1099 form for Brian Borders, Ivan Betancourt, or John Edwards?
A. I don't recall other than the accounting.
Q. So in 2005 when you terminated the employment status of Mr. Edwards and Mr. Borders as W-2 employees and transferred them or reclassified them as 1099 contractors, did you have any specific office space where they conducted their work?
A. Yes.
Q. What office space was that and where?
A. It was 4050, I believe, Interstate 30 West, Caddo Mills 75135.
Q. Is that an office building?
A. Yes.
Q. And was that where you had offices for ARM?
A. Yes.
Q. How long did you maintain an office space there?

A. Nine years maybe.
Q. When did you start having office space at 4050 I-30 West in Caddo Mills?
A. January 1, 2002.
Q. So I take it, then, that you no longer had office space at that location as of 2011?
A. No.
Q. When did you stop having office space at that location?
A. My best recollection would be sometime in Maith of 2010, I think.
Q. Did you no longer -- or did you choose to no longer use any office space or did you move office space after that point?
A. I think I determined that for five people 10,000 square feet was more than adequate, and so we sold the building.
Q. Okay. Did you go anywhere else in terms of maintaining an office space after you sold the building?
A. Yes.
Q. Where -- where did you go next or where did you --
A. 4088 Private Road 3336, Greenville 75402.
Q. What business was associated with that location and that office space?

A. Seguros.
Q. Any other business that you used for that office space?
A. Yes, Pearl.
Q. Any other business?
A. Not that I recall.
Q. How large was this office space?
A. A thousand square feet.
Q. Was it an open floor plan or did it have multiple offices within it?
A. It was open.
Q. Did you build it out at all?
A. What does that mean?
Q. Did you build out any desks, computers, kitchen area? Did you build out the space at all?
A. There was a restroom. There were cabinets and sinks, refrigerator, I believe a microwave, and we had racks of servers in there and then tables and chairs.
Q. How much time did you spend at this location?
A. How much time?
Q. Yes, sir.
A. I couldn't tell you. Quite a bit.
Q. Did you work at that location?
A. Did I?
Q. Yes, sir.

A. Yeah. I had computers, everything. The place I sat.
Q. Did anyone else work at that location?
A. Brian Borders, John Edwards. I don't recall -- I guess -- I don't recall Ivan, if he was there or not. We had another gentleman, Jeremy, that was there.
Q. Is that Jeremy Orosco?
A. Yes.
Q. How long did you have this office space?
A. I'm not sure, to be honest. Probably at least four years.
Q. So until on or around 2014?
A. No. It would have been a little bit longer than that. I'm wrong about that.
Q. Okay. So how -- about when did you stop using that office space, about what time?
A. You know, I'm trying to remember that, but say 2018.
Q. Did you sell that office space in 2018?
A. No.
Q. Do you still own that office space now?
A. No.
Q. When did you sell that office space?
A. I didn't sell it.
Q. So what happened to the office space?

A. Burned to the ground.
Q. Okay. After that office space burned -- well, actually, no. Let me ask you something else. Was there an investigation done on that -- on the burning of that office space?
A. I was told there was, but I don't know if it was or wasn't. I never got a report.
Q. Were you ever told what the cause of the fire was?
A. I was told it was electrical.
Q. Did you say that happened around 2018?
A. No, I did not.
Q. When did that happen?
A. That would have been January the 19th of '24.
Q. Was this thousand-foot -- thousand-square-foot office space in Greenville on your property?
A. Yes.
Q. So it's on the property where you maintain a home?
A. Yes.
Q. Is it -- is it a barn, or how would you describe the space?
A. I would have described it as an office in half of the building, and then the other half of the build was a shop.

Q. What kind of shop?
A. Where I kept my tools.
Q. In the half of office space -- or I'm sorry. In the half of the building that was the office space, did you maintain any computer equipment?
A. Yes.
Q. What kind of computer equipment did you have in that half of the building?
A. Primarily servers and disc arrays.
Q. Servers and disc what?
A. Array.
Q. Did you have any laptops in that area as well?
A. Yes.
Q. Were any of those laptops used by Mr. Borders or Mr. Betancourt or Mr. Edwards?
A. At what time?
Q. At the time that it burned.
A. No.
Q. Okay. Did Mr. -- did that part of the building maintain computer equipment like laptops and servers that Mr. Borders, Mr. Edwards, or Mr. Betancourt used at some time?
A. Yes.
Q. Okay. When would Mr. Borders, Mr. Edwards, or Mr. Betancourt have used the computer equipment in that

Q. And it says, "Tim, attached is the preliminary report for contractor pay due on Monday, August 26, 2013. Please verify its accuracy and inform me if it was all right to print the checks. Thanks, Tom." Signed Thomas A Edwards. Did I read that correctly?
A. That's correct, but that's not my email address.
Q. The Tim@sdinc.cc is not your email address?
A. No.
Q. Is there another Tim Hunt?
A. I don't know that.
Q. Well let's look at the next page. Maybe we can go through it and see if there's a possibility that another Tim Hunt is involved here. Looking at the second page, we've got -- it says Maith 1022. I have a document showing contract labor as of August 25th, 2013, and it lists Brian Borders and John Edwards as contractors who were getting paid. Correct?
MR. ALLEN: Objection; form.
THE WITNESS: That's what it appears.
Q. (BY MR. WELTGE) And the date of -- the date listed on here for both is August 18th of 2013 with a due date August 25th, 2013. Correct?
A. Where are you looking at that?
Q. Same page. That second page, sir.

A. Okay.
Q. It shows contractor pay of $1,779.40 for Mr. Borders and $2,000 even for Mr. Edwards. Is that correct?
A. Yes.
Q. If you go to the next page with me, it's Maith 1023. Do you know what this is that we're looking at?
A. It looks like it's where he kept his hours.
Q. Did you require Mr. Borders or Mr. Edwards to log hours?
A. No.
Q. Could they work whenever they wanted to work?
A. Yes.
Q. Would you agree with me, sir, that on the bottom of this page it shows that Mr. Borders had regular hours totaling 48.15?
MR. ALLEN: Objection; form.
THE WITNESS: Yes.
Q. (BY MR. WELTGE) Would you agree with me that it shows that Mr. Borders had overtime hours from July 27th, 2013, through August 10th, 2013, of 40.82 hours?
A. Okay.
Q. For a total of 88.97 hours through August 10th of 2013. Do you agree with that?

