**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC,<br><br>*Plaintiffs/Counter-Defendants*,<br><br>v.<br><br>MAITH SOLUTIONS LLC,<br><br>*Defendant/Counter-Plaintiff/Third-Party Plaintiff*,<br><br>v.<br><br>BRIAN BORDERS and IVAN BETANCOURT<br><br>*Third-Party Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No: 4:24-cv-00620-SDJ |

**PLAINTIFFS AND THIRD-PARTY DEFENDANTS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 6

*Deposition of Ivan Betancourt (Excerpts)*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | |
| Plaintiffs/Counter-Defendants, | CIVIL ACTION |
| VS. | NO.: 4:24-CV-00620SDJ |
| MAITH SOLUTIONS LLC, | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | |
| V. | |
| BRIAN BORDERS and IVAN BETANCOURT | |
| Third-Party Defendants. | |

---

ORAL DEPOSITION OF

IVAN BETANCOURT

FEBRUARY 27, 2025

---

ORAL DEPOSITION OF IVAN BETANCOURT, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the FEBRUARY 27, 2025, from 9:35 a.m.

to 12:49 p.m.  before Kelly Bryant, CSR in and for the State of Texas, reported by machine shorthand, at Kessler Collins, P.C. 500 N. Akard St., Ste. 3700, Dallas, TX 75201., pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

# A P P E A R A N C E S

FOR THE PLAINTIFFS:

EVAN WELTGE
Kessler & Collins, PC
500 N. Akard Street, Suite 3700
Dallas, TX 75201
Telephone:  214-379-0722
Eweltge@kesslercollins.com

FOR THE DEFENDANTS:

JOHN G. BISBIKIS
PROSPECT LAW LLP
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
Telephone: (312) 374-8084
Jbisbikis@prospectlaw.com

# INDEX


| | PAGE |
|---|---|
| IVAN BETANCOURT | |
| DIRECT EXAMINATION BY MR. BISBIKIS.............. | 5 |


## EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Ivan Betancourt LinkedIn page, October 4, 2024..................... | 15 |
| Exhibit 2 | Ivan Betancourt LinkedIn page, February 2, 2025.................... | 17 |
| Exhibit 3 | Tax return Schedule C from 2021, 2022 and 2023....................... | 35 |
| Exhibit 4 | 1099s for years 2017-2023........... | 37 |
| Exhibit 5 | Daily production summary report..... | 55 |
| Exhibit 6 | Offer letter........................ | 61 |
| Exhibit 7 | Insuror-Atlas website............... | 66 |
| Exhibit 8 | Betancourt prepared document........ | 69 |
| Exhibit 9 | E-mail exchange between Mr. Edwards and Mr. Betancourt.......... | 71 |
| Exhibit 10 | E-mail exchange between Ms. Hunt, Mr. Edwards, Mr. Borders and Mr. Betancourt.......................... | 84 |
| Exhibit 11 | Copyright assignment agreement...... | 87 |
| Exhibit 12 | Opinion letter...................... | 90 |
| Exhibit 13 | Letter from Thomas Warden to John Edwards, January 12................. | 91 |
| Exhibit 14 | E-mail exchange between Mr. Warden and Mr. Edwards.................... | 96 |
| Exhibit 15 | E-mail exchange between Mr. Warden and Mr. Edwards.................... | 97 |
| Exhibit 16 | E-mail exchange between Mr. Borders and Mr. Grumbles............ | 100 |
| Exhibit 17 | E-mail exchange between Mr. Borders and Mr. Grumbles............ | 102 |
| Exhibit 18 | E-mail exchange between Mr. Borders and Mr. Grumbles............ | 105 |
| Exhibit 19 | E-mail exchange between Mr. Borders and Mr. Grumbles............ | 109 |
| Exhibit 20 | E-mail exchange between Mr. Borders and Mr. Betancourt.......... | 112 |
| Exhibit 21 | E-mail exchange between Mr. Borders and Mr. Grumbles............ | 115 |
| Exhibit 22 | E-mail exchange between Mr. Borders and Mr. Grumbles............ | 118 |
| Exhibit 23 | E-mail exchange between Mr. | |

P R O C E E D I N G S

IVAN BETANCOURT,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BISBIKIS:

Q. Good morning, Mr. Betancourt.
A. Good morning.
Q. When did you start working for Tim Hunt?
A. Me and Mr. Hunt made an agreement to work in 2015.
Q. And that was the first time you began working for Mr. Hunt?
A. That's the first time I made -- I provided services for Mr. Hunt.
Q. What do you mean by provided services for him?
A. I provided a service for him and he paid me for that service.
Q. So you worked for him?
A. If what you said is what I just said, is I provided a service and he paid me, then yes.
Q. Okay. Was there a specific service you provided?
A. To begin with, I provided the service of consulting and underwriting for Pearl General Agency.
Q. Okay. And did you do any software development

anything that was created before you joined Mr. Hunt in 2015, are you?

