**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | § | |
| | § | |
| *Plaintiffs/Counter-Defendants*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No: 4:24-cv-00620-SDJ |
| MAITH SOLUTIONS LLC, | § | |
| | § | |
| *Defendant/Counter-Plaintiff/Third-Party Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| BRIAN BORDERS and IVAN BETANCOURT | § | |
| | § | |
| *Third-Party Defendants*. | § | |

**PLAINTIFFS AND THIRD-PARTY DEFENDANTS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 8

*Asset Purchase Agreement*

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into effective as of May 24, 2024 ("**Effective Date**"), by and between Timothy Craig Hunt, an individual resident of the State of Texas, ("**Seller**"), Maith Solutions LLC, a Texas limited liability company ("**Buyer**"), and solely for the purposes of Section 4.8(b) of this Agreement, Seaharbor Insurance Agency LLC, an Illinois limited liability company ("Seaharbor").

## RECITALS

WHEREAS, Seller provides a hosted underwriting and claims management software solution branded under the name "Insuror Atlas" (the "**Business**");

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, substantially all of the properties, business, and assets used in the operation of the Business, and Buyer desires to assume from Seller, and Seller desires to assign to Buyer, certain liabilities and obligations of Seller with respect to the operation of the Business, in each case for consideration and in accordance with the terms and conditions of this Agreement; and

WHEREAS, Buyer and Seller desire to enter into this Agreement for the purpose of setting forth their mutual understandings and agreements with respect to the foregoing; and

WHEREAS, capitalized terms used but not defined in the context of the Section in which such terms first appear shall have the meanings set forth in Section 6.8.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I. PURCHASE AND SALE OF ASSETS

**Section 1.1. Purchase and Sale of Assets.** Upon the terms and subject to the conditions set forth in this Agreement, Seller hereby sells, transfers, assigns, conveys, and delivers to Buyer, and Buyer hereby purchases and acquires from Seller, all of the Acquired Assets, free and clear of all Liens. Notwithstanding the foregoing, Buyer acknowledges that the Software is and will be subject to the Existing Licensee Rights at all applicable times. "**Acquired Assets**" means all right, title, and interest in and to all of the assets of Seller used in the operation of the Business, but specifically excluding the Excluded Assets. The Acquired Assets will include, but not be limited to, the following, to the extent permitted by applicable Law:

(a) The Software and the Documentation, including without limitation:

(1) (i) copyrights in the Software and Documentation, whether registered or unregistered, arising by any applicable Law of any jurisdiction throughout the world or any treaty or other international convention, (ii) registrations and applications for registration of such copyrights; and (iii) issuances, extensions, and renewals of such registrations and applications;

(2) if any, patents and patent applications claiming the Software and Documentation, in whole or in part, all patents that issue from such patent



EXHIBIT 17
WIT: Tim Hunt
DATE: 2/28/25
Natasha Duckworth, CSR

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

applications, and all continuations, continuations-in-part, divisionals, extensions, substitutions, reissues, re-examinations, and renewals, of any of the foregoing;

(3) the Source Code and any and all of the following that comprise, are comprised by the Software or Documentation, in whole or in part: information, inventions, discoveries, improvements, formulas, programs, tools, codes, algorithms, statements, notations, comments, descriptions, identifiers, instructions, flow charts, drawings, designs, patterns, design plans, compilations, database schema, devices, procedures, processes, and other content and materials;

(4) any databases or data compilations that comprise or are comprised by the Software or Documentation, including all sui generis rights in such databases or data compilations;

(5) All Intellectual Property Rights in and to the Software, together with the goodwill associated with and symbolized by the Intellectual Property Rights;

(6) other content within the Software in any format, medium, or form, including any audio, visual, graphic, digital, screen, menu, icon, GUI, or other work, expression, display, design, material, whether or not registered, copyrighted, or copyrightable;

(7) claims and causes of action with respect to any of the foregoing accruing on or after the Effective Date, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for infringement, dilution, misappropriation, violation, breach, or default occurring from and after the Effective Date; and

(8) other rights, assets, privileges, and protections of any kind whatsoever accruing under any of the foregoing provided by any Law (including any treaty or other international convention) throughout the world from and after the Effective Date.

(b) The contracts listed on **Schedule 1.1(b)** and all associated rights of Seller or Seller's Affiliate, as applicable (the "**Contracts**");

(c) All notes receivable, trade receivables, accounts receivable, commissions, and other receivables and rights to payment of Seller on account of the Business, but only to the extent they relate to work and services not performed or billed by Seller prior to Closing;

(d) All tangible personal property (whether as owner, lessor, lessee or otherwise), including, without limitation, all machinery, equipment, instruments and vehicles, used in the operation of the Business;

(e) All causes of action, claims, and demands of Seller related to the Acquired Assets and Assumed Liabilities (whether choate or inchoate, known or unknown, matured or unmatured, accrued or contingent), including rights to returned or repossessed goods and rights as an unpaid vendor; rights of recovery, rights of warranty and indemnity, rights to product liability insurance proceeds, rights of set-off and rights of recoupment; all security deposits, utility deposits and other deposits;



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER MAITH_0000356

(f) All Intellectual Property used in the operation of the Business, including without limitation the name "Insuror Atlas" and the associated goodwill, related licenses and sublicenses (in each case, whether granted or obtained), and other rights, remedies against infringements of, and rights to protection of interests in Intellectual Property under the Laws of all jurisdictions;

(g) All Permits obtained by, on behalf of, or for the benefit of Seller from any Governmental Authority used in the operation of the Business;

(h) All marketing and advertising materials; domain names; social media accounts; email addresses; P.O. boxes; and the use of any telephone numbers that are used in the operation of the Business;

(i) All insurance benefits, including rights and proceeds, arising from or relating to the Acquired Assets or the Assumed Liabilities after Closing; and

(j) All goodwill and the going concern value of the Acquired Assets and the Business.

**Section 1.2. "Excluded Assets"** means:

(a) All bank and investment accounts, cash, cash equivalents, short-term investments and marketable securities of Seller, wherever located;

(b) The assets, properties, and rights specifically listed and described on **Schedule 1.2(b)**; and

(c) All other assets of Seller not used in the operation of the Business.

**Section 1.3. Assumption of Liabilities.** On and subject to the terms and conditions of this Agreement, Buyer agrees to assume and become responsible for the Assumed Liabilities as of the Closing Date. Buyer shall not assume or have any responsibility with respect to any liability of Seller that is not an Assumed Liability. "**Assumed Liabilities**" means all obligations of Seller arising from and after the Closing Date under the Contracts listed on **Schedule 1.1(b).**

**Section 1.4. Excluded Liabilities.** Notwithstanding anything to the contrary contained in Section 1.3 or elsewhere in this Agreement, Seller shall maintain sole responsibility of, and solely shall retain, pay, perform any Liabilities arising out of or relating to the operation of the Business prior to the Closing Date, any Liability of Seller under this Agreement or any other document executed in connection with the transactions contemplated hereby, including any Liability of Seller for expenses incurred by Seller or its Affiliates in connection with this Agreement, or any Liability of Seller based upon Seller's acts or omissions occurring after the Closing (collectively, the "**Excluded Liabilities**").

**Section 1.5. Purchase Price.** In exchange for the Acquired Assets, Buyer shall deliver to Seller at Closing a note in the initial principal amount of $2,000,000, payable to Seller in substantially the form attached hereto as Exhibit A (the "**Note**"). The Note will be unconditionally and irrevocably guaranteed by Seaharbor pursuant to a Guaranty to be executed by Seaharbor and delivered to Seller at Closing.

**Section 1.6. Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at 11:59 p.m., local time, on May 31, 2024, by the remote exchange of electronic copies of documents and signatures. The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**".



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

**Section 1.7. Closing Obligations.**

(a) At the Closing, Seller shall deliver or cause to be delivered to Buyer an assignment of all of the Acquired Assets that are tangible and intangible personal property, which assignment shall also contain Buyer's undertaking and assumption of the Assumed Liabilities (the "**Assignment Agreement**") in substantially the form attached hereto as Exhibit B, duly executed by Seller.

(b) At the Closing, Buyer shall deliver, or cause to be delivered, to Seller:

(1) the Assignment Agreement, duly executed by Buyer;

(2) the Note, duly executed by Buyer;

(3) the Guaranty, duly executed by Seaharbor; and

(4) Certificate of Good Standing issued by the Texas Comptroller for Buyer and Seaharbor.

(c) Buyer's obligation to close shall be conditioned upon execution and delivery of the Employee Agreement, or Buyer's waiver of such requirement.

## ARTICLE II. REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Disclosure Schedule, Seller represents and warrants to Buyer that the following statements are true and correct as of the Closing Date:

**Section 2.1. Reserved.**

**Section 2.2. Authority.** Seller has the requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to perform its obligations hereunder. The execution, delivery and performance by Seller of this Agreement, and the consummation by Seller of the transactions contemplated hereby, have been duly and validly authorized by Seller and no other actions on the part of Seller are necessary to authorize this Agreement or to consummate the transactions contemplated hereby or to perform its obligations hereunder. This Agreement has been duly and validly executed and delivered by Seller and, assuming this Agreement constitutes the legal, valid and binding agreement of Buyer, constitutes a legal, valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws, now or hereafter in effect, affecting creditors' rights generally and by general principles of equity. Upon the execution and delivery by Seller of any other document to which Seller is party in connection with this Agreement, other than this Agreement and the Disclosure Schedule, each of such other documents will constitute the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws, now or hereafter in effect, affecting creditors' rights generally and by general principles of equity.

