**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | § | |
| | § | |
| Plaintiffs/Counter-Defendants, | § | |
| | § | |
| v. | § | Civil Action No: 4:24-cv-00620SDJ |
| | § | |
| MAITH SOLUTIONS LLC, | § | |
| | § | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BRIAN BORDERS and IVAN BETANCOURT | § | |
| | § | |
| Third-Party Defendants. | § | |

**MAITH SOLUTIONS LLC'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DKT. 80)**

Defendant/Counter-Plaintiff Maith Solutions LLC ("Maith"), by and through its undersigned counsel, states as follows for its Opposition to Plaintiffs/Counter-Defendants Acacia Insurance Managers, LLC ("Acacia"), Edgepoint Systems, LLC ("Edgepoint"), and Third-Party Defendants Brian Borders ("Borders") and Ivan Betancourt ("Betancourt") (all collectively referred to as "Plaintiffs") Motion For Summary Judgment ("Motion") (Dkt. 80).

## I. INTRODUCTION

Maith also has a pending Motion for Partial Summary Judgment ("Maith's Motion"). (Dkt. 82). Plaintiffs' Motion and Maith's Motion recognize that the Court decides as a matter of law whether Plaintiffs were employees or independent contractors in light of factors listed in

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ("*CCNV*"). None of the cases cited by Plaintiffs applying those factors are remotely similar to this case or support a determination here that, as a matter of law, Borders and Betancourt were independent contractors.

In addition, Plaintiffs' contention that Borders, Betancourt, and Edwards sought legal advice regarding any possible ownership rights they held in software Hunt marketed at Insuror Atlas Software ("IAS") and were advised that they very likely owned the IAS by virtue of their development of it as independent contractors omits two key facts for the Court's consideration. (Dkt. 80, p. 6). First, although Plaintiffs do not cite any support for this contention in their Motion, a January 12, 2024 letter that Edwards received from an attorney is attached to Border's declaration. (Dkt. 80-13, Ex. 12, par. 15 and Dkt. 80-13, pp. 33-35, Ex. 12-D). In the short letter, the lawyer *assumed* for purposes of his advice that they were independent contractors, and he did not analyze or even reference one, much less all, of the *CCNV* factors. Second, in a subsequent March 1, 2024 email, Borders explained to Acacia's Clinton Grumbles that "[Edwards] spoke with attorney today to ask how defendable it would be to branch out on our own. It sounds like it would be a bad lawsuit, and the only real option would be to build a new system." (Ex. A).

Borders' March 1, 2024 words are telling. Employees "branch out on their own." Independent contractors do not, because they are already independent. Moreover, a ruling by this Court granting Maith's Motion and denying Plaintiffs' Motion will leave Plaintiffs in the same posture that Borders acknowledged to Grumbles on March 1, 2024 was already the case, *e.g.*, their "only real option would be to build a new [non-infringing] system." (*Id.*).

## II. THE CCNV FACTORS SUPPORT AN "EMPLOYEE" DETERMINATION

The thirteen *CCNV* factors are listed in Maith's Motion (Dkt. 82, pp. 8-9) and Plaintiffs' Motion (Dkt. 80, p. 10). Maith addresses Plaintiffs' arguments with respect to each factor below.

### A. The Duration of Relationship

"Short time periods of work performed indicate a status as an independent contractor" and "[l]ong periods of employment with an employer indicate an employee status." *Young Again Prods., Inc. v. Supplement Spot, LLC* (In re Supplement Spot, LLC), 2009 Bankr. LEXIS 1981 at *48 (Bankr. S.D. Tex. July 8, 2009)(the "approximately two- to three-year working relationship" was "lengthy enough to support a conclusion that [person] was an employee rather than an independent contractor.").

Borders worked for Hunt for 25 years, and Betancourt worked for Hunt for 9 years, and the evolution and scope of their roles as employees in these long periods are much different from the role of an independent contractor retained to perform one project. (Dkt. 82-3, 8:9-9:23; Dkt. 82-4, 5:8-20). For example, neither Borders nor Betancourt were initially hired as programmers by Hunt, and neither did any software programming for him in the early stages of their relationships with him. Borders began working for Hunt as an employee for American Recreational Markets General Agency ("ARM") in about 1999, about a year after he graduated from high school. Initially, his role was working at ARM's PC help desk and, over time, he worked with the company's servers and moved into programming and networking. (Ex. B, 8:9-9:19; Dkt. 82-3, 7:20-25, 8:9-9:23; Dkt. 82-1, 68:23 –25, 84:2-11; Dkt. 82-2, 19:7–17). Betancourt was hired and started doing customer service work for Hunt's clients in about 2015. (Ex. C, 10:2-8). In about 2016, the same year Acacia began licensing the IAS, he too moved into programming for Hunt, but the IAS in Visual Basic originally developed in 2011 at issue had already been in development for over 4 years. (Dkt. 82-2, 23:1-2, 12-14; Ex. C, 11:23-12:5; Ex. D, 112:22-113:4).

