# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC, and EDGEPOINT SYSTEMS, LLC, | § | |
| Plaintiff/Counter-Defendants, | § | CIVIL NO. |
| VS. | § | 4:24-cv-00620SDJ |
| MAITH SOLUTIONS LLC, | § | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | § | |
| Vs. | § | |
| BRIAN BORDERS and IVAN BETANCOURT, | § | |
| Third-Party Defendants, | § | |

*****************************************

ORAL DEPOSITION OF

BRIAN BORDERS

FEBRUARY 25, 2025

*****************************************

Job no: 10279

Q. Since 1999. Is that when you first met him?
A. I believe so. Yes.
Q. Okay. And are you related to Mr. Hunt?
A. My dad and him are cousins.
Q. Okay. All right.
A. My mom wouldn't let me see Dad's side of the family, so I may have, as a little kid, but not that I remember.
Q. I see. And -- and what was -- what was the occasion that you met him in 1999?
A. Job interview.
Q. Okay. And that was for a job interview with whom?
A. With Tim.
Q. With Tim.
Okay. And was that for a company called -- it's -- American Recreational Markets General Agency --
A. Yes.
Q. -- Inc.?
A. Yes.
Q. And that would be -- and if I refer to that as ARM, A-R-M, you'll know what I'm referring to?
Is that okay?
A. Yes.
Q. So you met Mr. Hunt for a job interview with

ARM. Did you begin working for him after that job interview?
A. Yes.
Q. Okay. You started working for ARM at that time?
A. Yes.
Q. Okay. And what were your job responsibilities when you started?
A. PC help desk annually.
Q. Okay. And what -- what was entailed in -- in that?
A. If people couldn't print or had trouble logging in their computer or accessing things, I would fix that, sometimes reinstall Windows, install updates.
Q. Okay. That was in 1999?
A. Yes.
Q. And about how long were you in that role?
A. It was several years. And then I started helping with the servers after that.
Q. With the servers?
A. Uh-huh.
Q. Okay.
A. On the network, like, Microsoft.
Q. Is that --
A. I don't remember exact years.

A. No, it was not automated. So it was no other way to do it.
Q. Now, you wrote the software that allowed the import to happen --
A. Uh-huh.
Q. -- is that right?
A. Yes.
Q. But the import, you would also help with the import?
A. Yes.
Q. And did you do that for various clients, client data?
A. Yes.
Q. And by cliens, you mean clients of Insuror-Atlas?
A. Yes.
Q. Did you ever go to meetings with Tim Hunt -- did you ever go to client meetings with Tim Hunt?
A. Yes.
Q. And for Tim's client meetings, for Tim's Insuror-Atlas business?
A. Yes.
Q. Okay. And did you help him try and bring in new clients?
A. No. I was not involved in the sales or

Q. And what about other tasks for Insuror-Atlas?
A. Like, could I get an example?
Q. Yeah. Servicing clients.
A. Yes. Yes.
Q. And at one point, were you -- did you become more assigned to service Acacia?
A. Yes.
Q. And did John become more assigned to service Sea Harbor?
A. Yes.
Q. And so, when you service the clients, what were the types of things you would do for Acacia?
A. There would be, as you mentioned, rate changes, reports, customer reports integrate with vendors.
Q. And what -- what type -- whose vendors?
A. Acacia's vendors.
Q. Okay. And that was part of the work that you did for Insuror-Atlas?
A. Yes.
Q. Okay. For Tim's client.
And that was Tim's client, right?
A. Yes.
Q. And John would do similar types of things for Sea Harbor?
A. Yes.

Q. And that was Tim's client, also?
A. Yes.
Q. And if John was on vacation, would -- would you cover for him?
A. Yes.
Q. Okay. And would Ivan cover for him sometimes, too?
A. Yes.
Q. Okay. And vice versa, if you were out, would John or Ivan cover for you?
A. Yes.
Q. Okay. Let me show you real quick, mark this one as Exhibit 6.
(Exhibit 6 was marked for identification.)
Q. BY MR. BISBIKIS: Do you recognize this?
A. I -- I don't remember this exactly, but this would have been the e-mail for the photos. Yes.
Q. For the photos in the -- for the website that we looked at earlier?
A. Yes.
Q. Okay. And so, do you see the date?
This was sent April 2019?
A. Yes.
Q. So is that just -- kind of help orient. I know we were trying to come up with a date --

