# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, | ) |
| Plaintiffs/Counter-Defendants, | ) CIVIL ACTION |
| VS. | ) NO.: 4:24-CV-00620SDJ |
| MAITH SOLUTIONS LLC, | ) |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | ) |
| V. | ) |
| BRIAN BORDERS and IVAN BETANCOURT | ) |
| Third-Party Defendants. | ) |

---

ORAL DEPOSITION OF

IVAN BETANCOURT

FEBRUARY 27, 2025

---

ORAL DEPOSITION OF IVAN BETANCOURT, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the FEBRUARY 27, 2025, from 9:35 a.m.

take some work.

Q. Okay. So you said you made an agreement with Mr. Hunt in 2015.

What was that agreement?

A. I would provide underwriting and customer service for Paladin General Agency, I would set up other independent contractors to take phone calls and claims and service any agents that needed it.

Q. Okay. And do you have a copy of this agreement?

A. It was a verbal agreement.

Q. Verbal agreement?

A. Correct.

Q. Made in 2015?

A. Correct.

Q. Anything else part of that agreement?

A. Not that I can recall.

Q. Anything about how much he paid?

A. Yes. Yes. I believe we agreed on a monthly fee paid twice -- twice a month. The exact number is something I can't remember at this time.

Q. Okay. So it was a set fee every month?

A. Correct.

Q. Okay. Like a salary?

A. It was not a salary. It was a fee.

Q. It was a fee. Okay.
Did you use the word at that time, fee, with him?
A. I don't recall.
Q. Why are you saying it's a fee?
A. Because that's what it is.
Q. Okay. But why do you say it's a fee?
What do you mean by fee?
A. A fee is something you charge someone for a service.
Q. Okay. And did he agree to engage you for a certain period of time?
A. Length of time was not discussed.
Q. Okay. So he could have kept you on for a month, could have kept you on for two months and just terminated at any time?
A. Correct.
Q. Okay. And were there any -- did you -- so you didn't -- you got paid -- you got paid these monthly amounts, and did you get paid for any, you know, upon completion of any special projects?
A. Not that I can recall.
Q. Okay. When did you start programming, doing software programming for Mr. Hunt?
A. For Mr. Hunt?

Q. Yeah.
A. I started in 2000 -- I can't remember the exact date, but I believe it was around 2016.
Yeah, about 2016, when his -- when he stopped doing business with Pearl General Agency.
Q. And Pearl is where you first started with Hunt, right?
A. Correct, Pearl/Paladin.
Q. Yeah, Pearl Paladin. Paladin's the D/B/A, the name for Pearl General Agency, right?
A. That's my understanding.
Q. Okay. And so they stopped doing business and then Mr. Hunt kept you on?
A. Yes.
Q. Okay. Did you start -- did you -- was your first agreement over at that point?
A. Well, no, because there was still -- even though he couldn't write business, there were still claims to take, customers to service.
But that started to fade away slowly towards the end of 2016.
Q. Okay. So the original agreement you made was effectively over, right, because you said it was to provide services to Paladin?
A. I didn't consider it over until all the -- all

at Edgepoint than you did for Hunt and Insuror-Atlas? Take your time, if you need it.

A. Well, I am working on the user interface of Edgepoint's systems, a complete redo, so that would be different than what I was doing at Insuror-Atlas.

Q. Okay. Anything else?

A. Not that I can remember.

Q. Okay. So instead of needing approval from Hunt for certain things, now you need approval from Mr. Grumbles?

MR. WELTGE: Objection, assumes facts not in evidence.

A. No. No.

Q. (BY MR. BISBIKIS) Did you need approval from Mr. Hunt to work on the software code?

A. No.

Q. Mr. Hunt didn't know you were working on the software code?

A. No, he knew I was working on it, but the changes that I made, he did not authorize or he did not know about them. He didn't give me permission to do certain changes.

Q. He approved you to work on the software code, though, right?

A. Correct.

meeting?

A. I believe the purpose of that meeting was for us to talk to Mr. McClure about what he was planning to do with the software once he acquired it.

Q. Okay. And what did he tell you?

A. Oh, lots of stuff. He said he was going to grow it, he said he was going to hire more people, he said he was going to expand.

