# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DIVISION OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, Plf/Counter-Defs, | ) |
| V. | ) |
| MAITH SOLUTIONS, LLC, Dft/Counter-plf/TP Plf, | ) CIVIL ACTION NO. 4:24-cv-00620SDJ |
| V. | ) |
| BRIAN Borders and IVAN BETANCOURT, Third-Party Dfts. | ) |

---

ORAL AND VIDEOTAPED DEPOSITION OF

TIMOTHY HUNT

FRIDAY, FEBRUARY 28, 2025

---

shut down ARM?
A. No, that was it.
Q. That was it? When you said that you were involved in to some degree the coding using the DataFlex language in the 1980s and early '90s, was that at ARM?
A. Yes. I'm the one that picked that language.
Q. What is Seguros Direct?
A. I'm sorry?
Q. What is Seguros Direct?
A. Seguros Direct, that's a company that was a -- like a -- we put our property in. We built an office building and that was the entity that borrowed the money.
Q. Okay. I want to break that down a little bit because I'm not sure I understand. When did you form Seguros Direct?
A. I was to say it was in '99 or 2000.
Q. And what kind of work did Seguros Direct do?
A. In '99 or 2000?
Q. Yes, sir.
A. They didn't do any work.
Q. When did it start doing work or when did you start working through Seguros Direct?
A. Oh, maybe 2003 or '4.
Q. What was the purpose of that company?

A. What I previously explained. It was the company that bought property and financed the building we used.

Q. Okay. I'm having a little difficulty understanding. It's the company that bought and financed the building that you used?

A. It was the one that held the ownership of property, which we officed in. It was the entity that borrowed the money to build that building.

Q. So Seguros Direct didn't have any involvement in insurance underwriting or coding used for the insurance industry. Is that correct?

A. Not at that time, no.

Q. Okay. What was your motivation for forming Seguros Direct?

A. My motivation?

Q. Yes, sir.

A. Was to have an entity to hold the property.

Q. You said that it was a company that held ownership of the property that -- that you had an office in. Is that right?

A. Yes.

Q. Okay. When you said that you had an office in, what was that office for?

A. It's where we had Recreational Markets, All

Risk Claims. We had -- some accounting functions were taken care of there for our local recording agency. It's where we housed our servers where everyone that worked on those servers were at.

(Exhibit 1 marked.)

Q. (BY MR. WELTGE) Okay. Mr. Hunt, I'm going to hand you what's been marked as Exhibit 1. I'll represent to you, sir, that this is a publicly available document using the Texas Secretary of State website.

A. Uh-huh, yes.

Q. Do you recognize the information on this document?

A. Say again.

Q. Do you recognize the information on this document?

A. Yes.

Q. Can you tell me what I'm looking at here?

A. It looks like you've got a copy of the franchise tax report.

Q. And does that franchise tax report show a registration date for Seguros Direct of 12/1/2000?

A. That's what it says.

Q. Who's Kerri Fields?

A. She's an attorney.

Q. Was she an attorney that was representing you

Seguros Direct?

A. Either -- maybe 2005 or 2006.

Q. Okay. So in 2005 or 2006, what individuals were you paying through Seguros Direct?

A. John Edwards, Brian Borders.

Q. Okay. Were these individuals W-2 employees of Seguros Direct?

A. Not at that time.

Q. Were they ever W-2 employees of Seguros Direct?

A. No.

Q. Were they ever W-2 employees of yours?

A. Yes.

Q. When were they W-2 employees?

A. Whenever John Edwards came to work for me. That would have been 1990.

Q. Was that with ARM?

A. Yes.

Q. Okay. When did John Edwards stop being a W-2 employee?

A. When they were paid by Seguros Direct.

Q. And that was in 2005 or 2006?

A. I believe so.

Q. Okay. Why did you stop paying John Edwards as a W-2 employee?

A. I think I previously stated that we ran off our

business in American Recreational Markets and were shutting it down, and then I also had an accountant who was responsible for doing all the W-9s, the tax stuff and she left. So we just went ahead and started using just a straight payment as a W- -- as a 1099.

Q. Okay. So John Edwards stopped being a W-2 employee with ARM when and because your accountant left?

A. That was part out of it, yes.

Q. Okay. Was there any other part of it?

A. Yeah. I didn't have someone to calculate it. So we just went ahead so their consistency of payment continued.

Q. Okay. So you didn't have an accountant to calculate what?

A. The taxes and file the reports.

Q. Okay. What kind of taxes are you referring to?

A. Income taxes that was -- withholding.

Q. Okay. All right. Did you have any tax trouble in 2005 with ARM?

A. Any tax trouble?

Q. Yes, sir. Any issues with the IRS?

A. I don't recall that.

Q. You don't recall any issues at all with the IRS?

A. In 2005?

Q. Okay. I will represent to you, sir, that he was deposed this week on Wednesday, February 26th, and he testified about his W-2 status.

