# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DIVISION OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ACACIA INSURANCE MANAGERS, LLC and EDGEPOINT SYSTEMS, LLC, Plf/Counter-Defs, | ) | |
| V. | ) | |
| MAITH SOLUTIONS, LLC, Dft/Counter-plf/TP Plf, | ) | CIVIL ACTION NO. 4:24-cv-00620SDJ |
| V. | ) | |
| BRIAN BORDERS and IVAN BETANCOURT, Third-Party Dfts. | ) | |

---------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

30(b)(6) CORPORATE REPRESENTATIVE

OF MAITH SOLUTIONS, LLC

JOHN KILLACKY

MONDAY, MARCH 3, 2025

---------------------------------------------

there was no interruption of services to either SeaHarbor or Acacia.

Q. And that included continuing to develop work on Insuror Atlas and maintaining Insuror Atlas' databases. Correct?

A. Had this agreement been signed, yes.

(Exhibit 19 marked.)

Q. (BY MR. WELTGE) Okay. I'm going to hand you what's been marked as Exhibit 19. You're on this email exchange, aren't you?

A. I am.

Q. This is on June 5th of 2024. Correct?

A. Yes.

Q. But you are not on the email that initiated the chain, are you?

A. I am not.

Q. Is that email an email from Mr. Betancourt declining SeaHarbor's offer of employment?

A. Declining SeaHarbor's to perform consulting work pursuant to a draft agreement that we had provided to Mr. Betancourt.

Q. Yes, sir. After Mr. Betancourt declined that consulting agreement, was SeaHarbor or Maith in need of a software consultant?

A. For Mr. Betancourt?

Q. At any point during June of 2024, did Maith have any communications with Mr. Borders as to the terms of consulting agreement?
A. On June 25th, Mr. Borders forwarded to us what was basically a completely redrafted agreement that he said came from his attorney.
Q. Did Maith accept that draft? Did Maith accept any changes presented in that draft?
A. No, because two days later Acacia shut us off and Mr. Borders went silent and stopped responding to any sort of attempts to communicate with him.
Q. What do you mean Acacia shut you off?
A. June 27th is when Acacia terminated its agreement with Maith.
Q. I'm going to back up just slightly. Do you recall when Maith entered the Asset Purchase Agreement with Mr. Hunt?
A. The documents were signed on May 24th and the transaction closed at 11:59 p.m. on May 31st, 2024.
(Exhibit 20 marked.)
Q. (BY MR. WELTGE) Okay. I'm going to hand you what's been marked as Exhibit 20. Is this the Asset Purchase Agreement?
A. Yes.
Q. And it's signed by Mr. Hunt. Correct?

Maith calculating its damages in this lawsuit?

A. We do our damages a couple of different views without prejudice to make any arguments that we might make supported by the facts and the law at trial.

Number one, we paid -- we have a note where we're obligated $2 million to Mr. Hunt for the acquisition of the Insuror Atlas software and other assets that Mr. Borders and Mr. Betancourt took it upon themselves to misappropriate, take to Acacia, do what -- you know, we don't what they've done with it. So they've, you know, forever prejudiced our exclusive right and ownership of that software. So as an initial measure of damage, that would be the purchase price that we have to pay for that software.

Secondarily, we've got a Count IV Counting and Disgorgement of profit realized by Edgepoint, Mr. Borders, Mr. Betancourt, or Acacia from the Edgepoint software. Mr. Grumbles testified that he's continuing to pay the 1 percent from Acacia to Edgepoint. So the secondary measure would be disgorgement of the -- or an accounting of those revenues and a disgorgement of those revenues.

And, finally, you know, we can also calculate it based off of a reasonable royalty basis, which Acacia was paying 1 percent of its written premium

fees. Did pay that for a month before they terminated the contract, and therefore that revenue stream would have been expected to continue forward and into the future.

We also have claims for treble damages for willful infringement, any other damages that we might seek that are allowed under the Copyright Act or other applicable laws and attorneys' fees and costs.

Q. You testified earlier that SeaHarbor is now Maith's only client?

A. Currently, but that's correct.

Q. And Maith's CEO is Michael McClure?

A. Yes.

Q. And Michael McClure owned 100 percent of SeaHarbor?

A. Yes.

Q. So Michael McClure's client is Michael McClure?

A. No. Maith's client is SeaHarbor.

Q. What sales pricing and royalty rates have been created by Maith relating to its use of the Insuror Atlas software?

A. We have not created any price on our royalty rates other than the 1 percent of written premium and fees that's been -- that historically have been used. Those would be evaluated before we look at any other