A. Yes.
Q. Next page, sir, is what appears to be the same type of chart for John Edwards. Do you agree with that?
A. Yes.
Q. And did you require Mr. Edwards to log specific hours?
A. No.
Q. Was Mr. Edwards permitted to work whenever he wanted?
A. Yes.
Q. And it shows at the bottom of the page here that through August 10th of 2013, Mr. Edwards worked a total of 48.03 hours of regular hours and 40.36 of overtime hours for a total of 88.39 hours during that time period. Is that correct?
A. Yes.
Q. Do you have any reason to believe after looking at these documents that the Tim Hunt listed on the first page of this email correspondence from Thomas A. Edwards is not you?
A. No, I don't --
MR. ALLEN: Objection; form.
THE WITNESS: -- have a reason to believe that. I'm just telling you that wasn't my email address.

Q. (BY MR. WELTGE) Okay. But do you believe that this was intended for you?
A. Yes, I do.
Q. Okay. What type of work did Mr. Edwards perform in his capacity as a 1099 independent contractor with you?
A. What kind of work?
Q. Yes, sir.
MR. ALLEN: Objection; form.
THE WITNESS: He worked to maintain the software for -- at what period of time?
Q. (BY MR. WELTGE) So my understanding is that Mr. Edwards became a 1099 contractor as of 2005 or 2006. Correct?
A. Yes.
MR. ALLEN: Objection; form.
Q. (BY MR. WELTGE) So at that time, was he doing contract work for Seguros Direct?
MR. ALLEN: Objection; form.
THE WITNESS: I would say yes.
Q. (BY MR. WELTGE) Why would you say yes?
A. Because you asked me what I thought.
Q. Why do you think that?
A. Because that's who was being paid by.
Q. Why do you think that he was being paid as an

independent contractor?

MR. ALLEN: Objection; form.

THE WITNESS: Because we paid him with a 1099 and not a W-2. He was an employee working for me at that time.

Q. (BY MR. WELTGE) He was an employee when he was a W-2 employee. Correct?

A. He was a W-2 employee.

Q. He was not an employee. He was a 1099 contractor. Correct?

A. Well, I thought he was.

Q. You thought he was an employee when --

A. Yes.

Q. -- he was an independent contractor?

Why did you think he was an employee when he was a 1099 contractor?

A. Because the only person I knew that he did any work for was me.

Q. How does that have any affect on his status as a 1099 contractor versus a W-2 employee?

MR. ALLEN: Objection; form.

THE WITNESS: I don't know. I can't tell you that.

Q. (BY MR. WELTGE) So the only reason you think that he was a W-2 employee despite his tax status being

1099 contractor was because he was doing work for you.
MR. ALLEN: Objection; form.
THE WITNESS: No, I'm not agreeing with that.
Q. (BY MR. WELTGE) What don't you agree with?
A. One, I don't understand your question. I think that was more of a statement, so I don't know that I understood what you were saying.
Q. No, sir. I'm trying to understand your -- how you understand Mr. Edwards being an employee when he was classified as a 1099 employee or 1099 consultant.
A. Right.
Q. So you said that even when he was a 1099 contractor and had a 1099 tax form every year, you considered him an employee. Is that correct?
A. Yes.
Q. Why did you consider him an employee?
A. Because he was doing the exact same thing for me.
Q. What was he doing that was the same?
A. He was working on software for whatever we -- I asked him to work on.
Q. What kind of software was he working on?
A. Software for the general agency that I had, the claims that I had and then for the software that we had

other people that asked us to -- you know, work on for them.
Q. But you didn't control his hours. Right?
MR. ALLEN: Objection; form.
THE WITNESS: I didn't --
Q. (BY MR. WELTGE) You testified to that. Right?
A. Would you let me answer the question?
Q. Happily, yes, sir.
A. Okay. I didn't control his hours because he could take off any time he needed to, or if he needed to take a vacation, just whatever.
Q. Did you tell him John, you need to be in by 9:00 every morning and you were out by 5:00?
A. No.
Q. Did you give him a specific set number of hours that he had to work per week?
A. No.
Q. Did he have the freedom to come and go as he pleased?
A. To some extent, yes.
Q. Did he have the freedom to work where he wanted?
A. No.
Q. Did he have the freedom to do software development or coding outside of the -- any number of

offices that you mentioned earlier?
MR. ALLEN: Objection; form.
THE WITNESS: No, he didn't.
Q. (BY MR. WELTGE) He could not do any coding at home?
MR. ALLEN: Objection; form.
THE WITNESS: Oh I'm sorry. I misunderstood you. Yes, he could do coding at home because during COVID, for one thing, nobody was anywhere but home.
Q. (BY MR. WELTGE) Before COVID, could he do coding a home?
A. He could because we had hours we set where they would work from home three days a week when the price of fuel went to $4 a gallon. I said stay at home three days a week so you don't spend the money.
Q. I thought you said you didn't set any hours.
MR. ALLEN: Objection; form.
THE WITNESS: I didn't say I set hours. I said where they work from. I thought that was the question.
Q. (BY MR. WELTGE) Yes, sir, but I think you just said that you set hours.
A. Well, I didn't mean to say that. I said they would work from home three days a week when the price of

fuel back in 2012, I think it was, went to $4 a gallon to save them some money.

Q. When Mr. Edwards was classified as a 1099 contractor and receiving a 1099 tax form, did Seguros Direct or Pearl General Agency provide medical insurance to John Edwards?

A. No.

MR. ALLEN: Objection; form.

Q. (BY MR. WELTGE) Did Seguros Direct or Pearl General Agency provide visual or dental insurance to Mr. Edwards?

A. No.

Q. Okay. Did Seguros Direct or Pearl General Agency -- which for ease, by the way, I'm just going to call it PGA.

A. Sure.

Q. Provide a 401K for John Edwards?

A. No.

Q. Did Seguros Direct or PGA provide computer equipment to John Edwards?

A. I don't recall. They have and sometimes they bought their own.

Q. So John Edwards could use his own computer to do his work?

A. If that's what he chose.

Q. Did Seguros Direct or PGA provide desktop computers to Mr. Edwards?
MR. ALLEN: Objection; form.
THE WITNESS: Yes.
Q. (BY MR. WELTGE) Where were those desktop computers provided?
A. At our office.
Q. At all three of the offices you mentioned earlier?
A. I don't recall that.
Q. Okay. Did Seguros Direct or PGA provide software repositories to Mr. Edwards?
A. I'm not --
MR. ALLEN: Objection; form.
THE WITNESS: -- sure what your question is.
Q. (BY MR. WELTGE) Do you know what a software depository is?
A. I don't know your definition of it.
Q. What's your definition of it?
A. A place where the software is stored.
Q. That's my definition of it.
A. Okay. Well, then we're in a agreement.
Q. All right. So did Seguros Direct or PGA provide software repositories to John Edwards?