A. Correct. I am not claiming that I was the author of the Insuror-Atlas before I worked at -- before I worked with Mr. Hunt.

Q. Okay. What functional pieces have you added to the software since 2014 or 2015?

A. I created the entire content management system that is used for marketing reps to track the agencies and the potential agencies that a marketing rep might have and is turned into an agent. I also created reports for that system.

Q. The what? I'm sorry. I didn't hear what you said. The what for the system?

Did you say ports?

A. Reports.

Q. Oh, reports.

A. Yeah, reports.

Q. Anything else?

A. Yes. I rewrote the claims module from the ASPX architecture that it used to MVC models, and as I rewrote it, I also corrected any inconsistencies, errors that it had and added new features.

I also co-created the system maintenance module of the Insuror-Atlas system, which was used to

add agents to the system, modify their permissions, add commissioned appointments, most of the agency information that would be required for an agent to do business.

Q. Okay. Anything else?

A. I helped -- no, I authored the document system that is used by the underwriting portion of the Insuror-Atlas. It catalogs and uploads memos from the agents into the Insuror-Atlas system.

I also modified a version of that same software and added it to the claims system with a drag-and-drop feature so that you could get the photos and images straight from your desktop and drag them onto the website and automatically upload them.

Q. Okay. You referenced the content management system?

A. Correct.

Q. Is that something that could run independent of the Insuror-Atlas software?

A. It's a part of the Insuror-Atlas system, so --

Q. Is that something that could run independent of the Insuror-Atlas system?

MR. WELTGE: Let him finish his answer, please.

Q. (BY MR. BISBIKIS) It's a yes-or-no question.

Q. Okay. And was there any change in salary at that time?

MR. WELTGE: Objection, misstates evidence, assumes facts not in evidence.

A. There was no salary. There was a fee that we changed and he increased it by a bit. I didn't ask for it, but he did increase it.

Q. At the time you started programming?

A. Correct.

Q. Okay. And was that part of an agreement or he just did it as part of the normal course?

A. He -- he just did it.

Q. Okay. And did you work full time for him?

A. What do you mean by full time?

Q. Did you work full time --

A. I worked when I wanted to work. So sometimes it was a long time, sometimes it wasn't.

Q. So in a given week, were you expected to work roughly 40 hours for Mr. Hunt?

A. During what time period are you speaking?

Q. Starting in 2015.

A. 2015. 2015, when I was working through Pearl?

Q. Yeah.

A. During 2015, I would work most of the days because the business was, I believe, a ten-to-five

business.

So I would come in early sometimes to prepare for the day and then I would leave usually after the business was closed to make sure everything that had been processed was done.

Q. Okay. So you were flexible in hours.

Is that what I'm understanding?

A. Correct. I was very flexible in hours.

Q. So let me ask you: When you first started with Mr. Hunt in 2015 through '16 and continued through the set amount after he converted you to development, right?

MR. WELTGE: I'm sorry. I didn't hear the last part of your question.

MR. BISBIKIS: I'm sorry. We'll scratch that. I probably trailed off there.

Can we mark this as Exhibit 1?

(Defendant's Exhibit No. 1 marked)

Q. (BY MR. BISBIKIS) Mr. Betancourt, the court reporter has handed you what's been marked as Exhibit 1.

Do you recognize this?

A. I do.

Q. What is it?

A. It's a LinkedIn page.

Q. Okay. Do you see in the upper left-hand corner a date?

A. No, that's accurate.
Q. It says you're a software developer at Insuror-Atlas.com?
A. Correct.
Q. Okay. And it says that in two places?
A. Correct.
Q. Okay. You didn't update it to say you're working now for Edgepoint, did you?
A. No, not yet.
Q. Why not?
A. Because the status on Edgepoint hasn't been completed. I'm supposed to be a full-time employee, and I'd like to put that on here, but since I'm not technically a full-time employee, I wouldn't want to put that out there.
Q. So you didn't want to put something on there saying you were employed if you were not an employee?
A. Not yet, no.
Q. Okay. It also says that you're a software developer/consultant freelance.
Do you see that under your experience? I'm still looking at Exhibit 2.
A. Yes.
Q. What sort of freelance software development work do you have?