**Section 2.3. Non-Contravention; Filings and Consents.** Except as disclosed on **Schedule 2.3**:



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER MAITH_0000358

(a) The execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby do not and will not (with or without notice or lapse of time, or both):

(1) contravene, conflict with or result in a violation or breach of any provision of any Law or Order;

(2) require any consent or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, or constitute a change of control or Default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of any Contract to which Seller is a party or any of Seller's Affiliates is, or is identified as, a party, or by which their properties or assets may be bound or affected or any Governmental Authority affecting, or relating in any way to the Business; or

(3) result in the imposition or creation of any Lien on, or with respect to, any of the Acquired Assets.

(b) The execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated hereby by Seller do not and will not require any Permit of, action by, filing with or notification to, any Governmental Authority, other than any actions or filings the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. For purposes of this Agreement, "**Governmental Authority**" means any national, state or local, domestic or foreign or international, government or any judicial, legislative, executive, administrative or regulatory authority, tribunal, agency, body, entity or commission or other governmental, quasi-governmental or regulatory authority or agency, domestic or foreign or international.

**Section 2.4. Undisclosed Liabilities.** Except as disclosed on **Schedule 2.4**, Seller has no Liabilities related to the Business, other than Liabilities incurred in the ordinary course of the Business.

**Section 2.5. Litigation.**

(a) Except as set forth in **Schedule 2.5**, there is no complaint, claim, action, suit, litigation, proceeding or governmental or administrative investigation pending or, to the Knowledge of Seller, threatened against or affecting Seller, including in respect of the transactions contemplated hereby that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. Seller is not subject to any outstanding Order (i) that prohibits Seller from conducting the Business as now conducted, or (ii) that would, individually or in the aggregate, have had or would reasonably be expected to have had a Material Adverse Effect.

(b) Except as set forth in **Schedule 2.5**, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any complaint, claim, action, suit, litigation, proceeding or governmental or administrative investigation that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. Seller has delivered to Buyer copies of all pleadings, correspondence and other documents relating to each item listed in **Schedule 2.5**.



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

**Section 2.6. Tax Matters.**

(a) Seller has timely filed all federal, state, local and foreign Tax returns, estimates, information statements and reports relating to any and all Taxes of Seller or its operations (the "**Tax Returns**") required to be filed by Law. All such Tax Returns are true, correct, and complete, and Seller has timely paid all Taxes attributable to Seller that were due and payable by it as shown on such Tax Returns, except with respect to matters contested in good faith.

(b) There is no written claim or assessment pending or, to the Knowledge of Seller, threatened against Seller for any alleged deficiency in Taxes of Seller, and there is no audit or investigation with respect to any liability of Seller for Taxes. Seller has not waived any statute of limitations with respect to material Taxes or agreed to any extension of time with respect to a material Tax assessment or deficiency.

(c) There is no tax sharing agreement, tax allocation agreement, tax indemnity obligation or similar written or unwritten agreement, arrangement, understanding or practice with respect to Taxes (including any advance pricing agreement, closing agreement or other arrangement relating to Taxes) that will require any payment by Seller.

(d) Seller (i) has not been a member of an affiliated group within the meaning of Section 1504(a) of the Code or any similar group defined under a similar provision of state, local or foreign law and (ii) has no liability for Taxes of any Person other than Seller and, as applicable, its Subsidiaries under Treas. Reg. §§ 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor by contract or otherwise.

(e) Seller has withheld (and timely paid to the appropriate Governmental Authority) proper and accurate amounts for all periods through the date hereof in compliance with all Tax withholding provisions of applicable federal, state, local and foreign Laws other than provisions of employee withholding (including, without limitation, withholding of Tax on dividends, interest, and royalties and similar income earned by non-resident aliens and foreign corporations and withholding of Tax on United States real property interests).

(f) For purposes of this Agreement, "**Tax**" or, collectively, "**Taxes**" means any and all U.S. federal, state, local and non-U.S. taxes, assessments and other governmental charges, duties (including stamp duty), impositions and liabilities, including capital gains tax, taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, escheat, excise and property taxes as well as public imposts, fees and social security charges (including health, unemployment, workers' compensation and pension insurance), together with all interest, penalties, and additions imposed by a Governmental Authority with respect to such amounts.

**Section 2.7. Compliance with Laws; Permits.**

(a) To the Knowledge of Seller, Seller is not and has not been in conflict with, in Default or, with notice, lapse of time or both, would be in Default, with respect to or in violation of any (i) statute, law, ordinance, rule, regulation or requirement of a Governmental Authority (each, a "**Law**") or (ii) order, judgment, writ, decree or

injunction issued by any court, agency or other Governmental Authority (each, an "**Order**") applicable to Seller or by which any property or asset of Seller is bound or affected.

(b) Seller has not received any written notice:

(1) of any Default or violation as described in clause (a) above;

(2) of any administrative, civil or criminal investigation or audit by any Governmental Authority relating to Seller or the Business; or

(3) from any Governmental Authority alleging that Seller is not in compliance with any Law or Order.

(c) Seller has all permits, licenses, orders, registrations, certificates, variances, authorizations, consents, approvals, franchises, and similar rights from Governmental Entities required to conduct the Business as currently conducted ("**Permits**") and such Permits are valid and in full force and effect. Seller is in compliance with the terms of such Permits and has not received written notice from any Governmental Authority threatening to revoke, or indicating that it is investigating whether to revoke, any such Permit.

**Section 2.8. Intellectual Property.**

(a) **Schedule 2.8** lists all of Seller's patents, inventions, copyrights, software, trademarks, service marks, domain names, trade dress trade secrets and all other intellectual property rights of any kind or nature ("**Intellectual Property**") used in the Business as currently conducted. Seller owns or is validly licensed or otherwise have the right to use all Intellectual Property.

(b) No Affiliate of Seller holds, owns or claims any right, title or interest in or to any Intellectual Property or any Intellectual Property Rights. The Intellectual Property does not infringe, misappropriate or otherwise violate the Intellectual Property Rights of any Affiliate of Seller.

(c) To the Knowledge of Seller, the Intellectual Property used by Seller does not infringe, misappropriate or otherwise violate the Intellectual Property Rights of any third party.

(d) Seller has not received any written charge, complaint, claim, demand or notice alleging any such infringement, misappropriation or other violation (including any claim that Seller must license or refrain from using any Intellectual Property of any third party).

(e) To the Knowledge of Seller, no third party has infringed upon, misappropriated or otherwise violated any Intellectual Property of Seller. Seller makes reasonable best efforts to protect and maintain its Intellectual Property.

**Section 2.9. Contracts.**

(a) **Schedule 2.9** lists, and Seller has made available to Buyer, true, correct and complete copies of all of the Contracts to which Seller or any of Seller's Affiliates is a party and which bind or affect the Acquired Assets and the Business.



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

(b) Each Contract is valid and binding on Seller or its Affiliate, as applicable, and each other party thereto, and is in full force and effect and enforceable in accordance with its terms, except to the extent enforceability may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally, and to general equitable principles, and unless expired or terminated in accordance with its terms; (ii) Seller and each other party thereto, have performed and complied with all obligations required to be performed or complied with by them under each Contract; and (iii) there is no Default under any Contract by Seller or by any other party, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a Default thereunder by Seller or by any other party thereto.

(c) With respect to Contracts to which Seller's Affiliate is a party or identified as a party, Seller possesses all requisite power and authority to sell, transfer, assign, convey, and deliver to Buyer all of such Affiliate's rights and obligations in and to such Contract, and no other actions on the part of such Affiliate are necessary to authorize this Agreement or to consummate the transactions contemplated hereby or to perform its obligations hereunder.

**Section 2.10. Software and Documentation.**

(a) Subject only to the Existing Licensee Rights, the Software and Documentation are free and clear of all Liens other than Permitted Liens, which would in any material manner interfere with the transfer of the Acquired Assets from Seller to Buyer. No Affiliate of Seller holds, owns or claims any right, title or interest in or to the Software or Documentation. To the extent any Affiliate of Seller held, owned or claimed any right, title or interest in or to the Software or Documentation, such Affiliate has assigned, transferred and conveyed its entire right, title and interest in or to the Software and Documentation prior to the Closing Date.

(b) When used by Buyer or any Authorized User in accordance with this Agreement and the Documentation, no Software or Documentation as and in the form delivered by Seller does or will:

(1) infringe, misappropriate, or otherwise violate any Intellectual Property Right or other right of any third party (with respect to patent or trademark, limited to those perfected within and recognized by the United States); or

(2) violate applicable Law (provided that the foregoing does not apply to Buyer specific application thereof; for example and without limitation, Seller does not represent or warrant that the Software complies with the insurance laws of a given jurisdiction);

provided that the foregoing does not apply to the extent any such infringement, misappropriation, or violation arises out of or relates to (1) the combination of any Software or Documentation with any matter or material not provided by Seller; (2) any use of the Software or Documentation by Buyer other than strictly for insurance underwriting and claims management purposes; or (3) any other circumstance outside of Seller's fault (the "**Infringement Exceptions**").