Borders also testified his work for Hunt was his "full time job" (Dkt. 82-3, 59:7-18) and Betancourt testified that his work for Hunt was how he "paid the bills." (Dkt. 82-4, 42:13-43-17).

Borders and Betancourt also held themselves out as employees of Hunt's Insuror Atlas business on LinkedIn, with Betancourt holding himself out in LinkedIn as working at Insuror Atlas full-time, and on the Insuror Atlas website. (Dkt. 82-3, 58:7-59:18, Ex. 4, Ex. 8; Dkt. 82-4, 15:18, Ex. 1, Ex. 7; Dkt. 82-8; Dkt. 82-10). They attended client meetings as part of the IAS team. (Ex. B, 45:17-22; Ex. C, 84:2-20). They used Insuror Atlas email addresses (Dkt. 82-3, 47:1-3; 49:15-25; Dkt. 82-4, 65:3-12) and business cards. (Dkt. 82-3, 59:19-25; Dkt. 82-4, 65:20-22; Dkt. 82-7). Borders and Betancourt had no written agreements with Hunt concerning the duration of their work, and they worked for Hunt through the date he sold the business to Maith. (Dkt. 82-3, 24:8-25:6; Dkt. 82-4, 43:18-44:9). Plainly, this is all typically associated with long-term employment relationships, and Borders and Betancourt had such a relationship with Hunt and were paid by him in regular intervals like employees. (Dkt. 82-3, 20:9-17; Ex. C., 10:2-11:22).

Plaintiffs cite the *Alcatel* and *Kirk* cases as examples where relationships of 4½ years and 6 years, respectively, did not result in an employer/work for hire determination in view of other factors, but those intervals are far less than 25 or 9 years. Also, in *Alcatel* the court considered the fact that Alcatel and the developer's relationship ultimately proved to last beyond four years was less relevant in that case because the programs at issue were created in the infancy of the work relationship and were not what he was hired to develop. *Alcatel USA, Inc. v. Cisco Sys.,* 239 F. Supp. 2d 645, 653 (E.D. Tex. 2002) ("*Alcatel 2002*"). The court noted that at the time the relevant programs were created, "it was evident that neither Alcatel nor [the programmer] had reason to believe their contractual relationship would exceed nine months." *Id.* at 657. Here, the relevant version of IAS was created more than 10 years into Border's employment relationship with Hunt and almost 4 years <u>before</u> Betancourt's relationship even started. In addition, at the time the developer created the relevant computer programs, he was conducting services as an independent

contractor for two other companies. *Id.* at 656. The Court found this other work did not compel a finding of independent contractor status, but merely suggested he was not an Alcatel employee. *Id.*

In *Kirk*, the court made an independent contractor determination notwithstanding a six-year relationship between the two parties. There, a programmer received payments on an irregular basis (*e.g.*, he was paid 3 times in August 1991, and did not receive any payments from December 19, 1989 to July 11, 1990) and only submitted the number of hours he worked for the company in invoices to the company. *Kirk v. Harter,* 188 F.3d 1005, 1008 (8th Cir. 1999). Also, throughout the parties' relationship, the programmer engaged in computer consulting for other companies and on at least one occasion, hired a second programmer to help on a particular project. *Id*.

In contrast, the evidence Plaintiffs cite concerning their other work is limited and does not establish that they did outside consulting work on a regular basis throughout the term of their relationship with Hunt or that it was significant in terms of their income. Borders' alleged other work began in 2008 or 2009, almost 10 years after he began working for Hunt in 1999. (Dkt. 80, p. 19). He has offered no evidence of the volume of outside work he allegedly did. Betancourt's work in 2018 or 2019 occurred 3 or 4 years after he started with Hunt in 2015. *Id*. The evidence of Betancourt's outside work suggests that an outside client paid him $10,000 in 2019 or 2020 for consulting work. This was only about 10% of what Hunt paid him in those years alone. (Dkt. 80-14, Ex. 13-B). Thus, the evidence Plaintiffs cite concerning their alleged other work is very limited in scope and does not show they did work throughout the term of their relationship with Hunt, which is unlike *Kirk* where the individual did outside consulting work throughout the parties' six-year relationship.

Plaintiffs' Motion under the "duration factor' heading also includes extensive arguments

that relate to different factors (which Maith will address under the analysis below of such factors) to confound what nevertheless remains clear. The duration of relationship factor, and all that went with that as noted above, heavily favors Maith's position that the IAS was created on a work for hire basis.