A. Yes.
Q. Okay. And that was from January through June 4th; is that right?
A. Yes.
Q. Okay. All right. Thank you.
So over time, the amounts we looked at increased. Were those raises that you received from Tim?
A. Sometimes there would be a bonus, as you mentioned earlier.
Q. Okay. And so --
A. Times were -- did fluctuate.
Q. So the increases could have been a result of raises and/or from bonuses?
A. Yes.
Q. Okay. Okay. And were -- were all those payments either due to your hourly work or later salary?
A. Yes.
Q. So there -- there wasn't any, like, special payment for any project based work, anything like that?
A. No. It -- the bonus could have been for various reasons at times like it could be an extra rush on a project.
Q. But that would have been at Tim's discretion to pay the bonus?

A. Yes.
Q. Okay. So if you did a good job, got a project done, he might give you a bonus?
A. Yes.
Q. Or if you brought in a new client, he might give you a bonus, something like that?
MR. WELTGE: Objection. Calls for speculation.
THE WITNESS: I didn't bring in a new client.
Q. BY MR. BISBIKIS: Okay. The -- the Insuror-Atlas software that was designed in the 2010, 2011 time frame, and I -- and I -- I don't mean to re-ask, if I asked this already. But has the fundamental design and construction operation of that been the same from 2011 to 2024?
A. Portions, yes. Portions have been rewritten as time had gone by, yes. Some of both.
Q. Portions have been -- I'm sorry. What?
A. Portions have stayed the same. Portions have been rewritten as well.
Q. What portions have been rewritten?
A. Like I mentioned earlier, a lot of the web pages were ASPX based, and they were moved to MVC later.
Q. Can you help me with that?

created the software in 2011, did you think that you owned it at that time?
A. I don't remember my thought processes from 2011. No.
Q. Did you ever try to monetize that --
A. No.
Q. -- the Insuror-Atlas software?
A. No.
Q. Okay. Did you ever tell Tim that you owned that software?
A. No.
MR. BISBIKIS: Okay. All right. Let me -- you know, if we, maybe, take a short break, just to, kind of, switch gears here a little bit.
MR. WELTGE: Sure. Want to --
MR. BISBIKIS: Make it more efficient.
MR. WELTGE: No problem.
MR. BISBIKIS: Just need five minutes. Does that work?
MR. WELTGE: Yep.
MR. BISBIKIS: Try to get through this. It will be help the change.
(A recess was held from 11:29 a.m. to 11:38 a.m.)
(Exhibit 12 was marked for identification.)
Q. BY MR. BISBIKIS: Okay. Mr. Borders, I'm going

writing that you've seen, an opinion?
A. I have not seen anything.
Q. Okay. All right. And at that point in March, you didn't tell Tim that you were going to start a new company, did you?
A. It was not decided at that point.
Q. Okay. Well, did you -- had you told -- did you tell Tim that you were thinking about starting a new company?
A. No.
Q. Okay. And, in fact, you never told Tim that you were thinking of starting a new company with -- with Mr. Grumbles, did you?
A. No. The last --
Q. Okay.
A. No.
Q. Okay. And you didn't tell him that you had actually started the new company with Mr. Grumbles after you started it, right?
A. No. I have not talked to Tim.
Q. Okay. And you didn't tell Mike McClure that you were thinking of starting a new company with Mr. Grumbles, did you?
A. No.
Q. Okay. And when you did form Edge Point, you

didn't tell Mike McClure that you founded Edge Point with Clinton Grumbles, did you?
A. No.
Q. Okay. So did you feel that Edge Point and Maith were direct competitors?
A. I don't think I really thought about it.
Q. If I can -- let me refer you to a paragraph 4 of your declaration. If you can start with that on your second line, it says, "The Maith letter does not describe how Maith was able to infiltrate the inner workings of the Edge Point software."
A. Yes.
Q. Do you see that?
A. Yes, I do.
Q. What did you mean by inner workings of the Edge Point software?
A. To be able to log in as a customer with their information.
Q. But what -- what were the inner workings of the software?
A. The non-public parts of the website.
Q. What non-public parts of the website were accessed?
A. The consumer log-in.
Q. Is that someplace available to anybody who's a