Q. And did he tell you that he wanted you to join him?

A. Yes. Yes, he did.

Q. Okay. And Brian Borders was there too?

A. Yes.

Q. Okay. And did he say that -- did you hear him say that he wanted Brian to join also?

A. I don't specifically remember that, but I believe later on, I believe that to be true.

Q. He wanted you, Brian and John Edwards all to join; is that right?

A. Correct.

Q. Okay. Then you had a meeting with him. Do you recall having a meeting with him around December 12th of -- I'm sorry.

Do you recall having a meeting with him around February 12th, 2024 also at Al Biernat's?

A. Yes.

Q. Okay. And at that meeting, did Brian Borders and John Edwards also attend?

A. Yes.

Q. Was that a day that was raining outside really bad and all three of you drove in the same car together?

A. Yes.

Q. Okay. And at the time, did Mr. McClure continue to tell you he wanted you to come work for him if he bought the software?

A. Correct.

Q. Okay. And at that point, did you tell him that you thought you were -- think you were a co-owner of the software?

A. I did not.

Q. Okay. Did you hear anybody at that meeting tell him that? Did you hear Brian say that Brian thought he was a co-owner of the software?

A. No.

Q. Okay. And then do you recall having a meeting with Mr. McClure around March 7th at Mi Cocina restaurant?

A. Yes.

Q. Okay. And Brian Borders was there also?

A. Yes.

Q. And John Edwards?
A. Yes.
Q. Okay. And at that meeting, did Mike continue to tell you that he wanted you to come work for him?
A. Yes.
Q. Okay. And at that meeting, did you tell Mike McClure that you thought you were a co-owner of the Insuror-Atlas software?
A. No, I did not.
Q. And then do you recall meeting around March 22nd, 2024 at Al Biernat's again with Mr. McClure?
A. I think so, yes.
Q. Okay. And at that meeting, did you tell Mr. McClure that you thought you were a co-owner of the software, Insuror-Atlas software?
A. No.
Q. At any time, did you tell Mr. McClure that you thought you were a co-owner of the software?
A. I did not.
Q. Okay. You started to talk a little bit about your consulting work outside of work you were doing for Insuror-Atlas.
Aside from the piece you mentioned that you worked through -- that you were paid from TBB Technologies, are there any other consulting work that

(Defendant's Exhibit No. 10 marked)

Q. (BY MR. BISBIKIS) Do you recognize this document?

A. Oh, yes.

Q. The first page says it's an e-mail from Heather Hunt to John Edwards, Brian Borders and you.

Do you see that?

A. Yes.

Q. And this relates to a meeting agenda for Get Jerry?

A. Correct.

Q. Okay. And was this a meeting agenda for a meeting with a prospective client for Mr. Hunt?

A. Yes.

Q. Okay. And did you participate in that meeting?

A. I attended that meeting.

Q. You attended the meeting. Okay. And did that meeting take place around October 10th, 2019? Does that sound about right?

A. Yes.

Q. Okay. And Heather sent it to you, sent -- the second page is an agenda.

Do you see that?

A. Yes.

Q. And Heather asked you to please look over and

A. Correct.
Q. And you didn't tell him on that call that you took the code at that point to Acacia?
A. Correct.
Q. Okay. You didn't tell him that you thought you co-owned the software on that call?
A. Correct.
Q. So if I refer you back to Exhibit 23, please, that's an e-mail dated June 5th, right?
A. Yes.
Q. And under the planned switch over steps, it says, "Ivan declines consulting agreement," paren, "done."
A. (Moving head up and down.)
Q. Did you decline the consult -- does that refer to the consulting agreement with Sea Harbor?
A. Yes.
Q. Okay. And did you decline it earlier that day on June 5th?
A. I believe so.
Q. Okay. And did you -- at that point, when you -- when you turned it down, did you lose access to the Insuror-Atlas systems?
A. I don't know, but I never touched the Insuror-Atlas systems after that.

Q. Okay. Point No. 7 on this e-mail said, "Brian declines consulting agreement," paren, "Monday," question mark.

Do you see that?

A. Yes.

Q. Why did you decline your agreement before Brian?

A. I wanted to start fresh and start working with -- with Clinton and Edgepoint, the sooner, the better, so that's what I thought and that's why I did it.

Q. Okay. But Brian was working with Edgepoint at this point, right?

A. Brian was -- yeah, he was consulting with Acacia at this -- at this time.

Q. Consulting with them. So he was consulting with Acacia while still working with Maith?

A. Correct.

Q. Okay. Is there any other reason -- is there any reason you know of that Brian waited to decline his consulting agreement?

A. The only reason I know is that he talked about consulting for both Acacia and Maith so that the relationships would still be there and they would -- we could -- how do I put it?