A. Yes.

Q. And the changeover from being a W-2 employee to a 1099 contractor. And I will also represent to you, Mr. Hunt, that Mr. Edwards testified that in 2005 or 2006, as you mentioned, he was no longer W-2 employee. And he said that the reason he was given for the change in his employment status was because Tim no longer wanted to have employees. Do you agree with that statement?

MR. ALLEN: Objection; form.

THE WITNESS: I don't agree with it.

Q. (BY MR. WELTGE) What don't you agree with it on? What -- where do you differ with Mr. Edwards here?

A. I had employees.

Q. You had employees for what, for what entity?

A. I'm sorry?

Q. What entity did you have employees for?

A. Well, we were paying them from Seguros.

Q. You were paying employees from Seguros, but who were you paying?

A. I was paying John Edwards, Brian Borders, myself. I can't remember who else.

Q. Were you paying them as W-2 employees or 1099 contractors?
A. 1099.
Q. Okay. So they were not W-2 employees?
A. No.
Q. When Mr. Edwards was asked on Wednesday why, in his opinion, you didn't want to have employees anymore, I'll represent to you, sir, that Mr. Edwards testified that "because an accountant in his department -- in his company forgot or refused to pay the IRS and was fined half a million dollars."
A. Okay.
Q. Is there anything in that statement that you disagree with?
MR. ALLEN: Objection; form. And just to be clear, I was not a party to that deposition. I have no idea what was said or not said. So would you mind giving me a standing objection to any representations about testimony?
MR. WELTGE: No problem.
MR. ALLEN: Thank you.
THE WITNESS: Would you repeat the question?
Q. (BY MR. WELTGE) Do you have anything -- is there anything in Mr. Edwards' answer there that you

disagree with?
A. Repeat his answer, please.
Q. Mr. Edwards testified that he was transferred from a W-2 employee or his status as a W-2 employee ended because an accountant in your department at ARM forgot or refused to pay the IRS and was fined, meaning you, were fined half a million dollars.
A. I disagree with all of it.
Q. So you were never fined half a million dollars --
A. No.
Q. -- from the IRS?
A. No, I wasn't fined anything.
Q. Did you ever fail to pay payroll taxes through ARM?
A. My accountant did fail to pay them.
Q. When did your accountant fail to pay payroll tax?
A. I don't recall.
Q. Could it have been around this time 2005, 2006?
A. Yes, it could have.
Q. Okay. What is Pearl General Agency?
A. It's a corporation that we bought from Home State General Agency.
Q. It's a corporation that you bought from what?

A. Home State General Agency.
Q. What kind of business did Pearl General Agency do --
A. It was a managing general agency.
(Exhibit 4 marked.)
Q. (BY MR. WELTGE) I'm going to hand you now, sir, what's been marked as Exhibit 4. I'll represent to you, sir, that this is another publicly available document from the Texas Secretary of State. Would you agree with me, sir, that Pearl General Agency has a registration date listed on this page as February 6th, 2014?
A. Yes.
Q. Did you ever have any tax trouble with Pearl?
A. Not that I'm aware of.
Q. So you never failed to pay franchise tax or any other taxes associated with Pearl General Agency?
A. This was a possibility they didn't get paid on time.
(Exhibit 5 marked.)
Q. (BY MR. WELTGE) Okay. I'm going to hand you now, sir, what's been marked as Exhibit 5. Can you tell me what this document is, sir?
A. It's a record that you had produced, I guess.
Q. No, sir. This is a publicly available document

authority to transact business in Texas was revoked on 1/15/2021 for the following reason: Failure to file a franchise tax return and/or pay state franchise tax."

Does that refresh your memory as to why Pearl General Agency, Incorporated lost its forfeiture or forfeited its right to do business in Texas?

MR. ALLEN: Objection; form.

THE WITNESS: I don't recall.