A. Yes.
Q. Okay. Was that -- were those software repositories for the Insuror Atlas software?
A. Yes.
Q. Any other software?
A. There would have been a lot of other software.
Q. Okay. At any point after 2005 did you ask John Edwards to return to being a W-2 employee?
A. No.
Q. So he was -- after 2005, he was always a 1099 contractor?
A. Yes.
Q. When did you meet Brian Borders?
A. Maybe when he was nine months old.
Q. Do you have a family connection to Mr. Borders?
A. I'm sorry?
Q. Do you have a family connection to Mr. Borders?
A. I do.
Q. What's that connection?
A. He is a second cousin.
Q. So that would make your first cousin his dad?
A. Yes.
Q. Okay. When did Mr. Borders join you as an employee at ARM?
A. I believe it was in 1999.

Q. Would you tell Mr. Edwards what to assign to Mr. Borders?
A. I told him what we wanted him to do in terms of what he was able to do.
Q. Did you ever have any -- during this time period from 1999 to 2005, did you ever have any conversations with Mr. Borders about software development for ARM?
A. What was the last word?
Q. Did you have any conversations with Mr. Borders about software development for ARM?
A. I don't recall that, to be honest.
Q. Was Mr. Borders salaried?
A. I believe he was.
Q. And I take it he had medical insurance provided by ARM?
A. If he opted for it.
Q. Okay. Same with dental and vision insurance?
A. Same.
Q. Okay. But no 401K. Is that right?
A. No 401K.
Q. Was he required to be in the office full time during that period?
A. He knew what our operational hours were, but he had the option of being there if he needed to. If he

had other matters he needed to take care of, he was able to do that if he would let us know. He would take his grandmother shopping to get groceries sometimes in the day or to the doctor.

Q. But for the majority of his full-time work, was he required to be in the office?

A. Yes.

Q. You said you received the -- that your attorney provided the third-party complaint, Maith's third-party complaint to you. Did you review that document?

A. I briefly looked at it.

Q. Did you review any other documents related to this lawsuit?

A. You're going to have to kind of look at me when you talk. Did I review any other documents?

Q. Yes, sir, related to this lawsuit?

A. Other than the notices?

Q. Yes, sir.

A. Nothing besides that, I don't believe.

Q. Okay. After 2005, you transitioned or you terminated Mr. Borders' status as a W-2 employee --

A. Yes.

Q. -- for ARM. Correct?

A. Yes.

Q. And then that's when he became a 1099 employee?

A. Yes.
Q. Or, I'm sorry, a 1099 contractor.
A. Okay.
Q. For how many years did Mr. Borders perform contract work for PGA?
MR. ALLEN: Objection; form.
THE WITNESS: I'm sitting here thinking. Seventeen, maybe. Sixteen.
Q. (BY MR. WELTGE) Seventeen years of contract work?
MR. ALLEN: Objection; form.
Q. (BY MR. WELTGE) What kind of contract work would Mr. Borders handle for PGA?
MR. ALLEN: Objection; form.
THE WITNESS: He was my employee. What he would do is whatever I asked him do.
Q. (BY MR. WELTGE) You say as my employee.
A. Yep.
Q. So that brings me back to a conversation we had earlier. Why do you think Mr. Borders, during time that he was a 1099 contractor, was an employee?
A. That's what I thought.
Q. Why did you think that?
A. Because he worked for me full time.
Q. So is that -- is because he provided contract

were for you full time the only reason you thought they was an employee?

MR. ALLEN: Objection; form.

THE WITNESS: I didn't think of it as contract work. I thought of him as an employee.

Q. (BY MR. WELTGE) So why didn't you employ him at a W-2 employee?

A. Because that's how my accountant set him up.

Q. It has nothing to do with owing $500,000 to the IRS?

MR. ALLEN: Objection; form.

THE WITNESS: I have no idea what you're talking about.

Q. (BY MR. WELTGE) Do you know it's a federal crime to misrepresent to the IRS the status of your -- the tax status of individuals who are providing work to you?

MR. ALLEN: Objection; form.

THE WITNESS: I would think that's possible.

Q. (BY MR. WELTGE) Can you tell me what your definition of an employee is?

A. I'm sorry?

Q. Can you tell me what your definition of an employee is?

Q. Do you know?
A. No, I don't know for sure.
Q. Okay. And you agree with me that on the second page, which is Bates-labeled Edwards 184 and the third page labeled Edwards 185, shows both Brian Borders' and John Edwards' time sheets between April 26th, 2011, through May 10th of 2011?
A. Okay.
Q. Was this work done for Seguros Direct, if you know?
MR. ALLEN: Objection; form.
THE WITNESS: I don't know.
Q. (BY MR. WELTGE) Okay. And for Mr. Borders specifically on the second page, you see him routinely clocking in at different times. Correct?
MR. ALLEN: Objection; form.
THE WITNESS: What's your question?
Q. (BY MR. WELTGE) Yes, sir. Do you agree with me that this document here shows that Mr. Borders during this time period would clock in at different times?
A. Yes.
MR. ALLEN: Objection; form.
Q. (BY MR. WELTGE) And you agree with me that he would clock out at different times as well.
MR. ALLEN: Objection; form.

THE WITNESS: They're pretty uniform.
Q. (BY MR. WELTGE) These are uniform?
A. 6:03, 6:10, 6:07, 6:05, 6:12, 6:06, 6:12, 6:04.
Q. In the second column?
A. They are the different times, though. You're correct.
Q. Third column, though?
A. In?
Q. Yes, sir. The third one in from the left. 12:13, 12:03, 9:52, 12:00 p.m., 8:00 a.m., 6:00 a.m., 12:00 p.m., 6:00 p.m.
A. They don't even make sense. Maybe he was sick that day. I don't know.
Q. But they're not 9:00 to 5:00 --
A. It was, like, 15 minutes apart. I don't know what that means.
(Exhibit 10 marked.)
Q. (BY MR. WELTGE) I'm going to show you now what's been marked as Exhibit 10. It's a packet of documents here. Can you tell me what I'm looking at?
A. They look like copies of checks.
Q. And if you flip through, it looks like checks from 2020 to 2021. Right?
A. Yes.
Q. And checks specifically for Mr. Borders made

payable to Mr. Borders and Mr. Betancourt?
MR. ALLEN: Objection; form.
THE WITNESS: Say that one more time.
Q. (BY MR. WELTGE) You agree with me that these are checks made payable to either Mr. Betancourt or Mr. Borders?
A. Appears that way.
Q. And several of them, and I'll represent to you the vast majority of them, state in a memo line either services provided or services provided - contract.
A. Okay.
MR. ALLEN: Objection; form.
Q. (BY MR. WELTGE) Do you agree with me that these checks are written from the Seguros Direct, Incorporated operating account?
MR. ALLEN: Objection; form.
THE WITNESS: I see that.
Q. (BY MR. WELTGE) Okay. What services -- let's hear -- let me ask you this specifically. If you flip to the third page in, it's Maith 21805.
A. Okay.
Q. It's a check to Brian Borders dated 8/10/2020 for service provided - contract. Is that your signature on the check?
MR. ALLEN: Objection; form.