A. I have created or helped create, co-created a system for a premium finance company. I have created --
Q. And how long did that take?
A. I don't remember the exact time, but if I had to guess, it took between a year and two to create and complete it.
Q. And did you have -- did you have a written agreement with them to create it?
A. No. It wasn't -- it wasn't written. It was verbal.
Q. It was verbal. And did they pay you by the project?
A. Well, to clarify, I was working through TBB Tech. They were the ones that were paying me, and that was a monthly payment.
Q. Okay. And how much money did you make from TBB Tech on that project?
A. Overall?
Q. Yeah.
A. I don't remember the exact amount, but it was significant.
Q. What do you mean by significant?
A. It was enough for me to save for a down payment on a house.
Q. Okay. And how much was the down payment on the

house?

A. Approximately $10,000.

Q. Okay. So you made about $10,000 through TBB Tech for that project?

A. For that one project, correct.

Q. Okay. Over a year and a half you said?

A. Approximately.

Q. Okay. Did TBB Tech have a written agreement with the premium finance company to do the development?

A. Not that I'm aware of.

Q. Okay. And when did you do that? What -- what time period, you know, years approximately? 2014, 2015?

A. No, it was -- it just recently ended the payments for, so it was 2019, 2020 I want to say.

Q. Okay. And that was while you were working for Mr. Hunt?

A. Correct.

Q. And while you were working full time for him, at least according to your LinkedIn page?

A. Oh, the incorrect one I put that. Well, I was working whenever I wanted to.

Q. For Tim?

A. For any -- for any customer.

Q. Any time you wanted --

A. Any client, I would work, yeah, correct.

Q. Okay. And so did Tim Hunt know you were working for the premium finance company?
A. I don't know.
Q. Did you ask Tim if you could do that work?
A. I did not.
Q. Do you know if Brian asked him if you could do that work?
A. I do not.
Q. Okay. If Tim had told you he didn't want you to do that work, would you have stopped?
A. No.
Q. Okay. If Tim said you would lose your job because of that work, what would you have told Tim?
A. Well, I didn't have a job so I don't think I would have responded to something like that. I don't know what I would have said.
Q. Okay. So you didn't have a job with Tim Hunt?
A. Correct.
Q. Okay. So from 2014 to -- when did you stop working for Tim Hunt?
A. When did I stop doing the work for Mr. Hunt?
Q. Yeah.
A. I believe it was late May of 2023.
Q. 2023 or '24?
A. '24. I'm sorry. I believe it was, yeah, 2024.

Q. Okay. So you stopped working for Tim Hunt in late May of 2024?
A. Correct.
Q. And why did you stop working for him?
A. Because he sold his license of the Insuror-Atlas to Maith Solutions.
Q. Okay. How do you know he sold his license to Maith Solutions?
A. Well, I spoke to Mike McClure. He asked me to give him a call, and then at that point in time, he told me that he had bought the Insuror-Atlas from Mr. Hunt.
Q. When did he call you and tell you that?
A. I don't remember if he called me or he asked me to call him, but it was around that time on June 1st.
Q. Okay. So Mike -- that was -- that was -- was that the first time you learned that the software had been sold?
A. Correct, that it was finalized and sold.
Q. But you knew that it had -- discussions had been going on to sell the --
A. Correct.
Q. -- software to Mike McClure for a long time, right?
A. Correct.
Q. All right. So you're currently employed by

Q. Do you do database management?
A. Yes.
Q. Okay. How about hardware management?
A. Yes.
Q. Okay. Do you cover for Brian, if needed?
A. I don't know what you mean by cover.
Q. Do you cover for Brian Borders, if needed?
A. What do you mean by cover?
Q. Do you help him out with work?
A. I do help him, yes.
Q. Okay. All right. And did you do code maintenance for software when you worked for Mr. Hunt?
A. Yes.
Q. Did you do IT-related tasks when you worked for Mr. Hunt?
A. Yes.
Q. Did you do database management when you worked for Mr. Hunt?
A. Yes.
Q. Did you cover for Brian, if needed, when you worked for Mr. Hunt?
A. I helped Brian.
Q. You helped Brian. Okay. So what has substantively changed?
What substantively are you doing different

you've done outside of that, the work for Insuror-Atlas?
A. During what time period?
Q. During the time you worked for Mr. Hunt.
A. During the time I did work for Mr. Hunt, I did do quite a bit of other work and it varied. Most of it was web related, some of it was IT related.
Q. Okay. And you were paid -- were you paid for that work?
A. Yes.
Q. Okay. And it would have been reported on your income taxes?
A. Correct.
Q. Okay. Did you have any written consulting agreements with any companies you did work for outside of the work you did for Mr. Hunt?
A. No.
Q. Okay. Do you have your own consulting company?
A. No.
Q. Was Mr. Hunt aware of any of the consulting work you did --
A. I don't know.
Q. -- while you were working for him?
A. I don't know.
Q. Okay.
(Defendant's Exhibit No. 3 marked)