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER MAITH_0000362

(c) There is no pending or, to the Knowledge of Seller, threatened litigation, claim or proceeding (including in the form of any offer to obtain a license) which has not been settled or otherwise reasonably addressed, including by any holder of the Existing Licensee Rights:

(1) alleging that any use of the Software or Documentation, as used by Seller, does or would infringe, misappropriate, or otherwise violate any copyright, patent, trade secret or other Intellectual Property Right of any third party;

(2) challenging Seller's ownership of, or right to use or license, any Software or Documentation, or alleging any adverse right, title, or interest with respect thereto;

(3) alleging the invalidity, misuse, unregistrability, or unenforceability of any copyrights, trade secret rights, or patent rights in the Software or Documentation; or

(4) alleging any third-party infringement, misappropriation, or violation of any copyrights, trade secrets, or patent rights in the Software or Documentation, nor to Seller's Knowledge is any third party infringing, misappropriating, or violating, or preparing or threatening to infringe, misappropriate, or violate, any copyrights, trade secrets or patent rights in the Software or Documentation, and it has no Knowledge of any factual, legal, or other reasonable basis for any such litigation, claim or proceeding.

(d) Seller has not granted any license or other contingent or non-contingent right, title, or interest under or relating to the Software or Documentation that does or will conflict with this Agreement in any manner, including any of Seller's representations, warranties or performance or Buyer's rights or licenses hereunder.

(e) as provided by Seller, no Software contains any Harmful Code.

**Section 2.11. Insurance.** Seller maintains the policies of insurance related to the Business listed on **Schedule 2.11**. There is no claim pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed. There is no threatened termination of, or pending material premium increase with respect to, any such policies or bonds.

**Section 2.12. Brokers; Certain Expenses.** No agent, broker, investment banker, financial advisor or other firm or Person, whose fees and expenses shall be paid solely by Seller, is or shall be entitled to receive any brokerage, finder's, financial advisors, transaction or other fee or commission in connection with this Agreement or the transactions contemplated hereby based upon agreements made by or on behalf of Seller.

**Section 2.13. Adequacy of Acquired Assets; Title to Assets.**

(a) The Acquired Assets include, and upon the purchase of the Acquired Assets Buyer will own or have the uncontested right to use, all rights, properties (including Seller's Intellectual Property), interests in properties, and assets necessary to permit Buyer to carry on the Business as presently conducted by Seller.

(b) Seller owns good, indefeasible, and transferable title to all of the Acquired Assets, free and clear of any Liens other than Permitted Liens.



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER MAITH_0000363

(c) The Acquired Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Business in the manner presently operated by Seller.

**Section 2.14. Relationships With Related Persons.** Except as disclosed on **Schedule 2.14**, neither Seller nor any of its Affiliates has, or has had, any interest in any property (whether real, personal or mixed and whether tangible or intangible) used in or pertaining to the Business. Neither Seller nor any of its Affiliates owns, or has owned, of record or as a beneficial owner, an equity interest or any other financial or profit interest in any Person that has (a) had business dealings or a material financial interest in any transaction with Seller other than business dealings or transactions disclosed on **Schedule 2.14**, each of which has been conducted in the ordinary course of business with Seller at substantially prevailing market prices and on substantially prevailing market terms or (b) engaged in any Competing Business, except for ownership of less than one percent (1%) of the outstanding capital stock of any Competing Business that is publicly traded on any recognized exchange or in the over-the-counter market. Except as set forth on **Schedule 2.14**, neither Seller nor any of its Affiliates is a party to any Contract with, or has any claim or right against, Seller.

## ARTICLE III. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

**Section 3.1. Organization.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has the requisite corporate power to carry on its business as now conducted.

**Section 3.2. Authority.** Buyer has all necessary corporate power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Buyer and no other corporate proceedings on the part of Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by Buyer and, assuming due authorization, execution and delivery of this Agreement by Seller, constitutes a legal, valid and binding agreement of Buyer, enforceable in accordance with its terms against Buyer, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to creditors' rights generally and by general principles of equity.

**Section 3.3. Consents and Approvals.** The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby require no consent, approval, authorization or filing with or notice to any Governmental Authority other than any actions or filings the absence of which are not reasonably likely to prevent, materially delay or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement.

**Section 3.4. Non-Contravention.** The execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated by this Agreement do not and will not (with or without notice or lapse of time or both) (i) contravene, conflict with, or result in any violation or breach of any provision of the certificate of incorporation or bylaws of Buyer; (ii) assuming compliance with the matters referred to in Section 3.3, contravene, conflict



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

with or result in a violation or breach of any Law or Order; or (iii) require any consent or approval under, violate, conflict with, result in any breach of any loss of any benefit under, or constitute a change of control or Default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of any Contract to which Buyer is a party, or by which its properties or assets may be bound or affected, with such exceptions, in the case of each of clauses (ii) and (iii) of this section, as would not reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement.

**Section 3.5. Solvency.** Buyer is solvent as of the Closing.

**Section 3.6. Knowledge/Sophisticated Buyer.** Buyer represents and warrants that it is a sophisticated buyer and possess such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its purchase of the Acquired Assets and assumption of the Assumed Liabilities under this Agreement.

## ARTICLE IV. COVENANTS

**Section 4.1. Non-Competition and Non-Solicitation.**

(a) During the period commencing with the Closing Date and ending on the fifth (5th) anniversary of the Closing Date, Seller shall not, directly or indirectly, engage in, own, be employed by, consult with or otherwise render services to any Person who is engaged in any Competing Business; provided, however, that the ownership of an equity interest of not more than 2% in a publicly traded entity that is engaged in a Competing Business, without more, shall not constitute a violation of this covenant.

(b) During the period commencing with the Closing Date and ending on the fifth (5th) anniversary of the Closing Date, Seller shall not, directly or indirectly: (i) solicit the trade of, or trade with, any customer or supplier of Buyer such that the customer or supplier of Buyer reduces the amount of business that it does (or, but for that solicitation, would do) with Buyer, or (ii) solicit or induce any employee, distributor, sales representative, agent or contractor of Buyer to terminate his, her or its employment or other relationship with Buyer.

(c) If Seller shall be in breach of any of the provisions of subsection (a) or subsection (b) above, then the time periods set forth in those subsections shall, as they relate to the breaching party, be extended by the length of time during which the breaching party is in breach of any of those provisions.

(d) Seller acknowledges and agrees that Buyer would be irreparably damaged if any of the provisions of this Section 4.1 are not complied with in accordance with their specific terms or are otherwise breached. Accordingly, it is agreed that Buyer shall be entitled to an injunction or injunctions to prevent breaches of this Section 4.1 and shall have the right to specifically enforce Section 4.1 and its terms and provisions against Seller in addition to any other remedy to which Buyer may be entitled under this Agreement, at law or in equity.

(e) It is the intent of the parties that each provision of this Section 4.1 be adjudicated valid and enforced to the fullest extent permissible under the laws and public policies of each jurisdiction in which adjudication of the validity or enforcement of Section



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

4.1 is sought. In furtherance of the foregoing, each provision of Section 4.1_shall be severable from each other provision, and any provision of Section 4.1 that is prohibited or unenforceable in any jurisdiction shall be subject to the following:(i) if the prohibited or unenforceable provision is contrary to or conflicts with any requirement of any statute, rule or regulation in effect in the jurisdiction, then the requirement shall be incorporated into, or substituted for, the prohibited or unenforceable provision to the minimum extent necessary to make the provision valid or enforceable;(ii) the Governmental Entity or arbitrator considering the matter is authorized to (or, if that Governmental Entity or arbitrator is unwilling or fails to do so, then the parties shall) amend the unenforceable provision to the minimum extent necessary to make the provision valid or enforceable, and the parties consent to the entry of an order amending the provision to that extent for that purpose; and (iii) if any unenforceable provision cannot be or is not reformed and made valid or enforceable under this Section 4.1, then the prohibited or unenforceable provision shall be ineffective in that jurisdiction to the minimum extent necessary to make the remainder of Section 4.1 valid or enforceable in that jurisdiction. Any application of the foregoing provisions to any provision of Section 4.1 shall not (x) affect the validity or enforceability of any other provision of Section 4.1 or (y) prevent the prohibited or unenforceable provision from being adjudicated valid or enforced as written in any other jurisdiction.

**Section 4.2. Press Releases.** Buyer and Seller shall consult with each other before issuing any press release or making any other public statement with respect to this Agreement or the transactions contemplated hereby and shall not issue any such press release or make any such other public statement without the consent of the other party.