**B. Method of Payment**

Seguros Direct was a company Hunt formed in about 2000 to hold property for an office building he built, but Seguros Direct had no operations. (Ex. D, 21:7-23:4). Pearl General Agency, Inc. ("Pearl") was a managing general agency that Hunt bought and operated until about 2017. (Ex. D, 33:22-34:4; 37:15-16). Until about 2005, Edwards and Borders were employees of ARM and were issued W-2s. (Dkt. 82-1, 38:11-16). After Hunt lost his accountant and was shutting down ARM, he began paying Edwards and Borders by issuing them 1099s from Seguros (from about 2005 until 2015) and later Hunt began paying them, along with Betancourt, by issuing them 1099s from Pearl (from about 2015 to 2024). (Dkt. 82-1, 28:23-29:17; Dkt. 82-2, 25:5-24; Dkt. 80-7, Ex. 6, Dkt. 80-13, Ex. 12-A, Dkt. 80-14, Ex. 13-B).

Plaintiffs argue that because Hunt issued Borders and Betancourt 1099s and paid them through operating accounts associated with Seguros Direct and Pearl, the method of payment factor weighs in favor of a contractor relationship, citing *Alcatel*. (Dkt. 80, pp. 24-25). *Alcatel* was very different. Alcatel had a policy of permitting the acquisition of workers on a contract basis through certain authorized contractors, one of which was Prism. Through Prism, the developer worked for Alcatel on a contract basis from about 1994 to 1998. Alcatel paid the developer for his services indirectly through Prism. *Alcatel 2002,* 239 F. Supp. 2d 647. Here, Borders and Betancourt were not hired or paid through any contractor. Hunt paid them directly, through bank accounts of his companies, Seguros Direct and Pearl.

Merriam Webster's Online Dictionary defines "salary" as "fixed compensation paid regularly for services." (https://www.merriam-webster.com/dictionary/salary). The Department of Labor similarly considers an employee to be paid on a salary basis "if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. §541.602(a). Thus, Plaintiffs concede they were paid a salary because they concede Borders was paid a "flat rate" on a bi-monthly 1099 basis since 2005 and that Betancourt was paid set amounts on a similar basis. (Dkt. 82-3, 20:9-17; Ex. C., 10:2-11:22). They were paid regularly, not by the project, and did not receive any royalties. (Dkt. 82-1, 94:21-95:13; Dkt. 82-3, 20:9-17; Dkt. 82-4, 11:18-22, Ex. B, 71:5-72:4). They also received pay increases and periodic bonuses from Hunt. (Ex. B, 71:13-72:4; Dkt. 82-1, 86:9-13; 94:21-95:13; Dkt. 82-3, 25:18-27:7; Dkt. 82-4, 42:13-43:17, 44:10-45:10).

Payment of a "regular monthly salary," as opposed to a single payment upon conclusion of a project, "heavily" favors a determination of employee status. *Siniouguine v. Mediachase Ltd.*, 2012 WL 2317364 at *7 (C.D. Cal. 2012) (receipt of regular monthly compensation and benefits weighs "heavily" in favor of employment); *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1127 (9th Cir. 2010) (payment of regular monthly salary weighs heavily in favor of employment).

**C. The Right to Control**

Plaintiffs overweight this factor when they contend the "right to control" is the "master test" for determining whether the IAS is a "work made for hire". (Dkt. 80, p. 11) (citing *Resolution Trust Corp. v. Texas Moline, Ltd.*, 96 F. Supp. 2d 644, 648). *Resolution Trust* was not a copyright case. Citing a Texas state court decision, the court observed that the critical test for distinguishing an employee from an independent contractor is whether the employer has the right

to control the progress, details, and methods of operations of the employee's work. *Resolution Trust*, 96 F. Supp. 2d at 648 (citing *Thompson v. Travelers Indem. Co.,* 789 S.W.2d 277 (Tex. 1990)). In contrast, under *CCNV*, no single factor is determinative. *CCNV,* 490 U.S. at 752. ("[T]he extent of control the hiring party exercises over the details of the product is not dispositive.")

Regardless, Plaintiffs' arguments under this factor do not dispute that Hunt had *the right* to control how the IAS was developed (Dkt. 80, pp. 11-13). Plaintiffs instead argue that (1) Hunt did not *actually* control their work because he did not require Borders or Betancourt to log hours, they didn't have a set schedule of work hours dictated by Hunt, and were not required to work a specific number of hours per week and used their personal laptops for their work, (2) Hunt "had no knowledge that Borders and Edwards had individually decided to create a new software platform that they would then incorporate for use in Hunt's insurance business;" and (3) Hunt did not know Betancourt "was also working on the development of the Insuror Atlas software with Mr. Borders and Mr. Edwards." (Dkt. 80, pp. 11-13).