Q. (BY MR. WELTGE) Are you still involved with Pearl General Agency?

A. I would say no.

Q. Is Pearl General Agency still actively conducting business?

A. No.

Q. When did you close Pearl General Agency?

A. I believe in 2017 or '18.

Q. So you were not in the process of shutting it down in 2021?

A. I don't know that that would be the case, but it's possible.

Q. Did you employ any individuals as W-2 employees through Pearl General Agency?

A. I don't believe so.

Q. Did you employ any individuals as 1099 contractors?

Q. What kind of shop?
A. Where I kept my tools.
Q. In the half of office space -- or I'm sorry. In the half of the building that was the office space, did you maintain any computer equipment?
A. Yes.
Q. What kind of computer equipment did you have in that half of the building?
A. Primarily servers and disc arrays.
Q. Servers and disc what?
A. Array.
Q. Did you have any laptops in that area as well?
A. Yes.
Q. Were any of those laptops used by Mr. Borders or Mr. Betancourt or Mr. Edwards?
A. At what time?
Q. At the time that it burned.
A. No.
Q. Okay. Did Mr. -- did that part of the building maintain computer equipment like laptops and servers that Mr. Borders, Mr. Edwards, or Mr. Betancourt used at some time?
A. Yes.
Q. Okay. When would Mr. Borders, Mr. Edwards, or Mr. Betancourt have used the computer equipment in that

portion of your building?
A. From 2010 until 2018 or '19.
Q. So I take it then that there were eight or nine years of information on the computers and the servers that were in that building that burned?
A. Yes.
Q. Did you say that the -- that there was an investment done, but that no one apprised you of the results of the investigation?
A. No.
Q. No one told you the result of the investigation of a fire on your property?
A. No.
Q. Did you ask?
A. I didn't ask them.
Q. Who did you ask?
A. I said I did not ask them.
Q. Oh, you didn't ask them. Why didn't you ask them about the circumstances of a fire on your property that caused destruction to eight or nine years of computer equipment?
MR. ALLEN: Objection; form.
THE WITNESS: Repeat that.
Q. (BY MR. WELTGE) Why didn't you ask about the circumstances of a fire on your property that resulted

A. Okay. Ask one more time. Repeat that.
Q. When did Mr. Borders stop working for you as an independent contractor?
MR. ALLEN: Objection; form.
THE WITNESS: Brian quit working for me when we sold the company, the software.
Q. (BY MR. WELTGE) When you sold the Insuror Atlas software?
A. Yes.
Q. Would that have been around May of last year?
A. That would have been.
Q. Okay. From 2005 to May of last year, did you control what hours Mr. Borders was required to work?
MR. ALLEN: Objection; form.
THE WITNESS: Repeat the question, please, one more time.
Q. (BY MR. WELTGE) From 2005 to May of 2024, did you -- did you control the hours that Mr. Borders was required to work?
MR. ALLEN: Objection; form.
THE WITNESS: I mean, to the extent that he was able to work for me, yes.
Q. (BY MR. WELTGE) What do you mean to the extent that he was able to work for you?
A. If he was sick, if he had to do something for

his grandmother, if he wanted to take some days off.

Q. Okay. So apart from those instances, you required Mr. Borders to work a certain time of the day for you?

A. No.

MR. ALLEN: Objection; form.

Q. (BY MR. WELTGE) Okay. So you did not control his hours.

MR. ALLEN: Objection; form.

THE WITNESS: Not to -- not in that manner, no.

Q. (BY MR. WELTGE) How was Mr. Borders' compensation determined?

A. I honestly don't know that either.

Q. Did you have a verbal agreement with him?

MR. ALLEN: Objection; form.

THE WITNESS: I don't know if we really ever talked about salary very much.

Q. (BY MR. WELTGE) Did he ever tell you what he thought he deserved as a 1099 contractor?

MR. ALLEN: Objection; form.

THE WITNESS: I'm sorry. What's that again?

Q. (BY MR. WELTGE) Did he ever tell you what he thought he deserved to the paid as a 1099 contractor?

don't know if he was working on my work at this time or texting someone.

Q. Okay. Did you provide any servers to Mr. Borders during his time as a 1099 contractor from 2005 to 2024?

MR. ALLEN: Objection; form.

THE WITNESS: I've had servers since the early '80s. So there were servers that they accessed on a -- probably a daily basis.

Q. (BY MR. WELTGE) Do you know if Mr. Borders did any work for Seguros Direct or the Insuror Atlas software on his personal server?

A. No, I don't know.

Q. Okay. Do you know --

A. Wait. I take that back. He did some backups for us I think on his personal servers.

Q. Okay. Do you know if Mr. Borders used any personal repositories for his work on Insuror Atlas software or through Seguros Direct?

A. If that was his servers, that would -- he could have.

Q. Okay. Did Borders mostly work -- did Mr. Borders mostly work remotely from 2005 to 2024?

A. I'm sorry. Repeat that. I don't understand.

Q. Did Mr. Borders spend most of his working hours

specifically code for Visual DataFlex?

A. I don't think I did anything with Visual DataFlex.

Q. Did you know that Mr. Edward and Mr. Borders decided on their own to build a new platform using the Visual Basic coding language?

MR. ALLEN: Objection; form.

THE WITNESS: I did not know that.