THE WITNESS: I think it's a stamp, but yes.

Q. (BY MR. WELTGE) In the memo line, it says services provided - contract. What contract services was Mr. Borders providing that you paid him $2,000 on 8/10/2020?

A. They refer to --

MR. ALLEN: Objection; form.

THE WITNESS: -- contracts we were working on.

Q. (BY MR. WELTGE) What does that mean?

A. We had contracts with some MGAs to provide software.

Q. To provide software?

A. Yes.

Q. Are you referring to the Insuror Atlas software?

A. Yes.

Q. Is that the only services that Mr. Borders provided for you during this time?

A. I don't recall what all he provided services for honestly. We did a lot of things.

Q. From five to -- well, let me ask you this first. Let me back up. When did Mr. Borders stop working for you as an independent contractor?

A. Okay. Ask one more time. Repeat that.
Q. When did Mr. Borders stop working for you as an independent contractor?
MR. ALLEN: Objection; form.
THE WITNESS: Brian quit working for me when we sold the company, the software.
Q. (BY MR. WELTGE) When you sold the Insuror Atlas software?
A. Yes.
Q. Would that have been around May of last year?
A. That would have been.
Q. Okay. From 2005 to May of last year, did you control what hours Mr. Borders was required to work?
MR. ALLEN: Objection; form.
THE WITNESS: Repeat the question, please, one more time.
Q. (BY MR. WELTGE) From 2005 to May of 2024, did you -- did you control the hours that Mr. Borders was required to work?
MR. ALLEN: Objection; form.
THE WITNESS: I mean, to the extent that he was able to work for me, yes.
Q. (BY MR. WELTGE) What do you mean to the extent that he was able to work for you?
A. If he was sick, if he had to do something for

his grandmother, if he wanted to take some days off.

Q. Okay. So apart from those instances, you required Mr. Borders to work a certain time of the day for you?

A. No.

MR. ALLEN: Objection; form.

Q. (BY MR. WELTGE) Okay. So you did not control his hours.

MR. ALLEN: Objection; form.

THE WITNESS: Not to -- not in that manner, no.

Q. (BY MR. WELTGE) How was Mr. Borders' compensation determined?

A. I honestly don't know that either.

Q. Did you have a verbal agreement with him?

MR. ALLEN: Objection; form.

THE WITNESS: I don't know if we really ever talked about salary very much.

Q. (BY MR. WELTGE) Did he ever tell you what he thought he deserved as a 1099 contractor?

MR. ALLEN: Objection; form.

THE WITNESS: I'm sorry. What's that again?

Q. (BY MR. WELTGE) Did he ever tell you what he thought he deserved to the paid as a 1099 contractor?

MR. ALLEN: Objection; form.
THE WITNESS: No. I don't recall him doing that.
Q. (BY MR. WELTGE) Did his rate for contract pay fluctuate from 2005 to 2024?
MR. ALLEN: Objection; form.
THE WITNESS: There were fluctuations in his pay up or down, I'm pretty sure.
Q. (BY MR. WELTGE) Did you provide or give bonuses to Mr. Borders?
A. Yes.
Q. Did you give bonuses to Mr. Edwards?
A. Yes.
Q. Was Mr. Borders ever directly responsible for hiring or paying any assistants for Seguros Direct or PGA?
A. No.
MR. ALLEN: Objection; form.
Q. (BY MR. WELTGE) Would you agree with me that you essentially used Seguros Direct as a vehicle for paying individuals who were performing contract work for you?
MR. ALLEN: Objection; form.
THE WITNESS: No, I don't agree.
Q. (BY MR. WELTGE) What don't you agree with?

A. It was used to pay them. That's where we paid them from.
Q. And they were 1099 contractors?
MR. ALLEN: Objection; form.
THE WITNESS: They were 1099s is what was issued to them, yeah.
Q. (BY MR. WELTGE) Okay. How much time would you spend in person with Mr. Borders in a given month?
A. Well, it depends what year.
Q. Say 2023.
A. 2023.
Q. Yes, sir.
A. Not a lot, I don't think.
Q. Once a month?
A. I really don't recall. I'll be honest with you.
Q. But it wasn't full time 40 hours a week?
MR. ALLEN: Objection; form.
THE WITNESS: I had three surgeries that year, so I wasn't physically there.
Q. (BY MR. WELTGE) 2022, do you recall how much time you spent with Mr. Borders in a given week?
MR. ALLEN: Objection; form.
THE WITNESS: No, because that was just coming out of COVID and I had surgeries that year as

well.

Q. (BY MR. WELTGE) Okay. Did you have any surgeries in 2021?

A. No.

Q. Okay. Do you recall how much time you spent with Mr. Borders in a given week in 2021?

A. No. We would usually get together for lunch since we were all kind of out separately. We had COVID still. I don't know that we returned to work at that time, and so we would get to together for lunch and spend a couple of hours going over what was happening.

Q. When you say we, do you mean just you and Mr. Borders?

A. Sometimes just me and Mr. Borders. Sometimes his dad attended. Sometimes it was John Edwards. Sometimes Ivan was included.

Q. How often would you say you would go to lunch?

A. At least monthly.

Q. Monthly. Did you provide Mr. Borders with my laptops to do work for Seguros Direct?

A. I don't recall that.

Q. Do you recall ever seeing Mr. Borders perform work for Seguros Direct on his personal computer?

A. I mean, he had it with him in his -- 24/7 he always had his computer, so if he was working on it -- I

don't know if he was working on my work at this time or texting someone.

Q. Okay. Did you provide any servers to Mr. Borders during his time as a 1099 contractor from 2005 to 2024?

MR. ALLEN: Objection; form.

THE WITNESS: I've had servers since the early '80s. So there were servers that they accessed on a -- probably a daily basis.

Q. (BY MR. WELTGE) Do you know if Mr. Borders did any work for Seguros Direct or the Insuror Atlas software on his personal server?

A. No, I don't know.

Q. Okay. Do you know --

A. Wait. I take that back. He did some backups for us I think on his personal servers.

Q. Okay. Do you know if Mr. Borders used any personal repositories for his work on Insuror Atlas software or through Seguros Direct?