Q. Okay.
A. -- a period of time.
Q. Did it look like a raise? You're using your words very carefully here for some reason. You say he increased it. It wasn't a raise?
MR. WELTGE: Objection, argumentative.
A. He increased the amounts he paid me through time.
Q. (BY MR. BISBIKIS) Okay. Did you receive bonuses from Mr. Hunt periodically?
A. He paid me extra money aside from the fee that I charged him.
Q. Did you submit invoices to Mr. Hunt?
A. No.
Q. Okay. So how did you charge him?
A. We had agreed on a monthly fee every month, so that was just the way it was.
Q. When did -- so you said you had two times you met with him on agreements, right?
A. I talked to him two times on the amount -- on the fee.
Q. Once when you started in 2014, but there's no written agreement, right?
A. Correct. It was verbal.
Q. And then when you joined his Insuror-Atlas

A. I met him when I was working through Vision/Favoya (phonetic) at an industry conference. I met him and John there.

Q. Okay.

A. That was the first time I ever met him.

Q. You were working for Vision?

A. Correct.

Q. Okay. And they were a client of Tim Hunt?

A. I don't know if at that time they were, but they would eventually be, yes.

Q. Okay. And so they used the Insuror-Atlas software, right?

A. They used a version of the Insuror-Atlas, yes.

Q. Yeah. And so when you worked there, you used the Insuror-Atlas software?

A. Correct.

Q. Okay. And so you've known him about 20 years?

A. Approximately.

Q. Okay. When you worked for Mr. Hunt when you first started in about 2014 or 2015 -- I keep saying 2014. I know you said 2015. But that time when you first started working for Pearl, right?

A. (Moving head up and down.)

Q. Did you come to work in office space that was part of Tim Hunt's business?

A. No.
Q. You never came to any office?
A. At the beginning?
Q. Yeah.
A. No.
Q. You never worked --
A. Well, excuse me. Let me backtrack. I did go to an office but it did not belong to Mr. Tim Hunt.
Q. Who did it belong to?
A. Calema Insurance.
Q. Calema. And where was that office?
A. It was on Abram Street in Arlington.
Q. And why did you go to that office?
A. Mr. Casa is the owner of Calema Insurance, provided that space for me and Mr. Hunt to have some place to work out of so that I could have ample space since I didn't have, at the time, a place in my -- in my house to do work. So he provided that space for me and Mr. Hunt.
Q. Okay. And did Mr. Hunt rent that space from him?
A. Not that I -- no.
Q. Okay. And did you work there 40 hours a week?
A. I probably worked there more than 40 hours a week.

Q. Okay. All right. So you worked in the office space. What was the next office -- did you work in any other office space following that one?
A. Yes. After the Pearl/Paladin business went under, I would meet with John Edwards and Brian Borders at an office in Rockwell approximately two times a week.
Q. Okay. And that was office space that Tim Hunt rented?
A. Correct.
Q. Okay. And so that would have been from about 2017 until when? Or would that have started in about 2017?
A. It would have started about 2017.
Q. Okay. And how long did you work out of that office space?
A. It wasn't very long. About a year and a half or so.
Q. Okay. And when you weren't working in that office space, did you work anywhere else?
A. At home.
Q. At home. Okay. How many days a week did you work at home for Tim?
A. For what time period? That time -- that specific time period?
Q. Yeah.

A. During that specific time period, I worked three days from the house and went to meet with John and Brian to collaborate twice.
Q. Okay. And then did Tim Hunt have office space in Garland?
A. He did.
Q. And was that after the Rockwall office space?
A. Yes.
Q. Okay. And you worked out of the office in Garland?
A. Sometimes, yes.
Q. And did Brian ever meet you at that office space?
A. Yes.
Q. And he would work there?
A. Yes.
Q. Okay. How many days a week did you work in the Garland office?
A. I would work there maybe -- I mean, again, what time period are we speaking with because it varied.
Q. Well, you said it -- at my calculations, it would have been about 2019 you moved to Garland; is that right?
A. Yes.
Q. So following Rockwall, you moved to Garland