**Section 4.3. Salaries and Benefits.**

(a) Seller shall be responsible for (i) the payment of all wages and other remuneration due to current employees and contractors with respect to their services as employees or contractors of Seller through the close of business on the Closing Date, including pro rata bonus payments and all vacation pay earned prior to the Closing Date; and (ii) the payment of any termination or severance payments and the provision of health plan continuation coverage in accordance with the requirements of the Consolidated Omnibus Budget Reconciliation Act (COBRA) and Sections 601 through 608 of ERISA.

(b) Seller shall be liable for any claims made or incurred by current employees or contractors and their beneficiaries through the Closing Date under the Employee Plans. For purposes of the immediately preceding sentence, a charge will be deemed incurred, in the case of hospital, medical or dental benefits, when the services that are the subject of the charge are performed and, in the case of other benefits (such as disability or life insurance), when an event has occurred or when a condition has been diagnosed that entitles the employee to the benefit.

**Section 4.4. Payment of All Taxes Resulting From Sale of Assets.** Seller shall pay in a timely manner all Taxes resulting from or payable in connection with the sale of the Acquired Assets pursuant to this Agreement, regardless of the Person on whom such Taxes are imposed by Laws. Under no circumstances shall this Section 4.4. be interpreted to (a) obligate Seller to pay



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

the income Taxes of any of its stockholders, or (b) create any rights, as a third-party beneficiary or otherwise, in favor of any Person other than Buyer or Seller.

**Section 4.5. Reports and Returns.** After the Closing, Seller shall promptly prepare and file all reports and returns required by Laws relating to the business of Seller as conducted using the Acquired Assets, to and including the Closing. Seller and Buyer shall agree to the allocation of the Purchase Price for federal and state income tax purposes within thirty (30) days of the Closing, or such other time as mutually agreed to by Buyer and Seller. Buyer and Seller agree to file such allocation with the Internal Revenue Service, if required by any regulations that may be promulgated under Section 1060 of the Internal Revenue Code of 1986, as amended, and to file any other statement or information that may be required pursuant to such regulations. Buyer and Seller also agree to negotiate in good faith any modifications that may be required in the allocations.

**Section 4.6. Customer and Other Business Relationships.** Seller will refer to Buyer all inquiries relating to the Business. Seller shall not, and shall use its best efforts to be sure that none of Seller's officers, employees, agents or stockholders, take any action that would tend to diminish the value of the Acquired Assets after the Closing or that would interfere with the Business, including disparaging the name of the Business. Provided, however, Seller may enforce all rights and remedies available to it and collect all amounts owed to it, in its sole and absolute discretion.

**Section 4.7. Retention of and Access to Records.** After the Closing Date, Buyer shall retain for a period consistent with Buyer's record-retention policies and practices any records of Seller included in the Acquired Assets and delivered to Buyer. Seller shall have the right to retain copies of any and all such records for all legitimate purposes of Seller, including preparation of financial statements and tax returns. Buyer also shall provide reasonable access thereto, during normal business hours and on at least three days' prior written notice, to enable them to prepare financial statements or tax returns or deal with tax audits. Prior to the destruction of any records of Seller delivered to Buyer, Buyer shall notify Seller of such proposed destruction and shall offer Seller the option, exercisable within thirty (30) days after Seller's receipt of such notice, to retake possession and ownership of any such Records.

**Section 4.8. Releases.**

(a) **Seller Release.** Seller, on its behalf and on behalf of its Affiliates, hereby irrevocably and unconditionally releases and forever discharges the Buyer and Seaharbor, and their respective successors, heirs, beneficiaries and Affiliates, from any and all claims, charges, complaints, causes of action, damages, agreements and liabilities of any kind or nature whatsoever, whether known or unknown and whether at law or in equity, arising from conduct occurring on or prior to the Closing Date; provided, that nothing contained in this Section 4.8(a) shall release any obligations and liabilities under this Agreement or any other Transaction Document and/or any other documents executed and/or delivered by the parties in connection with this asset sale transaction or constitute a waiver of any claims that the Seller may bring or have for indemnification under this Agreement.

(b) **Buyer and Seaharbor Release.** Buyer and Seaharbor, on their behalf and on behalf of their Affiliates, hereby irrevocably and unconditionally release and forever discharge the Seller, and its successors, heirs, beneficiaries and Affiliates, from any and all claims, charges, complaints, causes of action, damages, agreements and liabilities of any kind or nature whatsoever, whether known or unknown and whether at law or in equity, arising from conduct occurring on or prior to



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

the Closing Date; provided, that nothing contained in this Section 4.8(b) shall release any obligations and liabilities under this Agreement or any other Transaction Document and/or any other documents executed and/or delivered by the parties in connection with this asset sale transaction or constitute a waiver of any claims that the Buyer may bring or have for indemnification under this Agreement.

## ARTICLE V. INDEMNIFICATION

**Section 5.1. Indemnification by Seller.** Seller shall defend, indemnify and hold harmless Buyer and its respective directors, officers, employees and agents from and against any and all claims (including without limitation any investigation, action or other proceeding) and Liabilities ("*Losses*") that constitute, or arise out of or in connection with:

(a) any misrepresentation or breach of warranty of Seller in this Agreement, any exhibit, or any certificate or instrument delivered by Seller pursuant to this Agreement;

(b) any default by Seller in the performance or observance of any of their covenants or agreements under this Agreement;

(c) any liability set forth on **Schedule 5.1(c)**;

(d) any Excluded Asset or any Excluded Liabilities; or

(e) any third-party claim based upon, resulting from or arising out of the Business of Seller conducted on or prior to the Closing Date.

**Section 5.2. Indemnification by Buyer.** Buyer shall defend, indemnify and hold harmless Seller and its respective shareholders, directors, officers, employees and agents from and against any and all Losses that constitute, or arise out of or in connection with:

(a) any misrepresentation or breach of warranty of Buyer in this Agreement, any exhibit, or any certificate or instrument delivered by Buyer pursuant to this Agreement; or

(b) any default by Buyer in the performance or observance of any of its covenants or agreements under this Agreement; or

(c) any Acquired Asset or any Assumed Liabilities resulting from or arising out of facts occurring on or after the Closing Date; or

(d) any third-party claim based upon, resulting from or arising out of the Business of Buyer conducted after the Closing Date.

**Section 5.3. Survival of Representations and Warranties.** All representations. warranties, and covenants made in this Agreement or in connection with the transactions contemplated in this Agreement shall survive the Closing for eighteen (18) months after the Closing Date; provided, however, that the representations and warranties in Section 2.2 (Authorization), Section 2.3 (Non-Contravention); Section 2.5 (Undisclosed Liabilities); Section 2.6 (Tax Matters); Section 2.12 (Brokers); Section 3.1 (Organization), Section 3.2 (Authority); Section 3.3 (Consents and Approval); Section 3.4 (Non-Contravention) (collectively, the "Fundamental Representations") shall survive until 60 days after the expiration of the applicable statute of limitations.

**Section 5.4. Limits on Indemnification.** The indemnification provided for in Section 5.1 will be subject to the following limitations:



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

(a) The aggregate amount of all Losses for which the Seller will be liable pursuant to Section 5.1, will not exceed the outstanding balance of the Note (the "**Cap**").

(b) Notwithstanding the foregoing or anything to the contrary herein, the limitations set forth in Section 5.4(a) will not apply to (i) Losses based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any of Fundamental Representations, or (ii) to any inaccuracy in or breach of any representation and warranty constituting criminal conduct or actual fraud under applicable Law.

**Section 5.5. Anti-Sandbagging.** Notwithstanding anything contained herein to the contrary, the parties agree that:

(a) Except as set forth in **Schedule 5.5(a),** Seller will not be liable for indemnification for direct claims by Buyer against Seller or claims by Seaharbor or its Affiliates if Michael J. McClure or Buyer's attorneys, Momkus LLP, had actual knowledge of the inaccuracy, breach, act, omission, non-performance, non-compliance, or any other matter that, directly or indirectly, gave rise to Seller's indemnification obligation; and

(b) Buyer will not be liable for indemnification for direct claims by Seller against Buyer if Timothy Craig Hunt or Seller's attorneys, Starr Law Firm, P.C., had actual knowledge of the inaccuracy, breach, act, omission, non-performance, non-compliance, or any other matter that, directly or indirectly, gave rise to Buyer's indemnification obligation;

provided, however, that nothing in this Section 5.5 shall preclude Buyer or Seller from seeking indemnification for third-party claims, other than claims by Seaharbor or its Affiliates as provided in Section 5.5(a)..

## ARTICLE VI. MISCELLANEOUS

**Section 6.1. Entire Agreement; Assignment; Amendments.** This Agreement (including the Disclosure Schedule and the exhibits to this Agreement) constitute the entire agreement and supersede all oral agreements and understandings and all written agreements prior to the date hereof between or on behalf of the parties with respect to the subject matter hereof. This Agreement shall not be assigned by any party by operation of law or otherwise without the prior written consent of the other parties hereto. This Agreement may be amended only by a writing signed by each of the parties, and any amendment shall be effective only to the extent specifically set forth in that writing.