Concerning (1), those arguments relate to different *CCNV* factors and do not establish that Hunt did not have the right to control the manner and means of developing the IAS and that he did not exercise sufficient control. Moreover, Hunt did exercise control. Hunt chose the programming language when the software was updated to Visual Basic in 2011, and Edwards and Borders updated the software to Visual Basic with input and direction from Hunt. Hunt went over the code with them, and they would show him what they were doing and how they were going to change things and make changes Hunt directed. They would discuss whether that was the way to do it or not. Edwards and Borders consistently reported to Hunt on their plans and development for the build and the progress of the updated IAS. (Dkt. 82-1, 105:8-107:17, 108:13-109:19; Dkt. 82-2,

23:1-2; Dkt. 82-11, par. 11). Hunt also supervised the update and approved all major decisions about the code's operation and design (Dkt. 82-11, par. 11). *See Aymes v. Bonelli,* 980 F.2d 857, 863 (2d Cir.1992) (input from client regarding computer program's functions "weighs heavily in favor of finding [programmer] ... an employee"); *JustMed, Inc.*, 600 F.3d at 1127 ("The business model and Byce's duties do not require that the project be completed in a particular manner or that Just continuously oversee Byce's work, so long as JustMed eventually found itself with a marketable product.")

Concerning (2), Plaintiffs are brazenly misconstruing Hunt's response to a poorly framed deposition question. Hunt was asked, "Did you know that Mr. Edwards and Mr. Borders decided on their own to build a new platform using the Visual Basic coding language?" Following an objection as to form, Hunt answered, "I did not know that." (Ex. D, 104-4:8). Later, Hunt clarified that testimony in the following:

> Q: I thought you testified that you didn't know that Mr. Borders and Mr. Edwards were working on –
>
> A. No, I didn't say that. I didn't say that. I believe you asked me if I knew that they were doing it, if they had -- they had chosen to do that.
>
> Q. And did you?
>
> A. No, because I'm the one that chose to do that.
>
> Q. When did you choose?
>
> A. Sometime after 2005 when we went from the Visual DataFlex to I believe it was [Visual] Basic.

(Ex. D, 109:1-10).

Concerning (3), Betancourt admitted that Hunt approved him to work on the IAS software code. (Ex. C, 26:14-25).

### D. Whether the Work is Part of the Business of Hunt's Entities

As shown in Maith's Motion, in 1983, Hunt created and developed an underwriting and claims management/data management software system used to run ARM. (Dkt. 82-1, 16:16-24, 17:16 18:22, 143:21-144:16). Hunt's MGA, Pearl, also used IAS to manage that company. (Ex. D, 110:7-17). By 2007, Hunt was marketing the software to other insurance companies as "Insuror Atlas" and by about 2016 licensed the IAS to Acacia. (Ex. D, 110:18-111:10; 112:22-113:4; Dkt. 82-5; Dkt. 82-11, par. 6). Ultimately, Hunt sold his Insuror Atlas business, including the Insuror Atlas Software, to Maith (Dkt. 82-12) and Acacia began paying Maith the same license fee it had been paying Hunt. (Ex. F, 87:12-14, 124:23-125-4). Plaintiffs nevertheless contend that Borders' and Betancourt's "creation and development" of the IAS was not part of Hunt's regular business because two of Hunt's companies, ARM and Pearl, were managing general agencies. Pearl was in the business of issuing policies, cancelling policies, and handling claims, and that another of Hunt's companies, Seguros Direct, did not use the software and was merely the "vehicle by which [Hunt] paid" Borders and Edwards. (Dkt. 80, pp. 26-27). However, they do not dispute that Hunt used the IAS software in his businesses, and as part of that business, he also licensed the IAS to Acacia and marketed it to other third parties.

Plaintiffs also attempt to underweight this factor by citing *Alcatel USA, Inc. v. Cisco Sys.*, 2001 U.S. Dist. LEXIS 25113, (E.D. Tex. Oct. 30, 2001) ("*Alcatel 2001*"). In *Alcatel 2001*, however, the Court noted that "courts are directed to inquire whether the hiring party is 'in business,' and if so, whether the retention of the hired party was pursuant to or in furtherance of that business...Alcatel [] is certainly engaged in a for-profit business; but this fact carries little relevance because this factor has been deemed to be not particularly useful in most cases." *Id.* at *37. The Court went on to explain, however, that "Alcatel is in the regular business of software

development, and the programs at issue were written for the purpose of furthering Alcatel's development of its software. Because Alcatel was engaged in the same business for which it retained [the programmer], this factor, if anything, tends to gravitate toward employment status." *Id.* Thus, this factor favors a determination of employment.