Q. (BY MR. WELTGE) Did you know that the Insuror Atlas software uses the Visual Basic coding language?

A. Yes.

Q. Did you know that Mr. Edwards and Mr. Borders decided to build the new platform using the Visual Basic coding language after you terminated them as W-2 employees specifically?

MR. ALLEN: Objection; form.

THE WITNESS: I believe in the timeline, that would be correct.

Q. (BY MR. WELTGE) And Mr. Borders and Mr. Edwards were working on the build of Insuror Atlas software on their own, weren't they?

MR. ALLEN: Objection; form.

THE WITNESS: I disagree with that.

Q. (BY MR. WELTGE) You disagree with that?

A. Yeah, if I understood the question correctly.

Q. I thought you testified that you didn't know that Mr. Borders and Mr. Edwards were working on --
A. No, I didn't say that. I didn't say that. I believe you asked me if I knew that they were doing it, if they had -- they had chosen to do that.
Q. And did you?
A. No, because I'm the one that chose to do that.
Q. When did you choose?
A. Sometime after 2005 when we went from the Visual DataFlex to I believe it was Microsoft C Basic.
Q. But you didn't contribute any code specifically to --
A. I'm sorry?
Q. You didn't contribute any code specifically to the Insuror Atlas software, did you?
MR. ALLEN: Objection; form.
THE WITNESS: I would say I did contribute code to it because when I went over it with them and we would make changes, those were changes I directed.
Q. (BY MR. WELTGE) But you didn't specifically code for the platform, did you?
MR. ALLEN: Objection; form.
THE WITNESS: I didn't get on a keyboard and code, no.
Q. (BY MR. WELTGE) What was Seguros Direct's

connection to the Insuror Atlas software?
A. It was the vehicle by which I paid them as we were transitioning from one company to the next.
Q. So Seguros Direct didn't use the software platform, did it?
A. No.
Q. And Pearl General Agency, did it use the Insuror Atlas software?
A. Yes.
Q. How did it use the software?
A. To manage the company.
Q. What does that mean?
A. Its daily operations were dependent upon the software.
Q. In what way?
A. To issue policies, to cancel policies, to handle claims.
Q. Do you know how many MGAs were using the Insuror Atlas software?
A. At what time?
Q. At any point that the Insuror Atlas software was being used.
MR. ALLEN: Objection; form.
THE WITNESS: Five or six.
Q. (BY MR. WELTGE) Do you know the names of those

MGAs?
A. Loya General Agency was one. Acacia, SeaHarbor, Amco. And there was a company out in San Diego. I don't recall their name.
Q. And these MGAs were licensed to use the software. Is that right?
MR. ALLEN: Objection; form.
THE WITNESS: In some instances, they were because they only -- they actually bought a part of the production.
Q. (BY MR. WELTGE) Who bought a part of the production?
A. Loya.
Q. What do you mean they bought a part of the production?
A. They bought a piece of code.
Q. A portion of the code for the software they bought?
A. Well, Loya was not using automobile. They were using it for property. So it was a specific program. It wasn't -- I guess it was -- and it was under their name because they bought it.
Q. So to your knowledge it was not a license?
MR. ALLEN: Objection; form.
THE WITNESS: It wasn't licensed.

Q. (BY MR. WELTGE) Did you enter into an agreement with Loya to buy that portion or a portion of the Insuror Atlas software?
A. Yes.
Q. Is that a written agreement or a verbal agreement?
A. I believe it was a verbal agreement.
Q. And how much did Loya pay to buy that portion or whatever portion of the Insuror Atlas software?
MR. ALLEN: Objection; form.
THE WITNESS: I don't recall how much it was.
Q. (BY MR. WELTGE) Was SeaHarbor insurance agency given a license to use the Insuror Atlas software?
MR. ALLEN: Objection; form.
THE WITNESS: They had an agreement.
Q. (BY MR. WELTGE) They had an agreement for what?
A. To use the software.
Q. To use the software?
A. Yeah.
Q. When did you start doing business with Acacia?
A. Probably -- well, that's hard to say. Maybe 2016.
Q. What was the nature of that business?

A. When we started doing business with them?
Q. Yes, sir.
A. We provided the software for his general agency.
Q. So in 2016, is that when you met Clinton Grumbles for the first time?
A. No.
Q. When did you first meet Clinton Grumbles?
A. I was first introduced to Clinton Grumbles in 1998 maybe.
Q. During your time with ARM?
A. Yes.
Q. Was he working for ARM?
A. I'm sorry?
Q. Was he working for ARM at the time?
A. No, no.
Q. What were the circumstances of you meeting with him?
A. What was the effect of the meeting.
Q. What were the -- why did --
A. His employer told him to call me.
Q. Did you have a positive working relationship with Mr. Grumbles?
A. I always thought so.
Q. And when you started working with him directly