A. If that was his servers, that would -- he could have.

Q. Okay. Did Borders mostly work -- did Mr. Borders mostly work remotely from 2005 to 2024?

A. I'm sorry. Repeat that. I don't understand.

Q. Did Mr. Borders spend most of his working hours

working remotely?
A. Through --
MR. ALLEN: Objection; form.
THE WITNESS: -- what period?
MR. ALLEN: Would you mind giving me a chance to object.
THE WITNESS: Oh, I'm sorry. I apologize.
MR. ALLEN: Thank you.
Q. (BY MR. WELTGE) Between 2005 and 2024.
A. Okay. But I have broke my train of thought here so --
Q. You're fine. Did Mr. Borders spend most of his working time, most -- the contract work he performed for Seguros Direct and the Insuror Atlas software, did he spend most of his working time working remotely or working in your offices?
A. I don't know.
Q. Okay. When did you come to know Mr. Betancourt?
A. 2002 maybe. I don't know if I knew him before that or not.
Q. What were the circumstances of your meeting in 2002?
A. I knew his employer.
Q. Do you know what his employer was at the time?

A. He had an insurance agency.
Q. Do you know what work Mr. Betancourt was doing at the time for that insurance agency?
A. No.
Q. Okay. Are you aware that Mr. Betancourt is a third-party defendant in this lawsuit?
A. Through these notices I am.
Q. Did you ever formally hire Mr. Betancourt as a W-2 employee?
A. I don't know. I don't think so.
Q. What kind of work would Mr. Betancourt help you with?
A. Like working with agents, you know, doing service work.
Q. Was that in 2015 or 2016?
A. It would have been, sure.
Q. Do you recall when you brought Mr. Betancourt on board as a 1099 contractor?
MR. ALLEN: Objection; form.
THE WITNESS: He came to work for me I believe what do you just said, around 2014, 2015. Probably 2014.
Q. (BY MR. WELTGE) Okay. And did you say he would help with --
A. He worked with our agents.

Q. Okay. What does that mean?
A. The agents that we did business with --
Q. Uh-huh.
A. -- under Paladin General Agency.
Q. Okay. What kind of -- how would he help the agents?
A. Like service work. Like, if someone had a question, they called in -- there was a -- they had a question about a policy. He would answer those questions, try to resolve the problem.
Q. Okay. Did Mr. Betancourt engage in contract work with you between 2015 and 2024 --
MR. ALLEN: Objection; form.
Q. (BY MR. WELTGE) -- or thereabout?
A. He was my employee during that time.
Q. Are you using the same definition of employee that we talked about earlier?
MR. ALLEN: Objection; form.
THE WITNESS: Yes.
(Exhibit 11 marked.)
Q. (BY MR. WELTGE) Okay. I'm going to hand you now what's been marked as Exhibit 11. Mr. Hunt, are these 1099 tax forms for Mr. Betancourt from 2017 through 2023?
MR. ALLEN: Objection; form.

MR. WELTGE: What's your objection?
MR. ALLEN: That he doesn't -- you haven't established that he has any knowledge of these documents. He didn't produce them. I don't know if he's ever even seen them before.
Q. (BY MR. WELTGE) Mr. Hunt, if you look at page -- the first page Bates-labeled Betancourt 13, in the top left-hand corner, do you see where it says 2017 Form 1099-MISC?
A. Yes.
Q. What does that mean to you?
A. It's a 1099 form.
Q. Okay. Do you have any reason to believe that this form is not a 1099 tax form for Ivan Betancourt with payor listed as Pearl General Agency, Incorporated for the year 2017?
A. Did you say not to believe?
Q. Do you have any reason not to believe --
A. I don't --
Q. -- what I've represented?
A. -- think there's any reason not to.
Q. Okay. Do you have any reason to believe that any one of these pages in this packet that I've handed you --
A. As I looked through them, I don't think there's

any reason not to.

Q. Okay. Do you know who prepared these 1099 forms?

A. No, I don't.

Q. Do you see on the second page Bates-labeled Betancourt 15 it says contact information John Edwards?

A. Yes.

Q. And the same for Betancourt 17, 18, and 19?

A. Yes.

Q. Did John Edwards prepare these forms?

MR. ALLEN: Objection; form.

Q. (BY MR. WELTGE) Do you know? Do you know if John Edwards prepared these forms?

A. I don't know.

Q. Okay. How is Mr. Betancourt's compensation determined, if you know?

A. How?

Q. How was Mr. Betancourt's compensation determined?

A. I don't recall.

Q. Do you know Mr. Betancourt's rate for contract work once he became an independent contractor?

MR. ALLEN: Objection; form.

THE WITNESS: I never knew he had a rate. Just he had a salary.

Q. (BY MR. WELTGE) He had a salary?
A. That's what I believe is correct.
Q. What was his salary?
A. It was different at different times.
Q. Do you normally give 1099 contractors a salary?
MR. ALLEN: Objection; form.
THE WITNESS: I gave these guys a salary.
Q. (BY MR. WELTGE) But you --
A. So that would have been normal since that was the only employees I had.
Q. You gave them a salary but you classified them as 1099 contractors?
A. Yes.
Q. Did you control what hours Mr. Betancourt was required to work?
MR. ALLEN: Objection; form.
THE WITNESS: Not that I'm aware of.
Q. (BY MR. WELTGE) Was Mr. Betancourt ever directly responsible for hiring or paying any assistants?
A. No, not that I'm aware of. I take that back. He -- never mind.
Q. Did you supply any laptops to Mr. Betancourt specifically?
A. I don't recall.

Q. Did you supply any desktop computers to Mr. Betancourt specifically?
A. Yes.
Q. Where did you supply those computers, those desktop computers?
A. Wherever he was officed at at the time.
Q. Okay. So were those computers owned by you?
A. Yes.
Q. Did you supply any servers to Mr. Betancourt specifically?
A. Whatever he accessed was off of a server.
Q. Okay. But you don't know if you supplied one personally for Mr. Betancourt to do his contract work on, do you?
MR. ALLEN: Objection; form.
THE WITNESS: I don't know the answer to that.
(Exhibit 12 marked.)
Q. (BY MR. WELTGE) I'm going to show you what's now marked as Exhibit 12. I'll represent to you, Mr. Hunt, that this is an email exchange between Mr. Betancourt and Mr. Edwards between December 11th of 2023 and December 13th of 2023. Mr. Hunt, were you aware during this time that Mr. Betancourt was working with a mortgage broker?