**Section 6.2. Severability; Expenses; Further Assurances.** If any term, condition or other provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible. Except as otherwise specifically provided in this Agreement, each party shall be responsible for the expenses



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

it may incur in connection with the negotiation, preparation, execution, delivery, performance and enforcement of this Agreement. The parties shall from time to time do and perform any additional acts and execute and deliver any additional documents and instruments that may be required by Law or reasonably requested by any party to establish, maintain or protect its rights and remedies under, or to effect the intents and purposes of, this Agreement.

**Section 6.3. Notices.** Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) upon confirmation of receipt by the addressee, if such notice or communication is delivered via facsimile or e-mail to the facsimile telephone number or e-mail address, as applicable, specified in this Section 6.3 or (b) upon receipt at address of the addressee specified in this Section 6.3, if such notice or communication is delivered by U.S. mail, courier or other physical delivery service. The addresses for such notices and communications shall be as follows:

If to Buyer, to:

Maith Solutions LLC
c/o Michael J. McClure
3826 Maplewood Avenue
Dallas,TX 75205
Email: mmclure@seaharborinsurance.com

with a copy (which will not constitute notice to Buyer) to:

Momkus LLP
1001 Warrenville Road, Suite 500
Lisle, IL 60532
Email: jkillacky@momkus.com
Attention: John Killacky

If to Seller, to:

Timothy Craig Hunt
4088 PR 3336
Greenville, TX 75402
Email: tchmango@gmail.com

with a copy (which will not constitute notice to Seller) to:

Starr Law Firm, P.C.
Attention: Michael Presbitero
3108 Midway Road, Suite 101
Plano, Texas 75093
Email: michael@starrlawfirm.com



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

or to such other address as the Person to whom notice is given may have previously furnished to the others in writing in the manner set forth above. Rejection or other refusal to accept or the inability for delivery to be effected because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

**Section 6.4. Governing Law; Submission to Jurisdiction.** This Agreement, and any dispute arising out of, relating to, or in connection with this Agreement, shall be governed by and construed in accordance with the Laws of the State of Texas, without giving effect to any choice or conflict of Law provision or rule (whether of the State of Texas or of any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas. The parties hereby submit to the exclusive jurisdiction and venue of in any court of competent jurisdiction in Hunt County, Texas for the purposes of all proceedings arising out of or relating to this Agreement. The parties irrevocably waive, to the fullest extent permitted by applicable law, any objection that the Buyer or Seller may now or hereafter have to jurisdiction or venue of any such proceeding brought in any such court and any claim that any proceeding brought in any such court has been brough in an inconvenient forum.

**Section 6.5. Headings.** The descriptive headings in this Agreement are inserted for convenience only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

**Section 6.6. Parties in Interest.** This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

**Section 6.7. Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one agreement. Photocopies, facsimile, email, or other electronic transmissions of PDF files of executed documents and signatures shall be deemed original documents and signatures and shall be fully binding on the Parties to the same extent as original documents with original signatures. At the Closing, signature pages of counterparts may be exchanged by facsimile or by electronic transmittal of scanned images thereof, in each case subject to appropriate customary confirmations in respect thereof by the signatory for the party providing a certification.

**Section 6.8. Certain Definitions.** For purposes of this Agreement, the following terms shall have the following meanings:

"**Affiliate**" shall mean, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with such Person. For the purposes of this definition, "control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, by agreement or otherwise. For the avoidance of doubt, Seller's Affiliates shall include, without limitation, "Insuror Atlas Inc.," "Insuror Atlas," "Seguros Direct Inc.," and "Seguros Direct."

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER MAITH_0000371

"**Competing Business**" means the business of providing or making available software solutions for the insurance industry.

"**Default**" means any breach or violation of, default under, contravention of, or conflict with, any contract, Law, Order, or Permit, any occurrence of any event that with the passage of time or the giving of notice or both would constitute a breach or violation of, default under, contravention of, or conflict with, any contract, Law, Order, or Permit, or any occurrence of any event that with or without the passage of time or the giving of notice would give rise to a right of any Person to exercise any remedy or obtain any relief under, terminate or revoke, suspend, cancel, or modify or change the current terms of, or renegotiate, or to accelerate the maturity or performance of, or to increase or impose any liability under, any contract, Law, Order, or Permit.

"**Documentation**" means Seller's user manuals, handbooks, and installation guides relating to the Software in any form or media, that describe the functionality, components, features, or requirements of the Software, including any aspect of the installation, configuration, integration, operation, or use of the Software.

"**Employee Agreement**" means the offer letter and Employee Proprietary Information and Inventions Agreement, both in a form acceptable to Buyer in its sole discretion, executed and delivered by John Edwards.

"**Existing Licensee Rights**" means the rights granted by the Seller to (a) Seaharbor Insurance Agency LLC, (b) Fred Loya Insurance, and (c) Acacia Insurance.

"**Harmful Code**" means any: (a) virus, trojan horse, worm, backdoor, or other software or hardware devices the effect of which is to permit unauthorized access to, or to disable, erase, or otherwise harm, any computer, systems or software; or (b) time bomb, drop-dead device, or other software or hardware device designed to disable a computer program automatically with the passage of time or under the positive control of any Person, or otherwise deprive Buyer of its lawful right to use the Software.

"**Intellectual Property Rights**" means any and all registered and unregistered rights granted, applied for, or otherwise now or hereafter in existence under or related to any patent, copyright, trademark, trade secret, database protection, or other intellectual property rights laws, and all similar or equivalent rights or forms of protection, in any part of the world.

"**IRS**" means the Internal Revenue Service of the United States of America.

"**Seller's Knowledge**" or "**Knowledge of Seller**" means the facts or matters of which Seller is actually aware, or those facts or matters which Seller could reasonably be expected to be aware of given his titles and positions, including without limitation, facts and matters relating to any of Seller's Affiliates.

"**Liability**" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER MAITH_0000372

"**Lien**" means, with respect to any property or asset, all pledges, liens, mortgages, charges, encumbrances, hypothecations, options, rights of first refusal, rights of first offer and security interests of any kind or nature whatsoever.

"**Material Adverse Effect**" means any state of facts, change, development, event, effect, condition, occurrence, action or omission that, individually or in the aggregate, is reasonably expected to result in a material adverse effect on the business, prospects, assets, properties, financial condition, results of operations or prospects of Seller, taken as a whole, or prevent the consummation by Seller of the transactions contemplated by this Agreement.

"**Permitted Lien**" means (i) Liens for Taxes not yet due and payable or that are being contested in good faith and by appropriate proceedings and for which adequate reserves have been established; (ii) mechanics', carriers', workmen's, repairmen's, materialmen's and other Liens arising by operation of Law; (iii) Liens or security interests that arise or are incurred in the ordinary course of business relating to obligations not yet due on the part of Seller or secure a liquidated amount that are being contested in good faith and by appropriate proceedings and for which adequate reserves have been established; (iv) pledges or deposits to secure obligations under workers' compensation Laws or similar Laws or to secure public or statutory obligations; (v) pledges and deposits to secure the performance of bids, trade contracts, leases, surety and appeal bonds, performance bonds and other obligations of a similar nature, in each case in the ordinary course of business; (vi) easements, encroachments, declarations, covenants, conditions, reservations, limitations and rights of way (unrecorded and of record) and other similar restrictions or encumbrances of record, zoning, building and other similar ordinances, regulations, variances and restrictions, and all defects or irregularities in title, including any condition or other matter, if any, that may be shown or disclosed by a current and accurate survey or physical inspection; (vii) pledges or deposits to secure the obligations under the existing indebtedness of Seller; (viii) all Liens created or incurred by any owner, landlord, sublandlord or other Person in title; and (ix) any other Liens which do not materially interfere with Seller's use and enjoyment of real property or materially detract from or diminish the value thereof.

"**Person**" means an individual, partnership, corporation, business trust, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Authority.

"**Software**" means the underwriting and claims management software code and related software configurations owned by Seller and described as "Insuror Atlas" including: (i) such software's Source Code and object code; and (ii) all database schema, objects, dynamic link libraries, application programming interfaces, and other components of and works embodied in such software (including any audio or visual content or screen displays in the user interface) as in existence as of the Effective Date.

"**Source Code**" means the human readable source code of the Software to which it relates, in the programming language in which the Software was written, together with all related flow charts, code, and technical documentation.

"**Transaction Documents**" means this Agreement including all schedules and exhibits hereto, together with all other documents executed and delivered in connection with this Agreement including, without limitation, the Note, the Guaranty and the Assignment Agreement.



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

"**Transfer Taxes**" means all sales, use, transfer and all other non-income taxes, and any fees incurred in connection with the purchase and sale of the Acquired Assets.

**Section 6.9. Interpretation.** The words "hereof," "herein," "hereby," "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and references to article, section, paragraph, exhibit and disclosure schedule are to the articles, sections, paragraphs, exhibits and disclosure schedules of this Agreement unless otherwise specified. Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation." The words describing the singular number shall include the plural and vice versa. The phrases "the date of this Agreement," "the date hereof," and terms of similar import, shall be deemed to refer to the date set forth in the preamble to this Agreement. Any reference in this Agreement to a date or time shall be deemed to be such date or time in Chicago, Illinois, unless otherwise specified. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any Person by virtue of the authorship of any provision of this Agreement.