**E. The Right to Assign Additional Projects**

"In examining the right to assign factor, courts should not consider whether the hiring party has a general right to assign to the hired party various projects that relate to the completion of the copyrighted works themselves, but whether the hiring party has the right to assign projects in addition to the project of creating the copyrighted works themselves." *Alcatel 2002*, 239 F. Supp. 2d at 655. This factor favors Maith.

Plaintiffs admit that Borders and Betancourt worked on multiple projects for Hunt at various times. (Dkt. 80, p. 21-22). They acknowledge that Betancourt did various other work for Hunt, which included mostly web-related work but also some IT-related work and database management. (Dkt. 80, pp. 21-22). For Borders, in addition to developing the IAS, Borders performed other tasks for Hunt, including "[s]ervicing clients." (Dkt. 80, p. 22). Further, Borders would also address Hunt's clients' issues submitted through the JIRA system that the IAS utilized. (Dkt. 80, p. 22).

In addition, Plaintiffs' comparison of Borders and Betancourt to Edwards to somehow show they were independent contractors (Dkt. 80, pp. 21-22) is flawed because it incorrectly assumes Edwards was an independent contractor. Edwards was Hunt's employee and believed Hunt owned the code (Ex. E, 42:13-19) ("Q. You didn't believe you were an owner. A. No. I didn't believe that I owned it. Q. Okay. And why is that? A. Because the same person had been paying for it since the very beginning. Since 1991 the same person has been paying my payroll, paying

my employment since the beginning."). In their effort to analogize their various duties and responsibilities performed for Hunt to those which Edwards also performed, Borders and Betancourt merely reinforce that they, like Edwards, were Hunt's employees.

### F. Source of Instrumentalities

Plaintiffs argue that Borders and Betancourt "routinely used their own personal computers" for the development of the IAS, so this factor favors them. (Dkt. 80, pp. 13, 15). Plaintiffs' scant evidence of Borders and Betancourt using their own computers is contrasted with the evidence cited in Maith's motion that Hunt paid all expenses for development of the IAS including the code location (*i.e.*, where the software was housed), hard discs, servers, memory, and programs used. (Dkt. 82-1,148:10-23). Notably, Plaintiffs acknowledge that Hunt provided access to his computers for Borders and Betancourt to work remotely, but contend it was only "occasional." (Dkt. 80, p. 16). But they ignore that Borders and Betancourt used virtual machines (*i.e.*, a virtual computer), which is software that allows them to remotely control programs and information on Hunt's servers, to operate the Insuror Atlas business. (Dkt. 82-11, par. 9). For example, they serviced Hunt's clients, maintained and updated the Insuror Atlas Software code using a virtual machine. (*Id.*).

Furthermore, even if Borders and Betancourt chose to use their own computers, Hunt provided computers for them to use for periods of time. (Ex. D, 43:7-44:2). Furthermore, as Edwards stated, "the actual laptop to log on to the system didn't really matter. It was the servers that we were typing everything on" and the servers were owned by Hunt and located in Hunt's office. (Ex. E, 45:8-46:2). Hunt also stated they accessed the servers almost on a daily basis. (Ex. D, 89:3-9). This factor favors Maith.

### G. Tax Treatment

Plaintiffs argue that Hunt issued Borders and Betancourt 1099s during the relevant time periods, and this is strong evidence of independent contractor status. (Dkt. 80, pp. 29). But Plaintiffs ignore that prior to 2004, Borders and Edwards were issued W-2s from Hunt's ARM Business. (Dkt. 82-1, 70:15-19, 76:18-21; Dkt. 82-2, 18:17-18, 19:11-12; Dkt. 82-3, 12:25-13:2). Further, notwithstanding the change from W-2s to 1099s, they both testified that their job responsibilities and roles did not change as a result of the transition. (Dkt. 82-2, 21:4-11; Dkt. 82-3, 19:4-13).

In addition, the Edwards' testimony cited by Plaintiffs that Hunt started issuing his staff, *i.e.*, Borders and Edwards, 1099s in 2005/2006 because Hunt no longer wanted employees was inadmissible speculation on Edwards' part and lacks foundation. Plaintiff's ignore Hunt's own testimony, in which he disagreed with the reasons Edwards gave and said he did so because he no longer had an accountant and decided to simply issue his employees 1099s *and to himself*. (Ex. D, 28:23-29:17, 32:6-33:21). Betancourt, who started in 2015, was always issued 1099s, but unlike the case in *Alcatel* where the company had formal employees and contractors and ensured that independent contractors were not on its payroll and treated them differently for tax purposes, Betancourt was not treated differently than Hunt, Edwards and Borders. *Alcatel 2002*, 239 F. Supp. 2d at 655.