A. Visual DataFlex.
Q. Was it your decision to change it from DataFlex to Visual DataFlex?
A. I think John Edwards and I discussed it.
Q. What did you discuss with Mr. Edwards?
A. That it was time to upgrade it because the people weren't going to support the DataFlex, the regular DataFlex.
Q. How would Visual DataFlex differ?
A. It was more designed for the web.
Q. What does that mean?
A. So they could go across the internet versus just being attached to a server with a note on it.
Q. Do you know the differences between the coding specifically for DataFlex and Visual DataFlex?
A. I don't know the specific differences, no.
Q. Could you have built the platform in using Visual DataFlex language yourself?
A. I think I --
MR. ALLEN: Objection; form.
THE WITNESS: I think I was in a way because I was paying them and directing them what to do. I wasn't a full-time programmer. I had other job titles that I took care of.
Q. (BY MR. WELTGE) Okay. But did you

specifically code for Visual DataFlex?
A. I don't think I did anything with Visual DataFlex.
Q. Did you know that Mr. Edward and Mr. Borders decided on their own to build a new platform using the Visual Basic coding language?
MR. ALLEN: Objection; form.
THE WITNESS: I did not know that.
Q. (BY MR. WELTGE) Did you know that the Insuror Atlas software uses the Visual Basic coding language?
A. Yes.
Q. Did you know that Mr. Edwards and Mr. Borders decided to build the new platform using the Visual Basic coding language after you terminated them as W-2 employees specifically?
MR. ALLEN: Objection; form.
THE WITNESS: I believe in the timeline, that would be correct.
Q. (BY MR. WELTGE) And Mr. Borders and Mr. Edwards were working on the build of Insuror Atlas software on their own, weren't they?
MR. ALLEN: Objection; form.
THE WITNESS: I disagree with that.
Q. (BY MR. WELTGE) You disagree with that?
A. Yeah, if I understood the question correctly.

Q. Why do you disagree with that?
A. Repeat the question. Let me make sure I understood it.
Q. Did you know that Mr. Borders and Mr. Edwards were working on the Insuror Atlas software on their own?
MR. ALLEN: Objection; form.
THE WITNESS: No.
Q. (BY MR. WELTGE) Was Mr. Borders reporting consistently to you on his plans for the build and the progress of the build for the Insuror Atlas software?
A. Yes.
Q. How often did he report to you?
A. I don't recall exactly that he even gave me a report necessarily.
Q. What -- if he didn't give you a report, what did he give you?
A. He would come and speak with me.
Q. Did you ask him to?
A. No, I don't recall doing that. But I guess also those hours that they recorded said what they were doing also.
Q. Was Mr. Edwards required to report consistently to you on his plans for Insuror Atlas software and his development?
MR. ALLEN: Objection; form.

THE WITNESS: It was never a requirement because he had done it for, I don't know, 16 years already.

Q. (BY MR. WELTGE) He hadn't worked on the Insuror Atlas software --

A. No, but he reported to me regularly.

Q. At any point did you specifically direct Mr. Borders or Mr. Edwards on how to implement the Visual Basic code for Insuror Atlas software?

A. The code itself?

Q. Yes, sir.

A. I don't believe I did.

Q. Did you ever sit down with Mr. Borders and Mr. Edwards and code with them or the Insuror Atlas software?

A. No, but I went over the code with them.

Q. What do you mean by "you went over the code with them"?

A. They would show me what they were doing and how they were going to change something, and we would discuss whether that was the way to do it or not.

Q. When did you learn that Mr. Betancourt was also working on the development of the Insuror Atlas software with Mr. Borders and Mr. Edwards?

MR. ALLEN: Objection; form.

THE WITNESS: I never knew that.
Q. (BY MR. WELTGE) Did Mr. Betancourt ever come to you and discuss what he was doing and what he was adding to the software?
A. No.
Q. Did you ever require him to come to you and discuss with you what he was doing and adding to the software?
A. No. He worked under John Edwards so John would tell me.
Q. But you never required John to come to you and tell you --
A. It was understood that he would do that and he did.
Q. Did he understand that?
MR. ALLEN: Objection; form.
THE WITNESS: Yes, he understood that.
Q. (BY MR. WELTGE) Can you tell me what the specific differences were between Insuror Atlas software with the Visual Basic language versus your previous -- the software that you used, Visual DataFlex or DataFlex?
MR. ALLEN: Objection; form.
THE WITNESS: Would you repeat the question, please?
Q. (BY MR. WELTGE) Yes, sir. Can you tell me the

specific differences between the Insuror Atlas software using the Visual Basic coding language --
    A.  I don't know that I could tell --
    Q.  Let me finish my question.
    A.  I'm sorry.
    Q.  You're fine.  From --
            MR. ALLEN:  Let me object too.  Thanks.
    Q.  (BY MR. WELTGE)  From the software platform that used Visual DataFlex?
            MR. ALLEN:  Objection; form.
    Q.  (BY MR. WELTGE)  Do you need me to repeat it again?
    A.  No, we're good.  I don't know that I could give specifics because we're talking about such a broad, large program of coding and different functions.  But I believe that I was the person who actually chose that software to be our next transition.  That was partly because DataFlex had no further path.  In other words, they weren't going to change their program and grow. The use of the internet grew.  We felt it was time to make a change and that's what we did.
    Q.  You're talking about the transition from DataFlex to Visual DataFlex.
    A.  No.  Visual DataFlex to the next trans- -- change of the software.

Q. I thought you testified that you didn't know that Mr. Borders and Mr. Edwards were working on --
A. No, I didn't say that. I didn't say that. I believe you asked me if I knew that they were doing it, if they had -- they had chosen to do that.
Q. And did you?
A. No, because I'm the one that chose to do that.
Q. When did you choose?
A. Sometime after 2005 when we went from the Visual DataFlex to I believe it was Microsoft C Basic.
Q. But you didn't contribute any code specifically to --
A. I'm sorry?
Q. You didn't contribute any code specifically to the Insuror Atlas software, did you?
MR. ALLEN: Objection; form.
THE WITNESS: I would say I did contribute code to it because when I went over it with them and we would make changes, those were changes I directed.
Q. (BY MR. WELTGE) But you didn't specifically code for the platform, did you?
MR. ALLEN: Objection; form.
THE WITNESS: I didn't get on a keyboard and code, no.
Q. (BY MR. WELTGE) What was Seguros Direct's

connection to the Insuror Atlas software?
A. It was the vehicle by which I paid them as we were transitioning from one company to the next.
Q. So Seguros Direct didn't use the software platform, did it?
A. No.
Q. And Pearl General Agency, did it use the Insuror Atlas software?
A. Yes.
Q. How did it use the software?
A. To manage the company.
Q. What does that mean?
A. Its daily operations were dependent upon the software.
Q. In what way?
A. To issue policies, to cancel policies, to handle claims.
Q. Do you know how many MGAs were using the Insuror Atlas software?
A. At what time?
Q. At any point that the Insuror Atlas software was being used.
MR. ALLEN: Objection; form.
THE WITNESS: Five or six.
Q. (BY MR. WELTGE) Do you know the names of those

MGAs?
A. Loya General Agency was one. Acacia, SeaHarbor, Amco. And there was a company out in San Diego. I don't recall their name.
Q. And these MGAs were licensed to use the software. Is that right?
MR. ALLEN: Objection; form.
THE WITNESS: In some instances, they were because they only -- they actually bought a part of the production.
Q. (BY MR. WELTGE) Who bought a part of the production?
A. Loya.
Q. What do you mean they bought a part of the production?
A. They bought a piece of code.
Q. A portion of the code for the software they bought?
A. Well, Loya was not using automobile. They were using it for property. So it was a specific program. It wasn't -- I guess it was -- and it was under their name because they bought it.
Q. So to your knowledge it was not a license?
MR. ALLEN: Objection; form.
THE WITNESS: It wasn't licensed.