[SIGNATURE PAGE FOLLOWS]



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all at or on the date and year first above written.

**BUYER:**

MAITH SOLUTIONS LLC

By: Michael McClure

Name: Michael J. McClure

Title: Chief Executive Officer

**SELLER**

Timothy Craig Hunt

***Solely for the purposes of Section 4.8(b)***

SEAHARBOR INSURANCE AGENCY LLC

By: Michael McClure

Name: Michael J. McClure

Title: Chief Executive Officer



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

EXECUTION VERSION

# EXHIBIT A

## Form of Note



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER MAITH_0000376

**EXECUTION VERSION**

**PROMISSORY NOTE SECURED BY GUARANTY**

**$2,000,000**

**May 31, 2024**
**Dallas, Texas**

**FOR VALUE RECEIVED, Maith Solutions LLC, a Texas limited liability company,** (the "Borrower"), hereby promises to pay to the order of **Timothy Craig Hunt, an individual resident of the State of Texas,** (the "Lender"), the principal amount of Two Million and no/100 U.S. Dollars ($2,000,000), together with interest, on the outstanding principal balance, until paid in full in accordance with the terms, conditions and provisions of this Promissory Note ("Note").

**INTEREST RATE**. The outstanding principal balance of the loan shall bear interest at the rate of 4.25% per annum for the Amortization Schedule. Interest will accrue daily and be computed based upon the aggregate outstanding principal balance as at the end of each day. Interest shall be payable monthly, at the same time and in the same manner, on accrued and unpaid interest, if any.

**INTEREST RATE ON MATURED, UNPAID AMOUNTS**: While any default by Borrower exists under this Note, and also after maturity (however such maturity may be brought about), the Borrower further promises to pay, from and after the earlier of default, acceleration of the entire unpaid balance of this Note, or the maturity date hereof, interest on the principal balance and accrued and unpaid interest thereon (to the extent not forbidden by law) of this Note, 18% per annum, or the maximum interest rate permitted under the laws of the State of Texas, if lower, compounded daily, and any such additional interest which has accrued shall be paid at the time of, and as a condition precedent to, the curing of any default.

**PURPOSE**: Borrower represents that the proceeds of this Note are being used solely for business purposes, specifically, Lender's financing of Borrower's purchase of those certain assets of Lender pursuant to that certain Asset Purchase Agreement by and between Borrower and Lender, dated of like date herewith.

**PRINCIPAL AND INTEREST PAYMENTS.** This Note will be repaid in 60 consecutive monthly installments of $37,059.11, commencing on July 1, 2024, and continuing on the first of each month thereafter with the balance then owing under this Note being paid on June 1, 2029. See attached Amortization Schedule attached as Exhibit A and incorporated herein.

**SECURITY**: This Note is secured by an unconditional and irrevocable Guaranty dated of like date herewith by Seaharbor Insurance Agency, LLC ("Guarantor").

**MATURITY DATE.** The entire balance of unpaid principal and accrued, unpaid interest with respect to the Note, plus any accrued but unpaid fees or other obligations arising under this Note, shall be due and payable without demand or notice, on the earlier of: (i) June 1, 2029, (ii) the sale, transfer, or conveyance of all or substantially all of the assets of the Borrower or Guarantor, (iii) the sale, transfer, or conveyance of a majority of the equity or ownership interests of Borrower or Guarantor, or (iv) the change in control or management of Borrower or Guarantor through sale or otherwise; provided, however, that a sale, transfer or conveyance of the assets, equity or ownership interests of Borrower or Guarantor to an entity in which Michael J. McClure owns greater than 51% of the equity shall not accelerate the maturity date pursuant to subsections (ii), (iii) or (iv) of this paragraph.

**LATE PAYMENT**: If any payment due under this Note is late 3 days or more late, Borrower will be charged, and Borrower agrees to pay Lender, 5.00% of the unpaid portion of such payment, or the maximum amount permitted by applicable law, if lower.

**DEFAULT**. Each of the following shall constitute an "Event of Default":



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER MAITH_0000377

a) if (i) the Borrower or Guarantor fails to make any payment of principal or interest on the loan or other amounts due under this Note on the date on which such payment is due and such failure shall continue for three (3) days after the date on which such payment is due, (ii) the Borrower or Guarantor fails to perform or observe any covenant, condition, or agreement contained herein or any document related hereto, which failure shall continue for a period of thirty (30) days after receipt of written notice detailing such failure; or (iii) any representation or warranty made by the Borrower or Guarantor herein or in any document related hereto or other writing furnished by Borrower or any guarantor in connection herewith shall have been incorrect or misleading when made; or

b) if the Borrower or Guarantor (i) applies for or consents to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator; (ii) is generally unable to pay their debts as such debts become due; (iii) makes a general assignment for the benefit of their creditors; (iv) commences a voluntary case under the United States Bankruptcy Code (as now or hereafter in effect); (v) files a petition seeking to take advantage of any other law of any jurisdiction relating to bankruptcy, insolvency, or composition or readjustment of debts; (vi) fails to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against them in an involuntary case under the United States Bankruptcy Code, (vii) commences the process of winding up or terminating, (viii) conceals, removes, or permits to be concealed or removed, any collateral for this Note or any other of their property, with intent to hinder, delay or defraud their creditors, or makes or suffers a transfer of any of the collateral or other property which may be fraudulent under any bankruptcy, fraudulent conveyance, or similar law; or (ix) takes any action for the purpose of effecting any of the foregoing; or

c) a proceeding or case shall be commenced, without the application or consent of the Borrower or Guarantor, in any court of competent jurisdiction, seeking (i) the liquidation of the their assets, or the composition or readjustment of their debts, (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of any substantial part of the their assets, (iii) the invalidation or termination of this Note, the Guaranty, or any security interest or lien in any collateral for this Note; or (iv) similar relief in respect of them under any law of any jurisdiction relating to bankruptcy, insolvency, or the composition or readjustment of debts, and such proceedings or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect for a period of sixty (60) days; or an order for relief against them shall be entered in an involuntary case under any bankruptcy, insolvency, composition, readjustment of debt, liquidation of assets or similar law of any jurisdiction;

d) a material adverse change to Borrower, Guarantor, or their respective business, including, but not limited to, a change in ownership, management, operations, or financial condition, which in Lender's opinion, impairs or may impair the repayment of this Note in full in accordance with its terms; or

e) The Guaranty is revoked or terminated for any reason, or held to be illegal, invalid, or unenforceable.

Upon the occurrence of any Event of Default and during the continuance thereof, Lender, at its election, may (i) declare this Note, all unpaid principal and interest thereon, together with all other amounts and obligations payable under this Note or any other document or instrument related to this Note to be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Borrower; provided that, upon the occurrence of an Event of Default specified in subparagraphs (b) and (c) above, the Note, all such interest and all such amounts and obligations payable shall automatically become due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower; or (ii) exercise any and all rights and remedies afforded by this Note or any other documents or instruments related to this Note, or by law or equity or otherwise, as Lender shall deem appropriate.

No right or remedy conferred herein is exclusive of any other right or remedy conferred herein or by law, but all such remedies are cumulative of every other right of remedy conferred hereunder or at law or in



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

equity, by statue or otherwise and may be exercised concurrently or separately from time to time. No covenant or condition of this Note can be waived except by written consent of Lender. Any forbearance or indulgence by Lender in regard to any default hereunder shall not constitute a waiver of the related Event of Default or any of Lender's remedies.

The Borrower shall compensate the Lender, upon the Lender's delivery of a written demand therefor to the Borrower (which demand shall, absent manifest error, be final and conclusive and binding upon all of the Parties) for all reasonable losses, expenses and liabilities that the Lender sustains as a consequence of the occurrence of any Event of Default by the Borrower in repaying the Note or any other amounts owing hereunder or otherwise performing its obligations due to the Lender when required by the terms of this Note.

**PAYMENTS**: Each payment Borrower makes on this Note will first reduce the amount Borrower owes Lender for accrued, unpaid fees and charges which are neither interest nor principal. The remainder of each payment will then reduce the accrued, unpaid interest, and then, finally, unpaid principal. If Lender and Borrower agree to a different application of payments, such agreement will be set forth on this Note. Borrower may prepay a part of, or the entire balance of this loan without penalty. All payments received by Lender after its internally established time for closing business on any business day shall be applied as of the next succeeding business day. Time is of the essence in the performance and payment of this Note.

**PREPAYMENT.** At any time while this Note is not in default, the Borrower may prepay all or any part of this Note, including accrued interest, without penalty or premium at any time or from time to time. Any partial prepayment will not excuse or reduce any later scheduled payments until this Note is paid in full (unless, when Borrower makes the prepayment, Lender and Borrower agree in writing to the contrary).

**WAIVER OF NOTICE.** The Borrower waives presentment, protest, notice of dishonor, days of grace, intent to accelerate, acceleration, and the right of set-off.

**AMENDMENT.** This Note may be amended, changed, modified, terminated or canceled only by a written agreement signed by the Party against whom enforcement is sought for any such action.