Thus, as shown in Maith's Motion, Hunt's issuing of 1099s to his employees reflects the informal nature of his business, rather than indication of an independent contractor arrangement. (Dkt. 82, pp. 13-14). Conversely, in *Alcatel*, the company was a large company with employees and contractors and the different payment methods for employees and contractors was significant in those circumstances. *Alcatel 2002*, 239 F. Supp. 2d at 656.

While the Court in *Aymes* stated that every case since *CCNV* found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes, *Aymes* came down in 1992, only 3 years after *CCNV* and the Court cited to 6 cases where that was the case and none of those cases involved a situation where someone was transitioned from receiving 1099s after originally receiving W-2s but their role did not change. *Aymes,* 980 F.2d at 863. Subsequent to *Aymes*, as discussed above, other cases have found the lack of payment of benefits and social security taxes were held to be less important under the circumstance and did not preclude a determination of "employment." *See, e.g., JAH IP Holdings LLC v. Mascio*, 2014 WL 6477923 at *7 (D. Col. Nov. 19, 2014) (fact that programmer was not subject to payroll withholding was a reflection on the sophistication of the business entity, rather than an independent contractor arrangement); *JustMed,* 600 F.3d at 1128 ("There is a danger, however, in relying on [the failure to pay benefits and fill out the appropriate employment forms, and the hiring company's tax treatment of the developer of the software at issue] too heavily, because they do not bear directly on the substance of the employment relationship—the right to control. In this case, the factors do not decisively favor Byce, especially when one considers JustMed's business model.").

At worst, this factor is neutral here given that Edwards and Borders' roles did not change after they were transitioned from W-2s to 1099s and Hunt himself received 1099s.

**H. The Provision of Employee Benefits**

Plaintiffs argue Borders and Betancourt received no benefits for their work for Hunt on the IAS. Specifically, they argue Borders and Betancourt were not provided medical insurance, retirement program benefits, workers' compensation, or unemployment insurance by Hunt. (Dkt. 80, pp. 28-29). Plaintiffs ignore that Borders and Betancourt received paid time off (*e.g.*, for sick

days, vacation or to help family members). (Dkt. 82-1, 86:9-13; 94:21-95:13; Dkt. 82-2, 34:6-24; 64:1-17; Dkt. 82-3, 20:9-20:17, 25:18-27:7; Dkt. 82-4, 42:13-43:17, 44:10-45:10). They also received reimbursement for their cell phones and other expenses they incurred. (Dkt. 82-1, 148:10-23). This factor is neutral.

**I. Location of Work**

Plaintiffs cite only one case, *CCNV,* in support of their argument on this factor. The facts of *CCNV* are inapposite. There, a sculptor (Reid) located in Baltimore was hired by an organization in Washington, D.C. (CCNV), to make a sculpture, and Reid worked in his own studio in Baltimore, making daily supervision of his activities from Washington practicably impossible. *CCNV*, 490 U.S. at 752-753.

Hunt provided Borders and Betancourt with an office in which to work. (Dkt. 80, pp. 16-17). Specifically, although Hunt permitted Borders and Betancourt on occasion to work from home, prior to Covid they primarily worked in the office and met regularly in the office after Covid. (Dkt. 82-1, 38:11-16, 53:3-9, 71:22-72:7; Dkt. 82-2, 44:20-23, 47:9-48:25; Dkt. 82-3, 161:1-20). *Interplan Architects, Inc. v. C.L. Thomas, Inc*., No. 4:08-CV-03181, 2010 WL 4366990, at *32 (S.D. Tex. Oct. 27, 2010)(provision of office space and requirement that work be conducted during certain hours influence employee finding).

Plaintiffs contend, however, that they spent only a small fraction of their time at that office space, and therefore this factor favors an independent contractor determination. (Dkt. 80, pp. 16-17). The materials they cite, however, only cover a fraction of their 25-year and 9-year relationships with Hunt. Borders' declaration contends he provided data only from 2015 to 2019. (Dkt. 80-13, Ex. 12, par. 12). Betancourt's declaration contends he provided data only from 2017 to 2019 and January 2020. (Dkt. 80-14, Ex. 13, par. 13). Moreover, any dispute or uncertainty over

how frequently Borders and Edwards worked in Hunt's office is immaterial, because not only did they admittedly work from Hunt's offices at least hundreds of times during even those limited time periods, but the nature of their work did not require them to be in an office. *JustMed, Inc.*, 600 F.3d at 1127 (the fact that a programmer may have worked from home was not particularly relevant). This factor, while not particularly relevant to evaluating employee status here, favors the IAS being a "work made for hire".

**J. Skill**

Plaintiffs argue that Borders and Betancourt maintained a particular skill set in their work on the IAS (*i.e.*, software coding, development, and maintenance), and that skill set did not include activities inherent to Hunt's insurance claims managing general agency because those operations consisted of issuing insurance policies, canceling insurance policies, and handling insurance claims. (Dkt. 80, pp. 13-14). Plaintiffs also cite *Alcatel 2001* and *Young Again* to contend this factor should be given much weight.