A. That the people at SeaHarbor had an agreement or lease or contract with to provide software. Had been unable to do the job and so Mr. Whitehead suggested that he contact me.

Q. Contact you --

A. Regarding software.

Q. Okay. In an effort to utilize or get a license to the Insuror Atlas software?

A. Yes, that would be correct.

Q. Okay. So were you working consistently with SeaHarbor from 2019 through 2024 with the Insuror Atlas software?

A. From whatever the date he initially contacted me, from that date, yes.

Q. Okay. And what's the -- what was the nature of your relationship with Maith Solutions?

A. With who?

Q. Maith Solutions. It looks to me like Maith but it's pronounce Maw.

A. Okay. I would have made the same mistake. Well, they were the purchasers of my software.

Q. Okay. Is that only -- and that was in May of 2024?

A. Yes.

Q. Okay. Did you have any relationship with Maith

Solutions prior to Maith 2024?
A. No.
Q. Okay. When did you first speak -- well, let me ask you this first: Do you know who Mike McClure is?
A. Yes.
Q. Who is Mike McClure?
A. He's the -- I believe he's the owner of SeaHarbor.
Q. When did you first speak with Mr. McClure at SeaHarbor concerning a potential sale of the Insuror Atlas software?
A. I want to say March or February of '23.
Q. What was the nature of that interaction?
A. We met for lunch.
Q. And you talked specifically about the potential for a sale of the software?
A. He brought it up.
Q. Mr. McClure brought it up?
A. Yes.
Q. Were you looking to sell the software at the time?
A. No, not particularly.
Q. What was your reaction to Mr. McClure's raising of that topic?
A. I was surprised, but not totally off guard. I

think at the initial time, he chose to lease the software that he said at some point he would like to be able to purchase the software. And I didn't have a disagreement with him. Clinton Grumbles had the same -- brought up the same thing at the time he started using it. He said at some point I would like to be able to buy this.

Q. Okay. So let's break that down a little bit. From your testimony, it looks like your first interaction with SeaHarbor insurance agency was 2019.

A. I'm guessing. It could have even been a little earlier, but that seems like a good date.

Q. Was it about that time that Mr. McClure first told you that he might want to buy the software at some point?

A. Both he and Clinton Grumbles at the time we structured their lease asked of they at some point could buy the software.

Q. Okay. So sometime around 2019, maybe a little earlier for SeaHarbor, would that have been around 2016 for Mr. Grumbles and Acacia?

A. Maybe a little bit later than that, but yes, in that neighborhood.

Q. Did you have discussions with anyone else apart from Mr. McClure at SeaHarbor concerning the Insuror

Atlas software? And I'm -- let me ask it in a different way because I'm not being clear. At SeaHarbor or Maith, did you speak to anyone other than Mr. McClure about the Insuror Atlas software?
A. With people at SeaHarbor?
Q. Yes, sir.
A. I don't believe there was anyone besides Mike McClure that I spoke with.
Q. Okay. Did you ever speak with John Killaky?
A. I don't know that I ever spoke directly with him. It's possible that I did, but I don't recall specifically.
Q. Is Mr. Killacky in the room today?
A. I don't know.
Q. I'll represent to you that he is.
A. Okay.
Q. He's right here. This gentleman behind Mr. Bisbikis.
A. The first time I seen him was today.
Q. Okay. When did you first tell Mr. Borders, Mr. Betancourt, or Mr. Edwards that you were contemplating a sale of the Insuror Atlas software?
MR. ALLEN: Objection; form.
THE WITNESS: I don't remember the exact date. I know that we met like we would usually meet and

go eat barbecue and have that as a time to catch up on everything that was going on.

Q. (BY MR. WELTGE) Okay. After you met with Mr. McClure in -- was it 2023?

A. Yes.

Q. And that's when he mentioned to you that --

A. I'm sorry?

Q. I'm sorry. Let me back up. So in 2023, you met with Mr. McClure and you had lunch with him and he asked you about the sale or potential sale of the Insuror Atlas software. Is that right?

A. Yes.

Q. Okay. After that meeting, at what point did you or did you tell Mr. Borders, Mr. Betancourt, and Mr. Edwards that you were contemplating a sale?

A. I don't think I ever told them anything about it until I felt like there was going to be a sale. In other words, there was an agreement between McClure and myself to do that.

Q. Would that agreement have been in May 2024?

A. Well, that's when we had a contract and concluded it, yes.

Q. So was there an agreement prior to that point upon the sale?

A. A verbal agreement to have a sale?

Q. Yes, sir.
A. There was.
Q. When was that verbal agreement?
A. Maybe in late April, perhaps, of '24.
Q. Okay. So at no point prior to late April of 2024 did you have discussions with Mr. Borders, Mr. Edwards, or Mr. Betancourt about a potential sale of the software?
MR. ALLEN: Objection; form.
THE WITNESS: It would have been December of '23, I believe.
Q. (BY MR. WELTGE) Okay. So you talked to Mr. Borders and Mr. Betancourt and Mr. Edwards in December of 2023 about a sale.
A. I believe it was December. It could have been January, but around that time.
Q. What did you tell them?
A. That I was exploring the sale of the company.
Q. Did you meet with all three of them at the same time?
A. I'm sorry?
Q. Did you meet with all three of them at the same time?
A. I did.
Q. Had you made up your mind about a sale of the