**GOVERNING LAW; SUBMISSION TO JURISDICTION.** This Note is a contract under the laws of the State of Texas and shall for all purposes be governed by and construed in accordance with the laws of the State of Texas, without regard to its principals of conflicts of laws. The Parties hereby submit to the exclusive jurisdiction of the courts of the Hunt County, Texas for the purposes of all legal proceedings arising out of or relating to this Note. The Parties irrevocably waive, to the fullest extent permitted by applicable law, any objection that the Borrower or the Lender may now or hereafter have to laying of the venue of any such proceedings brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

**COLLECTION COSTS**: Borrower agrees to pay all fees, costs, and expenses incurred by Lender for the enforcement and collection of this Note, including, without limitation, attorney's fees and costs of court. To the extent permitted by the United States Bankruptcy Code, Borrower also agrees to pay the attorney's fees and costs Lender incurs to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER OF JURY TRIAL.** THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE.



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

**FINAL AGREEMENT. THIS NOTE CONSTITUTES A "LOAN AGREEMENT" AS DEFINED IN SECTION 26.02(A)(2) OF THE TEXAS BUSINESS AND COMMERCE CODE AND REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

AUTHORITY. Borrower hereby represents and warrants to Lender that, by its execution below, Borrower has the full power, authority and legal right to execute and deliver this Note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Borrower without exception or limitation.

ELECTRONIC SIGNATURE. This Note may be executed and delivered by electronic signature and that the signature appearing on this Note is the same as a handwritten signature for the purposes of validity, enforceability and admissibility.

**IN WITNESS WHEREOF**, this Note has been executed as of the date first above written.

BORROWER
**Maith Solutions LLC**

______________________________
Name: Michael J. McClure
Title: Chief Executive Officer



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

# GUARANTY

**IN CONSIDERATION OF** the Lender extending a loan of $2,000,000 to the Borrower plus other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned Guarantor hereby guarantees the prompt, full and complete performance of any and all present and future duties, obligations and indebtedness due to the Lender by the Borrower, under the terms of that certain Promissory Note Secured By Guaranty dated May 31, 2024, and signed by Borrower (the "Note") and under the following terms and conditions:

1. The Guarantor guarantees that Borrower, will promptly pay the full amount of principal and interest as and when the same will, in any manner, be or become due, either according to the terms and conditions provided by the Note or upon acceleration of the payment under the Note by reason of a default. This is a primary, irrevocable, and unconditional guaranty of payment and performance and not of collection and is independent of Borrower's obligations under the Note.

2. This Guaranty will remain in effect regardless of any modification, extension, expiration, or termination of the Note. Guarantor's obligations will not be diminished by any compromise or release agreed on by Borrower and Lender or by the discharge, limitation, or modification of Borrower's obligations in any bankruptcy or other debtor relief proceeding.

3. The Guarantor agrees not to pledge, hypothecate, mortgage, sell or otherwise transfer all or substantially all of Guarantor's assets without the prior written consent of the Lender.

4. To the extent permitted by law, the Guarantor waives all defenses, counterclaims or offsets that are legally available to the Guarantor with respect to the payment all amounts due under the Note.

This Guaranty is a contract under the laws of the State of Texas and shall for all purposes be governed by and construed in accordance with the laws of the State of Texas, without regard to its principals of conflicts of laws. Guarantor hereby submits to the exclusive jurisdiction of the courts of the Hunt County, Texas for the purposes of all legal proceedings arising out of or relating to this Note. Guarantor irrevocably waives, to the fullest extent permitted by applicable law, any objection that the Guarantor may now or hereafter have to laying of the venue of any such proceedings brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. Guarantor agrees to pay all fees, costs, and expenses incurred by Lender for the enforcement and collection of this Guaranty, including, without limitation, attorney's fees and costs of court.

This Guaranty embodies the entire promise of Guarantor to guarantee Borrower' obligations and indebtedness pursuant to the Note and supersedes all prior agreements and understandings relating to the subject matter here, whether oral or in writing. This Guaranty may not be terminated, revoked, assigned, or transferred without a written document, signed by the Guarantor, Borrower, and Lender, permitting such termination, revocation, assignment, or transfer. Guarantor hereby represents and warrants to Lender that, by its execution below, Guarantor has the full power, authority and legal right to execute and deliver this Guaranty and that the Guaranty constitutes a valid and binding obligation of Guarantor without exception or limitation.

This Guaranty may be executed and delivered by electronic signature and that the signature appearing on this Guaranty is the same as a handwritten signature for the purposes of validity, enforceability and admissibility.

*<signature page follows>*



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

**IN WITNESS WHEREOF**, this Guaranty has been executed as of May 31, 2024.

GUARANTOR
**Seaharbor Insurance Agency LLC**

______________________________
Name: Michael J. McClure
Title: Chief Executive Officer



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

## EXHIBIT A

**Amortization Schedule**



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

Monthly Payment $37,059.11

| Month | | Beginning Balance | | Interest | Principal | | Ending Balance |
|---|---|---|---|---|---|---|---|
| 1 | $ | 2,000,000.00 | $ | 7,083.33 | $29,975.78 | $ | 1,970,024.22 |
| 2 | | 1,970,024.22 | | 6,977.17 | 30,081.94 | | 1,939,942.28 |
| 3 | | 1,939,942.28 | | 6,870.63 | 30,188.48 | | 1,909,753.80 |
| 4 | | 1,909,753.80 | | 6,763.71 | 30,295.40 | | 1,879,458.39 |
| 5 | | 1,879,458.39 | | 6,656.42 | 30,402.69 | | 1,849,055.70 |
| 6 | | 1,849,055.70 | | 6,548.74 | 30,510.37 | | 1,818,545.33 |
| 7 | | 1,818,545.33 | | 6,440.68 | 30,618.43 | | 1,787,926.90 |
| 8 | | 1,787,926.90 | | 6,332.24 | 30,726.87 | | 1,757,200.03 |
| 9 | | 1,757,200.03 | | 6,223.42 | 30,835.69 | | 1,726,364.34 |
| 10 | | 1,726,364.34 | | 6,114.21 | 30,944.90 | | 1,695,419.43 |
| 11 | | 1,695,419.43 | | 6,004.61 | 31,054.50 | | 1,664,364.93 |
| 12 | | 1,664,364.93 | | 5,894.63 | 31,164.48 | | 1,633,200.45 |
| 13 | | 1,633,200.45 | | 5,784.25 | 31,274.86 | | 1,601,925.59 |
| 14 | | 1,601,925.59 | | 5,673.49 | 31,385.62 | | 1,570,539.97 |
| 15 | | 1,570,539.97 | | 5,562.33 | 31,496.78 | | 1,539,043.19 |
| 16 | | 1,539,043.19 | | 5,450.78 | 31,608.33 | | 1,507,434.85 |
| 17 | | 1,507,434.85 | | 5,338.83 | 31,720.28 | | 1,475,714.57 |
| 18 | | 1,475,714.57 | | 5,226.49 | 31,832.62 | | 1,443,881.95 |
| 19 | | 1,443,881.95 | | 5,113.75 | 31,945.36 | | 1,411,936.59 |
| 20 | | 1,411,936.59 | | 5,000.61 | 32,058.50 | | 1,379,878.09 |
| 21 | | 1,379,878.09 | | 4,887.07 | 32,172.04 | | 1,347,706.05 |
| 22 | | 1,347,706.05 | | 4,773.13 | 32,285.98 | | 1,315,420.06 |
| 23 | | 1,315,420.06 | | 4,658.78 | 32,400.33 | | 1,283,019.73 |
| 24 | | 1,283,019.73 | | 4,544.03 | 32,515.08 | | 1,250,504.65 |
| 25 | | 1,250,504.65 | | 4,428.87 | 32,630.24 | | 1,217,874.41 |
| 26 | | 1,217,874.41 | | 4,313.31 | 32,745.80 | | 1,185,128.61 |
| 27 | | 1,185,128.61 | | 4,197.33 | 32,861.78 | | 1,152,266.83 |
| 28 | | 1,152,266.83 | | 4,080.95 | 32,978.16 | | 1,119,288.66 |
| 29 | | 1,119,288.66 | | 3,964.15 | 33,094.96 | | 1,086,193.70 |
| 30 | | 1,086,193.70 | | 3,846.94 | 33,212.17 | | 1,052,981.53 |
| 31 | | 1,052,981.53 | | 3,729.31 | 33,329.80 | | 1,019,651.73 |
| 32 | | 1,019,651.73 | | 3,611.27 | 33,447.84 | | 986,203.89 |
| 33 | | 986,203.89 | | 3,492.81 | 33,566.30 | | 952,637.59 |
| 34 | | 952,637.59 | | 3,373.92 | 33,685.19 | | 918,952.39 |
| 35 | | 918,952.39 | | 3,254.62 | 33,804.49 | | 885,147.90 |
| 36 | | 885,147.90 | | 3,134.90 | 33,924.21 | | 851,223.69 |
| 37 | | 851,223.69 | | 3,014.75 | 34,044.36 | | 817,179.33 |
| 38 | | 817,179.33 | | 2,894.18 | 34,164.93 | | 783,014.40 |
| 39 | | 783,014.40 | | 2,773.18 | 34,285.93 | | 748,728.47 |
| 40 | | 748,728.47 | | 2,651.75 | 34,407.36 | | 714,321.11 |
| 41 | | 714,321.11 | | 2,529.89 | 34,529.22 | | 679,791.88 |
| 42 | | 679,791.88 | | 2,407.60 | 34,651.51 | | 645,140.37 |