In *Alcatel 2001*, the developer was hired for his known level of skill for a particular project, but the court found this issue to be not highly probative of the issue of employment status in a technology company that merely added another programmer. *Alcatel 2001,* 2001 U.S. Dist. LEXIS 25113, at *33–34 ("in this case, while it is clear [the programmer] is a highly skilled worker, it is equally clear that highly skilled workers are nothing new to technical companies such as Alcatel. A technical company comprised almost exclusively of highly skilled employees, seeking the services of another highly skilled contractor, is not significantly probative on the issue of employment status").

Here, unlike the developer in *Alcatel*, neither Borders nor Betancourt were hired by Hunt as computer programmers. (Dkt. 82-3, 9:9-23, Ex. C, 10:2-8). They evolved into those roles over

time, so any programming skills they had were developed while they worked for Hunt, and this factor breaks in favor of Maith for that reason alone. In addition, those skills were directly related not only to Hunt's insurance businesses that *used* earlier versions of the software to run Hunt's insurance managing general agency (Dkt. 82-1, 16:16-24, 17:16-18:22, 143:21-144:16), but, more importantly, Hunt was also in the business of licensing the IAS. (Dkt. 82-11, par. 6). Thus, the computer programming skill set Borders and Betancourt had was directly related to Hunt's businesses.

*Young Again* was not a copyright case. In *Young Again*, although the Court noted that the individual in question needed to have certain computer skills and to be technically savvy to carry out her responsibilities, which weighed in favor of independent contractor status, the Court emphasized other factors (*i.e.*, "the extent of control which, by the agreement, the master may exercise over the details of the work" and "the method of payment, whether by the time or by the job") in making its determination of independent contractor status. *Young Again,* 2009 Bankr. LEXIS 1981 at *42-43.

**K. Discretion Over When and How Long to Work**

Plaintiffs argue they maintained autonomy and discretion over when and how long they provided services to Hunt. (Dkt. 80, pp. 22-24). Hunt also testified he <u>did</u> control the hours Borders was required to work, apart from common issues such as being sick, doing something for his grandmother or taking days off. (Ex. D, 84:17-85:1). Hunt also testified that Borders was required to be in the office for the majority of his full time work. (Dkt. 82-1, 72:22-72:7). In addition, Borders and Betancourt, along with Edwards, all serviced Hunt's clients and would cover for each other when someone was out. (Ex. B, 54:11-55:11). Edwards also testified that although they didn't have set working hours, they "needed to be there when people started working" from about 9-5. (Ex. E, 49:1-

12). In any event, this factor is of little relevance in this case. *See JustMed, Inc.*, 600 F.3d at 1127 (the nature of the business and the work meant that programmer's ability to set his own hours and ability to work from home are not particularly relevant).

**L. Whether the Hiring Party is in Business**

Plaintiffs argue that Hunt's ARM, Pearl General Agency and Seguros Direct, are no longer in business, so this factor weighs in favor of independent contractor determination. (Dkt. 80, pp. 27-28). Plaintiffs fail to acknowledge that Hunt's "Insuror Atlas" business, which was marketing the software to other insurance companies, was in business from at least 2007 until he sold his Insuror Atlas business, including the Insuror Atlas Software, to Maith, and that during the time period of their work for him Hunt's entities were clearly in business. (Dkt. 82-1, 16:16-24, 17:16-18:22, 143:21-144:16, Dkt. 82-11, par. 6). In fact, at all times after shutting down his insurance business in 2017 or 2018, Hunt was *exclusively* engaged in the "Insuror Atlas" business until it was sold to Maith. (Ex. D, 33:22-34:4; 37:15-16). Plaintiff's reliance on *Alcatel 2001* is also misplaced. There, the Court merely explained that "[w]here a hiring party is engaged in a not-for-profit activity and retains a highly skilled worker, the circumstances tend to resemble an independent contracting relationship. Alcatel, however, is certainly engaged in a for-profit business; but this fact carries little relevance because this factor has been deemed to be not particularly useful in most cases." *Alcatel 2001*, U.S. Dist. LEXIS 25113 at *33–34.

While this factor may carry little weight, it does favor a determination of employment here.

**M. Hiring and Paying of Assistants**

Plaintiffs argue this factor is inconsequential here because Borders and Betancourt did not require additional help. (Dkt. 80, pp. 25-26). Plaintiffs also speculate that Borders and Betancourt "retained the right to hire their own assistants" had such necessity arisen. (Dkt. 80, p. 26). The

simple fact is they never hired or paid any assistants. This factor favors an employment determination.