A. Because I do.
Q. You have no basis?
A. I didn't say I didn't have a basis. I just said I disagree.
Q. I asked you why. Do you have a basis?
A. Because I own the software.
Q. Why do you think you own the software?
A. I have no reason to believe otherwise. I asked those men pointblank, direct to their face did they have any ownership in and they all said no.
Q. Okay. So you thought you owned the software because you thought you owned the software.
MR. ALLEN: Objection; form.
THE WITNESS: Because I paid to develop it.
Q. (BY MR. WELTGE) In the midst of your interactions with Maith and SeaHarbor, did you ever consult an intellectual property attorney regarding who had ownership rights in the Insuror Atlas software?
A. No, I don't recall doing that.
Q. Is it possible you met with an intellectual property attorney on that issue?
A. No, I don't think so.
Q. Did you attempt to have Mr. Borders or Mr. Betancourt enter into a Nondisclosure and Intellectual Property Rights Disclaimer and Assignment

concerning the Insuror Atlas software?
A. No, not that I'm aware of.
Q. Not that you're aware of?
A. I'm not aware of doing that.
(Exhibit 16 marked.)
Q. (BY MR. WELTGE) I'm going to hand you what's been mark as Exhibit 16. Mr. Hunt, do you see on the first page where it shows that this is an email from Mr. Borders to Clinton Grumbles copying Mr. Betancourt on Wednesday, May 1st of 2024?
A. Yes.
Q. Do you see where Mr. Borders writes to Mr. Grumbles "Tim wanted us to sign these" and signs it Brian Borders?
A. Yes.
Q. Flipping to the next page, can you tell me what this is, sir?
A. Say it again.
Q. Flip to the -- yes, sir, so that page. Can you tell me what this is?
A. It's a Nondisclosure and Intellectual Properties Disclaimer and Assignment.
Q. What is the date in the first paragraph?
A. April the 30th.
Q. Does seeing this document now refresh your

recollection as to whether you attempted to have Mr. Borders and Mr. Betancourt enter into an NDA, an Intellectual Property Rights Disclaimer and Assignment as to the Insuror Atlas software?
A. It helps, yeah.
Q. Okay. So did you attempt to have them sign this?
A. I showed it to them and said send these to your attorneys and have them make any changes so that you're comfortable with it.
Q. Really? You told them that they could send it to their attorney and make any changes?
A. Well, they told me they had attorneys at that point.
Q. And you had no problem with them presenting this document to their attorney?
A. No, I didn't have a problem with it. They said they wanted to. They're entitled to do that.
Q. So when they told you -- when Mr. Borders told you that he wanted to have his attorney look at this document, you weren't upset about that?
A. No, I wasn't.
Q. Who drafted this document?
A. I think it came from Maith.
Q. So this is an NDA, an Intellectual Property

Rights Disclaimer and Assignment agreement between you and Mr. Borders and it came from Maith?
A. Yes.
Q. Did Maith tell you why they wanted you to have Mr. Borders sign this?
A. Not exactly, no.
Q. Did you wonder why Maith wanted you to have --
A. I think they wanted to have something to prevent any issues.
Q. Any issues as to the ownership of the software.
MR. ALLEN: Objection; form.
THE WITNESS: I think that was probably partly to do with it.
Q. (BY MR. WELTGE) Did you ever wonder why Maith wouldn't go directly to Mr. Borders of Mr. Betancourt with this but instead went through you?
MR. ALLEN: Objection; form.
THE WITNESS: No, I don't really know why they would or wouldn't have, but they produced it for me and I took it to the guys to look at it.
Q. (BY MR. WELTGE) So you would have no reason to disagree with the fact that the metadata for this agreement shows that Mr. John Killaky, SeaHarbor's general counsel drafted this agreement.
MR. ALLEN: Objection; form.

(Exhibit 17 marked.)
Q. (BY MR. WELTGE) Yes, sir. I'm going to hand you now, sir, what's been marked as Exhibit 17.
MR. KILLAKY: Can we take a five-minute break?
MR. WELTGE: Yeah.
THE VIDEOGRAPHER: We're off at 1:33.
(Break taken from 1:33 p.m. to 1:45 p.m.)
THE VIDEOGRAPHER: We're back on at 1:45.
Q. (BY MR. WELTGE) Mr. Hunt, before we move on to the next exhibit, I just want to return to Exhibit 17 here, this NDA -- or this Non-Disclosure and Intellectual Property Rights Disclaimer and Assignment. It's my understanding, sir, that you asked both Mr. Borders and Mr. Betancourt to sign this. Is that correct?
A. Yes.
Q. Okay. Were you concerned at all that if they chose not to sign this that your deal with Maith wouldn't go through?
A. That wasn't a concern, no.
Q. Did you ever in your discussions with Maith about the sale of the Insuror Atlas software have any indication that the sale wouldn't go through if Mr. Borders and Mr. Betancourt were deemed owners of the

software?

MR. ALLEN: Objection; form.

THE WITNESS: I think that was a point of concern.

Q. (BY MR. WELTGE) Was it a point of concern for you or for Maith?

A. I can't speak to them.

Q. So it was a point of concern for you?

A. It was a point of concern.

Q. So you were concerned that if Mr. Borders and Mr. Betancourt had rights to the software, that your deal with Maith would not go through.

MR. ALLEN: Objection; form.

THE WITNESS: That wasn't my primary concern, no.

Q. (BY MR. WELTGE) Was it a secondary concern?

MR. ALLEN: Objection; form.

THE WITNESS: I couldn't tell you where it was at on the list. There was a number of concerns at that time.

Q. (BY MR. WELTGE) But it was a concern.

A. It was a concern.

Q. What was your reaction when Mr. Borders and Mr. Betancourt told you that they weren't going to sign this?

A. They never told me that.
Q. Did you follow up with them on having this signed?
A. I did follow up with Mr. Betancourt.
Q. Did you follow up with Mr. Borders?
A. I don't recall.
Q. Well, clearly this was never signed.
A. I understand that.
Q. What was your reaction to it not being signed?
A. I wasn't really very happy, not because of the sale being contingent but because I had been told by them previously that they didn't own the software.
Q. When did they tell you they didn't own the software?
A. In the meeting where I gave them this.
Q. In the meeting when you gave them this nondisclosure?
A. Yes.
Q. When was that meeting?
A. Sometime in April. Last time I saw them.
Q. Why would it make sense for them to tell you they had no ownership rights when their intellectual property attorney --
A. Well --
Q. -- excuse me, was telling them and advising

them that they did?

MR. ALLEN: Objection; form.

THE WITNESS: Okay. Kind of go back a little bit in your question because that was a long sentence.

Q. (BY MR. WELTGE) Sure. So why would it make sense for Mr. Borders and Mr. Betancourt to tell you that they did not believe they had ownership rights in the software when the attorney they were paying to review their employment agreements from SeaHarbor told them that they likely had ownership rights in the software?

MR. ALLEN: Objection; form.

THE WITNESS: First, I didn't know that they had an attorney doing that.

Q. (BY MR. WELTGE) Well, you know now as a part of --

A. Yes.

Q. -- the deposition today.

MR. ALLEN: Objection; form.

THE WITNESS: That would be speculation on my part. All I know is they told me they didn't. Their objection to this was they said they wanted an attorney to look at it first and that's where we left it.

Q. (BY MR. WELTGE) And I want to be clear, too,