| | | | | |
|---|---|---|---|---|
| 43 | 645,140.37 | 2,284.87 | 34,774.24 | 610,366.13 |
| 44 | 610,366.13 | 2,161.71 | 34,897.40 | 575,468.73 |
| 45 | 575,468.73 | 2,038.12 | 35,020.99 | 540,447.74 |
| 46 | 540,447.74 | 1,914.09 | 35,145.02 | 505,302.72 |
| 47 | 505,302.72 | 1,789.61 | 35,269.50 | 470,033.21 |
| 48 | 470,033.21 | 1,664.70 | 35,394.41 | 434,638.80 |
| 49 | 434,638.80 | 1,539.35 | 35,519.76 | 399,119.04 |
| 50 | 399,119.04 | 1,413.55 | 35,645.56 | 363,473.48 |
| 51 | 363,473.48 | 1,287.30 | 35,771.81 | 327,701.67 |
| 52 | 327,701.67 | 1,160.61 | 35,898.50 | 291,803.17 |
| 53 | 291,803.17 | 1,033.47 | 36,025.64 | 255,777.52 |
| 54 | 255,777.52 | 905.88 | 36,153.23 | 219,624.29 |
| 55 | 219,624.29 | 777.84 | 36,281.27 | 183,343.02 |
| 56 | 183,343.02 | 649.34 | 36,409.77 | 146,933.25 |
| 57 | 146,933.25 | 520.39 | 36,538.72 | 110,394.53 |
| 58 | 110,394.53 | 390.98 | 36,668.13 | 73,726.40 |
| 59 | 73,726.40 | 261.11 | 36,798.00 | 36,928.39 |
| 60 | 36,928.39 | 130.79 | 36,928.39 | 0.00 |

# EXHIBIT B

## Form of Assignment Agreement



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

**EXECUTION VERSION**

# BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*") is made and entered into as of May 31, 2024, by and between by and between Tim Hunt ("*Seller*"), and Maith Solutions LLC ("*Buyer*"). Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

**WHEREAS,** this Agreement is executed pursuant to that certain Asset Purchase Agreement, of even date herewith (the "*Purchase Agreement*"), by and among Seller and Buyer, pursuant to which, among other things, Seller has agreed to sell, assign, transfer, convey and deliver to Buyer, and Buyer has agreed to acquire and accept from Seller, the Acquired Assets (as defined in the Purchase Agreement); and

**WHEREAS,** subject to the terms and conditions set forth in the Purchase Agreement, Seller desires to sell, assign, transfer, convey and deliver to Buyer and Buyer desires to acquire and accept from Seller, all right, title and interest of Seller in and to the Acquired Assets.

**WHEREAS,** subject to the terms and conditions set forth in the Purchase Agreement, Seller desires to assign and transfer, and Buyer agrees to assume, certain Assumed Liabilities (as defined in the Purchase Agreement);

**NOW, THEREFORE,** for and in consideration of the foregoing premises and the mutual covenants contained herein, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Seller and Buyer hereby agree as follows:

Section 1. Transfer of Assets. In accordance with and subject to the terms and conditions of the Purchase Agreement, Seller does hereby sell, assign, transfer, convey and deliver to Buyer, and Buyer does hereby acquire and accept, all of Seller's right, title and interest in, to and under the Acquired Assets.

Section 2. Assumption of Liabilities. In accordance with the terms and conditions of the Purchase Agreement, Buyer does hereby, and agrees to, assume, satisfy and discharge all Assumed Liabilities. Except for the Assumed Liabilities, Buyer shall not assume or agree to satisfy and discharge any liabilities or obligations of Seller.

Section 3. Miscellaneous.

(a) The transfer and assignment set forth herein is made by Seller without any express or implied representation or warranty of any kind, except as expressly set forth in and subject to the limitations described in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the Purchase Agreement shall govern, supersede and control this Agreement in all respects.

(b) Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or give to, any person or entity, other than the parties to this Agreement, any rights, remedies, obligations or liabilities.

(c) This Agreement shall be binding solely upon and inure to the benefit of Seller and Buyer, and their respective successors and permitted assigns.

(d) This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

(e) This Agreement shall be governed by and construed and enforced in accordance with the

laws of the State of Texas without regard to the conflict of laws rules of any jurisdiction.

(f) The recitals set forth above are incorporated herein by reference as reflecting the general understanding and intent of the parties.

[*signature page follows*]



CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER 

**IN WITNESS WHEREOF,** the parties have duly executed this Bill of Sale and Assignment and Assumption Agreement as of the date first written above.

**BUYER:**

MAITH SOLUTIONS LLC

By: ____________________________
Name: Michael J. McClure
Title: Chief Executive Officer

**SELLER**

________________________
Timothy Craig Hunt

*Signature Page to Bill of Sale and Assignment and Assumption Agreement*

citrix | RightSignature

# SIGNATURE CERTIFICATE

**REFERENCE NUMBER**
A5D74FF4-DE85-41D1-9FED-2BF9BA1A16BB

**TRANSACTION DETAILS**

**Reference Number**
A5D74FF4-DE85-41D1-9FED-2BF9BA1A16BB

**Transaction Type**
Signature Request

**Sent At**
05/24/2024 14:47 EDT

**Executed At**
05/24/2024 17:38 EDT

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
310c53379d0a6d0364209f563983522db4ef6dce2c23d6af6623b834dc27c49a

**Signer Sequencing**
Disabled

**Document Passcode**
Disabled

**DOCUMENT DETAILS**

**Document Name**
2024-05-24 Asset Purchase Agreement EXECUTION VERSION

**Filename**
2024-05-24_Asset_Purchase_Agreement_EXECUTION_VERSION_.pdf

**Pages**
35 pages

**Content Type**
application/pdf

**File Size**
299 KB

**Original Checksum**
443e06ec9f46a2aa2ab6fd09f3fcf72810678769943edfa554cd9f752c1ccd78

## SIGNERS

**SIGNER**

**Name**
Timothy Hunt

**Email**
tchmango@gmail.com

**Components**
1

**E-SIGNATURE**

**Status**
signed

**Multi-factor Digital Fingerprint Checksum**
314afe650ab407567d77e1d5c5026baf02d0ecc50ddfa87763b0fc3c02eeba7b

**IP Address**
174.224.5.128

**Device**
Chrome Mobile via Android

**Drawn Signature**



**Signature Reference ID**
911BD5E1

**Signature Biometric Count**
7

**EVENTS**

**Viewed At**
05/24/2024 17:36 EDT

**Identity Authenticated At**
05/24/2024 17:38 EDT

**Signed At**
05/24/2024 17:38 EDT

**Name**
Michael McClure

**Email**
mmcclure@seaharborinsurance.com

**Components**
2

**Status**
signed

**Multi-factor Digital Fingerprint Checksum**
b498e10edede466d117428efee357d2a2204bb4e65404c92eff61c34e880183c

**IP Address**
8.48.69.102

**Device**
Safari via Mac

**Typed Signature**

Michael McClure

**Signature Reference ID**
03553A74

**Viewed At**
05/24/2024 15:29 EDT

**Identity Authenticated At**
05/24/2024 15:30 EDT

**Signed At**
05/24/2024 15:30 EDT

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 05/24/2024 14:47 EDT | John Killacky (jkillacky@momkus.com) created document '2024-05-24_Asset_Purchase_Agreement_EXECUTION_VERSION_.pdf' on Chrome via Windows from 52.45.54.47. |
| 05/24/2024 14:47 EDT | Timothy Hunt (tchmango@gmail.com) was emailed a link to sign. |
| 05/24/2024 14:47 EDT | Michael McClure (mmcclure@seaharborinsurance.com) was emailed a link to sign. |
| 05/24/2024 15:29 EDT | Michael McClure (mmcclure@seaharborinsurance.com) viewed the document on Safari via Mac from 8.48.69.102. |

| TIMESTAMP | AUDIT |
|---|---|
| 05/24/2024 15:30 EDT | Michael McClure (mmcclure@seaharborinsurance.com) authenticated via email on Safari via Mac from 8.48.69.102. |
| 05/24/2024 15:30 EDT | Michael McClure (mmcclure@seaharborinsurance.com) signed the document on Safari via Mac from 8.48.69.102. |
| 05/24/2024 17:36 EDT | Timothy Hunt (tchmango@gmail.com) viewed the document on Chrome Mobile via Android from 174.224.5.128. |
| 05/24/2024 17:38 EDT | Timothy Hunt (tchmango@gmail.com) authenticated via email on Chrome Mobile via Android from 174.224:5.128. |
| 05/24/2024 17:38 EDT | Timothy Hunt (tchmango@gmail.com) signed the document on Chrome Mobile via Android from 174.224.5.128. |