**III. Maith's Copyright Registration is Not Invalid**

Plaintiffs contend that they have established that Borders and Betancourt were independent contractors when they developed the software and that the software at issue was not a "work made for hire." (Dkt. 80, p. 31) They also contend Maith knowingly provided inaccurate information to the copyright office when it claimed the software was a "work made for hire." (Dkt. 80, pp. 31-32).

As shown above and in Maith's Motion, the IAS software was a "work made for hire," so Maith provided accurate information. Maith's motion as to this Count should be denied on this basis alone.

In addition, Plaintiffs' conclusory allegations about Maith's conduct do not establish that Maith knowingly provided inaccurate information to the Copyright Office. For the reasons set forth herein and in Maith's Motion (Dkt. 82), Maith in good faith believes the work is a work made for hire.

Plaintiffs spend several pages in their Motion asking this Court to make improper inferences based on unsupported assertions concerning Maith's actions in connection with its job offers to Borders and Betancourt and its asset purchase agreement with Hunt. (Dkt. 80, pp. 33-35). For example, Plaintiffs assert, without citing any evidence, that Borders and Betancourt "rejected Maith's offers of employment precisely because of Maith's insistence that they disclaim their ownership rights in the Software." (Dkt. 80, p. 33). Yet neither Borders nor Betancourt gave such a reason to Maith and, in fact, they never told Maith's owner Mike McClure that they had any ownership rights in the software, despite meeting with him several times in February and March

2024 about their job offers. (Ex. C, 32:2-34:19). Indeed, even after Maith acquired the Insuror Atlas business, Borders and Betancourt continued to entertain consulting agreements with Maith without ever disclosing to Maith that they believed they had ownership rights in the software. (Ex. F, 85:12-21, 87: 1-6). And during the period Hunt was in discussions with Maith and they had job offers pending from Maith, they affirmatively told Hunt they did not have ownership rights in the IAS. (Dkt. 82-1, 139:7-10).

They also incorrectly assert that Maith had "acute knowledge" of an ownership dispute at the time Maith purchased the software, because of certain "anti-sandbagging" provisions in its purchase agreement. Again, this assertion is baseless. As discussed above, neither Borders nor Betancourt told Maith they owned any rights in the software. (Ex. C, 32:2-34:19; Ex. B. 77:5-11, 94:21-95:3). Also, at the time of closing, Maith still had open offers out to Borders and Betancourt. Betancourt waited until June 5, 2024 to decline Maith's offer, and Borders never formally declined Maith's offer, instead sending a redrafted consulting agreement offer to Maith on June 25, only two days before Acacia terminated its relationship with Maith and Edgepoint launched its infringing software. (Ex. C, 129:8-130:11; Ex. F, 85:12-21, 87: 1-6). Yet, at no point did either Borders or Betancourt inform Maith that it had acquired software which they believe they also owned. (Ex. C, 32:2-34:19; Ex. B. 77:5-11, 94:21-95:3). Maith's effort to minimize risk in the acquisition documents were merely a belt and suspenders approach to purchasing the software given Maith still had open offers to Borders and Betancourt.

Plaintiffs also suggest that in Maith's cease and desist letter to Acacia Maith misrepresented that the IAS was protected by copyrights even though Maith had not yet obtained a copyright registration. (Dkt. 80, p. 7). However, Plaintiffs fail to acknowledge that under the Copyright Act, an "author gains 'exclusive rights' in their work immediately upon the work's

creation." *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887 (2019); *see* 17 U.S.C. § 102; 17 U.S.C. § 408(a) ("[R]egistration is not a condition of copyright protection."). Thus, Maith owned copyrights in the IAS even though it did not yet have a registration.

Finally, even assuming that Borders and Betancourt had asserted to Maith that they believed they had ownership interests in the IAS, this would not establish that Maith knowingly provided inaccurate information to the copyright office when it claimed the software was a "work made for hire." Rather, such an assertion would not have changed the application of the CCNV factors noted above and, as Borders conceded to Grumbles on March 1, 2024, their "only real option would be to build a new system." (Ex. A).

For the reasons above, Maith requests that Plaintiffs' Motion (Dkt. 80) be denied.

Respectfully Submitted,

By: */s/ John G. Bisbikis*
Jason P. Bloom
jason.bloom@haynesboone.com
State Bar No. 24045511
HAYNES AND BOONE, LLP
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

John G. Bisbikis
jbisbikis@prospectlaw.com
Derek J. Meyer
rmeyer@prospectlaw.com
PROSPECT LAW LLP
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
Telephone: (312) 374-8084

*Attorneys for Defendant/Counter-Plaintiff*
*MAITH SOLUTIONS LLC*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on January 30, 2026, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ John G. Bisbikis*
John G. Bisbikis